UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

```
------------------------------X   Docket#
UNITED STATES OF AMERICA,      :   12-cr-00134-ERK-MDG
                               :
     - versus -                :   U.S. Courthouse
                               :   Brooklyn, New York
ADNAN IBRAHIM HARUN A HAUSA,   :
also known as "Spin Ghul",     :
also known as "Esbin Gol",     :
also known as "Isbungoul",     :
also known as "Abu Tamim",     :
also known as "Joseph Johnson",:   September 4, 2013
also known as                  :
"Mortala Mohamed Adam",        :
              Defendant        :
------------------------------X
```

TRANSCRIPT OF CRIMINAL CAUSE FOR CONFERENCE
BEFORE THE HONORABLE EDWARD R. KORMAN
UNITED STATES MAGISTRATE JUDGE

**A P P E A R A N C E S:**

**For the Government:**          **Loretta E. Lynch, Esq.**
                                 United States Attorney

                        BY:      **Shreve Ariail, Esq.**
                                 **Amanda Hector, Esq.**
                                 Assistant U.S. Attorney
                                 271 Cadman Plaza East
                                 Brooklyn, New York  11201


**For the Defendant:**           **David Stern, Esq.**
                                 Rothman, Schneider,
                                 Soloway & Stern, P.C.
                                 100 Lafayette Street
                                 Suite 501
                                 New York, NY 10013


**Transcription Service:**       **Transcriptions Plus II, Inc.**
                                 740 Sharon Road
                                 Copiague, New York 11726
                                 Transcriptions2@verizon.net

Proceedings recorded by electronic sound-recording,
transcript produced by transcription service

2

                    Proceedings
 1              THE CLERK:  United States v. Adnan Hausa.
 2          Your appearances, counsel.
 3          MR. ARIAIL:  Good morning, your Honor.
 4          Shreve Ariail and Amanda Hector for the United
 5  States.
 6          MR. STERN:  Good morning.  David Stern for
 7  Mr. Hausa.
 8              THE COURT:  All right.
 9              THE CLERK:  The interpreter previously sworn is
10  still under oath.  Please state your name for the record.
11              THE INTERPRETER:  My name is Mohammed Azziz
12  Shuaib.
13  (INTERPRETER PREVIOUSLY SWORN)
14              THE COURT:  We're on for status, Judge.
15          MR. ARIAIL:  Your Honor, at the last status
16  conference, we had advised the Court that we would have
17  discussions with our counterparts in Washington and also
18  with defense counsel about setting a scheduling order for
19  a motion related to the classified issues in the case.
20  We submitted a letter this morning and a proposed order
21  on the schedule but I believe defense counsel may have
22  some issues with that.
23          MR. STERN:  The issue is not in particular with
24  the schedule but with the idea that I should make
25  decisions for Mr. Hausa when it's yet to be resolved

3

Proceedings

1   whether or not he is going to act as his own lawyer.  He
2   and I have had conversations.  He has told me what he
3   wishes to do or hopes to do.  And those things may not be
4   precisely what I would do were I his lawyer but if he has
5   a right to act as his own lawyer, and that right is
6   obviously separate from his competence to be tried, that
7   seems to me needs to be decided before I make any
8   decisions on his behalf that he might later claim were
9   decisions he would not have elected to make.
10          So I think any decisions on how he should be
11  defended, what should be done, what should be
12  investigated, et cetera, have to be held in abeyance
13  until there's a decision about whether or not he is going
14  to act as his own counsel.
15          THE COURT:  Yes, Mr. Hausa?
16          THE DEFENDANT:  Your Honor, I want to defend
17  myself.  I want to be thrown to the highest supreme court
18  (indiscernible).
19          THE COURT:  I can't hear you.  The highest
20  supreme court of what?
21          THE INTERPRETER:  -- of Washington.
22          THE DEFENDANT:  The issue, my issue before it
23  came to killing the American soldiers in Afghanistan --
24          MR. STERN:  Judge, can I just interrupt him for
25  one second?  I'm sorry.

4

Proceedings

1          You know, it's my advice to him if I am still
2    his lawyer that he not be saying these kinds of things,
3    that he assert his Fifth Amendment right to remain
4    silent.  Just sit here --
5          THE COURT:  I'm not going to let the government
6    use anything he says --
7          MR. STERN:  Okay.
8          THE COURT:  -- until we get this resolved.
9          THE DEFENDANT:  Just like what we did like
10   killing the American soldiers in Afghanistan.  I stated
11   that before even going to Afghanistan for killing the
12   Americans and have now a --
13         THE COURT:  Mr. Hausa, if you want to be your
14   own lawyer, I have to go through an allocution.  I have
15   to ask you questions and answers to be sure that you
16   fully understand what you're doing and in my view, the
17   mistake that you're making by -- to be sure that you know
18   what you're doing.  I mean what is the sentence that he
19   faces?
20         MR. ARIAIL:  Your Honor?
21         THE COURT:  What is the sentence, the maximum
22   sentence?
23         MR. ARIAIL:  Life imprisonment, your Honor.
24         THE COURT:  So you face life imprisonment here.
25   And you'll probably wind up in some -- in Colorado where

Proceedings

1   they keep the most dangerous criminals inside a mountain

2   and never see anyone.  So in a sense, it's like deciding

3   to go through major surgery in which you could lose your

4   life and you decide to be your own surgeon.  Now that

5   doesn't make sense.

