SA:MJJ/MW
F.#2011R01313

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -                         12-CR-134 (BMC)

IBRAHIM SULEIMAN ADNAN ADAM
HARUN,
       also known as "Spin Ghul,"
       "Esbin Gol," "Isbungoul," "Abu
       Tamim," "Joseph Johnson" and
       "Mortala Mohamed Adam,"

                  Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - -X

**GOVERNMENT'S MEMORANDUM OF LAW IN SUPPORT OF MOTION
FOR AN ANONYMOUS AND PARTIALLY SEQUESTERED JURY**

ROBERT L. CAPERS
UNITED STATES ATTORNEY
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

Shreve Ariail
Melody Wells
Matthew J. Jacobs
Assistant U.S. Attorneys
    (Of Counsel)

<u>PRELIMINARY STATEMENT</u>

The government respectfully submits this memorandum of law in support of its motion for an anonymous and partially sequestered jury in the trial of this matter.  The government specifically requests (1) that the names, addresses and workplaces of members of both the <u>venire</u> and <u>petit</u> juries not be revealed; (2) that the jurors be kept together during recesses and taken to or provided lunch as a group each day during trial; and (3) that they be escorted to and from the courthouse each day during trial in a manner to be arranged by the United States Marshals Service.

Courts in this District have routinely approved the use of anonymous juries in prominent terrorism cases.[1]  As explained in greater detail below, the factors warranting the use of anonymous juries in these cases—namely, the seriousness of the charges, the potential threat of corruption of the judicial process and the expectation of publicity—require the use

---

[1] <u>See, e.g.</u>, <u>United States v. Kaziu</u>, 559 F. App'x 32, 37-38 (2d Cir. 2014) (upholding use of anonymous jury in prosecution for conspiracy to commit murder overseas and attempted provision of material support to the terrorist organization al-Shabaab); <u>United States v. Pugh</u>, --- F. Supp. 3d ---, 15-CR-116 (NGG), 2015 WL 8481877 (E.D.N.Y. Dec. 9, 2015) (granting government's motion for an anonymous, partially sequestered jury in trial of defendant accused of providing material support to the Islamic State); <u>United States v. Ahmed</u>, 12-CR-661 (SLT), 2014 U.S. Dist. LEXIS 171425 (E.D.N.Y. Dec. 10, 2014) (approving use of anonymous jury in terrorism trial); <u>United States v. Ibrahim</u>, 529 F. App'x 59, 65 (2d Cir. 2013) (affirming use of anonymous jury in case relating to plot to detonate fuel tanks at John F. Kennedy airport); <u>United States v. Kadir</u>, 718 F.3d 115, 121 (2d Cir. 2013) (affirming use of anonymous jury in case relating to terrorist plot at John F. Kennedy airport); <u>United States v. Naseer</u>, 10-CR-019 (RJD), Dkt. No. 361 (approving use of anonymous jury where defendant was charged with conspiring to provide material support to al-Qaeda); <u>see also</u> <u>United States v. Stewart</u>, 590 F.3d 93, 125 (2d Cir. 2009) (affirming use of anonymous jury in prosecution  in the Southern District of New York of defense attorney and two co-conspirators for involvement with Sheikh Omar Abdel Rahman); <u>United States v. Al Fawwaz</u>, 98-CR-1023 (LAK), 2014 WL 5005917 (S.D.N.Y. Sept. 30, 2014) (granting government's request for an anonymous jury in prosecution relating to plot to bomb at the U.S. embassies in Kenya and Tanzania).

of an anonymous jury in this case.   The threat of corruption of the judicial process is especially serious here given the defendant's demonstrated contempt for the authority of the Court and his threats against the prosecutors and Courthouse personnel.

I.      FACTUAL BACKGROUND

Defendant Ibrahim Suleiman Adnan Adam Harun, also known as "Spin Ghul," "Esbin Gol," "Isbungoul," "Abu Tamim," "Joseph Johnson" and "Mortala Mohamed Adam" is a member of al-Qaeda, the international terrorist organization responsible for the September 11, 2001 attacks on the United States.   In 2012, a grand jury indicted the defendant on the following six charges: (1) conspiracy to murder United States nationals, in violation of 18 U.S.C. § 2332(b); (2) conspiracy to bomb a government facility, in violation of 18 U.S.C. § 2332f; (3) conspiracy to provide material support to a foreign terrorist organization—al-Qaeda—in violation of 18 U.S.C. § 2339B; (4) providing and attempting to provide material support to al-Qaeda, in violation of 18 U.S.C. 2339B; (5) use of firearms in connection with terrorist activities, in violation of 18 U.S.C. § 924(c); and (6) use of explosives in connection with terrorist activities, in violation of 18 U.S.C. § 844(h).   The charges stem from the defendant's membership in al-Qaeda from 2001 to 2011, specifically his role as a jihadist fighter in the Pakistan-Afghanistan region from 2001 to 2003 and his role as an al-Qaeda external operative in West Africa from 2003 to 2005.

The government anticipates establishing the following facts at trial through statements of the defendant, witness and expert testimony, physical evidence, and documentary evidence, among other things.

A.    <u>Al-Qaeda</u>

Al-Qaeda is a militant Islamist terror organization that was founded in the late 1980s by Osama bin Laden.  In 1999, the United States Department of State formally designated al-Qaeda as a foreign terrorist organization under Section 219 of the Immigration and Nationality Act.  <u>See</u> 8 U.S.C. § 1189.

