```
 1   UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
 2   ------------------------------x
                                        12-CR-134(BMC)
 3   UNITED STATES OF AMERICA,
                                        United States Courthouse
 4           Plaintiff,                 Brooklyn, New York

 5           -against-                  May 13, 2016
                                        11:30 a.m.
 6   IBRAHIM SULEIMAN ADNAN ADAM
     HARUN,
 7           Defendant.
     ------------------------------x
 8
          TRANSCRIPT OF CRIMINAL CAUSE FOR STATUS CONFERENCE
 9            BEFORE THE HONORABLE BRIAN M. COGAN
                 UNITED STATES DISTRICT JUDGE
10
     APPEARANCES
11
     For the Government:       ROBERT L. CAPERS, ESQ.
12                             United States Attorney
                               Eastern District of New York
13                             271 Cadman Plaza East
                               Brooklyn, New York 11201
14                             BY:  SHREVE ARIAIL
                                    MATTHEW JACOBS
15                                  MELODY WELLS
                               Assistant United States Attorneys
16
     For the Defendant:        ROTHMAN, SCHNEIDER, SOLOWAY
17                             & STERN, LLP
                               100 Lafayette Street, Suite 501
18                             New York, New York 10013
                               BY:  DAVID STERN, ESQ.
19
     For the Defendant:        LAW OFFICES OF JOSHUA L. DRATEL, P.C.
20                             29 Broadway, Suite 1412
                               New York, New York
21                             BY:  JOSHUA L. DRATEL, ESQ.

22   Court Reporter:           LINDA D. DANELCZYK, RPR, CSR, OCR
                               Phone:  718-613-2330
23                             Fax:  718-804-2712
                               Email:  LindaDan226@gmail.com
24
     Proceedings recorded by mechanical stenography.  Transcript
25   produced by computer-aided transcription.
```

Proceedings

1          (Interpreter sworn.)

2          THE COURTROOM DEPUTY:  United States versus Adnan

3   Hausa, Docket number 12-CR-134.

4          Counsel, please state your appearances, starting

5   with the government.

6          MR. ARIAL:  Good morning, Your Honor.  Shreve Arial,

7   Melody Wells and Matt Jacobs for the United States.

8          MR. JACOBS:  Good morning.

9          MS. WELLS:  Good morning.

10          THE COURT:  Good morning.

11          MR. STERN:  David Stern and Joshua Dratel for

12   Mr. Harun.

13          MR. JACOBS:  Good morning, Your Honor.

14          THE COURT:  Good morning.

15          All right, the defendant is not present.  Let me

16   explain for the record how that came about, and then I'm going

17   to solicit input from the marshal, who is also present, and

18   ask the attorneys what they think we ought to do about it.

19          Just to very briefly recount the history of the

20   case.  The defendant has either refused to be brought to court

21   from the MDC on prior occasions for conferences, or has been

22   disruptive once we have brought him into court and thus has

23   not been present.

24          I had signed previously, as we discussed at the last

25   conference, I had signed a force order requiring the marshals

Linda D. Danelczyk, RPR, CSR
Official Court Reporter

Proceedings

1  to use whatever forces necessary to bring him today to the

2  proceeding.

3          I received a call a little while ago, about an hour

4  ago, from the marshals saying that force had been in fact

5  required; that they had put him in the van, that they were

6  concerned that he was so violent that he was going to kick out

7  the windows on the van and they, therefore, had restrained his

8  hands and feet with shackles.  Not withstanding those

9  restraints, the defendant had managed to tear his clothing to

10  shred and, therefore, arrived in court wearing nothing but

11  underwear.

12          I talked to the marshals about whether it would be

13  possible to dress him.  The marshals said they could get a

14  shirt on him and have him sit here in his underwear.  I said

15  that's not acceptable.  They said it would be very difficult

16  to get pants back on him because they would have to unshackle

17  his feet and put pants on him.

18          And I said at that point, subject to input from the

19  parties, I'm going to have the adjoining courtroom set up with

20  a television monitor so that he can watch the proceedings with

21  an interpreter and have the proceedings translated for him.

22          Now, as I took the bench today, I heard and I

23  continue to hear as I'm here, the defendant is screaming

24  incoherently, even though he is not in the courtroom, he's in

25  the holding cell.  I don't know if the lawyers can hear it as

Linda D. Danelczyk, RPR, CSR
Official Court Reporter

Proceedings

1    well as I can, I'm sure the defense lawyers can, but it's

2    quite loud.

