SA:MJ/MW/JNK
F. # 2011R01313

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

– – – – – – – – – – – – – – – – – – – – – – – – –X

UNITED STATES OF AMERICA

   - against -

IBRAHIM SULEIMAN ADNAN ADAM
HARUN HAUSA,
      also known  as "Spin
      Ghul," "Esbin Gol," "Isbungoul,"
      "Abu Tamim," "Joseph Johnson,"
      and "Mortala Mohamed Adam,"

         Defendant.

– – – – – – – – – – – – – – – – – – – – – – – – –X

Docket No. 12–CR-134 (S1) (BMC)

## GOVERNMENT'S MEMORANDUM OF LAW IN SUPPORT OF MOTIONS IN LIMINE TO ADMIT EVIDENCE AND TO PRECLUDE AN IMPROPER DEFENSE

ROBERT L. CAPERS
UNITED STATES ATTORNEY
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

Shreve Ariail
Melody Wells
Matthew J. Jacobs
Assistant U.S. Attorneys

Joseph N. Kaster
Trial Attorney,
Counterterrorism Section,
National Security Division
(Of Counsel)

**Table of Contents**

PRELIMINARY STATEMENT ................................................................................................ 1

FACTUAL AND EVIDENTIARY BACKGROUND ............................................................... 1

    I.    HARUN's Mirandized Interview by the United States Government in Italy .................... 3

        A.    HARUN's Miranda Waiver .................................................................................. 3

        B.    Inculpatory Statements ........................................................................................ 7

        C.    HARUN's Initial Training with al-Qaeda ........................................................... 8

        D.    Attacks on Firebase Shkin .................................................................................. 8

        E.    The Ridgeline Ambush ....................................................................................... 9

        F.    HARUN's Transition to External Operations ..................................................... 11

        G.    Tasking by and Communication with Hamza Rabia ........................................... 12

        H.    HARUN's Plot to Attack Government Facilities in Nigeria ............................... 12

        I.    The Arrest of Ashafa and Disruption of HARUN's Embassy Bombing Plot ....... 13

        J.    HARUN's Capture and Incarceration in Libya .................................................. 14

        K.    HARUN's Terrorist Interactions ......................................................................... 15

    II.    Prior Interviews by the Italians ................................................................................. 16

        A.    Statements to the Italian Law Enforcement Onboard the *Excelsior* ..................... 16

        B.    June 25, 2011 Post-Arrest Interview in Taranto ................................................. 18

        C.    Preliminary Court Proceeding in Agrigento on June 27, 2011 ........................... 19

        D.    July 25, 2011 Interview ...................................................................................... 19

        E.    August 24, 2011 Video Recorded Interview ....................................................... 20

    III.    Additional Statements in the United States ................................................................ 20

    IV.    Additional Evidence Related to HARUN's Involvement in the Ambush of U.S. Soldiers in and around Firebase Shkin ..................................................................................... 22

    V.    Expert Testimony Regarding al-Qaeda, GSPC and Jihadist Groups Operating in Nigeria, Niger, and Libya ...................................................................................................... 25

    VI.    Other Physical Evidence Related to al-Qaeda ............................................................ 27

    VII.    Additional Evidence Related to HARUN's Use of the usust- and slslglgl-- Email Accounts ................................................................................................................. 29

    VIII.    Additional Evidence Related to HARUN's Efforts in Nigeria on Behalf of al-Qaeda .... 30

    IX.    HARUN's Transfer to U.S. Custody ......................................................................... 31

ARGUMENT .................................................................................................................... 32

    I.    The al-Qaeda Journal ................................................................................................ 33

    A. The Discovery of the al-Qaeda Journal and a Summary of its Content................... 33

    B. The al-Qaeda Journal Is Relevant .......................................................... 34

    C. A Proper Foundation Exists for the al-Qaeda Journal ............................ 35

    D. The Content of the al-Qaeda Journal is Not Barred by the Rule Against Hearsay.. 36

    E. Residual Exception ............................................................ 43

II.   The Defendant Should be Precluded from Asserting the "Lawful Combatant Immunity" Defense ......................................................................... 44

    A.   Legal Standard .......................................................... 45

    B.   The Defendant is Not Entitled to Present Evidence or Argument in Support of a Lawful Combatant Defense ................................................... 46

CONCLUSION............................................................................... 51

## PRELIMINARY STATEMENT

The government respectfully submits this memorandum of law in support of its motions in limine in advance of trial, currently scheduled to begin on February 21, 2017. Generally, the government seeks to admit evidence set forth in detail below, all of which is relevant to the defendant's conduct as a member of al-Qaeda in connection with the charges, pursuant to Federal Rules of Evidence 401, 402, 403, and 404(b). More specifically, the government moves the Court in limine to admit an al-Qaeda journal, recovered near Shkin, Afghanistan, on April 25, 2003. The government also moves the Court in limine to preclude the defendant from offering an improper defense, specifically evidence or argument that the defendant should be considered a lawful combatant entitled to immunity.

For the reasons set forth below, the Court should grant the government's motions in limine in their entirety.

## FACTUAL AND EVIDENTIARY BACKGROUND

As set forth in the indictment, IBRAHIM SULEIMAN ADNAN ADAM HARUN HAUSA, also known as "Spin Ghul," "Esbin Gol," "Isbungoul," "Abu Tamim," "Joseph Johnson," and "Mortala Mohamed Adam" ("HARUN"), an al-Qaeda operative, is charged with conspiring to murder United States nationals in violation of Title 18, United States Code, Section 2332(b)(2); and conspiring to provide, providing and attempting to provide, material support to al-Qaeda in violation of Title 18, United State Code, Section 2339B, all in or about and between August 2001 and September 2011. In connection with the conspiracy to murder United States nationals, the government alleges multiple overt acts, including that: (a) in or about and between 2002 and 2003, HARUN, along with others attempted to kill United States military personnel in Afghanistan, (b) in

1

or about August 2003, HARUN traveled from Pakistan to Nigeria, and (c) in or about and between August 2003 and January 2005, HARUN traveled within Nigeria and other African countries.

HARUN is also charged with conspiring to attack a United States government facility in violation of Title 18, United States Code, Section 2332f, specifically United States diplomatic and consular facilities in Nigeria, in or about and between August 2003 and January 2005. Finally, HARUN is also charged with using firearms in furtherance of multiple crimes of violence in violation of Title 18, United States Code, Section 924(c), and with using or carrying an explosive to commit a federal felony, in violation of Title 18, United States Code, Section 844(h).

As set forth in more detail below, weeks before September 11, 2001, HARUN traveled to Afghanistan with the intention of joining a jihadist group. Upon arrival, HARUN quickly joined al-Qaeda, trained at al-Qaeda training camps, and participated in attacks on United States and Coalition troops in Afghanistan, one of which left two American soldiers dead and resulted in serious injury to others. In approximately August 2003, after having received additional training in explosives and chemical weapons from Abu Khabab al-Masri (then an explosives and chemical weapons expert working for al-Qaeda), HARUN traveled to Nigeria under the direction of al-Qaeda external operations leader Hamza Rabia ("Rabia"), also known as "Tom," with the intention of attacking United States Government facilities there. When HARUN's Nigerian plans were thwarted by the arrest of his al-Qaeda courier – Mohamed Ashafa – in Pakistan, HARUN traveled onward through Niger to Libya with the ultimate goal of reaching Europe to carry out terrorist operations against Western targets there. In January 2005, HARUN was captured in Libya. He was held in Libyan custody until June 2011, when he was released by Libya onto a refugee ship bound for Italy (near the time of the fall of former Libyan leader Muammar Qaddafi's regime). HARUN was

2

subsequently placed on an Italian ship bound for Taranto, Italy; while aboard the ship, HARUN assaulted Italian police officers and was arrested and charged in Italian criminal court.

I.      **HARUN's Mirandized Interview by the United States Government in Italy**

A.  HARUN's Miranda Waiver

Subsequent to HARUN's arrest onboard a ship, the *Excelsior*, bound from Italy carrying HARUN and a number of other refugees from North Africa, the government learned HARUN was in Italian custody. In September 2011, pursuant to a Mutual Legal Assistance Treaty request to the Italian authorities, representatives of the United States government traveled to Agrigento, Sicily, to conduct interviews of HARUN and Italian law enforcement officers involved in the case. The interviews took place on September 14, 15 and 16, 2011. Before the interviews, in the presence of defense counsel, the defendant was advised of, and agreed to waive, his Miranda rights.

Prior to the Mirandized interviews, HARUN was interviewed on several occasions in Italy. First, HARUN was interviewed on June 24, 2011, by Italian police officers onboard the *Excelsior* after he caused a disturbance by, in part, claiming to be a member of al-Qaeda. During this interview, HARUN also wrote a statement in Arabic admitting his membership in al-Qaeda. Second, after arriving in Italy, on June 25, 2011, HARUN was interviewed by Italian officials, in the presence of a defense attorney. Third, on June 27, 2011, in an Agrigento court, HARUN appeared before a preliminary investigative judge, related to his arrest, and he made additional statements, in the presence of the judge and a defense attorney. Fourth, on July 25, 2011, in the presence of two defense attorneys, HARUN made certain limited statements to Italian law enforcement. Fifth, on August 24,

3

2011, several weeks before the <u>Mirandized</u> interviews, Italian officials conducted an interview of HARUN in the presence of a defense attorney.[1]

Pursuant to the Italian legal process, the <u>Mirandized</u> interviews were audiotaped and conducted on the record in a courtroom in the Agrigento jail facility where HARUN was being held in connection with his assault charges.[2] An Italian magistrate presided over the hearing and HARUN was assigned Italian counsel. During the interview, HARUN was not handcuffed or otherwise physically restrained. All questions were posed either by the magistrate or by one of the two Assistant United States Attorneys present for the interview; questioning was done in Hausa, HARUN's native language, through an American Hausa-English interpreter.[3]

Prior to the first <u>Mirandized</u> interview, which took place on September 14, 2011, the magistrate, in accordance with Italian law, advised HARUN of the nature of the proceedings and began asking HARUN pedigree-type questions. The magistrate advised HARUN that although the substantive questions to follow would be voluntary, the pedigree-type questions were mandatory

---

[1] That interview was videotaped. The government recently learned of the statements made on June 27, 2011, and July 25, 2011. The government was previously aware of the defendant's August 24, 2011 statements to Italian officials and had received documents related to that interview, which were provided in discovery. However, the government recently learned of and received a video of that interview from the Italian government. This video was produced to the defendant on September 20, 2016. Based on records and reports recently provided by the Italian government, HARUN also appeared in Agrigento court in connection with his prosecution there on December 6, 2011, February 9, 2012, February 28, 2012, and on April 26, 2012.

[2] Transcripts of the September 2011 <u>Mirandized</u> interviews, and other statements to Italian officials, as well as all of the documents cited herein, are being reviewed and finalized prior to introduction at trial, and the Government's quotations, contained herein, are in draft, but near final form. Transcripts of the September 2011 <u>Mirandized</u> interviews are attached hereto as Exhibit A, but are submitted under seal and remain subject to the joint protective order dated October 2, 2012, which governs certain unclassified discovery in this case.

[3] When the magistrate posed his own questions, an Italian-English interpreter also interpreted each question and answer. A redacted photograph of the defendant in the Italian courtroom is attached as Exhibit B.

under Italian law. HARUN became agitated at the demeanor of the magistrate and questions about his current residence and employment.

HARUN stated that he was not refusing to answer questions, but rather that he was concerned about his lack of understanding regarding the law of Italy. HARUN then told the magistrate that he would not answer the pedigree questions, and that if the magistrate was "not pleased," HARUN would take his case to a "higher court." Subsequent to this exchange, the proceedings were adjourned for approximately fifteen minutes so that HARUN could consult with his Italian counsel regarding the proceedings and Italian law.

