SA:MJ/MW/JNK
F. # 2011R01313

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

– – – – – – – – – – – – – – – – – – – – – – – –X

UNITED STATES OF AMERICA

    - against -

IBRAHIM SULEIMAN ADNAN ADAM
HARUN HAUSA,
    also known  as "Spin
    Ghul," "Esbin Gol," "Isbungoul,"
    "Abu Tamim," "Joseph Johnson,"
    and "Mortala Mohamed Adam,"

                 Defendant.

– – – – – – – – – – – – – – – – – – – – – – – –X

Docket No. <u>12–CR-134 (BMC)</u>

## GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S DAUBERT CHALLENGE

                      ROBERT L. CAPERS
                      UNITED STATES ATTORNEY
                      Eastern District of New York
                      271 Cadman Plaza East
                      Brooklyn, New York 11201

Shreve Ariail
Melody Wells
Matthew J. Jacobs
Assistant U.S. Attorneys

Joseph N. Kaster
Trial Attorney
Counterterrorism Section
National Security Division
(Of Counsel)

## PRELIMINARY STATEMENT

The government respectfully submits this memorandum of law in opposition to the defendant's Daubert challenge to the expected expert testimony of Evan Kohlmann. As described below, in the expert report produced to the defendant on October 31, 2016, and in the government's motion in limine, filed on November 14, 2016, Kohlmann will provide critical context for the government's evidence in this case, which will assist the jury in understanding a set of discrete topics beyond the jury's common knowledge.[1]

As set forth in the indictment, IBRAHIM SULEIMAN ADNAN ADAM HARUN HAUSA, also known as "Spin Ghul," "Esbin Gol," "Isbungoul," "Abu Tamim," "Joseph Johnson," and "Mortala Mohamed Adam" ("HARUN"), an al-Qaeda operative, is charged with conspiring to murder United States nationals, in violation of 18 U.S.C. § 2332(b)(2), and conspiring to provide, providing and attempting to provide, material support to al-Qaeda in violation of 18 U.S.C. § 2339B, between August 2001 and September 2011.

HARUN is also charged with conspiring to attack a United States government facility, in violation of 18 U.S.C. § 2332f, specifically United States diplomatic and consular facilities in Nigeria, in or about and between August 2003 and January 2005. Finally, HARUN is charged with using firearms in furtherance of multiple crimes of violence, in violation of 18 U.S.C. § 924(c), and with using or carrying an explosive to commit a federal felony, in violation of 18 U.S.C. § 844(h).

---

[1] Copies of the Government's expert notice, Evan Kohlmann's report and his *curriculum vitae* are attached to the defendant's Daubert motion ("Def. Daubert Mot") as Exhibits 1, 2 and 9.

As set forth in its expert notice to the defendant, provided on October 31, 2016, the government anticipates that Kohlmann will testify at trial about:

- the history of al-Qaeda;

- al-Qaeda's infrastructure, leadership and geographic locations during the time period outlined in the indictment;

- the location and operation of certain al-Qaeda training camps;

- terrorist attacks carried out by al-Qaeda;

- the background and the significance of certain individual terrorists and regional al-Qaeda affiliates, including al-Qaeda in the Land of the Islamic Maghreb ("AQIM", formerly known as the Salafist Group for Prayer and Combat or "GSPC") and jihadist groups operating in Nigeria, Niger, Libya and the Sahel desert region of Africa, including Boko Haram; and

- The common meaning and usage of words and concepts used by members of the global jihadist movement.

Kohlmann's specialized knowledge of al-Qaeda is important in this case because it will enable the jurors to understand and evaluate critical aspects of the government's key evidence—i.e., the defendant's extraordinarily detailed Mirandized statements given over three consecutive days in September 2011. As described in greater detail in the government's November 14, 2016 motion in limine, during those Mirandized interviews, the defendant made extensive statements regarding the following topics, among others: his membership in al-Qaeda; his participation in a cross-border ambush in April 2003 in which two U.S. soldiers were killed; his close association with many key members of al-Qaeda and other high-ranking jihadists allied with al-Qaeda; and his intention and efforts to carry out attacks in Nigeria that would rival the 1998 Embassy bombings in Nairobi, Kenya and Dar es Salaam, Tanzania (terrorist attacks on two U.S. embassies which resulted in the deaths of more than 200 people).

For example, during his <u>Mirandized</u> statements, the defendant described his training at al-Qaeda's *al-Farouq* facility in Afghanistan shortly after the attacks of September 11, 2001, indicated that he swore *bayat* to Osama Bin Laden through senior al-Qaeda military commander Abdul Hadi al-Iraqi, and indicated that, in the aftermath of September 11th, he and other members of al-Qaeda crossed the Afghanistan-Pakistan border, and carried out cross-border attacks on U.S. soldiers based in Afghanistan.  The significance of this would be lost on the jurors if they were prevented from considering expert testimony that *al-Farouq* was indeed an important al-Qaeda training camp during this period, the significance of swearing *bayat* meant that HARUN had provided his oath of loyalty to Bin Laden – a practice common among al-Qaeda members, and that Abdul Hadi al Iraqi was a senior al-Qaeda military commander who, after the September 11, 2001 attacks in the United States, retreated – along with other key elements of al-Qaeda – across the Afghanistan-Pakistan border to the Federally Administrated Tribal Areas (the "FATA") and, from there, carried out cross-border attacks on U.S. soldiers stationed in Afghanistan.  The proffered expert testimony is thus not only relevant, but essential to the jury's assessment of the credibility and accuracy of the defendant's <u>Mirandized</u> statements about al-Qaeda and the crimes he committed on behalf of al-Qaeda.  Moreover, such expert testimony will not unfairly prejudice the defendant given the rest of the evidence the government intends to offer at trial, given the breadth of the defendant's repeated confessions, and given that Kohlmann's testimony essentially will be limited to a discussion of significant

terrorists, terrorist organizations, jihadist concepts and terrorist attacks discussed or referenced by the defendant in his various confessions.[2]

## DISCUSSION

### A.  The Standard for Admitting Expert Testimony

Federal Rule of Evidence 702 provides: "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a)    The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b)    The testimony is based on sufficient facts or data;

(c)    The testimony is the product of reliable principles and methods; and

(d)    The expert has reliably applied the principles and methods to the facts of the case."

The "Rules of Evidence provide a liberal standard for the admissibility of expert testimony," United States v. Dukagjini, 326 F.3d 45, 52 (2d Cir. 2003), as "[e]xpert witnesses are often uniquely qualified in guiding the trier of fact through a complicated morass of obscure terms and concepts."  United States v. Duncan, 42 F.3d 97, 101 (2d Cir. 1994).

