1    UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
2    --------------------------------x
                                 12-CR-134(BMC)
3    UNITED STATES OF AMERICA,
                                 United States Courthouse
4          Plaintiff,          Brooklyn, New York
5          -against-           February 21, 2017
                                 1:30 p.m.
6    IBRAHIM SULEIMAN ADNAN ADAM HARUN,
7          Defendant.
     --------------------------------x
8                 TRANSCRIPT OF CRIMINAL CAUSE FOR
                      EVIDENTIARY HEARING
9            BEFORE THE HONORABLE BRIAN M. COGAN
               UNITED STATES DISTRICT JUDGE
10
    APPEARANCES
11
    For the Government:       ROBERT L. CAPERS, ESQ.
12                     United States Attorney
                     Eastern District of New York
13                   271 Cadman Plaza East
                     Brooklyn, New York 11201
14                   BY:  SHREVE ARIAIL, AUSA
                         MATTHEW JACOBS, AUSA
15                      MELODY WELLS, AUSA
16    For the Defendant:        ROTHMAN, SCHNEIDER, SOLOWAY & STERN
                     100 Lafayette Street, Suite 501
17                   New York, New York 10013
                     BY:  DAVID STERN, ESQ.
18
                     LAW OFFICES OF JOSHUA L. DRATEL, P.C.
19                   29 Broadway, Suite 1412
                     New York, New York 10006
20                   BY:  JOSHUA L. DRATEL, ESQ.
21                   SUSAN GAIL KELLMAN, ESQ.
                     25 Eighth Avenue
22                   Brooklyn, New York 11217
23    Court Reporter:          Georgette K. Betts, RPR, CSR, OCR
                     Phone:  (718)804-2777
24                   Email:  Georgetteb25@gmail.com
    Proceedings recorded by mechanical stenography.  Transcript
25    produced by computer-aided transcription.

PROCEEDINGS

1              (In open court.)

2              THE COURT:  Good afternoon, have a seat.

3              THE COURTROOM DEPUTY:  The United States versus

4    Harun.  Docket number 12-CR-134.

5              Counsel please state your appearances, starting with

6    the government.

7              MR. ARIAIL:  Good afternoon, Your Honor, Shreve

8    Ariail for the United States.  I'm with Joe Kaster from the

9    Department of Justice CTS.  Matt Jacobs, AUSA office, Melody

10   Wells.  Greg Paciorek from the FBI, and Dr. Mark Mills, who is

11   here to testify.

12             THE COURT:  Okay.

13             MR. STERN:  David Stern, Josh Dratel and Susan

14   Kellman for Mr. Harun.  Mr. Harun is not here and we waive his

15   appearance.  We're also joined at our table by Jess Ghannam

16   who is here to testify, and Mayerlin Ulerio, who is here to

17   tell me how to do the case.

18             THE COURT:  This is the, if you could call it at

19   least a second or successive competency hearing, the defendant

20   having previously been determined to be competent some time

21   ago for purposes of standing trial.  And the defendant has

22   asked for reconsideration -- I won't say reconsideration

23   because it's de novo, but a rehearing as to competency.

24             Before I address that, there's two things I want to

25   cover, the first Mr. Stern alluded to which is the defendant

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter

PROCEEDINGS

1    is not present.  I did ask the marshals to see if he would

2    willingly come to court and they have advised me that he

3    declined to come to court.  That's consistent with what

4    Mr. Stern told me last time, which is he had conferred with

5    the defendant, to the extent the defendant will allow him to

6    confer, and the defendant had made it quite clear, I think

7    Mr. Stern said, that he does not want to attend any

8    proceedings in this Court.

9            The marshals asked me if I wanted to sign a force

10   order to get them to bring him here, but we know from our

11   prior experience that he has become sufficiently violent and I

12   think all parties have agreed that we should not attempt to do

13   that, and I think that's why Mr. Stern made the statement he

14   did last time.  So that explains why the defendant isn't here

15   today.

16           I also should tell the parties I intend, unless

17   anyone has a better proposal, if he is found competent in this

18   hearing and the trial begins as scheduled, I will have the

19   marshals ask him, probably not every day but maybe every

20   second day or third day, if he's willing to come without the

21   use of force.  And maybe we'll get an affirmative response and

22   he will, but I want to make sure everyone's agreed that we

23   should not use force in order to get him to be here.

24           MR. STERN:  We do agree with that.  We also

25   understand that there is a closed-circuit system where they

4

PROCEEDINGS

 1    can put him, not in the cell he's normally in but another,

 2    I'll call it a pen, a holding facility of some kind, and have

 3    the television within his view.  It's up to him whether he

 4    watches it or not, but at least that way if he sees things

 5    going on at the trial that he thinks require his appearance

 6    he'll come, but what you said is entirely accurate.  We do not

 7    want him brought here by force, we do not want to put him or

 8    the marshals or anyone else at risk for what I consider to be

 9    no apparent reason.  And I did try to talk to him, he didn't

10    say to me specifically the words, I don't want to come to

11    Court, but he said words that certainly led me to believe

12    that.  So that's where things are.

13          THE COURT:  I assume the government has no problem

14    with that.

15          MR. ARIAIL:  Your Honor, I think with respect to

16    today's proceeding, obviously the 475 request was made and

17    based on your representation also I heard from the marshals as

18    well that he refused.

19          There are two things I want to raise.  One, I

20    understand that he may have made some requests to be

21    accommodated in the manner that Mr. Stern actually indicated,

22    but I also think that at least on one occasion that we need to

23    consider having him brought in -- I'm not saying it's today,

24    having him brought in here with force so that we could at

25    least have the opportunity to potentially instruct him or give

5

PROCEEDINGS

1  him guidance that he has a trial, that he has a right to

2  testify, do all those things, but I would suggest Your

3  Honor -- and I don't know the answer here obviously, is that

4  perhaps on the day of the 27th when we convene the venire for

5  jury selection that we propose a force order on that date and

6  see if we can actually get through that.  We're just concerned

7  about process here and as I know the Court is as well.  And

8  that's just sort of our thoughts, so.

9         MR. STERN:  Judge, we're very much opposed to that

10  and we think there are ways to give him all the process to

11  which he's due without tormenting him by bringing him to

12  Court.  Among other things, we think that anything the

13  government is concerned about or Your Honor is concerned about

14  we can write to him a letter which can be translated into

15  Hausa, we can have someone give it to him by hand -- I have in

16  mind Lieutenant Lopez with whom he seems to have -- I wouldn't

17  say a good relationship, but whom he can tolerate, I guess

18  I'll say.  But I think bringing him here for that purpose is

19  really elevating form over substance.

20         He's going to come here and shout and curse and do

21  whatever the things are that he does and we won't really

22  accomplish anything more than we can by giving him a letter he

23  might tear up, he might eat, he might read, I don't know what

24  he'll do with it, but the idea that we need to bring him here

25  flies in the face of all we know about him and his behavior in

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter

PROCEEDINGS

1    this case so far and puts people at risk for really no gain.

2             MR. ARIAIL:  Your Honor, my concerns are structural

3    and Constitutional, they're not about what I think is the

4    perfect solution in this situation.  I think we just need to

5    at least make a record that we tried to get him here, that we

6    tried to advise him that he has a trial that is proceeding

7    right now.  We have secondhand reports about whether he is

8    aware that his trial is proceeding, and I think we just need

9    to give him that opportunity.

10            Look, if he refuses, if he is so dangerous that we

11   don't think we should bring him out into the courtroom, that's

12   a different thing, but I think we want to have that piece of

13   the record established so we don't later, when he has new

14   attorneys or when he decides he wants to engage in the process

15   three years from now, comes back and says, oh, well, the

16   marshals didn't tell me, you know, I could come.  You know,

17   the video link wasn't working.  So we have some clear record

18   of that, that's really what I'm looking for Your Honor.

19            MR. STERN:  Well, as the trial is proceeding he can

20   still see it on the closed-circuit television.

21            THE COURT:  Yes, first of all, certainly we will

22   have the TV set up so he can watch it if he wants to.  I think

23   the government is being faithful to the usual procedures in

24   what is a very unusual situation, and I think we have to

25   demonstrate with our creativity and be a little flexible and

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter

PROCEEDINGS

1   not to be just so concerned that we have to comply with a

2   technical requirement that we risk someone, the marshals, or

3   the defendant, or God forbid somebody else in the courtroom

4   getting hurt.

5          It seems to me that if force is required to bring

6   him to court, especially considering the great degree of

7   resistance he has previously used to the point of tearing off

8   his prison uniform while shackled, then we can be virtually

9   certain that if he is here, he's going to continue that

10  behavior once we get him here.  I don't hear the government

11  proposing that we ought to medicate him in order to get him

12  here, which I think is the only way, outside of his willful

13  desire to be here, that we could get him here without force

14  order.  And of course it will take a force order to administer

15  the medication.  And, you know, once he starts fighting with

16  the marshal in the jail, he's not going to come here and

17  behave himself.  He has not behaved himself at any hearing

18  that I recollect.  Every hearing I've done -- maybe he did

19  when Judge Korman had the case, but every hearing I've had we

20  had to take him out of the courtroom because he just doesn't

21  want to be here, or for other reasons as we'll hear today.

22         So now I'm not going to enter a force order for the

23  superficial compliance with the usual procedure in a case like

24  this which I think is extraordinary.  And if he files a 2255

25  saying I didn't know I could be there, it will come to me.

8

PROCEEDINGS

1          In the meantime, I think Mr. Stern's suggestion of

2     an advice letter is a good one.  I'd like Mr. Stern to write a

3     letter to him, have it translated into Hausa explaining his

4     right to be here.  I don't want to see that here, keep it in

5     your file.  If there is a 2255 -- if he's found competent and

6     if there is a conviction and then there is a 2255, then I may

7     issue an order for you to pull out that letter.

8          I will also issue an order advising him of his

9     rights to be here, and we'll have that translated into Hausa

10    and he will have that as well if he wants to read it.

11          He's demonstrated a complete desire not to be

12    involved or in the loop in these proceedings in any way, but I

13    think if we do all those things, that is the functional

14    equivalent of going to great extremes to make sure that he

15    knows he can be here and should be here if he wants to be

16    here, and that's really all I'm going to do about it.

17          Okay.  Then the last detail I need defendant to

18    respond to the government's motion in Limine that I got last

19    night in a week, can you do that?

20          MS. KELLMAN:  Yes.

21          MR. DRATEL:  Yes, Your Honor, in a week from today?

22          THE COURT:  Yes.

23          MR. DRATEL:  Thank you.

24          MR. ARIAIL:  Sorry, Your Honor, one more thing which

25    is tangentially related to this issue of force.  So, there are

9

PROCEEDINGS

1    scars on the defendant that the government intends to

2    introduce as evidence at trial.  We have one photograph of one

3    of the scars.  We believe there are other scars.  We are

4    currently working with the marshals and BOP to hopefully get a

5    full set of the pictures of the scars but we may have to come

6    back to the Court to ask for some sort of an order to

7    photograph the scars for purposes of the trial.

8              THE COURT:  Really?

9              MR. ARIAIL:  I'm flagging that for the Court.

10             THE COURT:  Why isn't one scar enough?  What's the

11   probative value of the scars that outweighs the need for the

12   marshals to exercise force and risk injury?

13             MR. ARIAIL:  Your Honor, I'm not at that point, at

14   this point.  I think we may have a way around it, I'm flagging

15   it for the Court, but --

16             THE COURT:  I'm flagging it for you.

17             MR. ARIAIL:  I understand.  The issue is that the

18   first witnesses that the government calls will testify they

19   observed scars on the defendant at the time they arrested him

20   and that raised their consciousness about him.

21             I don't know that I have pictures of those scars.  I

22   have pictures of one scar of the defendant's arm that appears

23   to be consistent with a bullet wound.  But there may be other

24   scars that I'm just not aware of and that's the issue, Your

25   Honor.

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter

10

PROCEEDINGS

1          THE COURT:  If you reach that stage, talk to the

2    defense counsel and see if you can reach a stipulation.

3          MR. STERN:  I think in all likelihood we're not

4    going to contest that he had whatever scars people say they

5    saw on him.  So I don't think that's really an issue worth

6    going through what it's going to take to get this done.  I

7    don't think we're going to get up and say, aren't you lying,

8    those scars don't exist or anything like that.

9          MR. ARIAIL:  I think the issue is, Your Honor, is

10   that they're going to argue that he's making things up and

11   that's going to be their defense I think in many respects, and

12   if he has scars on his head related to battle injuries, which

13   he probably does, those are very relevant facts for us.

14         THE COURT:  If the witnesses testify that they saw

15   these scars and the defendant stipulates that there are such

16   scars, why do you need to force him to have pictures taken?

17         MR. ARIAIL:  I think if we have a stipulation I

18   think that's a little bit different.  I'm not sure I was

19   hearing that from the defense.  I think they're saying --

20         THE COURT:  I'm not sure I'm hearing it yet either

21   but I'm saying at least talk about it --

22         MR. ARIAIL:  Understood.

23         THE COURT:  -- before we get to that point.

24         MR. ARIAIL:  And I don't want to get to that point

25   either, Your Honor.

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter

GHANNAM – CROSS – JACOBS

1        THE COURT:  All right.  So the way I have structured

2    this hearing is I have agreed to take the reports of each

3    expert, respectively, as their direct testimony as to the

4    defendant's competence and what I determined is that the

5    expert can then take the stand and be cross examined on their

6    report and any other relevant information to the formation of

7    their opinion.  And I think that since -- well, I should ask

8    that question, whose burden is it at this stage?

9        MR. STERN:  Our burden by preponderance.

10       THE COURT:  Why don't we have Dr. Ghannam testify

11   first and the government will cross him on his report.

12       MR. STERN:  Fine.

13   JESS GHANNAM, called as a witness, having been first duly

14   sworn, was examined and testified as follows:

15       THE COURTROOM DEPUTY:  Please state and spell your

16   name for the record.

17       THE WITNESS:  First name Jess, J-E-S-S.  Last name,

18   Ghannam, G-H-A-N-N-A-M.

19       THE COURTROOM DEPUTY:  You may be seated.

20       THE COURT:  You may inquire.

21       MR. JACOBS:  Thank you, Your Honor.

22   CROSS-EXAMINATION

23   BY MR. JACOBS:

24   Q    Good afternoon, Dr. Ghannam.

25   A    Good afternoon.

GHANNAM – CROSS – JACOBS

1   Q    How many times have you testified as an expert in

2   criminal proceedings?

3   A    Approximately three times.

4   Q    Three times.

5        Were you qualified as an expert in all those cases?

6   A    Yes, I was.

7   Q    When was the last time you testified as an expert in a

8   criminal proceeding?

9   A    I'd have to check back.  It was probably about two years

10  ago.

11  Q    Was it in around July 2015?

12  A    Correct.

13  Q    Was it the case of Raed Jaser?  I don't know if I'm

14  pronouncing that right.

15  A    Raed.

16  Q    Raed Jaser?

17  A    Jaser.

18  Q    So that was the case?

19  A    Yes, sir.

20  Q    And you provided an expert report in that case, right?

21  A    Correct.

22  Q    Then you testified in Court under oath at sentencing,

23  correct?

24  A    Correct.

25  Q    And the judge who presided over that sentencing issued a

GHANNAM - CROSS - JACOBS

1    written opinion, correct?

2    A    Correct.

3    Q    In that written opinion he stated that your sworn

4    testimony was not credible, correct?

5    A    Correct.

6    Q    He said that you did not live up to the standards of

7    objectivity expected of an expert witness, correct?

8    A    Correct.

9    Q    He said that your analysis of evidence was, quote,

10   selective, end quote, correct?

11   A    Correct.

12   Q    In other words, he thought you were cherry-picking

13   evidence, correct?

14   A    I don't know what he thought, Counsel.

15   Q    He said your analysis of evidence was, quote, biased,

16   unquote, correct?

17            THE COURT:  Mr. Jacobs, I read the opinion.

18            MR. JACOBS:  Okay.

19   Q    Is it your contention, Dr. Ghannam, that your testimony

20   in that case was objective?

21   A    According to the judge --

22   Q    No, no, Dr. Ghannam, according to you.

23   A    According to --

24   Q    Do you believe that your testimony in that case was

25   objective?

GHANNAM - CROSS - JACOBS

1    A    To the best of my ability at that time, I do believe

2    that.

3    Q    Is that the same level of objectivity you used when

4    evaluating the defendant in this case?

5    A    Actually I believe I have a higher level of confidence in

6    this case.

7    Q    I'm talking about objectivity, Doctor?

8    A    Yes.

9    Q    Same level of objectivity --

10   A    A higher objectivity.

11   Q    Higher level of objectivity.

12        So when you evaluate different patients or

13   individuals, you apply different levels of objectivity?

14   A    Not at all.

15   Q    Oh, but didn't you just say you used a higher level of

16   objectivity in this case --

17        MS. KELLMAN:  Objection, argumentative.

18        THE COURT:  I allow it.

19   Q    -- than in the Jaser case?

20        THE COURT:  You may answer.

21   A    Yes.

22   Q    Did you disclose to the Court in your report or testimony

23   that you used a level of objectivity below the optimal level

24   of objectivity in Jaser?

25   A    Counsel, I'm afraid I lost the train of your questioning.

GHANNAM – CROSS – JACOBS

1   Would you mind starting over.

2   Q    It's okay I'll move on.

3        You met with Jaser's family in that case, right?

4   A    Correct.

5   Q    You spoke to Jaser's siblings, or at least one, correct?

6   A    Correct.

7   Q    And that sibling was Nabil, right?

8   A    Correct.

9   Q    Because Jaser has two other siblings but they have

10  developmental disabilities, correct?

