UNCLASSIFIED//FOR PUBLIC RELEASE

## MILITARY COMMISSIONS TRIAL JUDICIARY
## GUANTANAMO BAY, CUBA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ABD AL RAHIM HUSSAYN MUHAMMAD AL NASHIRI | **AE 174A**<br><br>**Government Response**<br>To Defense Motion to Dismiss Charge IV, Specification 2, And Charges VII-IX For Failure To State an Offense<br><br>17 October 2013 |

1. **Timeliness**

The government timely files this response under Military Commissions Trial Judiciary Rule of Court 3.7.c(1).

2. **Relief Sought**

The government respectfully requests that the Commission deny the defense motion to dismiss all charges related to the MV *Limburg*, specifically Charge IV, Specification 2, and Charges VII-IX, for failure to state an offense.

3. **Overview**

The Commission should deny the defense motion because the charges relating to MV *Limburg* properly allege conduct that violates the Military Commissions Act of 2009 ("M.C.A.") and the international law of war, and, thereby, state offenses triable by military commission. Indeed, the charges allege, in one instance, that the accused "intentionally attack[ed] civilian persons onboard MV *Limburg,* a civilian oil tanker crewed by civilian personnel, not taking direct or active part in hostilities, and that resulted in the death of one person . . . and the [accused] knew that such targets were in a civilian status." Charge Sheet, Charge VII. This allegation and the allegations set forth in each of the specifications relating to the attack on MV

1

UNCLASSIFIED//FOR PUBLIC RELEASE

*Limburg* allege the protected status of MV *Limburg* and her crew, thereby complying with the rules governing how to allege offenses (R.M.C. 307(c)(3)) and properly stating offenses under the M.C.A. (R.M.C. 907(b)(1)(B)).

The defense argues that the challenged specifications fail to state offenses because all civilian oil tankers flagged to a belligerent are *per se* lawful military targets, rendering the factual allegations in the specifications categorically impossible as a matter of law. Of course, all oil tankers flagged to an adversary nation are not, at all times and all places, lawful military targets. The M.C.A. itself defines "military objective" to include objects that "by their nature, location, purpose, or use, effectively contribute to the war-fighting or war-sustaining capability of an opposing force and whose total or partial destruction, capture, or neutralization would constitute a definite military advantage for the attacker under the circumstances at the time of an attack." 10 U.S.C. § 950p(a)(1). The defense, however, makes no effort to demonstrate MV *Limburg* was a proper military objective as defined by the M.C.A. Rather, the defense asks the Commission to hold that all belligerent-flagged civilian vessels carrying oil are lawful military objectives. The approach urged by the defense, however, is at odds with the international law of war, relies entirely on anecdotal state acts without any reference to *opinio juris* or controlling treaties, and asks the Military Judge to redefine the law before trial, rather than allow the members to apply the law to the evidence at trial. This approach should be rejected, and the defense motion should be denied.

## 4. **Burden of Proof**

The defense, as the moving party, bears the burden to prove, by a preponderance of the evidence, all the facts necessary to resolve the motion. The defense also bears the burden to persuade the Commission that it is entitled to the relief requested. R.M.C. 905(c)(1)-(2).

2

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

## 5. Facts

Abd Al Rahim Hussayn Muhammad Al Nashiri ("the accused") stands charged with multiple offenses under the Military Commissions Act of 2009 ("M.C.A.") relating to terrorist attacks against the United States and its coalition partners. These include the attempted attack on USS THE SULLIVANS (DDG 68) on 3 January 2000, and the attacks on USS COLE (DDG 67) on 12 October 2000 and on the French supertanker MV *Limburg*, which together resulted in the deaths of 18 people, serious injury to dozens of others, and significant property damage.

The specifications set forth on the charge sheet allege crimes under the M.C.A. Each of the contested specifications asserts that MV *Limburg* was a civilian vessel with a civilian crew, and that it was not a lawful military target. Charge Sheet, Charge IV, Specification 2 (the targets of the attempted murder were "protected persons"); Charge VII (attack on civilians was against "civilian persons onboard MV *Limburg*, a civilian oil tanker crewed by civilian personnel, not taking direct or active part in hostilities"); Charge VIII (attack on civilian object was against "a civilian oil tanker owned by a civilian entity and crewed by civilian personnel, not a military objective"); and Charge IX (vessel hazarded "was not a legitimate military target").

