ORAL ARGUMENT SCHEDULED FOR FEBRUARY 17, 2016
Nos. 15-1023, 15-5020

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

IN RE: ABD AL-RAHIM HUSSEIN MUHAMMED AL-NASHIRI, Petitioner.

_____

ON PETITION FOR A WRIT OF MANDAMUS
TO THE MILITARY COMMISSION

_____

ABD AL-RAHIM HUSSEIN MUHAMMED AL-NASHIRI, Appellant,

v.

BARACK OBAMA, et al., Appellees.

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

BRIEF FOR THE UNITED STATES

_____

| | |
|---|---|
| MARK S. MARTINS<br>Brigadier General, U.S. Army<br>Chief Prosecutor of Military Commissions | JOHN P. CARLIN<br>Assistant Attorney General<br>for National Security<br>J. BRADFORD WIEGMANN |
| BENJAMIN C. MIZER<br>Principal Deputy Assistant<br>Attorney General<br>MATTHEW M. COLLETTE<br>SONIA K. McNEIL<br>MICHAEL SHIH<br>Attorneys, Appellate Staff<br>Civil Division<br>U.S. Department of Justice<br>Washington, DC 20530 | Deputy Assistant Attorney General<br>STEVEN M. DUNNE<br>Chief, Appellate Unit<br>JOHN F. DE PUE<br>JOSEPH F. PALMER<br>Attorneys<br>National Security Division<br>U.S. Department of Justice<br>Washington, DC 20530 |

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

I.      PARTIES

Abd Al-Rahim Hussein Muhammed Al-Nashiri ("Nashiri") is the petitioner in No. 15-1023.  The United States is the respondent.  Nashiri is the petitioner-appellant in No. 15-5020.  The respondents-appellees are Barack Obama, in his official capacity as President of the United States; Joseph R. Biden, in his official capacity as Vice President of the United States; John F. Kerry, in his official capacity as U.S. Secretary of State; Ashton B. Carter, in his official capacity as U.S. Secretary of Defense; John O. Brennan, in his official capacity as Director of the Central Intelligence Agency; Brigadier General Jose R. Monteagudo, in his official capacity as Commander of the Joint Task Force Guantánamo (JTF-GTMO); and Colonel David E. Heath, in his official capacity as Commander of the Joint Detention Operations Group, JTF-GTMO.[1]  Amici supporting Nashiri include Professor David Glazier, the National Institute of Military Justice (NIMJ), Physicians for Human Rights, and Retired Military Admirals and Generals.

---

[1]  Pursuant to Federal Rule of Appellate Procedure 43(c)(2), successors to the public officers named in Nashiri's habeas petition are automatically substituted as respondents.

i

II.     RULINGS

The ruling under review in No. 15-1023 is the military commission order dated January 15, 2013, denying Nashiri's motion to dismiss the charges.  Pet. App. 56.  The ruling under review in No. 15-5020 is the district court's decision denying Nashiri's motion for injunctive relief.  Al-Nashiri v. Obama, 76 F. Supp. 3d 218 (D.D.C. 2014).

III.    RELATED CASES

This Court denied a previous petition for a writ of mandamus brought by Nashiri in this case challenging the constitutionality of the United States Court of Military Commission Review (USCMCR).  In re Al-Nashiri, 791 F.3d 71 (D.C. Cir. 2015).  The United States District Court for the Western District of Washington dismissed a declaratory judgment action brought by Nashiri.  Al-Nashiri v. MacDonald, No. 11-5907, 2012 WL 1642306 (W.D. Wash. May 10, 2012).  The United States Court of Appeals for the Ninth Circuit affirmed the district court's judgment.  Al-Nashiri v. MacDonald, 741 F.3d 1002 (9th Cir. 2013).

DATED: December 28, 2015

ii

## TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS,
     AND RELATED CASES ........................................................................... i

TABLE OF AUTHORITIES ........................................................................ vi

GLOSSARY OF ABBREVIATIONS ..........................................................xii

STATEMENT OF JURISDICTION ............................................................. 1

ISSUES PRESENTED .................................................................................. 1

STATEMENT OF THE CASE ..................................................................... 2

    A.    Statutory Background .................................................................. 2

    B.    Factual and Procedural Background ........................................... 5

        1.    The Armed Conflict Between Al Qaeda and the United States ..5

        2.    The Charges Against Nashiri ........................................... 8

    C.    Prior Proceedings ..................................................................... 11

        1.    Military Commission Proceedings ................................. 11

        2.    Nashiri's District Court Actions Challenging
          Military Commission Proceedings ............................. 12

SUMMARY OF ARGUMENT ................................................................... 16

STANDARD OF REVIEW ........................................................................ 21

    A.    Mandamus Standard ................................................................. 21

    B.    Standard of Review Governing the District Court's Decision ............. 22

ARGUMENT ...............................................................................................22

I.    Nashiri Cannot Satisfy the Stringent Requirements
      for Obtaining a Writ of Mandamus ..............................................22

      A.    Nashiri Cannot Demonstrate That There Were
            No Other Adequate Means To Obtain Relief............................23

      B.    Nashiri Cannot Establish a Clear and Indisputable
            Right to Relief ...............................................................27

            1.    The Hostilities Element ............................................27

            2.    Nashiri's Conduct Was Committed
                  In the Context of and Associated with Hostilities ........31

                  a.    An Armed Conflict Between the United States
                        and Al Qaeda Existed before 9/11 ...................31

                  b.    Al Qaeda's Boats Operation Was Part of the Al Qaeda
                        Campaign that Culminated in the 9/11 Attacks and
                        Triggered Enactment of the AUMF and the
                        United States' Military Response.......................34

                  c.    Nashiri's Remaining Arguments Lack Merit ........36

      C.    Nashiri Cannot Show That the Writ Is
            Appropriate under the Circumstances..................................43

II.   The District Court Properly Abstained from Exercising
      Jurisdiction Over Nashiri's Habeas Petition ..................................44

      A.    Considerations of Comity Counsel in Favor of Abstention ........45

      B.    The Contrary Arguments Advanced by
            Nashiri and Amicus Curiae Lack Merit ................................50

III.  Nashiri is Not Entitled to Injunctive Relief ...................................58

iv

A.    Nashiri is Unlikely To Succeed on the Merits of the Action
Underlying His Preliminary-Injunction Motion Because
His Claim is Barred by 28 U.S.C. § 2241(e)(2) ....................................59

B.    Nashiri Cannot Demonstrate that He Will Suffer Irreparable
Injury if Preliminary Injunctive Relief is Denied ...............................61

CONCLUSION ..........................................................................................................63

CERTIFICATE OF COMPLIANCE .........................................................................64

CERTIFICATE OF SERVICE ..................................................................................65

STATUTORY ADDENDUM ...................................................................................1a

v

## TABLE OF AUTHORITIES*

Cases:

Aamer v. Obama, 742 F.3d 1023 (D.C. Cir. 2014)  ..................................59

Al-Adahi v. Obama, 613 F.3d 1102 (D.C. Cir. 2010)  ............................60

Al Bahlul v. United States, 767 F.3d 1 (D.C. Cir. 2014) (en banc) ..................28, 57

Al-Bihani v. Obama, 590 F.3d 866 (D.C. Cir. 2010)  ............................41

*In re Al-Nashiri, 791 F.3d 71 (D.C. Cir. 2015)  ................. ii, 22, 23, 25, 27, 36, 58

Al-Nashiri v. MacDonald, 741 F.3d 1002 (9th Cir. 2013) ....................... ii, 8, 13, 59

Al-Nashiri v. MacDonald, No. 11-5907, 2012 WL 1642306
    (W.D. Wash. May 10, 2012) ............................................. ii, 13, 52

Al-Nashiri v. Obama, 76 F. Supp. 3d 218 (D.D.C. 2014) ........................... ii, 14, 15

Baker v. Carr, 369 U.S. 186 (1962)  .......................................41

Belize Social Dev. Ltd. v. Government of Belize,
    668 F.3d 724 (D.C. Cir. 2012) ...................................................22

*Cheney v. U.S. Dist. Court, 542 U.S. 367 (2004)  .........................21, 22

Davis v. Pension Benefit Guar. Corp., 571 F.3d 1288 (D.C. Cir. 2009) ...............22

Dynes v. Hoover, 61 U.S. (20 How.) 65 (1857)  ....................................56

Fay v. Noia, 372 U.S. 391 (1963)  .......................................62

* Authorities upon which we chiefly rely are marked with asterisks.

vi

Foster v. Kassulke, 898 F.2d 1144 (6th Cir. 1990) ..................................................62

Greater New Orleans Fair Hous. Action Ctr. v. U.S. Dep't of
    Hous. & Urban Dev., 639 F.3d 1078 (D.C. Cir. 2011) ...............................58

Gusik v. Schilder, 340 U.S. 128 (1950)...................................................................54

Hamdan v. Gates, 565 F. Supp. 2d 130 (D.D.C. 2008) ...........................................52

Hamdan v. Rumsfeld, 548 U.S. 557 (2006)................... 7, 20, 41, 42, 47, 52, 53, 55

Hamdan v. United States, 696 F.3d 1238 (D.C. Cir. 2012)......................................29

Hamdi v. Rumsfeld, 542 U.S. 507 (2004) ..................................................................6

Handy v. Shaw, Bransford, Veilleux & Roth, 325 F.3d 346 (D.C. Cir. 2003) .......22

Hennis v. Hemlick, 666 F.3d 270 (4th Cir. 2012) ....................................................61

Kerr v. U.S. Dist. Court, 426 U.S. 394 (1976) ........................................................23

Khadr v. Bush, 587 F. Supp. 2d 225 (D.D.C. 2008) ................................................52

Khadr v. Obama, 724 F. Supp. 2d 61 (D.D.C. 2010) ..............................................52

Khadr v. United States, 529 F.3d 1112 (D.C. Cir. 2008) ........................................62

Kiyemba v. Obama, 561 F.3d 509 (D.C. Cir. 2009) ................................................59

Ludecke v. Watkins, 335 U.S. 160 (1948) ...............................................................41

McElroy v. Guagliardo, 361 U.S. 281 (1960) .........................................................24

Midland Asphalt Corp. v. United States, 489 U.S. 794 (1989) ...............................25

New v. Cohen, 129 F.3d 639 (D.C. Cir. 1997) .............................................45, 53, 54

Preiser v. Rodriguez, 411 U.S. 475 (1973) .............................................................59

Privitera v. Cal. Bd. of Med. Quality Assur., 926 F.2d 890 (9th Cir. 1991) ...........51

Prize Cases, 2 Black 635 (1862) ..................................................................38

Procter & Gamble Co. v. Kraft Foods Global, Inc.,
    549 F.3d 842 (Fed. Cir. 2008) ............................................................51

The Protector, 79 U.S. 700 (1871) ...............................................................41

Ex parte Quirin, 317 U.S. 1 (1942) ...............................................40, 44, 46

Reid v. Covert, 354 U.S. 1 (1957) ................................................................24

Relford v. Commandant, 401 U.S. 355 (1971)..............................................56

Roche v. Evaporated Milk Ass'n, 319 U.S. 21 (1943) ...................................23

*Schlesinger v. Councilman, 420 U.S. 738 (1975) ........................ 13, 19, 45-58, 61

Sprint Commc'ns, Inc. v. Jacobs, 134 S. Ct. 584 (2013) ...............................50

In re Terrorist Bombings, 552 F.3d 93 (2d Cir. 2008) ...................................5

*United States v. Al Bahlul, 820 F. Supp. 2d 1141
    (USCMCR 2011) ....................................................28, 29, 33, 35, 37

United States v. Hamdan, 801 F. Supp. 2d 1247 (USCMCR 2011) .......................29

United States v. Hamidullin, No. 3:14-CR-140, 2015 WL 4241397
    (E.D. Va. July 13, 2015) ....................................................................42

United States v. Harper, 729 F.2d 1216 (9th Cir. 1984) ................................26

United States v. Lindh, 212 F. Supp. 2d 541 (E.D. Va. 2002) ........................42

Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7 (2008) ........................58

Younger v. Harris, 401 U.S. 37 (1971) ....................................................62

Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579 (1952) ..........................47

Constitution:

U.S. Constitution

    art. III .......................................................................................49

Statutes:

Authorization for the Use of Military Force, Pub. L. No. 107-40,
    115 Stat. 224 (2001) ..............................................................7, 37, 60

