```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------- X
UNITED STATES OF            :
AMERICA                     :
                            :        12 Cr. 0134 (BMC)
- against –                 :
                            :
                            :
ADNAN IBRAHIM               :
HARUN A HAUSA,              :
a.k.a. Spin Ghul            :
a.k.a. Esbin Gol a.k.a.     :
Isbungoul a.k.a. Abu        :
Tamim a.k.a. Joseph         :
Johnson a.k.a. Mortala      :
Mohamed Adam,               :
         Defendant.         :
-------------------------------------------------- X
```

## REPLY IN SUPPORT OF DEFENSE MOTION TO DISMISS COUNT TWO FOR LACK OF JURISDICTION

This memorandum is submitted in reply to the Government's opposition to Defendant HAUSA's motion to dismiss Count Two of the Indictment (charging conspiracy to bomb a United States government facility in violation of 18 U.S.C. §2332f(a)), on the ground that, as set forth in 18 U.S.C.§2332f(d)(1), the district court does not have jurisdiction.

18 U.S.C. § 2332(f)(d)(1) is one of *three* "Exemptions to jurisdiction" enumerated in section 2332f(d).  Subsection (d) provides:

This section does not apply to—

(1) the activities of armed forces during an armed conflict, as those terms are understood under the law of war, which are governed by that law,

(2) activities undertaken by military forces of a state in the exercise of their official duties; **or**

(3) offenses committed within the United States, where the alleged offender and the victims are United States citizens and the alleged offender is found in the United States, or where jurisdiction is predicated solely on the nationality of the victims

or the alleged offender and the offense has no substantial effect on interstate or foreign commerce.

The prosecution argues that the exemption to jurisdiction set forth in 18 U.S.C. §2332f(d)**(1)** is mere surplusage, and asks this Court to ignore "the well-known canon of statutory construction that a statute should not be construed to render a word or clause inoperative," *United States v. Peterson,* 394 F.3d 98, 106 (2d Cir. 2005), *United States v. Menasche*, 348 U.S. 528, 538-9 (1955).  Further, they argue that subsection (d)**(1)** has no meaning independent of the exemption to jurisdiction set forth in subsection (d)**(2).** Thus, according to the Government, the jurisdiction exemption under 2332f(d)(1) "appears coterminous with the principle of combatant immunity" and applies only to the activities of "military forces of States" – the very activities Congress exempted from jurisdiction in subsection (d)(2). Inexplicably, the Government makes no mention of subsection (d)(2).  Nor does it attempt to offer any way in which the activities covered by subsection (d)(1) differ from, or would not be included among, the activities covered by subsection (d)(2).

The Government's assertion that these two clauses have an identical meaning ignores the wording and grammatical structure of the statute and asks the Court to conclude that Congress included two clauses in the same statute which have the same meaning but use different language – a statutory interpretation that defies logic, the rules of statutory construction, and common sense.  And, in support of this illogical analysis, the Government fails to point to any legislative report accompanying §2332f (enacted in 2002) that supports its reading of the terms or applicability of subsection (d)(1).  Rather, it relies on a snippet of the preamble of the International Convention for the Suppression of Terrorist Bombings (adopted by the General Assembly of the UN in 1997, and obliging its signatories to criminalize certain acts such as those subsequently covered by § 2332f) noting that certain acts are outside the framework of the Convention.

The referenced preamble portion does indeed refer to "the activities of military forces of States." However, the government misses the larger and seemingly inescapable argument – that the actual terms of Article 19, section 2 of the Convention are not so limited:  Like §2332f(d), the Convention specifically exempts not only "activities undertaken by military forces of a State in the exercise of their official duties" *but also* "activities of armed forces during an armed conflict." For the Court to accept the Government's analysis, it would have to ignore the plain language of Article 19 section 2, which makes clear that "activities of armed forces during an armed conflict" *are not the same as* "activities undertaken by military forces of a State" by stating that each is subject to a different set of rules of international law.