6        But if you want to do it, under the

7   Constitution of the United States, you have the right to

8   do that.  But I have to go through an allocution with you

9   to be sure that you know what you're doing.

10       MR. ARIAIL:  Your Honor, if I may too add just

11  in terms of competency, obviously we talked about

12  competency at the last status conference and as we have

13  indicated, the doctor had found him competent to stand

14  trial.  There's a case that's a Supreme Court case,

15  Indiana v. Edwards, and it is 554 U.S. 164 (2008), that

16  suggests that there may be additional considerations that

17  the Court should consider with respect to mental

18  competency to -- for a defendant to proceed pro se.

19       So I think before we get to the point of having

20  him go through the allocution, we would likely have to do

21  or at least get some kind of additional analysis from the

22  doctor who has examined him previously.

23       THE COURT:  Do you have that case?

24       THE CLERK:  Do you have the case with you?

25       MR. ARIAIL:  I don't have the case with me,

6

Proceedings

1   your Honor.  I'm sorry.

2            MR. STERN:  Judge, I have a copy here if you

3   want to see it.

4            THE COURT:  Yes, I would like to see it.

5            MR. ARIAIL:  Your Honor, I think I'll direct

6   you to page 176.

7            THE COURT:  176 of the U.S. report?

8            MR. ARIAIL:  Yes, your Honor.

9            (Pause)

10           THE COURT:  I have Dr. Mills' letter.  Does he

11   say that he suffers from mental illness?

12           MS. HECTOR:  Your Honor, I am not sure that I

13   can characterize whether Dr. Mills as an expert would

14   call what I am about to say mental illness or personality

15   issues; I'm not sure what he would characterize it to be.

16           THE COURT:  I don't know.  I am reading the

17   Supreme Court case which I happen to be one of those

18   judges that the Supreme Court refer to that think that

19   the right to the ineffective assistance of counsel, which

20   essentially Loretta enshrines is silly but that's the

21   law.  But the case that you gave me talks about, at least

22   some degree of mental illness affecting his capacity to

23   represent himself.

24           MS. HECTOR:  Yes, your Honor.  I would -- in

25   the conclusions --

7

Proceedings

1        THE COURT:  I mean if you had this case, I

2    don't know why you didn't ask the doctor to be more

3    specific in his report.

4        MR. ARIAIL:  Your Honor, I think that's what --

5    and you know I apologize that this was not perfected

6    before we came here to court today but I think that's

7    what we would propose doing is having the doctor to

8    consider those factors in Indiana v. Edwards and any

9    other factors that might be out there and at least opine

10   upon his ability to proceed pro se.

11        The other issues that has come up in the last

12   24 hours is we've also received additional information

13   from the BOP about his behavior at the BOP, that the BOP

14   medical people have concerns about.  Now it's unclear

15   whether that behavior is the same stuff that Dr. Mills

16   considered or whether that's additional stuff.  So we at

17   least need to have Dr. Mills consider that in addition to

18   presumably the factors in Indiana v. Edwards.

19        MR. STERN:  Judge, I'm not sure -- or I guess

20   to be more forceful, I don't think that this can continue

21   being a joint venture between the government and the

22   defense because of at some point this defendant says, for

23   example, on an appeal, I really wasn't fit.  There has to

24   be some kind of adversarial proceeding, I think.  Again,

25   I'm speaking for him when he wants to speak for himself.

8

Proceedings

1  We're in this odd limbo where we're kind of deciding if

2  he can speak for himself as a lawyer or as a defendant

3  representing himself in court.

4         But, you know, having looked at some of these

5  cases that the government was kind enough to tell me

6  about, it seems to me that his mental health is an issue

7  and having spoken to him, I think there are at least

8  potential mental health issues, some of which he

9  acknowledges and some of which he doesn't.

10        So I think we're going to take another step of

11 mental health examination.  Each party should have their

12 own expert.  He should be examined by both parties.  They

13 may reach agreement and they may not.  I don't know mean

14 to predict how that will come out.

15        THE COURT:  Well whose expert was Dr. Mills?  I

16 didn't get the impression --

17        MR. STERN:  He was a joint expert.

18        THE COURT:  Yes.

19        MR. STERN:  Both parties agreed that he would

20 do the part that he's done.  I'm not trying to undo that

21 but I am saying that of there's going to be further

22 psychiatric examinations with other potential goals in

23 mind, then I think each party should have their own

24 expert.  And I don't mean that disqualifies Dr. Mills

25 from doing it for the government but we may want our own

9

Proceedings

1    expert or at least want to see what he says and decide if

2    we want our own expert.