In February 1998, al-Qaeda's leadership issued the following worldwide directive:

> [I]n compliance with God's order, we issue the following fatwa to all Muslims:  the ruling to kill the Americans and their allies—civilians and military—is an individual duty for every Muslim who can do it in any country in which it is possible to do it.

In the years following this decree, al-Qaeda carried out numerous large scale attacks against the United States and other Western interests, from its base in Taliban-controlled Afghanistan, including (1) the 1998 bombings of the U.S. embassies in Kenya and Tanzania, which resulted over 200 deaths and more than 4,500 injuries; (2) the 2000 bombing of the U.S.S. Cole in Yemen, which resulted in scores of casualties; and (3) the September 11, 2001 attacks on the World Trade Center and the Pentagon, which resulted in thousands of deaths.

On October 7, 2001, less than one month after the attacks of September 11, 2001, the United States began formal military action against al-Qaeda and Taliban forces in Afghanistan.  During this time period, al-Qaeda operated numerous training facilities and safe houses in the Federally Administered Tribal Areas ("FATA") of Pakistan—a vast expanse of land located on the border of Pakistan's northwest frontier province and southeastern Afghanistan.  The FATA region has been described as "ground zero in the U.S.-jihadist war" and in the 2000s was "home to many al-Qaeda operatives [including the

4

defendant], especially numerous 'foreigners' from the Arab world, Central Asia, Muslim areas of the Far East, and even Europe who flock[ed] to this war zone." Center for Strategic and International Press, "FATA – A Most Dangerous Place," Jan. 2009, pp vi, 1.

B.     The Defendant Joins Al-Qaeda

Shortly before the terror attacks of September 11, 2001, the defendant—who purports to be a citizen of Niger—traveled from Saudi Arabia to Afghanistan to join a jihadist fighting group. Upon arriving in Afghanistan, the defendant met and embraced members of al-Qaeda, stayed at an al-Qaeda guesthouse, and became a member of that terrorist organization. The defendant was present in Afghanistan on September 11, 2001 and joined the celebrations of al-Qaeda jihadists as news of the attacks in New York and Washington spread.

In anticipation of an American invasion of Afghanistan, al-Qaeda military leaders sent the defendant and other jihadi fighters to various military training camps. The defendant initially trained at al-Qaeda training camp known as al-Farouq near the Taliban stronghold of Kandahar, Afghanistan, where the defendant received training in weapons such as Kalashnikov automatic rifles, Uzi machineguns, hand grenades and rocket-propelled grenades. The defendant was thereafter sent to two other al-Qaeda training camps near Kabul, Afghanistan—al Malik and Camp 9—where he learned additional military skills, including how to operate surface-to-air missiles, and underwent instruction in terrain analysis and geography, among other things. Around this time, the defendant received the "kunya" (i.e., "nom de guerre") "Spin Ghul"—a Pashto name meaning "White Rose," which had previously been used by a Somali martyr.

C.      The April 25, 2003 Ridgeline Firefight

The defendant traveled with other al-Qaeda jihadists to Waziristan in the

FATA region of Pakistan, where he operated under Abdul Hadi al-Iraqi ("Abdul Hadi")—

one of bin Laden's deputies and al-Qaeda's top military commander in Afghanistan at that

time.  From Waziristan, the defendant participated in attacks on U.S. and coalition military

forces operating just across the border in Afghanistan.

In April 2003, the defendant and other al-Qaeda fighters launched a series of

rocket attacks at a U.S. forward operating base in Shkin, Afghanistan ("FOB Shkin"), located

less than five miles from the Afghanistan-Pakistan border.  On April 25, 2003, the defendant

and fellow al-Qaeda jihadists ambushed a U.S. military patrol from FOB Shkin.  During the

ambush, the defendant fired machinegun rounds and threw grenades at American soldiers

while shouting "Allahu Akhbar" or "God is Great."   Several U.S. servicemen were injured

in the firefight, and two were killed as a result: 19-year-old Private First Class Jerod Dennis

of Oklahoma and 24-year-old Airman First Class Raymond Losano of Arizona.

The defendant was seriously injured in the firefight, and at least one al-Qaeda

jihadist—later identified as Abu Walid al-Pakistani ("Abu Walid")—was killed.  U.S.

military forces searched for the defendant and other al-Qaeda jihadists following the

firefight, but were unable to find them in the rocky terrain.  After the firefight, the defendant

crossed back into Pakistan.

Physical evidence has confirmed the defendant's presence at the site of the

attack near FOB Shkin on April 25, 2003.  In the aftermath of the attack, members of the

military recovered, among other items reflecting the defendant's involvement in the firefight,

a small brown Koran near the site of the firefight.  Approximately ten years later, subsequent

to the defendant's indictment and extradition to the United States, document forensic experts from the Federal Bureau of Investigation examined the Koran and identified the defendant's fingerprint on it.