3              Let me ask one of the marshals to -- first of all,

4    have I gotten it right?  Tell me your name, sir.

5              MR. ELCIK:  James Elcik, sir.  E-L-C-I-K.

6              Yes, you have.  And we spoke on the phone earlier.

7              THE COURT:  Okay.

8              MR. ELCIK:  And that is an accurate statement.

9              THE COURT:  Is it possible to get him into the

10   adjoining courtroom so that he can watch these proceedings on

11   TV?

12             THE MARSHAL:  Yes.

13             THE COURT:  All right.  Is there any reason why you

14   think we shouldn't do that?

15             THE MARSHAL:  Aside from the fact that he may fight

16   with us.  We're going to have to take him out of the cell

17   eventually to get him back downstairs anyway, so if that's

18   your wish, we will certainly comply.

19             THE COURT:  Do any of the parties have a view on

20   this?

21             MR. STERN:  May we have a moment, Your Honor to

22   discuss this?

23             THE COURT:  Sure.

24             (Pause.)

25             MR. JACOBS:  It was our position he shouldn't be

Linda D. Danelczyk, RPR, CSR
Official Court Reporter

Proceedings

1    brought today at all.  We understood the Judge's and the

2    government's position and he was brought.

3           It remains our position that there's no reason to

4    endanger marshals or him.  And while we have concerns about

5    his mental health, we know he's been evaluated before, we

6    continue to at least consider those concerns, but we don't

7    want him brought into a courtroom where he can get involved in

8    what can potentially result in more charges for him and more

9    danger for the marshals and for him.

10          We tried to see him and I think it's fair to say it

11   didn't have a favorable outcome.  He's not going to gain by

12   sitting in the other room because he doesn't listen to

13   anything.  So I would prefer he either be left where he is or

14   just brought back and not make it more complex than it already

15   is.

16          MR. STERN:  Your Honor, if I could add, he did not

17   engage us in a conversation where we could be heard and I

18   don't think that will change even with the interpreter

19   speaking on our behalf; he didn't listen, he yelled over us.

20   I don't think it would be any different in a courtroom.

21          And in addition to the whole question of the

22   marshal's safety and Mr. Harun's safety, I think that the

23   restraints that are -- right now he's in a cell, the

24   restraints that are going to be required to put him in a

25   courtroom for the safety of the marshals and the interpreter I

Proceedings

1  think is going to aggravate the situation in terms of his

2  hostility and his mental state.  So I don't know that that

3  would be a productive endeavor.

4           THE COURT:  All right, I'll hear from the

5  government.

6           MR. ARIAL:  Your Honor, a couple of things just in

7  terms of the narrative in terms of how things occurred this

8  morning before Your Honor came out.

9           We were advised that the defendant had actually

10 calmed down and was not overtly hostile.  Subsequently,

11 though, the defense counsel went in to speak with him and

12 that's when the defendant became enraged and began cursing in

13 English and then also speaking loudly and aggressively in a

14 foreign language, which I presume is Hausa, which is his

15 native tongue, and he also continues to speak in Hausa in an

16 aggressive manner.  So I just want to put that, make that

17 clear.

18          MR. STERN:  The interpreter told us some of it was

19 Hausa and some of it was in an unidentifiable language, or

20 maybe no language at all.  But it's true that some was Hausa

21 and it seems to be true that the interpreter hears it and

22 apparently some of it was not a language at least he was

23 familiar with and neither of us were familiar with.

24          MR. ARIAL:  And the reason, as Your Honor is aware

25 we brought the defendant here, and the safety concerns,

Linda D. Danelczyk, RPR, CSR
Official Court Reporter

7

Proceedings

1    obviously, are paramount here and particularly for the safety

2    of the marshals, that's our major concern.  But the reason we

3    brought him here was so that we could actually inform him of

4    the status of his case in some manner so that he knows he has

5    a trial date that is scheduled for October 24th.  So that he

6    also knows that his defense attorneys intend to seek to

7    adjourn that trial date for a substantial period of time, a

8    year from now, to conduct investigative measures that by all

9    accounts he disagrees with.