After HARUN consulted with his attorneys, the attorneys advised that HARUN wished to continue the proceeding. The magistrate then concluded his pedigree questions and advised HARUN that representatives of the United States were present and that the United States was investigating charges related to terrorist activity. An Assistant United States Attorney then advised HARUN of his rights under United States law, in substance as follows:

> We are here from the United States. United States law provides you with certain rights. Before we ask you any questions, we want to make sure that you understand your rights under U.S. law.
>
> You have the right to remain silent.
>
> If you have previously made statements, that does not mean you have to make statements to us now.
>
> Anything you say can be used against you in court.
>
> The Italian government has provided you with a lawyer. You have the right to consult with that lawyer at any time during this proceeding.
>
> Do you understand these rights?
>
> Are you willing to speak with us and to answer questions?

HARUN advised that he understood his rights under United States law and then agreed to answer questions. HARUN then spontaneously added that he wished to be "handed over" to the United States to answer more questions there.

HARUN was also advised of his rights under Italian law by the magistrate, including the right not to answer (non-pedigree) questions. HARUN then advised that he understood his rights under Italian law and again agreed to answer questions.

After a short break, the interview continued throughout most of the rest of September 14, 2011. HARUN was provided water, a lunch break, and time to pray. He was also instructed that he would have the opportunity to consult with counsel at any point during the interview. The same procedures were followed on September 15, 2011, and September 16, 2011. At the beginning of each day of interviews, HARUN was read his Miranda warnings and on each day he orally waived those rights and agreed to be questioned.

HARUN was a willing, eager and willful participant in the entire interview process. He answered questions fully, and often at length, in great detail and on his own terms. For example, at one point during the proceedings HARUN provided a lengthy description of his actions just prior to the April 25, 2003 ambush. When he was interrupted, HARUN expressed irritation at being cutoff stating, "I was trying to give you a long history of how the events transpired. Now since you want the, you, you want it quickly . . . . What I'm saying right now is, I'm trying to give you a description of that first strike." At another point during the proceedings, when HARUN stated that he had sworn *bayat,* or an oath of loyalty through the al-Qaeda military commander Abdul Hadi al Iraqi ("Abdul Hadi") to Osama bin Laden, he sought to confirm that his answer would be taken back to the United States.[4] As another example, on the second day of interviews, after HARUN was advised of his

---

[4] Abdul Hadi al Iraqi is currently in custody in Guantanamo Bay, Cuba.

Miranda rights a second time, he advised that he was "not playing around" and that he understood that "we are continuing from where we left off yesterday." Throughout the course of the interviews, HARUN regularly directed the Government to modify its questions, either because he did not wish to hurry past an important point, or because he believed the questions were flawed. HARUN also provided written consent to search one of his email accounts, (referred to herein as "*usust-*"), which he indicated he had used to communicate with Hamza Rabia, also known as "Tom," and Rabia's assistant, whose name HARUN could not specifically remember, but who HARUN identified as a Pakistani. Finally, at the conclusion of the interviews on September 16, 2011, HARUN expressed disappointment that American representatives would not be taking him back to the United States with them, stating "when I arrived [in Italy], what I, uh wanted was either to be turned over to my country or to the Americans."

       B.  Inculpatory Statements

During the Mirandized interviews, HARUN indicated that he was born in Saudi Arabia in 1971 and that he considered himself to be Nigerien. HARUN stated that approximately two weeks prior to September 11, 2001, he had traveled to Afghanistan with the purpose of joining a jihadist fighting group, so that he could fight in Chechnya or elsewhere. He then detailed his travel from Saudi Arabia to Karachi, Pakistan. Upon arrival in Karachi, HARUN traveled by airplane to Quetta, where he crossed the border into Afghanistan by car. Upon arriving in Afghanistan, HARUN was immediately embraced by members of al-Qaeda, and he stayed in an al-Qaeda guesthouse known as *Annibras*. HARUN stated that he was present in *Annibras* on September 11, 2001, and heard the celebratory calls of al-Qaeda members over the radio when news of the attacks on the United States were reported.

7

C.   HARUN's Initial Training with al-Qaeda

Several days after September 11, HARUN was sent for training in anticipation of the impending American invasion. Ultimately, HARUN traveled to an al-Qaeda training camp near Kandahar known as *al-Farouq*. He spent approximately a month receiving basic military training on weapons such as the AK-47, M-60, and Uzi machine guns, as well as on the use of rocket propelled and hand-held grenades. HARUN identified a number of the other trainees at the camp.

After his training at *al-Farouq*, HARUN was sent to a second al-Qaeda training camp, called *Malik* or *al-Malik*, which he said was located approximately 20 kilometers north of Kabul. At *Malik,* HARUN learned how to operate SAM-7 surface-to-air missiles. HARUN then went to a third camp, called "Camp 9." At Camp 9, which was under the control of an al-Qaeda military commander named Abdul Wakil al-Masri, HARUN took various courses related to military mapping, terrain analysis, and geography. HARUN was also given instructions on the use of TNT and other explosives. At Camp 9, HARUN explained, he also received his *kunya* or *nom de guerre,* "Spin Ghul." According to HARUN, the name, which is Pashto for "White Rose," was given to him because it had previously been used by a Somali martyr. HARUN indicated that he was at Camp 9 when the United States military invaded Afghanistan. At the time of the invasion, HARUN explained, the trainees in Camp 9 were split in to two groups, and his group was immediately evacuated from Afghanistan into the Federally Administrated Tribal Areas (the "FATA") of Pakistan.

D.   Attacks on Firebase Shkin

According to HARUN, he and his fellow fighters traveled to Waziristan, a province within the FATA. In Waziristan, they operated under the overall leadership of al-Qaeda's senior military commander, Abdul Hadi al-Iraqi.  From their base in Waziristan in the FATA, HARUN and

the others carried out cross-border attacks on United States military and Afghani military forces in Afghanistan.

HARUN specifically described attacks against the American firebase in Shkin, Afghanistan that ultimately led to his being wounded and reassigned to al-Qaeda's external operations. The American base in Shkin was directly across the border from Angor Ada, Pakistan. HARUN stated that he did not know the exact dates of the attacks because he did not carry a calendar at the time, but he was certain they took place in either 2002 or 2003; that they occurred shortly before a publicly scheduled visit to Afghanistan by then-Secretary of Defense Donald Rumsfeld that was later canceled or postponed; and that the attacks began with rocket fire and culminated a few days later with an ambush that took place on a Friday.

HARUN stated that prior to Rumsfeld's planned visit, he and other members of his al-Qaeda fighting group walked on foot from Waziristan to Afghanistan to carry out these attacks. On what he believed to be a Wednesday, from a position near the Shkin firebase, HARUN indicated that he and other al-Qaeda fighters launched at least four rockets at the base. According to HARUN, he handled all calibrations for the rockets. HARUN later learned from local villagers that two of the rockets landed outside of the base, one hit a vehicle, and one hit the wall of the compound. HARUN and his group then fired additional rockets at the base. HARUN explained that other al-Qaeda fighting groups were also operating nearby. Notably, HARUN said that he was carrying a Koran with him on the day of the attack.

E.  The Ridgeline Ambush

HARUN stated that on Friday of the same week, he and his group directly fought American soldiers. During the engagements, HARUN fired his AK-47 and threw numerous

9

grenades. HARUN believed that his own shots and grenades likely injured or killed at least one of the Americans.

HARUN explained that while his group was attempting to set up their rockets for additional strikes at the firebase, he saw an American Apache helicopter and an American Chinook helicopter. He believed he was a short distance south of the Waziristan town of Angor Ada. When the Apache helicopter approached his position, HARUN fired his weapon at it, though without apparent effect. The Apache then flew out of range, and along with the Chinook, eventually left the area of FOB Shkin. HARUN then heard the sound of American military vehicles approaching from the firebase. HARUN observed two American soldiers approaching his position, looking for HARUN and the other fighters. HARUN then observed the two soldiers return to a military vehicle located on a ridgeline directly above his position. HARUN opened fire with his AK-47 and yelled "Allah Akbar!" HARUN explained that he was carrying eight grenades, and that he threw multiple grenades at the American soldiers on the ridge. HARUN believed that one or more Americans were wounded, and either saw or heard a vehicle drive away with a wounded soldier. HARUN said that he was close enough to observe specific movements and characteristics of the servicemen involved. For example, HARUN identified one of the soldiers (referred to herein as "Soldier A") as a "large black man." HARUN stated that Soldier A was wounded, and that two white soldiers then moved to assist Soldier A. At that point, HARUN threw a grenade that exploded directly between Soldier A and one of the other men; he was certain that both men were injured or killed by the grenade.

During the firefight, HARUN was seriously injured by the Americans' return fire. HARUN stated that he sustained an injury to his arm and shrapnel wounds to the side of his head and body. HARUN stated that a Pakistani member of his group, whom he referred to as Abu Walid, was killed after sustaining severe trauma to his lower body and another Pakistani fighter in his group,

10

Abu Khalid, was injured. HARUN remembered that additional American troops began to move into the area as he and his fellow fighters retreated.

HARUN also stated that he remembered observing three Apache helicopters approaching as he evacuated. He also recalled hearing members of a Pakistani militia operating nearby, and he prepared himself for suicide by unpinning a grenade. While he was hiding, HARUN saw and heard several airplanes pass over his position. He continued to hide until after evening prayer time, ultimately secured the grenade, and then returned to Waziristan.

F.  HARUN's Transition to External Operations

HARUN indicated that he spent significant time recovering from his wounds in Pakistan. HARUN stated that he had several conversations with Abdul Hadi al Iraqi, the overall commander for military operations where he was fighting, and Abu Faraj al Liby ("Abu Faraj"), who was responsible for al-Qaeda external operations, regarding his desire to engage in operations against Americans outside of Afghanistan.[5] HARUN stated that he wanted to conduct attacks similar to those committed by al-Qaeda against the United States Embassies in Kenya and Tanzania.[6] HARUN stated that he specifically told Abdul Hadi and Abdul Wakil al Masri that he wanted to meet with Osama bin Laden or other external operations leaders within al-Qaeda so that they could put HARUN in touch with those al-Qaeda members working around the world. HARUN was introduced to Abu Faraj, and Abu Faraj ultimately put HARUN in touch with external operations leader Hamza Rabia.

According to HARUN, Hamza Rabia arranged for him to receive additional training from, among others, a notorious poisons expert who worked for al-Qaeda known as Abu Khabab al-

---

[5] Abu Faraj al Liby is incarcerated in Guantanamo Bay, Cuba.
[6] The al-Qaeda bombings of the United States Embassies in Kenya and Tanzania in 1998 resulted in the deaths of more than 200 people.

Masri, who provided him further instruction in explosives and poisons, including ricin and cyanide. Ultimately, at Rabia's direction, HARUN left the FATA, traveled to central Pakistan, and, on Pakistani Independence Day (August 14, 2003), traveled to Nigeria to carry out his plans to attack the United States Embassy in Nigeria.

G.  Tasking by and Communication with Hamza Rabia

According to HARUN, Rabia had developed a system to stay in contact with him while HARUN was in Nigeria. They communicated through the use of at least two email accounts, one of which was a Yahoo! email account, beginning with the letters *usust-*. HARUN identified the password as "asas---," and provided the Government with written permission to search the account. HARUN explained that he and Rabia would communicate in code, that Rabia used the alias "Tom," and that HARUN identified himself as "Esbin Gol" or "Spin Ghul." Rabia also used a Pakistani aide, whose name HARUN could not remember, to send and receive communications on Rabia's behalf. HARUN added that he and Rabia used at least one other email account, but that HARUN could not remember its name.

H.  HARUN's Plot to Attack Government Facilities in Nigeria

HARUN stated that, upon his arrival in Nigeria, he sought out a suitable target for a terrorist attack, focusing on offices and buildings belonging to the United States, including the United States Embassy in Abuja and other American and Western diplomatic facilities. HARUN stated that, with his associate Mohammed Ashafa, he cased a neighborhood in Abuja where he knew embassies of various foreign governments were located. HARUN stated that he could not locate the American Embassy, but that he did locate several other Western facilities in Abuja.