The Court must also ensure that expert testimony "rests on a reliable foundation." Daubert v. Merrell Dow Pharm. Inc., 509 U.S. 579, 597 (1993).  This requires that a trial court make a "preliminary assessment of whether the testimony's underlying reasoning or

---

[2] Notably, with few exceptions, defense counsel does not directly address Kohlmann's expert report or substantive opinions.  Instead, defense counsel relies on legal generalities, inapposite historical testimony and *ad hominem* attacks on Kohlmann in an attempt to support their claim that the testimony Kohlmann intends to offer in this case is inappropriate.

methodology is scientifically valid and . . . can be applied to the facts in issue." Id. at 592-93.

The Court must make a "common sense inquiry into whether the untrained layman would be

qualified to determine intelligently and to the best possible degree the particular issue without

enlightenment from those having a specialized understanding of the subject involved in the

dispute. United States v. Kassir, 2009 WL 910767, at *3 (quoting United States v. Locascio, 6

F.3d 924, 936 (2d. Cir 1993)).

> The Court may consider several indicia of reliability enumerated in Daubert:
>
> (1) "Whether a theory or technique has been or can be
> tested"; (2) "whether the theory or technique has been
> subjected to peer review and publication"; (3) "the
> technique's known or potential rate of error . . ."; and (4)
> "whether a particular technique or theory has gained
> general acceptance in the relevant scientific community."

United States v. Williams, 506 F. 3d, 151, 160 (2d Cir. 2007) (quoting Daubert, 509 U.S. at

593-94). "The test of reliability is flexible, and Daubert's list of specific factors neither

necessarily nor exclusively applies to all experts or in every case." Kumho Tire Co. v.

Carmichael, 526 U.S. 137, 141 (1999). Courts have "considerable leeway in deciding in a

particular case how to go about determining whether particular testimony is reliable." Id. at

152. The object is to "make certain that an expert, whether basing testimony upon professional

studies or personal experience, employs in the courtroom the same level of intellectual rigor

that characterizes the practice of an expert in the relevant field." Id.

### B. The Second Circuit's Approval of Testimony Offered by Evan Kohlmann

The Second Circuit has repeatedly upheld the admission of Kohlmann's expert

testimony regarding al-Qaeda and other terrorism-related matters. United States v. Kaziu, 559

Fed. Appx. 32 (2d Cir. 2014) (upholding Judge Gleeson's admission of expert testimony by

Kohlmann about "how al-Shabaab and al-Qaeda distribute their propaganda through 'media wings,'" and how "outsiders' familiarity with such material facilitates their assimilation into terrorist groups," noting that Kohlmann "based his testimony on specialized research and training removed from the instant case"); United States v. Mustafa, 406 Fed. App'x. 526, 528-29 (affirming Judge Keenan's decision in United States v. Kassir, 04-CR-356 (JFK), to allow Kohlmann to testify as a "terrorism expert" regarding al-Qaeda); United States v. Farhane, 634 F. 3d 127, 158-60 (2d Cir. 2011) (upholding Kohlmann's expert testimony regarding "al-Qaeda and Azzam Publications, the publisher of a jihadist videotape"); United States v. Aref, 285 Fed. Appx 784, 792 (2d Cir. 2008) (upholding Kohlmann's expert testimony regarding Pakistani and Kurdish terrorist groups); United States v. Paracha, 313 Fed. Appx. 347, 351 (2d Cir. 2008) (upholding Kohlmann's expert testimony regarding the "organization and structure of al-Qaeda").[3]

      The gravamen of the defendant's Daubert challenge is that Kohlmann employs an invalid methodology that results in unreliable opinions. Yet, the Second Circuit has repeatedly affirmed that Kohlmann's basic methodology, and his resulting opinions, satisfy the requirements of Rule 702. See Farhane, 634 F.3d at 158-159; Mustafa, 406 Fed. Appx. 526 at **1-5; Paracha, 313 Fed. Appx. 347 at **3. The defendant does not claim that Kohlmann's methodology has changed; rather, the defense asserts that all the previous courts to admit expert

---

[3] A number of other circuit courts have also upheld the admission of Kohlmann's expert testimony. See United States v. Hassan, 724 F. 3d 104, 131-32 (4th Cir. 2014); United States v. Amawi, 695 F. 3d 457, 478-79 (6th Cir. 2012), cert. denied, 133 S. Ct. 1474 (2013).

testimony from Kohlmann were woefully uninformed about his qualifications and the validity

of his analytical approach.  A review of those decisions belies that incredible assertion.

### C. Kohlmann's Testimony Has Repeatedly Been Found Reliable by Judges in the Eastern and Southern Districts of New York and Elsewhere in the United States and Overseas

While the defendant seeks to challenge the reliability of Kohlmann's expert

testimony and his methodology, no serious dispute about his qualifications to testify as an

expert exists.  Kohlmann has previously testified as an expert witness on similar or the same

subject matter in over 25 federal criminal trials in the United States.  He has likewise testified

twice in the military commission trials held in Guantanamo Bay, Cuba.  And he has testified in

eight different foreign courts and tribunals as an expert witness on terrorism issues.

At least four different judges in the Eastern District of New York have qualified

Kohlmann as an expert witness on terrorism-related issues.  These include the Honorable John

Gleeson, United States v. Kaziu, 09-CR-660 (JG) (E.D.N.Y June 30, 2011) (finding Kohlmann

an expert on the international jihadist movement and the use of internet, computer media and

electronic media in connection with the internationalist jihadist movement, *without a Daubert*

*objection from defense counsel, Joshua Dratel, Esq., or David Stern, Esq.*)[4] and United States

v. Medunjanin, 10-CR-19 (JG) (E.D.N.Y. April 26, 2012) (qualifying Kohlmann as an expert

witness in "al-Qaeda and sources of radical Islamist media");[5] the Honorable Eric N. Vitaliano,

United States v. Shehadeh, 10-CR-1020 (ENV) (E.D.N.Y. March 18, 2013) (finding Kohlmann

---

[4] The relevant transcripts associated with Kaziu are attached as Exhibits A (see p. 710) and B, and discussed in more detail below.

[5] The relevant transcript associated with Medunjanin is attached as Exhibit C (see p. 1631).

qualified to testify as an expert on international terrorism and websites used by international terrorists and their supporters),[6] and the Honorable Raymond J. Dearie in <u>United States v. Naseer</u>, 10-CR-019 (RJD) (E.D.N.Y. February 18, 2015) (qualifying Kohlmann as an expert in al-Qaeda).[7]

      At least five different judges in the Southern District of New York have qualified Kohlmann as an expert witness on terrorism-related issues.  These include the Honorable Sidney H. Stein, <u>United States v. Paracha</u>, No. 03-CR-1197 (SHS), 2006 WL 12768 (S.D.N.Y. Jan. 3, 2006), <u>aff'd</u>, 313 Fed. Appx 347, 351 (2d. Cir. 2008); the Honorable Loretta A. Preska, <u>United States v. Sabir</u>, 05-CR-673 (LAP), 2007 WL1373184 (S.D.N.Y. May 10, 2007), <u>aff'd sub nom.</u>, <u>United States v. Farhane</u>, 634 F. 3d 127, 158-60 (2d Cir. 2011); the Honorable Robert W. Sweet, <u>United States v. Nayyar</u>, 09-CR-1037 (RJS) (S.D.N.Y.); the Honorable John F. Keenan, <u>United States .v Kassir</u>, 04-CR-356 (JFK), 2009 WL 910767 (S.D.N.Y. Apr. 2, 2009); and the Honorable Lewis A. Kaplan, <u>United States v. Gayth</u>, 98-CR-1023 (LAK) (S.D.N.Y.).