11  A    Correct.

12  Q    You testified Jaser was not a jihadist, correct?

13  A    Correct.

14  Q    That he was a con man, correct?

15  A    Correct.

16  Q    And then Nabil, the brother of Jaser, testified, correct?

17  A    Correct.

18  Q    And he controverted your testimony, correct?

19  A    I didn't hear his testimony.

20  Q    You read the opinion and Justice Code found that he

21  controverted your testimony, correct?

22  A    Correct.

23  Q    When did you disclose this finding to the defense

24  attorneys that hired you for this case?

25  A    Approximately three days ago.

GHANNAM - CROSS - JACOBS

1  Q    So it's your testimony that you disclosed that opinion to

2  defense counsel three days ago?  What day is that?

3  A    No, I'm sorry, Counsel, it's right after you guys

4  submitted your --

5  Q    Okay.

6  A    -- your motion, whenever that was.

7  Q    That sequence is fairly important.  So after we disclosed

8  the existence of this adverse credibility finding to the Court

9  and your attorneys, you then disclosed it again?

10 A    It's not that I disclosed it, they brought it to my

11 attention.

12 Q    Gotcha, that's what I wanted to get straight.

13          So you never disclosed it to them?

14 A    That's correct.

15 Q    Why did you hide it?

16 A    I didn't hide it, I wasn't aware of it actually.

17 Q    You claim, I think in two places on your CV, to be an

18 expert witness, correct?

19 A    Correct.

20 Q    But it's your testimony you don't realize how significant

21 an adverse credibility finding is for expert witnesses?

22 A    It was never sent to me so that's correct.

23 Q    When you spoke with defense counsel when they retained

24 you, they asked you how many times have you testified before,

25 correct?

GHANNAM - CROSS - JACOBS

1   A    Correct.

2   Q    And they asked you whether you were qualified as an

3   expert, correct?

4   A    Correct.

5   Q    And they asked you whether you've ever had any adverse

6   credibility determinations, correct?

7   A    I don't believe they asked me that question.

8   Q    You think that defense counsels experienced as these

9   wouldn't ask that fundamental question?

10  A    Correct.

11  Q    You think they have taxpayer money spent flying you

12  across the country three times?

13             MS. KELLMAN:  Objection, Your Honor.

14             THE COURT:  Sustained.

15  Q    Did you just say that the opinion was never sent to you?

16  A    Correct.

17  Q    Do you know who John Norris is?

18  A    Yes, I do.

19  Q    He's the attorney for Jaser, right?

20  A    Correct.

21  Q    He retained you, correct?

22  A    Correct.

23  Q    And he lives up in Toronto, right?

24  A    Correct.

25  Q    And his phone number is (416)596-2960, right?

1    A    I don't know, Counsel.

2    Q    You know we have phones in the U.S. Attorney's Office,

3    right?

4    A    Correct.

5    Q    Because I left a message on your voice mail, correct?

6    A    You did?

7    Q    I did.

8    A    When did you do that?

9    Q    And you spoke with Mr. Norris after the sentencing

10   proceeding?

11          THE WITNESS:  I'm sorry, Counsel, did you leave me a

12   message?

13          THE COURT:  You're not allowed to ask questions.

14          THE WITNESS:  I'm sorry, sir.

15          MR. JACOBS:  If you didn't receive a message, you

16   didn't receive a message.

17   Q    You spoke with Mr. Norris after the sentencing

18   proceeding, right?

19   A    I don't believe I spoke with Mr. Norris afterwards.  I'd

20   have to go back and check.

21   Q    Would it surprise you to learn that Mr. Norris said, we

22   definitely were in communication after the sentence?

23          MR. DRATEL:  Objection as to form.

24          THE COURT:  I'll allow it.

25   A    Could you restate.

GHANNAM – CROSS – JACOBS

1   Q    Would it surprise you to learn that Mr. Norris said,

2   quote, we definitely were in communication after the

3   sentencing, end quote?

4   A    It would not surprise me.

5             THE COURT:  Can I have only one defense counsel

6   objecting.

7   Q    It would not surprise you he said that?

8   A    Not at all.

9   Q    You just said you didn't speak with him after the

10  sentencing?

11  A    Well, Counsel, you're asking me a very specific question,

12  if I spoke with him.  Did we have email communication

13  afterwards, I believe we did.

14  Q    So if we asked you to produce those communications you'd

15  be able to?

16  A    Yes.

17  Q    Let's talk about your report for a few minutes.

18            MS. KELLMAN:  Sorry, Judge, are we talking about in

19  this case?

20            MR. JACOBS:  Yes, I'm sorry, your December 19th

21  letter.

22            MS. KELLMAN:  Thank you.

23            THE WITNESS:  May I get a copy, please?

24            MR. JACOBS:  I'm going to use the overhead,

25  Dr. Ghannam, so we can follow along together.

1  Q    I'd like to direct your attention to the bottom of

2  page 4.  You wrote that, during both evaluations, he, the

3  defendant, was disheveled, unkempt, and exhibited poor

4  self-care and poor hygiene.  Poor even by standards of

5  correctional facilities.  In consultation with guard staff on

6  both occasions, they indicated that Mr. Hausa failed to shower

7  on a regular basis.  Only splashing water on his face on

8  occasion.  His level of hygiene could be revealed also by the

9  nature of his body odor which clearly demonstrates that

10 Mr. Hausa was finding it difficult, if not impossible, to

11 engage in adequate self-care.

12           So you saw that he was not clean, correct,

13 Dr. Ghannam?

14 A    Correct.

15 Q    You spoke to guard staff who said he doesn't shower

16 regularly, correct?

17 A    Correct.

18 Q    And on the basis of that you concluded that Mr. Harun is

19 finding it difficult, if not impossible, to bathe himself,

20 correct?

21 A    Correct.

22 Q    You know, though, that a doctor who evaluated Mr. Harun

23 previously found that he stated that Mr. Harun didn't bathe

24 volitionally, that is, he was not bathing on purpose, correct?

25 A    Can you reference that, Counsel.

GHANNAM – CROSS – JACOBS

1   Q     Sure.

2            It's a report of Dr. DeMier, page 11, on

3   December 6th, Physician Chiedu Okafor states, Lastly, patient

4   states --

5            THE COURT:  Read slow, please.

6   Q     Lastly, patient states that he is not bathing due to the

7   fact that he does not want to make the prison's job any easier

8   in taking care of him or being around him.

9            You reviewed that, right?

10  A     That's correct.

11  Q     But you didn't reference that alternative hypothesis in

12  your report, correct?

13  A     Correct.

14  Q     You didn't mention a possibility his bathing or refusal

15  to bathe could be volitional, correct?

16  A     Correct.

17  Q     You just concluded he was finding it difficult, if not

18  impossible, to bathe, correct?

19  A     Correct.

20  Q     Is that what Justice Code meant by selective analysis of

21  evidence, cherry-picking evidence?

22            MS. KELLMAN:  Objection, Your Honor.

23            THE COURT:  Sustained.

24  Q     Do you consider that a selective use of evidence?

25  A     I do not.

1    Q    Are you familiar with the concept of confirmation bias?

2    A    Correct.

3    Q    Confirmation bias is a cognitive bias towards confirming

4    a set of beliefs or assumptions that one already holds,

5    correct?

6    A    Correct.

7    Q    Just a yes or no answer, please, are you immune from

8    confirmation bias?

9              THE COURT:  He said correct.

10             MR. JACOBS:  Excuse me?

11             THE COURT:  You asked him if that's correct, he said

12   correct.  I think that's okay.

13             MR. JACOBS:  Judge, the yes or no part was for the

14   next question.

15             THE COURT:  Oh, okay.

16   BY MR. JACOBS:

17   Q    And please try to answer this question yes or no, Doctor.

18   Are you immune from confirmation bias?

19   A    No.

20   Q    By the way, on page 12 of your report, you write that he,

21   meaning the defendant, refuses to attend recreational

22   activities, correct?

23   A    Correct.

24   Q    You did not write that he finds it difficult, if not

25   impossible, to attend recreational activities, correct?

1    A    Correct.

2    Q    Dr. Ghannam, you are an activist, right?

3    A    Can you define activist?

4         MR. JACOBS:  Judge, at this time I'd like to play a

5    video clip, it's about 30 seconds long.  It's marked for

6    identification purposes as Government Exhibit 102.

7         MS. KELLMAN:  Is that last question withdrawn then,

8    Judge?

9         MR. JACOBS:  No, the question --

10        THE COURT:  I think it was answered.  So now he's on

11   to something else.

12        MR. JACOBS:  Is it possible to get the sound,

13   please.

14        THE COURTROOM DEPUTY:  It's on your end.

15        MR. JACOBS:  We're having a technical difficulty.

16   It seems like our volume is up.

17        THE COURT:  I don't think we have volume control

18   when you're plugged in there.  I think it cedes control to

19   you.

20        MR. JACOBS:  I'm going to play this clip, Judge.

21   Apologies for this.

22   Q    I'm going to play a second of this clip so you can see

23   it, Dr. Ghannam.

24        Do you remember filming this?

25   A    I don't see anything.

GHANNAM - CROSS - JACOBS

1    THE COURT:  Really?  How about now?

2    THE WITNESS:  I do now.

3    (Video clip played.)

4  Q    So I want to go back to my question.  Do you consider

5  yourself an activist, Dr. Ghannam?

6  A    Community activist.

7  Q    Okay.  And when the lights go down that's when you put on

8  the community activist hat, correct?

9  A    Correct.

10 Q    But you also wear the hat in the day sometimes, right?

11 A    Sometimes, correct.

12 Q    And you mentioned serving on boards, right?  You

13 co-founded in 2009 the U.S. Campaign for the Academic and

14 Culture Boycott of Israel, correct?

15 A    Correct.

16 Q    And you're a member of the International Executive

17 Committee of Al-Awda, which is the Palestinian Rights Return

18 Coalition, right?

19 A    Correct.

20 Q    You're a member of the Muslim Legal Fund of America,

21 correct?

22 A    No longer, but previously, yes.

23 Q    Former president of the San Francisco Chapter of the

24 American Arab Antidiscrimination Committee?

25 A    Correct.

GHANNAM - CROSS - JACOBS

1    Q    None of these organizations are on your CV, right?

2    A    If they are, they are.  If they're not, they're not.

3    Q    You can't tell us right now --

4    A    I just don't have my CV in front of me, Counsel, that's

5    all.

6    Q    Well, it's 25 pages long so we won't go through it.

7         You host a weekly radio show called Arab Talk,

8    correct?

9    A    Correct.

10   Q    And previously you said you are a community activist,

11   right?

12   A    Correct.

13        MR. JACOBS:  Ms. Clarke, may have I have the Elmo,

14   please.

15   Q    This is a screen shot from your web page, right?

16   A    Correct.

17   Q    And there is a little bio which I've highlighted here,

18   this is Government Exhibit 16 for identification, which I'll

19   actually move to admit.

20        THE COURT:  Any objection?

21        MR. STERN:  No.

22        MS. KELLMAN:  No, Your Honor.

23        THE COURT:  Received.

24        (Government Exhibit 16, was received in evidence.)

25

GHANNAM - CROSS - JACOBS

1    BY MR. JACOBS:

2    Q    In your bio you describe yourself as a human rights

3    activist and a professor, correct?

4    A    Correct.

5    Q    Who lectures and writes about the health effects of war

6    and occupation in Palestine where you travel frequently,

7    correct?

8    A    Correct.

9    Q    So you're a community activist, you're also a human

10   rights activist, right?

11   A    Correct.

12   Q    You're a political activist too, right?

13   A    I prefer human rights activist.

14        MR. JACOBS:  Okay, Judge, I'd like to play another

15   clip now which is marked for identification as Government

16   Exhibit 101.

17        THE COURT:  Okay.

18   Q    But before doing that I'll direct the Court and defense

19   counsel's attention to Government Exhibit 101T, which is a

20   transcript related to the recording.

21        I'm passing copies to the court reporter and the

22   clerks.

23        THE WITNESS:  Counsel, can I get one too?

24        MR. JACOBS:  Of course.

25        Judge, do you mind if I control the computer from

GHANNAM – CROSS – JACOBS

1    counsel table?

2            THE COURT:  Go right ahead.

3            MR. JACOBS:  Thank you.

4    Q    I'm going to play about 20 seconds from this clip then

5    ask you a question about it.

6            (Video clip played.)

7            Dr. Ghannam, this is at Ralph Nader's presidential

8    campaign rally, correct?

9    A    Correct.

10   Q    At Berkeley, correct?

11   A    Correct.

12   Q    You're the person speaking wearing the "Free Palestine"

13   shirt, correct?

14   A    Correct.

15   Q    I want to play another clip and it corresponds to line 35

16   of page 1 of the transcript beginning, "Listen, you guys."

17           (Video clip played.)

18   Q    Dr. Ghannam, in this clip you essentially say that both

19   Bush and Kerry believe in the removal of constitutional

20   protections for people of color, for Arab and Muslim

21   Americans, correct?

22   A    Correct.

23   Q    Then you tell this large crowd that, quote, they have

24   already built the internment camps --

25   A    Correct.

GHANNAM – CROSS – JACOBS

1    Q    -- correct?

2    A    Correct.

3    Q    Do you regret saying that?

4    A    No, I don't.

5    Q    Where are the internment camps?

6    A    They were in Louisiana.

7    Q    Later on you talk about a trip to Gaza, a city called

8    Rafah, right?

9    A    Correct.

10   Q    Where you met a five-year old boy named Ahmed, correct?

11   A    Correct.

12   Q    I'm going to play a clip on that, it starts on page 2,

13   line 31.

14              (Video clip played.)

15   Q    Dr. Ghannam, when you refer to the empire, you're

16   referring to the United States of America --

17   A    Correct.

18   Q    -- correct?

19              And you don't mean that as a compliment, correct?

20   A    At the time I didn't.

21   Q    Would you mean that as a compliment now?

22   A    Arguably not.

23   Q    Like Winston Churchill looked lovingly upon the British

24   empire, right?

25   A    He did.

GHANNAM - CROSS - JACOBS

1  Q    You don't look the same way upon the American empire,

2  correct?

3  A    At that time, no.

4  Q    Then after saying you're from the empire, you apologized

5  to Ahmed, correct?

6  A    Correct.

7  Q    You apologized for being from the United States, correct?

8  A    Correct.

9  Q    Do you always apologize to people when you tell them

10  you're from this country?

11  A    I do not.

12  Q    Do you sometimes?

13  A    Sometimes.  With Ahmed I did.

14  Q    You're aware that the entity that you refer to as the

15  empire is one of two parties in this criminal matter, correct?

16  A    Correct.

17  Q    But is it your testimony that that doesn't affect your

18  ability to offer objective expert testimony?

19  A    Absolutely, Counsel.

20  Q    Now I want to play one more clip from this speech.  You

21  go on to criticize anybody but Bush school of thought and

22  that's a school of thought that anybody except for George Bush

23  should be president, correct?

24  A    Correct.

25  Q    And this clip corresponds to page 3, line 31.

GHANNAM – CROSS – JACOBS

1          MR. STERN:  What was the line?

2          MS. KELLMAN:  Your Honor, I'm going to object.  I

3   think we've gone -- the government has made its point unless

4   the Court is going to keep them to their hour and a half, then

5   I'm happy to have them do this.

6          THE COURT:  I'm going to keep them to their hour and

7   a half and, therefore, I'll overrule your objection.

8          MR. STERN:  I'm sorry, the line was?

9          MR. JACOBS:  Page 3, line 31.

10          MS. KELLMAN:  Same exhibit number?

11          MR. JACOBS:  Correct.

12          (Video clip played.)

13          (Continued on the next page.)

14

15

16

17

18

19

20

21

22

23

24

25

1    BY MR. JACOBS: (Continuing.)

2    Q     Did you come up with the line about, "The imperial wet

3    dreams of Bush and Kerry," or did an aider or staffer give

4    that to you?

5    A     Actually, I believe that was my line.

6    Q     What do you mean by, "Imperial wet dreams of George Bush

7    and John Kerry"?

8    A     Well, at the time, Counsel, I believe that it represented

9    the fact that in terms of the perspective of the time of being

10   engaged in war, at the time there was little difference

11   between George Bush and John Kerry.

12   Q     What legal standard did you apply when evaluating the

13   defendant's competence?

14   A     What legal standard?

15   Q     Yes.

16   A     I used all of the standards that are well known in the

17   forensic psychology and forensic psychiatry literature.

18   Q     You're not board certified in forensic psychology; right?

19   A     I am not.

20   Q     What legal standard did you apply?

21   A     All of the guidelines that are part of forensic

22   psychology and psychiatry.

23   Q     I'm not board certified either, so I want to know what

24   legal standard you applied?

25   A     Well, there are standards.  The Melton and Petrila book

GHANNAM - CROSS - JACOBS

1  is a classic standard that most mental health professionals

2  use, I consult that.  And then the Academy of Forensic

3  Psychologists is a standard that I use, also.

4  Q    What are those standards?

5  A    Well, the standards about objectivity.  About attempting

6  to always -- is there another question, Counsel?  I'm sorry.

7  Q    Are you finished with your answer?

8  A    Yes.

9  Q    No.

10        What legal standard did you apply when opining that

11  the defendant was not competent to stand trial?

12  A    The forensic behavioral guidelines that are used and

13  agreed upon by most forensic psychologists and psychiatrists.