The MV *Limburg* was a civilian oil tanker registered in France, owned by a civilian entity, crewed by civilian mariners, and not taking any part in the hostilities between the United States and al Qaeda. The MV *Limburg* had been chartered by a Malaysian company to onload crude oil in Iran and Yemen and deliver it to Malaysia. On 6 October 2002, MV *Limburg* was transiting the Gulf of Aden in the vicinity of Al Mukallah, Yemen, when an explosives-laden, ostensibly civilian, boat pulled alongside MV *Limburg* and deliberately exploded. The explosion blasted a hole through both hulls of the ship, resulting in the vessel catching fire, the death of one civilian mariner serving onboard, injury to twelve other crewmembers, the spillage of

3

UNCLASSIFIED//FOR PUBLIC RELEASE

approximately 90,000 barrels of crude oil into the Gulf of Aden, and significant damage to MV *Limburg*, which had to be towed into port in Dubai, United Arab Emirates, for significant emergency repairs. *See generally* http://www.marinelink.com/news/article/company-profile-dubai-drydocks/324803.aspx.

On 3 October 2013, the defense filed the present motion, seeking to dismiss Charge IV, Specification 2, and Charges VII, VIII and IX for failure to state an offense under the theory that all oil tankers are legitimate military targets under "modern state practice." AE 174 at 1.

## 6. Law and Argument[1]

### I. The Contested Charges and Specifications Properly Allege the Protected Status of MV *Limburg* and Her Crew, and thus State Offenses

In each charge and specification at issue in this motion, the government has alleged every element of the charged offense, including the protected status of MV *Limburg* and its crew. The defense motion, styled as a motion to dismiss for failure to state an offense, actually contests the factual allegation that MV *Limburg* and her crew had protected status. Because the defense contests the underlying facts, and not the sufficiency of the allegations contained in the specifications, the Commission should deny the defense motion to dismiss the charges relating to the attack on MV *Limburg*.

Rule 307(c)(3) states a specification is sufficient if it alleges every element of the charged offenses expressly or by necessary implication. Here, the government alleged every element of every offense charged under the M.C.A. The defense asserts Charge IV, Specification 2, and the

---

[1] The defense continues to assert—as it now does in nearly all of its pleadings—that denying the motion will violate various rights of the accused. *See* AE 174 at 1-2. The defense, however, persists in omitting any explanation of how those rights are implicated in the present case. Absent any explanation as to how those rights are implicated in this request and under these facts, the Commission should reject this boilerplate language. *See Harding v. Illinois*, 196 U.S. 78, 87 (1904) (dismissing writ of error because no federal question was raised properly in the state court where the Illinois Supreme Court concluded that "no authorities were cited nor argument advanced in support of the assertion that [a] statute was unconstitutional" and thus the "point, if it could otherwise be considered, was deemed to be waived"); *United States v. Heijnen*, 215 F. App'x 725, 726 (10th Cir. 2007) ("We nevertheless reject these arguments because they are unsupported by legal argument or authority or by any citations to the extensive record of the proceedings . . . . [A]ppellant's issues are not supported by any developed legal argument or authority, and we need not consider them.").

4

UNCLASSIFIED//FOR PUBLIC RELEASE

specifications under Charges VII, VIII, and IX fail to state an offense because the MV *Limburg* was a lawful target. The contested specifications, however, specifically alleged the protected status of the MV *Limburg* and her crew. *See* Charge Sheet, Charge IV, Specification 2 (the targets of the attempted murder were "protected persons"); Charge VII (attack on civilians was against "civilian persons onboard MV *Limburg*, a civilian oil tanker crewed by civilian personnel, not taking direct or active part in hostilities"); Charge VIII (attack on civilian object was against "a civilian oil tanker owned by a civilian entity and crewed by civilian personnel, not a military objective"); and Charge IX (vessel hazarded "was not a legitimate military target"). Because the charges and specifications set forth on the charge sheet clearly state offenses under the relevant law, the government properly alleged each charge and specification and, for that reason, the charges are not properly subject to a motion to dismiss under R.M.C. 907(b)(1)(B). *See United States v. Crafter*, 64 M.J. 209, 211-12 (C.A.A.F. 2006).

Simply, a pretrial motion to dismiss for failure to state an offense is not an appropriate means to test the government's factual assertions and supporting evidence. *See, e.g., United States v. Huet*, 665 F.3d 588, 595 (3d Cir. 2012). Despite styling its motion as a motion to dismiss for failure to state an offense, the defense argument is not really that the government failed to allege a required element *vis-à-vis* the protected status of MV *Limburg* and its crew; rather, the defense argument is that the government's allegation of the protected status of MV *Limburg* cannot possibly be correct because—the defense contends—all belligerent-flagged civilian oil tankers are lawful military objectives.