Military Commissions Act of 2006, Pub. L. No. 109-366,
    120 Stat. 2600 .............................................................................2, 7

Military Commissions Act of 2009, Pub. L. No. 111-84,
    123 Stat. 2574 ........................................................................2, 7, 46

    *10 U.S.C. § 948a(9).................................................................3, 27, 34

    10 U.S.C. § 948b..............................................................................2

    10 U.S.C. § 948c .....................................................................2, 24, 55

    *10 U.S.C. § 948d ........................................................1, 3, 12, 34, 35, 49

    10 U.S.C. § 948h..........................................................................3, 46, 47

    10 U.S.C. § 950b(c) ........................................................................4

    10 U.S.C. § 950c ............................................................................4

    10 U.S.C. § 950f(d)......................................................................4, 44

ix

10 U.S.C. § 950g ........................................................................................................1

10 U.S.C. § 950g(a) .........................................................................................4, 24, 47

10 U.S.C. § 950g(b) .........................................................................................4, 23, 44

10 U.S.C. § 950g(d).........................................................................................4, 24, 47

10 U.S.C. § 950g(e) .........................................................................................4

*10 U.S.C. § 950p(c) .............................................................................3, 11, 17, 24, 27

10 U.S.C. § 950t ........................................................................................................3

10 U.S.C. § 821 ..........................................................................................................39

18 U.S.C. § 2332(a) ...................................................................................................26

28 U.S.C. § 1259 ........................................................................................................53

28 U.S.C. § 1291 ..........................................................................................................1

28 U.S.C. § 1651 ..........................................................................................................1

28 U.S.C. § 2241(a) ......................................................................................................1

*28 U.S.C. § 2241(e)(2) ...................................................................1, 13, 14, 20, 59, 61

Rules:

Rule for Military Commissions 101(a)....................................................................2

Rule for Military Commissions 401 .......................................................................3

Rule for Military Commissions 407(a).....................................................................3

Rule for Military Commissions 601 .......................................................................3

x

Miscellaneous:

Geneva Convention Relative to the Treatment of Prisoners of War, 6 U.S.T. 3316,
        T.I.A.S. No. 3364 (Aug. 12, 1949)................................................................38

Letter Dated 20 August 1998 from the Permanent Representative of the
        United States of America to the United Nations Addressed to the
        President of the Security Council, U.N. Doc. S/1998/780.............................6

Military Order of Nov. 13, 2001: Detention, Treatment, and Trial of Certain
        Non-Citizens in the War Against Terrorism, 66 Fed. Reg. 57833............7, 37

National Commision on Terrorist Attacks upon the United States,
        The 9/11 Commission Report............... 5, 6, 10, 11, 31, 32, 33, 34, 35, 39, 41

President William J. Clinton, Letter to Congressional Leaders Reporting on
        Military Action Against Terrorist Sites in Afghanistan and Sudan, 2 Pub.
        Papers 1464 (Aug. 21, 1998) ....................................................................6, 33

President William J. Clinton, Address to the Nation on Military Action
        Against Terrorist Sites in Afghanistan and Sudan, 2 Pub.
        Papers 1460 (Aug. 20, 1998) .........................................................................33

Prosecutor v. Akayesu, Case No. ICTR-96-4-T
        (ICTR Trial Chamber Sept. 2, 1998)......................................................30, 31

Prosecutor v. Tadic, Case No. IT-94-1-T (I.C.T.Y. May 7, 1997)..........................30

## GLOSSARY OF ABBREVIATIONS

AUMF. .....................................................Authorization for the Use of Military Force

Br. ...........................................................................................................Brief of Petitioner

JTF-GTMO. ...............................................................Joint Task Force Guantánamo

MCA ...........................................................................................Military Commissions Act

NIMJ ...............................................................National Institute of Military Justice

Pet. App. ................................................................Petitioner's Appendix, Volume I

RMC. ........................................................................................Rules for Military Commissions

USCMCR ................................United States Court of Military Commission Review

STATEMENT OF JURISDICTION

The jurisdiction of the military commission rested on 10 U.S.C. § 948d.

Nashiri invoked this Court's jurisdiction in No. 15-1023 under 10 U.S.C. § 950g

and the All Writs Act, 28 U.S.C. § 1651.

Nashiri invoked the district court's jurisdiction in No. 15-5020 under 28

U.S.C. § 2241(a).  On December 29, 2014, the district court held in abeyance

Nashiri's self-styled habeas petition and denied as moot Nashiri's request for a

preliminary injunction, holding in the alternative that Nashiri had failed to

demonstrate that he is entitled to injunctive relief.  Nashiri filed a timely notice of

appeal on January 26, 2015.  See Fed. R. App. P. 4(a)(1)(B).  This Court has

appellate jurisdiction under 28 U.S.C. § 1291.  For the reasons explained below,

however, Nashiri's claims are not cognizable in habeas and, therefore, are barred by

28 U.S.C. § 2241(e)(2).

ISSUES PRESENTED

1.  Whether Nashiri is entitled to a writ of mandamus ordering the military

commission to dismiss the charges against him on the ground that his conduct was

not committed in the context of and associated with hostilities.

2.  Whether the district court appropriately abstained from exercising

jurisdiction over Nashiri's self-styled habeas petition in light of Nashiri's ongoing

1

prosecution before a military commission.

3. Whether the district court appropriately denied Nashiri's request for a preliminary injunction to halt the military commission proceedings.

STATEMENT OF THE CASE

A.   Statutory Background

The Military Commissions Act of 2009, Pub. L. No. 111-84, 123 Stat. 2574 (codified at 10 U.S.C. §§ 948a et seq.) ("2009 MCA" or "MCA"),[1] authorizes the President to establish military commissions to try alien unprivileged enemy belligerents for violations of the law of war and other offenses triable by military commissions. 10 U.S.C. §§ 948b(a)-(b), 948c. The MCA establishes procedures governing military commissions, id. § 948b(a), and further procedures are set forth in the Rules for Military Commissions. See R. for Mil. Comm. ("RMC") 101(a).[2]

The MCA provides that military commissions "shall have jurisdiction to try persons subject to this chapter," i.e., "alien unprivileged enemy belligerent[s]," 10 U.S.C. § 948c. Such persons may be tried for "for any offense made punishable"

---

[1] The 2009 MCA largely supersedes the Military Commissions Act of 2006, Pub. L. No. 109-366, 120 Stat. 2600.

[2] The Rules for Military Commissions appear in the Manual for Military Commissions (2012), available on the Office of Military Commissions' website at http://www.mc.mil/portals/0/pdfs/2012manualformilitarycommissions.pdf.

2

by the MCA, "whether such offense was committed before, on, or after September 11, 2001." Id. § 948d. Subchapter VIII, titled "Punitive Matters," defines 32 offenses that are "triable by military commission." Id. § 950t. Subsection 950p(c) of that subchapter, titled "[c]ommon [c]ircumstances," further provides that "[a]n offense specified in this subchapter is triable by military commission under this chapter only if the offense is committed in the context of and associated with hostilities." The statute defines "hostilities" as "any conflict subject to the laws of war." Id. § 948a(9).

When the government seeks to try an individual before a military commission under the MCA, the Secretary of Defense or his designee – known as the "convening authority" – determines whether the charges should be "referred" to a military commission for trial. Id. § 948h; RMC 401(a), (b), 407(a), 601(a), (b), (d). The convening authority may refer charges only if "the convening authority finds, or is advised by a legal advisor," that "there are reasonable grounds to believe that an offense triable by a military commission has been committed and that the accused committed it." RMC 601(d)(1).

If an accused is convicted by a military commission, the conviction is subject to multiple layers of administrative and judicial review. First, the convening authority has discretion to dismiss any charge on which an accused was found

3

guilty, to convict the accused only of a lesser included offense, and to approve, disapprove, suspend, or commute (but not enhance) the sentence rendered by the commission.  10 U.S.C. § 950b(c).  If the convening authority approves a finding of guilty, the convening authority must refer the case to the United States Court of Military Commission Review (USCMCR) unless the accused was not sentenced to death and waives the right of review.  Id. § 950c(a), (b).  The USCMCR may affirm findings of guilty and sentences only if it concludes that those findings and sentences are "correct in law and fact" and only if it "determines, on the basis of the entire record, [that the findings and sentences] should be approved."  Id. § 950f(d).

After exhausting these procedures, an accused may file a petition for review in this Court, which has "exclusive jurisdiction to determine the validity of a final judgment rendered by a military commission (as approved by the convening authority and, where applicable, as affirmed or set aside as incorrect in law by the [USCMCR])."  Id. § 950g(a)-(b).  This Court's review encompasses all "matters of law, including the sufficiency of the evidence to support the verdict."  Id. § 950g(d).  Supreme Court review of this Court's final judgment may be sought by writ of certiorari.  Id. § 950g(e).

4

B.      Factual and Procedural Background

1.      The Armed Conflict Between the United States and Al Qaeda

Going back to at least 1998, the United States has been in an armed conflict with the al Qaeda terrorist organization.  In February 1998, Usama bin Ladin, the founder of al Qaeda, issued a fatwa purporting to command all able Muslims to kill Americans wherever they may be found.  See Nat'l Comm'n on Terrorist Attacks upon the U.S., The 9/11 Commission Report 47-48 (2004).[3]  Bin Ladin's 1998 declaration followed a series of earlier public and private calls for attacks on the United States, including a 1996 "Declaration of War" in which bin Ladin publicly called for attacks on U.S. military personnel in the Arabian Peninsula.  Id. at 48, 466 n.3.

Al Qaeda planned, supported, and carried out several attacks on U.S. military and diplomatic targets before September 11, 2001.  Id. at 47-48, 59-61, 68-70.  On August 7, 1998, al Qaeda conducted coordinated attacks against the U.S. embassies in Kenya and Tanzania, killing more than 200 people, including 12 Americans, and wounding thousands more.  See id. at 68-70; In re Terrorist Bombings, 552 F.3d 93,

---

[3] The 9/11 Commission Report is available at http://www.9-11commission.gov/report/911Report.pdf.

5

104 (2d Cir. 2008).   In response to those attacks, the United States conducted missile strikes against al Qaeda training camps in Afghanistan and a suspected chemical weapons facility in Sudan.  9/11 Commission Report 116-17.  President Clinton publicly stated that the strikes were an "exercise of our inherent right of self-defense consistent with Article 51 of the United Nations Charter."  President William J. Clinton, Letter to Congressional Leaders Reporting on Military Action Against Terrorist Sites in Afghanistan and Sudan, 2 Pub. Papers 1464 (Aug. 21, 1998); see also Letter Dated 20 August 1998 from the Permanent Representative of the United States of America to the United Nations Addressed to the President of the Security Council, U.N. Doc. S/1998/780.  The President considered and prepared to launch additional military operations against al Qaeda.  9/11 Commission Report 120-21, 126-43.  In doing so, the President determined that such operations, including the United States' participation in efforts to kill bin Ladin, were lawful under the law of armed conflict.  Id. at 132, 485 n.123.

Al Qaeda's armed attacks against the United States continued with the bombing of the *U.S.S. Cole* in Yemen in October 2000, in which 17 American sailors were killed, and in the attacks of September 11, 2001, in which nearly 3,000 people were killed.  Id. at 190-91; Hamdi v. Rumsfeld, 542 U.S. 507, 510 (2004).  Following those attacks, Congress recognized the President's "authority under the

6

Constitution to take action to deter and prevent acts of international terrorism against the United States," and authorized him to use "all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001." Authorization for Use of Military Force (AUMF), Pub. L. No. 107-40, preamble & § 2a, 115 Stat. 224 (2001). Shortly thereafter, the President issued an order establishing military commissions to try certain members of al Qaeda and other persons for violations of the law of war, in which the President found that al Qaeda had "carried out attacks on United States diplomatic and military personnel and facilities abroad and on citizens and property within the United States on a scale that has created a state of armed conflict." Military Order of Nov. 13, 2001: Detention, Treatment, and Trial of Certain Non-Citizens in the War Against Terrorism, 66 Fed. Reg. 57833.

In Hamdan v. Rumsfeld, 548 U.S. 557 (2006), the Supreme Court held that the adoption by the President of military commission procedures that deviated from those governing courts-martial was inconsistent with the Uniform Code of Military Justice. In response to that decision, Congress enacted the 2006 MCA, and later the 2009 MCA, which provided statutory authority for military commissions, limited their jurisdictional scope, codified offenses triable by the commissions, and

7

reformed their procedures in various ways to enhance the procedural rights of military commission defendants.