2

Thus, Article 19, section 2 of the Terrorist Bombings Convention provides (emphasis added):

> The activities of armed forces during an armed conflict, as those are understood under *international humanitarian law, which are governed by that law*, are not governed by this Convention, *and* the activities undertaken by military forces of a State in the exercise of their official duties, inasmuch as they are *governed by other rules of international law*, are not governed by this Convention.

Significantly, the legislative history leading to Congress's ratification of the Convention also makes plain the understanding of both the Executive and Congress that, as used in Article 19 section 2, "activities of armed forces during an armed conflict" and "activities undertaken by military forces of a state in the exercise of their official duties" were "different concepts." See Senate Report attached as Exhibit 3 to Government's opposition (ecf 268), at 19, 50.

When Congress ratified the Convention, it did so with an express "understanding" with regard to the term "international humanitarian law" as used in Article 19 of the Convention in connection with, and as governing, the "activities of armed forces during an armed conflict." Congress understood that "international humanitarian law" "has the same substantive meaning as the law of war." Congress then used the term "law of war" in 18 U.S.C. § 2332f(d)(1) without otherwise defining or delimiting "law of war" in the statute. Nor did it limit or explain how "the activities of armed forces during an armed conflict" are understood under or governed by the "law of war" other than to clarify in §2332f(e)(11) that the term "armed conflict" "does not include internal disturbances and tensions, such as riots, isolated and sporadic acts of violence, and other acts of a similar nature."

As is evident in the June 2015 "Department of Defense Law Of War Manual" prepared by the Office of General Counsel (https://www.defense.gov/Portals/1/Documents/DoD_Law_of_War_Manual-June_2015_Updated_May_2016.pdf) (the most comprehensive Government document explaining law of war principles we could find, discussed in our motion to dismiss (ecf 251, pp. 5-6) but not addressed by the Government in its opposition), "law of war" reflects a complex, evolving and dynamic set of laws, rules and norms. (See also, the 650-page tome by Sandesh Sivakumaran, *The Law of Non-International Armed Conflict,* Oxford University Press, 2012).

In defendant's motion to dismiss, we pointed to the House Report accompanying H.R. 3275, wherein it was "anticipated that courts, when interpreting and applying Subsection (d), will solicit the views of the Executive Branch *on whether the activities at issue were conducted by armed forces during armed conflict, as those terms are understood under the law of war*…" (Emphasis added.) In our moving papers, we then set forth numerous expressions by the Executive Branch that the United States was

3

engaged in an armed conflict with al Qaeda forces such that its activities were governed by international law of war principles.[1] The Government points to nothing in the vast "law of war" arena to counter this, or to substantiate its view that, during the period charged in Count Two, the activities at issue either were not understood under the "law of war" to be activities of "armed forces," or committed during an "armed conflict," or that such activities are not governed by the law of war. To the extent that there is uncertainty about the meaning of these terms, the statute directs the Court to the "law of war" to resolve the ambiguity. What the Court must determine is how the terms used in the statute are understood under the laws of war, which is exactly what the defense provided in our earlier submission, and which went unchallenged in the prosecution's opposition memorandum. The Government offers no "law of war" argument to rebut the defense position as to how these terms are used and understood under the laws of war. Rather, it boldly claims, without foundation, that the method of statutory interpretation specifically commanded by the statute is "intrinsically unsound". (Gov't Response at 9)

Instead, the prosecution posits, again without benefit of any authority for this proposition, that the "law of war" governs only "lawful combatants". This posture is in direct opposition to the position our country has consistently embraced. As discussed in our initial motion: since 9/11, the Government has repeatedly applied the "law of war" to justify its detention of al Qaeda members as "unprivileged enemy belligerents" and its prosecution of them for their activities in military tribunals in Guantanamo.