3              MR. ARIAIL:  And, your Honor, this -- sorry,

4    this is the first I am learning of this, as well.  So I

5    think we may --

6              MR. STERN:  That's --

7              MR. ARIAIL:  -- need to discuss that

8    (indiscernible).

9              MR. STERN:  Yes, you know, Judge, a lot of this

10   I've only begun thinking about very recently.  I was on

11   trial for a long time.  I've now begun sort of to focus

12   on this case and as long as I'm talking about problems in

13   this case, if he is allowed to represent himself, there

14   would be issues, I think, with classified information.

15   He is not allowed to look at it.  Someone would have to

16   look at it, make applications about the parts that --

17             THE COURT:  Well first of all, whether he's

18   allowed to look at it or not, if he represents himself is

19   an interesting question which I don't --

20             MR. STERN:  I don't know the answer either.

21             THE COURT:  Neither do I.

22             MR. STERN:  There would also be --

23             THE COURT:  I don't take it as a given that it

24   could necessarily be withheld from him.

25             MR. STERN:  Yes, I guess I don't know the

Proceedings

1   answer to that.

2           THE COURT:  It's an interesting question.

3           MR. STERN:  There also will be investigations

4   that need to be done, some of them outside the country

5   and it's obvious that he can't do that.  So, I don't say

6   that to urge you not to allow him to represent himself.

7   That's his choice ultimately.

8           THE COURT:  I'm not interested -- I don't think

9   he should represent himself.  It's not like I'm --

10          MR. STERN:  I don't either.

11          THE COURT:  -- interested in having him

12  represent himself but that's a separate question.

13          All right.  You wanted to speak, Mr. Hausa --

14  Harun, I'm sorry -- Hausa.

15          THE DEFENDANT:  The way I am thinking I went

16  away last time when I was here --

17          THE COURT:  Could you talk -- move the

18  microphone next to you?

19          THE DEFENDANT:  And last time when I came here,

20  if I could remember when the doctor came out of

21  Washington and examined me, and he said I'm sound, I'm

22  okay.  And I want to speak about what you are talking

23  about.

24          In Lybia, under -- when I was arrested, the

25  truth is that through the politics, the kind of food I

Proceedings

1  was given from the water, the kid of water I was given,

2  they were putting a lot of drugs inside, so that I

3  shouldn't be able to talk.

4          This happened during years and if you want to

5  listen from my explanations, what one of the policemen of

6  Lybia told me, they have the technology and it's afraid

7  and it goes through somebody's body.  They use it to read

8  the mind of the person.  I don't know the truth about

9  that.  That's number one.

10          The secondly, the truth is I was in Lybia until

11  now that I am in this courtroom, and there are some

12  things about Lybia that came to flash in my head and

13  there are sometimes I over -- I heard something, they are

14  talks come to my ears.  I don't know whether it was this

15  (indiscernible) subject, I do hear them -- they do talk

16  in Arabic and also MCC is the same.

17          Even at MCC psychology, those doctor, the

18  psychologist doctor, they came and sat with me, not once,

19  not twice.  They do ask me about what I do here and

20  things of search and I told them that -- I think this

21  technology is CIA's technology.  I don't know and I'm not

22  sure about that only that now.

23          In Italy, before the FBI took me for two weeks,

24  those who are working there at the City, Benevento City.

25  They do arrest me by false -- they took an injection and

Proceedings

1   some word, they put me -- they put a shot in me.  And

2   they didn't take my -- my consent.  After they gave me

3   those injections, I can feel something in my head as if

4   it's balloon that is blown up and it's like a blowing on

5   the -- and it shrinks.  And I am feeling that just a

6   compressor in my head is shrinking.

7           And after two weeks, they did that, I was

8   brought here.  All those things that I been hearing in

9   Lybia were disturbing me and after that shot, that

10  injection, and it gots to much on me.  And I told FBI

11  this talk.  I don't know if you heard about that or not.

12          And my head is okay.  And if you ask me about

13  what I am saying, I know what I am saying.  It's not that

14  I am crazy.  I'm good.  My head is okay.

15          What I want to explain, I know last time you

16  told me when I was here what you told me, either I

17  represent myself or I use the lawyer to represent me.  I

18  -- what I want to tell you and I told them since -- in

19  Italy, the City Argigento and when they -- I was asked on

20  that, I told them.  What's I want to say is that -- an

21  explanation and the truth has to be told in front of

22  everybody and everybody should hear it.

23          And you, you may not see it very well, saying

24  it better is important to me.  In Afghanistan, it's so

25  many people have to hide and was a shame, so many people

13

Proceedings

1  died.  And again, September that 3,000 people died and

2  you continue since then, since September 11, killing,

3  killing till now.  And every way in the world is like

4  that.  This policing that is going on and it's just like

5  a secret one.  I think it's not unnecessary.  Even in

6  Lybia, they heard it from me before the old man died and

7  we do all this, whatever they said about killing of

8  Khadafi and so on, and only those and any -- all those

9  who are there in the Lybia, if old men are there, they

10 can tell you what's going on.