D.    The Defendant's Transition to al-Qaeda External Operative

While recovering from his wounds in Pakistan, the defendant met with senior al-Qaeda officials—including Abdul Hadi and Abu Faraj al-Libi ("Abu Faraj"), al-Qaeda's external operations chief—to discuss his future with al-Qaeda.  During these meetings, the defendant expressed his desire to engage in acts of terror against U.S. interests outside of Afghanistan.   Specifically, the defendant told his superiors that he wanted to conduct attacks similar to 1998 al-Qaeda bombings of the U.S. embassies in Kenya and Tanzania.  Also during this time, the defendant swore "bayat"—or formal allegiance—to bin Laden through bin Laden's military commander Abdul Hadi.

Abu Faraj subsequently connected the defendant with Hamza Rabia, a senior al-Qaeda official based in Pakistan whose responsibilities included overseeing al-Qaeda operatives and terror attacks outside the Afghanistan-Pakistan region.  Rabia arranged for the defendant to receive additional training from an al-Qaeda expert in explosives and poisons. Then, in August 2003, at Rabia's direction, the defendant left Pakistan and traveled to Nigeria to surveil and carry out an attack on U.S. interests there, including U.S. diplomatic facilities in Abuja, operating under the direction of Rabia and his aide, Abu Talha al Pakistani.

During his years as an al-Qaeda jihadist in Pakistan and Afghanistan, the defendant interacted with numerous leading al-Qaeda officials.  In addition to Abdul Hadi and Abu Faraj, the defendant came into contact with Ramzi bin al-Shibh, Ahmed Khalfan

Ghailani, Abu Zubaydah, and Adam Gadanh, to name a few.  Al-Shibh was directly involved in the attacks September 11, 2001, Ghailani was involved in the 1998 bombings of the U.S. embassies in Kenya and Tanzania, Abu Zubaydah was a prominent terrorist facilitator, and Gadahn was a top English-speaking member of al-Qaeda's propaganda department.[2]

      E.      The Defendant's Terrorist Activities in Africa

Upon arriving Nigeria, the defendant cased U.S. buildings, including U.S. diplomatic facilities in Abuja, and other Western diplomatic facilities, for the purpose of identifying suitable targets for attack.   During this time, the defendant also attempted to obtain large quantities of explosives from an industrial supply company in Kano, Nigeria. The defendant specifically directed an associate to purchase explosives from the company, though the attempt was ultimately unsuccessful.

While in Nigeria, the defendant met with members of other radical Islamic terror groups on behalf of al-Qaeda.  The defendant liaised, for example, with members of the Nigerian Taliban, the predecessor of the Nigerian terrorist group Boko Haram.  He also met with members of the Algerian terror organization "Groupe Salafiste pour la Predication et le Combat," also known as the "Society for Preaching and Killing" ("GSPC"), the

---

[2] Ghailani was convicted for his involvement in these attacks in 2010 and sentenced to life imprisonment.  See United States v. Ghailani, 98-CR-1023 (S.D.N.Y.).  Abu Zubaydah, al-Shibh, Abdul Hadi and Abu Faraj are in custody in Guantanamo Bay, Cuba.  Abdul Hadi has been charged by the Office of Military Commissions for his involvement in a series of attacks in Afghanistan and Pakistan between in 2003 and 2004, with conspiracy to commit law of war offenses, and for substantive law of war offenses, including denying quarter, attacking protected property, using treachery or perfidy, and attempted use of treachery or perfidy. See United States of America v. Abd Al Hadi al Iraqi, (http://www.mc.mil/cases.aspx).  Gadahn and Rabia are reportedly deceased.

predecessor of the terrorist organization al-Qaeda in the Lands of the Islamic Maghreb ("AQIM").

F.   The Defendant's Flight from Nigeria and Arrest in Libya

In the summer of 2004, the defendant directed an associate, Mohammad Ashafa—who had previously assisted the defendant in identifying potential bombing targets in Abuja—to travel to Pakistan and deliver messages and materials to Hamza Rabia.  While Ashafa successfully traveled to Pakistan and made contact with al-Qaeda leadership, he was captured by Pakistani authorities when attempting to return to Nigeria.

After Ashafa's arrest, Rabia told the defendant to leave Nigeria immediately, and the defendant fled north across the border to Niger.  The defendant then traveled from Niger to neighboring Libya.  From Libya, the defendant planned to surreptitiously enter Europe to carry out terrorist attacks against Western interests there.  In early 2005, however, Libyan law enforcement arrested the defendant in Tripoli and placed him in custody, where he remained until his release in 2011.

G.   The Defendant's Release from Libya and Arrest in Italy

In 2011, shortly before the fall of Muamar Gadhafi's regime in Libya, the defendant was released from Libyan custody and placed on a ship bound for Lampedusa, an Italian island in the Mediterranean Sea about 120 miles south of Sicily.  On June 23, 2011, in Lampedusa the defendant boarded an Italian ship, the Excelsior, which was carrying approximately 1,200 North African refugees and 40 crew members, bound for Taranto on the Italian mainland.

On June 24, 2011, security officials on the Excelsior noticed the defendant acting strangely.  When approached by an official, the defendant stated in English that he

was "different" than the other refugees on the ship.  Another officer, noticing scars on the

defendant's arm, contacted the head of security on the Excelsior, who brought the defendant

to a private room along with an Arabic-speaking cultural officer.  In the private room, the

defendant told security officials that he was a member of al-Qaeda and provided a written

statement to this effect.