10            So I do appreciate that defense counsel is concerned

11   about getting him upset by bringing him in here.  I do

12   appreciate that he's not listening to them.  But that is his

13   MO, that is his engagement with this process, which is to

14   refuse to engage with this process.  If we could at least have

15   him present during the proceedings and we could actually

16   orally communicate to him what's happening, that actually

17   might, I believe, be helpful in terms of getting some kind of

18   a record that he knows what's going on and he's engaged in.

19            THE COURT:  Do you hear what's going on in there?

20            MR. ARIAL:  I do, Your Honor.

21            MR. STERN:  Judge, to the extent the government's

22   concerned, we can get the transcript, have it translated into

23   Hausa and mail a copy to him.  That would be at least as

24   effective as bringing him in here to holler and make sure no

25   one else can be heard.

8

Proceedings

1          MR. ARIAL:  And I'm not asking that he be brought

2   into this courtroom at all, Your Honor.  I'm not suggest that,

3   I was suggesting the alternative, which was to place him in

4   the adjourning courtroom so that he can hear the proceedings.

5          MR. JACOBS:  Your Honor --

6          THE COURT:  But if he's screaming at the top of his

7   lungs, as he's continuing to do, he will not hear.  That is

8   the problem.

9          Look, I appreciate the fact that the government

10  needs to do everything possible and I need to do everything

11  possible to give him an understanding of what's going on.

12         But keep in mind we've had extensive mental health

13  evaluations, and I have made the finding already that this is

14  a defendant who, with a resolution that I have not seen in any

15  other defendant, absolutely refused to acknowledge or

16  participant or have any interest in these proceedings in any

17  way and whose desire is simply to obstruct them as much as

18  possible and shield himself from any knowledge.

19         And short of administering drug treatment to him to

20  get him in a more somnolent state, which I don't hear anybody

21  abdicating, I don't know how we're going to convey that

22  information to him.

23         Your point -- I'm speaking to defense counsel -- of

24  sending him the transcript in Hausa, the indication is going

25  to be that he's going to rip it up, because he doesn't want to

Linda D. Danelczyk, RPR, CSR
Official Court Reporter

Proceedings

1    know.  That's his way of defeating the system.

2              Now that does not mean I won't that.  Again, we have

3    to make every effort to try to do that.  But there is a safety

4    concern that everyone's acknowledged.  Every time we require

5    the marshals to put their hands on him, somebody is at risk to

6    get hurt and I don't know that we gain anything from pushing

7    it further than we have today.

8              MR. ARIAL:  I guess, Your Honor, my concern is that

9    he have the opportunity to hear what's going on.  I'm with

10   you.  I don't think he's going to listen, I don't think he

11   cares.  But that at least he hears it from the Court, that he

12   hears what's going on in here in another room that is not, you

13   know, filled with defense counsel, government personnel,

14   people who might cause him to be animated.  That he at least

15   hear what's happening so we know that he's heard it and we

16   have that record.

17             I agree if we send the transcript to him, he'll rip

18   it up and he'll throw it away before he even looks at it.  And

19   if we do that, then I think we would be comfortable

20   proceeding.  But that's our request.

21             THE COURT:  All right, I have to balance the

22   possible utility of the marshals laying hands on him again and

23   literally strapping him into a chair in the adjourning

24   courtroom and the unlikelihood that he is going to follow the

25   proceedings at all.  Also there will be some risk to the

Linda D. Danelczyk, RPR, CSR
Official Court Reporter

Proceedings

1    interpreter who will be there.  I have to balance that against

2    the utility of his right to be present.

3          And I think the balance very easily comes out in

4    favor of not making another physical confrontation that's not

5    going to do him any good.  That's especially so because the

6    first thing we have to decide is when is the trial date.  We

7    haven't decided that.  Are we going to have him strapped in

8    next door for the 5, 10 or 15-minute conversation we need to

9    have in order to do that?  He certainly isn't going to give us

10   any input on his views on that.  I mean, we're all agreed on

11   that.

12         So I see no reason to subject him or the marshals,

13   or the interpreter or, frankly, defense counsel to any further

14   physical altercations.

15         What I think I want to do is just keep him in the

16   holding cell for now, let's talk about the trial date and then

17   when we adjourn, defense counsel and the interpreter and the

18   government as well, if it wants to be there, can go into the

19   holding area and tell him:  Your trial date is going to be at

20   this time.  And then at least there will have been an effort

21   to communicate with him.