HARUN explained that he also took steps to obtain explosives while in Nigeria. For example, HARUN explained that he had tasked an unwitting courier to obtain explosives from a

12

company in Kano, Nigeria. HARUN described the location of the company in Kano but he ultimately did not obtain the explosives, because the company required purchasers to fill out paperwork at the police station before buying explosives. HARUN provided a number of his aliases including "Spin Ghul," "Abu Tamim,", "Joseph Johnson [McIlhenny]," and "Mortala Muhammadu." HARUN also obtained multiple false passports in order to facilitate his movement and activities in Nigeria. Specifically, HARUN obtained a Nigerian passport under the name "Joseph Johnson [McIlhenny]" and an East African passport under the name "Mortala Mohamed Adam."

While in Nigeria, HARUN met with members of other Islamic radical groups on behalf of al-Qaeda. HARUN explained that these individuals were involved with the "Nigerian Taliban," and the "Society for Preaching and Killing." The "Nigerian Taliban" appears, based on context, to be a predecessor organization for the Nigerian terrorist group Boko Haram or otherwise to be a general reference to jihadist elements in Nigeria at that time. The "Society for Preaching and Killing" plainly refers to the "Salafist Group for Preaching and Combat," "*Groupe Salafiste pour la Prédication et le Combat,*" or "GSPC," the predecessor organization for the designated foreign terrorist organization al-Qaeda in the Lands of the Islamic Maghreb ("AQIM").

I.    The Arrest of Ashafa and Disruption of HARUN's Embassy Bombing Plot

HARUN stated that while he was in Nigeria, Mohamed Ashafa, who had helped him case the embassies, agreed to act as a courier on his behalf and travel back to Pakistan with messages and materials for Hamza Rabia. In 2004, Ashafa traveled to Pakistan and made contact with Rabia; however, when Ashafa attempted to return, he was caught by the Pakistanis as he attempted to leave the country.

After Ashafa's arrest, Rabia contacted HARUN by telephone and told him to leave Nigeria immediately. Soon thereafter, HARUN fled to his home country of Niger (which borders

13

Nigeria). He then attempted to maintain a low profile in Niger, traveling back and forth to Nigeria at times to communicate with Rabia by email. Rabia ultimately instructed HARUN to reconnect with their contacts in GSPC in order to carry out his plots, but HARUN was concerned that the GSPC members had also been compromised by law enforcement as a result of Ashafa's arrest.

J.  HARUN's Capture and Incarceration in Libya

After his plans were disrupted in Nigeria, HARUN ultimately made his way through Niger to Libya. He sent messages to Rabia, but grew concerned that his email communications had also been compromised. HARUN explained that, as a result, he used cryptic references to advise Rabia of his location in Libya, emailing Rabia that he was in the land of "Abu Layth," a reference to al-Qaeda leader Abu Layth al Liby. HARUN also advised Rabia to contact him at the "777" number, which was a pre-planned code for Rabia to contact to HARUN's mother at a Saudi Arabian telephone number ending in "25777."

HARUN stated that he traveled to Libya because he believed that it would be the easiest route for him to reach Europe. He wanted to travel onwards to Europe to reformulate a plan of attack against Western interests there. While in Libya, HARUN came into contact with another terrorist operative named Bassam Shaban. HARUN advised Shaban of his plans to carry out an attack in Europe and, according to HARUN, Shaban provided training materials for HARUN to review and encouraged HARUN to undertake more terrorist training in Tripoli. HARUN then identified a specific building to "case" in order to practice his terrorist skills. He mapped out the area that he "planned" to attack and sketched drawings of his purported "target" in a notebook. When HARUN was arrested by the Libyans, the Libyans found the notebook and accused him of plotting to attack the building in Tripoli. HARUN, however, was adamant that his acts in Libya were only

14

preparatory for a later attack in Europe, and believed that his incarceration by the Libyans was therefore unjustified.

K.  HARUN's Terrorist Interactions

During his Mirandized interviews, HARUN provided more detail about his association with other al-Qaeda-related terrorists that he met in Afghanistan, the FATA, Pakistan, Nigeria, Niger and Libya. Some of the more significant individuals tied to al-Qaeda include the following:

- *Abdul Hadi al Iraqi* – As noted above, HARUN stated that Abdul Hadi al Iraqi was his military commander in the FATA when HARUN fought U.S. forces in Afghanistan. HARUN also stated that he swore *Bayat* (that is, an oath of loyalty) to Osama bin Laden through Abdul Hadi, (see 9/15/11 Interview). HARUN further advised that he discussed with Abdul Hadi al Iraqi the idea of making a martyrdom video – to be sent to HARUN's family in case he were killed. HARUN understood that Abdul Hadi gave the video to Abu Faraj, (see 9/16/11 Interview).

- *Abu Faraj al Liby* – HARUN described Abu Faraj as a senior leader of al-Qaeda with external operations responsibilities for the organization. HARUN first met Abu Faraj at the al-Qaeda guest house known as *Annibras,* (see 9/14/11 Interview). When he first met Abu Faraj, Abu Faraj was with Khallad al-Kuwati, also known as "Wallid Bin Atosh," a key architect of the September 11, 2001 attacks on the United States and a close advisor to Osama bin Laden, (see 9/16/11 Interview). Separately, HARUN stated that he met with Abu Faraj after recovering from injuries he sustained during the April 25, 2003 ridgeline ambush and advised that the wanted to become an external operative for al-Qaeda to attack American installations around the world. Thereafter, Abu Faraj introduced HARUN to Hamza Rabia who became HARUN's external operations commander, (see 9/15/11 interview).

- *Hamza Rabia, also known as "Tom"* – HARUN stated that he was introduced to Rabia by Abu Faraj and that HARUN lived and trained with Rabia in Waziristan for some time before Rabia dispatched him to Nigeria. HARUN kept in contact with Rabia by email and telephone while in Nigeria using the *usust-* email and at least one other email account. Rabia often communicated with him using a Pakistani assistant. Rabia also met with HARUN's courier, Mohamed Ashafa, in Pakistan and sent HARUN messages for him using Ashafa as a courier. When Ashafa was arrested by Pakistani authorities, Rabia contacted HARUN and told him to leave his current location in Nigeria. HARUN sent a message to Rabia, whom he referred to as "Tom," shortly before he left Niger to tell him that he was the land of "Abu Layth,"

15

or Libya. HARUN advised Rabia to contact him at the "777" number which was a reference to the telephone number of HARUN's house in Saudi Arabia, (see 9/15/11 Interview).

• *Rabia's Pakistani Assistant or Messenger* - HARUN indicated that he communicated with Rabia's Pakistani assistant regularly on email, but HARUN could not remember his name, (see 9/15/11 Interview).

• *Abu Zubaydah al Filistini, also known as "Abu Tariq"* - HARUN indicated that Abu Zubaydah al Filistini was one of many jihadists he met while fighting with al-Qaeda, (see 9/16/11 Interview).[7]

• *Abu Walid al Pakistani* and *Abu Khalid al Pakistani* – HARUN described Abu Walid and Abu Khalid as Pakistani members of HARUN's fighting group who participated in the April 25, 2003 ambush near Shkin. Abu Khalid was injured in the battle and Abu Walid was killed. (see 9/14/11 Interview).[8]

## II.    Prior Interviews by the Italians

As noted above, in addition to the Mirandized interviews conducted on September 14, 15 and 16, 2011, HARUN made statements to Italian law enforcement and judicial officials on multiple prior occasions, most significantly on June 24, 2011, June 25, 2011, June 27, 2011 and on August 24, 2011.

### A.   Statements to the Italian Law Enforcement Onboard the *Excelsior*

The government also interviewed the Italian law enforcement officers who first encountered HARUN onboard the ship *Excelsior*. According to a head of security for the *Excelsior*, the *Excelsior* departed Lampedusa for Taranto on the night of June 23, 2011. Approximately 40 officers were assigned to protect and keep order on the ship, which was carrying over 1,000 refugees.

---

[7] Abu Zubaydah al Filistini is incarcerated in Guantanamo Bay, Cuba.

[8] Notably, as discussed in more detail below, the body of an al-Qaeda fighter, likely that of the Pakistani individual HARUN referred to as Abu Walid, was discovered by members of the U.S. military along with an al-Qaeda journal that references HARUN's kunya, "Abu Tamim" and describes the firing of missiles on April 22, 2003. The government intends to offer a photograph of the dead al-Qaeda fighter and the al-Qaeda journal itself in evidence at trial. (See Argument I, infra.)

16

On the morning of June 24, 2011, the head of security received word from another officer on the ship, that he observed HARUN pacing along the upper deck of the ship carrying a Koran and demanding water. When he was approached by the officer, HARUN stated, in English, that he was "different" from the other refugees on the ship. The officer, noticing the scars on HARUN's arm, contacted the head of security, who directed the officer and other officers to move HARUN to a private room, and brought in an Arabic-speaking cultural officer to translate. The head of security asked HARUN about the scar on his arm and HARUN pointed to his scar and stated "training camp." HARUN also said that he was a member of al-Qaeda and that he was not afraid to be sent to Guantanamo Bay.[9]

The head of security asked HARUN to make a written statement. HARUN eagerly complied with the request. HARUN wrote, in sum and substance:

> I, Adnan Ibrahim Maroun Adam, whose nom de guerre is "ESPINGOL," that I am a member of al-Qaeda in the West African countries, "ACWAS." From 2005, I was detained by the Libyan authorities, at "Internal Political Security," and because I was not charged with any crime, I was therefore, transferred to the "Foreign Political Security." I was detained at the Libyan Intelligence Center until 6/21/2011. I was then taken from the Intelligence Center to Benzor port in Tripoli where I was placed on a fishing boat along with some Libyans and immigrants. I demand to either hand me over to the INTERPOL, or to the International Court of Justice in Scotland. And you may as well call the Embassy of Niger, or the Intelligence Agency in Niger for any required process. I did not voluntarily come to Italy, and I hate to be present on the Italian land in an illegal manner. The measures which are being applied to the illegal immigrants do not apply to me because I am not an illegal immigrant. I have spent 6 years in jail, from 2005 until 2011. I have entered Libya with an official passport via through the southern land exit [illegible] under the name of Adnan Ibrahim [H]aroun Adam. The country of Niger.[10]

---

[9] Multiple officers also recalled seeing HARUN point to his scars and identify them as having been caused by American soldiers in Afghanistan.

[10] HARUN's complete written statement and a draft translation is attached hereto as Exhibit E.

HARUN then became agitated and asked to get off the ship. When he was advised that the ship was in the middle of the sea and would not stop until it reached Taranto, Italy, HARUN threatened to jump overboard. He then became violent, shouting "Allah Akbar" and "Osama bin Laden Akbar," and assaulted the officers who ultimately restrained him. HARUN was then given a sedative and detained overnight prior to his arrival in Taranto on the morning of June 25, 2011.

B.  June 25, 2011 Post-Arrest Interview in Taranto

Upon HARUN's arrival in Taranto, Italian fficials interviewed HARUN and prepared a formal *"verbale"* for the interview. In Italian practice, a *verbale* is a detailed and simultaneously prepared summary of an interview. [11]

Before the interview, HARUN was transported from the ship to the local police station to await the arrival of an Arabic interpreter and a defense attorney to represent him. The interview began late in the day on June 25, 2011. After asking HARUN for pedigree information, in which he provided his name as "Ibrahim Harun Adam Saleh," and along with the telephone number discussed above ending "7425777," the interviewers advised him that he would be questioned in relation to his statements of his presumed affiliation to the terrorist organization al-Qaeda, and in response, HARUN indicated that he would like to respond.