      In <u>Paracha</u>, Judge Stein conducted a day-long <u>Daubert</u> hearing and concluded that Kohlmann had sufficient education, experience, and training to qualify as an expert, and that his methodology was sufficiently reliable.  The <u>Paracha</u> Court found that:

> [Kohlmann's] methodology consists of gathering multiple sources of information, including original and secondary sources, cross checking and juxtaposing new information against existing information and evaluating new information to determine whether his conclusions remain consonant with the most reliable sources. . . .  His methodology is similar to that employed by his peers in his field; indeed, he explained that he works collaboratively with his peers, gathering additional

---

[6] The relevant transcript associated with <u>Shehadeh</u> is attached as Exhibit D (<u>see</u> p. 102).

[7] The relevant transcript associated with <u>Naseer</u> is attached as Exhibit E (<u>see</u> p. 439)

information and seeking out and receiving comments on his own
work.

Paracha, 2006 WL 12768, at *20.[8] The Court further found that Kohlmann's expert opinions
"regarding al-Qaeda's origins, leaders and certain tradecraft are generally accepted within the
relevant community" and that he employed "sufficiently reliable methodology to meet the
requirements of" Rule 702.  Id.  The Paracha Court further noted that Kohlmann's testimony is
analogous to the type of expert testimony routinely admitted in cases involving organized crime
families.  See, e.g., United States v. Amuso, 21 F.3d 1251, 1263-64 (2d Cir. 1994) and Paracha,
2006 WL 12768 at *21 (citing cases).  See also United States v. Abu Jihaad, 553 F. Supp. 2d
121, 124 (D. Conn)., aff'd 630 F.3d 102 (2d Cir. 2010).[9]  The Second Circuit agreed that the
District Court "was well within its discretion in ruling that Kohlmann's methodology was
sufficiently reliable and his testimony and relevant to the jury's understanding of al-Qaeda so
as to be admissible under" Rule 702 and Daubert.  Paracha, 313 Fed. Appx. at 351.

Similarly, in Sabir, Judge Preska concluded that Kohlmann was "qualified as an
expert to provide testimony on" al-Qaeda's origins, history, structure, leadership, training
camps, instructional methods, and operational logistics, specific acts of terrorism perpetrated

---

[8]  A copy of the transcript of the Daubert hearing in Paracha, as well as the relevant findings made
at the hearing, are attached hereto as Exhibits F and G.

[9]  The Second Circuit has deemed "organized crime" to be a relevant subject area for expert
testimony, including the nature, structure, and methods of organized crime. See United States v.
Lombardozzi, 491 F.3d 61, 77 (2d Cir. 2007); United States v. Locascio, 6 F.3d 924, 938 (2d Cir. 1993);
United States v. Daly, 842 F.2d 1380, 1388 (2d Cir. 1988).  Relatedly, the Second Circuit has upheld
expert testimony concerning (1) the nature and function of organized crime, (2) the structure of the
organization, (3) the rules, (4) interpretation of conversations, including the meaning of certain jargon and
code words, and (5) identification of individuals, other than the defendant, by name and rank. See
Locascio, 6 F.3d at 936-37; Daly, 842 F.2d at 1388; United States v. Gotti, No. 02-743, 2004 WL
2423799, at *1-2 (S.D.N.Y. Oct. 29, 2004) (permitting the government's organized crime expert to
"identify specific members of organized crime families, other than the defendants, by name and rank").
The general nature of Kohlmann's expert testimony regarding terrorism is no different.

by al-Qaeda, and Azzam Publications, a producer of jihadist videos.  2007 WL 1373184, at *2,

10.  The Second Circuit affirmed that ruling finding that:

> Kohlmann's proposed expert testimony had a considerable factual basis: (1) his graduate studies at Georgetown University's School of Foreign Service and Center for Contemporary Arab Studies and at the University of Pennsylvania Law School; (2) his full time employment at two organizations focusing on terrorism and al-Qaeda, "Globalterroralert.com" and the Investigative Project; (3) his authorship of various academic papers and a book on al-Qaeda; (4) his provision of consulting services on terrorism and al-Qaeda to various federal agencies; and (5) his ongoing efforts to collect, analyze, and catalogue written, audio, and visual materials relevant to terrorism generally and al-Qaeda in particular, including the records of guilty pleas and confessions from admitted al-Qaeda operatives.

Farhane, 634 F.3d at 158-59.

The Farhane court also noted the district judge's reliance on the Daubert hearing in Paracha, which established that "Kohlmann's work had undergone various forms of peer review, that his opinions were generally accepted within the relevant community, and that his methodology was similar to that employed by experts that have been permitted to testify in other federal cases involving terrorist organizations." Id. at 159 (internal quotation marks omitted).

In Kassir, Judge Keenan cited the Paracha Court's findings before concluding "Kohlmann's expertise and reliability have not diminished, and the standard under Rule 702 and Daubert remains the same.  Therefore, his testimony on the origins, history, structure, leadership and various operational methods of al-Qaeda and other terrorist groups is sufficiently reliable." 2009 WL 910767 at *87.  Likewise, in Gayth, Judge Kaplan agreed with the Paracha court's findings, noting that Kohlmann "is qualified under Rule 702.  He has been qualified to

testify in twenty-five federal criminal trials." United States v. Ghayth, 2104 WL 978629, at *1 (S.D.N.Y. Feb. 28, 2014).[10]

Ignoring the numerous cases approving Kohlmann's methodology and opinions regarding topics at issue in this case (e.g., al-Qaeda's leadership, methods, and organization), the defense struggles in vain to find instances where the *scope* of Kohlmann's opinions has been limited in other contexts.  See Def. Daubert Mot. at 13 (specific attacks attributed to Hamas); Id. at 18 (defendants' lack of ties to terrorist organizations rendered opinions about who made the group's videos irrelevant); Id. 28 (creation of a "homegrown terrorist" profile). But the defense offers no legitimate basis to dispute that Kohlmann's anticipated opinions regarding al-Qaeda in this case are grounded in a sound methodology which has produced opinions not merely admissible, but "generally accepted within the relevant community."  See Paracha, 2006 WL 12768 at * 20, aff'd, 313 Fed. Appx. 347 (2008).

In light of the Second Circuit's multiple decisions establishing the reliability of Kohlmann's expert testimony—on a substantially similar subject matter—the Court should deny the defendant's Daubert motion and allow Kohlmann to testify as an expert on al-Qaeda and related terrorism matters.