14  Q    So you find --

15        So the defendant, you opine, is psychotic or

16  whatever language you used.

17        What legal standard did you use to determine he

18  wasn't competent to stand trial?

19  A    I'm not sure I understand the question, Counsel.

20        THE COURT:  Let me try.

21        When you say, "Forensic behavioral guidelines," what

22  does that mean?

23        THE WITNESS:   Standard guidelines that are agreed

24  upon within the forensic community, your Honor.

25        THE COURT:  Where are those?

GHANNAM – CROSS – JACOBS

1          THE WITNESS:  They're on the website of the

2    American, you know, Board of, you know, Psychology Forensic

3    Examiners.  It's part of the American Psychological

4    Association, and it's part of the website.

5    Q    And where is that legal standard listed in, or set forth,

6    in your letter, Dr. Ghannam?

7    A    It's not in my letter.

8    Q    So we just watched a clip from 2004.  I want to now go to

9    a clip from, I believe, 2012.  It's Government Exhibit 103.

10   In the interest of time, I'm not going to play lengthy clips

11   from this, but I'll ask you.

12   A    Do you have a transcript, Counsel?

13              (Handing to the witness.)

14          MR. JACOBS:  It's at the end of the Court's binder I

15   will hand the court reporter and the Court's clerks a copy.

16          THE COURT:  It's at the end of the big binder that

17   you gave me?

18          MR. JACOBS:  Yes, Judge.

19          THE COURT:  With the yellow sticker on it?  No, it's

20   not.

21          MR. JACOBS:  I'm sorry if we left that out.

22          MR. STERN:  It's in our binder.

23          THE COURT:  Go ahead.

24   EXAMINATION

25   BY MR. JACOBS: (Continuing.)

GHANNAM – CROSS – JACOBS

1   Q    The talk you gave here, the teach-in, was about war

2   crimes and regime change in the Middle East; right?

3   A    Correct.

4   Q    The country that's being accused of war crimes here is

5   the United States?

6   A    Correct.

7   Q    You gave a 12-minute speech or thereabouts; correct?

8   A    Approximately.

9   Q    This is eight years after your Nader speech; right?

10  A    Yes.

11  Q    And, in this speech, you referred to the United States as

12  "An imperial juggernaut that keeps countries in the Arab world

13  and Middle East under its boot and thumb."  Correct?

14  A    Can you point to the line?

15       MR. STERN:  Sure.

16  Q    It's on Page 3, for the record, at 806 on the recording.

17  It's Page 3, Line 2.

18       Starting on Line 1.  "Because of all the countries

19  of all the places that have been under the boot and the thumb

20  of this imperial juggernaut in the Arab world and in the

21  Middle East," and it goes on.

22       Does that refresh your memory?

23  A    Yes, thank you.

24  Q    And later in the speech, you accused the United States of

25  a specific war crime; correct?

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

GHANNAM – CROSS – JACOBS

1   A     Can you point to it, Counsel.

2   Q     Sure.

3         Before I do.  Do you remember, sitting here today,

4   accusing the U.S. of a specific war crime?

5   A     In this context, I don't remember so that's why I'm

6   asking you to point to it.

7   Q     But you've done so frequently enough in other contexts

8   you have accused the U.S. of war crimes?

9   A     If you point to it, I can confirm it or disconfirm it,

10  yeah.

11  Q     It's the paragraph from Page 3, Line 17 to Line 28.  Take

12  a second to look at that, if you will.

13  A     I don't see it, Counsel.  Can you point to the line

14  number, please.

15  Q     I'll paraphrase, and if you disagree with anything I say

16  you let me know.  You say that people don't realize on

17  Line 20, that within 24 hours of the invasion, the most recent

18  invasion of Iraq, and that's by the United States; right

19  Dr. Ghannam?

20  A     Coalition forces I would assume, also.

21  Q     "There was a catastrophic collapse of the healthcare

22  system because there was no power and electricity.  This was,

23  in my opinion, deliberate."

24        That's what you said; right, Dr. Ghannam?

25  A     Correct.

GHANNAM — CROSS — JACOBS

1   Q    So in the context of the paragraph as a whole, you're

2   accusing the United States of deliberating cutting fuel to the

3   civilian healthcare system of Iraq?

4   A    That's not what I said.  I said, The destruction of the

5   healthcare infrastructure from the bombings.

6   Q    That was a deliberate objective of the U.S. defense

7   policy?

8   A    Coalition forces.

9   Q    So a deliberate objective of coalition forces' policy was

10  to destroy the civilian healthcare infrastructure of Iraq?

11  A    Yes.

12  Q    Dr. Ghannam, I'm going to read you a question verbatim,

13  and I'd like you to answer yes or no to it.  I know hundreds

14  of people have been able to answer it just yes or no, so I

15  think you can, too.

16         Do you have any views about, or experiences with,

17  the United States's response to terrorism or its foreign

18  policy concerning the Middle East that would prevent you from

19  being a fair and impartial expert witness in this case?

20  A    No.

21         MS. KELLMAN:  Objection.

22         THE COURT:  I'm not sure I've got the question.  Do

23  you have any views?

24         Are you asking him if he's been asked that question

25  before?

GHANNAM - CROSS - JACOBS

1          MR. JACOBS:  No, Judge, I'm asking a question

2     that --

3          THE COURT:  This is your sum-up question?  This

4     is -- you're asking him now, does he have any views or

5     experiences?

6          MR. JACOBS:  Right now.  Correct, Judge.

7          THE COURT:  Okay.

8     Q    As you sit here today, and I'll read it verbatim again?

9          THE COURT:  He answered it.

10          MR. JACOBS:  I didn't hear the answer.

11          THE COURT:  He said, "No."  It's in the transcript.

12          MR. JACOBS:  Oh.

13     Q    You're also involved in street demonstrations; right,

14     Dr. Ghannam?

15     A    Sometimes, yes.

16     Q    Okay.  I'm going to play a final clip.  There is no

17     transcript for this.

18          (Video file played in open court.)

19          (Video file concludes.)

20          MS. KELLMAN:  Is there an exhibit number?

21          MR. JACOBS:  This is Exhibit No. 104.

22          MS. KELLMAN:  Thank you.

23          (Video file played in open court.)

24          (Video file concludes.)

25

GHANNAM - CROSS - JACOBS

1    EXAMINATION

2    BY MR. JACOBS: (Continuing.)

3    Q    Dr. Ghannam, this was at a rally for al-Nakbah; right?

4    A    I don't know what it's -- I don't know, to be honest,

5    Counsel.

6    Q    Fair to say that it's a rally in favor of Palestinian

7    statehood.  Palestinian causes?

8    A    To be honest, I don't know.  I don't know what the

9    context is for this one.

10   Q    So you're not able to say that you are speaking at a

11   rally in favor of Palestine?

12   A    That's what I feel comfortable saying now, correct.

13   Q    And you clearly have strong feelings about Israel;

14   correct?

15   A    I have some feelings about Israel, that's correct.

16   Q    You founded the U.S. movement to boycott Israel.  You

17   can't testify here today that you have strong negative

18   feelings about Israel?

19   A    Well, Counsel, that's absolutely incorrect.  It's the

20   U.S. academic and cultural boycott, not the boycott itself to

21   be precise.

22   Q    I appreciate the precision.

23   A    That's okay.

24   Q    The precision.

25         Doctor, since you brought up precision, you once

GHANNAM − CROSS − JACOBS

1   spoke at an event where you prefaced comments by explaining

2   the importance of precision; correct?

3   A     Can you reference it, Counsel.

4   Q     And then after doing that, you specifically accused

5   Israel of genocide; correct?

6   A     I don't know what your reference is, Counsel.

7   Q     Do you remember ever accusing Israel of genocide?

8   A     I don't know the context or the reference.

9   Q     That's not my question.  Do you remember ever doing it?

10  A     I don't recall right now.

11  Q     Okay.  And what I care more about is, Do you consider

12  Israel −−

13         MR. JACOBS:  Excuse me, withdrawn.

14  Q     Do you consider the United States complicit in Israeli

15  crimes?

16         MS. KELLMAN:  Objection.  Relevance.

17         THE COURT:  It's relevant.  I know what this goes

18  to, but you are getting to a saturation level.

19         MR. JACOBS:  Judge, I have two more minutes on this.

20         THE COURT:  Okay.  I'll allow it.

21  Q     You can answer, Dr. Ghannam.

22  A     Could you restate the question?

23  Q     Do you consider the United States complicit in Israeli

24  crimes?

25  A     In some cases, yes.

GHANNAM – CROSS – JACOBS

1  Q    When you post as much on your public Twitter feed;

2  correct?

3  A    I haven't posted since 2014, Counsel, so you have to

4  refresh my memory.

5  Q    Sure.

6         This is your Twitter feed.  You retweeted this guy,

7  "Israel can be charged for war crimes and U.S. for

8  complicity."  Correct?

9  A    Is that one from Vince Warren?

10        MR. STERN:  Can we get page numbers for this?  I'm

11  not sure --

12        MR. JACOBS:  There is Government Exhibit 222-G.

13        MR. STERN:  222-G, I'm sorry.  I got it.  Thank you.

14  Q    I'll move on.

15        This is another posting where you retweet a post,

16  "New book reveals top secret collusion between Israel and the

17  U.S. during 20 years of "peace" talks."  You retweeted that,

18  correct?

19  A    Yes.

20        MR. JACOBS:  May I approach, your Honor, and hand

21  Dr. Ghannam his CV?

22        THE COURT:  Yes.

23        (Approaching the witness.)

24        (Handing to the witness.)

25  Q    Please turn to Page 3 of your CV.  I'm sorry, Page 8 of

GHANNAM – CROSS – JACOBS

1  the CV which is, for convenience, marked as

2  Government Exhibit 3 in the binders.

3           Tell me when you're there, Dr. Ghannam.

4  A     Page 8, Counsel?

5  Q     Yes.

6  A     Yes.

7  Q     So you see on the overhead you published an article or

8  chapter called, "A Nation Traumatized."  Correct?

9  A     Correct.

10  Q     "Palestine:  A Nation Traumatized."

11           And you published that in a book called,

12  "Psycho-Political Aspects of Suicide Bombers, Terrorism, and

13  Martyrdom"?

14  A     Correct.

15  Q     I didn't hear your answer.

16  A     Correct.

17  Q     I actually went and bought that book and I'm going to put

18  it on the overhead projector.

19           Down below on the cover of the book there is a

20  graffiti that says, "Yankee Go Home."  Correct?

21  A     Correct.

22  Q     And on the other side, "Down With Invader."  Correct?

23  A     Correct.

24  Q     Can you read the title of the book into the record,

25  Dr. Ghannam?

GHANNAM - CROSS - JACOBS

1   A    "Psycho-political Aspects of Suicide Warriors, Terrorism,

2   and Martyrdom:  A Critical View from Both Sides in Regard to

3   Cause and Cure."

4   Q    Do you notice anything different about this title

5   compared to your CV?

6            I'll help you out?

7   A    Yes, can you help me, Counsel.

8   Q    The real title of the book includes the term, "Suicide

9   Warriors," but on your CV you write, "Suicide Bombers."

10           Did you change it because you know the concept of

11  suicide warriors is offensive?

12  A    Absolutely not.

13  Q    So innocent mistake?

14  A    I believe so, yes, Counsel.

15  Q    But you don't believe that all people who target

16  civilians should be tarred with the label "terrorist"?

17  A    Absolutely.  I believe they should.

18  Q    Dr. Ghannam, I'm putting on the overhead what's

19  Government Exhibit 20.

20           Some academics wrote an article, and in that article

21  they defined terrorism; correct?

22  A    Correct.

23  Q    And you took issue with their definition of terrorism;

24  correct?

25  A    Correct.

GHANNAM – CROSS – JACOBS

1   Q    You thought it was too broad; correct?

2   A    Correct.

3   Q    And you proposed, at a minimum, that the author should

4   have used a more neutral term such as "violence against

5   civilians."  Correct?

6   A    Correct.

7   Q    Because, to your mind, and as you wrote, "One person's

8   terrorist is another person's freedom fighter."  Correct?

9   A    Correct.

10           MR. JACOBS:  I'll move to admit that as

11  Government Exhibit 20.

12           MS. KELLMAN:  No objection.

13           THE COURT:  Received.

14           (Government Exhibit 20, was received in evidence as

15  of this date.)

16  Q    You spent about three and a half hours interviewing the

17  defendant; correct?

18  A    I believe in total more, Counsel.

19  Q    Okay.  I'm showing you Page 2 of your report which I

20  think you have if you need to look at it.

21           You evaluated him twice; right?

22  A    That's correct.  You're correct, Counsel.  Three and a

23  half hours.

24  Q    Three and a half hours.

25           That's significantly less time spent with the

GHANNAM – CROSS – JACOBS

1   defendant than Dr. Mills; correct?

2   A      Correct.

3   Q      And that's significantly less time spent with the

4   defendant than Dr. DeMier and his team?

5   A      Correct.

6   Q      In fact Dr. DeMier spent a period that spanned eight

7   weeks, approximately, with the defendant?

8   A      I'm not aware but I'll take your word.

9   Q      You don't have to take my word.  You reviewed his report;

10  right?

11  A      Correct.  I'm not exactly sure about the eight weeks and

12  how much time.

13  Q      There's a portion of your report titled "Sources of

14  Information."  Correct?

15  A      Correct.

16  Q      Beginning on Page 2?

17  A      Correct.

18  Q      And in it, you listed the sources that you reviewed in

19  connection with preparing your report; right?

20  A      Correct.

21  Q      Now, I have it on the screen.

22         You did not review any FBI reports, did you?

23  A      If it's not in my report, then no.

24  Q      But you're aware that they existed; right?

25  A      Correct.

GHANNAM – CROSS – JACOBS

1    Q    In fact, you're aware that at least 15 expert reports

2    existed from reviewing Dr. DeMier's report; correct?

3    A    Counsel, what's the document that you're referencing

4    right now?

5    Q    I'm referencing Dr. DeMier's report?

6    A    I see.  Correct.

7    Q    Did you ever ask defense counsel if you could review

8    those reports after discovering their existence?

9    A    I did not.

10   Q    What about transcripts of court appearances in which the

11   defendant participated and spoke.  Did you review any of

12   those?

13   A    If it's not in my report, I did not.

14   Q    But you knew that such transcripts existed; correct?

15   A    Correct.

16   Q    You note that you reviewed the indictments charging

17   Mr. Hausa.  How many indictments did you review?

18   A    I received and reviewed the indictments that were

19   forwarded to me.

20   Q    How many, though?

21   A    I don't have it in front of me, Counsel.

22   Q    Okay.  I'll just gather my materials.  Here they are.

23   Let's go through the content of your report now.

24            Starting on Page 2, you can follow along on yours or

25   with me on the overhead.  You write that, "During my initial

GHANNAM - CROSS - JACOBS

1   evaluation of Mr. Hausa, I obtained verbal consent to proceed

2   with the evaluation."  Correct?

3   A    Correct.

4   Q    And you write, "He agreed to speak with me."  Correct?

5   A    Correct.

6   Q    And on the next line you wrote, "He was cooperative and

7   respectful to the examiner."  Correct?

8   A    Correct.

9   Q    You're the examiner; correct?

10  A    Correct.

11  Q    And then the next line begins, "However, during the

12  second evaluation."  Correct?

13  A    Correct.

14  Q    And you proceed to say that he exhibited various

15  symptoms; correct?

16  A    Correct.

17  Q    Then you say, "Although, he," the defendant, "provided

18  initial consent for the initial evaluation, and consented to

19  participate, during the second evaluation, he exhibited a wide

20  range of behaviors."  Correct?

21  A    Correct.

22  Q    Let's go to Page 4.  You write during the first

23  evaluation on 11/17/16 you meant '14?

24  A    Correct.  What page are you on, Counsel?

25  Q    Four.

GHANNAM - CROSS - JACOBS

1    A    Yes.

2    Q    "Mr. Hausa, was cooperative with the examiner."  You,

3    right?

4    A    Correct.

5    Q    "And was able to engage in the evaluation process for,

6    approximately, two hours."  Correct?

7    A    Correct.

8    Q    And that's exactly how long the first evaluation took;

9    correct?

10   A    Correct.

11   Q    That was on November 14th; right?

12   A    Correct.

13   Q    And later that day, later on November 14th, you spoke to

14   Mr. Stern; right?

15   A    I believe so.

16   Q    Yes.  And what I'm showing you now is the letter that

17   Mr. Stern submitted to the Court on November 14th.  And in

18   that letter --

19             MR. JACOBS:  Withdrawn.

20   Q    You informed Mr. Stern that, "You do not have sufficient

21   information to rule out the possibility that Mr. Harun is

22   incompetent."  Correct?"

23   A    Correct.

24   Q    Mr. Stern does not write in his letter that your

25   preliminary opinion is that he is incompetent; correct?

GHANNAM – CROSS – JACOBS

1   A    Correct.

2   Q    And then Mr. Stern lists things that you need in order to

3   form a more final opinion; correct?

4   A    Correct.

5   Q    First, is at least one more opportunity to meet with the

6   defendant.  Correct?

7   A    Correct.

8   Q    Second, additional information regarding his treatment in

9   Libya.  Correct?

10  A    Correct.

11  Q    Third, it says "The expert has also informed us that the

12  attorneys and the expert will need to interview witnesses that

13  are current held by the U.S. Government and who knew Mr. Harun

14  prior to his incarceration."  Correct?

15  A    Correct.

16  Q    So let's focus on the next 48 hours.  Just the next

17  48 hours, so November 15th and November 16th.  All right.  Are

18  you with me?  Okay.