## II.     Oil Tankers Flagged Under an Adversary Nation Are Not *Per Se* Lawful Military Objectives

The federal government's legislative and executive branches agree that the international law of war prohibits attacking civilian objects (10 U.S.C. § 950t(3)), such as the French supertanker MV *Limburg*, because such attacks violate the fundamental law-of-war principle of distinction. This principle provides, *inter alia*, that belligerents must, in conducting attacks,

5

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

distinguish between military objectives and civilian objects, the latter being protected from attack unless they are used for military purposes or otherwise become military objectives. The facts surrounding the attack on MV *Limburg* establish that she was not being used for military purposes and had not otherwise become a military objective. Thus, MV *Limburg* was not a legitimate object of attack under the law of war.

### a. Attacking Civilian Objects Is a Recognized Violation of the International Law of War

The United States is at war with al Qaeda, the Taliban, and associated forces. *See, e.g.,* *Hamdan v. Rumsfeld*, 548 U.S. 557, 628-32 (2006) ("*Hamdan I*"); *Hamdan v. United States*, 696 F.3d 1238, 1240 (D.C. Cir. 2012) ("*Hamdan II*"); President Barack Obama, Remarks at the National Archives and Records Administration, 1 Pub. Papers 689, 691 (May 21, 2009) ("Now let me be clear: We are indeed at war with Al Qaida and its affiliates."); Authorization for Use of Military Force, Pub. L. No. 107-40, 115 Stat. 224 (2001). At trial, the government will prove that the accused is an alien unprivileged enemy belligerent, that the conduct alleged in the charges related to MV *Limburg* was committed in the context of, and associated with, hostilities, and that that conduct violates the law of war. The government also will show at trial that the attack on MV *Limburg* was part of a broader al Qaeda plot to conduct terrorist attacks against U.S. interests.

Under the D.C. Circuit's analysis in *Hamdan II*, this Commission has jurisdiction over offenses that were established violations of the international law of war when the accused committed the alleged criminal conduct. The *Hamdan II* Court looked to three sources to determine whether an offense is triable by a law-of-war military commission: (1) the major treaties and conventions on the law of war (including those concluded at The Hague and Geneva); (2) customary international law (as evidenced by, *e.g.*, certain provisions of the Rome

6

UNCLASSIFIED//FOR PUBLIC RELEASE

Statute[2] and decisions of modern international criminal tribunals); and (3) the writings of international-law commentators.

Attacking civilians and civilian objects is one of the core violations of the international law of war because it transgresses the fundamental requirement of the law of war to distinguish between military objectives (which *may* be the object of attack) and protected civilians and civilian objects (which generally may *not* be the object of attack).  Incorporating these international norms, the M.C.A. defines "military objective" as:

> Combatants and those objects during hostilities which, by their nature, location, purpose, or use, effectively contribute to the war-fighting or war-sustaining capability of an opposing force and whose total or partial destruction, capture or neutralization would constitute a definite military advantage to the attacker under the circumstances at the time of the attack.

10 U.S.C. § 950p(a)(1). *See also* 2012 Manual for Military Commissions, Part IV, ¶ 1(a)(1). This definition is in accord with relevant international law, as reflected in numerous law-of-war treaties.

The Geneva Conventions of 1949 provide that all parties to the treaty are prohibited from committing "violence to life and person, in particular murder of all kinds [against] [p]ersons taking no active part in the hostilities . . . ." *See, e.g.*, Geneva Convention Relative to the Protection of Civilian Persons in Time of War ("Geneva IV") art. 3, Aug. 12, 1949, 6 U.S.T. 3516, 75 U.N.T.S. 287.  Building on this foundational requirement, Additional Protocol I to the Geneva Conventions further codifies the principle of distinction in its "basic rule" for protecting the lives and property of civilians, and its underlying rationale:

> In order to ensure respect for and protection of the civilian population and civilian objects, the Parties to the conflict shall at all times distinguish between the civilian population and combatants and between civilian objects and military

---

[2] The United States is not a party to the Rome Statute, but the *Hamdan II* Court used provisions of the Rome Statute as one source of evidence of customary international law for offenses triable by military commission. *See Hamdan II*, 696 F.3d at 1250.