> 2.    The Charges Against Nashiri

Nashiri, a Saudi national, was arrested in Dubai in 2002 and held in U.S. custody.  In September 2006, he was transferred to the U.S. Naval Station at Guantánamo Bay, Cuba.  The following year, a Combatant Status Review Tribunal determined that he was an "enemy combatant."  Al-Nashiri v. MacDonald, 741 F.3d 1002, 1004-05 (9th Cir. 2013).

On September 28, 2011, the convening authority referred nine charges against Nashiri to trial by military commission.  See Pet. App. 52; Al-Nashiri v. MacDonald, 741 F.3d at 1004-05.  The charges stem from Nashiri's alleged role in two terrorist attacks and one attempted attack: (1) the attempted bombing of the U.S.S. The Sullivans in Yemen in 2000; (2) the bombing of the Cole later that year in Yemen, resulting in the deaths of 17 U.S. sailors; and (3) the bombing in Yemen in 2002 of the MV Limburg, a French oil tanker, that killed one crew member.  See Pet. App. 20-42; Al-Nashiri v. MacDonald, 741 F.3d at 1004-05.

According to the charges, Nashiri met personally with bin Ladin and other senior members of al Qaeda, including Walid Muhammad Salih Mubarak bin Attash ("Khallad"), to plan a "boats operation" that would involve a series of

8

attacks on ships in the Arabian Peninsula.  Pet. App. 24.  Under bin Ladin's direction, Nashiri and Khallad prepared to execute the boats operation by surveilling the Port of Aden in Yemen, obtaining and storing explosives, recruiting additional co-conspirators, and purchasing a boat and other materials.  Id. at 25. Yemeni authorities arrested Khallad, who returned to Afghanistan after his release, and bin Ladin directed Nashiri to take control of the boats operation.  Id.

On January 3, 2000, two of Nashiri's co-conspirators, under Nashiri's direction, launched a boat filled with explosives into Aden Harbor and attempted to steer it towards a U.S. warship, the *U.S.S. The Sullivans*.  Id.  The attack failed when the explosives-laden boat foundered in the surf.  Id.  Nashiri and his co-conspirators recovered the boat and explosives with heavy construction equipment and returned them to storage in Aden.  Id. at 26.

Nashiri went back to Afghanistan for additional meetings with Khallad and bin Ladin.  Id.  Nashiri received training in explosives from an al Qaeda expert and tested the explosives that he recovered from the failed attack.  Id.  Nashiri returned to Yemen and prepared for a second boats operation attack.  Id.  Nashiri and his co-conspirators repaired the attack boat, hired a crane operator to launch it, tested it in Aden Harbor, and packed it with explosives.  Id.

9

In September 2000, Nashiri informed Khallad that the second boats operation attack was ready and that Nashiri had selected the suicide bombers who would execute it.  Id.  Bin Ladin, through Khallad, ordered Nashiri to leave Yemen before the attack and to return to Afghanistan.  Id.  Nashiri returned to Afghanistan and told bin Ladin that the attack was imminent.  Id. at 27.

On October 12, 2000, Nashiri's hand-picked suicide bombers launched the explosives-packed boat and approached the *U.S.S. Cole*, which was refueling in Aden Harbor.  Id.  The bombers, dressed in civilian clothes, made friendly gestures to crew members and brought the boat alongside the *Cole*.  Id.  The bombers detonated the explosives.  Id.  The blast killed 17 members of the ship's crew, injured at least 37 others, and tore a 30-foot hole in the warship's side.  Id.

At the same time that bin Ladin was directing Khallad and Nashiri's planning of the "boats operation," he was also directing Khalid Sheikh Mohammed, Khallad, and others in planning the "planes operation" that al Qaeda executed on September 11, 2001.  See 9/11 Commission Report 153-69.  Nashiri's codefendant Khallad was simultaneously involved in directing both operations.  See Charge Sheet, United States v. Khalid Shaikh Mohammad, at 2-4 (Mil. Comm'n filed Apr. 4, 2012) ("9/11 Charge Sheet") (charging Khallad with taking various actions in 1999

and 2000 in preparation for the 9/11 attacks).[4]  In October 2000, when the *Cole*

attack took place, three of the 9/11 pilots were already attending pilot training in the

United States.  9/11 Commission Report 223-25.

In 2001 and 2002, Nashiri planned the next stage of the boats operation, an

attack on the *MV Limburg* in the port of Al Mukallah, Yemen.  Pet. App. 27.  On

October 6, 2002, suicide bombers under Nashiri's direction used an explosives-

laden boat to attack the French ship, which killed one crewmember, injured

approximately 12 others, and caused 90,000 barrels of oil to spill into the Gulf of

Aden.  Id.

C.    Prior Proceedings

1.    Military Commission Proceedings

On August 30, 2012, Nashiri moved the military commission to dismiss the

charges, alleging that, contrary to the requirements of 10 U.S.C. § 950p(c) and the

Constitution, none of the charged offenses "occurred in the context of or were

associated with a conflict subject to the law of war."  See Defense Mot. To Dismiss

Because the Convening Authority Exceeded His Power, No. AE 104, at 7 (filed

---

[4] Available at
http://www.mc.mil/Portals/0/pdfs/KSM2/KSM%20II%20(Referred%20Charges).
pdf.

11

Aug. 30, 2012).[5]   Colonel James L. Pohl, the military judge then presiding over the

military commission, denied the motion without prejudice.  Judge Pohl held that

"[w]hether hostilities existed between Al Qaeda and the United States on the dates

of the accused's alleged acts is a question of fact and an element of proof, which

must be carried by the government" at trial.  Order, Defense Mot. To Dismiss, No.

AE 104F, at 4-6 (Jan. 15, 2013) (Pet. App. 58-60).  To the extent that the existence

of hostilities was an issue of law "subject to purely legal determination," Judge Pohl

deferred to the implicit determinations of Congress (in providing for military

commission jurisdiction over offenses occurring "before, on, or after September 11,

2001," 10 U.S.C. § 948d) and the Executive Branch (in authorizing the charges

against Nashiri) that hostilities existed at the time of Nashiri's conduct.  Pet. App.

58-60.

       2.      <u>Nashiri's District Court Actions Challenging Military Commission
Proceedings</u>

In 2011, nearly ten months before Nashiri asked the military commission to

dismiss the charges against him, Nashiri filed a complaint in the District Court for

the Western District of Washington seeking a declaratory judgment that "neither the

_____

[5] Nashiri's motion, as well as other pleadings in the military commission
case, are available on the Office of Military Commissions website at
http://www.mc.mil/CASES/MilitaryCommissions.aspx.

President nor Congress certified the existence of an armed conflict subject to the laws of war in Yemen prior to September 2003." Al-Nashiri v. MacDonald, No. 11-5907, 2012 WL 1642306, at *4 (W.D. Wash. May 10, 2012) ("Al-Nashiri I"). The district court dismissed the case, ruling that it lacked subject-matter jurisdiction under 28 U.S.C. § 2241(e)(2) and that the "principles of comity" articulated in Schlesinger v. Councilman, 420 U.S. 738 (1975), required it to abstain from deciding the merits of Nashiri's claims. Al-Nashiri I, 2012 WL 1642306, at *11. The Ninth Circuit affirmed, holding that Nashiri's lawsuit was "plainly" barred by Section 2241(e)(2), without addressing the issue of abstention. Al-Nashiri v. MacDonald, 741 F.3d 1002, 1007 (9th Cir. 2013) ("Al-Nashiri II").

Having failed before the military commission and in his declaratory judgment action, Nashiri sought essentially identical relief through habeas proceedings in the District Court for the District of Columbia. Nashiri had filed a habeas petition in 2008, but that petition had not been resolved. In 2014, he requested leave to file a "supplemental petition for a writ of habeas corpus" as a substitute for the earlier petition. See Pet. App. 1-16.

The supplemental petition did not challenge the fact, duration, place, or conditions of Nashiri's confinement. Instead, the petition recapitulated the arguments Nashiri had unsuccessfully advanced to the military commission, to the

13

Western District of Washington, and to the Ninth Circuit.  The petition sought three specific forms of relief:  (1) a "writ of habeas corpus enjoining" the pending military commission proceedings; (2) a "declaratory judgment affirming that neither the President nor the Congress recognized the existence of an armed conflict" when Nashiri committed his crimes; and (3) a "writ of mandamus" compelling the government to rescind the charges against him.  Pet. App. 14.  Nashiri also moved for a preliminary injunction to suspend the military commission convened to try him.

The government opposed both motions.  The government argued that (1) "the principles of comity articulated in Councilman" required the court to abstain from enjoining ongoing military commission proceedings, and (2) Nashiri's claims did not sound in habeas and, therefore, were barred by 28 U.S.C. § 2241(e)(2) and were not otherwise within the district court's jurisdiction.  Dkt. 235 at 1-8, 14-27.  The government also filed a motion to hold Nashiri's habeas action in abeyance until the military commission process could run its course.  Id. at 28.

The district court granted the government's motion.  Al-Nashiri v. Obama, 76 F. Supp. 3d 218 (D.D.C. 2014).  The court reasoned that Councilman required federal courts to abstain from exercising jurisdiction when "consideration of [the issues] would interfere with the military commission proceedings."  Id. at 222-23.

14

Nashiri's sole argument – that "his charged conduct is not covered by the [Military Commissions Act]" – "necessarily overlaps with a prime determination the military commission must make":  whether the government could prove the jurisdictional element of the offenses with which he has been charged.  Id. at 222.  As "[p]roceeding with the habeas petition" would "interfere with the military commission trial" and disregard "traditional principles of . . . judicial economy," the district court stayed Nashiri's case.  Id. at 222-23.

The district court also denied Nashiri's motion for a preliminary injunction as moot.  Id. at 222 n.3.  The court ruled in the alternative that Nashiri "ha[d] failed to show irreparable injury" and thus was not entitled to a preliminary injunction.  Id.  Nashiri had not demonstrated that he would suffer any harms other than those attendant to an ordinary criminal prosecution, the court explained.  Id.  Such harms are "insufficient, standing alone, to warrant federal court intervention."  Id.

Following issuance of the district court's order, Nashiri filed: (1) a notice of appeal insofar as the order denied injunctive relief (docketed as No. 15-5020); and (2) a petition for a writ of mandamus (docketed as No. 15-1023) seeking an order from this Court requiring the military commission to dismiss all charges.  This Court consolidated the cases.

15

SUMMARY OF ARGUMENT

1.  Nashiri challenges by writ of mandamus the military commission's denial, without prejudice, of Nashiri's pretrial motion claiming that the charged conduct occurred outside the geographical and temporal boundaries of an armed conflict. This Court should deny Nashiri's petition because he cannot satisfy the exacting standards for obtaining a writ of mandamus.

a.  Nashiri cannot demonstrate that there are no other adequate means to attain the requested relief.  If Nashiri is convicted and exhausts his remedies in the military commission system, he may then renew in this Court the claims he raises now.  Nashiri cannot establish any irreparable injury that will occur if his claim is adjudicated in the first instance by the military commission, followed by review by the convening authority, the USCMCR, and this Court.

Nashiri's claim does not implicate any right not to be tried in a military commission.  Nashiri has not raised in this Court any contention that he is not a person subject to military commission jurisdiction, i.e., an alien unprivileged enemy belligerent.  The challenge that Nashiri has raised – whether the conduct occurred in the context of hostilities – depends in part on the proof at trial and does not involve any personal immunity from trial or guarantee that trial will not occur.  Nashiri's claim that he will suffer unique psychological harms from a capital trial is

16

unavailing because this Court's precedents, including its denial earlier this year of a previous mandamus petition brought by Nashiri, make clear that there is no death-penalty exception to the traditional mandamus standard.

b.  Nashiri cannot demonstrate that his right to issuance of the writ is clear and indisputable because the charges and the public record indicate that the government will be able to satisfy the nexus-to-hostilities requirement at trial. Under the MCA and the Rules for Military Commissions, whether the charged conduct occurred "in the context of and associated with hostilities," 10 U.S.C. § 950p(c), is a mixed question of fact and law that depends primarily on the intensity of the alleged conflict and the degree of organization of the parties to the conflict.  In this case, several factors demonstrate that an armed conflict existed between the United States and al Qaeda before September 11, 2001, and that Nashiri's "boats operation" occurred within the context of that conflict.  Those factors include (1) al Qaeda's 1996 and 1998 declarations of war against the United States; (2) the destructiveness and scale of al Qaeda's pre-9/11 armed attacks on U.S. military and diplomatic facilities; (3) the organized nature of al Qaeda itself and its manner of conducting attacks; (4) the United States' military strikes in response to al Qaeda's 1998 bombing of U.S. embassies in Africa; and (5) the

17

United States' determination that the law of armed conflict applied to military operations the United States prepared in response to al Qaeda attacks.