DoD's manual clearly states: a State may exercise "both sovereign and belligerent rights over non-State armed groups," and, therefore, "a State [*if it so chooses*] may prosecute individuals for participating in hostilities against it." While "a non-State actor may lack any legal privilege or immunity from prosecution by a State that is engaged in hostilities against that group," this has no bearing on the questions at issue here – whether, under the law enacted by Congress, the activities of the defendant charged in Count Two were exempt from criminal prosecution because they were the "activities of armed forces during an armed conflict, as those terms are understood under the law of war;" if so, the "law of war" governs the situation, not §2332f.

---

[1] §2332(d)(1) does not identify any particular forces or any particular conflicts. This makes sense given the changing nature of forces and the changing nature of conflicts, and this also explains why Congress, when it enacted §2332(d), contemplated that the court would solicit the views of the Executive as to the current state of affairs. It may be that in 1997 (when the Terrorist Bombing Convention was written), the actions of al Qaeda were deemed "isolated and sporadic acts of violence, and other acts of a similar nature." But after 9/11, the Government began to view al Qaeda differently. Since late 2001 (and certainly during 2003-2005, the period charged in Count Two of the indictment), the Government has characterized our global interactions with al Qaeda as an armed conflict with armed forces subject to the laws of war.

4

The law of war is drawn from both treaty law and customary law, and the DoD manual is unambiguous: "The law of war applicable in a non-international armed conflict is binding upon all parties to the armed conflict, including State armed forces and non-State armed groups." The applicability of the law of war to an armed force during an armed conflict does not depend on the force's formal acceptance of law of war principles, its signature on a treaty, or whether it is entitled to immunity from criminal prosecution. (§§ 17.4.1, 17.4.1.1, 17.2.4, pp. 1022, 1025) See also Sivakumaran, *ibid,* at 241 ("the law of armed conflict binds not only states but individuals. Indeed, it has been noted that the `entire law of war is based on the assumption that its commands are binding not only upon States but also upon their nationals, whether members of their armed forces or not.'") (Footnotes omitted.)

The prosecution proffers selected comments of Executive Branch officials urging Congress's ratification of both the Terrorist Bombings Convention as well as the separate and the similarly structured International Convention for Suppression of Acts of Nuclear Terrorism.[2] They then draw on these selections to support the contention that the "*raison d'etre"* of both Conventions and the implementing legislation was to criminalize the activities of terrorist groups like al Qaeda and "to provide criminal penalties in federal district courts." It argues that defendant's construction of §2332f(d)(1) is "absurd" because, if the exemption in §2332f(d)(1) applies to al Qaeda, al Qaeda members would be effectively given a "safe harbor." Notwithstanding the existence of Guantanamo Bay Prison, and our Government's frequent contention that the "law of war" allows for the detention and prosecution of al Qaeda members in military tribunals there, the Government argues that, if the exemption in §2332f(d)(1) applies, al Qaeda members would escape all sanction because "many nations would object to adjudications in military commissions and thus oppose the extradition of al Qaeda terrorists to the United States if exclusive jurisdiction was vested in Guantanamo Bay, Cuba."

---

[2] The Government quoted testimony by a State Department official offered at a hearing in 2008 on the International Convention for Suppression of Acts of Nuclear Terrorism (ecf # 268, at 10). Attributing her response to a "review of our lawyer", the official posited, essentially, that only "State armed forces" are covered by the exclusion for "activities of armed forces during an armed conflict," and it would not apply to "an organization like al Qaeda." As she put it, al Qaeda is not an "armed force" "in the general sense of international understanding" because they do not wear uniforms and are not "visible as an armed force" and "they do not respect international treaties that define the limitations of what is an armed force." (Govt. Ex. 4, at 28-29) Notably, she neither referred to the "law of war" nor cited any authority, and Congress did not incorporate this position (or anything related to it) as an explicit "understanding" when it gave its consent to the Nuclear Terrorism Convention or in connection with the subsequently enacted statute.