11         That's why I want to tell you my issue.  That's

12 why I want you to send me to Washington.  I said before,

13 I was sent to Afghanistan, killing Americans and the

14 issue is from Saudi Arabia, when I was in Saudi Arabia.

15         I have a relationship with Osama bin Laden's

16 friends.  I told them my idea of what I can contribute on

17 Pentagon and they used the one -- that's they work with

18 it, so when -- to go to Pentagon.  The truth that I am

19 guilty, that guilty -- the one of Afghanistan and also

20 I'm guilty of the one of so far Washington.

21         And I think they should take me to the high

22 court and I think if this is not the small issue, then I

23 want the big Supreme Court to look at it.  And I spent

24 eleven months here in New York since I came from Italy.

25 And now I ask you did you speak to your counterpart is

14

Proceedings

1  CIA in Lybia?  It's not my job but I didn't get nay reply

2  out of that.  And did you get some other information till

3  now?  To me (indiscernible) was missing, since I was

4  arrested, since I was (indiscernible) -- since I was

5  arrested in Lybia for twelve years.  And (indiscernible)

6  till now, it's -- oh, having it till now the year 2013,

7  nobody spoke to me.  And this is a very long time with

8  the CIA since Lybia.  They say that they are going to

9  open a case with those in Saudi Arabia.

10         And it's true, they did some investigation with

11  my family in Nigeria.  Then they started asking them

12  about Nigeria.  But with my issue, they asking them

13  questions.  This is the work of CIA.  And now it's FBI

14  here in America.  And you as a judge, you don't know all

15  these and I don't know if this is important to you or if

16  it's of no importance.  To me, and this is an issue, it's

17  a heavy issue to me if you can just put me to the high

18  court and say everything and everything should be

19  understood.  Do -- those family that died in Pentagon or

20  also in the plane crash at Pentagon, they should know

21  what is going on.  It's not an issue of the government.

22         What the sheriff was saying is not on that

23  issue, the issue that happens in Pentagon.  I think this

24  issue of how he has to deal with those people, the people

25  who are working in Pentagon, the armed forces that are

Transcriptions Plus II, Inc.

15

Proceedings

1  working in Pentagon and those who crashed in the aircraft
2  at Pentagon.  If you want to -- if you want to forgive
3  them, you forgive them.  If they don't want to forgive
4  them, that's -- they're on their own.
5          Some of them are not here.  Nobody's here to
6  represent them.  They are not running.  Or they put
7  something on my head and I told you last time -- I told
8  you last time, I came to here, I say I'm continue doing
9  my jihad.  And whatever is doing now -- anyway you see
10 it, I'm just working for the religion.  I'm not fear --
11 I'm not fearful.
12         And all those people have -- I have elected
13 them; Osama bin Laden and those more in Taliban --
14 Mohammed Omar (ph.), the one of Taliban.  I'm not scared
15 in this world.  Anything that you need to do, they should
16 do it.
17         All those things that you're talking about, I
18 wrote a letter to Conqemon (ph.) and all these things.  I
19 had explained in that letter.  Even if they take me to
20 the world court, when they were talking about the local
21 issue and the issue explained everything and everybody
22 should get his own judgment.  And I'm not hiding
23 anything.  I'm not ready to run anywhere.  And I'm not
24 scared.
25         Everything should be -- should be cleared in

16

Proceedings

1  front of everybody and everybody should know that I don't

2  want anything hidden.  It is there hiding things and

3  about what they are doing and they want to use me as a

4  secret officer because those in Lybia, the CIA in Lybia,

5  they were offering me such -- you don't know that?  You

6  know that the CIA, they're working there.  They are doing

7  things even to Afghanistan but you are -- you're not

8  aware what's -- it's between what they told me -- the CIA

9  told me between me and them.

10         I don't want to be a secret agent and I'm not

11  ready to be and that's what -- that's it on the issue of

12  -- I want also the people of my country to know that --

13  to explain this.  Whatever -- whatever is the judgment,

14  whatever they want to do then, it should be right in

15  front of the people of my country.

16         Which you -- you can do it through your

17  protocol and permission.  You have -- you have this

18  diplomacy between the U.S. and the Niger.  Those who were

19  arrested in Afghanistan were taken to Guantanamo.  They

20  didn't explain it to them in America.  But that the

21  pentagon -- at the pentagon, they use the relationship

22  that they have and take them to Guantanamo.

23         To say the relationship between the America and

24  the -- those people that were arrested, they called their

25  governments to go -- to go and see their people in

17

Proceedings

1  Guantanamo, the one that has nothing do with America was

2  freed.

3          But here in America, the government -- we are

4  now in America and Italy.  It's not so the government of

5  America that arrested me.  From Lybia, I was taken to

6  Italy and the one that told them to invite the American

7  government.  You call this secret -- secret policing?