On June 25, 2011, upon his arrival in Taranto, Italian anti-terrorism agents

conducted a formal interview of the defendant, in the presence of defense counsel, during

which the defendant provided specific information about his membership in al-Qaeda and his

role in cross-border attacks on U.S. Soldiers in Afghanistan.  The defendant stated, for

example, that (1) he was at an al-Qaeda guesthouse in Afghanistan on September 11, 2001;

(2) he received military training at multiple al-Qaeda training camps; (3) he participated in an

attack on U.S. military personnel near the Afghanistan-Pakistan border; and (4) he later

traveled to Nigeria to carry out terror attacks against American or European diplomatic

facilities there.

On August 24, 2011, the defendant was interviewed by an Italian magistrate.

During the interview, the defendant confirmed the accuracy of his prior statements to Italian

officials, including those concerning his membership in al-Qaeda.  Further, in response to a

question regarding his motives for seeking to enter Europe in 2005, the defendant stated that

he sought carry out a terror attack "superior to the September 11, 2001 attacks in the United

States."  And when asked if he still harbored such intent, the defendant replied "even now, if

I had the opportunity to organize an attack in Europe I would do it, because Europe agrees

with American politics."

H.     <u>Involvement of U.S. Law Enforcement and the Defendant's Extradition</u>

After learning of the defendant's arrest in Italy, the U.S. government requested permission from Italian authorities to interview the defendant.  Italian authorities granted this request, and in September 2011, the government conducted three days of audio-recorded interviews of the defendant in Italy, before an Italian judge and in the presence of defense counsel.  During these interviews, in which the defendant was advised of and waived his <u>Miranda</u> rights, the defendant described his involvement in al-Qaeda, beginning with his travel to Afghanistan shortly before the attacks of September 11, 2001.  Significantly, the defendant also provided a detailed account of the firefight near Shkin, Afghanistan, discussed above.  In addition, the defendant disclosed information about his activities as an al-Qaeda external operative in Nigeria, the subsequent arrest of Ashafa, his flight from Nigeria, his arrest in Libya, and his eventual release.

During these interviews, the defendant was contemptuous, entitled and extraordinarily prideful.  At one point, for example, the presiding judge requested that the defendant specifically answer the questions posed instead of expounding on other topics.  In response, the defendant told the judge that "if you're not pleased with my answers, we can go to a higher court, a court that's higher than this one."  The defendant appeared to relish the opportunity to describe his commitment and contributions to al-Qaeda and his role during a critical time period in that organization's ascendancy among terrorist organizations.

As noted above, on February 21, 2012, a federal grand jury indicted the defendant on charges including conspiracy to murder U.S. nationals, conspiracy to attack a government facility, and provision of material support to al-Qaeda.  On March 19, 2012, the government formally requested the defendant's extradition from Italy pursuant to the 2006

U.S.-Italy Extradition Instrument.  On September 17, 2012, Italian authorities granted the government's extradition request—subject to the limitation that the government not seek the death penalty against the defendant—and on October 4, 2012, the defendant was extradited to the United States.

After his arrival in the United States, the defendant, with advice of counsel, continued meeting with the government.  After some time, however, the defendant grew frustrated with, and became extraordinarily hostile toward, the government.  In light of the defendant's changed demeanor, in early 2013, defense counsel and the government retained a forensic psychiatrist, Dr. Mark Mills, who, after substantial evaluation and interaction with the defendant concluded that the defendant was "fit to proceed" to trial.  (ECF 62 at 2.)  Dr. Mills described the defendant as "rational, thoughtful, often convivial and seemingly blessed with a remarkable memory," and noted that the defendant at times had become "angry, demanding and (arguably) self-defeating" when irritated or challenged.  (Id.)  Significantly, Dr. Mills noted that the defendant could "be obstructionist and manipulative" and— consistent with the government's perception of the defendant during the September 2011 interviews— "wants to be listened to, deferred to and acknowledged as a witness to some very important history."  (Id.) [3]

During other appearances before the Court, the defendant has been openly hostile and belligerent, and has openly challenged the Court's authority in this case,

---

[3] Similarly, Dr. Richard Demier, a clinical and forensic psychologist who was assisted in his evaluation by Drs. Preston Baecht and Randy Brandt, all of whom are employed by the United States Medical Center for Federal Prisoners, located in Springfield, Missouri, agreed that the defendant was competent to proceed.  (ECF 62 at 2.)  At a hearing dated March 12, 2015, the Court, having considered the assessments referred to herein, and various other materials submitted by the government for the Court's consideration, found similarly.

demanding to be tried in an "international" or "military" court.  For example, on May 3, 2013, the defendant demanded to be handed "over to a military court."  (May 3, 2013 Transcript at 3.)  At the same Court appearance the defendant also declared that "God is the only Judge."  (Id. at 13.)  At a later appearance before then-presiding Judge Edward Kor, the defendant indicated his desire to be tried in an "international court" like "[Abdelbaset] al-Magrebi who did the Lockerbie [bombing]."  (June 28, 2013 Transcript at 7.)   Having been advised that the district Court did not have the authority to transfer him to another tribunal, then defendant lashed out, and in broken English stated: "Fuck you, Judge. Judge, you bad [indiscernible]."  (June 28 2013 Transcript at 19.)  Counsel for the defendant has also advised that the defendant "wants a military attorney. . . . [and] wants to be tried in a military tribunal."  (Id. at 29.)