22         MR. STERN:  Judge, I have two things to say:  One is

23   that, you know, I don't really think the government should go

24   back there.  He is in his underwear exposing himself.  It's a

25   very -- I don't know how to describe it, that's what it is.

Proceedings

1    And they can be confident that we will go and tell him the

2    things that you're suggesting we tell him.  We can write a

3    letter confirming that we told him those things.  And by

4    saying tell him, I mean the words will leave our mouths.  What

5    happens after that I don't know.

6           But the other suggestion, which I made before but

7    I'm hoping something can done about it, is that if we can get

8    a closed-circuit camera so that he can stay in his cell, they

9    can set up the screen outside his cell.  He could watch from

10   there and not put the marshals at risk and not put him at

11   risk.  The interpreter can be there outside the cell

12   translating for him or maybe through, I don't know the

13   technology.  But to bring him here like this isn't really good

14   for him, isn't good for us, it isn't good for anybody, and

15   doesn't really accomplish anything since we all acknowledge

16   that in some ways we're going through the motions by informing

17   him since he doesn't listen any way.

18          So if there's a trial in this case, and I expect

19   there will be, maybe that way we wouldn't have to bring him

20   every single day and go through this, and he would still be

21   present.

22          THE COURT:  You raise a valid point.  But there is a

23   question of how much in resources the government, and by that

24   I mean particularly the BOP, should be required to use to

25   indulge a defendant's absolute refusal to participate in the

Linda D. Danelczyk, RPR, CSR
Official Court Reporter

Proceedings

1   process.  On the other hand, I recognize we are using lots of

2   resources to do this every time any way.  That's for the next

3   hearing, okay?

4          Maybe I will do that at the next hearing, just

5   because there is no practical alternative.  But for today's

6   hearing, I'm just going to -- I think you are right there's no

7   point in holding him there screaming.  Let's get him back to

8   his cell at the MDC.  I am going to require defense counsel to

9   convey to him the rulings made as we continue with the hearing

10  today and confirm that they have done so by letter.  And

11  anything else they want to say to him is between them and him.

12  And there is just no reason to keep making this more difficult

13  than he's trying to make it.  Okay.

14          Is it possible or is it a security issue to keep

15  that door closed so we do not need to hear him screaming?

16          MR. ARIAL:  Your Honor.

17          THE COURT:  Yes.

18          MR. ARIAL:  I'm sorry.  I mean, our concern is that

19  down the road there's some sort of an appeal.  Obviously

20  that's our main concern here.  And if the only record we have

21  that this defendant was notified of a trial date that came and

22  went is through the expected testimony of Mr. Dratel or

23  Mr. Stern or Miss Kellman, I'm not sure that's a great

24  circumstance for us to be in.

25          I would just like for some objective manner for us

Proceedings

1     to be able communicate to him what's going on, and maybe we

2     can work this out after this appearance today.

3              THE COURT:  You can try to do that.  We will in

4     addition to counsel communicating with him send him the

5     translated transcript so that if he wants to read it, he can

6     read it.

7              I'll issue a short order summarizing whatever

8     rulings that I've made so it's only a couple of pages that has

9     to be translated and he has to read.

10             MR. ARIAL:  That's fine, Your Honor.

11             THE COURT:  Yes, I understand that you do not want

12    an appeal or a 2255 after this, but I do not see one here,

13    frankly.  I think everybody here, defense counsel, the

14    government, the marshals and myself and the interpreter have

15    done everything possible to get the smallest amount of

16    cooperation from this defendant.  He's just made it as clear

17    as he can that he is going to fight us at every opportunity.

18             That does not mean that we stop making efforts, but

19    it does mean that we cannot put people at risk for the sake of

20    protecting an issue from appeal that to me at this point, at

21    this point -- and I do not know, I'm not going to predict what

22    is happens going forward -- but at this point is not a real

23    vulnerability of the case as to what happens in the future.

24             MR. ARIAL:  Understood, Your Honor.

25             I was going to move on to the second issue at hand,

Linda D. Danelczyk, RPR, CSR
Official Court Reporter

14

Proceedings

1  which is defense counsel's application to adjourn the trial

2  date.

3            THE COURT:  Right.

4            MR. ARIAL:  Which the government continues to object

5  to and I will just say to the Court when we left the Court

6  last week, the idea, as I understood it, was defense counsel

7  would reach out to the government and advise the government of

8  what things, what requests it could potentially facilitate to

9  give us some clarity in terms of what their needs were and

10  what the basis for the actual adjournment was.