During the course of the interview, HARUN described, in sum and substance, (1) his membership in al-Qaeda, (2) his use of various aliases, including "Abu Tamim," "Isbungoul," "Joseph Johnson," and "Mortala Mohamed Adam," (3) his presence in Afghanistan on September 11, 2001 and his training at *al-Farouq*, among other al-Qaeda camps, (4) his involvement in attacks

---

[11] While waiting for the translator and HARUN's lawyer to arrive, HARUN continued to make inculpatory statements to the Italian law enforcement officers similar to those previously made on board the *Excelsior*.

on U.S. military personnel in Afghanistan across the border from Angor Ada, Pakistan, (5) his plans to attack the United States Embassy in Nigeria, (6) his use of the email account *usust-* and, (7) the disruption of his plans due to Mohamed Ashafa's arrest in Pakistan. Notably, HARUN indicated that it had been his intent, since he was 10 or 12 years old, to join and fight with the *mujahideen* in Afghanistan and elsewhere. He also described his association with various significant members of al-Qaeda, including Abu Faraj al Liby and Rabia.

C.     Preliminary Court Proceeding in Agrigento on June 27, 2011

HARUN appeared in Italian court again on June 27, 2011 and was represented by an attorney and assisted by an Arabic translator. HARUN was advised of his Italian rights and HARUN indicated that he "intend(ed) to respond" to questions. HARUN, thereafter, made inculpatory statements in the presence of an attorney in which he (1) recounted aspects of his interactions on the *Excelsior*, and his interview on the afternoon of June 25, 2016 by Italian officials in the presence of his attorney in Taranto, and (2) indicated that he was a member of al-Qaeda who had previously been imprisoned in Libya.

The Court indicated that HARUN had "substantially admitted the facts" presented against him and that there existed "serious evidence of guilt concerning" the same. The Court also ordered HARUN placed in custody.

D.     July 25, 2011 Interview

While HARUN's case was pending, Italian officials sought to interview HARUN again in Agrigento on July 25, 2011. HARUN's attorneys were present for the interview, in which he advised the Italians that he did not intend to further answer any questions about his membership in al-Qaeda without the assistance of a Hausa interpreter (as opposed to an Arabic or English one), or without the presence of a diplomatic representation from Niger.

19

E.   August 24, 2011 Video Recorded Interview

On August 24, 2011, Italian officials sought to interview HARUN again. HARUN was represented by an attorney and assisted by a Hausa translator. HARUN was advised of his Italian rights, including his right not to answer questions, and HARUN stated that he intended to answer questions. Thereafter, HARUN made substantial inculpatory statements. The interview, which lasted several hours, was video recorded.

During the interview, HARUN (1) described his release from Libyan custody, (2) acknowledged the accuracy of his statements to Italian officials on June 25, 2011 – including his statements that he was a member of the terrorist group al-Qaeda and that he had participated in atttacks in Afghanistan against U.S. soldiers in which U.S. soldiers were killed, (3) discussed his relationship with Hamza Rabia and other members of al-Qaeda, (4) stated that he had received orders from Rabia to attack the U.S. Embassy in Nigeria but that the mission had failed as a result of the arrest of Mohamed Ashafa in Pakistan, (5) discussed his efforts in Libya to learn how to assimilate in Europe in order to commit a terrorist attack "superior" to the September 11th attacks in the United States, (6) recounted his desire to "demonstrate to Italy things that are worse than Mussolini and Hitler," and (7) conveyed a request to contact the Nigerien Embassy.

## III.   Additional Statements in the United States

Upon his arrival in the United States, HARUN continued to be cooperative and met with the government on more than twenty occasions along with his attorneys, including Susan Kellman, David Stern, and an associate of Mr. Stern's, Lucas Anderson. Those statements are memorialized in approximately two-hundred and fifty pages of FBI FD 302 reports. During those proffers, HARUN recounted in more specific detail the events described above, and expanded

20

broadly on his time and interactions with various terrorists and terrorist organizations in Afghanistan, Pakistan, Nigeria, Niger, Libya, and Italy.

Those proffers were conducted under terms which provided limited protections to the defendant. The agreements specifically provided that: "In any prosecution brought against the Client by the Office, except a prosecution for false statements, obstruction of justice, or perjury with respect to acts committed or statements made at or after the Meeting, the Office will not offer in evidence any statements made by Client at the Meeting (A) in its case-in-chief or (B) at sentencing . . . Notwithstanding [the foregoing], the Office may use any statements made by the Client: . . . (C) as substantive evidence to rebut, directly or indirectly, any evidence offered or elicited or factual assertions made, by or on behalf of Client at any stage of a criminal prosecution (including but not limited to detention hearing, trial or sentencing)."[12]

In addition to his proffer statements, HARUN has made repeated statements in the United States in open court regarding his affiliation with al-Qaeda, his hatred of the United States, and his association with Osama bin Laden. Those statements are memorialized in various transcripts associated with court proceedings before Your Honor and the Honorable Edward R. Korman.

---

[12]  To the extent that the defendant or his counsel seeks – through argument, or though other factual assertion or testimony – to challenge, at a hearing or trial, HARUN's participation in the April 25, 2003 ambush, the relevancy or authentication of various items recovered from the battlefield, or otherwise any aspect of his operational conduct on behalf of al-Qaeda in Afghanistan, Pakistan, Nigeria, Niger, Libya (including his photographic identification of a number of individuals discussed herein), his interactions in Italy, or if he otherwise asserts that any of his statements made during proceedings in Italy or the United States were involuntarily made, the government intends to offer testimony regarding HARUN's proffer-protected statements, "as substantive evidence to rebut" any such assertions.  To provide more context, in a separate letter to defense counsel, the government intends to provide additional notice of the proffer-protected statements that may be implicated by the defendant's potential challenges in this case.

HARUN has also detailed his complaints regarding his prosecution in the United States in a letter to the former Secretary General of the United Nations. Notably, in that letter, HARUN also summarized his historical involvement in al-Qaeda, including (1) his training at *al-Farouq*, (2) his involvement in attacks on United States troops in Afghanistan, (3) his swearing of allegiance to Osama bin Laden, through Abdul Hadi al Iraqi, (4) his transition to external operations, and deployment by al-Qaeda in Nigeria to attack U.S. diplomatic facilities there, (5) the arrest of his courier Mohamed Ashafa in a Pakistani airport, (6) HARUN's later arrest in Libya, (7) his release from Libya and arrival in Lampedusa, (8) his statements to the Italian officers onboard the *Excelsior* regarding his involvement in al-Qaeda, (9) his assault of the Italian officers and later prosecution there, (10) his statements to Italian law enforcement upon arrival in Taranto, Italy, and (10) his proffers with the government and efforts to cooperate and potentially testify against individuals incarcerated in Guantanamo Bay, Cuba.

## IV.     Additional Evidence Related to HARUN's Involvement in the Ambush of U.S. Soldiers in and around Firebase Shkin

Substantial evidence also exists to corroborate, both generally and specifically, the information provided by HARUN in his Mirandized statements to the U.S. government, in his prior voluntary statements to the Italians, and his later statements in the United States. That evidence serves to underscore HARUN's significant role and involvement in al-Qaeda's operations during an extraordinary period in the terrorist group's history. Notably, much of that same corroborative evidence also serves independently as evidence of HARUN's involvement in al-Qaeda and his participation in the conduct charged in the government's indictment.

Significantly, the government has obtained substantial evidence of HARUN's direct involvement in the April 25, 2003 ambush near Shkin, Afghanistan. At trial, in addition to offering evidence of HARUN's involvement in the April 25, 2003 ambush at Shkin based on evidence

obtained in Italy, the Government anticipates that a number of American military personnel who served in Afghanistan at that time, will testify that in 2002 and 2003 an American firebase or forward operating base ("FOB Shkin") was located in Shkin, Afghanistan, a town directly across the border from Angor Ada, a town in South Waziristan. Moreover, during that time period, FOB Shkin sustained frequent rocket attacks from enemy fighters, many of which were based in Waziristan. These enemy fighters included Afghan Taliban and other foreign fighters, assessed to be members of al-Qaeda.

In addition, the American soldiers employed, during that time, the weapons and equipment described by HARUN—grenades, automatic rifles, Humvees, Apache and Chinook helicopters, and fighter jets, while the enemy used AK-47-type automatic rifles, rockets, and hand grenades. Finally, the tactics described by HARUN – that is, cross-border incursions by al-Qaeda groups to launch rockets at the base, followed by retreat across the border into Waziristan after engagement with American pursuers – are consistent with those experienced by the Americans serving in the area at the time.

A number of details provided by HARUN regarding the attack have been firmly corroborated by the expected testimony of United States military officers who were involved in the April 25, 2003 attack at FOB Shkin, including HARUN's indication that: (1) the firefight occurred on a Friday in 2003 near FOB Shkin;[13] (2) the firefight occurred at approximately the time of a planned visit to Afghanistan by Donald Rumsfeld[14]; (3) the firefight was preceded several days

---

[13] As noted above, HARUN indicated that the attack occurred in 2002 or 2003, but the timing of his mission to Nigeria indicates that the attack must have been in 2003.

[14] Significantly, it was widely reported beginning around April 24, 2003, that Secretary Rumsfeld was planning to visit Kabul and Bagram Airbase in Afghanistan on Sunday, April 27, 2003. Beginning on April 27, 2003, however, it was also reported that Rumsfeld's visit would be delayed or canceled due to mechanical problems with his airplane. He ultimately visited Kabul on

23

earlier by rocket fire directed at the base; (4) HARUN observed Apache and Chinook helicopters prior to the firefight, and Apache helicopters and jets after the firefight; (5) as the American troops approached HARUN's group's position, HARUN opened fire with automatic weapons, and also threw grenades; (6) the Americans responded with automatic fire and grenades; (7) one member of HARUN's group was killed; and (8) more than one American was killed and others were wounded.

The military witnesses to the April 25, 2003 attack will also establish that (1) FOB Shkin was subject to significant shelling in the days or week prior to April 25, 2003; (2) the base was receiving a helicopter resupply the morning of the attack; (3) on April 25, 2003, a patrol was sent out in response to reports of insurgents near the Afghanistan-Pakistan border; (4) the patrol was ambushed by enemy forces who fired automatic weapons and threw grenades; (5) the Americans responded with both automatic weapons and grenades, and later summoned support from Apache helicopters; (6) two American servicemen – Private Jerod Dennis and Tactical Air Coordinator Raymond Losano – were killed by enemy fighters during the ambush, and several other soldiers were wounded; and (7) at least one enemy fighter was killed.

At trial, the government expects to offer photographs of FOB Shkin, the surrounding area, and various items recovered from the April 25, 2003 battlefield that corroborate HARUN's statements, including AK-47s, and other weapons and tools described by HARUN, as well as a deceased al-Qaeda fighter—fitting the description of the deceased Pakistani fighter, Abu Walid, described by HARUN—a knife and other military gear, a leather-bound Koran, which was left by

---

Thursday, May 1, 2003, and canceled the planned visit to Bagram. See, e.g., "Rumsfeld to visit Afghanistan: foreign military," Agence France Presse, Apr. 24, 2003; "U.S. Soldier Killed in Afghanistan; 5 Wounded in Gun Battle With Suspected Taliban Fighters," Washington Post, Apr. 26, 2003; "US soldier dies in Afghanistan on eve of Rumsfeld visit," British Broadcasting Corp., Apr. 26, 2003; "Rumsfeld cancels Afghan visit: Afghan official," Agence France Presse, Apr. 27, 2003.

HARUN on the battlefield, and a black and yellow journal (referred to hereinafter as the "al-Qaeda Journal"), which contains references to HARUN's alias "Abu Tamim," and recounts the activities of HARUN's al-Qaeda fighting group in the days before the ambush.[15]

The leather-bound Koran depicted in the photograph was also processed by U.S. military personnel, but was not retained in official military custody. Significantly though, the Koran and the knife described above were retained as mementos by one of the soldiers involved in the attack. The knife and the Koran were located in the fall of 2012 at the home of the soldier, and were subsequently transported to the FBI laboratory for forensic analysis.