---

[10] In qualifying Kohlmann as an expert, Judge Kaplan also "considered the transcript of a full-day Daubert hearing in [Paracha], in which another judge [of the Southern District of New York] focused deeply on Kohlmann's experience, training, education, and methodology, and determined that Rule 702 was satisfied." Gayth, 2014 WL 978629.  Judge Kaplan noted that the "Second Circuit upheld that determination, and that [he] agree[d] with the Paracha court's findings." Id.  A copy of the court's order is attached hereto as Exhibit H.  In his motion, the defendant does not request a hearing, nor is one required for the Court to fulfill its gate-keeping function under Daubert.  See United States v. Williams, 506 F.3d 151, 161 (2d Cir. 2007).

### D.     Kohlmann's Testimony is Relevant and Helpful to the Jury

Defense counsel argues that portions of Kohlmann's testimony should be precluded under Federal Rules of Evidence 401 and 403.  Specifically, defense counsel seeks to exclude expert testimony regarding "(1) various terrorist attacks and threats against the U.S. and its nationals (and in concert with al-Qaeda), many of which occurred or were planned to occur in countries and regions not involved in this case, and which took place outside the timeframe of the conduct alleged in the indictment; (2) notorious individuals in the al-Qaeda network, most of whom lack any connection to the charges in this case, for example, Abu Zubaydah al-Filastini."  Def. Daubert Motion at 23-24.

#### i.     Kohlmann's Testimony is Relevant and Will Assist the Jury

At trial, the jury will see evidence and hear testimony about various members and associates of al-Qaeda with whom the defendant directly interacted.  That evidence will primarily be presented through the defendant's detailed statements to Italian and U.S. officials about his work for al-Qaeda and through documentary evidence recovered during various raids that occurred overseas, in Afghanistan and elsewhere.  The jury will also hear testimony about the location and activities of al-Qaeda personnel between 2001 and 2005, including through the testimony of U.S. military personnel who fought in Afghanistan during the relevant time period and through the expected testimony of U.S. government personnel who conducted a forensic exploitation of *al-Farouq*, an al-Qaeda training camp identified by the defendant in his <u>Mirandized</u> statements.

In order to place that testimony and evidence in context, the government intends to elicit expert testimony from Kohlmann on the formation, structure, and leadership of al-

Qaeda (prior to and during the time period of the charged conduct), as well as the location and activities of al-Qaeda personnel between 2001 and 2005. The government expects that Kohlmann will testify about the *al-Farouq* training camp, an al-Qaeda training camp which in 2001 was located near Kandahar, Afghanistan. Similarly, Kohlmann will testify that, after the American invasion of Afghanistan in late 2001, surviving al-Qaeda foreign fighters escaped into Pakistan, where they regrouped. From bases in the FATA of Pakistan, al-Qaeda fighting groups then began to engage American and Coalition troops in Afghanistan. And Kohlmann will also testify that, during the 2002-2003 period that HARUN described, al-Qaeda fighting groups were in fact active along the Afghanistan-Pakistan border. Without such testimony, the jury would not be able to fully understand, let alone assess, the significance the defendant's statements. See Fed. R. Evid. 702(a). As in drug and gang cases, the Second Circuit has approved of the use of terrorism experts like Kohlmann to provide historical context and structural information. See Abu Jihaad, 553 F. Supp. 2d at 124 (citing cases).

      The government expects that Kohlmann will also testify about prominent terrorists identified by HARUN as his associates and superiors. For example, HARUN described fighting against American troops while under the command of Abdul Hadi al Iraqi. After he was wounded in the April 25, 2003 ambush, HARUN told Abu Faraj al Liby that he wanted to engage in al-Qaeda operations in other countries. Abu Faraj then placed HARUN under the command of Hamza Rabia, who ensured that HARUN was trained in Waziristan by al-Qaeda explosives expert Abu Khabab al-Masri. Kohlmann will corroborate, in substantial respects, HARUN's specific recounting of his terrorist activity, through an independent discussion of those individuals described by HARUN.

14

The jury will also see independent evidence and hear testimony about the defendant's involvement with individuals associated with the GSPC and other jihadists – referred to by the defendant as the Nigerian Taliban – that were operating in Nigeria, Niger, Libya and the Sahel desert region of Africa.  While in Nigeria, HARUN met with members of other Islamic radical groups on behalf of al-Qaeda. HARUN explained that these individuals were involved with the "Nigerian Taliban," and the "Society for Preaching and Killing."  The "Nigerian Taliban" appears, based on context, to be a predecessor organization for the Nigerian terrorist group Boko Haram or otherwise to be a general reference to jihadist elements in Nigeria at that time.[11]

Kohlmann will independently identify the Salafist Group for Preaching and Combat (also known as the *Groupe Salafiste pour la Predication et le Combat* or GSPC) as a terrorist organization based in North Africa, which allied itself with al-Qaeda in the 2003-2005 time period discussed by HARUN (and ultimately became al-Qaeda in the Lands of the Islamic Maghreb or AQIM).  Kohlmann will likewise discuss the existence of other jihadist groups operating in Nigeria, Niger, Libya and the Sahel desert region of Africa, including Boko Haram.

The weakness of defense counsel's argument concerning the relevance and alleged prejudice of Kohlmann's testimony is underscored by the sole example he cites to support it—i.e., that Abu Zubaydeh al-Filistini's activities as a jihadi recruiter and organizer are "irrelevant to the charges in this case." Def. Daubert Mot. at 23.  In making this argument,

---

[11] The "Society for Preaching and Killing" plainly refers to the "Salafist Group for Preaching and Combat," "*Groupe Salafiste pour la Prédication et le Combat,*" or "GSPC," the predecessor organization for the designated foreign terrorist organization al-Qaeda in the Lands of the Islamic Maghreb ("AQIM").

defense counsel entirely (and inexplicably) ignores that the defendant confessed that he "met with Abu Zubaydah.  Abu Zubaydah Filinstini" during his years as a member of al-Qaeda in Afghanistan and Pakistan.  See Transcript of Defendant's September 2011 Statements at 119:11-12.  The relevance of the association between the defendant (a jihadist accused of providing material support to al-Qaeda) and Abu Zubaydah (a jihadist recruiter and organizer in Pakistan) is clear on its face.  Expert testimony concerning Abu Zubaydah's jihadist activities will enable the jury to understand why the defendant's admission that he associated with Abu Zubaydah is relevant.[12]

### ii.  Kohlmann's Testimony is not Unfairly Prejudicial

Defense counsel also fails to explain how the probative value of the proffered testimony is *substantially* outweighed by unfair prejudice to the defendant, especially given the nature of the charges, the character of his statements to U.S. and Italian law enforcement officers, and other evidence the government anticipates introducing in this case. See Fed. R. Evid. 403 ("[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice" to the defendant).