19          During that time period, did you not get any of the

20  additional information that you said you needed in this

21  letter; correct?

22  A    Correct.

23  Q    Nonetheless, on November 10th -- nonetheless, on November

24  16th, Mr. Stern files this letter which says, "It is

25  Dr. Ghannam's preliminary opinion that Mr. Harun is not

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

1   competent to proceed to trial."  Correct?

2   A    Correct.

3   Q    That is different than what was written in the letter two

4   days earlier; correct?

5   A    That is correct.

6   Q    And nothing you needed to augment your evaluation of the

7   defendant you received during that interview?

8   A    Correct.

9        MS. KELLMAN:  Objection.  This is Mr. Stern's letter

10  not this witness's.

11       THE COURT:  I know that.

12       MS. KELLMAN:  Okay.

13       THE COURT:  I thought you were going to object

14  because it was asked and answered, which it was.

15       MS. KELLMAN:  That, too.

16  Q    And in Mr. Stern's letter, which you spoke to them about;

17  correct?

18  A    Correct.

19  Q    He identified four things that you needed in order to

20  and, I'm sorry, I'm going to go back to Page 1, in his words,

21  "Form a fully" -- "In order to form a fully formed informed

22  opinion, Dr. Ghannam needs access to four things."  Right?

23  A    Correct.

24  Q    I'm going to paraphrase.  More information about

25  defendant's treatment in Libya; correct?

GHANNAM – CROSS – JACOBS

1    A     Correct.

2    Q     An opportunity to meet Italian mental health

3    professionals; correct?

4    A     Correct.

5    Q     An opportunity to discuss Harun's health before his

6    incarceration with people who knew him; correct?

7    A     Correct.

8    Q     And the need to consult with other experts; correct?

9    A     Correct.

10   Q     And I realize that defense counsel pointed out that this

11   is Mr. Stern's letter, but you submitted an affidavit in which

12   you swore to essentially the same things; correct?

13   A     Correct.

14   Q     And nothing in Mr. Stern's letter is incorrect; right,

15   correct?

16   A     I don't believe so.

17   Q     These four things that the defense team represented were

18   necessary and that you represented in your affidavit were

19   necessary to form a fully informed opinion you never received;

20   right?

21   A     Correct.

22   Q     Yet, you submitted a letter on December 19th opining that

23   the defendant was not competent to proceed to trial; correct?

24   A     Correct.

25   Q     So that opinion was not fully formed; correct?

GHANNAM – CROSS – JACOBS

1    THE COURT:  Counsel, I got your point.  Really.

2    MR. JACOBS:  Okay.

3    Q    You note in your report that the defendant exhibited

4    logorrhea; correct?

5    A    Correct.

6    Q    You're aware that Dr. DeMier noted the same thing;

7    correct?

8    A    Correct.

9    Q    You stated in your report that the defendant would often

10   switch between languages; correct?

11   A    Counsel, can you point to the page that you're

12   referencing, please.

13   Q    Do you not recall stating that?

14   A    That's correct.  I just want to make sure we're literally

15   on the same page.

16   Q    Page 5.

17   A    Correct.

18   Q    So he would often speak in two or three languages.

19        Speaking of languages, do you speak Hausa?

20   A    I do not.

21   Q    Ever been to Niger?

22   A    I have not.

23   Q    You note that he appeared to touch his genitals or his

24   penis when you were with him; correct?

25   A    Correct.

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

GHANNAM - CROSS - JACOBS

1  Q    You're aware he was observed doing that by the mental

2  health professionals who observed him in the past; correct?

3  A    Correct.

4  Q    You reference repeatedly the CIA and B-52s in your

5  report; correct?

6  A    Correct.

7  Q    You're aware that these facts and these statements were

8  known to the prior mental health professionals when they

9  conduct their examples; correct?

10  A    Some of them.  I'm not sure about all of them, but that's

11  correct.

12  Q    Which weren't you sure of?

13  A    I have to review them to give you the exact, but yes.

14  Q    But you know the fact that the defendant had mentioned

15  B-52s before?

16  A    That is correct.

17  Q    And about the CIA and electronic waves?

18  A    Microwaves, correct.

19  Q    And that he previously expressed anger with his attorneys

20  to the past mental health providers; correct?

21  A    Well it's not just anger, Counsel, it's --

22  Q    Yes or no.

23  A    Yes.

24  Q    Okay.  You're a licensed clinical psychologist; right,

25  Dr. Ghannam?

GHANNAM – CROSS – JACOBS

1    A    In California, correct.

2    Q    I apologize.  I seem to have misplaced your CV.  Here it

3    is.

4         You're not a psychiatrist?

5    A    Correct.

6    Q    Not a medical doctor?

7    A    Correct.

8    Q    So you can't prescribe medications; correct?

9    A    Correct.

10   Q    You can't prescribe antipsychotics; correct?

11   A    Correct.

12   Q    You used the terms "linguistic competence," "linguistic

13   sophistication," "linguistic facility," linguistic

14   understanding" a bunch of times in your letters; right?

15   A    Correct.

16   Q    Is that the same as you speak Arabic; correct?

17   A    No, it's not.

18   Q    Do you speak any or languages?

19   A    I have familiarity with other languages; correct.

20   Q    Which languages?

21   A    Spanish, French, Italian, Arabic, obviously.  Some Farsi.

22   Q    Can you understand Spanish TV?

23   A    Unfortunately, yes.

24   Q    What do you mean unfortunately?

25   A    Telenovelas can be addictive sometimes.

GHANNAM – CROSS – JACOBS

1   Q    What telenovelas do you watch?

2   A    I prefer not to answer that question in court.

3   Q    Okay.

4            THE COURT:  You have 28 minutes.

5            MR. JACOBS:  Yes, Judge.

6   Q    You worked for a lot of organization that protect the

7   rights of individuals detained at Guantanamo; right?

8   A    Correct.

9   Q    You consulted for an organization called Reprieve; is

10  that correct?

11  A    Correct.

12  Q    I'm showing you what's marked as Government's 23-A.

13           This is a screenshot from the Reprieve website;

14  correct?

15  A    Correct.

16  Q    And I will now show you 23 -- well, before moving on, it

17  says here you concede that Reprieve represents seven prisoners

18  held in Guantanamo Bay and provides assistance to a number of

19  others; correct?

20  A    Correct.

21  Q    And there is an Abu Zubaydah from the Reprieve website;

22  correct?

23  A    Correct.

24  Q    You know that Abu Zubaydah is a co-conspirator of the

25  defendant; correct?

1          MS. KELLMAN:  Objection.

2          MR. JACOBS:  Can I follow up?

3          THE COURT:  Overruled.  Go ahead.

4    A    I don't know that.

5    Q    You don't know that.

6          But you reviewed, according to your report, the

7    transcripts of the defendant's statements in Italy; correct?

8    A    Some of them but not all of them, correct.

9    Q    Where in your report do you indicate that you only

10   reviewed some of the materials that you say you reviewed in

11   this long list?

12   A    I reviewed all of the records that I said in my report,

13   Counsel.

14   Q    But not the entire records, I guess is the distinction

15   you're making now?

16          MS. KELLMAN:  Objection.

17   A    No.

18          THE COURT:   Overruled.

19   A    I reviewed the records that I stated in my report,

20   Counsel.

21   Q    You say you reviewed transcripts of proceedings from the

22   Italian court system.  So then if you reviewed that, you would

23   have seen that the defendant in that transcript stated that he

24   met Abu Zubaydah in Afghanistan; correct?

25   A    Correct.

GHANNAM – CROSS – JACOBS

1   Q    Do you recall seeing that here?

2   A    When you say that he was a co-defendant I believe was

3   your exact language, Counsel.

4   Q    We can have it read back, but I know or I'm fairly sure I

5   said "co-conspirator"?

6   A    Co-conspirator.  I just was paying attention to your

7   language, that's all.

8   Q    Because precision matters.  Then I'll state the question

9   again.

10            Are you aware that Abu Zubaydah is a co-conspirator

11   of the defendant?

12   A    Co-conspirator or that the defendant claimed that he knew

13   Abu Zubaydah would that be, yes, in that regard, yes.

14   Q    Okay.  And you know that Abu Zubaydah was captured in a

15   raid in Faisalabad in March 2002; correct?

16   A    Correct.

17   Q    You know Nor Uthman Mohammad was also captured in that

18   raid; correct?

19   A    Correct.

20   Q    You worked for Nor Uthman's defense team?

21   A    Correct.

22   Q    He ultimately pled guilty to terror-related crimes;

23   correct?

24   A    Correct.

25   Q    But before that, you attempted to offer a mental health

GHANNAM – CROSS – JACOBS

1   analysis of Nor Uthman; correct?

2   A    Correct.

3   Q    And you opined that Nor maybe suffering from undiagnosed

4   and untreated post-traumatic stress disorder and depression;

5   correct?

6   A    Correct.

7   Q    When you made that opinion, you had never met Nor;

8   correct?

9   A    That's correct.

10  Q    The Court did not allow you to present that opinion

11  ultimately; correct?

12  A    That's not correct, Counsel.  I was never asked.

13  Q    So the defense team, after asking for your preliminary

14  analysis, never asked for a final report; correct?

15  A    That's correct.

16  Q    Later, you submitted other documents in connection with

17  Nor; correct?

18  A    Correct.

19  Q    In connection with proceedings related to his release;

20  correct?

21  A    Correct.

22  Q    And you opined that Nor is a good candidate for release

23  and reintegration into civil society; correct?

24  A    Correct.

25  Q    That's similar to your opinion that Raed Jaser was not a

1    jihadist?

2    A    I don't see the connection at all.

3    Q    But for both of those individuals, these convicted

4    terrorists you thought they could live in society without

5    hurting people?

6            MS. KELLMAN:  Objection.

7            THE COURT:  I don't need that question.  Go ahead.

8    Q    Was your analysis of Nor objective?

9    A    Yes.

10   Q    The same level of objectivity used here?

11   A    Yes.

12   Q    The same level used in the Jaser case or different?

13   A    Yes.

14   Q    All three are the same?

15   A    Correct.

16   Q    Okay.  Have you ever treated individuals, patients, that

17   didn't speak a language you spoke?

18   A    I have not.

19   Q    Do you remember the number that you gave in your sworn

20   affidavit, the number of patients you said you've treated or

21   evaluated over the course of your career?

22   A    I don't have the number in front of me, Counsel.

23   Q    Was it 10,000?

24   A    Correct.

25   Q    And your testimony is that you've never treated a person

GHANNAM - CROSS - JACOBS

1  who didn't speak a language that you could speak?

2               MS. KELLMAN:  Asked and answered.

3               THE COURT:  Sustained.

4  Q    Have you ever treated a patient with the assistance of an

5  interpreter?

6  A    Yes, I have.

7  Q    You said that on Page 12 of your report at the bottom, "I

8  would like to comment on the previous psychiatric reports

9  which although noted the possibility that Mr. Hausa had a wide

10 range of psychotic symptoms were apprehensive about making a

11 diagnosis of psychotic spectrum disorder or schizophrenia."

12              Did either Dr. Mills or Dr. DeMier use the word

13 "apprehensive" in their reports?

14 A    I don't have the record in front of me, so I would have

15 to refer directly to those.

16 Q    DeMier's report is about 25 pages long; correct?

17 A    I would have to look at it to give you the exact answer,

18 Counsel.

19 Q    I don't think we have time to review the whole thing.

20              You say this, I imagine you're refer to

21 apprehensiveness.  "In my opinion results from perhaps not

22 having the linguistic sophistication, linguistic competence,

23 or cultural competence to truly understand the full extent of

24 Mr. Hausa's psychotic states and psychiatric."

25              I have a simple question.  Is it your belief, yes or

GHANNAM – CROSS – JACOBS

1   no, that Dr. Mills and Dr. DeMier were qualified to evaluate

2   the defendant's mental health?

3   A    I have some concerns about it.

4   Q    So that would be a no then?

5   A    I have some concerns.

6   Q    In your second letter --

7   A    I'm sorry, Counsel, can I get a copy?

8   Q    Thank you.  I'm sorry.

9            (Continued on the next page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

GHANNAM - CROSS - JACOBS

1  BY MR. JACOBS:

2  Q     In your second letter, on page 4, you write, It is

3  incumbent upon mental health professionals as part of their

4  ethical obligation to provide evaluations that are based on

5  linguistic and cultural competence in order to understand

6  individuals who may not come from the examiner's cultural

7  background.  It should be noted that there is no evidence to

8  suggest that any of the previous examiners, be it

9  psychologists or psychiatrists who evaluated Mr. Harun, had

10  the linguistic or cultural background to adequately and fully

11  assess Mr. Harun's psychiatric functioning.  And then down

12  below you say, Having the use of interpreters does not

13  necessarily fill this ethical requirement.

14  A     Correct.

15  Q     Dr. Ghannam, yes or no, do you believe that Dr. Mills or

16  Dr. DeMier violated the ethical rules of their profession in

17  opining on Mr. Harun's health status?

18  A     I have some concerns.

19  Q     Concerns specifically about their qualifications and the

20  ethical correctness of them evaluating the defendant?

21  A     A specific --

22          MS. KELLMAN:  Object to the form of the question.

23          THE COURT:  Sustained.

24          MR. JACOBS:  May I have second, Judge?

25          THE COURT:  Yes.

GHANNAM – REDIRECT – STERN

1          MR. JACOBS:  No further questions at this time,

2   Judge.

3          THE COURT:  Okay, any redirect?

4          MR. STERN:  Excuse me, could we have five minutes to

5   try to streamline the redirect?

6          THE COURT:  Sure.

7          Recess five minutes.

8          (Recess.)

9          THE COURTROOM DEPUTY:  All rise.

10          THE COURT:  Be seated, please.  Please proceed.

11          MR. STERN:  Thank you.

12   REDIRECT EXAMINATION

13   BY MR. STERN:

14   Q     Good afternoon.

15          You were asked questions about your objectivity, do

16   you recall those questions?

17   A     Yes.

18   Q     And do you bring a different level of objectivity to

19   every case you do?

20   A     Yes, I do.

21   Q     And explain that.

22   A     Well, it's my obligation, as a psychologist working in

23   forensics settings and I would say all settings, to work hard

24   and deliberately and be as thoughtful as possible to be

25   objective any time I'm in a clinical situation and I work very

GHANNAM – REDIRECT – STERN

1    hard to do that.  And that involves being able to separate

2    obviously one's feelings and beliefs from the clinical task

3    that's in front of you.

4    Q    And are you able to do that?

5    A    Yes, I am.

6    Q    You were asked some questions about Mr. Harun's bathing

7    habits and whether or not they were volitional.  Can you talk

8    a little bit about what that meant to you.

9    A    Well, you know, the issue of bathing, especially in this

10   context, becomes enormously important and complicated because

11   Mr. Harun grew up and was a devout Muslim, and the bathing

12   practices within that culture and within the Islamic tradition

13   and cultural habits are very well proscribed.  They are very

14   well identified and it is extraordinarily rare to forego

15   bathing habits in any context for a Muslim.

16   Q    And is that one of those things that you've referred to

17   as requiring cultural competence?

18   A    Yes, it is.

19   Q    How about masturbating in front of other people?

20   A    Well, masturbating in front of other people to begin with

21   would be something that you would obviously have to take very

22   seriously and think about in terms of its meaning, you know,

23   especially in the context of a forensics setting or in a court

24   proceeding, but again in the context of the Islamic tradition

25   and for a devout Muslim, that would be considered abhorrent at

1   every level of civil society, in any Muslim society.  So it is

2   so outside of the norm and considered so abhorrent that it

3   would give pause to anybody who had that kind of understanding

4   of Islam why someone would do that.

5   Q    And would that also require cultural competence to fully

6   understand what it meant?

7   A    Absolutely.  It's one of those areas where the cultural

8   competency gives you a leg up on nuance.  It gives you a leg

9   up on understanding complex behaviors of individuals who have

10  grown up in complex societies, and it helps, if you will,

11  contextualize an understanding of the behavior of an

12  individual when you have that cultural understanding.

13  Q    And how about defecating in front of someone else?

14  A    Well, again, in terms of the Islamic notions of

15  cleanliness it probably would be considered the most abhorrent

16  and, as they say in Arabic "haram," which is completely

17  forbidden to defecate not just in front of anybody else but to

18  defecate in any kind of close proximity at a space where

19  you're also supposed to pray.  It is beyond the pale, as I

20  said, Counsel, it's just something that is -- for anybody who

21  is a devout Muslim, it's just would never be done.

22  Q    Have you evaluated other Muslim Arabic speakers?

23  A    Yes, I have.

24  Q    Have you ever seen this kind of behavior before?

25  A    Frankly, within this context I've -- I've yet -- and I've

                        GEORGETTE K. BETTS, RPR, CSR
                           Official Court Reporter

1    been doing this a long time as you know, I've yet to see

2    someone, among the hundreds of people that I've evaluated who

3    are devout Muslims, go so much against the normative

4    cleanliness rituals of Islam.

5    Q    Now you were asked something about confirmation bias, do

6    you recall that?

7    A    Correct.

8    Q    What is confirmation bias?

9    A    Confirmation bias is the bias that all of us have when

10   we're involved in forensic and, frankly, in any setting where

11   we seek to confirm our hypotheses in lieu of contradictory

12   information.

13   Q    Is anyone immune from confirmation bias?

14   A    Nobody is.  You just have to work really hard at

15   accepting the reality that we all have it, make peace with it

16   and then work really hard to make sure that you're confronting

17   it whenever possible.