7

UNCLASSIFIED//FOR PUBLIC RELEASE

objectives and accordingly shall direct their operations only against military objectives.

Protocol Additional to the Geneva Conventions of 12 August 1949, and Relating to the Protection of Victims of International Armed Conflicts art. 48, June 8, 1977, 1125 U.N.T.S. 3 ("Additional Protocol I"). Article 52 of Additional Protocol I reiterates:

> Civilian objects shall not be the object of attack or of . . . . Civilian objects are all objects which are not military objectives . . . [, which] are limited to those objects which by their nature, location, purpose or use make an effective contribution to military action and whose total or partial destruction, capture or neutralization, in the circumstances ruling at the time, offers a definite military advantage.

*Id.* art. 52(1)-(2); *see generally* Protocol Additional to the Geneva Conventions of 12 August 1949, and Relating to the Protection of Victims of Non-International Armed Conflicts art. 13, June 8, 1977, 1125 U.N.T.S. 609 ("Additional Protocol II") (providing general protections to civilians in non-international armed conflicts); *see also* Protocol on Prohibitions or Restrictions on the Use of Incendiary Weapons (Certain Conventional Weapons Protocol III) art. 1(3), Oct. 10, 1980, TIAS 09-721.1, 1342 U.N.T.S 171.

Although the United States is not a party to the Additional Protocols, "the principle of the military objective has become a part of customary international law for armed conflict whether on land, at sea or in the air." YORAM DINSTEIN, THE CONDUCT OF HOSTILITIES UNDER THE LAW OF ARMED CONFLICT 82 (2004) (internal citation and quotation marks omitted); *see id.* (explaining the "requirement of distinction between combatants and civilians lies at the root" of the law of war); Legality of the Threat or Use of Nuclear Weapons, Advisory Opinion, 1996 I.C.J. 226, 257 (July 8) (concluding "States must never make civilians the object of attack" and that the distinction between combatants and civilians is a fundamental principle of customary international law); Letter from J. Fred Buzhardt, Gen. Counsel, Dep't of Defense, to Sen. Edward Kennedy, Chairman, Subcomm. on Refugees of the S. Comm. on the Judiciary (Sept. 22, 1972), *reprinted in* 67 AM. J. INT'L L. 122 (1973) (explaining the general principle "[t]hat a

8

UNCLASSIFIED//FOR PUBLIC RELEASE

distinction must be made at all times between persons taking part in the hostilities and members of the civilian population to the effect that the civilians be spared as much as possible" is "declaratory of existing customary international law").

The customary-international-law principle of distinction was recognized as early as 1863 in the Lieber Code:

> Nevertheless, as civilization has advanced during the last centuries, so has likewise steadily advanced, especially in war on land, the distinction between the private individual belonging to a hostile country and the hostile country itself, with its men in arms. The principle has been more and more acknowledged that the unarmed citizen is to be spared in person, property, and honor as much as the exigencies of war will admit.

General Orders, No. 100, Instructions for the Government of Armies of the United States in the Field ¶ 22 (Apr. 24, 1863) ("Lieber Code"). The principle that civilian objects may not be attacked remains a norm of customary international law to this day: "The parties to the conflict must at all times distinguish between civilian objects and military objectives. Attacks may only be directed against military objectives. Attacks must not be directed against civilian objects." 1 J.-M. HENCKAERTS & L. DOSWALD-BECK, CUSTOMARY INTERNATIONAL HUMANITARIAN LAW Rule 7 at 22-29 (2005). The principle of distinction applies to, and underlies, the law of naval targeting. J. Ashley Roach, *Missiles on Target: Targeting and Defense Zones in the Tanker War*, 31 VA. J. INT'L L. 593, 594-96 (1991) ("*Tanker War*").

The various modern international criminal tribunals also consider intentionally attacking civilian objects to constitute a violation of the law of war. Rome Statute art. 8(2)(b)(ii) (listing as a war crime "[i]ntentionally directing attacks against civilian objects which are not military objectives"); *see id.* art. 8(2)(a)(iv) (listing as a war crime the "[e]xtensive destruction and appropriation of property, not justified by military necessity and carried out unlawfully and wantonly"); *id.* art. 8(2)(b)(xiii) (listing as a war crime "[d]estroying or seizing the enemy's