Nashiri errs in treating the "boats operation" as a series of isolated attacks that were unrelated to al Qaeda's declarations of war, previous armed attacks, and the subsequent 9/11 attacks.  Rather, the boats operation was one arm of an ongoing offensive that included the 9/11 attacks that ultimately led Congress to authorize the President to use force in an armed conflict that was already ongoing.  Moreover, the geographic scope of military commission jurisdiction is not limited to conduct occurring in a theater of active military operations.  The AUMF and the MCA were plainly intended to apply to the 9/11 attacks, which did not occur in a theater of active military operations.  Those statutes make clear that the geographic scope of the conflict covers places, including Yemen, where al Qaeda has planned and executed armed attacks.

c.  The exercise of this Court's discretion to award mandamus relief would be particularly inappropriate at this interlocutory stage.  Congress has provided multiple levels of review for military commission proceedings, and there is no compelling reason for this Court to preempt that process now.  Deferring this Court's review until after that process has run would be consistent with the

18

deference that courts have traditionally shown to the political branches' wartime determinations related to the existence of armed conflict.

2.  The district court correctly abstained from exercising jurisdiction over Nashiri's self-styled habeas petition, which challenges only his ongoing military commission proceedings, not his detention.  Deciding Nashiri's claim now would interfere with the "integrated system of military courts and review procedures" created by Congress and the Executive to try Nashiri's crimes.  Schlesinger v. Councilman, 420 U.S. 738, 756-58 (1975).  The review authority the system accords this Court – a civilian body "completely removed from all military influence or persuasion" – reinforces the presumption that the system will operate responsibly.  Id. at 758.  These comity considerations require abstention here, where judicial deference to the political branches is at its zenith.

Abstention is particularly appropriate because of the fact-bound nature of Nashiri's claim.  Nashiri has made the same arguments before the military commission, where evidence bearing on this issue is being developed.  The military commission is uniquely equipped to evaluate this evidence and congressionally empowered to decide in the first instance what the evidence shows.  Preempting that process would deprive this Court of the ability to assess Nashiri's claim properly, in contravention of congressional intent.

19

Nashiri's contrary arguments lack merit.  First, the district court did not abuse its discretion by declining to decide Nashiri's preliminary-injunction motion once it determined that abstention is appropriate here.  Nashiri's argument to the contrary would require the precise sort of interference with military commission proceedings that abstention is intended to prevent.  Second, the abstention doctrine that applies to Nashiri's claim cannot be limited to court-martial proceedings involving members of the U.S. military.  Indeed, the Supreme Court has expressly recognized that "abstention may be appropriate" for military commissions like the one established by the MCA.  Hamdan v. Rumsfeld, 548 U.S. 557, 590 (2006) ("Hamdan II").  Third, this Court's power to review both military commission and district court decisions does not render abstention inappropriate.  Such review does not eliminate the friction that would be generated by different courts reaching different conclusions on issues pending before different military tribunals.  Fourth, Nashiri does not qualify for the narrow personal-jurisdiction exception to abstention, as he has not challenged his status as an alien unprivileged enemy belligerent who is properly subject to military jurisdiction.

3.  The district court's ruling should be affirmed for the additional reason that Nashiri is not entitled to injunctive relief.  Nashiri cannot demonstrate a likelihood of success on the merits because his claim is barred by 28 U.S.C. § 2241(e)(2).

20

While federal courts have jurisdiction over habeas claims, Nashiri's claim does not challenge any aspect of his detention and thus is not a proper habeas action.

The remaining injunction factors also weigh against Nashiri. He cannot demonstrate that he will suffer any cognizable irreparable injury if the commission proceedings continue. The burdens of litigation are not sufficient to merit extraordinary relief, even in the context of a capital case. Because the commission may lawfully exert authority over Nashiri's person, his trial before that body inflicts no legal harm upon him. Finally, neither the balance of equities nor the public interest favors an injunction. This Court should not upend the system that Congress and the Executive jointly created, which has proven capable of vindicating defendants' rights while fulfilling its duties. And as in other criminal cases, the public interest will be served by post-judgment review.

## STANDARD OF REVIEW

### A.   Mandamus Standard

Because issuing a writ of mandamus is a "drastic and extraordinary" remedy, "only exceptional circumstances amounting to a judicial usurpation of power or a clear abuse of discretion will justify [its] invocation." Cheney v. U.S. Dist. Court, 542 U.S. 367, 380 (2004) (internal quotation marks and citations omitted). The writ will issue only when the petitioner demonstrates that: (1) there is "'no other

21

adequate means to attain'" the requested relief; (2) the petitioner's "'right to issuance of the writ is clear and indisputable;'" and (3) "'the writ is appropriate under the circumstances.'"  Belize Social Dev. Ltd. v. Government of Belize, 668 F.3d 724, 729-30 (D.C. Cir. 2012) (quoting Cheney, 542 U.S. at 380-81); see In re Al-Nashiri, 791 F.3d 71, 78 (D.C. Cir. 2015).

> B.      Standard of Review Governing the District Court's Decision

This Court reviews de novo the district court's legal conclusions.  Handy v. Shaw, Bransford, Veilleux & Roth, 325 F.3d 346, 349 (D.C. Cir 2003) (abstention); Davis v. Pension Benefit Guar. Corp., 571 F.3d 1288, 1291 (D.C. Cir. 2009) (preliminary injunction).  This Court reviews for abuse of discretion the district court's decision to abstain, see Handy, 325 F.3d at 349, as well as the district court's "weighing of the four preliminary injunction factors and ultimate decision to issue or deny such relief."  Davis, 571 F.3d at 1291 (internal quotation marks omitted).

ARGUMENT

I.      Nashiri Cannot Satisfy the Stringent Requirements for Obtaining a Writ of Mandamus

As explained below, Nashiri's petition for mandamus (No. 15-1023) must be denied because he cannot satisfy any of the three prongs of the mandamus standard.

22

A.      Nashiri Cannot Demonstrate That There Were No Other Adequate Means To Obtain Relief

Earlier this year, this Court denied Nashiri's mandamus petition challenging the constitutionality of the assignment of military judges to the USCMCR.  See In re Al-Nashiri, 791 F.3d at 75.  The Court denied relief because, inter alia, Nashiri's claims were reviewable on direct appeal from final judgment, and Nashiri failed to identify any "irreparable injury that will go unredressed if he does not secure mandamus relief."  Id. at 78-79.  This Court should reject Nashiri's current petition for the same reason.

As this Court explained, "[m]andamus is inappropriate in the presence of an obvious means of review: direct appeal from final judgment."  In re Al-Nashiri, 791 F.3d at 78 (citing Roche v. Evaporated Milk Ass'n, 319 U.S. 21, 27-28 (1943)).  If the judiciary exercised a "readiness to issue the writ of mandamus in anything less than an extraordinary situation," it would defeat the "judgment of Congress that appellate review should be postponed until after final judgment."  Id. at 78 (quoting Kerr v. U.S. Dist. Court, 426 U.S. 394, 403 (1976)) (internal quotation marks omitted); see 10 U.S.C. § 950g(b) (requiring an accused to waive or exhaust "all other appeals under this chapter" before this Court's review).

23

Nashiri does not dispute that if he is convicted, the convening authority approves the findings and sentence, and the USCMCR affirms the convictions, his claim that the charged offenses were not committed "in the context of and associated with hostilities," 10 U.S.C. § 950p(c), will be squarely before this Court and ripe for review. See 10 U.S.C. § 950g(a), (d). Instead, he claims (Br. 44-46) that allowing the military commission process to go forward will deprive him of his "right not to be tried" for offenses "not triable" by the commission. But the premise of this argument is flawed. Nashiri has confused the commission's jurisdiction over an individual defendant with the commission's jurisdiction to adjudicate a category of offense with which that defendant has been charged. To the extent the Supreme Court has recognized a right not to be tried that is enforceable on interlocutory review, it has done so only in the former context, not the latter. See McElroy v. Guagliardo, 361 U.S. 281 (1960) (evaluating whether a military court could exercise jurisdiction over a military contractor); Reid v. Covert, 354 U.S. 1, 35 (1957) (plurality op.) (evaluating whether a military court could exercise jurisdiction over civilian dependents of armed services personnel).

Nashiri is an "alien unprivileged enemy belligerent" subject to military commission jurisdiction under the Military Commissions Act. See 10 U.S.C. § 948c. He does not contest the validity of that designation. The issue Nashiri has

24

raised is not whether he is a person who is properly subject to trial in a military proceeding, but whether the government can – as a factual matter – establish a necessary element of the offense with which he has been charged. That issue does not involve any "explicit statutory or constitutional guarantee that trial will not occur." Midland Asphalt Corp. v. United States, 489 U.S. 794, 801 (1989). Because the commission may lawfully exert authority over Nashiri's person, allowing the military commission to adjudicate in the first instance whether Nashiri's offense was committed in the context of and associated with hostilities, followed by multiple layers of administrative review and judicial review in this Court, does not inflict an irreparable injury that must be remedied by mandamus relief.

Nashiri also asserts (Br. 47-49) that he will suffer unique harms attendant to defending himself in a capital military commission. However, in rejecting Nashiri's previous mandamus petition, this Court held that there was no "'death penalty' exception to the traditional rules of mandamus." In re Al-Nashiri, 791 F.3d at 80. The Court recognized that such an exception would contravene "the bedrock principle of mandamus jurisprudence that the burdens of litigation are normally not a sufficient basis" for establishing the irreparable-injury prerequisite to mandamus relief. Id.

25

Nashiri claims (Br. 50-53) that trial before a capital military commission will inflict psychological injury upon him. But psychological stressors are inevitable incidents of any capital trial, as Nashiri himself acknowledges. Dkt. 229 at 26 (explaining that "the infliction of these significant and irreparable harms may be inevitable" if he is subjected to any capital prosecution, no matter the forum); see also Physicians for Human Rights Br. 28. The indictment in the Southern District of New York against Nashiri's co-conspirators contains death-eligible charges. See Indictment, United States v. Al-Badawi, No. 98-CR-1023 (S.D.N.Y. filed May 15, 2003) (charging Nashiri's co-conspirators with, among other crimes, murder in violation of 18 U.S.C. § 2332(a)(1)).

United States v. Harper, 729 F.2d 1216 (9th Cir. 1984), is not to the contrary. Although the Harper court issued a writ of mandamus nullifying the district court's conclusion that the death penalty passed constitutional muster, it did not do so based on the hardships of enduring a death-penalty trial alone. See id. at 1220-21 (noting that requiring a defendant to defend himself against capital charges did not necessarily implicate "rights . . . [that] would be significantly undermined if appellate review . . . were postponed until after conviction and sentence"). In Harper, there were other factors that "set th[at] case apart from the ordinary criminal proceeding and influence[d]" the court's "decision to employ the drastic

26

remedy of mandamus," not least the government's concession that the challenged

district court decision was wrong.  Id. at 1223-24.  This Court distinguished Harper

in denying Nashiri's previous mandamus petition.  In re Al-Nashiri, 791 F.3d at 81.

B.      Nashiri Cannot Establish a Clear and Indisputable Right to Relief

Nashiri cannot demonstrate a "clear and indisputable right to the writ."  In re

Al-Nashiri, 791 F.3d at 82, 86.  As this Court explained in rejecting Nashiri's prior

petition, a petitioner who raises an "open question[]" of "first impression" cannot

obtain mandamus relief.  Id. at 85.  Because Nashiri identifies no authority

establishing that his conduct could not have been committed "in the context of and

associated with hostilities," 10 U.S.C. § 950p(c), his petition must be denied.

1.      The Hostilities Element

The MCA provides that the codified offenses are triable by military

commission only if the offense was "committed in the context of and associated

with hostilities."  10 U.S.C. § 950p(c).  "Hostilities" is defined as "any conflict

subject to the laws of war."  Id. § 948a(9).  The language of Section 950p(c), its

placement in the subchapter enumerating offenses, and its title ("Common

Circumstances") all indicate that Congress established the "hostilities" requirement

as a "common" element of each MCA offense.  The Rules for Military

Commissions explicitly require, as an element of each offense under the MCA, that

27

the government prove beyond a reasonable doubt that the conduct took place in the context of and was associated with hostilities.  See Manual for Military Commissions Part IV, 1-19 (2012).