Case 1:12-cr-00134-BMC-MDG   Document 274   Filed 04/19/17   Page 6 of 8 PageID #: 6330

This "safe harbor" rhetoric is a red herring: to the extent any nation would oppose extradition of an alleged "al Qaeda terrorist" involved in the bombing of public places for adjudication in a military tribunal, the Government has a robust supply of other criminal charges from which it can choose to insure that there will be a trial in a federal district court. Instead of charging under § 2332f, which specifically exempts from federal court jurisdiction "the activities of armed forces during an armed conflict, as those terms are understood under the law of war," the Government can – and often does – bring multiple material support charges under 18 U.S.C. § 2339B – as it has in this case. Further, it has at its disposal other criminal statutes that, unlike §2332f, do not contain such an express exemption from federal district court jurisdiction. Indeed, according to a 2006 study, suspected terrorists had been prosecuted in the U.S. for 104 different criminal offenses. *See* Ctr. On Law & Sec., Terrorist Trial: Report Card: U.S. Edition 3 (Karen J. Greenberg et al eds., 2006) *available at* http://lawandsecurity.org/publications/TTRCComplete.pdf

The only support the Government offers for its "many-nations-would-object-to-military-commissions-and-oppose-extradition" claim, is a 2011 article in the Journal of National Security Law & Policy, by David S. Kris, former Assistant Attorney General for National Security at the Department of Justice (hereinafter "Kris"). This article makes only a passing footnote reference to § 2332f as one of many in a list of criminal statutes with extraterritorial jurisdiction, though it makes no reference to §2332f(d), the "exemptions" to such jurisdiction at issue here. Rather, the article is an explanation of Mr. Kris's opposition to legislation enacted a decade after §2332f that prohibits the use of federal funds to transfer to the United States any individual currently detained at Guantanamo. (*See* The Ike Skelton National Defense Authorization Act for Fiscal Year 2011, H.R. 6523, 111th Cong. §1032, enacted as Publ. L. No. 111-383 (Jan. 7, 2011).)

As Mr. Kris notes, the purpose of the legislation he writes about "was to prevent the prosecution of these [Guantanamo] detainees in federal court in the United States." As such, the legislation "was part of a broader public debate about the role of law enforcement as a counterterrorism tool," with some arguing that the criminal justice system should *never* be used against terrorists, others arguing that law enforcement is the *only* legitimate way to the detain terrorists, and others, like Mr. Kris, rejecting these binary positions and arguing that "we should continue to use all of the military, law enforcement, intelligence, diplomatic, and economic tools at our disposal" to counter terrorism.

Mr. Kris reviews three counterterrorism tools – "civilian law enforcement, military commissions, and law of war detention" -- and concludes, "Each has its strengths and weaknesses, and whether it is *legally appropriate* and strategically wise to use any tool in a particular case depends on the circumstances of that case." (Kris, at 71; emphasis added.) If anything, Mr. Kris's article shows there is nothing "absurd" about defendant's reading of §2332f(d)(1), or that, with respect to certain activities, Congress may have expressed its policy preference for dealing with al Qaeda under the law of war paradigm

-- either on the battlefield or as detainees in Guantanamo -- rather than in civilian courts.

The Government's reliance on Kris is misplaced. Kris does not discuss the exemptions to jurisdiction set forth in §2332f(d), and, therefore, takes no position on whether or not it is "legally appropriate" to try an al Qaeda member for a violation of §2332f in civilian courts, a determination that requires an examination and specialized understanding of law of war terms and principles. However, far from suggesting that our reading of §2332f(d)(1) is unsupported or that "al Qaeda terrorists" would be given a "safe harbor" if the exemption applies, Mr. Kris notes (1) "we are at war" against al Qaeda; (2) "the government interprets the 2001 AUMF, as informed by law-of-war principles, as authorizing detention of those who are part of, or who substantially support, Taliban, al Qaeda, or associated forces that are engaged in hostilities against the United States or its coalition partners;" and (3) so long as a defendant is deemed an unprivileged enemy belligerent "under the law of war" with the requisite connection to al Qaeda, he can be tried by a military commission. (See Kris, at p. 12 n. 44; p. 40, n. 114; pp. 55-58 & nn. 153, 156) (citing and quoting, *Al Bihani v. Obama*, 590 F.3d 866, 872 (D.C. Cir. 2010); *Hamily v. Obama*, 616 F. Supp. 2d 63, 75 n. 17 (D.D.C. 2009); *Bensayah v. Obama,* 610 F.3d 718, 725 (D.C. Cir. 2010); and 10 U.S.C. § 948c).[3]