8  And this secret policing should stop.  Since 2005, I was

9  in the prison.  Why?  This was (indiscernible) if they

10 kill me, they should kill me.  If they want to do

11 anything, that is fine.

12          My -- my -- my head is just there and I'm not

13 feeling good -- I feel my head.  I won't -- what's

14 happened and anything that happens to anybody's life,

15 they are secretive -- but anybody's life and this is

16 going to reach a limit.

17          I'm not -- I'm not so refusing anything and I'm

18 just talking through my conscience.  That's what I wanted

19 to tell you.  If you can -- you can -- you can look to

20 this issue, refer me to the big judge in Washington and

21 also under war, we go to the international courts and you

22 say you can't send me to the international court.  I want

23 the biggest judges in America just to look into this

24 issue and I'm not American.  I'm -- I'm not -- and you

25 are not the one that arrested me.  They arrested me in

18

Proceedings

1   Afghanistan.  And because of the relationship that you

2   had with Italy, I was taken here and it's not like I was

3   -- I was whatever in Italy, it's not like I was there.

4   It took -- they took steps to bring me here.  That's the

5   truth.  And this is -- it's not your right.

6            THE COURT:  Are you finished?

7            THE DEFENDANT:  Yes.

8            THE COURT:  First of all, I can't send you to

9   the Supreme Court.  The Supreme Court here has seventy

10  cases a year and they only hear criminal cases after

11  someone is convicted.  And the person can then appeal to

12  the Court of Appeals and then you can only go to the

13  Supreme Court if they want to listen to you.  At this

14  stage of the proceedings, I can't send you to the Supreme

15  Court and I can't send you to some international court.

16           THE DEFENDANT:  You can't send me to the

17  international court.

18           THE COURT:  I can't.  They'll send you right

19  back to me.

20           THE DEFENDANT:  The meaning of sitting here?

21           THE COURT:  They'll send you right back to me.

22  They'll send you right back to me.  I explained to you

23  that --

24           THE DEFENDANT:  They will bring me back --

25           THE COURT:  They'll send you right back.  I

Proceedings

1  can't send you to an international court.  The

2  international court it operates generally pursuant to the

3  Treaty of Rome and has a prosecutor and it prosecutes

4  people generally for violations of international law,

5  customary international law and there's a prosecutor who

6  decides who he wants to prosecute and who he doesn't want

7  to prosecute.

8          So you're in this court and the question is how

9  we're going to proceed in a way that's in your best

10  interest and there are complicated -- criminal trials are

11  complicated proceedings.  They involve issues relating to

12  the admissibility of evidence, to whether you should take

13  the stand and speak in your own behalf or not.  Your

14  lawyers have to review the evidence offered by the

15  government.  Mr. Stern indicated for example, that he

16  might have to travel to Europe to find evidence that

17  could be helpful to you.  None of this is anything that

18  you could do for yourself.

19          And it's exceptionally foolish of you to

20  attempt to do it yourself and it only redound to your --

21  it won't redound in any way to your benefit and as I told

22  you, you could wind up spending your life in some

23  unpleasant jail in the United States unless you cooperate

24  with your lawyers and unless you have a lawyer

25  representing you.

Proceedings

1              And now that I read the Supreme Court case that

2    the government gave me, it's not so clear that you may

3    have an absolute right even if I go through the whole

4    allocution with you but you have to go through an

5    allocution with me.  Otherwise, I can't -- an allocution

6    meaning I ask you questions and you answer my questions

7    in a normal, rational way and not in a rambling narrative

8    of the kind we've just went through.

9              THE DEFENDANT:  If it's not the issue that you

10   take me back to -- I don't understand what you say.

11             THE COURT:  I can't --

12             THE DEFENDANT:  If that's issue, take me back

13   to Niger.

14             THE COURT:  Well --

15             THE DEFENDANT:  I will take me to my

16   (indiscernible).

17             THE COURT:  I can't.  I'm sorry.  Could you

18   speak up in the microphone?

19             THE DEFENDANT:  I say when (indiscernible)

20   this, take me to my -- to government my land near me.  I

21   will sent to -- government from -- you seem to

22   government, my land, Niger.  Come to here and understand

23   what you -- or send me -- me, myself, to my land, to

24   Niger.  I cannot understand you.

25             THE COURT:  I can't do that.  You're charged

21

Proceedings

1   with a crime.  We have procedures here to be followed.  I
2   can't send you anywhere other than to jail for the rest
3   of your life, if you're convicted.  The question is
4   whether you want to try and help yourself by behaving in
5   a rational way and being represented by counsel or you
6   want to not do that, which will only hurt you.
7           THE DEFENDANT:  What you have with taking the
8   international court under the --
9           THE COURT:  I can't send you to an
10  international court and I can't send you to the Supreme
11  Court of the United States.  This case has to be resolved
12  here and the question is what's the best way to resolve
13  it and what's in your best interest.
14          THE DEFENDANT:  Here you in the United States,
15  you became now a United Nation.  You became now the
16  United Nation and you want to judge everything.  You --
17  that's the -- was the control between you and I.  And I'm
18  -- okay, I'm just here alone or I'm your enemy and I'm
19  here to fight you.
20          THE COURT:  Yes, but I'm not your enemy and I'm
21  not here to fight you.  I'm here to see that you get a
22  fair trial and protect your constitutional rights.
23          THE DEFENDANT:  No, I say on myself, I am
24  enemy.  I fight you --
25          THE COURT:  You make a --

22

Proceedings

1          THE DEFENDANT:  -- not to stay in America.  And

2    to now, only one.  The war in Afghanistan it is not

3    finished.  And to now, me and Afghanistan.