The defendant has also openly expressed in Court his continued ties to al-Qaeda and its jihadist mission.  On May 3, 2013, in open court the defendant declared: "I am a warrior and the war is not over. . . .  Our terrorism is not over."  (May 3, 2013 Transcript at 8.)   Later in the proceeding, the defendant advised: "I want to remind you I am still in battle."  (Id. at 9.)   At a later proceeding, the defendant admitted in open court his involvement in the killing of American soldiers in Afghanistan.  (See September 4, 2013 Transcript at 3-4.)

Many of these aggressive, prideful and contemptuous characteristics were also reflected in a letter the defendant wrote to United Nations Secretary General in July or August 2013, in which he generally describes his criminal conduct in Pakistan, Afghanistan, Nigeria, Libya and Italy between 2001 and 2011.  (See August 2, 2013 Transcript at 13-14.)  Near the end of the letter, the defendant makes clear that he remains as committed to

terrorism as ever, stating that "I have not declared it nor have I abandoned the idea of Jihad for the sake of Allah."   Likewise, outside of court, the defendant has threatened to kill the prosecutors assigned to this case along with other courthouse personnel.

II.     ANALYSIS

    A.     Applicable Law

        The Second Circuit has repeatedly upheld the use of anonymous and partially sequestered juries where (1) there is strong reason to believe that the jury needs protection, and (2) reasonable precautions have been taken to minimize any adverse effect on the jurors' opinion of the defendant.  See, e.g., Kaziu, 559 F. App'x at 37-38; United States v. Arillotta, 529 F. App'x 81, 82 (2d Cir. 2013); Ibrahim, 529 F. App'x at 65; Kadir, 718 F.3d at 120–21. "Within these parameters, the decision whether or not to utilize an anonymous jury is left to the district court's discretion."  Pica, 692 F.3d at 88 (quoting Gotti, 459 F.3d 296, 345 (2d Cir. 2006)).

        "In determining whether there is a 'strong reason' to believe that the jury needs protection, courts should consider several factors, including whether (1) the charges against the defendants are serious, (2) there is a substantial potential threat of corruption to the judicial process, and (3) considerable media coverage of the trial is anticipated."  Al Fawwaz, 57 F. Supp. 3d at 309 (citing United States v. Quinones, 511 F.3d 289, 296 (2d Cir.2007), and United States v. Tomero, 486 F.Supp.2d 320, 322 (S.D.N.Y.2007)); see also Pugh, 2015 WL 8481877, at *2 (same).  While "it is unclear whether any of these factors individually justify impaneling an anonymous jury," "there are numerous cases indicating that anonymity is appropriate when some combination of these factors is present."  Pugh,

2015 WL 8481877, at * 2 (quoting Khan, 59 F. Supp. 2d at 169 (citing Quinones, 511 F.3d at 296)).

While empaneling an anonymous jury presents "the possibility of unfair prejudice to the defendant," Tutino, 883 F.2d 1125, 1132 (2d Cir. 1989), "the use of an anonymous jury does not infringe a defendant's constitutional rights, so long as the court conducts a voir dire designed to uncover any bias as to the issues or the defendants and takes care to give the jurors a plausible and nonprejudicial reason for not disclosing their identities," United States v. Aulicino, 44 F.3d 1102, 1116 (2d Cir. 1995); see also Kadir, 718 F.3d at 120. "The Second Circuit has consistently 'made clear that when genuinely called for and when properly used, anonymous juries do not infringe a defendant's constitutional rights.'" Pugh, 2015 WL 8481877, at *2 (quoting Kadir, 718 F.3d at 120).

In Barnes, 604 F.2d at 141, the Second Circuit upheld the empaneling of an anonymous jury and specifically rejected any claim that the law requires jurors to disclose their identities:

> If a juror feels that he and his family may be subjected to violence or death at the hands of a defendant or his friends, how can his judgment be as free and impartial as the Constitution requires?  If the anonymous juror feels less pressure as a result of anonymity, . . . this is as it should be a factor contributing to his impartiality.

Id. at 140–41 (noting further that "in a case that generated as much pretrial publicity as [this one] and in which allegations of dangerous and unscrupulous conduct abounded, precaution was best taken so that fears would not become realities.").

Similarly, in Thomas, 757 F.2d at 1364, the Second Circuit explained that the protection of jurors is vital to the proper functioning of the federal criminal justice system.

15

The court described jury anonymity as a mechanism to ensure a fair and impartial verdict, free from fear or intimidation:

> As a practical matter, we cannot expect jurors to "take their chances" on what might happen to them as a result of a guilty verdict.  Obviously, explicit threats to jurors or their families or even a general fear of retaliation could well affect the jury's ability to render a fair and impartial verdict.  Justice requires that when a serious threat to juror safety reasonably is found to exist, precautionary measures must be taken.

Id.

     B.     <u>An Anonymous Jury Is Appropriate In This Case</u>

As noted above, the key factors in determining whether an anonymous jury is warranted are (1) the seriousness of the charges against the defendant; (2) the potential threat of corruption of the judicial process; and (3) the expectation of publicity.  <u>See</u>, <u>e.g.</u>, <u>Quinones</u>, 511 F.3d at 296.  As described below, each of these factors favor empaneling an anonymous and partially sequestered jury in this case.