11           Thus far we've had no requests from the defense for

12  any assistance in terms of the things that they are seeking,

13  and we have no real understanding why they are actually

14  seeking an adjournment, other than the representation that's

15  been made ex parte.  So we're at a difficult spot, Your Honor.

16           THE COURT:  And you understand the irony of that,

17  right?  I mean, the irony of that is that the defendant is in

18  a difficult spot because of the CIPA production protocol that

19  does not let them know for sure that they have what they need

20  to defend the case.

21           I have ex parte submissions from the government on

22  that, and I've done the best I can to make sure that the

23  defendants have what they need.  But I am not the defense

24  counsel, nevertheless the statute charges me with that role.

25           I also have, you may have not heard from the

Linda D. Danelczyk, RPR, CSR
Official Court Reporter

Proceedings

1    defendant again, but I have, I've gotten a second ex parte

2    letter, and let me say I know exactly why they are not talking

3    to you about what they need, because if they were to talk to

4    you about what they need, the only way I can conceive of to do

5    that would be to disclose their investigative efforts and

6    basically give you a roadmap to the defense.

7           And so here I am in the middle, where a judge always

8    is, but a little unusually I am in the middle kind of

9    mediating two sides who are, for different reasons, in partial

10   darkness about where the case is going, and I have to make

11   determinations of adequacy of your position and their position

12   without either one of you giving me the benefit of whether you

13   think each other's position is correct.

14          MR. ARIAL:  And I understand that that is your role

15   as a judge, obviously, Your Honor.  But when we left last

16   time, they had advised us that there were things that they

17   thought we could them with, and I'm sure there are.  I think

18   if their theory of defense, whatever it might be, involves

19   sending off investigators to Afghanistan, to Pakistan, to

20   Libya, to places that are around the globe, war zones, you

21   know, those sorts of expeditions, while I understand in a

22   traditional case might be reasonable or easily obtained, here

23   we're in a different circumstance, and I think we are in a

24   position probably to assist them on those sorts of things.

25   And if they would engage with us, we might be able to resolve

Linda D. Danelczyk, RPR, CSR
Official Court Reporter

Proceedings

1    some of that earlier.

2            THE COURT:  Well, maybe.  But the fact of the matter

3    is, you can help them at a very -- at a 50,000-foot level,

4    which is where it would have to stay.  I'm not sure that kind

5    of help would be of any assistance to them without disclosing

6    to you what they want to do when they come down from that

7    50,000-foot level, or to say it another way, if they tell you

8    they want to go to a certain area of Afghanistan, the

9    government is going to be able to figure out why they are

10   going, who they want to see and what they want to talk about.

11           MR. ARIAL:  And if they do want to go to a certain

12   part of Afghanistan, they are going to need the government's

13   assistance, no doubt.

14           THE COURT:  Some parts of it, yes.  Look, we're

15   using Afghanistan as an example.  There may be other places.

16   And I'm not saying they've said they want to go to

17   Afghanistan.  I'm not telling you anything about the strategy

18   that they have told me, except I will say because I don't

19   think it's confidential, they need to go places, okay,

20   difficult places, some of which they can get to themselves

21   without the government's assistance, some of which they may

22   need the government's assistance, they may not.

23           But all of which, I think, to the extent they --

24   almost all of which, to the extent they brought the government

25   in, would give the government an advantage in knowing where

Linda D. Danelczyk, RPR, CSR
Official Court Reporter

Proceedings

1    their case is going that the government does not ordinarily

2    get in criminal prosecutions.  That's the problem.

3            MR. ARIAL:  And I understand these are not ordinary

4    criminal prosecutions.  So to the extent that defense counsel

5    can and the Court can facilitate that process in terms of

6    making requests early, I'm sure in certain there are things

7    that we can do to assist them.

8            THE COURT:  Don't be so sure.  Having read their

9    letter, I'm just telling you, don't be so sure.

10           I know the desire to help is genuine.  I am not

11   questioning that.  And it's the desire to help being genuine

12   because you want to keep the trial date, so I understand it.

13   But there's a lot they have to do that they can do without

14   you, but it's going to be hard work whether they do it through

15   you or not.