Approximately ten years from the date of the attack, HARUN's fingerprints were identified on the Koran, definitively establishing that HARUN was involved in the April 25, 2003 ambush, and thus confirming with absolute certainty his account of his involvement in the al-Qaeda attack on the U.S. soldiers and his responsibility for the deaths of U.S. soldiers on April 25, 2003.

The government also intends to offer photographs of scars visible on HARUN's body, as well as other photographs from the battlefield.

## V.    Expert Testimony Regarding al-Qaeda, GSPC and Jihadist Groups Operating in Nigeria, Niger, and Libya

In addition to the above, the Government intends to present evidence corroborating the accuracy of the relevant portions of HARUN's statements about al-Qaeda activities and personalities and his description of al-Qaeda hostilities against American soldiers in Afghanistan. The Government intends to present expert testimony regarding the formation, structure, and leadership of al-Qaeda; the location and activities of al-Qaeda personnel between 2001 and 2005;

---

[15] Redacted copies of those photographs are attached hereto as Exhibit F.

the formation and leadership of the GSPC, as well as general information about jihadist groups operating in Nigeria, Niger, Libya and the *Sahel* desert region of Africa.[16]

With regard to HARUN's statements about his time with al-Qaeda, the Government expects that an expert will testify about the *al-Farouq* training camp, an al-Qaeda training camp which in 2001 was, as HARUN stated, located near Kandahar. Standard training at *al-Farouq* included, as HARUN stated, military-type training in small arms such as AK-47s, hand and rocket propelled grenades. Similarly, an expert witness (as well as the soldiers who were involved in the April 25, 2003 ambush) will testify that, after the American invasion of Afghanistan in late 2001, surviving al-Qaeda foreign fighters escaped into Pakistan, where they regrouped. From bases in the FATA of Pakistan, al-Qaeda fighting groups then began to engage American and Coalition troops in Afghanistan. An expert witness will also testify that, during the 2002-2003 period that HARUN described, al-Qaeda fighting groups were in fact active along the Afghanistan-Pakistan border.[17]

With regard to HARUN's time in Africa, an expert witness will likewise identify the Salafist Group for Preaching and Combat (also known asthe *Groupe Salafiste pour la Predication*

---

[16] Courts in the Second Circuit have generally approved expert testimony of this type. *See, e.g.,* United States v. Farhane, 634 F.3d 127, 160 (2d Cir. 2011) (testimony by expert witness concerning "al Qaeda's 'origins,' 'history,' 'structure,' leadership,' 'instructional methods,' 'operational logistics,' and acts of terrorism'" admissible); United States v. Paracha, 313 Fed. Appx. 347, 351 (2d Cir. 2008) (same); United States v. Locascio, 6 F.3d 924, 936-40 (2d Cir. 1993) (permitting expert witness to testify about history and structure of Gambino organized crime family, including identification, "together with their titles, ranks, and functions, numerous members and associates of the Gambino Family and other criminal organizations"); United States v. Kassir, 2009 U.S. Dist. LEXIS 28837, *14-*15 (S.D.N.Y. Apr. 2, 2009) (permitting testimony by expert witness identifying al-Qaeda leaders below bin Laden referred to in propaganda found on the defendant's computer)

[17] Likewise, a video released by al-Qaeda in August 2005, which is narrated by Abdul Hadi al Iraqi (identified as the "Emir of the Front"), depicts and describes al-Qaeda fighters carrying out cross-border attacks on U.S. soldiers from the same area, during the same time period that HARUN was fighting there.

*et le Combat* or GSPC) as a terrorist organization based in North Africa, which allied itself with al-Qaeda in the 2003-2005 time period discussed by HARUN (and ultimately became al-Qaeda in the Lands of the Islamic Maghreb or AQIM). An expert will likewise discuss the existence of other jihadist groups operating in Nigeria, Niger, Libya and the Sahel desert region of Africa, including Boko Haram.

The Government expects that an expert witness will also testify about the more prominent al-Qaeda personalities with whom HARUN interacted. For example, HARUN described fighting against American troops while under the command of Abdul Hadi al Iraqi. After he was wounded in the April 25, 2003 ambush, HARUN told Abu Faraj al Liby that he wanted to engage in al-Qaeda operations in other countries. Abu Faraj then placed HARUN under the command of Hamza Rabia, who ensured that HARUN was trained in Waziristan by al-Qaeda explosives expert Abu Khabab al-Masri. The expert will corroborate, in substantial respects, HARUN's specific recounting of his terrorist activity, through an independent discussion of the key personalities and locations described by HARUN.

## VI.    Other Physical Evidence Related to al-Qaeda

Relatedly, the Government anticipates offering additional evidence to prove selected aspects of al-Qaeda's activities and structures through law enforcement or other government witness testimony. For example, the government anticipates calling one or more law enforcement witnesses to testify regarding a crime scene examination conducted in July 2004 in the Ghorak District, in Kandahar Province, Afghanistan, of a site identified as the al-Qaeda training camp *al-Farouq* in which HARUN receiving basic military training on weapons such as the AK-47, M-60, and Uzi machine guns, as well as on the use of rocket propelled and hand-held grenades. Photographs and analysis conducted at the crime scene confirmed that the site was in fact the location of *al-Farouq*

that had been depicted in official videos produced by al-Qaeda's propaganda arm. Additionally, agents identified items on the ground at the site which were consistent with the location having been used as a terrorist training facility.

Similarly, the government anticipates calling a law enforcement agent to testify regarding the recovery, in Afghanistan, of a ninety-four page training manual associated with *Malik*, the second al-Qaeda training camp in which HARUN was trained, and which he indicated was located approximately 20 kilometers north of Kabul. At *Malik*, HARUN learned how to operate SAM-7 surface-to-air missiles. The training manual contains various sketches, diagrams, charts and information about military-related topics.

Moreover, the government intends to introduce physical evidence seized from the battlefield in Afghanistan after the American invasion to establish that Abdul Hadi al Iraqi served as a senior military commander for al-Qaeda and that Abu Faraj al Liby was a senior al-Qaeda official, as HARUN described, including al-Qaeda-related documents containing Abdul Hadi al Iraqi and Abu Faraj al Liby's fingerprints.[18]

In addition, official al-Qaeda propaganda videos and a lengthy interview released on an official al-Qaeda internet forum confirm that Abdul Hadi al Iraqi continued as al-Qaeda's military

---

[18] In addition to relying on the self-authenticating nature of these documents, and the forensic ties to Abdul Hadi al Iraqi and Abu Faraj al Liby, the government anticipates relying on the testimony of one or more U.S. government personnel to authenticate them, consistent with the procedures used in United States v. al-Moayad, 545 F.3d at 156, 172-73.

For example, one such document entitled "Communication from Arab Liaison Committee," was recovered by the United States government after the fall of Kabul. The document is a memorandum issued from a six-person committee appointed by the Taliban to liaise with the "Arab Immigrant Brothers." The committee included "Brother Bin Sheikh," "Brother Abu Musab al-Suri," "Brother Abd-al-Hadi al Ansari," and "Brother Abu Musab al-Zarqawi." The document has been fingerprinted by the FBI, and it contains the fingerprint of Abdul Hadi al Iraqi.

leader in the Afghanistan-Pakistan region during the 2002-2004 time period and that Abu Faraj al Liby served as an important lieutenant to Osama bin Laden.[19]

### VII.   Additional Evidence Related to HARUN's Use of the usust- and slslglgl-- Email Accounts

Subsequent to HARUN's admissions in Italian court, and his identification of the *usust-* email account as an account through which he communicated with Hamza Rabia, the Government obtained business records from Yahoo! for the *usust-* email account, including internet protocol ("IP") data, date and time of creation, as well as other relevant identification about the user of the account.

Specifically, records provided by Yahoo! regarding the *usust-* account indicated (1) that the account was created on Saturday, August 9, 2003, at 10:42 a.m., GMT, (2) the account was created at an IP address of 210.56.9.254, in Islamabad, Pakistan, and (3) the name of the subscriber was "Mr tom jon".

The Government also identified a second Yahoo! email account ("*slslglgl-*"). Records obtained from Yahoo! indicated that (1) the *slslglgl-* account was created on Saturday, August 9, 2003, at 11:11 a.m., GMT, and (2) the account was created at the IP login address 210.56.9.254—the same Islamabad IP address used to create the *usust-* account 29 minutes earlier— and (3) the name of the subscriber was "Mr lola makaja." The timing and the location of the creation

---

[19] Such materials include a transcript of an interview of Abdul Hadi al Iraqi, dated July 7, 2002, which was published on the al-Qaeda website al-Neda, and the video referred to above that was narrated by Abdul Hadi al Iraqi. Similarly, a video of Abu Faraj al Liby with Osama bin Laden, recovered in Afghanistan depicts a speech by bin Laden at the Tarnak Farms compound in Afghanistan in 2000. The audience includes Abu Faraj, who is seated near other al-Qaeda leaders, as well as two September 11th hijackers. Similar evidence is available relating to Abu Khabab al-Masri, including postings on official al-Qaeda internet forums, and eulogies by Ayman al-Zawahiri and Sheikh Saeed al-Marsi after Abu Khabab's death.

of these accounts corroborate HARUN's <u>Mirandized</u> statements regarding the date on which he departed Pakistan for Nigeria and the manner and means through which HARUN communicated with Rabia in Nigeria.

**VIII.    <u>Additional Evidence Related to HARUN's Efforts in Nigeria on Behalf of al-Qaeda</u>**

As discussed above, in Italy, HARUN stated that while he was in Nigeria, Mohamed Ashafa, who had helped him surveil the embassies, agreed to act as a courier on his behalf and travel back to Pakistan with messages and materials for Hamza Rabia. In 2004, Ashafa traveled to Pakistan and made contact with Rabia; however, when Ashafa attempted to return, he was caught by Pakistani authorities as he attempted to leave the country.

After Ashafa's arrest, HARUN indicated that Rabia contacted HARUN by telephone and told him to leave Nigeria immediately. Soon thereafter, HARUN fled to the country of Niger. He then lay low in Niger, traveling back and forth to Nigeria at times to communicate with Rabia by email. Rabia ultimately instructed HARUN to reconnect with their contacts in GSPC in order to carry out his plots, but HARUN was concerned that the GSPC members had also been compromised by law enforcement as a result of Ashafa's arrest.

Relatedly, documentary evidence and testimony will corroborate HARUN's detailed description of his use of Ashafa as a courier to communicate with Rabia and al-Qaeda leadership in Pakistan. In 2004, Ashafa was deported to Nigeria from Pakistan.[20]

---

[20] Ashafa was publicly charged in approximately 2006 for (1) his illegal receipt of $1500 from al-Qaeda operatives in Pakistan, "with intent that the said money shall be used to identify and carry out terrorist attacks on the residences of Americans living in Nigeria," (2) for his facilitation of acts of terrorism by "serv[ing] as [a] Courier to al Qaeda" and for "receiving and decoding coded messages and disseminating [such messages] to members of an illegal terrorist organization known and called 'The Nigerian Taliban' with [the] intent that such information shall be used to identify and carry out attacks on residences of Americans living in Nigeria," (3) that as a member of "an illegal terrorist organization known and called 'the al-

Among other documents related to Ashafa that were provided by the Nigerians, the government intends to introduce a certified copy of the official Nigerian travel authorization that Ashafa used when he was deported in custody from Pakistan to Nigeria in December 2004. As noted above, Ashafa was arrested by Pakistani law enforcement in August 2004. To authorize Ashafa's travel back to Nigeria, on December 9, 2004, the Embassy of Nigeria in Islamabad, Pakistan (known as the "Nigeria High Commission in Pakistan") issued an "Emergency Certificate" to Ashafa, which authorized Ashafa to make a single journey from Pakistan to Nigeria within one week of the certificate's issuance.[21]

## IX.    HARUN's Transfer to U.S. Custody

On February 21, 2012, a Federal grand jury in the Eastern District of New York returned the instant indictment against HARUN charging him with conspiracy to murder United States Nationals, in violation of Title 18, United States Code, Section 2332(b)(2); conspiracy to bomb a government facility, in violation of Title 18, United States Code, Section 2332f; conspiracy to provide material support to a foreign terrorist organization (al-Qaeda), in violation of Title 18, United States Code, Section 2339B; provision and attempted provision of material support to a foreign terrorist organization (al-Qaeda), in violation of Title 18, United States Code, Section 2339B; illegal use of firearms in relation to one or more crimes of violence, in violation of Title 18, United States Code, Section 924(c); and illegal use of explosives to commit one or more felonies, in violation of Title 18, United States Code, Section 844(h). That same day, the Honorable

---

Qaeda network,' 'Ashafa' permitted [his] house to be used as [an] al-Qaeda secret operational base; and rendered logistics and intelligence services to Adhan Kata Spinghul [HARUN]" among others, and (4) that he "contracted, sponsored and ferried" more than eighteen persons "to receive combat training on terrorism from an Algerian Terrorist network known as Salafis Group for Combat and Preaching [GSPC]."