As set forth above, HARUN is charged with several extremely serious, terrorism-related crimes – including for his involvement in the killing of U.S. soldiers in Afghanistan, his operational conduct on behalf of al-Qaeda, including a plot to blow up the U.S. Embassy in Nigeria.  Moreover, during his Mirandized interviews, HARUN provided extensive detail about his association with dozens of al-Qaeda-related terrorists that he met in

---

[12] Expert testimony concerning particular jihadists is all the more relevant for the reasons described in other classified submissions submitted to the Court. See e.g. ECF # 146.

Afghanistan, the FATA, Pakistan, Nigeria, Niger and Libya, e.g., Abdul Hadi al Iraqi Abu

Faraj al Liby; Hamza Rabia, and Abu Zubaydah al Filistini.

In light of those charges and that record, it is hard to see how Kohlmann's

proffered testimony could be considered unduly prejudicial in any way.  Indeed, a review of

the expert report provided by the government will reflect the fact that *every single terrorist,*

*terrorist organization, or terrorist attack* described by Evan Kohlmann, was discussed by the

defendant in his three-day, <u>Mirandized</u> statements to the United States government in Italy and

his other interviews with Italian law enforcement.

### E.  Kohlmann's Testimony Will Appropriately Rely on Hearsay, Will Not Contravene Circuit Guidance, and Will Not Violate the Confrontation Clause

Without providing specific areas of complaint, defense counsel states broadly

that Kohlmann's testimony appears to be based "nearly entirely, if not entirely, on hearsay,

some of which may very well include the product of custodial interrogation." Def. Daubert Mot.

at 12.  Experts, of course, may rely on hearsay in formulating their opinions where experts in

that field reasonably rely on such evidence.  <u>See</u> <u>United States v. Daly</u>, 842 F. 2d 1380, 1387

(2d Cir. 1993).  It would certainly be improper to offer testimonial statements into evidence

through the testimony of an expert witness.  <u>See</u> <u>United States v. Lombardozzi</u>, 491 F.3d 61,

72 (2d Cir. 2007) (noting that <u>Crawford</u> is violated when an expert communicates "out-of-court

testimonial statements of cooperating witnesses and confidential informants directly to the jury

in the guise of an expert opinion").  Here though, the Government is not seeking to offer into

evidence the *statements* Kohlmann relied upon, but rather his expert opinion based on those

statements and the other sources he consulted.  Expert opinions of this nature are routinely

admitted by courts in the Second Circuit.  <u>See</u> <u>United States v. Escobar</u>, 462 Fed. Appx. 58, 62

(2d Cir. 2012) (rejecting Confrontation Clause challenge to expert testimony because "there is no evidence [the expert] communicated any out-of-court testimony statements to the jury.")[13] As such, Kohlmann's expert testimony is appropriate.

Defense counsel also complains that Kohlmann will serve as a summary witness for the government, and contravene the Circuit's guidance in United States v. Mejia, 545 F.3d 179 (2d Cir. 2008), where the Court found error in a prosecution where a law enforcement officer involved in the case investigation intermixed specific testimony about actual steps taken in the investigation, based entirely on hearsay, in addition to appropriate expert testimony in the case.[14] Def Daubert Mot. at 21.   Here, the concerns addressed by the

---

[13]  To the extent that Kohlmann does convey information about specific out-of-court statements, those will be related to a limited number of materials described in the expert report that, through self-authentication or otherwise through Kohlmann's explanation of the materials' authenticity, will be independently admissible at trial.  For example, a video released by al-Qaeda in August 2005, which is narrated by Abdul Hadi al Iraqi (identified as the "Emir of the Front"), shows al-Qaeda fighters carrying out cross-border attacks on U.S. soldiers from the same area, during the same time period that HARUN was fighting there.  In addition, official al-Qaeda propaganda videos and a lengthy interview released on an official al-Qaeda internet forum confirm that Abdul Hadi al Iraqi continued as al-Qaeda's military leader in the Afghanistan-Pakistan region during the 2002-2004 time period and that Abu Faraj al Liby served as an important lieutenant to Osama bin Laden. They also include a video of Abu Faraj al Liby with Osama bin Laden, recovered in Afghanistan that depicts a speech by bin Laden at the Tarnak Farms compound in Afghanistan in 2000. The audience includes Abu Faraj, who is seated near other significant al-Qaeda members.

[14]  In Mejia, a case in which the defendant was prosecuted in connection with his membership in MS-13, the Circuit specifically found fault with the fact that "the source of (the law enforcement expert's) statements about the number of firearms the [investigation team] had seized and the number of murders on Long Island that MS-13 members had committed [likely was obtained through the expert's review of] police reports, Task Force meetings, conversations with other officers, or conversations with members of MS-13" and that there "was at least one fact to which [the expert] testified [about] that was based directly on statements made by an MS-13 member in custody ([developed] *during the course of [the government's] very investigation*)"). Id. (emphasis in original).  The Second Circuit found that the district court had erred in admitting law enforcement expert testimony regarding the activities of the "MS-13" street gang. Id. at 194.  In sum, the court held that it was error to allow the expert to testify regarding "material well within the grasp of the average juror[,]" and to "essentially summarize[]" the results of the investigation that had led to the prosecution at issue in that case. Id. at 194-95.  Here, the government does not seek to have Kohlmann testify regarding the instant investigation, or to provide any facts or conclusions regarding the defendant on trial.

Circuit in Mejia are non-existent.  As it stands, Kohlmann initially drafted his expert report prior to reviewing the defendant's September 2011 statements, was not directly involved in the government's investigation, and has otherwise only been provided with an overview of the government's case to aid him.   To contrast, in Mejia, the expert at issue was a member of law enforcement who had participated in the government's investigation and impermissibility mixed his expert testimony with hearsay information obtained from custodial sources and other information *which had been developed during the government's investigation into the defendants who were then on trial*. See Mejia 545 F.3d. at 197, 199.

### F. Despite Dr. Sageman's Comments and Defense Counsel's Arguments, No Serious Challenge to Kohlmann's Expertise Has Been Raised

Finally, despite the strong-worded critique of Evan Kohlmann by defense counsel regarding Kohlmann's pedigree and methodology, which includes quotes from his "rebuttal expert" Marc Sageman (see generally Def. Daubert Mot. at 27-50) who defense counsel had previously retained in at least two other terrorism cases, no serious challenge to Kohlmann has been raised.[15]  Notably much of the critique of Kohlmann has been recycled from previous submissions provided to various courts and, as set forth above, most, if not all, of these arguments have been rejected by various courts after assessing the credibility and appropriateness of Kohlmann's testimony, methodology and credentials.[16]

---

[15] The defense also includes commentary from others, including Philip Giraldi, who has, on more than one occasion, made questionable assertions related to national security based on information provided by unnamed confidential sources.