18   Q    And you did that I take it?

19   A    Yes, I did.

20   Q    Now you were asked about organizations you didn't put on

21   your curriculum vitae, do you recall those questions?

22   A    Yes, I do.

23   Q    Was that a professional curriculum vitae or was it the

24   story of your life?

25   A    It's a professional curriculum vitae.

1    Q     Were you hiding your membership in those organizations?

2    A     Obviously not, no.

3    Q     Have you made public appearances for those organizations?

4    A     Yes, I have.

5    Q     Now one of the things you said in one of the clips that

6    was played was that we all need to participate in the civic

7    process.  Do you recall saying that?

8    A     Yes, I do.

9    Q     And what did you mean by that?

10   A     Well, the short version is I believe it is incumbent on

11   all of us during especially these difficult times and, you

12   know, I connect it to since 911 obviously, that civic

13   engagement, thoughtful civic engagement can be the antidote,

14   if you will, to malaise and disengagement from the

15   complexities that we're all facing right now.  So I've always

16   been an advocate for civic engagement for people, especially

17   people who feel dispossessed, disconnected, you know, not well

18   represented.  So it's a plea for civic engagement.

19   Q     In any of the talks you've given, whether they were shown

20   here or not, have you advocated violence?

21   A     Never.

22   Q     Have you spoken in favor of terrorism?

23   A     Never.

24   Q     Have you told people that you believe in the Constitution

25   and due process?

GHANNAM – REDIRECT – STERN

1   A    On a regular, if not daily, basis.

2   Q    Now having met Mr. Harun on two occasions and read the

3   various things you've read about him, do you think that he's

4   able to understand the proceedings against him?

5   A    Counsel, he is so delusional right now about what's in

6   his environment, the people, his surroundings, it's my opinion

7   with, you know, reasonable medical probability at a high

8   confidence level that he's not competent at this time to

9   proceed nor assist his attorneys.

10  Q    Would you lie to help him?

11  A    Never.

12  Q    Now you were asked about the amount of time you spent

13  speaking to Mr. Harun and you said it was about three and a

14  half hours I think; is that right?

15  A    Correct.

16  Q    And I take it you've read Dr. Mills' report, right?

17  A    Correct.

18  Q    And is it fair to say that Dr. Mills, the first two times

19  he went, barely spoke to Mr. Harun at all?

20  A    Correct.

21  Q    And do you know -- and you may not -- how long in total

22  he spent actually speaking to Mr. Harun?

23  A    I do not know.

24  Q    Now, there were things you said you needed -- by the way,

25  when you spoke with him did you use an interpreter?

GHANNAM – REDIRECT – STERN

1   A    I did not.

2   Q    You said you have used interpreters, correct?

3   A    Yes, I have.

4   Q    Does that speed up or slow down the process?

5   A    Well, it's very complicated, Counsel.  Typically, most

6   likely it slows down the process.

7   Q    You were read a number of things from a letter I wrote,

8   things that you said you needed to speak with Mr. Harun.  Do

9   you recall that?

10  A    Yes, I do.

11  Q    And, preliminarily, let me ask you when you went to speak

12  with Mr. Harun what, if anything, did you do that enabled you

13  to speak with him?

14  A    Well, Counsel, I think it's important to put in context

15  that Mr. Harun has, you know, rejected any contact with his

16  defense team for the two years prior to me going to see him.

17            MR. JACOBS:  Objection, lack of foundation.

18            THE COURT:  I assume that the defense lawyers told

19  him that.

20            MR. STERN:  Correct, Judge, he's an expert and we

21  shared with him all the facts that we know about this case.

22            THE COURT:  I might not let him in with a jury, but

23  the box is empty.

24            THE WITNESS:  That I went into the initial contact

25  with Mr. Harun, formulating in my mind what would be an

GHANNAM - REDIRECT - STERN

1    appropriate way to engage with him to give him the best

2    probability of feeling comfortable and a sense of that there

3    was somebody here that he could engage with that was within

4    his cultural sphere of understanding.

5    Q     And how did you go about that?

6    A     I greeted him with a Muslim Islamic salutation that when

7    you hear it would automatically engage two people immediately

8    in a kind of very familiar way.

9    Q     Did you do anything else?

10   A     I gesticulated to him that would indicate that there was

11   some familiarity with him and his culture.

12   Q     And were those things required, what we refer to as

13   cultural competence?

14   A     Yes, they are.

15   Q     Now you were asked about getting additional information

16   about what happened in Libya and what happened in Italy and I

17   just want you to answer this question yes or no, don't say any

18   words other than yes or no, okay?

19         Did you go to the SCIF and read about this case?

20   A     Yes, I did.

21   Q     And did you factor in the information you learned there

22   in rendering your opinion?

23   A     Yes, I did.

24   Q     And did you have an opportunity to consult with other

25   professionals about this case?

GHANNAM - REDIRECT - STERN

1    A    Yes, I did.

2    Q    With whom did you consult?

3    A    With Dr. Porterfield.

4    Q    So several of the things that I wrote you needed in that

5    letter, you actually were able to accomplish, is that fair to

6    say?

7    A    Some but not all, correct.

8              MR. STERN:  May I have one moment, Judge?

9              THE COURT:  Yes.

10   Q    Dr. Ghannam, you said you have some concerns about

11   Dr. DeMier and Dr. Mills, could you tell me about those

12   concerns?

13   A    Well, I think both of them are clearly, you know, very

14   good clinicians, good forensic examiners of course, but I

15   think one of the concerns I had is a specific understanding

16   culturally and linguistically of Mr. Harun's history, the --

17   specifically, you know, his cultural history, his family

18   history.  But also, you know, the clinical history which I

19   took very seriously in fact, and I'm going to speak carefully

20   so that we don't have to go -- you know, that I can say this,

21   you know, publicly if there's any problems that --

22             MR. STERN:  Hold on one second, let me talk to the

23   government for a minute, okay.

24             MR. ARIAIL:  Your Honor, may we approach?

25             THE COURT:  Yes.

GHANNAM – REDIRECT – STERN

1          (Sidebar conference.)

2          (Continued on the next page.)

72

                                SIDEBAR

1              MR. STERN:  I didn't want to take a chance doing

2    something we shouldn't do.

3              THE COURT:  I appreciate that.  Go to another

4    question.

5              MR. STERN:  Okay.  What was my question?  I don't

6    want to ask the same question.

7              (End of sidebar conference.)

8              (Continued on the next page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

73

PROCEEDINGS

1              (In open court.)

2              MS. KELLMAN:  Judge, we want to make sure whatever

3      questions we elicit don't cross any lines.

4              THE COURT:  Let me say to the witness that he

5      understands there are certain matters he reviewed that he's

6      not able to discuss.  If he feels the answer requires him to

7      do so, he should simply say I can't answer the question

8      without disclosing matters I've reviewed.

9              MS. KELLMAN:  Your Honor, would you allow a certain

10     amount of leading so we are carefully not to cross that.

11             THE COURT:  Yes.

12             MR. STERN:  Judge, we don't have anything else.

13     Thank you.

14             THE COURT:  All right, you may step down.

15             Any further evidence from defendant?  I assume not.

16             MR. STERN:  Not is the answer.

17             THE COURT:  I just thought I'd give you a chance.

18             All right.  Let's have the government's witness on,

19     please.

20             MS. MILLS:  Your Honor, Dr. Mark Mills is here for

21     the government.

22             THE COURT:  Yes.

23             MR. STERN:  With your permission, I'm going to give

24     Dr. Mills a book of evidence so we don't have to schlep back

25     and forth.

MILLS - CROSS - STERN

1    MARK MILLS, called as a witness, having been first duly sworn,

2    was examined and testified as follows:

3            THE COURTROOM DEPUTY:  Please state and spell your

4    name for the record.

5            THE WITNESS:  Mark with a K.  John, J-O-H-N.  Mills,

6    M-I-L-L-S.

7            THE COURTROOM DEPUTY:  Thank you.

8            THE WITNESS:  Your Honor, good afternoon.

9            THE COURT:  Good afternoon.

10           You may inquire.

11   CROSS-EXAMINATION

12   BY MR. STERN:

13   Q    Good afternoon, Dr. Mills.

14   A    Good afternoon, Mr. Stern.

15   Q    Dr. Mills, do you think it's fair to say that this case

16   is more complex than some you've seen?

17   A    Yes.

18   Q    This defendant, Mr. Harun, has a complex ethnic

19   background, doesn't he?

20   A    Yes.

21   Q    Born in Niger, right?

22   A    Yes.

23   Q    Raised in Saudi Arabia?

24   A    Yes.

25   Q    Traveled the world after that for many years, correct?

MILLS - CROSS - STERN

1   A     Yes.

2   Q     Were you able at all to have contact with his family?

3   A     No.

4   Q     You're aware, aren't you, that he was subjected to

5   torture?

6   A     In Libya, yes.

7   Q     Do you know exactly what techniques were used?

8   A     No.

9   Q     Do you know how frequently he was tortured?

10  A     No.

11  Q     Do you know the circumstances under which he was held,

12  that is, whether it was solitary or not?

13  A     No.

14  Q     He also speaks several languages, right?

15  A     Correct.  He speaks Hausa, Arabic, a smattering I think

16  of English, French, Italian.  That's my understanding of his,

17  I guess we're using the term linguistic competency this

18  afternoon.

19  Q     When you spoke with him, you needed to speak with him

20  through an interpreter, right?

21  A     Yes.

22  Q     And it's fair to say, isn't it, that languages other than

23  ours use intonation differently than we do?

24  A     I'm not a linguist but that certainly is my lay

25  understanding, yes.

MILLS - CROSS - STERN

1   Q    You also were aware, were you not, that since he's been

2   in the United States he's been in solitary confinement?

3   A    Yes.

4   Q    Now -- I'm sorry.  You're aware that he's Muslim, right?

5   A    Yes.

6   Q    Do you have a wide ranging knowledge of the Muslim faith?

7   A    No.

8   Q    Do you have a wide ranging knowledge of the rules that

9   apply to Muslims' daily activities?

10  A    No.

11  Q    And in this case you were unable to use testing to check

12  against your own conclusions; is that right?

13  A    Yes, as reflected in my report.

14  Q    Did you speak with prison personnel about him?

15  A    No, I spoke with the gentlemen who were transporting him,

16  but I did not speak with prison personnel.

17  Q    A number of mental health professionals have found this

18  to be a difficult case, haven't they?

19  A    Yes.

20  Q    He's been seen by at least nine mental health

21  professionals between Italy and here and Springfield, the

22  various places he's been, right?

23  A    I can't confirm that number.  I mean, I know the

24  Springfield numbers, but I don't know the numbers from Italy.

25  Q    Well, by a number of people anyway?

MILLS - CROSS - STERN

1   A    Certainly.

2   Q    When he was in Italy, I'm talking about before he came to

3   the U.S., there was one mental health professional who thought

4   he was normal?

5   A    That's how I read it, yes.

6   Q    And there was another one who thought he was psychotic,

7   right?

8   A    And who prescribed medication for him, yes.

9   Q    To treat his psychosis as they perceived it?

10  A    Treated the perceived psychosis, yes, sir.

11  Q    And when Mr. Harun was brought to the Metropolitan

12  Correctional Center there was one person who thought he was

13  normal, right?

14  A    Yes.

15  Q    And another who thought that he was psychotic?

16  A    Yes.

17  Q    And then he was brought to Springfield for examination?

18  A    That's correct.

19  Q    And Dr. DeMier, who we've heard some talk about, at first

20  thought he was not competent, right?

21  A    Yes.

22  Q    And then later decided he was competent?

23  A    Yes, I mean this is a summary obviously of a

24  considerable -- two considerably long reports, but that's

25  fair.

MILLS - CROSS - STERN

1   Q     And, finally, we're here and you say he's competent,

2   right?

3   A     Yes.

4   Q     And Jess Ghannam says he is not competent?

5   A     Correct.

6   Q     Now you've been a psychiatrist for quite some time,

7   haven't you?

8   A     Since 1975 I guess.

9   Q     And in 1975, you began to work at Stanford, right?

10  A     Yes.

11  Q     And while you were at Stanford you personally did about

12  9,000 evaluations, is that fair to say?

13  A     Yes.

14  Q     And what kind of evaluations were those?

15  A     Psychiatric, because that's what I am.

16  Q     Psychiatric towards what end?

17  A     Towards determining primarily their clinical evaluations

18  at that period to determine whether somebody needed treatment

19  or what kind of treatment they would -- would be most useful

20  for them or whatever kinds of emergencies were developing and

21  how they should be handled.

22  Q     And you were there, I take it, from 1975 through 1978

23  about three years, right?

24  A     No.  I was there from 1975 to nearly 1980.  In fact, it

25  was in 1980 that I stepped down from Stanford.

MILLS - CROSS - STERN

1    Q    Well, is it between 1975 and 1978 that you personally did

2    around 9,000 evaluations?

3    A    Yes, that was part -- it was actually between '75 and

4    '80.  It was part of my internship, residency, chief residency

5    and then the two years following my residency where I was the

6    director of the -- whatever it was called at that time, the

7    psychiatric assessment unit or whatever they called it.

8    Q    Sir, you testified in a prior proceeding not in

9    connection with this case, in a prior proceeding, right?

10   A    Pardon me?

11   Q    You've testified in court before?

12   A    Yes, sir.

13   Q    And you testified in a case I think called United States

14   against Kamel Solomon Eaton; is that right?

15   A    Yes.

16   Q    And you were asked about your experience, correct?

17   A    I don't recall but that, presumably, if you're cross

18   examining me, you have looked at the transcript and you know.

19   Q    You're right.

20        I'm reading now from page 625, line 20.  Were you

21   asked this question and did you give this answer:

22        "QUESTION:  Can you tell us a little bit more about

23   that?

24        "ANSWER:  Sure.  While I was at Stanford I directed

25   for the DA the Psychiatric Evaluation Unit and we evaluated

MILLS - CROSS - STERN

1   about 10,000 patients a year.  I was there doing that three

2   years.  I probably did 30 percent, so I probably did about

3   9,000 psychiatric evaluations then and I probably have done

4   now probably 3,000 forensic evaluations.  So I've done more

5   than 10,000 psychiatric evaluations in these many decades."

6            Were you asked that question and did you give that

7   answer?

8   A    Assuming you read it correctly, yes.

9   Q    Would you like me to show it to you?

10  A    No, no, I have the book here, I can follow along but I'm

11  sure you're not trying to trick me, at least so far.

12  Q    Okay, I'll take that I guess.

13           Now was that accurate when you said you did 9,000 in

14  three years?

15  A    Yes.  However, the question you asked me originally was

16  during the period '75 to '78 when I was director of the

17  Psychiatric Evaluation Unit from '77 to '80.

18  Q    The question I'm asking you -- and maybe I did ask it

19  wrong -- is did you do 9,000 evaluations in three years?

20  A    Approximately, yes, sir.

21  Q    And so that's about 10 every day for three years, right?

22  A    Yes.

23  Q    So is it fair to say you didn't spend a tremendous amount

24  of time on each evaluation?

25  A    Sure.

MILLS - CROSS - STERN

1   Q    And you also said, I think, that you've done around 3,000

2   forensic evaluations that would be in the past, approximately,

3   40 years; is that right?

4   A    Yes.

5   Q    And about how often, that is, once a week, twice a week,

6   once a year, do you do forensic evaluations?

7   A    It varies.  Sometimes I do 10 a week and sometimes I

8   don't do any for several weeks.

9   Q    But it's true, isn't it, that that averages out to about

10  80 per year for 40 years?

11  A    Yes.

12  Q    And that's accurate?

13  A    Pardon me?

14  Q    That's accurate?

15  A    To the best of my ability, yes.

16  Q    Now as a result of the work you do now, have you

17  continued pursuing your academic career?

18  A    No, I stopped my academic career some years ago.

19  Q    So it's fair to say, isn't it, that you last published

20  something in 2003?

21  A    I think that's fair.  I mean, I think my formal academic

22  appointment ended sometime prior to my testimony in the

23  Solomon Eaton matter that you referenced.  Unbeknownst to me,

24  and it was during that trial that I learned that they had sent

25  me some letter indicating I was no longer part of the faculty.

MILLS - CROSS - STERN

1    Q    When did you last teach?

2    A    It would have been about seven, eight years ago.

3    Q    When did you last have a hospital appointment?

4    A    Oh, it would have been before that.  That would have been

5    when I was at UCLA, so that would have been in the early

6    '80s -- no mid '80s.

7    Q    Like 16 years ago, right?

8    A    Pardon me?

9    Q    About 16 years ago?

10   A    Maybe.  I think it's probably longer ago than that.

11   Q    One of the things you've been involved with throughout

12   your career is the American Academy of Psychiatry and The Law,

13   right?

14   A    No, I've been involved with it up 'til about 20 years ago

15   probably.

16   Q    Well, you've been a member since 2005, right?

17   A    No, I was a member before, I may have stopped being a

18   member in 2005.

19   Q    I'm sorry, you said, I haven't been a member since 2005;

20   is that right?

21   A    That's correct.  Well, and again, I could look at my CV

22   but without referencing it I wouldn't know off the top of my

23   head, but I haven't been a member in some time.  I wouldn't

24   have known the date.

25   Q    Whether it's 2006 or -- it's that area?

MILLS - CROSS - STERN

1    A    That sounds about right.  Again, I haven't been a member

2    for a while and before I wasn't a very active one, so it's not

3    something I know off the top of my head.