9

UNCLASSIFIED//FOR PUBLIC RELEASE

property unless such destruction or seizure be imperatively demanded by the necessities of war" in an international armed conflict); *id.* art. 8(2)(e)(xii)) (same in a non-international armed conflict); Statute of the International Tribunal for the Prosecution of Persons Responsible for Serious Violations of International Humanitarian Law Committed in the Territory of the Former Yugoslavia Since 1991, U.N. Doc. S/25704 art. 2(d) (May 3, 1993) (criminalizing the "extensive destruction and appropriation of property, not justified by military necessity and carried out unlawfully and wantonly"); *id.* art. 3(b) (criminalizing the "wanton destruction of cities, towns or villages, or devastation not justified by military necessity"); *id.* art. 3(c) (criminalizing the "attack, or bombardment, by whatever means, of undefended towns, villages, dwellings, or buildings"); United Nations Transitional Administration in East Timor Regulation No. 2000/15 art. 6.1(a)(iv) (June 6, 2000) (criminalizing the "[e]xtensive destruction and appropriation of property, not justified by military necessity and carried out unlawfully and wantonly"); *id.* art. 6.1(b)(ii) (criminalizing "[i]ntentionally directing attacks against civilian objects, that is, objects which are not military objectives"); *id.* art. 6.1(b)(v) (criminalizing "[a]ttacking or bombarding, by whatever means, towns, villages, dwellings or buildings which are undefended and which are not military objectives"); Law on the Establishment of the Extraordinary Chambers in the Courts of Cambodia art. 6, Doc. NS/RKM/1004/006 (Oct. 27, 2004) (criminalizing the "destruction and serious damage to property, not justified by military necessity and carried out unlawfully and wantonly"); *see also* Lieber Code ¶¶ 15-16; Brussels Declaration, Project of an International Declaration Concerning the Laws and Customs of War art. 13(g), Aug. 27, 1874; Hague Convention art. 23(g).  Similarly, international-law commentators cited by the D.C. Circuit—*see Hamdan II*, 696 F.3d at 1251 (citing ANDREA BIANCHI & YASMIN NAQVI, INTERNATIONAL HUMANITARIAN LAW AND TERRORISM 244 (2011) ["BIANCHI & NAQVI"])—have said the

10

UNCLASSIFIED//FOR PUBLIC RELEASE

prohibition on "attacking civilian objects [is] without a doubt part of the laws and customs of war." BIANCHI & NAQVI at 244 & n.234. Traditional law-of-war sources, including those relied upon in *Hamdan II*, establish that attacking civilians and attacking civilian objects violate the international law of war. Both offenses are, under the *ratio decidendi* of *Hamdan II*, offenses triable by military commission.

### b. MV *Limburg* Was Not a Lawful Military Objective

Merchant vessels, regardless of flag or nation of origin, are civilian objects protected from attack by the law of war unless they become a military objective. That a vessel is carrying oil, by itself, is insufficient to make it a lawful target. The facts of the attack on MV *Limburg* establish that she was not subject to attack under the law of war as she was not being used for military purposes, and MV *Limburg* had not otherwise become a military objective.[3] *See* 10 U.S.C. § 950p(a)(1) (defining military objective).

Attacking a merchant vessel like MV *Limburg*, owned by a civilian entity, operated by a civilian crew, and not taking any part in hostilities, violates the principle of distinction. As a type of civilian property, the general prohibition against attacking civilian objects extends to maritime vessels that are not military objectives, such as a merchant vessel like MV *Limburg*. UK MINISTRY OF DEFENCE, THE MANUAL ON THE LAW OF ARMED CONFLICT §§ 12.39, 13.40-13.41, 13.44, 13.47 (2004) ("UK MANUAL"); INTERNATIONAL LAWYERS AND NAVAL EXPERTS CONVENED BY THE INTERNATIONAL INSTITUTE OF HUMANITARIAN LAW, SAN REMO MANUAL ON

---

[3] For example, "otherwise making an effective contribution to military action, *e.g.*, carrying military materials." INTERNATIONAL LAWYERS AND NAVAL EXPERTS CONVENED BY THE INTERNATIONAL INSTITUTE OF HUMANITARIAN LAW, SAN REMO MANUAL ON INTERNATIONAL LAW APPLICABLE TO ARMED CONFLICTS AT SEA ¶ 60(g) (Louise Doswald-Beck ed. 1995) ("SAN REMO MANUAL"). The defense posits that this Commission "must 'discern between military, quasi-military, industrial, economic and other strategic targets, and rule upon the legitimacy of targeting such sites. . . .'" AE 174 at 3 (citing *Linder v. Portocarrero*, 963 F. 2d 332, 335 (11th Cir. 1992)). This quotation is taken out of context, as the Eleventh Circuit noted the "broad judicial inquiry into contra policies in Nicaragua" that the plaintiffs' complaint would have required was properly dismissed as "non-justiciable." *Id.* at 335-36. This Commission need not undertake any such inquiry.