The MCA's hostilities element requires the government to prove "a nexus between the charged conduct and an armed conflict."  United States v. Al Bahlul, 820 F. Supp. 2d 1141, 1188-89 (USCMCR 2011), rev'd in part on other grounds, Al Bahlul v. United States, 767 F.3d 1 (D.C. Cir. 2014) (en banc).  That element "performs an important narrowing function in determining which charged acts of terrorism constitute conduct punishable by such a law of war military commission, while effectively excluding from their jurisdiction isolated and sporadic acts of violence not within the context of an armed conflict." Id. at 1189.

In considering whether the MCA's hostilities element has been satisfied, the military commission members must find, beyond a reasonable doubt, that hostilities of a sufficiently intense and organized character occurred, as opposed to armed violence that was too "isolated and sporadic" to constitute armed conflict.  Id.  The military commission considers a number of factors that generally relate to the "intensity and duration" of the armed violent acts between the United States and al Qaeda, including, for example, the number of casualties, the amount of property damage, whether there was "protracted" armed violence, the use of military

28

weapons and tactics, the extent of al Qaeda's organization as an armed group, the

extent to which the United States "employ[ed] the combat capabilities of its armed

forces" against al Qaeda, and the statements of the United States and al Qaeda

regarding the existence of an armed conflict.  Id. at 1190.  Although the intentions

of the United States and al Qaeda are relevant, the test for existence of hostilities is

ultimately an "objective" one.  Id. at 1189-90.  Finally, the government must also

establish a sufficient connection between the hostilities and the offense.  Id. at

1188-89.[6]

---

[6] In United States v. Hamdan, the first fully-contested military commission under the 2006 MCA, the members of the commission were given the following instruction regarding hostilities:

> In determining whether an armed conflict existed between the United States and al Qaeda and when it began, you should consider the length, duration, and intensity of hostilities between the parties, whether there was protracted armed violence between governmental authorities and organized armed groups, whether and when the United States decided to employ the combat capabilities of its armed forces to meet the al Qaeda threat, the number of persons killed or wounded on each side, the amount of property damage on each side, statements of the leaders of both sides indicating their perceptions regarding the existence of an armed conflict, including the presence or absence of a declaration to that effect, and any other facts or circumstances you consider relevant to determining the existence of armed conflict.

United States v. Hamdan, 801 F. Supp. 2d 1247, 1277-78 & n.54 (USCMCR 2011), rev'd on other grounds, Hamdan v. United States, 696 F.3d 1238 (D.C. Cir. 2012). The USCMCR held that this instruction properly governed the members'

The approach to the "hostilities" requirement reflected in the MCA, the Rules for Military Commissions, and the case law of the USCMCR is consistent with the practice of contemporary international war crimes tribunals applying the international law of war. Those tribunals generally consider similar factors, including the intensity of the violence and the relative organization of the parties, in distinguishing between armed conflicts and internal disturbances and tensions, such as riots, isolated and sporadic acts of violence, or other acts of a similar nature to which the law of armed conflict does not apply. See, e.g., Prosecutor v. Tadic, Case No. IT-94-1-T, Opinion and Judgment ¶¶ 559-62 (I.C.T.Y. May 7, 1997) (requiring a showing that an armed conflict existed and that the acts of the accused were committed "within the context" of the armed conflict, and focusing on the "intensity of the conflict" and the "organization of the parties" to distinguish armed conflict from more sporadic violence that did not amount to armed conflict);[7] Prosecutor v. Akayesu, Case No. ICTR-96-4-T, Judgment ¶ 625 (ICTR Trial Chamber Sept. 2,

---

determination whether an armed conflict existed between al Qaeda and the United States during the charged period. Id.; see also Al Bahlul, 820 F. Supp. 2d at 1190 (approving a similar instruction).

[7] Although the Tadic opinion lists "terrorist activities" as an example of violence that might be too sporadic to constitute armed conflict, nothing in that opinion suggests that a sustained campaign of major attacks by a terrorist group could not give rise to an armed conflict. See id. ¶ 562.

30

1998) ("an armed conflict is distinguished from internal disturbances by the level of intensity of the conflict and the degree of organization of the parties").

> 2.      Nashiri's Conduct Was Committed in the Context of and Associated with Hostilities

Nashiri's conduct was committed "in the context of and associated with hostilities" under this test.  Although at this pretrial stage the government has not yet presented its evidence on the "hostilities" element, the nature of the charges and the public record provide more than sufficient grounds to reject Nashiri's claim of a clear and indisputable right to relief.

> a.      An Armed Conflict Between the United States and Al Qaeda Existed before 9/11

The scale, organized nature, and warlike purpose of al Qaeda's armed attacks on the United States before September 11, 2001, went far beyond the isolated and sporadic violence that is typical of internal disturbances and riots.  As alleged in the charge sheet, Nashiri personally participated in and masterminded several such armed attacks under al Qaeda's direct orders and on its behalf as part of al Qaeda's publicly declared war against the United States.  Al Qaeda was an armed organization that trained and directed its members, including Nashiri and his co-conspirators, to conduct complex, coordinated attacks using military methods and weapons.  See Pet. App. 24-27; 9/11 Commission Report 67.  In particular, al

31

Qaeda carried out operations with large bombs with the destructive power normally used by military forces in war. Those attacks, including the bombing of the U.S. embassies in Kenya and Tanzania (in which Nashiri participated by providing a false passport that one of the attackers used to enter Kenya, see Pet. App. 25), as well as the "boats operation," resulted in thousands of casualties and extensive property damage. Nashiri's carefully planned and successfully executed armed attack on the *U.S.S. Cole*, a military vessel, killed 17 sailors, wounded approximately 40 others, and crippled the ship. Pet. App. 27.

Al Qaeda's attacks were not isolated and sporadic – they were part of a concerted plan to further the group's explicit purpose of carrying out ever more destructive attacks, including using weapons of mass destruction if they could be obtained, fully expecting a military response by the United States. See 9/11 Commission Report 60, 67. And Nashiri's planning of the "boats operation" and the bombing of the *U.S.S. Cole* proceeded simultaneously with the planning of the "planes operation" that culminated in the 9/11 attacks. See Pet. App. 25-27; 9/11 Charge Sheet at 2-4; 9/11 Commission Report 153-69. Thus, Nashiri's participation in al Qaeda's campaign of large-scale attacks, following multiple public declarations of war and with the purpose of creating an armed conflict, is more than sufficient to establish that his conduct was committed in the context of

32

and associated with hostilities.  See Al Bahlul, 820 F. Supp. 2d at 1190 ("[W]e conclude that hostilities rising to the level of armed conflict existed on or before February 1999.").

The United States' response to al Qaeda's armed attacks also demonstrates the existence of an armed conflict before September 11, 2001.  For example, in response to the 1998 embassy bombings, President Clinton ordered U.S. armed forces to conduct missile strikes on al Qaeda training camps in Afghanistan and a suspected chemical weapons facility in Sudan.  See 9/11 Commission Report 116-17.  President Clinton publicly stated that "law enforcement" and "diplomatic tools" were "not enough" to "wage the fight" against al Qaeda.  See President William J. Clinton, Address to the Nation on Military Action Against Terrorist Sites in Afghanistan and Sudan, 2 Pub. Papers 1460, 1461 (Aug. 20, 1998).  President Clinton also publicly invoked the inherent right of self-defense under the United Nations Charter and notified Congress "consistent with the War Powers Resolution" that he had authorized the missile strikes against the terrorist organization's camps and installations.  See President William J. Clinton, Letter to Congressional Leaders Reporting on Military Action Against Terrorist Sites in Afghanistan and Sudan, 2 Pub. Papers 1464 (Aug. 21, 1998).  Moreover, President Clinton authorized additional military operations against al Qaeda based on a

33

determination that the law of armed conflict applied to such operations. 9/11

Commission Report 120-21, 132, 485 n.123. That determination presupposed that

the United States and al Qaeda were at that time engaged in a conflict subject to the

law of war. See 10 U.S.C. § 948a(9) (defining "hostilities" as "any conflict subject

to the laws of war").

    b.  Al Qaeda's Boats Operation Was Part of the Al Qaeda
        Campaign that Led to the 9/11 Attacks and Triggered
        Enactment of the AUMF and the United States' Military
        Response

The pre-9/11 facts are more than sufficient to establish that Nashiri's

participation in al Qaeda's attempted armed attack on the *U.S.S. The Sullivans* and

al Qaeda's completed armed attack on the *U.S.S. Cole* were committed in the

context of and associated with hostilities. That is true even if, as Nashiri contends,

the analysis does not take into account subsequent events, including the 9/11

attacks, the enactment of the AUMF, the resulting U.S. military operations in

Afghanistan and elsewhere against al Qaeda and associated forces, and the MCA's

explicit authorization of military commission jurisdiction for conduct "*before*, on,

or after September 11, 2001." 10 U.S.C. § 948d (emphasis added). But it is far

from "clear and indisputable" that those events are irrelevant.

34

As the USCMCR has recognized, "[c]onduct of the accused that occurs . . . prior to the start of the conflict can still be in the context of and associated with armed conflict as long as it was closely and substantially related to the hostilities that comprised the conflict." Al-Bahlul, 820 F. Supp. 2d at 1190. Nashiri's "boats operation" was not an isolated act unrelated to al Qaeda's other attacks and its larger purpose of prosecuting a war against the United States. Rather, it was part of a continuous campaign of al Qaeda attacks on U.S. targets that indisputably constituted an armed conflict following 9/11 and the enactment of the AUMF, both of which occurred less than a year after the *Cole* bombing. Thus, even assuming (contrary to the facts the government intends to prove at trial) that al Qaeda's campaign did not give rise to an armed conflict until the 9/11 attacks, Nashiri's conduct prior to that date was still "in the context of and associated with hostilities" because Nashiri's operations were an integral part of a larger strategic campaign that was intended to, and ultimately did, lead to a war with the United States. See 9/11 Commission Report 47-70.

Congress expressly provided that hostilities falling within the MCA's scope could predate the terrorist attacks of September 11, 2001, and the ensuing pronouncements by the President and Congress concerning the existence of an armed conflict. See 10 U.S.C. § 948d. Congress's clear statement is inconsistent

35

with Nashiri's view that the existence of hostilities must be established by a formal, contemporaneous statement by the political branches announcing the existence of the hostilities.  Given the plain terms of the governing statute, the military judge's denial of Nashiri's motion did not amount to a "clear abuse of discretion or usurpation of . . . power" warranting a writ of mandamus.  In re Al-Nashiri, 791 F.3d at 82.

### 3.    Nashiri's Remaining Arguments Lack Merit

Nashiri offers a number of additional arguments in support of his claim that his conduct was not committed in the context of and associated with hostilities.  As explained below, all of those arguments depend on the mistaken premise that a formal, contemporaneous pronouncement by Congress or the President that hostilities existed in a particular location is a necessary condition for a finding of "hostilities" under the MCA.

Nashiri contends (Br. 39-41) that the United States did not take any military action in response to the *Cole* attack and that the President suggested it had been a peacetime attack and did not issue any public statement, report consistent with the War Powers Resolution, or other formal pronouncement indicating the existence of an armed conflict.  However, there is no requirement that the government must issue a statement or immediately respond militarily to a specific attack to preserve

36

the possibility of military commission jurisdiction.  The absence of such a requirement is especially clear in the circumstances here because the United States took actions and made public statements in 1998, in response to al Qaeda's embassy attacks, indicating that an armed conflict with al Qaeda already existed.  See Al Bahlul, 820 F. Supp. 2d at 1190 (finding that "hostilities rising to the level of armed conflict existed on or before February 1999").

Within a year of the *Cole* bombing, Congress and the President made the intention of the United States to respond with military force to the 9/11 attacks unmistakably clear with the enactment of the AUMF.  The text of the AUMF looks backward to conduct that occurred on September 11, 2001 and before, authorizing military force against the "organizations, nations, or persons" that the President determines "planned, authorized, committed, or aided" the 9/11 attacks.  Moreover, the President found that it was not the 9/11 attacks alone, but also al Qaeda's previous attacks on U.S. military and diplomatic facilities, that gave rise to a state of armed conflict.  See Military Order of Nov. 13, 2001: Detention, Treatment, and Trial of Certain Non-Citizens in the War Against Terrorism, 66 Fed. Reg. 57833 (finding that al Qaeda had "carried out attacks on United States diplomatic and military personnel and facilities abroad and on citizens and property within the United States on a scale that has created a state of armed conflict").