Subsection 2332f(d)(1) dictates that, if the activities in question are activities of armed forces during an armed conflict, as those terms are understood under the law of war, then the law of war governs those activities and the district court does not have jurisdiction to apply §2332f. The burden of establishing this court's jurisdiction is with the government. See *United States v. Mitchell-Hunter*, 663 F.3d 45, 51 n. 8 (1st Cir. 2011). Inflammatory rhetoric is not a substitute for a careful presentation of how the terms "armed forces" and "armed conflict" used in §2332f(d)(1) are understood under the law of war.

Here, there can be no credible challenge that Harun's actions were "activities of armed forces during an armed conflict." Indeed, there was considerable testimony by a series of government witnesses at trial, elicited repeatedly by the prosecution team, describing in unmistakable and incontrovertible detail an armed conflict between the U.S. and al Qaeda, and that al Qaeda conducted military activities. To this end, the government offered abundant evidence through testimony and exhibits that Harun was directed by the military chain of command of al Qaeda to conduct military activities against the U.S. and U.S. interests in Africa. Specifically, the Government offered a letter that it argued was authored by Harun's al Qaeda military commander. Govt. Exhibit 23-H. The letter stated in pertinent part, "This is what I want you to focus on during the upcoming phase: Preparing for a military action at your end. This military

---

[3] As for the concern that certain nations may oppose extradition or limit cooperation unless the defendant is tried in civilian court, Mr. Kris cites several examples where the United States, in order to obtain extradition of terrorism suspects, gave assurances against the use of military commission, and, ultimately, charged the defendant with providing material support to al Qaeda.

7

action requires a few important necessities that must be available to get the job done." TR. at 761.

In addition to Harun's own sworn statements in Italy acknowledging his involvement with al Qaeda as an armed militant or soldier, he was also described as a military recruit by the government's own al Qaeda expert Evan Kohlman. TR. at 585. During his testimony, Kohlman made several references to the military nature of Harun's activities and described how these activities were part of the larger ongoing armed conflict. TR. at 585 -623.   Specifically, Kohlman testfied that Abdul Wakil, with whom Harun conspired, was a "military leader" and a "frontline fighter and commander", who was issuing orders to Harun.  TR. at 600. And, on cross examination by Mr. Dratel, Mr. Kohlman testified that another co-conspirator, Abu Hadi al-Iraqi, was responsible for maintaining open lines of communication between al Qaeda and the Taliban, specifically with regard to "military operations" against United States forces and military personnel. TR at 622-623. Even the parade of military witnesses called during the Government's case-in-chief described Al Qaeda fighters in strictly military terms.  For example, Command Sergeant Major Brian Severino described how U.S. soldiers "engaged with enemy forces." TR. at 467.  If the Government's al Qaeda expert and its own military witnesses consider al Qaeda fighters to be members of "armed forces" engaging in military activities, it seems disingenuous for the prosecution to argue otherwise.

Consequently, the Government has failed to offer any support for its position. Accordingly, we respectfully submit that the Government has not met its burden of establishing jurisdiction here, and, therefore, Count Two must be dismissed.

                                                  Respectfully submitted,

                                                  Susan G. Kellman
                                                  Joshua L. Dratel
                                                  David Stern

cc: All counsel