4          THE COURT:  Well, you could be -- you could --

5          THE DEFENDANT:  Okay.  How could -- how could

6    my -- my enemy -- how can the Court that is my enemy then

7    give me a good judgment?

8          THE COURT:  Well because the Court is not your

9    enemy.  I explained to you the first time you were here

10   that the judges in the United States are part of an

11   independent branch of government.  I have life tenure.

12   The government can't cut my salary if they don't like

13   what I do.  I think I told you when you were here the

14   first time that I had written an opinion that was very

15   critical of the President of the United States and the

16   only thing he said was that he was going to take an

17   appeal.  So I'm here to protect your rights.  I'm not

18   your enemy.  I don't regard you as my enemy.  And the

19   question is I want to -- I actually want to try to make

20   sure that you don't do any unnecessary damage to

21   yourself.  If I were really your enemy, I would let you

22   do everything you want and you would wind up in a jail

23   that's buried in a mountain in Colorado for the rest of

24   your life.  So I'm trying to help you avoid that.  And

25   you are trying to do exactly what's against your best

23

Proceedings

1  interests.

2      THE DEFENDANT:  What is my best interest --

3  what is my best interest is when I was in prison, I wrote

4  to General Martin (ph.).  I wrote him a letter about my

5  issues.  And if he likes, he can take me to the military

6  courts and he'll can just invite all those soldiers of

7  Afghanistan and the ones of Pentagons because this issue

8  is the issue in this country in the United States.

9      They say in MCC that there's no response from

10 the general, only God knows.  And I wrote a letter also

11 to the military court in Pentagon and they didn't answer

12 me.  And you didn't see me at that time when I was

13 working.  You don't know also the relationship I had with

14 those people in Saudi Arabia before I got --

15     THE COURT:  No, you've got to -- look --

16     THE DEFENDANT:  I so want to (indiscernible).

17 You don't have any reading --

18     THE COURT:  Mr. Hausa?  Mr. Hausa, I've let you

19 speak for a long time and I think we have to draw to a

20 close.  Do you want to allow me to ask you questions

21 which you will answer that I can make a judgment that you

22 really want to waive your right to a lawyer or not?

23     THE DEFENDANT:  If it's that the way you want

24 to proceed, I have to -- then to say either you send me

25 to Guantanamo.  I know that is our have -- or you could

24

Proceedings

1   send me to Colorado, do whatever you like.  That's fine.

2   That's fine.

3          THE COURT:  So you don't want to let me go

4   through a question and answer to be sure you know what

5   you're doing?

6          THE DEFENDANT:  The truth is that it's whatever

7   is really is not that a judgment.  It's just you playing

8   where the Courts on the -- there's nobody representing

9   the world here.  There are no embassies here and we're in

10  your house and all of you are Americans.  And you want to

11  judge me the way you want.  You're right.  And everybody

12  in this house knows best.  I want to tell you one thing.

13         THE COURT:  Just one more thing.  Just one more

14  thing.

15         THE DEFENDANT:  Islam Algiers, they put -- they

16  took some Americans on hostage and it's is not under the

17  judgment of the Algerians to kill them.  Obama himself,

18  also he's talking about that issue.  It's not good.  If

19  it never went to -- I'm just like a hostage now in your

20  hands.  You became now an Islamic American or whether --

21  all you became now an American group.  You took me here

22  and then you want to judge me within yourselves.  You

23  don't need to ask me any questions; just do what you like

24  and this is whatever -- because I am a Muslim and you are

25  Christians.  And I'm your enemy and it's okay.  Go ahead.

25

Proceedings

1   Do what you want. God is there and you're not Allah.  And

2   I'm telling you that even Jesus is here, he's not going

3   to accept what you are doing.

4              THE COURT:  So you don't want to let me ask you

5   questions and answers, so that I can satisfy myself that

6   you know what you're doing?

7              THE DEFENDANT:  I am sorry.  And with me, I

8   have finished.  So you don't have ask me any questions.

9              MR. STERN:  Judge, could I have one minute to

10  talk to him?

11             (Counsel and client confer)

12             THE COURT:  Mr. Stern, what do you want to do?

13  Now, I don't understand what you want to do here?  He

14  doesn't want to --

15             THE DEFENDANT:  I mean, for a hundred year --

16             THE COURT:  I am not letting him waive his --

17  I'm not going to let him proceed without counsel because

18  he won't even cooperate in my asking him questions that

19  would allow me to make even a preliminary judgment.