     1.     <u>The Charges In This Case Are Serious</u>

The charges the defendant faces are indisputably serious.  The indictment charges the defendant with conspiring to murder U.S. nationals, conspiring to attack U.S. diplomatic facilities, and providing material support to al-Qaeda, among other things.  If convicted at trial, the defendant will face a United States Sentencing Guidelines range of life imprisonment.[4]  Courts in this district have regularly approved anonymous juries in cases

---

[4] Certain of the crimes with which the defendant could have been charged for the conduct alleged herein would have been punishable by death.  But as noted previously, the government has agreed, as a condition of the defendant's extradition from Italy, not to seek the death penalty in this case, or to otherwise charge the defendant in this case with a death-eligible offense.

involving similarly serious charges.  See, FN1, supra.  Indeed, the charges the defendant

faces—including conspiracy to murder U.S. nationals and conspiracy to bomb U.S.

diplomatic facilities—are more serious than those charged in recent terrorism-related cases in

this District in which an anonymous jury was used.  See, e.g., Pugh, 2015 WL 8481877

(anonymous and partially sequestered jury authorized in case in which the defendant was

charged in a two-count indictment with attempted material support of terrorism and

obstruction of justice).

> 2. The Judicial Process Is At Risk

In addition to the seriousness of the charges facing the defendant, an

anonymous and partially sequestered jury is also warranted because of the risk of

interference with the judicial process.  As noted above, the defendant is an admitted member

of al-Qaeda, the terrorist group that orchestrated the attacks of September 11, 2001, and the

defendant has proudly declared his continued dedication to that terrorist organization.[5]

Every juror will likely be aware of these attacks, and many will undoubtedly know that they

were perpetrated by al-Qaeda.  Many jurors will also likely be aware of al-Qaeda attacks on

U.S. interests predating September 11, 2001—specifically the coordinated attacks on the

U.S. embassies in Kenya and Tanzania in 1998 and the attack on the U.S.S. Cole in 2000.

Despite the elimination of Osama bin Laden in 2011 and the emergence of other terror

groups, most notably the Islamic State, jurors will likely be aware that al-Qaeda remains

operational and committed to violently attacking U.S. and other Western interests.  Indeed,

---

[5] As indicated above, evidence at trial will establish that the defendant was present in Afghanistan on September 11, 2001, and celebrated, along with his al-Qaeda colleagues, the terrorist attacks in the United States that day.

as recently as earlier this year, al-Qaeda claimed responsibility for terror attacks on two high-end hotels in Burkina Faso, which claimed the lives of 30 people.[6]

As the Second Circuit has stated, "even a general fear of retaliation could well affect the jury's ability to render a fair and impartial verdict."  Thomas, 757 F.2d at 1364. There is a legitimate concern in this case that jurors may fear that an associate of the defendant, a member of al-Qaeda, or a member of another Islamist extremist group will target them.  It would not be unreasonable for jurors to believe that disclosure of their identities or information about their families or workplaces may expose them to unnecessarily heightened risk.  See Stewart, 590 F.3d at 125 (noting "the reasonable likelihood that the pervasive issue of terrorism would raise in the jurors' minds a fear for their individual safety").

The jurors' fear of retaliation may be amplified by the fact that the defendant has extraordinary connections to al-Qaeda, including to several of its most significant leaders, some reportedly deceased, others currently in custody in Guantanamo Bay, and to at least two other jihadist terror organizations.  As noted above, the defendant was al-Qaeda's liaison to the Nigerian Taliban, which ultimately became Boko Haram, and GSPC, which ultimately became AQIM.  In recent years, Boko Haram has engaged in numerous terror attacks, including most notoriously, the kidnapping of over 200 schoolgirls in Nigeria in

---

[6] Al-Qaeda Attacks in Burkina Faso Kill at Least 30, Wall Street Journal, Jan. 16, 2016, http://www.wsj.com/articles/operation-ends-at-burkina-faso-hotel-seized-by-al-qaeda-1452936866.

2014.[7]  The jurors in this case will also likely be aware of recent pronouncements by al-Qaeda and other terrorist organizations, including the Islamic State, regarding the targeting of Americans both within and outside the United States.[8]

The threat of corruption to the judicial process in this particular case is not merely hypothetical.  The defendant has already attempted to corrupt the judicial process by threatening to kill the prosecutors and Courthouse personnel, and has consistently disrupted Court proceedings, repeatedly conveying his contempt for the Court and the United States criminal process.  See Pugh, 2015 WL 8481877, at *5 ("courts have found that an anonymous jury may be needed where a defendant's conduct demonstrates disrespect for the judicial process"); see also United States v. Ashburn, 13-CR-303 (NGG), 2014 WL 5800280, at *8 (holding that the "defendants' lack of respect for the judicial process suggests there is a serious need to protect the jury").

3.    Publicity Surrounding The Case Has Been Extensive

An anonymous and partially sequestered jury is also warranted because of the extensive media attention this case has already generated and the publicity likely to result from trial.  Major newspapers and wire services from around the country, including all major television news networks and major New York newspapers, reported the unsealing of the

---

[7] See, e.g., 'I Will Sell Them,' Boko Haram Leader Says of Kidnapped Nigerian Girls, CNN, May 6, 2014, http://www.cnn.com/2014/05/05/world/africa/nigeria-abducted-girls/.