16           All right.  Anything the defendants need to add to

17   what I have just said?

18           MR. STERN:  No.

19           MR. ARIAL:  Your Honor, if I also may be heard in

20   terms of the delay.

21           THE COURT:  Yes.

22           MR. ARIAL:  I understand that there are

23   investigative tasks that we aren't aware of.  Again, I'm in

24   this position of advocating without full information as we

25   both sides are, apparently.

Proceedings

1          However, as is it stands, the trial date is

2    October 24th.  That is approximately six months from now.  The

3    adjournment that they seek, as I understand it, is to April of

4    2017.  That is a year from now, and --

5          THE COURT:  Well, it's a year from now, but it's

6    only six months from the trial date, right, if it's six months

7    adjourned.

8          MR. ARIAL:  Yes, but that is a year from now.  And

9    that, from our perspective, regardless of what investigative

10   task need to be done is a long time for a case that was

11   charged four years ago for crimes that occurred many years

12   ago; when we have victim family members who are seeking

13   resolution in this case, when we've had significant

14   adjournments due to issues that out of everybody's control,

15   except for the defendant's, so if there is an adjournment, and

16   it sounds like Your Honor is considering it given the

17   statements you've said here earlier today, we would request

18   that we proceed to trial by the end of the year or early in

19   2017 at the latest.

20         THE COURT:  Anything to that?

21         MR. STERN:  I guess only this:  The government

22   investigates cases for as long as they want under the Statute

23   of Limitations and it indicts people and then they are ready

24   and we get these massive cases with tons of information to be

25   investigated, and they want us to do it in what they say is a

Proceedings

1    long time.  But they take all the time they need and now, for

2    reasons we've articulated to the best we can, we need this

3    time.  We feel like we have an immense amount to do.

4              THE COURT:  All right.  I am convinced by the

5    defendant's ex parte submissions that there are -- the only

6    thing that weighs against granting an adjournment is that

7    there are things the defendants want to do, and if I were in

8    their shoes I would want to do them, too, things that should

9    be done, but I think there's some things they want that are

10   not going to get done if I gave them a year or two years to do

11   them.  Nevertheless, they have got to make the effort.

12             And I want to talk about that for a minute because

13   there was a suggestion at the last hearing that unless the

14   defendant gives active instructions to defend to his

15   attorneys, then they may not have an obligation to pursue

16   those leads.

17             You want to worry about appellant issue or 2255

18   issues, that is the one to worry about, all right?  The

19   possibility that this defendant might go ahead and a month

20   before the scheduled trial suddenly say, yes, I want to defend

21   this case and his attorneys, because they have no direction,

22   have done nothing to prepare the case.  That to me is a

23   position that I will not put the Court in.

24             So I am in agreement with defense counsel that

25   notwithstanding the lack of input from their client, they have

Linda D. Danelczyk, RPR, CSR
Official Court Reporter

Proceedings

1    to undertake to prepare the best defense that they can.  That

2    is their ethical and legal obligations to do.  But I don't

3    think that April of next year is going to be any better than

4    February of next year.

5            What I am going to do is this because I understand

6    the government's logistical problems.  I am going to reset the

7    trial for whatever date in February or March the government

8    says it can coordinate its witnesses.  I will leave it open

9    now, give you a couple of weeks, whatever I've got in February

10   and March I will move to accommodate this case.  And if you

11   can be ready February 1st, then we will pick on February 1st.

12   And if you cannot be ready until March 1st, then we will pick

13   on March 1st.

14           But looking at the tasks that the defendants have to

15   do which are onerous, I mean really onerous and yet perfectly

16   necessary in a case like this, either it's going to get done

17   by that timetable or it's not going to get done at all, in my

18   view, and some of it is not going to get done at all.

19           So I think that's the new timetable I want to set

20   that is going to keep a trial date open right now until I hear

21   from the government as to what you want.

22           MR. ARIAL:  Certainly, Your Honor.  And just so the

23   Court is aware, our main concern in terms of foreign witnesses

24   are the Italian witnesses and we are meeting with them in the

25   near term over the next week and so that will actually drive a

Linda D. Danelczyk, RPR, CSR
Official Court Reporter

Proceedings

1    lot of our concerns --

2               THE COURT:  Okay, you will get back to me when you

3    can.