[21] A copy of the certificate is attached here as Exhibit C.  The certificate is signed by a Nigerian public official and bears the stamp of the Nigeria High Commission.

Magistrate Judge Lois Bloom signed a warrant for the arrest of HARUN for the offenses charged in the indictment.

Thereafter, the Government sought the extradition of HARUN from the Italian government. On March 22, 2012, a formal request for extradition was provided to the Italian authorities and that request was later granted by the Italian government.

The defendant was transferred, in FBI custody, to the United States and arraigned on October 5, 2012, in a closed courtroom. Immediately following the Defendant's arraignment, the Government engaged in plea negotiations and the defendant voluntarily met and proffered with the Government. Upon order of the Court, the case was sealed and HARUN's presence in the United States and his cooperation were not publicly revealed, until he later ceased cooperating with the Government in this case.

## ARGUMENT

In addition to providing the Court and the defendant additional detail regarding the government's case, the government respectfully submits this memorandum to notify the Court and the defendant of its intention to introduce the evidence set forth generally above as direct evidence of the charged criminal conduct in this case pursuant to F.R.E. 401, 402, 403, and 404(b), specifically of HARUN's involvement in a conspiracy to kill Americans, a conspiracy to provide material support to the terrorist organization al-Qaeda, conspiracy to bomb U.S. government facilities, and the illegal use of weapons or explosives in connection therewith. This evidence is direct proof of the crimes with which HARUN is charged and, in the alternative, is admissible pursuant to Rule 404(b) of the Federal Rules of Evidence. Morevoer, the government moves in limine as set forth below.

## I.    The al-Qaeda Journal

The government moves in limine to admit at trial a journal (the "al-Qaeda Journal" referenced above) recovered from an al-Qaeda fighter ("Coconspirator 1" or "CC-1") who participated in—and was killed during—the April 25, 2003 ambush. As explained more fully below, the al-Qaeda Journal is relevant, authentic, and not barred by the rule against hearsay.

### A.    The Discovery of the al-Qaeda Journal and a Summary of its Content

In the aftermath of the April 25, 2003 ambush near FOB Shkin, U.S. soldiers discovered the body of a dead al-Qaeda fighter (i.e., CC-1) near the site of the ambush. According to these soldiers, CC-1 appeared to have died from serious injuries to his lower extremities.[22] Pursuant to standard protocol, the soldiers searched CC-1's body for weapons, contraband and other items. They also took photographs of CC-1 and the items recovered from him. One of these photographs includes the al-Qaeda Journal, alongside a non-American automatic rifle and magazines.[23]

Consistent with the photograph, the al-Qaeda Journal is pocket-sized with a black cover bearing a yellow logo depicting a minaret, the letters "MCH" and the word "NOTES." The al-Qaeda Journal contains 18 pages of handwritten notes, primarily in Urdu (the national language of Pakistan). Most of the entries are dated, and the dates range from March 14, 2003 to April 22, 2003—three days before the April 25, 2003 ambush.

The handwritten notes in the al-Qaeda Journal include the following: (1) names of cities and villages within Pakistan and the FATA, including Angor Ada, a Pakistani village

---

[22] The soldiers' observations are consistent with the defendant's Mirandized statements—specifically, the defendant's statements that a fellow fighter—a Pakistani man named Abu Walid—died during the April 25, 2003 ambush after sustaining serious injuries to his lower body.

[23] A photograph of the al-Qaeda journal taken in Afghanistan, and a photograph of the cover of the journal taken in the United States, are both attached hereto as Exhibit D.

approximately one mile from the location of the April 25, 2003 ambush; (2) descriptions of travel between locations in Pakistan and the FATA, along with departure and arrival times and the duration of travel; (3) the names of various individuals, including two references to the defendant's alias "Abu Tamim," and that of Hamza al-Australi, a member of al-Qaeda that HARUN identified as being a member of his fighting group;[24] (3) references to meetings with specific individuals; (4) references to specific events, such as "America['s] attack on Iraq"; and (5) references to actions— both general (e.g., "departure [for] Jihad") and specific (e.g., "fired 12 BM missiles").[25]

Three portions of the Journal are particularly significant. First, under an entry dated "14/4/03 Tuesday" is a list of names, including the defendant's alias "Abu Tamim";[26] Second, under an entry dated "18-4-03 Friday" is a list of 14 names, again including the defendant's alias "Abu Tamim," and the name of al-Qaeda terrorist Hamza al-Australi, who is referred to in the al-Qaeda Journal as "Hamza (Australia)." Third, under an entry dated "22/4/03" is the statement "Fired 12 BM missiles."

    B.  <u>The al-Qaeda Journal Is Relevant</u>

Rule 401 of the Federal Rules of Evidence states that "[e]vidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence;

---

[24] Hamza al Australi is known to the government as a former Australian soldier whose true name is Matthew Stewart.

[25] The notes in the al-Qaeda Journal also include Koranic verses and Urdu translations of commonly used phrases in Pashto (a language spoken in Afghanistan) and Arabic, including phrases such as "How are you?" and "Where is the bathroom?" These rudimentary Urdu-Pashto and Urdu-Arabic translations further corroborate the defendant's <u>Mirandized</u> statement that CC-1 was an al-Qaeda fighter from Pakistan.

[26] The defendant has admitted to using this alias on numerous occasions. For example, on September 16, 2011, in the presence of defense counsel and after waiving his <u>Miranda</u> rights, the defendant stated that his "friends call him Abu Tamim." When asked about the names he used in his travels, the defendant replied "I used my name Adnan and also my alias Abu Tamim."

and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. Rule 402 provides the relevant evidence is generally admissible. Fed. R. Evid. 402.

The al-Qaeda Journal is highly relevant primarily for two reasons. First, the references to the defendant's alias "Abu Tamim" tend to establish the defendant's association with CC-1. Evidence of association between the defendant and CC-1—an al-Qaeda member killed during the April 25, 2003 ambush—corroborates the defendant's admission that he too participated in the April 25, 2003 ambush. Second, the statement "fired 12 BM missiles" under the entry dated April 22, 2003 corroborates the defendant's statements that he and his fellow al-Qaeda fighters fired missiles at FOB Shkin during the week prior to the April 25, 2003 ambush.

C.  A Proper Foundation Exists for the al-Qaeda Journal

Rule 901(a) of the Federal Rules of Evidence states that a party offering an exhibit "must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). As the Second Circuit explained in United States v. Dhinsa, 243 F.3d 635, 658 (2d Cir. 2001),

> Rule 901 does not erect a particularly high hurdle, and the proponent
> of the evidence is not required to rule out all possibilities
> inconsistent with authenticity or to prove beyond any doubt that the
> evidence is what it purports to be. The requirement under Rule 901
> is satisfied if sufficient proof has been introduced so that a
> reasonable juror could find in favor of authenticity or identification.

Further, evidence that an exhibit is authentic "may be direct or circumstantial," United States v. Maldonado-Rivera, 922 F.2d 934, 957 (2d Cir. 1990), "and the latter category may include distinctive characteristics of the document itself, such as its '[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances.'" Id. (quoting Fed. R. Evid. 901(b)(4)).

35

Here, there is substantial evidence demonstrating that the al-Qaeda Journal belonged to a member of al-Qaeda—specifically, CC-1—who was present at the April 25, 2003 ambush. As noted above, (1) CC-1's body was discovered at the site of the April 25, 2003 ambush after the ambush ended; (2) CC-1's body was searched; (3) a photograph of the items recovered from CC-1 was taken; and (4) the al-Qaeda Journal is visible in that photograph. Thus, even if no witness specifically testifies to having observed the al-Qaeda Journal being recovered from CC-1's body, there is a sufficient basis to conclude that the al-Qaeda Journal belonged to an al-Qaeda fighter who participated in the April 25, 2003 ambush.

The contents of the al-Qaeda Journal also support its authenticity. See Fed. R. Evid. 904(b)(4). The first several pages of the al-Qaeda Journal describe the route the owner-author and others traveled to get to the site of the April 25, 2003 ambush.[27] The reference to "departure [for] jihad" on March 23, 2003 further indicates that the author-owner of the al-Qaeda journal was affiliated with a jihadist group, and the reference to "fir[ing] 12 BM missiles" on April 22, 2003 indicates that the author-owner participated in acts of violence.

D.  The Content of the al-Qaeda Journal is Not Barred by the Rule Against Hearsay

As described in greater detail below, the content of the al-Qaeda Journal is not barred by the rule against hearsay. Specifically, the references to the defendant's alias "Abu Tamim" and other relevant names and aliases, including "Hamza (Australia)" are admissible for the simple reason that they are not assertions and therefore not hearsay. Entries that do constitute assertions—such as the statement "fired 12 BM missiles"—are admissible under Rule

_____

[27] Specifically, the al-Qaeda Journal describes the owner-author traveling from cities in eastern Pakistan (Sheikupura, Shahdara, and Lahore) through Dera Ismail Khan in central Pakistan to villages in the FATA (Wana, Shakai, Azam Warsak and Angor Ada) close to the Afghanistan border in western Pakistan

801(d)(2)(E) as statements of a coconspirator in furtherance of the conspiracy and as a statements against penal interest of an unavailable witness. The remaining content—including references to meetings, dates and times of travel, and locations—are not barred by the rule against hearsay because they are not offered for their truth.

1.      *The References to "Abu Tamim" and Other Names and Aliases in the Journal Are Not Hearsay*

Rule 801 of the Federal Rules of Evidence defines hearsay as an out-of-court statement admitted to prove the truth of what it asserts. Fed. R. Evid. 801(c). A "statement," for purposes of the hearsay rule, is "a person's oral assertion, written assertion, or nonverbal conduct, if the person intended it as an assertion." Fed. R. Evid. 801(a).

The references to the alias "Abu Tamim" in the al-Qaeda Journal are not hearsay because they are not assertions and, therefore, do not constitute statements under Rule 801(a). Rather, they constitute circumstantial evidence of association between the defendant and CC-1.[28] This evidence of association, in turn, tends to corroborate the defendant's statement that he was present with CC-1 at the April 25, 2003 ambush and is independent evidence of that fact.

Courts in this Circuit have routinely held that references to names in notebooks, journals and address books—like the al-Qaeda Journal—do not constitute hearsay under Rule 801. In United States v. Al-Moayad, for example, the government moved to admit two address books, belonging to al Qaeda-affiliated mujahidin fighter, which contained the defendant's name and telephone number. 545 F.3d at 157, 177 (2d Cir. 2008). Over the defendant's hearsay objection, the court permitted introduction of the address books to show the defendant's connection to the

---

[28] For the same reason, the references to "Hamza (Australia)" and other names and aliases do not constitute hearsay.

mujahidin fighters and, by extension, to al-Qaeda. Id. On appeal, the Second Circuit affirmed the district court's decision, explaining simply that "[t]he address books were not hearsay." Id. at 177.