[16] See e.g. Paracha, 03-CR-1197 (SHS) (during cross-examination at the Daubert hearing, defense attorneys Anthony Ricco, Esq., and Edward Wilford, Esq., (1) sought to criticize Kohlmann for not having a masters doctorate degree, Paracha Daubert Transcript ("Paracha Tr.") 43-44; (2) sought to criticize an expert, Steven Emerson, for whom Kohlmann had previously worked, as being biased, Paracha Tr. 44; (3) sought to criticize Kohlmann's analytical methodology, Paracha Tr. 44-45; (4) sought to criticize

Moreover, defense counsel's more recent reliance on Sageman's critique of Kohlmann is substantially undermined by the nature of these experts' historical relationship – which strongly suggests that Sageman's animosity towards Kohlmann is born of a straightforward academic dispute or pique which provides an unfortunate backdrop for Sageman's testimony in a trial.[17]  According to Sageman's testimony during the trial of United States v. Mehanna, in 2008, Sagemen was personally friendly with Kohlmann, to the extent that Sageman and Kohlmann engaged socially, having met on at least one occasion to discuss

---

Kohlmann for not having had more people review his undergraduate thesis, Paracha Tr. at 46; (5) sought to criticize Kohlmann for relying on particular sources, Paracha Tr. 46-47; (6) sought to criticize Kohlmann for his formal and informal relationships with members of law enforcement, Paracha Tr. 47-48; (7) suggested that Kohlmann traded information to law enforcement in exchange for information from law enforcement, Paracha Tr. 48-49; (8) suggested that Kohlmann did not allow his writings to be "peer-reviewed," and criticized him for not being able to name all of the academics with whom he worked "off the top of his head," Paracha Tr. 50-52; (9) criticized Kohlmann for providing informal assistance to the 9/11 Commission, Paracha Tr. 53; (10) criticized Kohlmann's sourcing for his book and other articles, Paracha Tr. 54-63; (11) discussed various social science methodologies used by Kohlmann and others in the social sciences, and criticized Kohlmann's methodology, Paracha Tr. 62-63, 71; and (12) discussed his prior court testimony, Paracha Tr. 67-69.).

    See also United States v. Sherifi, 09-CR-216 (FL) (E.D.N.C. 2011) ("The court does not find that Kohlmann deliberately overstated his credentials . . . [as the defendant] contends he did.  To the contrary, Kohlmann was forthright about his experience, his work, and his critics, particularly when questioned by the court regarding issues of peer review. . . .  [The defendant's] arguments that Kohlmann deliberately overstates the extent to which his work is peer reviewed is unsupported and finds no support in the record developed at [the Daubert] hearing . . . ").  A copy of the Court's decision in Sherifi, is attached hereto as Exhibit I.

    [17] Indeed, while the government does not challenge Sageman's expertise on Daubert grounds, much of the testimony noticed by the defendant on December 20, 2016, attached hereto as Exhibit J, is legally inappropriate for an expert and should be precluded, as discussed in more detail below.  For the Court's context, according to the defendant's notice, defense counsel has indicated that in addition to providing testimony on relevant topics such as on the evolution of al-Qaeda, Abu Zubaydah's relationship with al-Qaeda, the status of Abdel Hadi al-Iraqi, and Abu Faraj al LIby, as well as the roles within al-Qaeda of Abdel Hadi, Abu Faraj and Hamza Rabia, Sageman is also expected to testify "Regarding Mr. Kohlmann's Alleged Expertise and Analysis," essentially serving in part as an "expert" to provide his "expert testimony" about Evan Kohlmann's credentials and to provide the jury with his opinion of him as a witness.

their work "over a couple of glasses of wine" and, thereafter, had discussed the possibility of meeting "again for drinks and discussion." Transcript of Mehanna Trial ("Mehanna Tr.") at 101-102.  Sageman has relied on Kohlmann in his published works, see e.g., *A Strategy for Fighting International Islamist Terrorists*, Marc Sageman, Richard Clarke, July 2008, The Annals of the American Academy of Political and Social Science.[18]  They have traded emails with each other over the years, presented a case together at a conference before the United Nations, and sought, at one time, to publish a book together, for which Sageman provided Kohlmann a proposed template or outline.  Id. 101-105.  Sageman has traveled overseas to watch Kohlmann testify as an expert witness.  Mehanna Tr. at 101.

At some point, however, Sageman's perspective on Kohlmann changed, while his own reputation and methodology were aggressively and quite effectively challenged during cross-examination by the government in U.S. v. Tareq Mehanna, 04-17 (GAO) (D. Mass.).  While Sageman was found appropriately qualified as an expert in that case, a trial in which both Kohlmann and Sageman were called as "dueling experts," the government noted during cross-examination Sageman's potential for bias: "And to date, you've billed around $30,000 for your time" working on the defense case?", (Mehanna Tr. at 92); that Sageman – not unlike Kohlmann – was also not fluent in Arabic (id. at 92-93.); the fact that prior to his 2011 testimony in that

---

[18]  Relying on Kohlmann's work for the point that "[t]he same support and validation that young people use to derive from face-to-face peer groups are now found worldwide in online forums which promote the image of terrorist heroes, promote extremist ideas, links users to the virtual social movement, give them guidance and instruct them in tactics. See Kohlmann 2008 this volume."  A copy of Sageman's article is attached hereto as Exhibit K.  Sageman apparently presented that same work during his testimony before Congress ("Much of the material in this article was presented by Marc Sageman as testimony for the U.S. Senate Committee on Homeland Security and Governmental Affairs on June 27, 2007.").

case, he had only been twice qualified as a terrorism expert, and had never testified in court as a terrorism expert, (id. at 94.); the fact that he had previously been accused of plagiarism in his book *Leaderless Jihad* and that *his publisher printed a retraction as a result*, (id. at. 95.); and the fact that he had failed to appropriately educate himself about an al-Qaeda video "State of the Ummah: The final Solution," about which he opined during his direct examination (id. at 109-113).

More relevant, however, to a clear understanding of Sageman's (and to some extent the defense's) attack on Kohlmann, is the fact that the "academy" (or the terrorism expert community of which Kohlmann and Sageman are well-established participants), has at times been critical of Sageman's own work product.  In 2008, Bruce Hoffman, a well-respected terrorism expert and historian from Georgetown University, severely criticized Sageman's book *Leaderless Jihad* (which was the subject of the plagiarism dispute discussed above) in a review entitled "The Myth of Grass Roots Terrorism: Why Osama Bin Laden Still Matters," published in the national security journal, *Foreign Affairs*.

In his review, Hoffman commented that the "salient weakness" in Sageman's book "is its insistence that [informal local terrorist groups] represent [] the *entire* threat facing the United States today." The Myth of Grass-Roots Terrorism: Why Osama bin Laden Still Matters, Bruce Hoffman, May/June 2008 Issue, *Foreign Affairs*.  After critiquing Sageman's characterization of two historical events, and noting that Sageman had ignored two major U.S. intelligence estimates that directly contradicted his thesis – that al-Qaeda in the post-September 11th world was no longer a central organizing force that aided or authorized terrorist attacks or recruits terrorists, Hoffman noted that:

22

> Sageman's historical ignorance [was] surpassed only by his
> cursory treatment of social networking theory, which forms the
> foundation of the scientific methodology he claims to employ.
> *Leaderless Jihad's* first chapter, titled 'How to Study Terrorism
> in the Twenty-first Century,' takes exception to much of the
> literature on terrorism, which, in Sageman's opinion, is
> unscientific, relies too much on narrowly explanatory case
> studies and profiles of leading terrorist figures, is too heavily
> dependent on information gleaned from government sources,
> and amounts to 'nothing more than arguments made for the sake
> of scoring political points.' Id.