4    Q    When you say you weren't active, you wrote papers for

5    them, right?

6    A    Sure.  But you don't have to be active as a member to

7    write a paper for the journal.  They are totally different --

8    Q    Is it fair --

9    A    -- systems.

10   Q    I'm sorry.

11   A    They are totally different systems.

12   Q    Is it fair to say that -- I'm going to call it the AAPL,

13   you'll know what I'm talking about, right?

14   A    I think most people call it AAPL.

15   Q    Okay.  I'll call it AAPL then.

16        It's fair to say, isn't it, that AAPL is the

17   preeminent American organization in the field of psychiatry?

18   A    No, it's fair to say that the American Psychiatric

19   Association is the preeminent field of psychiatry in America,

20   but AAPL is a much smaller group that, arguably, is preeminent

21   in psychiatry and the law.

22   Q    So in forensic psychiatry, it's the preeminent

23   organization.

24   A    You know, it certainly is a major organization, why don't

25   we just call it that without worrying about whether it's

MILLS - CROSS - STERN

1    preeminent or significantly eminent.

2    Q    Well, I guess we'll worry about calling it that.  I'm

3    going to read you a question and answer and you tell me if

4    it's accurate.

5    A    Okay.

6    Q    I'm just going to call it -- I suppose they said AAPL --

7    I'm reading, I'm sorry, from page 683, line 3.

8              "I'm just going to call it AAPL because it's easier.

9              Is it fair to say that AAPL is the preeminent

10   professional organization in field of forensic psychiatry?

11             "ANSWER:  Well, I think it is probably the

12   preeminent American organization in the field of forensic

13   psychiatry."

14             Were you asked those questions and did you give that

15   answer?

16   A    If you're reading from the transcript, I guess the answer

17   is yes.

18   Q    Okay.

19             We've talked about something like 3,000 forensic

20   evaluations you've done, right?

21   A    In the last 30 or 40 years, yes, sir.

22   Q    Those are different from the evaluations you were doing

23   earlier that we talked about where you said you did 9,000?

24   A    Of course.

25   Q    They are different in what way?

MILLS - CROSS - STERN

1    A    Well, because many of the clinical evaluations are

2    determining whether or not somebody should be admitted to

3    hospital, whether or not they're too intoxicated to drive,

4    whether or not they need a neurologic or a medical evaluation.

5    The immediate issue is very particularized.  Whereas, forensic

6    evaluations often have a very long tail.  Somebody might be

7    going to prison for a very long time, conceivably even be

8    executed, so the matters generally require a greater

9    attention.

10   Q    Now out of the 3,000 forensic evaluations you've done, do

11   you remember how many of those people were Muslim?

12   A    No.

13   Q    Do you recall how many of them were North African?

14   A    No.

15   Q    Do you remember how many of them were subjected to

16   torture?

17   A    Very, very few indeed.  But I can't give you a number.

18   Q    Do you remember how many of them you were able to give

19   testing to?

20   A    Of the 3,000?

21   Q    Uh-huh.

22   A    I didn't use testing really until about 15 years ago.

23   Since then I've been become a major believer in it, I've

24   written about it extensively and I use it whenever I can.  But

25   before then I just didn't use it very much and when I did need

MILLS - CROSS - STERN

1    it I asked a colleague to administer it.

2    Q    Let's talk about the past 15 years then.  In the past 15

3    years, how many people were there that you were unable to

4    administer tests to?

5    A    Again, I don't sort of category that way in my mind.  I

6    mean I probably haven't administered tests to something like

7    20 percent, sometimes it's because of timing considerations,

8    sometimes it's because of reading limitations, sometimes it's

9    because of interpreter limitations, and sometimes because

10   somebody was just too impaired from my perspective to even

11   think about administering tests to them.

12   Q    But it's your practice about 80 percent of the time then

13   to administer tests?

14   A    I would say that's correct.

15   Q    How many of the people you dealt with had been held in

16   solitary for many years?

17   A    Well, relatively few.  I mean, I do maybe a third of my

18   practice is -- involves criminal work or criminal assessments,

19   if you prefer, and a number of those people have been held in

20   solitary or in special housing units, but most have not.

21   Q    I want to talk to you about work you did before you met

22   Mr. Harun, okay?

23   A    Your cross, sir.

24   Q    My pleasure.

25            In Italy you reviewed the records that were made by

87

MILLS - CROSS - STERN

1   the doctors there, right?

2   A    I did.

3   Q    Now one of those doctors was a neurologist, the one who

4   saw him on the boat, right?

5   A    Yes.

6   Q    And was around 80?

7   A    Pardon me?

8   Q    Around 80 years old?

9   A    I didn't know his age.

10  Q    And his practice was to ride around on boats helping out

11  on boats, right?

12  A    I don't know that.  I'll accept your statement to me if

13  that's what you're making.

14  Q    Okay.  Now, you're familiar with the term "logorrhea,"

15  aren't you?

16  A    I am.

17  Q    What is that?

18  A    Sort of verbal diarrhea.

19  Q    Are you familiar with the term "intense psycho-physical

20  agitation?"

21  A    Yes.

22  Q    What is that?

23  A    Somebody is moving, talking, writhing, gesticulating,

24  verbalizing in a way that appears out of control and intense

25  or hyperactive.

MILLS – CROSS – STERN

1    Q    Are those things sometimes symptoms of mental illness?

2    A    Of course.

3    Q    You're also aware that while in Italy Mr. Harun was

4    treated with psychotropic medication?

5    A    Yes, two I believe.

6              (Continued on the next page.)

MILLS - CROSS - STERN

1   EXAMINATION BY

2   MR. STERN: (Continuing.)

3   Q    And are you aware what, if any, effect that had on him?

4   A    Well, I'm aware that apparently he calmed down.  That

5   that would be hardly surprising.  One of those was

6   haloperidol, the antipsychotic.  And the other was a

7   benzodiazepine that we don't see in this country.  The latter

8   is very clearly, very sedating.

9         So whether he was psychotic or not, almost anybody

10  would have been much calmer after the administration of those

11  medications.

12  Q    So it's true, isn't it, that after even of that

13  medication, he continued to display delusional ideations?

14  A    It is true, but it's more complicated as you asked me

15  about his mental state early on that the effects of the

16  medication work in terms of sedation very rapidly within

17  24 hours.  But the effect on delusional systems may not work

18  for days, weeks, or even occasionally months.  So even if he

19  were, in fact, delusional, and I think there is a real

20  question there.  But even if he were, and the medication was

21  continuously administered during that period, he might well

22  not have had a therapeutic response during the period that he

23  was administered the medication.

24  Q    Might not have acted yet, is that what you're trying to

25  say?

                              90
                    MILLS - CROSS - STERN

1    A    That's correct.

2    Q    You also reviewed from the Metropolitan Correctional

3    Center, am I right?

4    A    Yes.

5    Q    Those records record different behaviors that both

6    professionals and, by professionals, I mean mental health

7    professionals, and nonprofessionals, that is, guards observed;

8    is that right?

9    A    Yes.

10   Q    And so, for example, on December 30th, he was in his cell

11   making bizarre statements; right?

12   A    I don't recall specifically but I'm happy to say that he

13   has displayed multiple mental states including significant

14   agitation and behavior which could be interpreted as psychosis

15   in multiple contexts.  And some of which the Court has

16   observed.

17   Q    So I'm just going to tell you some things and you can

18   tell me if you think they're wrong.

19            He, at one point, made body armor out of milk

20   cartons; right?

21   A    Yes.

22   Q    Heard an Arab man talking to him?

23   A    Yes.

24   Q    Talks to himself almost nonstop including severe arguing?

25   A    That is what was reported, yes.

MILLS - CROSS - STERN

1    Q     Dances around naked after a shower?

2    A     Yes.

3    Q     Sleeps on the floor to avoid nylon which prevents his

4    body from recharging electrons?

5    A     That is what he has claimed, yes.

6    Q     Talks to himself in the mirror?

7    A     Oh, I haven't done that since I shaved this morning, but

8    yes.

9    Q     I'm not going to diagnose you.

10   A     Thank you, sir.

11   Q     And talks to the wall?

12   A     Yes.

13   Q     And those are all behaviors observed regularly during the

14   time he's been held at Metropolitan Correctional Center?

15   A     I think they've all been observed.  I'm not sure all of

16   those were observed regularly.

17   Q     Withdrawn.  I don't mean every one observed regularly, I

18   mean that group of behaviors?

19   A     That's correct.

20   Q     Now, you heard some talk in here about cultural

21   competence; right?

22   A     I heard testimony, sir, more than just talk.

23   Q     And is it fair to say that psychiatric symptoms cannot be

24   assessed independent of an individual's background and

25   culture?

MILLS - CROSS - STERN

1   A     No, that would be inaccurate.  It's fair to say that a

2   more nuanced and better assessment occurs in the context of

3   cultural understanding.  But some symptoms, if they are of

4   sufficient magnitude, can be assessed without cultural

5   competence.

6   Q     Okay.  Are you familiar with a book called, "The

7   Comprehensive Textbook of Psychiatry"?

8   A     I am.

9   Q     And is it fair to say that that's a book that's used by

10  people in your field?

11  A     And of which I've published chapters.  Yes, sir.

12  Q     And that Kaplan and Sadock, who are the authors, are well

13  respected in your field?

14  A     Well, you made a misstatement, sir.  They are not he

15  authors, they are editors, but they are well respected.

16  Q     And the book they edit is well respected and

17  authoritative?

18  A     Yes.

19  Q     And I'm referring you now to Page 1075.  If you look at

20  exhibit in the book, or I can just read it to you, and you can

21  acknowledge so far it's up to --

22  A     So far your reading strikes me as good.  Keep going.

23  Q     That Kaplan and Sadock, at Page 1075 in their book, say

24  "Psychiatric signs and symptoms cannot be assessed independent

25  of an individual's background and culture.  Many phenomenon

MILLS - CROSS - STERN

1   often considered to be symptoms of psychiatric disorder may

2   not be experienced as psychiatric problems by patients."

3           Is that what it says in Kaplan and Sadock?

4   A    Yes.  Did you tell me, I may have missed it, what edition

5   of this is their textbook?

6   Q    I believe it's 9th edition.

7   A    When was that published, sir?

8   Q    I can show you, it's in your book under G.  We have the

9   frontage piece there.

10  A    I'll take a look.

11          MS. WELLS:  Which tab?

12          MR. STERN:  G should be G.  It's I.  I'm sorry.

13          THE WITNESS:  I don't see the little lettered tabs.

14  I'm sure the tabs are in there, but they don't is letters on

15  them at least mine doesn't.

16          MR. STERN:  Mayerlin is going to come up and tell

17  you.

18          THE WITNESS:  Just tell me, I'm happy with that.

19          MR. STERN:  We think it's the current edition, but I

20  guess I don't --

21          THE COURT:  Does it say which edition?

22          MR. STERN:  The 9th edition.

23          THE COURT:   Okay.  Does that mean anything to you?

24          THE WITNESS:  No, your Honor.

25          THE COURT:  It doesn't have a date?

MILLS – CROSS – STERN

1          MR. STERN:  We'll try and find the date.  I'll go

2     out and try and find the date.

3          THE WITNESS:  Go ahead.  I don't want to hang you up

4     here on that.

5     EXAMINATION BY

6     MR. STERN: (Continuing.)

7     Q    Thank you.

8          You knew we've said already that there were claims

9     by Mr. Harun that he had been tortured; right?

10    A    Yes, sir.

11    Q    And would you want to know what that torture consisted of

12    to help you in evaluating him?

13    A    Of course, in the abstract.  I'm not sure I felt that it

14    was necessary; in fact, I didn't know, and I still have

15    rendered the opinions I've presented here in my reports.  But

16    sure I'd want to know.  In general, you're better off with

17    more information than with less.

18    Q    Putting aside the abstract for the time being.  When

19    someone has been subjected to torture, are there things that

20    trigger psychiatric problems for them?

21    A    There can be, of course.

22    Q    And what does that mean?  What does that mean to trigger

23    psychiatric problems?

24    A    It means that torture, like any major stress, can cause

25    regression and psychiatric problems and one can develop

MILLS – CROSS – STERN

1    psychiatric symptoms.

2    Q    So, for example, if someone was given a psychotropic drug

3    in their tea and later had the same kind of tea, might that be

4    a trigger?

5    A    I think it would be a very unusual trigger but, you know,

6    it's conceivable, sure.

7    Q    Did you try to learn, putting aside what specifically

8    happened to Mr. Harun, what kind of torture the Libyan

9    government engaged in during the time he was there?

10   A    I did not try to make any separate assessment of the

11   degree or the kind of his torture on my own other than what he

12   told me.

13   Q    Did you look at Department of State reports on human

14   rights about Libya?

15   A    No.

16   Q    This edition is the 9th edition, 2009.  The 10th edition

17   is coming May 2017.

18   A    I appreciate it.  Thank you, sir.

19   Q    I hope it's right but I think so.  Okay.

20          I think you've already said, but just to be clear.

21   You're aware of things like torture can have complex effects

22   on the development and persistence of psychiatric

23   symptomology.

24          Is that a fair thing to say?

25   A    Yeah.  I mean probably just better to say "psychiatric

MILLS - CROSS - STERN

1   symptoms."  Symptomology is the study of symptoms and is

2   generally used redundantly.  But, yes, of course it can.

3   Q    You should talk to Kaplan and Sadock?

4   A    They aren't experts in English.

5   Q    You knew that he was from Niger and Saudi Arabia; right?

6   A    Yes.

7   Q    Did you make attempts to contact his family?

8   A    No.

9   Q    Did you try to learn about people from those countries?

10  A    No, and it wasn't that I'm insensitive.  But you remember

11  the poet Andrew Marvell, and the poem he wrote called "To His

12  Coy Mistress."

13        "Had we but world enough and time, This coyness,

14  lady, were no crime."

15        The point being if you have enough time, you can do

16  almost anything better and that if the Government had said

17  take a month, do your research, you know, read whatever you'd

18  like I probably would have included attempts to reach the

19  family to learn more about Niger, which I know very little

20  about it, learn more about Arab and you Muslim culture.  All

21  of those things were worthwhile, but I didn't feel they were

22  directly relevant to my report, which is why I wrote my report

23  as I did.

24  Q    Your report was done, your first report, was done about

25  four years ago; is that right?

MILLS – CROSS – STERN

1    A    That's correct.

2    Q    And your most recent report was done when?

3    A    Done in January of this year.

4    Q    So during those four years did you do any of that stuff?

5    A    No.

6            MR. STERN:  Can I have one second, Judge.

7    Q    I think you said earlier that you're not terribly

8    knowledge about Islam, the religion?

9    A    I did say that.

10   Q    Do you know the rules about toileting?  About defecating

11   in front of others?

12   A    No.

13   Q    Do you know the rules about prayer?

14   A    Vaguely.  I know that prayer has to occur multiple times

15   a day, but I don't know much more than that.

16   Q    Do you know the rules about nudity in front of others?

17   A    No.

18   Q    Do you know the rules about cursing?

19   A    No.

20   Q    Now, you, yourself, have done some work in the area of

21   cultural competence, haven't you?

22   A    I've talked about it, I lectured about it in various

23   American Bar Association fora.

24   Q    Specifically, in 2010, you were part of an ABA project.

25   You were part of the staff who had a presentation called,

MILLS - CROSS - STERN

1    "Building Community Trust:  Improving Cross Cultural

2    Communication in the Criminal Justice System."  Right?

3    A    I'm not trying to pick words with you.  I wasn't part of

4    the staff, I was one the presenters at that presentation.

5    Q    Sir, I'm going to show or, I guess, you can go to it.

6    The first page of Exhibit J?

7    A    My tabs don't have letters on them, sir.

8    Q    It was just to trick you.  I'm going to bring it up?  I'm

9    sorry about that, I gave you a bad book.

10   A    It didn't have letters.

11   Q    Look under there where it says, "Project Staff."

12   A    Okay.

13   Q    And tell me if you see your name?

14   A    I do.  Curriculum Author, Unit 9.

15   Q    You were listed by them as project staff; is that right?

16   A    Yeah.  But that's nonsense.  I mean, it's very flattering

17   and I would like to be an ABA staff member at least a time to

18   ten, but I was a lecturer.  They have given me a title far

19   beyond my worth.

20   Q    Congratulations.  And your lecture was, as you suggested,

21   Chapter 9?

22   A    It was.

23   Q    And that chapter is about cultural competence?

24   A    I believe in cultural competence, sir.

25   Q    And don't you say in that chapter that cultural

MILLS - CROSS - STERN

1  competence throughout the justice system is necessary to

2  ensure justice for all?

3  A    Yes.

4  Q    And don't you also say:  "Proper handling of cross

5  cultural cases requires interdisciplinary approaches and

6  partnerships with psychologists and psychiatrists with cross

7  cultural expertise."

8  A    Yes.  And, in general, I believe that.  Correct.

9  Q    Who was the psychologist or psychiatrist who you dealt

10 with who had cross cultural expertise?

11 A    Well, I dealt with many but none in this case.

12 Q    It's fair to say, isn't it, that psychiatric signs and

13 symptoms cannot be assessed independent of an individual's

14 background and culture?

15 A    Well, you asked that question in a different form earlier

16 and the answer is, often that is true but not absolutely and

17 let me give you a reference.

18        There is an article in "Science," the journal

19 Science, from about 1975 by a sociologist named Jane Murphy.

20 And what she did was to ask people from two different

21 cultures, one an Aleutian culture, Aleutian Island culture.