UNCLASSIFIED//FOR PUBLIC RELEASE

INTERNATIONAL LAW APPLICABLE TO ARMED CONFLICTS AT SEA ¶¶ 39-41, 46(b), 59-60 (Louise Doswald-Beck ed. 1995) ("SAN REMO MANUAL").

As the defense acknowledges, multiple sources describe in detail the relevant factors that might change a merchant vessel from protected property to a military objective. The San Remo Manual is a study of the law applicable to armed conflict at sea drafted by a group of international naval-warfare experts over a period of seven years and under the auspices of the International Institute of Humanitarian Law. Louise Doswald-Beck, *Current Development: The San Remo Manual on International Law Applicable to Armed Conflicts at Sea*, 89 AM. J. INT'L L. 192, 192-93 (1995). The Manual explains that, although enemy merchant vessels are subject to *capture*, they remain civilian property, protected against *attack*, unless or until they become a military objective, by:

> (a) engaging in belligerent acts on behalf of the enemy, *e.g.*, laying mines, minesweeping, cutting undersea cables and pipelines, engaging in visit and search of neutral merchant vessels or attacking other merchant vessels;
>
> (b) acting as an auxiliary to an enemy's armed forces, *e.g.*, carrying troops or replenishing warships;
>
> (c) being incorporated into or assisting the enemy's intelligence gathering system, *e.g.*, engaging in reconnaissance, early warning, surveillance, or command, control and communications missions;
>
> (d) sailing under convoy of enemy warships or military aircraft;
>
> (e) refusing an order to stop or actively resisting visit, search or capture;
>
> (f) being armed to an extent that they could inflict damage to a warship; this excludes light individual weapons for the defence of personnel, *e.g.*, against pirates, and purely deflective systems such as chaff; or
>
> (g) otherwise making an effective contribution to military action, *e.g.*, carrying military materials.

SAN REMO MANUAL ¶ 60. The UK Law of War Manual adopted these conditions verbatim (other than punctuation). UK MANUAL § 13.41.

The naval-warfare experts in San Remo thoroughly discussed the residual category (identified above as subsection (g)) to avoid the shoals of being too inclusive (and thereby

12

negating the protection owed to civilian property under the principle of distinction) or too

exclusive (and thereby negating the purpose of the residuary clause):

> The phrase chosen to describe the residual category of merchant vessels which were legitimate military objectives was merchant vessels which make an effective contribution to military action, by, for example carrying military materials. . . . [which] is the same as the wording used in . . . the definition of military objective. It must be noted that the categories of enemy merchant vessels liable to *attack* is narrower than the categories of enemy merchant vessels liable to *capture*. *All* enemy merchant vessels may be *captured*. Only *some* may be *attacked*.

SAN REMO MANUAL ¶ 60.11 (emphasis added); *see also id.* at ¶¶ 60.2, 60.4, 60.6, 60.9

These scholarly views of applicable international law are largely consistent with the

longstanding practice of the U.S. Navy as set forth in the Commander's Handbook on the Law of

Naval Operations:

> [E]nemy merchant vessels may be attacked and destroyed by surface warships,[4] either with or without prior warning, in any of the following circumstances:
>
> 1. Persistently refusing to stop upon being duly summoned to do so
>
> 2. Actively resisting visit and search or capture
>
> 3. Sailing under convoy of enemy warships or enemy military aircraft
>
> 4. If armed with systems or weapons beyond that required for self-defense against terrorist, piracy, or like threats
>
> 5. If incorporated into, or assisting in any way, the intelligence system of the enemy's armed forces
>
> 6. If acting in any capacity as a naval or military auxiliary to an enemy's armed forces
>
> 7. If integrated into the enemy's war-fighting/war-sustaining effort and compliance with the rules of the 1936 London Protocol would, under the circumstances of the specific encounter, subject the surface warship to imminent danger or would otherwise preclude mission accomplishment.

COMMANDER'S HANDBOOK ON THE LAW OF NAVAL OPERATIONS, NWP 1-14M ¶ 8.6.2.2 (July

2007) (COMMANDER'S HANDBOOK).