37

Nashiri (Br. 42) and amici (Brief of Retired Officers 16-19) contend that the government may not recognize an armed conflict retroactively. However, it is often the case that the armed attacks or series of armed attacks giving rise to a conflict occur first, and explicit recognition of the armed conflict by the parties only comes after the fact, if at all. See Prize Cases, 2 Black 635, 668 (1862) (recognizing that initiation of war may precede congressional action). If conduct only occurring *after* the explicit declaration of armed conflict by Congress could be "in the context of and associated with hostilities," the 9/11 attacks themselves would be excluded (since they predated the AUMF), as would the Japanese attacks on Pearl Harbor (since they predated Congress' declaration of war and the United States and Japan had not been engaged in hostilities with each other prior to those attacks). There is no support for Nashiri's contention that the political branches may not "retroactively" recognize, for purposes of military commission jurisdiction, an armed conflict that already existed as a matter of fact. Indeed, the law of war is generally understood to impose restrictions on warring parties even if the war is not declared or if the state of war is not recognized by them. See, e.g., Geneva Convention Relative to the Treatment of Prisoners of War, 6 U.S.T. 3316, T.I.A.S. No. 3364, art. 2 (Aug. 12, 1949). Moreover, any requirement that the United States must *immediately* acknowledge the armed conflict would be particularly impractical

38

in the context of attacks by non-State actors such as al Qaeda, where it may take time for the government to attribute the attack to a particular group and to determine the appropriate responses. See 9/11 Commission Report 193-97 (noting that the Clinton Administration, in considering military strikes against al Qaeda in response to the *Cole* attack, was concerned about the government's initial difficulty in definitively identifying bin Ladin and al Qaeda as responsible for the attack).

The fact that conduct occurring before a formal recognition of hostilities by the President or Congress can still be "in the context of and associated with hostilities" under the MCA does not raise any *ex post facto* issue. The charges against Nashiri allege conduct (including engaging in perfidy by leading the *Cole*'s crew to believe that the attackers were civilians entitled to protection under the law of war, Pet. App. 21) that was well-recognized as punishable in U.S. military commissions at the time the conduct occurred. See 10 U.S.C. § 821. Moreover, an alien unprivileged enemy belligerent who engages in an unlawful attack on a U.S. warship on behalf of al Qaeda, after its leadership has declared war on the United States, and knowing that previous al Qaeda attacks on U.S. targets had triggered a military strike in response, is on notice that the United States may treat his attack as an offense subject to military jurisdiction.

39

Nashiri contends (Br. 27, 36) that, even if hostilities existed between the United States and al Qaeda at the relevant time, such hostilities did not exist in Yemen, which, according to Nashiri, was not then an active "theater" of those hostilities. Nashiri's contention is inconsistent with Ex parte Quirin, 317 U.S. 1 (1942), in which the Supreme Court upheld military commission jurisdiction over Nazi saboteurs whose war crimes were committed *in the United States*, outside the zone of active hostilities. The Court explained that individuals may be "enemy belligerents within the meaning of the . . . law of war" even if "they have not . . . entered the theatre or zone of active military operations." Id. at 37-38. The same is true of the 9/11 attackers, none of whom had engaged in combat operations against U.S. forces on a foreign battlefield or in a theater of active military operations. Nashiri's contention that the MCA applies only to theaters of active combat would require this Court to hold that Congress did not intend to authorize military commission jurisdiction over the 9/11 attacks or future attacks like it.

In any event, it is not "clear and indisputable" that Nashiri's boats operation did not take place in a theater of active military operations, given al Qaeda's focus on attacks in Yemen and elsewhere in the Arabian Peninsula. Nashiri's boats operation contemplated or executed three attacks on U.S. and allied ships in Yemen's ports. Al Qaeda's "Declaration of War" specifically threatened attacks on

40

U.S. military forces that it claimed were occupying the Arabian Peninsula, and al

Qaeda identified driving U.S. military forces out of that area as among its war aims.

See 9/11 Commission Report 47-48.  And al Qaeda planned or supported earlier

attacks on U.S. targets in the Arabian Peninsula, including a bombing attack

targeting U.S. military personnel at a hotel in Aden, Yemen, in 1992.  See id. at 47-

48, 59-60.  Finally, the charges here also allege conduct in Afghanistan, al Qaeda's

base of operations, in addition to Yemen.  Pet. App. 24-27; see Hamdan II, 548 U.S.

at 684 (Thomas, J., dissenting) ("[E]very aspect of the charge, which alleges overt

acts in 'Afghanistan, Pakistan, *Yemen* and other countries' taking place from 1996

to 2001, satisfies the temporal and geographic prerequisites for the exercise of law-

of-war military commission jurisdiction.") (emphasis added).

Nashiri relies on a number of cases, including Baker v. Carr, 369 U.S. 186

(1962), Ludecke v. Watkins, 335 U.S. 160 (1948), The Protector, 79 U.S. 700, 702

(1871), and Al-Bihani v. Obama, 590 F.3d 866, 874-75 (D.C. Cir. 2010), for the

proposition that hostilities can only come into existence through formal action by

Congress or the President.  Although those cases recognize in various contexts that

courts should defer to determinations by the political branches regarding when or

whether hostilities have begun or have ceased, they do not establish that such

formal action, contemporaneous with the conduct, is necessary for the future

41

exercise of military commission jurisdiction where the government proves as a matter of fact that hostilities exist.  Here, deference to the political branches, which recognized that hostilities existed before the 9/11 attacks and which established the hostilities element as a question of fact for the military commission to decide, compels the denial of a writ of mandamus.  See Hamdan II, 548 U.S. at 688 (Thomas, J., dissenting) ("[T]he President's judgment – that the present conflict substantially predates the AUMF, extending at least as far back as al Qaeda's 1996 declaration of war on our Nation, and that the theater of war extends at least as far as the localities of al Qaeda's principal bases of operations – is beyond judicial reproach.").

Finally, the fact that Nashiri's armed attack on the *Cole* was investigated by the FBI and the subject of an indictment in federal district court does not establish that the attack was committed outside the context of hostilities, nor does it otherwise preclude Nashiri's prosecution by military commission.  First, as noted above, the government simultaneously considered military operations, in addition to an FBI terrorism investigation, in response to the *Cole* attack.  Moreover, the government has prosecuted in federal court unprivileged enemy belligerents for conduct that was indisputably committed in the context of hostilities.  See, e.g., United States v. Lindh, 212 F. Supp. 2d 541 (E.D. Va. 2002); United States v.

42

Hamidullin, No. 3:14-CR-140, 2015 WL 4241397 (E.D. Va. July 13, 2015).  There

is no constitutional or statutory principle that undercuts that practice.  Thus, while

there are criminal statutes that may be used for prosecuting alien unprivileged

enemy belligerents who commit terrorist attacks in the context of hostilities,

nothing in those statutes or in the Constitution precludes prosecution of such

persons under the MCA.  The determination whether the exercise of military

authority rather than criminal law-enforcement authority against an alien

unprivileged enemy belligerent is appropriate in a particular case is a classic

executive determination that may turn on numerous national security

considerations.

C.    Nashiri Cannot Show That the Writ Is Appropriate under the Circumstances

Nashiri has failed to demonstrate any other reasons for this Court to exercise

its discretion and to award him mandamus relief.  Mandamus review is particularly

unwarranted given the pretrial posture of this case.  The military commission judge

denied Nashiri's motion *without prejudice* because, as the military judge

recognized, the question whether the offenses were committed in the context of and

associated with hostilities depends on the facts and circumstances, which in turn

will be informed by the evidence that the parties present at trial.  It is inappropriate

43

for this Court to review the question now because that evidence has not yet been presented. Nashiri remains free to renew his motion before the military commission at the appropriate time and to contend that the government's evidence is insufficient to establish the hostilities element. And if Nashiri is convicted, he could renew those claims to the convening authority and in the USCMCR, which is specifically empowered to "determine controverted questions of fact" (such as the existence of hostilities), to "weigh the evidence," and to "judge the credibility of witnesses." 10 U.S.C. § 950f(d). There is no reason for this Court to preempt that process now. Doing so would short-circuit the extensive review process contemplated by Congress, see 10 U.S.C. § 950g(b) (requiring an accused to waive or exhaust "all other appeals under this chapter" before this Court's review), and fly in the face of the deference Article III courts have traditionally afforded to the military justice system. See, e.g., Quirin, 317 U.S. at 25 (President's wartime decisions involving military commissions "are not to be set aside . . . without the clear conviction that they are in conflict with the Constitution or laws of Congress").

II.    The District Court Properly Abstained from Exercising Jurisdiction over Nashiri's Habeas Petition

With mandamus unavailable, Nashiri seeks another type of extraordinary writ – habeas corpus – to obtain the same end. Significantly, Nashiri's self-styled

44

habeas petition does not challenge the fact, place, duration, or conditions of his confinement.  At no point does he allege that he is not detainable as an enemy belligerent under the AUMF, as informed by the law of war.  Instead – like his mandamus petition – Nashiri's habeas petition attempts to halt his ongoing prosecution before a military commission, convened by the Executive Branch with express authorization by Congress, on the theory that the commission lacks authority over the crimes he committed.  Deciding this claim on the merits now would undermine the considerations of comity underlying the settled rule that courts must defer to the judgment of the political branches about how crimes such as Nashiri's should be tried and must refrain from interference with ongoing military commission proceedings.  The district court correctly abstained from Nashiri's case.

     A.     Considerations of Comity Counsel in Favor of Abstention

     1.  Courts do not lightly "intrud[e] on the integrity of military court processes."  Schlesinger v. Councilman, 420 U.S. 738, 761 (1975); see New v. Cohen, 129 F.3d 639, 642-43 (D.C. Cir. 1997).  As the Supreme Court explained in Councilman, "considerations of comity" bar federal courts from exercising their equitable powers to enjoin ongoing military proceedings that occur within "an integrated system of military courts and review procedures, a critical element of

45

which is [a court] consisting of civilian judges completely removed from all military influence or persuasion." 420 U.S. at 756-58 (internal quotation marks omitted). "[I]mplicit" in such a scheme "is the view that the military court system generally is adequate to and responsibly will perform its assigned task," which includes protecting defendants' rights. Id. at 758. Permitting a habeas court to interfere with that system would disrupt the balance struck by the political branches between two "competing interests": "military necessities" on the one hand and "fairness" to individuals "charged with military offenses" on the other. Id. at 757-58.

Those considerations apply with full force to the system of military commissions created under the Military Commissions Act. The MCA establishes an "integrated system of military courts and review procedures" as robust as the system of courts-martial at issue in Councilman. The military commission system exists to balance countervailing interests implicated by an "important incident to the conduct of war": the task of "seiz[ing] . . . and disciplin[ing] . . . enemies who in their attempt to thwart or impede our military effort have violated the law of war." Quirin, 317 U.S. at 28-29; see 10 U.S.C. § 948a et seq. And Nashiri's prosecution before a military commission reflects the judgment of both Congress and the Executive as to the forum in which such offenses should be tried. See 10 U.S.C.

46

§ 948h.  The deference courts owe such express and unanimous judgments, see

Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 635-38 (1952) (Jackson,

J., concurring), underscores the peril of disrupting the process this express and

unanimous judgment has created.

Furthermore, the MCA provides for review by "civilian judges completely

removed from all military influence or persuasion," Councilman, 420 U.S. at 758,

as this Court has "exclusive jurisdiction to determine the validity of a final

judgment rendered by a military commission" and to review all "matters of law,

including the sufficiency of the evidence to support the verdict," 10 U.S.C.

§ 950g(a), (d).  The MCA therefore establishes a military court system where

reviewing bodies enjoy "structural insulation from military influence."  Compare

Hamdan II, 548 U.S. at 587-88 (declining to apply abstention principles when

"review bodies clearly lack . . . structural insulation from military influence").  The

presence of this "critical element" in the MCA reinforces the presumption that the

Act's integrated system "generally is adequate to and responsibly will perform its

assigned task" while vindicating defendants' rights.  Councilman, 420 U.S. at 758.