20             THE DEFENDANT:  I'm not going to answer you.

21  If you give me 400 years, it's okay by me.

22             THE COURT:  I can't hear you.

23             THE DEFENDANT:  If you give me life, life

24  sentence, just like Rachman (ph.), it's fine.  I'm not

25  going to answer you any questions.

26

Proceedings

1          THE COURT:  Okay.  Thank you.

2          Now, Mr. Stern, what do you want to do here?

3          THE DEFENDANT:  He's not my lawyer.  I

4   represent myself.

5          THE COURT:  Well I told you, you can't

6   represent yourself unless you let me go through and ask

7   you questions and answers to make sure you understand

8   what you're doing.  And that's only the beginning.  If

9   you don't want to, then he's going to represent you.

10         THE DEFENDANT:  I say do -- if that's a -- go

11  -- go and do what you want to.  As from today, I seal my

12  mouth.

13         THE COURT:  Okay.  Thank you.  You can -- you

14  don't have to stay.

15         THE DEFENDANT:  Thank you.  I don't have

16  anything to say.

17         (Defendant exits.)

18         THE COURT:  All right.  He doesn't have to be

19  here for discussions of legal issues and also, I can't

20  conduct proceedings with him in the courtroom because of

21  the way he's acting.

22         MR. STERN:  Are you looking to me for

23  something?

24         THE COURT:  Well, whatever.  We started off --

25  you asked for --

Proceedings

1          MR. ARIAIL:  Yes, your Honor, actually we asked

2    for something too which was to have Dr. Mills consider

3    the Indiana v. Edwards factors.  Obviously the allocution

4    did not go forward here but we would still request that

5    that be done.

6          THE COURT:  All right.

7          MR. ARIAIL:  And if defense counsel has

8    additional applications, obviously he can make them.

9          THE COURT:  Well you could ask him, considering

10   -- I mean, I don't -- go ahead.  Ask him to consider it.

11         MR. STERN:  I think, Judge, that I have to give

12   this a little thought.  I mean he is obviously not going

13   to cooperate with me in any way.  He's not going to talk

14   to me about the case.  He's not going to do anything that

15   allows me to prepare the case.

16         I don't know if that makes him incompetent or

17   willful.  I'll have to look into that.  But the idea of

18   doing this case where I think you've had some taste of

19   what it's like to try to talk to him about the case is a

20   little bit daunting.  So I have to think about what

21   applications I want to make and how I would go about

22   doing it.  I know the government has material to give me.

23   I'll obviously review the material they have.

24         They've proposed a schedule and as long as I'm

25   still his lawyer, that schedule is fine with me.  I have

28

Proceedings

1  no objection to the schedule.

2          THE COURT:  Why aren't you still his lawyer?

3          MR. STERN:  Well I am.

4          THE COURT:  Unless you want to withdraw?

5          MR. STERN:  No, I'm not -- I don't mean to

6  laugh but I'm not seeking to withdraw.  I'm seeking to

7  figure out how to proceed really.  So at least for the

8  time being, I'm going to consent to that schedule and

9  think about the things that I need to do to proceed with

10  this case.  I'm really a little bit at sea.  I've never

11  had exactly this situation before.

12          THE COURT:  Well look, in most cases if you --

13  step back for a moment.  Notwithstanding a lot of the

14  rhetoric and opinions about the defendant's ability to

15  cooperate with counsel, the truth is that the trial

16  proceeds with the government putting in its case and you

17  trying to tear it down and often there's very little that

18  a defendant could actually contribute to his own defense,

19  even if he tells you he's innocent.

20          MR. STERN:  You're stuck.

21          THE COURT:  I mean the reality is is that you

22  could probably -- you and Ms. Kellman are competent

23  enough to try and tear down the government's case and he

24  may or may not help you because I don't -- you know,

25  according to Dr. Mills, if he -- part of this -- his

29

Proceedings

1    conduct, is volitional --

2            MR. STERN:  Yes, I think what you may have --

3            THE COURT:  -- and that they're -- and he might

4    decide at some point that he wants to cooperate

5    particularly if he's not going to let me ask him

6    questions to get a waiver of his rights, then as far as

7    I'm concerned, that's the end of the discussion.

8            MR. STERN:  That's fine.

9            THE COURT:  Unless, you know, unless -- I mean

10   I can't -- I think that he's not competent to represent

11   himself.

12           MR. STERN:  Yes.  All right.  I mean I think

13   that the problem may be if he won't let us attack the

14   government's case, he seems to be quite intent on doing

15   something other than that but all I can tell you is I'll

16   try and figure it out.  I'm going to try and meet with

17   him.  I'm not sure he'll meet with me and see what I can

18   figure out.