[8] See, e.g., Al-Qaeda Branch Calls for New Attacks Against United States, CNN, Aug. 5, 2015, http://www.cnn.com/2015/08/04/middleeast/al-qaeda-branch-yemen-united-states/; Randy DeSoto, ISIS Claims to Have 71 Trained Soldiers In Targeted U.S. States, Western Journalism, May 7, 2015, http://www.westernjournalism.com/isis-claims-to-have-71-trained-soldiers-in-targeted-u-s-states/; Barbara Starr, Stream of al-Qaeda Threats Has U.S. Intelligence Concerned, CNN, May 21, 2014, http://www.cnn.com/2014/05/20/us/al-qaeda-threats-intelligence/.

indictment against the defendant (and the government's corresponding press release) in March 2013.[9]   Due to the widespread public attention the defendant's case has already garnered, the government expects that the defendant's pretrial proceedings and trial will attract substantial media coverage.

Given the level of media attention and public scrutiny that this case already has generated, it is reasonably foreseeable that the trial, including the jurors' identities, may

---

[9] See, e.g., Suspected al-Qaeda Fighter to Face Charges, Wall Street Journal, Mar. 20, 2013, http://www.wsj.com/articles/SB10001424127887323419104578372531513067880; Terrorism Suspect has been security held in New York since October, Washington Post, Mar. 20, 2013, https://www.washingtonpost.com/world/national-security/terrorism-suspect-has-been-secretly-held-in-new-york-since-october/2013/03/20/036af038-9194-11e2-bdea-e32ad90da239_story.html; Man Charged with Plotting Against U.S. Abroad, New York Times, Mar. 20, 2013, http://www.nytimes.com/2013/03/21/nyregion/man-accused-of-plotting-terrorism-abroad.html?_r=0; Another Terrorism Suspect Indicted in New York, Los Angeles Times, Mar. 20, 2013, http://articles.latimes.com/2013/mar/20/nation/la-na-terror-charges-20130321; Feds Hit Qaeda Creep, New York Post, Mar. 20, 2013, http://nypost.com/2013/03/21/feds-hit-qaeda-creep/; Mental Health Questions Delay Al-Qaeda Operative's Court Date in Brooklyn, New York Post, Mar. 22, 2013, http://nypost.com/2013/03/22/mental-health-questions-delay-al-qaeda-operatives-court-date-in-brooklyn/; Alleged Al-Qaeda Operative Charged with Plotting to Kill U.S. Personnel Overseas, Fox News, Mar. 20, 2013, http://www.foxnews.com/us/2013/03/20/alleged-al-qaeda-operative-charged-with-conspiracy-to-kill-us-troops-overseas.html; Meet the 'Prototype' Al-Qaeda Operative: 'Spin Ghul', ABC News, Mar. 20, 2013; U.S. charges Saudi in al-Qaeda plots against Americans abroad, Reuters, Mar. 20, 2013, http://www.reuters.com/article/us-usa-plot-idUSBRE92J0XM20130320; Alleged Al-Qaeda Operative Charged with Conspiring to Kill U.S. Diplomats, Military Personnel, CBS News, Mar. 20, 2013, http://newyork.cbslocal.com/2013/03/20/alleged-al-qaeda-operative-charged-with-conspiring-to-kill-u-s-diplomats-military-personnel/; Terror Suspect Who Allegedly Potted with Al-Qaeda to Kill Americans Overseas Charged in NYC, NBC News, Mar. 20, 2013, http://usnews.nbcnews.com/_news/2013/03/20/17389313-terror-suspect-who-allegedly-plotted-with-al-qaeda-to-kill-americans-overseas-charged-in-nyc?lite; Saudi Native Charged in New York with Fighting for Al-Qaeda, CNN, Mar. 20, 2013, http://www.cnn.com/2013/03/20/justice/new-york-al-qaeda/index.html; Terrorism On Trial: Alleged Al-Qaeda Operative Indicted in US Court, International Business Times, Mar. 20, 2013, http://www.ibtimes.com/terrorism-trial-alleged-al-qaeda-operative-indicted-us-court-1140371; Saudier beschuldigd van moodcomplot tegen VS, de Volkskrant, Mar. 20, 2013, http://www.volkskrant.nl/sport/saudier-beschuldigd-van-moordcomplot-tegen-vs~a3412653/;

be the subject of extensive media coverage.  It is also conceivable that individuals

sympathetic to the defendant (or the causes he supports) or hostile to the government may

seek to obtain information about the jurors.

The Second Circuit has repeatedly held that the expectation of publicity at trial

weighs in favor of anonymity to avoid the jurors' exposure "to inappropriate contacts that

could compromise the trial."  Paccione, 949 F.2d 1183, 1193 (2d Cir. 1991); see also Thai,

29 F.3d 785, 801 (2d Cir. 1994); Vario, 943 F.2d 236, 240 (2d Cir. 1991); Tutino, 883 F.2d

at 1132; Persico, 832 F.2d 705, 717 (2d Cir. 1987); Barnes, 604 F.2d at 141.  Juror

anonymity is an effective remedial measure to prevent possible prejudice and inappropriate

contact by the press.

Moreover, potential jurors will be more willing to serve if they are confident

that they and their families will not be subjected to scrutiny, harassment, and possible threats.

See Barnes, 604 F.2d at 141 (upholding anonymous jury and explaining that in a case with

"much pretrial publicity"  and "allegations of dangerous and unscrupulous conduct,"

"precaution was best taken so that fears would not become realities").  The media's interest

in this case clearly "militate[s] in favor of an anonymous jury." Vario, 943 F.2d at 240.