4               MR. ARIAL:  It will likely be early February, but...

5               THE COURT:  Okay.  You know, it is essentially a

6    four-month delay of the trial to make absolutely certain that

7    this very difficult defendant has any due process concerns

8    that are possible satisfied.  And I think the investment of

9    that time is well worth it, and as I said before, the

10   government chose to bring a criminal prosecution in this

11   manner.  And doing so, we have to make some extra effort to

12   make sure that as something we all concede is a very

13   unorthodox case does not end up depriving the defendant of any

14   process that he is possibly seeking.

15              So that's going to be the new timetable, and the

16   government will let me know.

17              All right.  Anything else?

18              We are still going to use October 24th as a status

19   conference, just so we make sure that we are on track, but I

20   am telling the defendant that it will have to be much more

21   than you've given me so far to get a further adjournment.

22              Really, I am looking at what you told me you had to

23   do.  I am not disregarding any of that.  I thought everything

24   you said are things that really have to be done, and I do not

25   think it is going to require or even tolerate much assistance

Proceedings

1    from the government, but that's the absolute.

2              And also I will mention, it is not that long for a

3    case like this.  I mean, my God, two years ago I tried a mafia

4    case that was indicted in 2008, and it was tried in 2015 and

5    the crimes had occurred in the 1990s.  So these things happen

6    in these cases.

7              MR. ARIAL:  I understand, Your Honor, and it's just

8    that this case has had some lags and we're looking for

9    finality.

10             The only thing else I would request is with respect

11   to the trial date, that when we submit a proposed trial date

12   that we also set a motion schedule or a proposed motion

13   schedule upon agreement by the parties so that we have some

14   clarity because there are other hearings that could come up

15   beforehand that are complicated as well and we'll want to get

16   those done.

17             THE COURT:  I think that's a good point.  If it's

18   possible, I'd like to have motions filed by October 24th.

19             MR. ARIAL:  That's feasible and it's certainly

20   reasonable with a couple of exceptions, maybe some in limine

21   issues that we may not be able to forecast.

22             Another issue is, obviously, that depending on what

23   we get and, you know, where we are by that time.  The other

24   is -- and, obviously, we will working on this in the interim,

25   sometimes the CIPA stuff takes a little bit longer.

Proceedings

1          THE COURT:  Well, I factored that in, okay.  You've

2    told me the difficulties with that in your letter, and I agree

3    with you, and I'm thinking how much time can this take.  And

4    like I said, you're either going to get to the bottom of that

5    within this time or you're not.  So I am taking that into

6    account.

7          MR. ARIAL:  Your Honor, I think in terms of in

8    limine issues, I think that those are particularly the types

9    of things that we should be dealing with earlier rather than

10   later given the nature of the case and the classified issues

11   that could come up, because many of the in limine issues

12   ultimately are going to be the most difficult issues that we

13   are going to have address before trial.

14         THE COURT:  I want those motions made by

15   October 24th, to the extent they're based on information that

16   was known prior to October 24th.

17         MR. ARIAL:  And that was my point, Your Honor.

18         THE COURT:  If something comes up later, it will

19   come up later, but there has to be cause to make a motion

20   later than October 24th.

21         The other thing with the in limine motion is before

22   you file them, please talk to your adversary.  Sometimes these

23   things get consented to and filed for no reason and that will

24   save everyone a lot of time.  Okay?

25         Anything further we need to address?

Proceedings

1          MR. STERN:  Not from us.

2          MR. ARIAL:  No, Your Honor.

3          In terms of speedy trial, though, we would ask that

4   time be excluded because of the complexity of the case and the

5   motions and the trial schedule as it is.

6          THE COURT:  All right, that's fine.  At this point I

7   will exclude time until October 24th.  I have previously found

8   the case to be quite obviously complex.  I expect I will

9   exclude more time until the trial, once we know what the

10  actual start date is.  And the government will get back to me

11  with that as soon as possible.  But for now, time is excluded

12  until October 24th.

13         Okay, thank you all.

14         MR. ARIAL:  Thank you.

15         THE COURT:  Thank you, marshals, I appreciate your

16  efforts.

17         (Matter concluded.)

18

19                    *    *    *    *    *

20

21  I certify that the foregoing is a correct transcript from the
    record of proceedings in the above-entitled matter.
22

23         /s/ Linda D. Danelczyk              June 27th, 2016

24         LINDA D. DANELCZYK                  DATE

25