Similarly, in United States v. Ellis, 461 F.2d 962, 970 (2d Cir. 1972), the defendant argued unsuccessfully that address books belonging to coconspirators containing his name should have been excluded on hearsay grounds. "The flaw in this argument," the court explained, "is that address books belonging to one defendant, containing names of other defendants, are not hearsay and are admissible as circumstantial evidence showing association." Id. (citing United States v. Cusumano, 429 F.2d 378, 381 (2d Cir. 1970)); see also United States v. Ruiz, 477 F.2d 918, 919 (2d Cir. 1973) (admitting piece of paper belonging to coconspirator with defendant's name and a telephone number, where slip was introduced to show that the coconspirator knew the defendant); United States v. Panebianco, 543 F.2d 447, 456-57 (2d Cir. 1976) (admitting codefendant's telephone book entry referencing the defendant over the defendant's hearsay objection and explaining that "what is probative is the mere existence of the entry rather than the meaning intended by the writer").

Because the presence of the alias "Abu Tamim" and other names in the al-Qaeda Journal are not assertions—and because they are offered as circumstantial evidence of the association with an al-Qaeda fighter who participated in the April 25, 2003 ambush—they does not constitute hearsay.

2.     *The Reference to Missile Attacks on April 22, 2003—and other Assertions in the al-Qaeda Journal—Are Admissible as Statements of a Coconspirator in Furtherance of the Conspiracy*

"Rule 801(d)(2)(E) provides that '[a] statement is not hearsay if [t]he statement is offered against a party and is . . . [made] by a coconspirator of a party during the course and in

furtherance of the conspiracy.'" In re Terrorist Bombings of U.S. Embassies in East Africa, 552 F.3d 93, 137 (2d Cir. 2008) (quoting Fed. R. Evid. 801(d)(2)(E)).

"To admit hearsay testimony under Rule 801(d)(2)(E), the district court must find (a) that there was a conspiracy, (b) that its members included the declarant and the party against whom the statement is offered, and (c) that the statement was made during the course of and in furtherance of the conspiracy." United States v. Coplan, 703 F.3d 46, 82 (2d Cir. 2012) (internal quotations omitted). "These are 'preliminary questions of fact' to be resolved by the district court under a preponderance of the evidence standard." Id. (quoting Bourjaily v. United States, 483 U.S. 171, 175 (1987)). A district court's findings on these preliminary questions are reviewed for "clear error." In re Terrorist Bombings of U.S. Embassies in East Africa, 552 F.3d at 137.

Here, the three criteria are plainly satisfied. First, a conspiracy to kill U.S. nationals, with which the defendant is charged in Count One of the Indictment, was ongoing in 2003 when the al-Qaeda Journal entries were created.[29] The defendant's Mirandized statements alone—during which he admits to joining al-Qaeda and agreeing to attack U.S. forces in Afghanistan—establishes the existence of the conspiracy at that time.

Second, the conspiracy to kill U.S. nationals included the defendant and CC-1. The defendant's detailed descriptions of his criminal activities as a member of al-Qaeda in the early 2000s establishes his involvement in the conspiracy. The fact that CC-1 was killed in the April 25, 2003 ambush of U.S. forces—and subsequently found in possession of a journal referencing "jihad"

---

[29] A conspiracy to provide material support to al-Qaeda was also ongoing.

and missile attacks—is sufficient, in and of itself, to establish that he too was a jihadist fighter and member of the conspiracy to kill U.S. nationals.[30]

Third, the statements were made during the conspiracy. The defendant is charged with conspiring to murder U.S. nationals between 2001 and 2011 and the Journal entries are dated March and April 2003, within weeks of the April 25, 2003 ambush. The entries in the al-Qaeda Journal were also made "in furtherance of" the conspiracy. The al-Qaeda Journal is essentially an operational log containing information and intelligence related to the conspirator and his al-Qaeda fighting group's terrorist activities in Afghanistan at that time, including travel routes into areas where al-Qaeda fighters were engaging in hostilities with American troops and Coalition forces, dates and times of travel, specific locations (including locations near active hostilities), names of individual members of the conspiracy (including fellow al-Qaeda fighters like "Abu Tamim" and Hamza al-Australi (referred to in the al-Qaeda Journal as "Hamza (Australia)"), records of meetings

---

[30] The available evidence—including the defendant's <u>Mirandized</u> statements about CC-1's death and the presence of the al-Qaeda journal in a photograph of items recovered from CC-1—plainly establishes that CC-1 was the owner-author of the al-Qaeda journal. But even if, <u>arguendo</u>, the owner-author of the al-Qaeda Journal could not be specifically identified, the assertions within the al-Qaeda Journal would still qualify as statements of a coconspirator. The location where the al-Qaeda Journal was discovered (<u>i.e.</u>, the site of the April 25, 2003 ambush), the time it was discovered (<u>i.e.</u>, in the aftermath after that ambush), and its contents (describing travel routes from eastern Pakistan to the FATA, "depart[ing for] jihad" and "fir[ing] 12 BM missiles") establish that al-Qaeda Journal entries were drafted by a member of al-Qaeda fighting alongside the defendant. <u>See</u>, <u>e.g.</u>, <u>Maldonado-Rivera</u>, 922 F.2d at 934 (admitting a communiqué under Rule 801(d)(2)(E) even "[t]hough the precise identify of the author . . . was unknown" because "there was . . . a sound basis for inferring that it had been authored by one or more of the coconspirators" based on its content and other circumstances); <u>see also</u> <u>United States v. El-Mezain</u>, 664 F.3d 467, 505 (5th Cir. 2011), as revised, (Dec. 27, 2011) ("Our conclusions . . . are consistent with those of our sister circuits, which have also held that anonymous statements may be admissible under Rule 801(d)(2)(E) if sufficient evidence is presented to connect the declarant with the conspiracy at issue.").

with various individuals, references to specific events (like "America['s] attack on Iraq"), and references to actions—both general ("departure [for] Jihad") and specific ("fired 12 BM missiles").

It is well-established that "[n]otes containing information relevant to the conspiracy"—such as the notes recorded by CC-1 in the al-Qaeda Journal—"may be admissible against co-conspirators as statements in furtherance of the conspiracy." United States v. SKW Metals & Alloys, Inc., 195 F.3d 83, 88 (2d Cir. 1999) (quoting United States v. Schmit, 881 F.2d 608, 613 (9th Cir.1989)). For this reason, ledgers and lists are routinely admitted against coconspirators. See, e.g., United States v. Donovan, 55 Fed. Appx. 16, 21-22 (2d Cir. 2003) (admitting ledger under Rule 801(d)(2)(E)).

In short, the records maintained in the al-Qaeda Journal "were not mere idle chatter, but rather were intended . . . to act as a record and a guide to future conduct." SKW Metals, 195 F.3d at 89 (internal citations and quotation marks omitted); see also United States v. McPartlin, 595 F.2d 1321 (7th Cir. 1979) (ruling calendar entries admissible under Rule 801(d)(2)(E) and holding that "[s]ince th[] entries were made so that the [coconspirator] could rely on them in carrying out his scheme, they aided and were "in furtherance of" the conspiracy); United States v. Woodman, 980 F.2d 740 (9th Cir. 1992) (affirming admission of "statements in diaries" of a coconspirator under Rule 801(d)(2)(E) because the "diaries contained notes concerning the [coconspirator's] surveillance of the [victims'] home"). Moreover, a statement is deemed to have been made "in furtherance" of a conspiracy if it "informs other conspirators of the current status of the conspiracy." In re Terrorist Bombings of U.S. Embassies in East Africa, 552 F.3d at 139 (internal quotation marks omitted) (quoting United States v. Simmons, 923 F.2d 934, 945 (2d Cir. 1991)), or if it "giv[es] associated persons information about its membership." A coconspirator reviewing the al-Qaeda Journal—or receiving information derived from the al-Qaeda Journal—would learn not only about the status of

41

the conspiracy (e.g., when and where missiles were launched), but also about the identities of coconspirators the specific locations within the FATA they have traveled to.[31]

       3.     *The Reference to Missile Attacks on April 22, 2003 and Other Inculpatory Assertions Are Admissible as Statements Against Penal Interest of an Unavailable Witness*

Rule 804(b)(3) of the Federal Rules of Evidence provides for the admission of "a statement that: (A) a reasonable person in the declarant's position would have made only if the person believed it to be true because, when made, it . . . had so great a tendency . . . to expose the declarant to civil or criminal liability; and (B) is supported by corroborating circumstances that clearly indicate its trustworthiness, if it is offered in a criminal case as one that tends to expose the declarant to liability" and if the declarant is unavailable. Fed. R. Evid. 803(b)(3).

In Afghanistan in April 2003, any "reasonable" member of al-Qaeda would have known that evidence of his affiliation with al-Qaeda—and, specifically, of his participation in attacks against U.S. forces—would have exposed him to criminal penalties upon capture. See Fed. R. Evid. 804(b)(3)(A). Moreover, the trustworthiness of the assertions in the al-Qaeda Journal are corroborated by the defendant's statements describing missile attacks against FOB Shkin in days

---

[31] Of course, the government does not need to prove that other coconspirators actually read or relied on the records in the al-Qaeda Journal for those statements to be deemed created "in furtherance of" the conspiracy. "In order to admit a co-conspirator's statement under Rule 801(d)(2)(E) . . . it is not necessary that another co-conspirator know about the statement." El-Mezain, 664 F.3d at 507. "This is consistent with the principle that a co-conspirator's statements are admissible under a general agency rationale insofar as one conspirator may be held responsible for the statements of another conspirator in furtherance of that conspiracy whether or not he was present when the statement was made." Id.; see also Lutwak v. United States, 344 U.S. 604, 617 (1953) ("Declarations of one conspirator may be used against the other conspirator not present on the theory that the declarant is the agent of the other, and the admissions of one are admissible against both under a standard exception to the hearsay rule applicable to the statement of a party."); cf 5–801 Weinstein's Fed. Evid. § 801.34 ("A defendant need not have been aware of particular transactions within the conspiracy for statements in furtherance of those transactions to be admissible against him or her.").

before the April 25, 2003 ambush. See Fed. R. Evid. 804(b)(3)(B). There can be no dispute that CC-1, who died during the April 25, 2003 ambush, is unavailable as a witness. See Fed. R. Evid. 804(a)(4). But even if the precise identity of the al-Qaeda member who authored the journal could not be established by a preponderance of the evidence, see Fed. R. Evid. 901(a), the anonymous author would still be considered unavailable because no reasonable effort could secure his attendance at trial, see Fed. R. Evid. 804(a)(5).

E.  Residual Exception

For many of the same reasons, the al-Qaeda Journal would also be admissible under the residual hearsay exception. Rule 807 of the Federal Rules of Evidence provides that a hearsay statement is admissible if four conditions are satisfied:

> (1) the statement has equivalent circumstantial guarantees of trustworthiness; (2) it is offered as evidence of a material fact; (3) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts; and (4) admitting it will best serve the purposes of these rules and the interests of justice;

Here, the four criteria are satisfied. First, the statements within the al-Qaeda journal are trustworthy because the al-Qaeda Journal would have been worthless to CC-1 and his coconspirators if it contained inaccurate reports and records. Moreover, the entries seem to have been created within days of the events they describe, when they were freshest in CC-1's mind. Accordingly, the entries lack all "four classes of risk peculiar to [hearsay] evidence: those of (1) insincerity, (2) faulty perception, (3) faulty memory and (4) faulty narration." Schering Corp. v. Pfizer Inc., 189 F.3d 218, 232-33 (2d Cir. 1999).

Second, the writings within the journal are offered to establish material facts—for example, the prior association between CC-1 and the defendant and the firing of 12 rockets on April 22, 2003. Third, the al-Qaeda Journal is more probative on these points than any other evidence the

government could reasonably obtain. The government cannot reasonably call a member of the defendant's al-Qaeda fighting group to provide detailed testimony of the nature of the defendant's association with CC-1. While the defendant's criminal association with CC-1 can be established from his Mirandized statements and the presence of CC-1's body at the site of the April 25, 2003 ambush, U.S. soldiers present at the ambush cannot offer evidence about the nature or duration of the defendant's association with CC-1 prior to their joint engagement in the April 25, 2003 ambush.