Hoffman further noted that:

> Sageman's own critique of the contemporary literature [on
> terrorism] appears *sniping and petulant.* It would seem less so if
> Sageman had provided specific examples and citations of the
> studies that he believes have contributed so little to the
> understanding of terrorism, explained exactly why they are so
> wanting, and demonstrated how his approach is superior.
> Indeed, Sageman's analysis would have been clearer and more
> scientifically rigorous had he employed essential and basic tools
> of social science research and built on the core theories of social
> and terrorist networks . . .[19] Id. (emphasis added).

Undercutting Sageman's own criticism of Kohlmann's methodology, Hoffman

criticized Sageman's book and his analysis as:

> *founder[ing] precisely on what Sageman claims are its
> strengths: the empirical data on which his analysis is based
> and his technique of examining terrorism as a social
> movement.* For a book that extols scientific methods and the
> importance of facts, *Leaderless Jihad* has a surprisingly curt
> discussion of methodology and only a brief elucidation of the
> data to be tested. Sageman claims that he began building a

---

[19] Instead, Hoffmann noted that the "reader is told that 'until recently, a large part of the literature on terrorism concentrated on definitions of terrorism' – with the citation justifying this fatuous assertion referencing a book published in 1984. What little explanation follows briefly describes how trial transcripts and media accounts are the most reliable sources for terrorism research. According to Sageman, academic publications are the least useful because 'most academic experts on terrorism are experts in other fields who do not follow the literature on terrorism closely and therefore pick selectively only those facts that support their arguments.'" Id.

database from information about the 19 terrorists who carried out the 9/11 attacks.  That grew to contain a sample of 172 jihadists, on which his previous book was based, and then to contain the more than 500 profiles from which this work is derived.  Of this database, however, Sageman says only that it contains 'information on people and their relationships with other terrorists, non-terrorists, ideas, and the social, political, economic, cultural, and technological context.'[20]  Id. (emphasis added).

Indeed, it appears that Sageman's al-Qaeda-is-just-a-bunch-of-guys theory – set forth in *Leaderless Jihad* –did not gain acceptance among other terrorism experts given the clear significance of al-Qaeda leadership during the particular time period.  Sageman appears to have taken Hoffman's critique personally.  In a direct response published in Foreign Affairs – that echoes Sageman's criticism of Kohlmann in this case – Sageman claimed that Hoffman "blatantly misrepresent[ed]" his position commenting that:

> "Disagreements among experts are the driving force of the scientific enterprise. However, science has some rules for settling such arguments. These rules do not condone taking quotes out of context and building a straw man through gross misrepresentation and then subjecting him to a hatchet job."

*Does Osama Call the Shots: Debating the Containment of al-Qaeda's Leadership*, Marc Sageman, Foreign Affairs, July/August 2008 Issue.

In response, Hoffman again criticized Sageman for his *claim of superior methodology and analysis in the field of terrorist analysis*:

------

[20] "[According to Hoffman, Sageman] goes on to argue that a good database 'should trace the evolution of these relationships to see how they form, intensify, and fade so as to describe them over time.' From a social science perspective, however, these types of unidentified or vaguely identified data sources and unclear collection procedures pose serious problems.  Furthermore, Sageman does not explain how his collection of data conforms to the scientific standards of academic inquiry that he finds so lacking in the work of most terrorism scholars." Id.

As for methodology, Sageman writes in these pages that 'in science, the strength of the evidence should trump loyalty to authority.' But he seems not to understand that science is cumulative.  Sageman publicly shared his data on the 'bunches of guys' he studied for his last book, *Understanding Terror Networks*, but he has not done the same with his data for *Leaderless Jihad* [(which was the subject of the plagiarism dispute discussed at the Mehanna trial)].  The type of appendix that appeared in the first book, with the names of his subjects and brief biographies, is absent from the second. It is therefore impossible for a reader to determine if Sageman's new evidence really is superior to other existing data. It is also curious that an author who rails in his book against scholars who supposedly rely on information from "mysterious sources--anonymous tips from the 'intelligence community' – that cannot be verified" defends himself by citing 'what I have heard from law enforcement agencies around the world during my extensive consultations with them.'" Id. *(rebuttal),* Bruce Hoffman.

Not willing to let it go, Sageman was quoted in an interview with the New York Times suggesting that Hoffman's critique was born of jealousy, "*Maybe he's mad that I'm the go-to guy now*." *A Not Very Private Feud Over Terrorism*, New York Times, June 8, 2008 (emphasis added).

Like Sageman, defense counsel appears to have had some dramatic change of perspective on Kohlmann – whether as a result as a result of the fact that Kohlmann's testimony over the subsequent years has proven effective in conveying to juries the significance of al-Qaeda, or perhaps because they have recognized that Sageman's commentary on the "bunch of guys" theory is consistent with defense strategy of jury nullification.  It is unclear now what exactly motivates the defense to attack Evan Kohlmann so vehemently, given their prior acceptance of him as an expert in a terrorism case in this courthouse.

In 2011, in United States v. Kaziu, 09-CR-660 (JG), a terrorism case in which Mr. Dratel served as co-counsel with David Stern, Esq., the government provided the defendant with expert notice that it intended to call Evan Kohlmann at trial, and advised that it sought to elicit testimony from Kohlmann regarding the terrorist groups al-Qaeda and al-Shabaab, various al-Qaeda and jihadist personalities, and video and audio recordings produced by al-Qaeda and its media wing, *as-Sahab*.[21]  Among other materials provided to Mr. Stern and Mr. Dratel were transcripts of Kohlmann's trial and Daubert hearing testimony, various Court rulings, export reports and briefings relevant to Kohlmann's testimony in federal courts, U.S. military tribunals, and foreign courts prior to 2011.  By the time of his testimony in Kaziu, Kohlmann had been qualified to testify as an expert in sixteen cases.

Prior to trial, neither Mr. Stern, Mr. Dratel, nor their co-counsel, Henry Steinglass, filed any formal Daubert challenge to Evan Kohlmann's testimony.  While Mr. Dratel raised aspects of the admission of certain jihadist videos on 403 grounds, *no Daubert challenge of Kohlmann, his pedigree, his resume, his citations or his credentials in any way was made by either Stern or Dratel*, before, during or after trial, even though most – if not all – of the meritless claims defense counsel seek to raise today (regarding Kohlmann's pedigree, his resume, his citations, credentials etc.) were raised and addressed in numerous prior court proceedings involving Kohlmann – which were disclosed in discovery to Mr. Dratel and Mr. Stern well in advance of trial.  In particular, those disclosures included the public Daubert

---

[21] Copies of the two expert reports, the relevant expert notice and Kohlmann's curriculum vitae then provided to defense counsel in U.S. v. Kaziu, 09-CR-660 (JG), are attached hereto as Exhibits L, M, N, and O.

hearing of Kohlmann held in November 2005 in <u>United States v. Paracha</u>, 03-CR-1197 (SHS), discussed in detail above.