22 One, a central African culture.  The tribe was like the

23 Yorbinda, Y-o-r-b-i-n-d-a.

24        And she asked them what's crazy?  And they basically

25 came up with an list of symptoms that has kind of cross

Case 1:12-cr-00134-BMC-MDG   Document 232   Filed 02/27/17   Page 100 of 131 PageID #: 4708

MILLS - CROSS - STERN

1   cultural universality and validity.  And what they said was,

2   people who urinate, defecate, masturbate in public.  People

3   who talk nonsense; people who don't sleep; people who eat

4   dirt, and there were a few more.

5           But the point is, when symptoms are gross enough,

6   one doesn't need cultural sensitivity.  Although, it's always

7   a good thing to have it.  And yet, you can still make a

8   meaningful diagnosis.

9   Q    Do you know what year that article came?

10  A    The Jane Murphy article?

11  Q    Yes.

12  A    I believe it was in 1975.  I know it was in "Science."

13  Q    Do you know if things have evolved since then?

14  A    Human nature hasn't evolved since then.  Certainly,

15  medication and diagnostic specificity has evolved since then.

16  And depending upon what you're talking about, there have been

17  huge transformations in medicine.  But the treatment of

18  psychosis, sadly, has not advanced a great deal since 1975 and

19  the universality of distress and of psychotic symptoms hasn't

20  changed very much since 1975.

21  Q    We've talked a little about Kaplan and Sadock; right?

22  A    Yes.

23  Q    And isn't it true --

24          MR. STERN:  Well, withdrawn.

25  Q    You agree it's an authoritative source?

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

MILLS - CROSS - STERN

1   A     Yes.

2   Q     Isn't it true that they say, "Psychiatric signs and

3   symptoms cannot be assessed independent of an individual's

4   background and culture."

5   A     And, again, I'm picking words with you slight.  And the

6   answer is not quite and here's why.  They don't say anything,

7   they're the editors.  Each chapter is written by an author or

8   two or three, and it's the author of some particular chapter

9   you're quoting from that says that.

10         THE COURT:  Okay.  But I think whoever that author

11  is probably an authoritative statement?

12         THE WITNESS:   I think that's generally fair.  Sure,

13  your Honor.

14  Q     Now, there's a specific document put out by ABA referred

15  to as, "The Practice Guideline for the Forensic Psychiatrist's

16  Evaluation Competence to Stand Trial."

17         Are you familiar with that document.

18  A     I've seen it a long time ago.  I haven't looked at it

19  recently.

20  Q     And it's fair to say that that's a document directed at

21  psychiatrists and other clinicians who are working in a

22  forensic role in conducting evaluations and providing opinions

23  related to competence to stand trial?

24  A     Sure.

25  Q     And it's true, isn't it, that they also say, "Cultural

MILLS - CROSS - STERN

1  competence is a requisite for sensitive, effective delivery of

2  service."

3  A    If you're quoting from the source, I believe you.

4  Q    Okay.  Now, I want to talk to you a little about

5  components of cultural competence.

6  A    Okay.

7  Q    One is language; right?

8  A    Yes.

9  Q    Someone religion; correct?

10  A    Yes.

11  Q    One is conceptions of wellness and disease; right?

12  A    I think that's fair.

13  Q    One is the limitations and nuances of language; right?

14  A    Yes.

15  Q    And one has to do with conceptions of status in a given

16  culture?

17  A    I presume this list is not exhaustive, but that's

18  certainly true.

19  Q    Correct.  I'm sure there are others.  But those are all

20  true?

21  A    Correct, in my belief.

22  Q    Now, do you know how al-Qaeda treated black Africans?

23  A    Is that the end of the question?

24  Q    That's the end of the question.

25  A    No, I don't.

MILLS - CROSS - STERN

1    Q    Do you know what life was like for domestics in Saudi

2    Arabia?

3    A    I'm sure it wasn't good, but I don't know that that as a

4    fact.

5    Q    Do you know the attitudes of Muslims towards mental

6    illness?

7    A    I do have some knowledge of that because I have another

8    national security case right now where I'm appearing for the

9    defense and I've inquired into that.  But in general, mental

10   illness is greeted with he considerable shame and there's not

11   much discussion of its presence.

12   Q    Now, Mr. Harun told you he was tortured in Libya and that

13   was consistent with his affect and other information he has,

14   isn't that right?

15   A    That's correct.

16   Q    And when you first visited him on February 21st -- 25th,

17   2013, his behavior suggested to you that he was paranoid and

18   potentially psychotic?

19   A    Yes.

20   Q    And you noted that he was responding to internal stimuli?

21   A    Yes, appeared to be.  Yes.

22   Q    And did you talk with him on that visit?

23   A    I certainly endeavored to.  He didn't talk back very

24   much.  He was mostly yelling at his Arabic interpreter who was

25   there at the Government's production and who was befuddled and

MILLS - CROSS - STERN

1    baffled and I think very gracious, but humiliated by

2    Mr. Harun's behavior.

3    Q    And on your second visit, which was a couple months

4    later, April 26, 2013, you wrote that he was irrational,

5    paranoid, intermittently angry and given to frequent

6    expostulation, isn't that right?

7    A    That's what I wrote.  And the only correction I would

8    make, even in hindsight, was he appeared those things;

9    correct.

10   Q    And that behavior is consistent with what you knew that

11   he had done in Italy; right?

12   A    Yes.

13   Q    And consistent with what had been reported at MCC?

14   A    Yes.

15   Q    You said, again, he's probably suffering from a psychotic

16   disorder?

17   A    That was my impression at the time that's correct.

18   Q    And now comes the third visit; right?  That's a few days

19   later on May 3, 2013.

20   A    Yes.

21   Q    And, at that meeting, you said he was calm, responsive,

22   respectful, thoughtful, forthcoming, and provided detailed

23   information; right?

24   A    Almost literally night and day, that's correct.

25   Q    And it's based on that meeting, that single meeting, that

MILLS - CROSS - STERN

1    you say that he's competent?

2    A    Well, no.  It's not based on that single meeting, it's

3    based on my impressions from all three meetings and from the

4    documents and the history that I have reviewed and elicited

5    and the other sources from which I gathered information.  It's

6    a compilation of all of that, but if you mean was there a

7    moment when I -- when the light bulb went off, when I had an

8    epiphany, when I realized that things were different than they

9    had appeared then the answer is yes and it was that third

10   session.

11   Q    But you don't think he's malingering, do you?

12   A    No.  I mean, malingering really means -- there footnote

13   in my report about malingering -- and malingering means doing

14   something for a particular end.

15         Ordinarily, when you malinger psychotic symptoms,

16   you do so so that the Court finds one incompetent to stand

17   trial, or the Court finds one insane at the time of the act,

18   and thereby, one hopes to get better treatment in some way.

19         I think he is faking his symptoms, or at least most

20   of them, but I think he's doing that as report says from

21   Springfield because he wants to kind of get back at the court

22   system, or the justice system, or make Americans miserable or

23   something but I don't think he's malingering in the classic

24   sense.

25   Q    And he's been doing that constantly for six years?

MILLS - CROSS - STERN

1   A    Well, not constantly.  He's not, you know, people aren't

2   always watching him.  He's been doing it frequently, often

3   with great intensity, in a way that is very distressing often

4   to guards and others who are around him.

5   Q    You're aware, aren't you, he has cameras in his cell?

6   A    Yes.

7   Q    And that he's watched 24 hours a day?

8   A    Yes, I am.

9   Q    Now, one of the things he's done is to try to say he's

10  not ill; right?

11  A    That's true.

12  Q    He's told Dr. DeMier, "My mind is fine."  Right?

13  A    Yes.

14  Q    He's told other people, I don't know why I'm here?

15  A    Yes.

16  Q    He hasn't made any effort to convince you or anyone else

17  that he's mentally ill, has he?

18  A    Except by his behavioral outbursts his expostulations and

19  his bizarre behavior which is pretty -- I mean, that's sort of

20  an, "Other than that, Mrs. Lincoln, how was the play?"  Kind

21  of moment.

22  Q    He doesn't say himself that he has any psychiatric

23  problems?

24  A    No, but he behaves in a way that appears grossly

25  disturbed and disordered.  Often, not always, though.

MILLS - CROSS - STERN

1    Q    Now, is it fair to say that signs and symptoms of mental

2    illness are usually not static.  Depending on the

3    circumstances, they often vary in intensity and even in their

4    existence?

5    A    I think that's a pretty good summary, in general.

6    Q    And you, yourself, have said, haven't you, that most of

7    the serious psychopathology, once it gets established, exists,

8    as Dr. Goldsmith says, with waxing and waning.  But it exists

9    for decades.  It exists across the lifespan.  That's what

10   you've said, haven't you?

11   A    I don't recall my quote.  Sounds very good, though.

12             MR. STERN:  Judge, may I approach for a moment.

13             THE COURT:  You may.

14             (Approaching the witness.)

15             (Handing to the witness.)

16             THE WITNESS:  I did say that.

17   Q    You said that under oath at a different proceeding?

18   A    That's correct, sir.

19   Q    Is it also fair to say that the course of paranoid

20   schizophrenia may be episodic with partial or complete

21   remissions?

22   A    Yes.

23   Q    Now, there were a lot of important things in this case

24   that, through no fault of your own, you weren't able to do;

25   right?

MILLS - CROSS - STERN

1   A    Sure.

2   Q    So we've talked about testing a little, haven't we?

3   A    We have.

4   Q    And it's fair to say that tests helped reveal how ill

5   someone really is?

6   A    Yes.

7   Q    It's fair to say that tests are a way of checking on your

8   own work in case you were not sufficiently focused when you

9   interviewed someone?

10  A    Yes.

11  Q    And it's fair to say that for over a decade you were

12  given two or more psychological tests as a routine part of

13  your forensic assessment?

14  A    Yes.  Sounds like you're reading from my testimony again.

15  Q    I am.

16          Now, in this case, you couldn't give any tests;

17  right?

18  A    I didn't try.  I could have on that third session

19  possibly, but I didn't try.  The first two sessions, I thought

20  he was so disturbed and/or uncooperative that it would have

21  made no sense to even try.

22          And the third session, it was such a remarkable

23  transformation that it didn't really occur to me at that

24  moment.  I was more interested in trying to elicit more

25  information in trying to determine whether or not the

MILLS - CROSS - STERN

1    transformation I thought I was seeing was real.

2    Q    Well, don't you say in your report of August 22nd that,

3    "There are no tests normed for the Hausa-speaking population

4    so I couldn't use this check on myself."

5    A    I did say that, but that was sort of an post-hac

6    rationalization.  My other national security matter is a Saudi

7    matter.  And it's been an important issue about the tests, an

8    MMPI test in that case.  And there are no MMPIs normed on

9    Saudis.  So there are huge swaths of humanity for whom the

10   ordinary psychological tests aren't available.

11   Q    That's because it's not that they're useless, it's

12   because it would be impossible for you to do it?

13   A    It would be inappropriate.  It would be inapposite to use

14   those tests, that's correct.  But here, in candor, I was so

15   dumbfounded, gobsmacked is a nice word, by the transformation

16   that I was witnessing at the moment I didn't think about

17   administering psychological tests.

18   Q    Now, I want to talk a little about your second report

19   which I think you wrote on January 10, 2017?

20   A    I think I wrote it a couple days before but that's close

21   enough.

22   Q    Did you review all the reports of Harun's behavior in

23   prison since your previous report?

24   A    No.  In fact, my report specifies that so we don't go

25   round and round.  What I did review, and basically what I

MILLS - CROSS - STERN

1    reviewed, is Dr. Ghannam's report and his curriculum vitae,

2    and Dr. DeMier's two reports.  I mean, essentially, that was

3    pretty much all that was knew.

4    Q    So you were unaware of whether he continued to have the

5    same fixed beliefs about people talking to him and flying

6    overhead and things like that?

7    A    I'm not unaware because, of course, some of that is

8    reflected in Dr. Ghannam's report, number one.  And number

9    two, I wouldn't be surprised I would have expected that when

10   he wasn't in that kind of wonderfully open, candid, quiet,

11   reflective, responsive moment that he was on my third

12   evaluation not because my doing but because of the, I think,

13   the skills of the Hausa interpreter who I referenced in my

14   report; that when he's not like that he tends to be the other

15   extreme -- he's bombastic, he's expostulative, he's explosive,

16   he's angry, disgusting, humiliating.  He's a real handful.  I

17   think I once said that it's like watching an adult have a

18   temper tantrum, that he's very much like that.

19   Q    So do you think the day that you had the interpreter you

20   believe he liked he forgot to act up?

21   A    No, I think it was halation.  I think he felt seduced

22   into some kind of moment of not literal intimacy, but of

23   metaphoric intimacy.  Some closeness whether it was linguistic

24   or cultural or some connection that felt comfortable and he

25   kind of let down the pretense of his disturbances.

MILLS - CROSS - STERN

```
1   Q    Did you speak to any of the jailers who tended to him on
2   a daily basis?
3   A    No, I think I've already testified I have not.  I did
4   speak with those who transported him.
5   Q    I'm talking now about the time between your first report
6   and your second report?
7   A    No, sir.
8   Q    Did you observe the conditions under which he's been held
9   for the past six years?
10  A    Well, I've been on the SHU at the MDC several times, and
11  at the MCC a couple times as well.  So I know the general
12  conditions, I don't know specifically how he was treated.
13  Q    It's true, though, isn't it, you haven't seen or spoken
14  to Mr. Harun in four years?
15  A    It is true.
16  Q    And did you ask the Government if you could see and speak
17  with Mr. Harun?
18  A    No.  I said I was willing to see him if they thought it
19  was necessary, and if they presented material to me which,
20  after reviewing, I thought it was necessary.  After I reviewed
21  Dr. Ghannam's report because I didn't see him describing
22  anything very different than what I had seen in my first two
23  evaluative sessions, I did not think it was necessary but I
24  was willing to do so and I'm frankly still willing to do so.
25  Q    Is it fair to say this:  Competence evaluations are
```

MILLS – REDIRECT – WELLS

1    neither retrospective nor prospective.  They focus on the

2    defendant's present functional level and emphasized the

3    evaluee's mental functioning capacity rather than the

4    psychiatric diagnose.

5              Is that fair to say?

6    A    I think a better phrase is, is accurate to say.  But,

7    yes, sir, it is accurate.

8    Q    Okay.  Thank you.

9              MR. STERN:  I have nothing else.

10             THE COURT:  Okay.  Redirect.

11             MS. WELLS:  Yes, your Honor.

12   REDIRECT EXAMINATION

13   BY MS. WELLS:

14   Q    Good afternoon, Dr. Mills.

15   A    Good afternoon, Ms. Wells.

16   Q    Who first retained you in this case?

17   A    Actually, I was retained by the defense in this case.

18   Q    And when you provided your initial report in 2013, to

19   whom was that report directed?

20   A    It was addressed to Ms. Kellman and the Government

21   because by that point the Government, having discovered that I

22   was going to be involved, very graciously said that they would

23   retain me, too.  And I think I may have actually addressed a

24   report to the judge, the prior judge in this matter,

25   Judge Korman.

MILLS - REDIRECT - WELLS

1  Q   In reaching your conclusions set forth in your 2013

2  reports, did you have sufficient information to come to the

3  conclusions that you reached?

4  A   I believe so.  Otherwise, I would have either asked for

5  more evaluative sessions, more information, or both or I

6  wouldn't have opined.

7  Q   And as to your report issued in January of 2017, did you

8  have sufficient information to reach the conclusions stated

9  there?

10 A   I believe so, yes.  With a microcaveat that I understand

11 that folks change, as my testimony reflected, over time and

12 that there can be intercurrent events that may change things.

13       So it's possible Mr. Harun, Mr. Hausa, had a stroke

14 but there was nothing in Dr. Ghannam's report to indicate that

15 he was dysphoric, or that he couldn't move a limb, or some

16 other catastrophic intercranial event had occurred.  It's

17 possible, he's a little young, but he could posttraumatically,

18 we don't know the nature of torture in Libya, or he could

19 develop a degenerative disease like early Alzheimer's.

20       Again, I didn't see any evidence that made me

21 suspicious of those.  So with no evidence of new condition, or

22 some unexpected intercurrent condition, my belief, my best

23 belief, is that his condition continued pretty much as it was

24 when I saw him, when Dr. DeMier saw him, and when Dr. Ghannam

25 saw him.  I think we obviously reached some somewhat different

MILLS - REDIRECT - WELLS

1   conclusions, but I think his condition is relatively stable.

2   Q    So was there any evidence, then, in other words, to

3   suggest that he was suffering from any new or previously

4   undiagnosed condition in Dr. Ghannam's report?

5   A    I saw no evidence of that there.

6   Q    You were asked a series of questions about different

7   behaviors that the defendant in this case has demonstrated

8   over time; fair to say?

9   A    Yes.

10  Q    Among those behaviors was his personal hygiene?

11  A    Yes.

12  Q    And were you able to observe what kind of hygiene or,

13  pardon me, let me rephrase that.

14         In reviewing the materials provided by Dr. Ghannam

15  and Dr. DeMier, are you aware that the defendant has, in the

16  past, failed to maintain what we would call ordinary standards

17  of hygiene?

18  A    Yes.

19  Q    Did you consider that information in reaching your

20  conclusions in your most recent report?

21  A    Yes.

22  Q    And what did you conclude?

23  A    Well, again, I think it is evident that Mr. Hausa feels

24  significantly aggrieved, and he may have many reasons to have

25  that feeling, and that one of the way expresses his grievances

MILLS - REDIRECT - WELLS

1   is by making life more difficult for those around him.  Thus,

2   can be the security staff in jails and prisons.  It can be his

3   Honor or his predecessor.  It can be for the various staff

4   around him.  And I think that, to my mind, that behavior

5   appears to be significantly volitional and that's my belief.