---

[4] Note that the U.S. view is that only warships are permitted to attack enemy merchant ships. The explosives-laden small boat that attacked MV *Limburg* was certainly not a warship, which provides another argument against the legitimacy of the attack in the context of the hostilities between the United States and al Qaeda.

13

UNCLASSIFIED//FOR PUBLIC RELEASE

Even if MV *Limburg* could be considered an "enemy merchant vessel" in the context of the hostilities between the United States and al Qaeda, the facts of the attack on MV *Limburg* do not fall within any of the categories upon which a lawful attack against her could be based. At the time of the attack, MV *Limburg* was unescorted and transiting the Gulf of Aden to onload more crude oil for delivery to a Malaysian company. She had neither been summoned and refused to stop, nor actively resisted attempts to conduct a visit, search, or capture. She was not sailing under convoy of enemy warships or enemy military aircraft. She was not armed with any weapons beyond self-defense weapons. She was not incorporated into, providing intelligence to, or acting as an auxiliary to, military forces. She was not "integrated into the enemy's war-fighting/war sustaining effort" or otherwise "making an effective contribution to military action." *Compare* COMMANDER'S HANDBOOK ¶ 8.6.2.2, *with* SAN REMO MANUAL ¶ 60.

The defense fails to adduce any evidence that MV *Limburg* was assigned to a military purpose when she was attacked by al Qaeda with an explosives-laden civilian boat. Therefore, the only possible foundation upon which a lawful attack against her could be based would be if she otherwise became a military objective under either one of the residual formulations (*i.e.* by "otherwise making an effective contribution to military action," or by being "integrated into the enemy's . . . war-sustaining effort."). *Compare* SAN REMO MANUAL ¶ 60, *with* COMMANDER'S HANDBOOK ¶ 8.6.2.2. The Annotated Supplement to an earlier edition of the Commander's Handbook[5] explains:

> Although war-sustaining commerce is not subject to precise definition, commerce that indirectly but effectively supports and sustains the belligerent's war-fighting capability properly falls within the scope of the term. . . . Examples of war-sustaining commerce include *imports* of raw materials used for the production of

---

[5] Although the earlier edition of the Commander's Handbook was updated in 2007, its annotated supplement has not yet been updated. Thus, the 1997 edition of the Annotated Supplement is the most current edition. However, this paragraph (8.6.2.2) is practically verbatim to the earlier paragraph (8.2.2.2), and thus the comments in the annotated supplement remain applicable.

14

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

armaments and *exports* of products the proceeds of which are used by the belligerent to purchase arms and armaments.

ANNOTATED SUPPLEMENT TO THE COMMANDER'S HANDBOOK ON THE LAW OF NAVAL OPERATIONS, NWP 1-14M ¶ 7.4 n. 88 (p. 7-16) (Nov. 1997) ("ANNOTATED SUPPLEMENT"); *see id.* at ¶ 8.2.2.2 n. 57 (p. 8-12) (same). Here, MV *Limburg* had been chartered by a Malaysian company to onload crude oil in Iran and Yemen and deliver it to Malaysia. Thus, Iran and Yemen were exporting oil to Malaysia—France's only involvement was that a French oil tanker was being used as the conveyance.

The situation in this case is in sharp contrast to the "Tanker War" between Iran and Iraq, cited by the defense. In that case, oil was the lifeblood of both belligerents: "Iran financed almost all of its war effort from the sale of its oil." *Tanker War*, 31 VA. J. INT'L L. at 606-07. Therefore, both Iraq and Iran's oil transportation systems "were legitimate military objectives," subject to attack without warning, but only when the "tankers or other merchant vessels [were] operating directly under enemy control, charter or employment, and [were] integrated into the enemy's war-sustaining effort . . . ." *Id.* at 596-97, 600, 606-07; *see also* SAN REMO MANUAL ¶ 60.7. Moreover, merchant vessels are traditionally stopped, visited, searched, and, if necessary, diverted to a friendly port where the contraband cargo and vessel may be captured. Attacking a merchant vessel without warning is only permissible if such other methods "under the circumstances of the specific encounter [would] subject the surface warship to imminent danger or would otherwise preclude mission accomplishment." COMMANDER'S HANDBOOK ¶ 8.6.2.2; SAN REMO MANUAL ¶¶ 60, 60.4, 60.11; UK MANUAL § 13.41.

With such other methods possible in the Tanker War, one expert "question[ed] whether there was a sufficient legal basis for Iran's attacks on these ships . . . [many of which were] exempt from capture or destruction." *Tanker War* at 603. "The Iran-Iraq conflict [can] not be

15

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

relied upon since the parties to that conflict obviously had not taken any legal aspects into consideration." SAN REMO MANUAL ¶ 60.8. Simply, war-sustaining *cargo* (*e.g.*, cotton in the American Civil War, oil in the Tanker War) *may* be subject to seizure or destruction under the law of war, but, in the circumstances ruling at the time, it and its mode of *conveyance* are not necessarily legitimate military objectives for the purpose of being made the object of attack. SAN REMO MANUAL ¶ 60.7. The defense's assertion that "State practice reflects that belligerent oil tankers, like warships, are *per se* legitimate military targets" (AE 174 at 5) is a gross overstatement and mischaracterization of customary international law. In fact, the defense's proposed *per se* approach was expressly rejected by both the San Remo Manual and the U.S. Commander's Handbook. SAN REMO MANUAL ¶¶ 60, 60.7, 60.11; COMMANDER'S HANDBOOK ¶ 8.6.2.2. The law in this area is not as simple, precise, or pellucid as the defense suggests. Rather, the protected civilian status of MV *Limburg* is a factual matter that will be proven at trial.

The defense's argument relies on its erroneous assertion of customary international law, based solely on a couple of anecdotal episodes of state practice, with little or no evidence of *opinio juris*, *i.e.* sense of legal obligation accompanying those state acts that might support these state acts as expressions of at least those states' views of international law. Even in the cases where the defense describes acts that might legitimately be within the law of war, the facts of the cited examples differ from the facts alleged here. In particular, the defense fails to show that targeting MV *Limburg* provided any definite military advantage to the accused or his organization, even if one accepts, for argument's sake, that the purpose of the attack was fully divorced from a desire to kill westerners on and around the Arabian Peninsula.[6]

---

[6] Perhaps the most puzzling part of the defense argument is its appeal to combatant immunity, a privilege reserved for lawful combatants. Not only does the charge sheet allege that the accused is an unprivileged enemy

16

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

Aside from its categorical assertions, the defense offers no evidence supporting the conclusion that MV *Limburg* fell into any category (military purpose or objective) that would justify an attack against an enemy merchant vessel, even if MV *Limburg* could be considered an enemy merchant vessel in the context of the hostilities between the United States and al Qaeda. The defense motion to dismiss all charges relating to MV *Limburg* for failure to state offenses should be denied.

### 7. Conclusion

The government respectfully requests that the Commission deny the defense motion to dismiss all charges related to MV *Limburg*, specifically Charge IV, Specification 2, and Charges VII-IX. The charges properly state offenses triable by military commission, as codified under the M.C.A. The MV *Limburg* was not subject to lawful attack under the international law of war, as she neither was used for military purposes nor had otherwise become a military objective. Moreover, the defense failed to establish—because it cannot—its claim that all belligerent-flagged oil tankers are *per se* lawful military targets as a matter of customary international law.

### 8. Oral Argument

The defense requested oral argument on its motion. The government believes the Commission can resolve this motion without oral argument, but if the Commission grants the defense request for oral argument, the government respectfully requests the opportunity to be heard.

---

belligerent, putting the matter beyond a motion under R.M.C. 907(b)(1)(B), the defense offers no evidence to the contrary and has provided no information to the government that would support such an assertion.

17

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

9. **Witnesses and Evidence**

The government does not anticipate relying on any witnesses or evidence to support this response.

10. **Additional Information**

The government has no additional information.

11. **Attachments**

A. Certificate of Service, dated 17 October 2013.

Respectfully submitted,

_____//s//_____

Anthony W. Mattivi
CDR Andrea Lockhart, JAGC, USN
Justin T. Sher
Joanna Baltes
Maj Chris Ruge, USMC
LT Bryan Davis, JAGC, USN
Trial Counsel

Mark Martins
Chief Prosecutor
Military Commissions

18

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

# ATTACHMENT A

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

## CERTIFICATE OF SERVICE

I certify that on the 17th day of October 2013, I filed **AE 174A, Government Response** To Defense Motion to Dismiss Charge IV, Specification 2 and Charges VII-IX for Failure to State an Offense, with the Office of Military Commissions Trial Judiciary and served a copy on counsel of record.


_____//s//_____
CDR Andrea K. Lockhart, JAGC, USN
Trial Counsel
Office of the Chief Prosecutor
of Military Commissions