The judgment of the political branches on this score "must be respected"; thus, "the

federal district courts must refrain from intervention, by way of injunction or

otherwise."  Id.

47

2.  The application of these abstention principles to the claim Nashiri seeks to maintain in the habeas action is clear.  Nashiri does not merely seek to litigate a case presenting issues that overlap with the military commission proceedings against him.  He seeks to litigate issues identical to those presented to the military commission and requests a district court order enjoining the ongoing proceedings.  His petition thus interferes directly with the careful balance set by Congress and the Executive Branch.  In these circumstances, the comity considerations recognized in Councilman are at their peak.

Indeed, abstention is especially appropriate when, as here, the underlying merits issue presents a question of law and fact.  Nashiri's district court filings raise just one claim: that the terrorist attacks he committed did not occur in the context of a conflict subject to the laws of war.  See Pet. App. 2-14; Dkt. 235 at 18-19 n.10.  As the government pointed out before the military commission, Nashiri's argument may require further factual development into questions such as whether the hostilities with al Qaeda involve separate geographical conflicts or one global conflict against a transnational enemy.  Pet. App. 77-82.  And the military commission rejected Nashiri's argument on the ground that it presented a mixed question of law and fact which a fact-finder must resolve after a complete presentation of evidence.  See Pet. App. 87.

48

The fact-intensive underpinnings of Nashiri's claims highlight the importance of adhering to the "integrated system" the MCA created. Congress has empowered the military commission, the convening authority, and the USCMCR with authority to hear such claims before they reach this Court. Should this Court preempt the military commission process to decide Nashiri's claim now, it would do so without factual development and without the benefit of those tribunals' "singularly relevant" expertise to render "judgments indispensable to . . . any eventual review in Art[icle] III courts." Councilman, 420 U.S. at 760. The military officers assigned as members of the commissions possess particular expertise in resolving the fact-bound jurisdictional issue presented here – examining the extent to which an armed conflict existed and whether Nashiri's actions were committed in the context of and associated with those hostilities. Those are precisely the sorts of questions that should be addressed by the military commission process in the first instance. Moreover, Congress expressly assigned to military commissions the responsibility to "make a finding sufficient for jurisdiction." 10 U.S.C. § 948d. The relief sought by Nashiri would circumvent that fact-finding function by military officer experts.

Finally, this Court's preemption of the military commission process would contravene Congress's express desire to empower military tribunals to decide such

49

claims in the first instance – a congressional prescription to which this Court must "give due respect." New, 129 F.3d at 645; Councilman, 420 U.S. at 758. These prudential reasons further counsel in favor of affirming the district court's decision to apply Councilman abstention here.

B.     The Contrary Arguments Advanced by Nashiri and Amicus Curiae Lack Merit

Nashiri and amicus curiae National Institute of Military Justice (NIMJ) raise five arguments in response. All lack merit.

1.  Nashiri claims that the district court abused its discretion when it abstained from exercising jurisdiction over his supplemental habeas petition without first deciding whether he was entitled to preliminary injunctive relief. This argument misunderstands the role abstention serves: to prevent one tribunal from issuing a decision that would "undu[ly] interfere[]" with ongoing proceedings in a different tribunal. See Sprint Commc'ns, Inc. v. Jacobs, 134 S. Ct. 584, 588 (2013). Had the district court decided Nashiri's preliminary-injunction motion on the merits, its decision would have occasioned the precise sort of interference the Councilman doctrine was designed to prevent. Nashiri's theory – that the district court was required to address the merits of his motion despite Councilman's applicability – leaves no room for abstention at all.

50

The cases Nashiri cites afford him no support.  One case simply explains that a district court cannot avoid the merits by applying an abstention doctrine inappropriately.  Privitera v. Cal. Bd. of Med. Quality Assur., 926 F.2d 890, 894 (9th Cir. 1991).  The other case does not involve abstention at all.  See Procter & Gamble Co. v. Kraft Foods Global, Inc., 549 F.3d 842 (Fed. Cir. 2008).

2.  The contention of Nashiri and amicus that Councilman is inapplicable to military commissions because enemy belligerents are not members of the U.S. armed forces reflects an unduly narrow view of Councilman abstention.  Although Councilman itself involved a court-martial proceeding brought against a member of the armed forces, the decision did not turn on that distinction.  Rather, the decision turned on concepts fully applicable here: the deference owed to coordinate branches of government and the need to maintain a system consistent with military necessity.  Councilman, 420 U.S. at 757 (emphasizing that courts should be loath to disrupt proceedings conducted against the backdrop of "military necessities").  A system established by Congress and the Executive to disable, deter, and punish alien unprivileged enemy belligerents merits just as much (if not more) deference as a system of military discipline for military servicemembers.

It is therefore not surprising that the Supreme Court expressly left open "the possibility that abstention may be appropriate in some cases [where a detainee]

51

seek[s] review of ongoing military commission proceedings." Hamdan II, 548 U.S. at 590.   Moreover, every court to examine Councilman's applicability to an ongoing military commission proceeding under the MCA – including both district courts in this litigation – has refused to distinguish Councilman on the basis argued by Nashiri.  To the contrary, each court abstained from interfering with an ongoing commission proceeding solely on the basis of the respect that must be afforded to the joint decision of the political branches in this context.  See Dkt. 251 at 5-9; Al-Nashiri I, 2012 WL 1642306, at *11; see also Khadr v. Obama, 724 F. Supp. 2d 61, 64-70 (D.D.C. 2010); Khadr v. Bush, 587 F. Supp. 2d 225, 230-34 (D.D.C. 2008); Hamdan v. Gates, 565 F. Supp. 2d 130, 136-37 (D.D.C. 2008).

Amicus incorrectly suggests (NIMJ Br. 14-15) that Councilman abstention applies only to an integrated system that is "wholly separate" from the civilian courts.  Under that theory this Court's jurisdiction to review military commission decisions on appeal renders Councilman inapplicable.  But amicus cannot identify, and we have not found, any authority for this novel interpretation of Councilman abstention.  That is because one of the "critical element[s]" compelling abstention is not the complete separation between Article III courts and the "integrated system" of military courts created by Congress, but the existence within that "integrated system" of a tribunal "consisting of civilian judges 'completely removed from all

52

military influence or persuasion.'"  420 U.S. at 757-58.  This Court is just as

removed from "military influence or persuasion" as the Court of Appeals for the

Armed Forces, whose review authority Councilman relied upon to justify

abstention.  See Hamdan II, 548 U.S. at 587-88 (explaining that "the Court of

Appeals for the Armed Forces" enjoys "structural insulation from military

influence").  The "structural insulation" provided by this Court's appellate authority

underscores why abstention is appropriate.

This Court's practice further undermines amicus's contention.  Eight years

after Councilman, Congress granted the Supreme Court authority to review certain

decisions originating in the courts-martial system, eliminating the jurisdictional

separation between that system and Article III.  See 28 U.S.C. § 1259.

Nevertheless, this Court continues to abstain from deciding questions at issue in

ongoing courts-martial proceedings when warranted, even though the court-martial

system is no longer "wholly separate" from the civilian courts.  See, e.g., New, 129

F.3d at 641.

3.  Nor does the fact that this Court reviews both military commission rulings

and appeals from habeas actions render Councilman inapplicable.  See NIMJ

Br. 15.  Amicus wrongly suggests that this Court's review authority eliminates any

"danger of inconsistent judgments."  The potential that multiple district courts

53

might reach different conclusions on a host of procedural and substantive issues,

coupled with simultaneous military commission proceedings against multiple

defendants, creates uncertainty about the orderly progression of all military

commission proceedings.  Moreover, to the extent the issues raised turn on the

facts, different tribunals may reach different conclusions based upon the evidence

presented in their particular cases.  This Court's power to settle conflicts concerning

legal issues does not eliminate the "wholly needless" friction between military

tribunals and Article III courts that a patchwork system of interlocutory review

would produce.  See Gusik v. Schilder, 340 U.S. 128, 132 (1950).

Moreover, the fact that a reviewing court will eventually pass on issues from

both tribunals does not provide a basis for district courts to superintend military

commission proceedings as they occur.  "The general rule that a federal court must

await the final outcome . . . in the military justice system before entertaining an

action" by the subject of military proceedings lies "[a]t the heart of" the comity

principles articulated in Councilman.  See New, 129 F.3d at 642.  The Military

Commissions Act requires the military commission, the convening authority, and

the USCMCR to hear Nashiri's claim before this Court reaches it.  Preempting that

process would mean that district courts in habeas cases would act without the

benefit of such expertise.

4. The assertion of amicus that <u>Councilman</u> does not apply because Nashiri challenges the military commission's jurisdiction to try him (NIMJ Br. 18-20) fares no better. Far from establishing a rule that abstention is inappropriate whenever jurisdiction is challenged, <u>Councilman</u> merely recognized a narrow exception "when there is a substantial question whether a military tribunal has personal jurisdiction over the defendant." <u>Hamdan II</u>, 548 U.S. at 585 n.16. That exception "turn[s] on the status of the persons as to whom the military asserted its power," <u>Councilman</u>, 420 U.S. at 759, rather than on the tribunal's subject-matter jurisdiction.

Nashiri's action does not fall within this narrow personal-jurisdiction exception. At no point does he contend that the military commission lacks personal jurisdiction over him and therefore that he is not subject to trial. <u>See</u> 10 U.S.C. § 948c ("Any alien unprivileged enemy belligerent is subject to trial by military commission as set forth in this chapter."). Nashiri alleges only that his charged offenses are not triable by military commission because "none of [his crimes] relate to events that occurred 'in the context of and were associated with hostilities.'" Pet. App. 12. Thus, Nashiri's claim is closely analogous to the claim at issue in <u>Councilman</u>. There, the habeas petitioner argued that he had been charged with offenses that were not "service connected," <u>Councilman</u>, 420 U.S. at 741-42, which

55

at the time was a prerequisite for the offenses to be "triable by a military court," Relford v. Commandant, 401 U.S. 355, 367 (1971). The Supreme Court held that the petitioner's challenge did not qualify for the personal-jurisdiction exception because the military court could exercise jurisdiction over him. Councilman, 420 U.S. at 758-60. Because Nashiri is an "alien unprivileged enemy belligerent" who is challenging only the "nexus to hostilities" requirement, his challenge does not qualify for the personal-jurisdiction exception either.

Amicus resists this conclusion by citing a litany of cases, all but one of which Councilman explicitly distinguished – as the Councilman dissenters observed, see 420 U.S. at 763 (Brennan, J., dissenting), and as amicus itself concedes, see NIMJ Br. 22 ("[T]he exemplar cases cited by the Councilman Court in support of the exception to abstention . . . involved suits by civilians seeking to challenge Congress's constitutional authority to subject *them* to trial by court-martial."). The last case amicus cites – Dynes v. Hoover, 61 U.S. (20 How.) 65 (1857) – does not address the personal-jurisdiction exception at all. Dynes explains that federal courts may generally exercise subject-matter jurisdiction to grant collateral relief from the consequences of "illegal" or "irresponsible" court-martial judgments. See Councilman, 420 U.S. at 747-48 & n.16 (discussing Dynes's limited holding). As Councilman noted, the holding in Dynes has nothing to do with the question of

56

whether comity considerations require federal courts to abstain from exercising jurisdiction they may lawfully assert.  Id. at 753-54.

5.  As noted above, the military commission system reflects the considered judgment of Congress and the Executive concerning the best approach for adjudicating certain offenses allegedly committed by alien unprivileged enemy belligerents, manifesting a careful balance between military preparedness and fairness.  Councilman, 420 U.S. at 757-58.  The judgment of both coordinate branches of government is entitled to significant respect.

Amicus nonetheless suggests (NIMJ Br. 16-18) that this Court should not respect the balance struck by Congress and the Executive here.  But amicus provides no reasoned basis upon which to abandon Councilman's command to "assume[]" that the "military court system generally is adequate to and responsibly will perform" its tasks.  420 U.S. at 758.  Amicus' contention that this Court's reversal of aspects of one military commission decision, see Al Bahlul, 767 F.3d at 27-31, is hardly sufficient to support the proposition that military commission proceedings in general are somehow unworthy of respect.  Indeed, the Military Commissions Act affords multiple layers of procedural protections to defendants, and amicus is wrong to suggest that rulings are not made in favor of defendants.

57

See, e.g., In re Al-Nashiri, 791 F.3d at 75 (noting that the military judge dismissed all charges and specifications arising out of Nashiri's attack on the *MV Limburg*).

III.    Nashiri Is Not Entitled to Injunctive Relief

Because Councilman fully supports the district court's decision to deny Nashiri's preliminary-injunction motion as moot, this Court need not decide whether Nashiri is entitled to injunctive relief.  In any event, the district court's ruling should be affirmed for the additional reason that Nashiri cannot demonstrate any entitlement to injunctive relief.

Preliminary injunctions are "never awarded as of right."  Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 22, 24 (2008).  Rather, the party requesting that "extraordinary remedy" must make a "clear showing" along four familiar lines: "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  Id. at 20-24.  If a petitioner cannot show a likelihood of success on the merits, this Court need not reach the other three factors.  Greater New Orleans Fair Hous. Action Ctr. v. U.S. Dep't of Hous. & Urban Dev., 639 F.3d 1078, 1089 (D.C. Cir. 2011).  Nashiri's motion fails in all respects.

58

A.   <u>Nashiri Is Unlikely to Succeed on the Merits of the Action Underlying His Preliminary-Injunction Motion Because His Claim Is Barred by 28 U.S.C. § 2241(e)(2)</u>

Section 2241(e)(2) limits the jurisdiction of the federal courts over actions by detainees such as Nashiri to claims of "the sort that may be raised in a federal habeas petition under section 2241." <u>Aamer v. Obama</u>, 742 F.3d 1023, 1030 (D.C. Cir. 2014). A detainee who does not allege a "proper claim for habeas relief" may not invoke the subject-matter jurisdiction of the federal courts. <u>Kiyemba</u>, 561 F.3d at 513. Because Nashiri's claim does not sound in habeas, it constitutes "an action other than habeas corpus barred by section 2241(e)(2)." <u>See</u> <u>Aamer</u>, 742 F.3d at 1030; <u>Al-Nashiri II</u>, 741 F.3d at 1007 (explaining that Section 2241(e)(2) "plainly" barred Nashiri's identical claims).

The habeas petitioner's "essential claim is that his custody in some way violates the law." <u>Aamer</u>, 742 F.3d at 1036. At its core, the writ allows a petitioner to challenge the fact, place, or duration of his confinement. <u>Preiser v. Rodriguez</u>, 411 U.S. 475, 486 (1973). This Court has held that the writ allows a petitioner to challenge certain conditions of his confinement as well. <u>Aamer</u>, 742 F.3d at 1038. However, none of Nashiri's district court filings has anything to do with any aspect of his confinement.

59

As the government pointed out to the district court, Nashiri has not contested the legality of his detention.  Nor has Nashiri at any point asserted that he ought to be detained in a different facility, that he ought to be detained in a different fashion, or that he ought to be released on a different timetable.  His filings advance only one argument: that the military commission lacks subject-matter jurisdiction over the crimes with which he has been charged.  And the relief he seeks – an injunction preventing the government from trying him before a military commission, a declaration that his crimes were not committed in the context of an armed conflict, and a writ of mandamus directing the government to dissolve the military commission convened to try him – plainly does not sound in habeas.

Nashiri does not explain how a ruling on his claim that the military commission lacks the authority to try him for the alleged offenses affects the government's authority to detain him under the laws of war.  Nashiri's detention is non-punitive and is authorized by the 2001 AUMF, which authorizes the detention of persons who were part of or substantially supported al Qaeda, the Taliban, or associated forces for the duration of hostilities.  See Pub. L. No. 107-40, § 2(a), 115 Stat. 224 (2001); Al-Adahi v. Obama, 613 F.3d 1102, 1103 (D.C. Cir. 2010).  Thus, a decision granting Nashiri all of the relief he seeks here would not affect his detention in any way.

60

Because 28 U.S.C. § 2241(e)(2) prevents the district court from exercising jurisdiction over Nashiri's habeas petition, Nashiri cannot succeed on the merits of his case. He is therefore not entitled to a preliminary injunction. Indeed, the fact that the district court lacks subject-matter jurisdiction over Nashiri's supplemental habeas action supports affirming the district court's ruling even if this Court ultimately concludes that Councilman abstention is inapposite.

B.     Nashiri Cannot Demonstrate that He Will Suffer Irreparable Injury if Preliminary Injunctive Relief Is Denied

Nashiri's preliminary-injunction motion also fails for the independent reason that he cannot identify any irreparable injury he will suffer if military commission proceedings continue.

As explained above (see Part I.A.), the burdens of litigation are normally insufficient to establish the irreparable-injury prerequisite to mandamus relief. In re Al-Nashiri, 791 F.3d at 80-81. Similarly, the burdens of litigation are not enough to preclude abstention, despite the fact that the "inevitable injury . . . incident to any criminal prosecution" is "often of serious proportions." Councilman, 420 U.S. at 754; see Hennis v. Hemlick, 666 F.3d 270, 280 (4th Cir. 2012) (rejecting the argument that a "death sentence implicates an extraordinary circumstance mandating federal court intervention under Councilman"). Nor is the possibility of

61

a capital sentence sufficient to justify disregarding exhaustion requirements in habeas proceedings.  Fay v. Noia, 372 U.S. 391, 439-40 (1963), abrogated on other grounds by Coleman v. Thompson, 501 U.S. 772 (1991); cf. Foster v. Kassulke, 898 F.2d 1144, 1145-46 (6th Cir. 1990) (abstaining from an ongoing appeal of death-penalty convictions under Younger v. Harris, 401 U.S. 37 (1971)).  Because the burden of defending oneself against capital criminal charges does not constitute "irreparable injury" for the purposes of mandamus, abstention, or habeas, that burden likewise does not constitute "irreparable injury" for the purposes of a preliminary injunction, since, as Nashiri recognizes, the standards are materially identical.

Finally, neither the balance of equities nor the public interest favors an injunction.  Enjoining the military commission proceedings here would thwart congressional intent, deprive reviewing courts of the expertise of the military commission, and unduly interfere with an ongoing military commission prosecution.  "There is no substantial public interest at stake in this case that distinguishes it from the multitude of criminal cases for which post-judgment review of procedural and jurisdictional decisions has been found effective."  Khadr v. United States, 529 F.3d 1112, 1118 (D.C. Cir. 2008) (denying a request for interlocutory review to address a challenge to a military commission's jurisdiction).

62

<u>CONCLUSION</u>

For the foregoing reasons, the petition for a writ of mandamus and

prohibition should be denied, and the judgment of the district court should be

affirmed.

Respectfully submitted,

MARK S. MARTINS                                  JOHN P. CARLIN
Brigadier General, U.S. Army                     Assistant Attorney General
Chief Prosecutor of Military Commissions         for National Security
                                                 J. BRADFORD WIEGMANN
BENJAMIN C. MIZER                                Deputy Assistant Attorney General
Principal Deputy Assistant                       STEVEN M. DUNNE
Attorney General                                 Chief, Appellate Unit
MATTHEW M. COLLETTE                              JOHN F. DE PUE
SONIA K. McNEIL                                  JOSEPH F. PALMER
MICHAEL SHIH                                     Attorneys
Attorneys, Appellate Staff                       National Security Division
Civil Division                                   U.S. Department of Justice
U.S. Department of Justice                       Washington, DC 20530
Washington, DC 20530

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

this brief contains 13,727 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Circuit Rule 32(a)(1).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because:

this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14 point font size and Times New Roman type style.

DATED: December 28, 2015                    /s/ Joseph Palmer
                                            Joseph Palmer
                                            Attorney for the United States

## CERTIFICATE OF SERVICE

U.S. Court of Appeals Docket Numbers 15-1023, 15-5020.

I hereby certify that I electronically filed the foregoing Brief for the United States with the Clerk of the Court for the United States Court of Appeals for the D.C. Circuit by using the appellate CM/ECF system on December 28, 2015.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

DATED: December 28, 2015                     /s/ Joseph Palmer
                                             Joseph Palmer
                                             Attorney for the United States

## STATUTORY ADDENDUM

Except for the following, all applicable statutes, etc., are contained in the Brief for Petitioner.

## CONTENTS

Military Commissions Act of 2009, Pub. L. No. 111-84,
        123 Stat. 2574 .........................................................................................2a

        § 948c.........................................................................................................2a

        § 948d .......................................................................................................2a

        § 950b(c) ...................................................................................................2a

        § 950c.........................................................................................................3a

        § 950f(d) ...................................................................................................4a

10 U.S.C. § 821 .................................................................................................4a

**Military Commissions Act of 2009, Pub. L. No. 111-84, 123 Stat. 2574**

**§ 948c. Persons subject to military commissions**

Any alien unprivileged enemy belligerent is subject to trial by military commission as set forth in this chapter.

**§ 948d. Jurisdiction of military commissions**

A military commission under this chapter shall have jurisdiction to try persons subject to this chapter for any offense made punishable by this chapter, sections 904 and 906 of this title (articles 104 and 106 of the Uniform Code of Military Justice), or the law of war, whether such offense was committed before, on, or after September 11, 2001, and may, under such limitations as the President may prescribe, adjudge any punishment not forbidden by this chapter, including the penalty of death when specifically authorized under this chapter. A military commission is a competent tribunal to make a finding sufficient for jurisdiction.

**§ 950b. Review by the convening authority**

. . .
(c) Action by convening authority.—
(1) The authority under this subsection to modify the findings and sentence of a military commission under this chapter is a matter of the sole discretion and prerogative of the convening authority.
(2) The convening authority is not required to take action on the findings of a military commission under this chapter. If the convening authority takes action on the findings, the convening authority may, in the sole discretion of the convening authority, only--
(A) dismiss any charge or specification by setting aside a finding of guilty thereto; or
(B) change a finding of guilty to a charge to a finding of guilty to an offense that is a lesser included offense of the offense stated in the charge.
(3)(A) The convening authority shall take action on the sentence of a military commission under this chapter.
(B) Subject to regulations prescribed by the Secretary of Defense, action under this paragraph may be taken only after consideration of any matters submitted by the accused under subsection (b) or after the time for submitting such matters expires,

2a

whichever is earlier.

(C) In taking action under this paragraph, the convening authority may, in the sole discretion of the convening authority, approve, disapprove, commute, or suspend the sentence in whole or in part. The convening authority may not increase a sentence beyond that which is found by the military commission.

(4) The convening authority shall serve on the accused or on defense counsel notice of any action taken by the convening authority under this subsection.

## § 950c. Appellate referral; waiver or withdrawal of appeal

(a) Automatic referral for appellate review.--Except as provided in subsection (b), in each case in which the final decision of a military commission under this chapter (as approved by the convening authority) includes a finding of guilty, the convening authority shall refer the case to the United States Court of Military Commission Review. Any such referral shall be made in accordance with procedures prescribed under regulations of the Secretary.

(b) Waiver of right of review.--(1) Except in a case in which the sentence as approved under section 950b of this title extends to death, an accused may file with the convening authority a statement expressly waiving the right of the accused to appellate review by the United States Court of Military Commission Review under section 950f of this title of the final decision of the military commission under this chapter.

(2) A waiver under paragraph (1) shall be signed by both the accused and a defense counsel.

(3) A waiver under paragraph (1) must be filed, if at all, within 10 days after notice of the action is served on the accused or on defense counsel under section 950b(c)(4) of this title. The convening authority, for good cause, may extend the period for such filing by not more than 30 days.

(c) Withdrawal of appeal.--Except in a case in which the sentence as approved under section 950b of this title extends to death, the accused may withdraw an appeal at any time.

(d) Effect of waiver or withdrawal.--A waiver of the right to appellate review or the withdrawal of an appeal under this section bars review under section 950f of this title.

## § 950f. Review by United States Court of Military Commission Review

. . .

(d) Standard and scope of review. -- In a case reviewed by the Court under this section, the Court may act only with respect to the findings and sentence as approved by the convening authority. The Court may affirm only such findings of guilty, and the sentence or such part or amount of the sentence, as the Court finds correct in law and fact and determines, on the basis of the entire record, should be approved. In considering the record, the Court may weigh the evidence, judge the credibility of witnesses, and determine controverted questions of fact, recognizing that the military commission saw and heard the witnesses.

## 10 U.S.C. § 821. Art. 21. Jurisdiction of courts-martial not exclusive

The provisions of this chapter conferring jurisdiction upon courts-martial do not deprive military commissions, provost courts, or other military tribunals of concurrent jurisdiction with respect to offenders or offenses that by statute or by the law of war may be tried by military commissions, provost courts, or other military tribunals. This section does not apply to a military commission established under chapter 47A of this title.