19           I know I am not helping anybody much by saying

20   that but I don't have good answers to these things that

21   I've never encountered before.  So I'll try and figure it

22   out.  That's the best I can tell you.  I would like, if

23   we can, to come back on the 25th.  Hopefully I'll have

24   some answers for you by then and we'll see where we are.

25           THE CLERK:  2:30, counsel?

30

Proceedings

1          (Pause)

2          THE CLERK:  How's October 25th, counsel?

3          MS. HECTOR:  That's fine.

4          THE CLERK:  You want to do it at noon?

5          MR. STERN:  That's fine.

6          MR. ARIAIL:  That's fine for the government.

7          THE COURT:  Well you could ask Dr. Mills to do

8  whatever it is you want him to do with this.

9          MR. ARIAIL:  Certainly, your Honor.  And then

10  ultimately, your Honor, obviously we have based on what

11  Dr. Mills has said already, you know, we're making an

12  application for the Court to find him competent and you

13  know, obviously we could wait until the rest of the

14  report comes in or you can consider that at this time but

15  I think a finding actually needs to be made by the Court

16  that is competent to stand trial before we could proceed.

17          THE COURT:  But do you want to have any further

18  psychiatric evaluations?

19          MR. STERN:  I think I have to talk with -- it

20  strikes me that some of the things he says are irrational

21  but some of the things he says are not.  So I don't

22  really know enough to make that decision.

23          THE COURT:  Okay.

24          MR. STERN:  I read Dr. Mills' report.  I know

25  what his opinion about it is.

31

Proceedings

1          THE COURT:  I don't -- well, I don't know that

2     he said anything rational today.  I mean it's just a

3     rambling.

4          MR. STERN:  So I think that will be one --

5          THE COURT:  Totally irrational -- totally

6     irrational presentation.

7          MR. ARIAIL:  Your Honor, I think you also --

8     you know, we do have to consider in terms of the context

9     of where he has been over the last, you know, twenty

10    years and his circumstances and his ideologies are very

11    complex and obviously not what we are used to dealing

12    with and I think that in that context, I think Dr. Mills

13    opined that he was essentially rational in his approach

14    to his proceedings.

15          So while we may not --

16          THE COURT:  I don't know -- you could give him

17    the transcript and ask him if he thinks that this is

18    rational.

19          MR. ARIAIL:  I will provide it to him, of

20    course, along with any other information that we've

21    uncovered.

22          THE COURT:  I me4an I don't -- I could send him

23    to a Butner for a psychiatric evaluation but he may come

24    back worse.

25          MR. ARIAIL:  I can tell you also too, your

32
Proceedings

1   Honor, you know that in terms of his interactions with

2   defense counsel and the government at times, that they're

3   perfectly rational.  He's incredibly intelligent.  He has

4   a memory that is phenomenal and much of the information

5   that he is providing to the Court to the Secretary

6   General of the United States, to defense counsel, to

7   everyone, and I'm not speaking about all of it but

8   significant aspects of it are accurate and corroborated.

9           In particular, obviously you know as we talked

10  about before, he was involved in a battle in Afghanistan

11  in which U.S. soldiers were actually killed.  His

12  fingerprint was found on a Koran that was recovered at

13  that battle.  So you know, just to point out that there

14  are some pieces to his story that are incredibly

15  corroborated and suggestive of someone who is actually

16  talking about things he knows about.

17          THE CLERK:  Counsel, do you want --

18          THE COURT:  And it's a policy of the

19  government, the department, to prosecute cases like this

20  in a normal criminal proceeding?

21          MR. ARIAIL:  It is, your Honor.

22          THE COURT:  When did that happen?

23          MR. ARIAIL:  That's what we're here for, the

24  United States Attorney's Office represents the Department

25  of Justice.

33

Proceedings

1          THE CLERK:  We need an OED, Judge.  You've

2  previously designated this case complex.  There is the

3  defendant's pro se motion to proceed pro se and review of

4  materials for Dr. Mills --

5          MR. ARIAIL:  That's correct.

6          THE COURT:  -- from now until October 25th.

7          MR. STERN:  And I consent to that.  There's a

8  lot to be done here.

9          THE COURT:  All right.  I continue the complex

10  designation until October 25th.  In the meantime, I am

11  going to sign this order.  Do I have to sign this or is

12  it just simply for my --

13          MR. ARIAIL:  I think it has a spot for your

14  signature, your Honor.  So we can --

15          THE CLERK:  I can sign it online, Judge.

16          MR. ARIAIL:  -- work without it --

17          THE COURT:  I'll sign it now.

18               (Matter concluded)

19                    -o0o-

20

21

22

23

24

25

34

# C E R T I F I C A T E

I, LINDA FERRARA, hereby certify that the foregoing transcript of the said proceedings is a true and accurate transcript from the electronic sound-recording of the proceedings reduced to typewriting in the above-entitled matter.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I hereunto set my hand this **1st** day of **October**, 2013.

_Linda Ferrara_
Linda Ferrara

CET**D 656
Transcriptions Plus II, Inc.