In addition, because anonymity would be useless if jurors were permitted to

interact freely with the public in the courthouse during recesses and at the beginning and end

of each trial day, the jurors should be kept together during recesses, taken or provided lunch

as a group, and escorted to and from the courthouse in a manner designated by the Marshals

Service.  Persico, 832 F.2d at 718; United States v. Maldonado-Rivera, 922 F.2d 934, 971

(2d Cir. 1990).

C.      An Anonymous, Partially Sequestered Jury Will Not Prejudice The Defendant

The defendant will not be prejudiced by the use of an anonymous, partially

sequestered jury.   As noted above, the use of an anonymous jury does not infringe a

defendant's rights provided that (1) "the jurors [are given] a plausible and nonprejudicial

reason for not disclosing their identities"; and (2) "the court conducts a voir dire designed to

uncover any bias as to the issues or the defendants." Aulicino, 44 F.3d at 1116.  ; see also

Kadir, 718 F.3d at 120.

Here, the jurors may accurately be informed that their identities are being

withheld due to anticipated media interest, to prevent any arguable inference that the

defendant himself poses a danger to them.  See Gotti, 459 F.3d at 345 (upholding use of

anonymous jury and finding that prejudice was avoided by "instructing the jury that the

special precautions had been implement to protect them from the media"); see also Thai, 29

F.3d at 801 ("In order to provide a nonprejudicial reason for maintaining anonymity, the

introduction to the [jury] questionnaire stated, with approval of the parties, that '[s]electing

an anonymous jury is not an unusual practice and has been followed in many cases in the

Federal Court.  Anonymity will ward off curiosity that might infringe on juror's

privacy[.]'"); Paccione, 949 F.2d at 1193 (upholding anonymous jury and finding that the

court "adequately instructed the jury at the outset of the trial that the special precautions were

designed to protect the jury from contacts by the media, thereby implying that the security

measures were not the result of threats from the defendants"); Tutino, 883 F.2d at 1133

(upholding anonymous jury procedure where the jury was instructed that "It is a common

practice followed in many cases in Federal court to keep the names and identities of the

jurors in confidence.  This is in no way unusual.").  Kaziu, 559 F. App'x at 38 ("the district

court told jurors that their identities were being hidden only because of the extensive media coverage and did not implicate Kaziu's dangerousness").  Thus, in keeping with Second Circuit precedent, the Court can eliminate any potential prejudice to the defendant by issuing an instruction informing the jury in a neutral manner that anonymity is necessary to protect them from the media, and that selection of anonymous juries is not an unusual procedure.

Furthermore, the use of an anonymous and partially sequestered jury does not conflict with the defendant's right to conduct meaningful voir dire.  See Rosales-Lopez v. United States, 451 U.S. 182, 188 (1981).  As the Second Circuit explained in Barnes,

> as long as a defendant's substantial rights are protected by a voir dire designed to uncover bias as to issues in the case and as to the defendant himself, then reasonable limitations on the questioning should not be disturbed on appeal.

604 F.2d at 140.  The trial court has substantial discretion in controlling and limiting the voir dire process.  See Rosales-Lopez, 451 U.S. at 189; Barnes, 604 F.2d at 137.  Accordingly, a full voir dire may be conducted about subjects other than the juror's name, address and employer's name, and the parties and counsel have an unrestricted opportunity to observe the jurors during this process.  See, e.g., Barnes, 604 at 142–43.

In the anonymous jury context, the Second Circuit has frequently noted that a defendant's rights are protected by the district court's conduct of "a voir dire designed to uncover bias as to issues in the cases and as to the defendant[s]."  Vario, 943 F.2d at 242 (quoting Barnes, 604 F.2d at 140); see also Thai, 29 F.3d at 801.  Here, through the use of a questionnaire, the parties can receive ample information about the background and possible bias of potential jurors.  See, e.g., Thai, 29 F.3d at 801; Paccione, 949 F.2d at 1192; Vario, 943 F.2d at 241–42; Tutino, 883 F.2d at 1133; United States v. Edmond, 730 F. Supp. 1144,

1149 (D.D.C. 1990) (recognizing use of juror questionnaire as efficient means of eliciting information necessary to provide meaningful <u>voir</u> <u>dire</u> while protecting jurors' identities). Accordingly, under the circumstances presented, empaneling an anonymous, partially sequestered jury will not prejudice the defendant.

<u>CONCLUSION</u>

For the reasons set forth above, the Court should grant the government's motion for an anonymous and partially sequestered jury.  The Court should specifically order (1) that the names, addresses and workplaces of members of both the <u>venire</u> and <u>petit</u> juries not be revealed; (2) that the jurors be kept together during recesses and taken to or provided lunch as a group each day during trial; and (3) that they be escorted to and from the courthouse each day during trial in a manner to be arranged by the United States Marshals Service.

Dated: Brooklyn, New York
      April 8, 2016

Respectfully submitted,

ROBERT L. CAPERS
United States Attorney
Eastern District of New York

By:                 /s/
      Shreve Ariail
      Melody Wells
      Matthew J. Jacobs
      Assistant United States Attorneys
      (718) 254-6616/6422/6401

cc:    Counsel for Defendant, via email and ECF