Finally, and most importantly, the interests of justice will served by the admission of this evidence. Given the locations where most of the defendant's criminal activity occurred—specifically, Afghanistan, Pakistan and Nigeria—and the fact that most of this criminal activity occurred more than a decade ago, the government's access to physical evidence is extremely limited. Given this reality, and the manifest reliability of the al-Qaeda Journal, its admission under the residual hearsay exception would be warranted.[32]

## II. The Defendant Should be Precluded from Asserting the "Lawful Combatant Immunity" Defense

Federal criminal law recognizes the affirmative defense of lawful combatant immunity, which applies in certain limited circumstances to members of legitimate military organizations fighting on behalf of a state who comply with the requirements for lawful combatants. This defense is not available to HARUN. The defense has provided no notice that they intend to rely on this, or any other, affirmative defense. Further, they have not – and cannot – make a prima facie showing that HARUN qualifies for lawful combatant immunity. See United States v. Gonzalez, 407 F.3d 118, 122 (2d Cir. 2005) ("A defendant is entitled to an instruction on an

---

[32] Because the content of the al-Qaeda Journal is nontestimonial within the meaning of Crawford v. Washington, 541 U.S. 36 (2004), its admission would not violate the Sixth Amendment. See, e.g., United States v. Morgan, 385 F. 3d 196, 208-09 (2d Cir. 2004).

affirmative defense only if the defense has 'a foundation in the evidence.'" (citing United States v. Podlog, 35 F.3d 699, 704 (2d Cir. 1994)). Therefore, the Court should preclude the defendants from arguing or presenting evidence that HARUN is entitled to this defense.

A.  Legal Standard

The doctrine of lawful combatant immunity "forbids prosecution of soldiers for their lawful belligerent acts committed during the course of armed conflicts against legitimate military targets," and derives from the customary international law of war. United States v. Hamidullin, 114 F. Supp. 3d 365, 380 (E.D. Va. 2015); United States v. Lindh, 212 F. Supp. 2d 541, 553 (E.D. Va. 2002). The provisions of the Geneva Convention Relative to the Treatment of Prisoners of War, Aug. 12, 1949, 6 U.S.T. 3316, 75 U.N.T.S. 135, 1956 WL 54809 (U.S. Treaty 1956) (hereinafter the "GPW"), set forth the parameters of this doctrine. See Lindh, 212 F. Supp. 2d at 553. Article 87 of the GPW states that prisoners of war may not be sentenced to any penalty "except those provided for in respect of members of the armed forces of the said Power who have committed the same acts." Article 99 states that a prisoner of war may only be tried or sentenced for acts which are "forbidden by the law of the Detaining Power or by international law, in force at the time the said act was committed." In sum, these Articles "make clear that a belligerent in a war cannot prosecute the soldiers of its foes for the soldiers' lawful acts of war." Lindh, 212 F. Supp. 2d at 553. The United States is a party to the GPW and it therefore has the force of law under the Supremacy Clause. See U.S. Const. art. VI, § 2.

For the relevant portions of the GPW to apply, there must be an international armed conflict within the meaning of Article 2 of the GPW. Second, the GPW sets forth four criteria an organization must meet for its members to qualify for lawful combatant status:

> i.  the organization must be commanded by a person responsible for his subordinates;

45

    ii.   the organization's members must have a fixed distinctive emblem or uniform recognizable at a distance;

    iii.   the organization's members must carry arms openly; and

    iv.   the organization's members must conduct their operations in accordance with the laws and customs of war.

See GPW, art. 4(A)(2).[33] All of these elements must be met in order for the affirmative defense of lawful combatant immunity to apply. See United States v. Hamidullin, 114 F. Supp. 3d 365, 381 (E.D. Va. 2015) (a defendant must "satisfy[] the criteria for lawful combatant status articulated under the GPW" to qualify for this defense); United States v. Lindh, 212 F. Supp. 2d 541, 557 n.35 (E.D. Va. July 11, 2002) (noting that "the four criteria have long been understood under customary international law to be the defining characteristics of any armed force . . . Thus, all armed forces of militias, regular and irregular, must meet the four criteria if their members are to receive combatant immunity"); United States v. Khadr, 717 F. Supp. 2d 1215, 1222 (USCMCR 2007).

        B.  The Defendant is Not Entitled to Present Evidence or Argument in Support of a Lawful Combatant Defense

The defendant, an admitted member of the designated terrorist group al-Qaeda, is ineligible to assert any claim of lawful combatant immunity. First, HARUN cannot make a prima facie showing that he can produce evidence on each element of the defense. As the Supreme Court explained in United States v. Bailey, 444 U.S. 394, 416 (1980), "[i]f . . . an affirmative defense consists of several elements and testimony supporting one element is insufficient to sustain it even if believed, the trial court and jury need not be burdened with testimony supporting other elements of the defense." In such circumstances, the court may preclude the defendant from offering any evidence of that affirmative defense. United States v. Gonzalez, 407 F.3d 118, 122 (2d Cir. 2005) (a

---

[33] These criteria are also established under customary international law and were also included in the Hague Regulations of 1907. Lindh, 212 F. Supp. 2d at 557 citing Hague Convention Respecting the Laws and Customs of War on Land, Oct. 18, 1907, 36 Stat. 2277, T.S. No. 539.

defendant must "make some showing on each element" of an affirmative defense); United States v. Lizalde, 38 F. App'x 657, 660 (2d Cir. 2002) ("if the court finds that the defendant's evidence is insufficient as a matter of law to establish an element of the duress defense, the court may preclude the defendant from presenting evidence of that defense to the jury")

Here, the defendant is, specifically, an admitted foreign fighter for the designated terrorist group al-Qaeda, from Saudia Arabia or Niger, and he has repeatedly acknowledged his role in ambushing U.S. soldiers in Afghanistan in 2003 during a cross-border attack (from Pakistan) that left two young soldiers dead and others seriously injured. He has further described his role in planning an attack against on the American Embassy in Nigeria – an attack that he hoped would rival the deadly 1998 bombings of American Embassies in Kenya and Tanzania. At trial, these statements will be corroborated by physical and documentary evidence as well as by testimony from other government witnesses. Under these circumstances, the defendant cannot satisfy the threshold requirement of demonstrating, by a prima facie showing, that he is entitled to present evidence in support of lawful combatant immunity because the facts relevant to each element of the lawful combatant immunity defense weigh against HARUN. See United States v. Gonzalez, 407 F.3d 118, 122 (2d Cir. 2005) ("A defendant is entitled to an instruction on an affirmative defense only if the defense has "a foundation in the evidence.") (quoting United States v. Podlog, 35 F.3d 699, 704 (2d Cir.1994)).

First, Article 2 of the GPW states that "the present Convention shall apply to all cases of declared war or of any other armed conflict which may arise between two or more of the High Contracting Parties, even if the state of war is not recognized by one of them." Al-Qaeda is neither a "High Contracting Part[y]" nor a state. Accordingly, the provisions of GPW, including Article 4 which set forth the criteria for claiming lawful combatant immunity, do not apply to HARUN.

Second, even if the GPW's provisions applied to an al-Qaeda foreign fighter, HARUN cannot show that he: (1) was commanded by a person responsible for his subordinates; (2) which had a fixed, distinctive sign recognizable at a distance; (3) carried its arms openly; and (4) conducted its operation in accordance with the laws and customs of war. GPW. Art. 4A.(2). There is no credible argument that the al-Qaeda terrorist network, which is responsible for the attacks on September 11, 2001, which killed thousands of U.S. civilians and precipitated the U.S. actions in Afghanistan, has ever conducted its operations in accordance with the laws and customs of war. This alone defeats any claim of lawful combatant status. See United States v. Lindh, 212 F. Supp. 2d 541, 558 (E.D. Va. 2002) (holding that the relevant question is whether the organization, rather than the individual, violated the laws and customs of war). In addition, members of al-Qaeda do not wear any "distinctive sign that could be recognized by opposing combatants" or any "uniforms or insignia" but instead "were effectively indistinguishable from the rest of the population". Id. (holding that members of the Taliban did not employ fixed, distinctive signs recognizable at a distance). Next, while al-Qaeda members use arms and other weapons to carry out attacks, they do not do so "openly" in the manner of regular military personnel. They do not wear uniforms or other military insignia and they use *kunyas*, or *nom de guerre*, meant to conceal their identities. Finally, al-Qaeda does not have a clearly structured command system in which a leader is held legally accountable for the actions of his subordinates. While al-Qaeda fighters (including HARUN) often swear loyalty oaths to their religious and military commanders and choose to obey their orders, the defendant cannot not show that al-Qaeda members directly report to senior officers or that deviation from any such order could subject the leader or subordinate to a disciplinary regime equivalent to that used by a regular military, e.g., court martialing. In other words, an al-Qaeda member could not

48

credibly assert that he was "following orders" as a defense to criminal conduct akin to the charges in this case.

Notably, the defendant has only recently advised the government, in an email dated November 10, 2016, that they expect to call David Frakt, as a "expert in the Law of Armed Conflict."[34] Putting aside their failure to comply with the joint scheduling order requiring Defense expert notice to be filed on November 8, 2016, and putting aside the validity of calling a lawyer as expert at trial, no credible theory of the law of war would provide the defendant with lawful combatant immunity. As Mr. Frakt himself has previously opined: an individual who participates in "direct attacks on lawful combatants (uniformed soldiers of a state party involved in the conflict) in a zone of conflict intended to kill or seriously injure them" and is "unquestionably" a not entitled to combatant immunity. David J. R. Frakt, Direct Participation in Hostilities As A War Crime: America's Failed Efforts to Change the Law of War, 46 Val. U. L. Rev. 729, 729-30, 734 (2012) (explaining that "unprivileged belligerents" and "Direct Participant in Hostilities" who attack lawful combatants are "not entitled to the privilege of being treated as POWs if captured, nor are they entitled to combatant immunity for lawful acts of war-under POW status."). According to Frakt, "[t]he use of weapons or other means to commit acts of violence against human and material enemy forces is probably the most uncontroversial example of direct participation in hostilities." Id. At 734.

_____

[34] Despite the recently agreed upon deadline of November 8, 2016 for the defendant's expert notice and despite the fact that defense counsel has been aware of its intention to call Frakt and other experts for months, they have failed to provide any meaningful notice pursuant to Fed. R. Crim. P 16(b)(1)(C), which requires that the defendant must provide a "written summary of any testimony that the defendant intends to use," which "must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications." Fed. R. Crim. P. 16(b)(1)(C). The defense has merely stated that it intends to "call an expert on the history of Afghanistan," and a "competency expert." They have not advised the government of what opinions these experts will offer or the bases for those opinions. By separate letter, the government intends to request a status conference at the Court's earliest convenience to address this issue.

For all of these reasons, the defendant may not claim status as a lawful enemy combatant and the defense should be precluded from arguing or eliciting evidence in support of such a claim.

## CONCLUSION

For the reasons stated above, the government's motions in limine should be granted in their entirety.

Dated:     Brooklyn, New York
           November 14, 2016

                                   Respectfully submitted,

                                   ROBERT L. CAPERS
                                   UNITED STATES ATTORNEY
                                   Eastern District of New York
                                   Attorney for Plaintiff
                                   271 Cadman Plaza East
                                   Brooklyn, New York 11201


                        By:    _____/s/_____
                                   Shreve Ariail
                                   Melody Wells
                                   Matthew J. Jacobs
                                   Assistant United States Attorneys
                                   (718) 254-7000

                                   Joseph N. Kaster
                                   Trial Attorney,
                                   Counterterrorism Section,
                                   National Security Division

51