At trial, when asked by Judge Gleeson whether he had any objection to qualifying Kohlmann, Mr. Dratel indicated he had no objection to Kohlmann's testimony as an "expert in the international jihadist movement, more specifically, the use of the internet or computer media or electronic media, in connection with that." <u>See</u> Exhibit A at 710.

G. **<u>Sageman's Proffered "Expert" Testimony About Kohlmann Should be Barred</u>**

Finally, to the extent that the defendant seeks to elicit "expert" testimony of Marc Sageman as an "expert witness" on Evan Kohlmann, such testimony would usurp the jury's role in assessing witness credibility, it would run afoul of rule 403 of the Federal Rules of Evidence by sewing confusion in the Court room, and it is outside the proper scope of expert testimony as set forth in 702 and <u>Daubert</u>.  As such, this testimony should be barred.

As set forth briefly above, in addition to providing testimony on relevant terrorism-related topics, Sageman is also expected to testify "Regarding Mr. Kohlmann's Alleged Expertise and Analysis," essentially offering an "expert" opinion on Evan Kohlmann's credentials and his opinion of him as a witness.

In particular, in the Sageman Expert Notice, the defendant has indicated that Sageman will testify that:

> (1)  Mr. Kohlmann is a lawyer without any social science training or publications in a peer reviewed journal to his credit.  Mr. Kohlmann spends most of his time following jihadi websites online;
>
> (2)  Dr. Sageman rejected Mr. Kohlmann's book, Al-Qaida's Jihad in Europe: the Afghan Bosnian Network, in a blind peer review for the University of Pennsylvania Press;
>
> (3)  The methodology of Mr. Kohlmann's book is woefully

deficient.  The vast majority is composed of unreliable – as
opposed to primary or secondary – source material.  Only
seven of Mr. Kohlmann's 872 footnotes refer to primary
sources; 42 cite secondary sources (such as court filings); a
staggering 823 footnotes – 94% -- reference unreliable
sources;

(4) Mr. Kohlmann's book contains many factual inaccuracies and
represents sloppy scholarship;

(5) Mr. Kohlmann has not been to Afghanistan or Pakistan and
does not speak any of the indigenous languages in use there.
In his prior work, he has also made many basic factual errors
with respect to his description of the Taliban;

(6) during cross-examination at a hearing determining
admissibility of expert testimony at trial, Mr. Kohlmann
admitted not being familiar with basic concepts of scientific
methodology necessary to test his claims.  He claimed to have
conducted a statistical analysis on his sample, but admitted he
never took a class in statistics or used any sampling or
randomization techniques. He claimed to have conducted a
statistical analysis on his sample, but admitted he never took a
class in statistics or used any sampling or randomization
techniques; and

(7) intelligence professionals, academics, and judges have
criticized Mr. Kohlmann's methodology and analysis, as well
as his lack of experience in important aspects of terrorism
study.  See Sageman Expert Notice at 2-3.

The defendant also notes that "[a]dditional aspects of Dr. Sageman's analysis of

Mr. Kohlmann's purported expertise are included in Mr. Harun's motion to preclude Mr.

Kohlmann's testimony pursuant to *Daubert v. Merrell Dow Pharmaceuticals*, 526 U.S. 579

(1993)." Id.  See Exhibit J at 2-3.

First, to the extent that the defendant intends to challenge Kohlmann's

credentials or expert opinions, these should be "tested before the jury with the familiar tools of

'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the

burden of proof.'" Lapsley v. Xtek, Inc., 689 F.3d 802, 805 (7th Cir. 2012), (quoting Daubert

v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 596, 113 S.Ct. 2786 (1993).  It is clear

that the existence of bias or prejudice of one who has expressed an expert opinion can always be examined into on the cross-examination of such expert; as well as the facts upon which his expert opinion was based.  Wigmore on Evidence, Sec. 949 (3rd Ed. 1940); United States v. Abrams, 427 F.2d 86, 90 (2nd Cir. 1970).  Here, the proper tool for the defendant to challenge Kohlmann is cross-examination.

Second, the credibility and reliability of witness testimony is a question of fact to be determined by the jury, and not another expert witness. Mason v. Brathwaite, 432 U.S. 98, 116 (1977); United States v. Singh, 628 F. 2d 758, 766 (2d Cir. 1980) (issues of credibility are solely within the jury's province).  As such, experts should be limited in what they can testify to and cannot attack the credibility of other experts. Fafara v. McMahon, 2006 WL 5086618, at *5 (citing United States v. Carter, 410 F.3d 942, 950 (7th Cir. 2005); United States v. Welch, 368 F.3d 970, 975 (7th Cir.2004); Richman v. Sheahan, 415 F.Supp.2d 929, 941–42 (N.D.Ill.2006) ("A fundamental premise of our system of trial in both civil and criminal cases is that determining the weight and credibility of witness testimony is for the jury, who are presumed to be fitted for the task by their natural intelligence and their practical knowledge of the affairs of life")).

Finally, having a second expert testify as to the credibility and qualifications of the first would undoubtedly interfere with the jury's role.  Moreover, such testimony would fall outside the proper scope of Sageman's expertise under FRE 702, and would simply open the door for a third or fourth expert such as Bruce Hoffman to be called by the government to criticize Sageman.  This would undoubtedly cause chaos and confusion in the courtroom and would needlessly waste the Court's and the jury's time.  See F.R.E. 403.  To avoid such an

occurrence, the Court should carefully confine Sageman's expected testimony to his "field of study" or the actual area of his expertise appropriately designated under the Federal Rules of Evidence – terrorism.[22]

CONCLUSION

For the reasons stated above, the defendant's <u>Daubert</u> motion to preclude the testimony of Evan Kohlmann should be denied, and the defendant's proposed expert testimony of Marc Sageman should be limited, as described above.

Dated:      Brooklyn, New York
            January 5, 2017

Respectfully submitted,

ROBERT L. CAPERS
UNITED STATES ATTORNEY
Eastern District of New York
Attorney for Plaintiff
271 Cadman Plaza East
Brooklyn, New York 11201

By:      _____/s/_____
         Shreve Ariail
         Melody Wells
         Matthew J. Jacobs
         Assistant United States Attorneys
         (718) 254-7000

         Joseph N. Kaster
         Trial Attorney
         Counterterrorism Section
         National Security Division

---

[22]  To the extent that such testimony is allowed by the Court, and it should not be, the government hereby provides notice that it intends to call Bruce Hoffman, or one or more other experts, who are available to provide opinions on Sageman's credibility, his methodology and analysis, as well as his research and publications, and scholarly citation issues, as a rebuttal expert in this case.