6   Q    What about some of other behaviors you were asked about

7   including exposing himself or masturbating in public.  What,

8   if anything, did you conclude about that?

9   A    The same thing, basically, that folks masturbate in

10  public for various reasons.  It can be sexual arousal, it can

11  be an indication of disgust, it can be to keep people at bay.

12          So, ideally, one would like to inquire about that.

13  I didn't when I had that couple hours with him when he was

14  pretty calm.  I wish I had in retrospect, but it didn't occur

15  to me at that moment.

16  Q    Is it possible, well, let me ask you one more.

17          What about instances of public defecation.  Were you

18  aware of that behavior of the defendant?

19  A    Yes.

20  Q    What conclusions, if any, did you reach about those

21  behaviors?

22  A    Again, it seems to me it was volitional behavior during

23  the period that I saw him in my third evaluative session.  He

24  didn't masturbate, touch himself inappropriately, indicate

25  that he needed to urinate or defecate or attempt to do so

MILLS - REDIRECT - WELLS

1   inappropriately.  He seemed calm and responsive to what was

2   going on around him.

3           And, again, psychotic illnesses develop generally

4   insidiously and take weeks or months to be treated

5   effectively.  You can't turn it on and off.  And when you can

6   turn it on and off, that means what you're turning on is not a

7   psychotic illness, but an attempt to be irritating or

8   demanding or entitled or something to push people away, or to

9   humiliate the Government or whatever.

10  Q    And was that what you observed in terms of the

11  defendant's behavior?

12  A    Yes.

13  Q    These behaviors that we just discussed:  Hygiene

14  masturbating in public, public defecation, are any those

15  acceptable in our society, in American society?

16  A    No.  I mean, they may not be considered as unusual as

17  they apparently are in Muslim or Arabic societies, but they

18  are certainly not routine behaviors in America in the 21st

19  century.

20  Q    And is it possible for a person a patient to fake

21  behaviors for any end?

22           MR. STERN:  Object as to what's possible.

23           THE COURT:  Sustained.

24  Q    Did you reach any conclusions as to whether the defendant

25  in this case was exhibiting real or fake symptoms?

MILLS - REDIRECT - WELLS

1    A    Well, I mean he certainly exhibits symptoms, and he

2    certainly can exhibit what I would call for one word kind of

3    normalcy.  And so, if he's exhibiting very unusual and

4    dramatic symptoms, and he's also exhibiting normalcy and can

5    be normal, then I presume he is manifesting those symptoms

6    volitionally and that means he is in effect faking them, sure.

7    Q    As we discussed earlier, you were initially retained by

8    the defense counsel in this case?

9    A    Yes, by Ms. Kellman.

10   Q    And when they retained you in 2013, were you

11   given -- were you given copies of State Department reports on

12   Libya?

13   A    I don't believe so, no.

14   Q    Were you asked to research those issues?

15   A    Of course not.

16   Q    And were you asked to research or further educate

17   yourself on Muslim religious or cultural practices?

18   A    No.

19            MS. KELLMAN:  Your Honor, can we approach?

20            THE COURT:  Okay.

21            (Continued on the next page.)

22

23

24

25

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

118

SIDEBAR

1          (Sidebar conference held on the record in the

2    presence of the Court and counsel, out of the hearing of the

3    witness.)

4          MS. KELLMAN:  Your Honor, I asked to stop the

5    proceedings because I think that the representation that I

6    retained Dr. Mills is very, very misleading to the point of

7    being completely untrue.

8          THE COURT:  I didn't even hear that.  Is that what

9    he said?

10         MS. KELLMAN:  Twice in the last --

11         MS. WELLS:  He is retained by the defense.

12         MR. ARIAIL:  He was retained by Ms. Kellman and you

13   came to me Ms. Kellman and asked me if I would work with you

14   with Dr. Mills.

15         MS. KELLMAN:  No, that is not what happened.  That

16   is not my recollection of what happened, Judge.

17         When we started, we were working together, and when

18   we started to see signs of Mr. Harun's decline, we were, and I

19   would say, when I say "we," all parties were concerned about

20   his decline.  And so, I suggested that there was a

21   psychiatrist I knew and that perhaps we could have him talk to

22   Mr. Harun.  And, technically, yes, I recommended the doctor

23   But the reality was that there was a confluence of a meeting

24   of the minds.

25         THE COURT:  I didn't hear anything different than

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

SIDEBAR

 1    that.

 2         MS. KELLMAN:  Well, the suggestion is that this is

 3    my doctor.

 4         THE COURT:  No, I'm not taking it for that.

 5         MS. KELLMAN:  Okay.

 6         THE COURT:  It's your recommendation.

 7         MS. KELLMAN:  Right.  I just want the Court to be

 8    clear that those first three interviews were done literally

 9    almost within our -- two of them, I believe, were when we were

10    physically there.  And by "we," I mean both sides were there

11    physically.

12         THE COURT:  I got all that.

13         MR. ARIAIL:  Just to be clear, I don't believe that.

14    I think the first one I was not there but neither here nor

15    there.

16         MS. KELLMAN:  David Bitkower was.

17         THE COURT:  Hold on.  To the extent the Government

18    is suggesting that I should give this witness enhanced

19    credibility because he was brought to them by Ms. Kellman.

20         MS. KELLMAN:  Something no one's ever suggested

21    before.  Sorry.

22         THE COURT:  I'm way beyond that.  That's just not an

23    issue for me.

24         MS. KELLMAN:  Okay.

25         (Sidebar discussion concludes.)

SIDEBAR

1          (Continued on the next page.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MILLS - REDIRECT - WELLS

1            (In open court.)

2            THE COURT:  Let's finish up.

3            MS. WELLS:  Thank you, your Honor.

4    EXAMINATION BY

5    MS. WELLS: (Continuing.)

6    Q    Dr. Mills, you described a moment ago, and I am going to

7    paraphrase so please correct me if I misspeak.

8            But essentially, that the defendant's behaviors that

9    we've talked about were volitional and that he could, I think

10   you said, turn them on and off.

11           Is that a fair characterization?

12   A    Yes, and I wouldn't have opined about that had I not seen

13   it.  Again, as I said previously in my testimony, I was

14   gobsmacked.  I was completely blind-sided when I saw how well

15   he behaved.  How well mannered he was.  How gracious he was in

16   his interaction.  I kept asking the interpreter:  Now, is he

17   really saying that?  Is that what you really mean?  Isn't this

18   very different than what you've heard?  And I kept being told

19   yes, yes, yes.

20   Q    And in the context of this particular interaction, which

21   was your third interview, did you work with an interpreter?

22   A    Oh, yes.  It's referenced in my report I worked with a

23   Hausa interpreter.

24   Q    What, if any, language preference had the defendant

25   expressed that he had in terms of what language he wanted to

MILLS - REDIRECT - WELLS

1    speak during his evaluations?

2    A    It was clear that, well, I saw him on three occasions as

3    I've testified and the first two there was a government

4    oriented -- hired by the Government -- Arabic interpreter

5    present and Mr. Hausa refused, really, to engage him.  And the

6    interpreter pled, he was gracious, he never got angry when he

7    was, as I said, scolded, even humiliated.  But it was very

8    clear from that interaction that Mr. Hausa wanted to speak

9    Hausa.  And that, in fact, is what happened.

10          So the Government obtained an interpreter, I

11   believe, from the Department of Defense and they developed

12   quite a rapport virtually instantaneously.

13          (Continued on the next page.)

14

15

16

17

18

19

20

21

22

23

24

25

MILLS - REDIRECT - WELLS

1    BY MS. WELLS:

2    Q    When you worked with that Hausa interpreter to conduct

3    this third valuation or the third portion of your evaluation,

4    did you consult with him from time to time?

5    A    Sure.  I mean, I -- we took little breaks, I asked him

6    what was going on.  I mean, I tried to understand, was this

7    some kind of hallucination, you know, 'cause it seemed so

8    counter to what I had originally thought, or was this

9    something that was real.  You know, is he really talking about

10   his time is Libya?  Is it your understanding that he was

11   tortured?  Do you understand why he's being cooperative now?

12   "No" was the answer.  But he was -- you know, he was not only

13   cooperative, he was polite and engaging.

14   Q    Is it your ordinary practice when working through an

15   interpreter to consult with those individuals to better

16   understand the content and the context of the interview that

17   you're conducting?

18   A    Absolutely.  And I think we talked about this yesterday a

19   little bit and I cited a case where I involved -- where I

20   assessed a Korean flight attendant who was burned in the

21   Korean Air crash in Guam, and I took the interpreter to lunch

22   and spent an hour and a half talking to her about the

23   importance of scars in Korean culture and how it affects

24   marriageability.

25   Q    And what's the purpose of asking these additional

1   questions of interpreters in situations like these?

2   A    Because, you know, I mean we talked about cultural

3   competence again.  And when I believe my cultural competence

4   is lacking, I do what I can within a reasonable time to

5   bolster or to address that lack.

6   Q    Are you aware of any ethical requirements or rules that

7   require a psychiatrist or any treating doctor to have common

8   language skills with their patient?

9   A    No.  And it wouldn't make sense.  I mean, you know, there

10  are some languages that are very, very small and no

11  psychiatrist is going to know them all, so it makes sense that

12  when you don't have linguistic skill you hire a competent

13  interpreter.

14  Q    Are you aware of any ethical principles or rules that

15  discourage the use of interpreters to conduct interviews?

16  A    No, I believe there are no such rules.  In fact, I think

17  on the contrary, ethical requirements would suggest that

18  competent interpreters be used frequently.

19  Q    And you testified earlier that you believe cultural

20  competence is a relevant factor in conducting an evaluation;

21  is that correct?

22  A    Of course.

23  Q    Did you weigh your cultural competency in this case

24  against the other information that was available to you in

25  coming to your conclusion?

MILLS - REDIRECT - WELLS

1  A     Yeah, no, of course.  I verbally admit to the fact that,

2  you know, my cultural competence with Muslims, with Arabs,

3  with those from Niger is limited, I don't speak Hausa, but the

4  magnitude of the transformation that I saw before me was so

5  great as to make me believe that that is Mr. Hausa --

6  Mr. Harun's core competence and that most of the anger and

7  upset and adult temper tantrum behavior is artifice.

8  Q     When you say core competence, what do you mean?

9  A     Say again?

10  Q     When you say core competence, what do you mean?

11  A     That he is able to turn off the seemingly bizarro

12  behavior and he knows how to use toilets, he knows how to use

13  proper hygiene.  He can make a proper conversation.  He

14  doesn't have to been expostulating or cursing, and he can

15  cooperate when he chooses to.

16            THE COURT:  Ms. Wells, I think we're getting

17  repetitive, can you wrap it up.

18            MS. WELLS:  Yes, Your Honor.

19  Q     Can you tell us just very briefly, Dr. Mills, the

20  difference between psychology and psychiatry?

21  A     Well, look, I mean, they're obviously different

22  disciplines that have been honed --

23            THE COURT:  Do you want that for the record?  I

24  don't need it.  I know it, I know it very well.

25  BY MS. WELLS:

MILLS - REDIRECT - WELLS

1    Q     What is the standard of care for people who suffer from

2    psychosis?

3    A     It's medication.

4    Q     Are psychologists able to prescribe medication to people

5    who suffer from psychosis?

6    A     In most states, no.  I believe there are two states now

7    that allow psychologists under special circumstances to

8    prescribe, but generally no.

9    Q     At what age does schizophrenia typically present in men?

10   A     Late teens, early twenties most typically.

11   Q     How likely would it be for schizophrenia to present for

12   the first time when someone is in their 40s?

13             MR. STERN:  Objection.

14             THE COURT:  What is the objection?

15             MR. STERN:  The objection is, first, how likely is

16   something and, second, there is no evidence to say when he

17   became schizophrenic or was schizophrenic.

18             THE COURT:  Sustained.

19             MS. WELLS:  I'll try it in a slightly different way,

20   Your Honor.

21   Q     How common is it for people to present with schizophrenia

22   for the first time in their 40s?

23   A     It is uncommon.

24   Q     You were asked a series of questions about using testing

25   including the MMPI, do you recall that?

MILLS - REDIRECT - WELLS

1    A    Yes.

2    Q    Who is that test normed for?

3    A    Say again.

4    Q    Who is that test normed for?

5    A    Oh, it is normed basically on Minnesotans originally in

6    the '40s and now the most recent edition in the restructured

7    form into the teens, but it's normed on a broad swath of

8    Americans, but drawn primarily from Minnesota.

9    Q    At any point did you observe the defendant in court?

10   A    Oh, yes.

11   Q    And what, if anything, did you observe or what, if

12   anything, do you recall about his behavior in court?

13   A    Well, again, he had -- he saw Ms. Kellman and he had a

14   melt down, in popular parlance.  He got angry, started

15   yelling, didn't -- he was disrespectful of the Judge and of

16   the whole courtroom proceedings and he was disruptive.

17   Q    How was he behaving before he saw Ms. Kellman?

18   A    It was -- it appeared to be relatively calm.

19   Q    What, if anything, can you conclude based on that quick

20   situation in behavior?

21   A    Well, again, it's like the fundamental switch between his

22   rather regressed bizarre behavior and his seemingly very

23   appropriate behavior.  To me it appeared, again, volitional.

24        MS. WELLS:  Just one moment, Your Honor.  Nothing

25   further.

MILLS - REDIRECT - WELLS

```
 1              THE COURT:  Okay.  You may step down.

 2              THE WITNESS:  Thank you, Your Honor.

 3              MR. STERN:  Judge, can I have one second before you

 4   let him go?

 5              THE COURT:  Don't step down.

 6              MR. STERN:  Sorry, Judge, I need one more moment.

 7              We have no other questions.

 8              THE COURT:  Now you may step down.

 9              Anything further from the government?

10              MR. ARIAIL:  No, Your Honor.

11              MR. JACOBS:  No, Your Honor.

12              MS. WELLS:  No, Your Honor.

13              THE COURT:  I'm going to reserve decision.  I will

14   get out a short decision within the next few days.

15              Anything else we need to talk about?

16              MR. STERN:  Judge, do you want us to write on this

17   or do you need it?

18              THE COURT:  I don't think I need it.  If anyone

19   wants to tell me anything that they think highlights their

20   argument that came out in the testimony you can, but I suspect

21   I see what each of you would rely on already so I don't feel

22   like I need it, but I don't want to stop anyone.

23              MR. STERN:  I don't want to write for no reason so I

24   think we'll leave well enough alone.

25              THE COURT:  Okay.  The government too?
```

MILLS - REDIRECT - WELLS

1          MR. ARIAIL:  Yes, Your Honor.

2          MR. JACOBS:  Yes, Your Honor.

3          MR. ARIAIL:  Just briefly two quick housekeeping

4    issues.  It's our understanding that the Court may be

5    unavailable on the 14th.

6          THE COURT:  Yes.  You can talk to your colleague on

7    that.  I have to do --

8          MR. ARIAIL:  I understand, Your Honor, no need.

9          THE COURT:  Okay.  But I'm hoping it's just a half

10   day.

11         MR. ARIAIL:  Okay.

12         THE COURT:  I'm trying to get them to commit to half

13   days so that we can start with the jury here at 1:00 o'clock.

14   Because that proceeding is going to start at 9:00 o'clock in

15   the morning, so we should be able to finish by one it seems to

16   me.

17         MR. ARIAIL:  Understood.  I was just trying to

18   figure out for scheduling purposes because we have folks

19   coming from out of state.

20         THE COURT:  I can tell you that morning is gone for

21   sure.

22         MR. ARIAIL:  Thank you, Your Honor.

23         THE COURT:  Hopefully that's all.

24         MR. ARIAIL:  Then the last thing which in the

25   government's memorandum of law and opposition to the defense

MILLS - REDIRECT - WELLS

1    Daubert challenge, the government actually sought to bar

2    certain testimony from Mark Sageman and I don't think that's

3    been ruled on or responded to directly by the defense.  May be

4    it has been responded by the defense, but I think that's one

5    last issue that's out there, so I just wanted to flag it for

6    the Court and everybody.

7              THE COURT:  I think there was no response from the

8    defense and I took that as an acquiescence.

9              Does the defense remember that motion?

10             MR. STERN:  We remember it and you can take it as

11   acquiescence.

12             THE COURT:  Okay, anything else?

13             MR. ARIAIL:  No, Your Honor.

14             MS. KELLMAN:  Thank you, Judge.

15             THE COURT:  Thank you.

16             (Matter concluded.)

17

18                     *     *     *     *     *

19

20   I certify that the foregoing is a correct transcript from the
     record of proceedings in the above-entitled matter.

21

22   s/ Georgette K. Betts              February 22, 2017

23   GEORGETTE K. BETTS                 DATE

24

25

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter

MILLS – REDIRECT – WELLS

1                    I N D E X

2    WITNESS                        PAGE

3    JESS GHANNAM

4    CROSS-EXAMINATION     BY MR. JACOBS     11

5    REDIRECT EXAMINATION  BY MR. STERN      62

6    MARK MILLS

7    CROSS-EXAMINATION     BY MR. STERN      74

8    REDIRECT EXAMINATION  BY MS. WELLS      112

9

10                   E X H I B I T S

11   GOVERNMENT            PAGE
     16                   25
12   20                   43

13

14

15

16

17

18

19

20

21

22

23

24

25

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter