```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------  X
                                                              :
UNITED STATES OF AMERICA                                      :
                                                              :
                    - against -                               :   **MEMORANDUM**
                                                              :   **DECISION AND ORDER**
ADNAN IBRAHIM HARUN A HAUSA,                                  :
a.k.a. Spin Ghul                                              :
a.k.a. Esbin Gol                                              :   12 Cr. 0134 (BMC)
a.k.a. Isbungoul                                              :
a.k.a. Abu Tamim                                              :
a.k.a. Joseph Johnson                                         :
a.k.a. Mortala Mohamed Adam,                                  :
                                                              :
                              Defendant.                      :
------------------------------------------------------------  X
```

**COGAN**, District Judge.

Before the Court are two motions by defendant – one motion to dismiss for lack of jurisdiction, or in the alternative for acquittal, as to Count Two of the Indictment and one motion for a judgment of acquittal, pursuant to Federal Rule of Criminal Procedure 29(a), as to Counts One (or to dismiss the Indictment as to this Count, in the alternative), Three, Four, and Six. For the reasons that follow, defendant's motions are denied.

## BACKGROUND

As set forth in the Indictment and as the Government proved at trial, defendant Ibrahim Suleiman Adnan Adam Harun was an al Qaeda operative. He traveled to Afghanistan and joined al Qaeda in the weeks before September 11, 2001. Thereafter, he received training at two al Qaeda training camps, participated in attacks on U.S. and Coalition troops in Afghanistan, one of which left two American soldiers dead and resulted in serious injury to others, and conspired to attack U.S. facilities in Africa as part of an external operations assignment.

Harun confessed to these acts during a number of interviews, the last several of which were Mirandized interviews with representatives from the U.S. Attorney's Office for the Eastern District of New York. Specifically, during the Mirandized interviews, Harun recounted his path to *jihad*, stating that approximately two weeks prior to September 11, 2001, he had traveled to Afghanistan for the purpose of joining a *jihadist* fighting group so that he could fight in Chechnya or elsewhere. He described attending two training camps and crossing the border from Pakistan to attack American and Coalition forces stationed in Afghanistan.

Harun specifically described attacks against the American forces at Forward Operating Base ("FOB") Shkin in Afghanistan, in either 2002 or 2003, acts which form the basis of some of the Counts charged in the Indictment. Harun stated that he believed that one or more Americans were wounded during one such attack and that he either saw or heard a vehicle drive away with a wounded soldier. He recounted throwing a grenade that exploded directly between two soldiers and stated that he was certain that both men were injured or killed by the grenade.

Harun recounted conversations with certain al Qaeda leaders, including one with the head of al Qaeda's external operations, where Harun expressed his desire to engage in attacks against Americans outside of Afghanistan. Harun was thereafter assigned to carry out such an attack and traveled to Nigeria, where he sought out a suitable target for a terrorist attack. He said that he wanted to focus on targeting offices and buildings belonging to the United States, including the U.S. Embassy in Abuja and other American and Western diplomatic facilities. He also stated that the inspiration for such an attack was the U.S. embassy bombings in Nairobi, Kenya, and Dar es Salaam, Tanzania.

During his time in Nigeria, Harun was exchanging letters with al Qaeda leader Hamza Rabia through a courier named Mohamed Ashafa. Ashafa traveled back and forth between

2

Hamza Rabia in Pakistan and Harun in Nigeria, but in 2004, Ashafa was caught by the Pakistanis as he attempted to leave the country. After Ashafa's arrest, Hamza Rabia contacted Harun by telephone and told him to leave Nigeria immediately. Harun fled to Niger, but he traveled back and forth to Nigeria at times to communicate with Hamza Rabia by email.

After his plans were disrupted in Nigeria, Harun ultimately made his way through Niger to Libya with the ultimate goal of reaching Europe to carry out terrorist attacks against Western targets there. However, in January 2005, Harun was captured in Libya and held in Libyan custody until June 2011, near the time of the fall of former Libyan leader Muammar Qaddafi's regime, at which time he was released onto a refugee ship bound for Italy.

The ship onto which Harun was placed, the Excelsior, was an Italian ship bound for Taranto, Italy. While on board, Harun declared that he was a member of al Qaeda, assaulted Italian police officers, was arrested, and thereafter charged in Italian criminal court. As part of the Italian criminal process, Harun was interviewed on several occasions in Italy, including (i) on June 24, 2011, by Italian police officers onboard the Excelsior; (ii) on June 25, 2011, by Italian officials in the presence of a defense attorney in Agrigento, Italy; (iii) on June 27, 2011, in an Agrigento court before a preliminary investigative judge and with a defense attorney; (iv) on July 25, 2011, by Italian law enforcement in the presence of two defense attorneys; and (v) on August 24, 2011, by Italian officials in the presence of a defense attorney. Thereafter, in September 2011, pursuant to a Mutual Legal Assistance Treaty request to the Italian government, representatives of the U.S. Government traveled to Agrigento to interview Harun and the Italian law enforcement officers involved in the case. These latter interviews of Harun, which are the <u>Mirandized</u> interviews during which Harun recounted his acts, took place on September 14, 15, and 16, 2011.

Harun was later extradited to the United States and indicted in 2012. The Government charged Harun with conspiring to murder U.S. Nationals, in violation of 18 U.S.C. §§ 1111(a) and 2332(b)(2) (Count One); conspiring to attack a U.S. government facility, in violation of 18 U.S.C. § 2332f(a) (Count Two); conspiring to provide material support to al Qaeda, in violation of 18 U.S.C. § 2339B (Count Three); providing and attempting to provide material support to al Qaeda, in violation of 18 U.S.C. § 2339B (Count Four); using firearms in furtherance of one or more crimes of violence, in violation of 18 U.S.C. § 924(c) (Count Five); and using and carrying an explosive to commit one or more felonies, in violation of 18 U.S.C. § 844(h) (Count Six).

This Court presided over his trial in March 2017, during which time the Government presented evidence of the foregoing events, including the taped audio from the September 14, 15, and 16, 2011 <u>Mirandized</u> interviews. But the Government did not rest on the taped confessions alone; rather, the Government presented detailed testimonial, forensic, and documentary evidence that corroborated many of defendant's own statements during the <u>Mirandized</u> interviews. This additional evidence included the testimony of the Italian counterterrorism officer for the Guardia di Finanza who arrested defendant aboard the Excelsior and to whom Harun declared he was an al Qaeda fighter. In addition, the Government presented testimony from the Deputy Commissioner of the Italian State Police and a then-lieutenant in the Carabinieri Corps who were also aboard the Excelsior, who also interviewed Harun and whom Harun assaulted.

The Government also presented testimony from the translator who interpreted Hausa, Harun's native language, for the Italians, as well as the Special Agent with the FBI's Joint Terrorism Task Force, who was responsible for the investigation into Harun. Through the FBI Special Agent, a host of documentary evidence was authenticated and admitted, including

materials related to captured courier Mohamed Ashafa. With respect to the charged crimes arising from Harun's attack on FOB Shkin, the Government presented compelling testimony from several U.S. Army soldiers who defended against the attack and who either suffered their own injuries as a result or witnessed the deaths and injuries of several members of their Army company. This sometimes emotional and moving testimony offered details that, in numerous respects, precisely corroborated Harun's description of the attack in his own <u>Mirandized</u> statements.

The Government also corroborated Harun's statements through the testimony of several individuals who took part in certain raids on al Qaeda safehouses or who were involved in the evidence collection and analysis arising from those raids. The evidence presented through these individuals corroborated Harun's association with al Qaeda. The Government further presented documentary evidence, including communications between Harun and Hamza Rabia, done through aliases, and material corroborating the location and training content taught at the two training camps Harun attended.

At the close of the evidence, the Government gave its closing argument and defendant declined to present one. The jury returned a verdict of guilty on Counts One, Two, Three, Four, and Six.[1]

## DISCUSSION

### I. <u>Motion to Dismiss Count One, or Alternatively for Acquittal, on Count One</u>

Defendant moves this Court, pursuant to Federal Rule of Criminal Procedure 12(b)(2), to dismiss Count One or, in the alternative, to acquit him of the charge because, as he contends, the Government failed to present proof beyond a reasonable doubt that an objective of the

---

[1] The Government did not include Count Five in the Indictment presented to the jury.

5

conspiracy alleged under 18 U.S.C. § 2332(b)(2) included the murder of U.S. nationals "within the special maritime and territorial jurisdiction of the U.S." The Court denies defendant's motion as to Count One for several reasons.

First, the Court rejects defendant's argument that § 2332(b)(2) has no extraterritorial application. In support of his argument, defendant parses the extant case law to argue that, while courts, including the Second Circuit in United States v. Al Kassar, 660 F.3d 108, 117-18 (2d Cir. 2011), have found § 2332(b) to apply extraterritorially, the same cannot be said of § 2332(b)(2).

Section 2332(b) provides as follows:

> Whoever outside the United States attempts to kill, or engages in a conspiracy to kill, a national of the United States shall (1) in the case of an attempt to commit a killing that is a murder as defined in this chapter, be fined under this title or imprisoned not more than 20 years, or both; and (2) in the case of a conspiracy by two or more persons to commit a killing that is a murder as defined in section 1111(a) of this title, if one or more of such persons do any overt act to effect the object of the conspiracy, be fined under this title or imprisoned for any term of years or for life, or both so fined and imprisoned.

18 U.S.C. § 2332(b). In the first instance, defendant argues that the Court should distinguish § 2332(b)(1), which applies extraterritorially, from § 2332(b)(2), which he argues does not. There is no basis for this reading.

The linchpin of defendant's argument is his contention that the reference to § 1111(a) limits the jurisdiction for a conspiracy charged under § 2332(b)(2). This is incorrect. Section 1111(a), as referenced in § 2332(b)(2), defines murder as "the unlawful killing of a human being with malice aforethought." Section 1111(a) itself imposes no jurisdictional limitation whatsoever. Thus, § 2332(b)(2) captures the conduct that defendant was charged with and convicted of at trial. He was "outside the United States" and engaged "in a conspiracy to kill a national of the United States" that is a "murder as defined in section 1111(a)." See also Al

Kassar, 660 F.3d at 117-18 (holding that 18 U.S.C. § 2332(b) contains "explicit provisions applying them extraterritorially").

Defendant attacks this fairly unremarkable reading by arguing that § 1111(b) "restricts the application of § 1111 to murders occurring '[w]ithin the special maritime and territorial jurisdiction of the United States.'" There is no basis for this argument either. First, the complete text of § 1111(b) effects no such jurisdictional limitation; rather, it sets outs the penalties *if* a murder is committed within the special maritime and territorial jurisdiction of the United States. In particular, § 1111(b) states:

> Within the special maritime and territorial jurisdiction of the United States,
>
> > Whoever is guilty of murder in the first degree shall be punished by death or by imprisonment for life;
> >
> > Whoever is guilty of murder in the second degree, shall be imprisoned for any term of years or for life.

18 U.S.C. § 1111(b). Nothing about § 1111(b) suggests that it limits § 1111(a).

What is most fatal to defendant's argument is the baseline that § 1111 is the "generic federal murder statute." United States v. Bruno, 383 F.3d 65, 92 n.23 (2d Cir. 2004), as amended (Oct. 6, 2016); see also United States v. Antelope, 430 U.S. 641, 643 n.3 (1977) ("Title 18 U.S.C. § 1111 is the federal murder statute."). The general applicability of § 1111 to murder is made clear on review of any sample of the cases that charge § 1111(a) as a substantive offense. See, e.g., United States v. Thomas, 34 F.3d 44, 48 (2d Cir. 1994); United States v. Gonzalez, 922 F.2d 1044, 1048 (2d Cir. 1991); United States v. Puff, 211 F.2d 171, 173 (2d Cir. 1954); United States v. Ashburn, No. 11-CR-303, 2015 WL 5098607, at *1 (E.D.N.Y. Aug. 31, 2015).[2]

---

[2] I respectfully disagree with United States v. Bin Laden, 92 F. Supp. 2d 189, 204 (S.D.N.Y. 2000), in which the district court held that, "Section 1111(b) specifies the penalties for each of these two types of murder, and limits the

Stated simply, § 1111(b) effects no jurisdictional limitation whatsoever on § 1111(a). Moreover, numerous statutes reference the definition of murder in § 1111 when criminalizing conduct. See, e.g., 18 U.S.C. § 36 (murder during the commission of a major drug offense); 18 U.S.C. § 924 (gun murders during federal crimes of violence and drug trafficking crimes); 18 U.S.C. § 1114 (murder of federal law enforcement officials); 18 U.S.C. § 1118 (murder by a federal prisoner); 18 U.S.C. § 1120 (murder by escaped prisoners). To impute § 1111(b)'s "special maritime and territorial jurisdiction of the United States" to any of these statutes would render these provisions essentially inoperable.

Although a summary order, the Second Circuit has rejected attempts to impute the jurisdictional condition in § 1111(b) when the substantive crime charged references the definition of murder in § 1111(a) only. In United States v. Lee, 660 F. App'x 8, 16 (2d Cir. 2016), the Second Circuit rejected defendant's argument that "the district court lacked jurisdiction over the counts charging him with violating 18 U.S.C. § 924(j)(1) and (2), because the murders did not take place within the 'special maritime and territorial jurisdiction of the United States,' as defined in 18 U.S.C. § 1111(b)." Rather, as the Second Circuit held, "§ 924(j) 'incorporates only the definition of murder' set out in § 1111(a), not the jurisdictional basis set out in § 1111(b)." Id. at 17 (quoting United States v. Young, 248 F.3d 260, 275 (4th Cir. 2001)). Moreover, the Court held that "§ 924(j) sets forth its own independent jurisdictional basis," id., which is exactly what § 2332(b)(2) does by criminalizing conduct "outside the United States."

---

reach of Section 1111 to murders committed '[w]ithin the special maritime and territorial jurisdiction of the United States.'" (citation omitted). Nothing in subsequent law or the legislative history of § 1111 evinces any such limitation or intent to impose such a limitation.

Thus, because the Second Circuit has already held in Al Kassar that § 2332(b) applies extraterritorially[3] and because defendant's arguments for limiting that application are meritless, the Court denies defendant's motion to dismiss Count One. This holding also requires denial of defendant's motion for acquittal, which is based on the argument that the Government "failed to present sufficient evidence that the charged conspiracy" targeted U.S. nationals in the "special maritime and territorial jurisdiction of the United States."

The Court additionally rejects defendant's argument that the Government had no authority to pursue Count One because the Government did not secure a certification under § 2332(d) from the Attorney General. The Government provided this certification as part of its opposition to the instant motion, and this provision defeats defendant's argument.

Section 2332(d) provides a limitation on federal prosecution by requiring the following:

> No prosecution for any offense described in this section shall be undertaken by the United States except on written certification of the Attorney General or the highest ranking subordinate of the Attorney General with responsibility for criminal prosecutions that, in the judgment of the certifying official, such offense was intended to coerce, intimidate, or retaliate against a government or a civilian population.

18 U.S.C. § 2332(d).[4]  As held in United States v. Siddiqui, 699 F.3d 690, 699-700 (2d Cir. 2012), a § 2332(d) certification is timely made if it is made on the date of the indictment. Here,

---

[3] The Court need not reach defendant's arguments regarding the presumption against extraterritoriality, as enunciated in, *inter alia*, Morrison v. National Australia Bank Ltd., 561 U.S. 247, 255 (2010), and Kiobel v. Royal Dutch Petroleum Co., 133 S. Ct. 1659, 1664 (2013), as these cases do not change the analysis in the face of well-settled law and the fact that the statutes at issue "contain a clear indication of Congress's intent to provide for extraterritorial application or relate to crimes against the United States government." United States v. Vilar, 729 F.3d 62, 73 (2d Cir. 2013). Moreover, the Second Circuit decided Al Kassar after Morrison, and the Second Circuit confirmed that its holding was still good law in Vilar. See Vilar, 729 F.3d at 73 ("In Al Kassar, we considered the extraterritorial application of four counts of conviction that relied on statutes with 'explicit provisions applying them extraterritorially,' and one count for 'conspiracy to kill U.S. officers or employees,' which we held applies extraterritorially in light of 'the nature of the offense – protecting U.S. personnel from harm when acting in their official capacity.'" (internal citations omitted)).

[4] Nothing in § 2332(d) requires the Government to provide defendant with this certification as part of discovery or prior to trial.

the certification was provided by then-Deputy Attorney General of the United States, James M. Cole, on February 21, 2012, the date that the operative Indictment was returned in this case.[5]

To the extent defendant's argument is that the Government's failure to provide the certification at trial means that the Government did not meet its burden, I reject that argument. As the Second Circuit held in United States v. Yousef, 327 F.3d 56, 116-18 (2d Cir. 2003), the § 2332(d) certification requirement is not an element of the offense and a jury does need to find this fact to convict a defendant.

**II.     Motion to Dismiss Count Two for Lack of Jurisdiction**

Defendant contends that the Court lacks jurisdiction over the alleged crime – conspiracy to bomb a U.S. Government facility in violation of 18 U.S.C. § 2332f. There is no merit to this argument either.

Defendant's argument in support of his motion to dismiss is that § 2332f provides certain "exemptions to jurisdiction," one of which he contends applies to his particular conduct. The plain language of the statute, congressional intent, and the legislative history all defeat this argument.

Section 2332f(a) states:

(a) (1) In general. – Whoever unlawfully delivers, places, discharges, or detonates an explosive or other lethal device in, into, or against a place of public use, a state or government facility, a public transportation system, or an infrastructure facility –

    (A) with the intent to cause death or serious bodily injury, or

    (B) with the intent to cause extensive destruction of such a place, facility, or system, where such destruction results in or is likely to result in major economic loss,

---

[5] Defendant argues in his reply that the certification is undated; however, that is not true. Although very faint, one can see that the certification bears the glimmers of a stamp, and the Court accepts the Government's proffer that the certification was made on February 21, 2012.

shall be punished as prescribed in subsection (c).

(2) Attempts and conspiracies. – Whoever attempts or conspires to commit an offense under paragraph (1) shall be punished as prescribed in subsection (c).

18 U.S.C. § 2332f(a). Section 2332f(b) sets out the circumstances under which U.S. courts have jurisdiction over the crimes defined in § 2332f(a), and relevant here is where "the offense takes place outside the United States and . . . the offense is committed against a state or government facility of the United States, including an embassy or other diplomatic or consular premises of the United States." 18 U.S.C. § 2332f(b)(2)(E).

Section 2332f, however, provides certain exemptions to jurisdiction, and defendant asserts that he falls under one of the exemptions in subsection (d). Specifically, *inter alia*, § 2332f(d) exempts "the activities of armed forces during an armed conflict, as those terms are understood under the law of war, which are governed by that law." 18 U.S.C. § 2332f(d)(1).[6]

I reject defendant's contention that the subsection shields him from prosecution. Section 2332f is the "implementation legislation" for the International Convention for the Suppression of

---

[6] Prior to trial, defendant proffered testimony from a purported law-of-war expert regarding the applicability of § 2332f(d)(1) to defendant. Defendant wanted to present expert testimony opining that members of al Qaeda constituted an "armed force" engaged in an "armed conflict" within the meaning of 18 U.S.C. § 2332f(d)(1). The Court precluded the testimony, holding that "[d]etermining the applicability of the 18 U.S.C. § 2332f(d)(1) prosecutorial exemption requires the legal interpretation or definition of certain key phrases in the subsection itself, and that is for the Court, not an attorney expert on the law of war, to determine." Relatedly, the Court also had previously ruled that defendant could not invoke the "lawful combatant immunity" defense, which even defendant's expert conceded was inapplicable. The lawful combatant immunity defense forbids the "prosecution of soldiers for their lawful belligerent acts committed during the course of armed conflicts against legitimate military targets." United States v. Hamidullin, 114 F. Supp. 3d 365, 380 (E.D. Va. 2015). For the lawful combatant immunity defense to apply, an organization engaged in an international armed conflict (1) must be "commanded by a person responsible for his subordinates;" (2) must have its members wear "a fixed distinctive emblem or uniform recognizable at a distance;" (3) must "carry[] arms openly;" and (4) must have its members "conduct[] their operations in accordance with the laws and customs of war." Geneva Convention Relative to the Treatment of Prisoners of War art. 4(A)(2), Aug. 12, 1949, 6 U.S.T. 3316, 75 U.N.T.S. 135. With respect to the lawful combatant immunity defense, the Court had ruled that none of the Geneva Convention factors can even be arguably alleged of al Qaeda, which has no leader responsible for its fighters, wears no recognizable uniform or emblem, does not carry its arms openly, and disregards the laws and customs of war. Defendant's instant argument regarding § 2332f(d)(1) implicates several of the same considerations, and as I had previously noted, "[i]t is also a question of law for the Court to determine whether and to what extent the lawful combatant immunity doctrine is mirrored in, or interchangeable with, the exemption in 18 U.S.C. § 2332f(d)(1)."

Terrorist Bombings ("Terrorist Bombings Convention"). See Terrorist Bombings Convention Implementation Act of 2002, Pub. L. 107-197, 116 Stat. 721 (2002). The United States signed this Convention on January 12, 1998, and on September 9, 1999, then-President Clinton submitted a "Letter of Transmittal" with the Terrorist Bombings Convention to the Senate for advice and consent to ratification. This letter stated the following:

> The United States initiated the negotiation of this convention in the aftermath of the June 1996 bombing attack on U.S. military personnel in Dhahran, Saudi Arabia, in which 17 U.S. Air Force personnel were killed as a result of a truck bombing. That attack followed other terrorist attacks including poison gas attacks in Tokyo's subways; bombing attacks by HAMAS in Tel Aviv and Jerusalem; and a bombing attack by the IRA in Manchester, England. Last year's terrorist attacks upon United States embassies in Nairobi and Dar es Salaam are recent examples of such bombings, and no country or region is exempt from the human tragedy and immense costs that result from such criminal acts.

Two of the examples in this Transmittal Letter, the embassy bombings in Nairobi and Dar es Salaam, are exactly the terrorist acts that defendant wanted to emulate in his intended attacks on U.S. facilities in Nigeria.

Notwithstanding the consonance between the criminal offense defined in § 2332f(a) and defendant's own conduct, and the fact that defendant's "inspirations" were among the animating reasons that several nations, including the United States, signed the Terrorist Bombings Convention, defendant argues that he is entitled to the jurisdictional limitation because al Qaeda is an "armed force[]" acting in "an armed conflict, as those terms are understood under the law of war." 18 U.S.C. § 2332f(d)(1).

Although the term "armed conflict" is further defined in the statute as not including "internal disturbances and tensions, such as riots, isolated and sporadic acts of violence, and other acts of a similar nature," 18 U.S.C. § 2332f(e)(11), the term "armed forces" is not therein

defined. Defendant seizes on this absence of a statutory definition to advance a definition of "armed forces" that includes al Qaeda. I reject this proposed definition for several reasons.

First, defendant's argument carves out the very terrorist group responsible for two of the bombings that prompted nations to sign the Terrorist Bombings Convention. Second, statutes should be "interpreted consonant with the provisions of the whole law, and . . . its object and policy." Holloway v. United States, 526 U.S. 1, 9 (1999) (internal quotation marks and citation omitted). When interpreting the terms of a statute, a court should first look to the language of the statute itself, see Mallard v. U.S. Dist. Ct., 490 U.S. 296, 300 (1989), and if the meaning of a statutory term is ambiguous, the court may then resort to canons of statutory interpretation to help resolve the ambiguity, see Auburn Hous. Auth. v. Martinez, 277 F.3d 138, 143 (2d Cir. 2002).

With these principles in mind, the language, policy, and every statutory interpretation canon confirms that the term "armed forces" cannot include al Qaeda. There is no question that Congress enacted the Terrorist Bombings Convention Implementation Act of 2002 to provide federal courts with jurisdiction over bombings committed by al Qaeda specifically, as well as other terrorist organizations. See, e.g., Pub. L. 107-197 ("An Act to implement the International Convention for the Suppression of Terrorist Bombings to strengthen criminal laws relating to attacks on places of public use . . . to combat terrorism and defend the Nation against terrorist acts . . . .").

This conclusion is unavoidable given the fact that, although the United States signed onto the Convention in 1998, the Act did not pass until 2002, after al Qaeda's terrorist attacks against the United States on September 11, 2001. This intervening terrorist attack no doubt would have strengthened Congress's resolve to criminalize terrorist bombings and put them within the

13

purview of federal prosecution. In fact, the U.S. Department of Justice said as much: In a statement to the Senate Foreign Relations Committee, in support of the enactment of 18 U.S.C. § 2332f, the agency said that "events such as the September 11th attacks fall within the coverage of the Terrorist Bombings Convention, as would the 1998 bombings of our embassies in Tanzania and Kenya." S. Rep. No. 107-2, at 25 (2001). The U.S. Department of State's testimony before the Foreign Relations Committee further confirms the understanding that al Qaeda members could be prosecuted under § 2332f:

> We need to make a distinction between the acts of terrorists and acts that occur in a conflict that armed forces normally conduct. Those are not terrorist acts. They are the acts of state military forces, and we want to be sure they are not covered as terrorist acts, and likewise, on the contrary, that the terrorist acts are included even though they might look like the acts of an armed force, but if they are committed by terrorists, isolated acts and so forth, then they are covered. . . . The law of armed conflict would apply in a case where there are hostilities between regular armed forces, the military forces of a state. Terrorist acts are conducted by irregular groups, not recognized armed forces that conduct themselves in accordance with the law of war.
>
> So they are the ones that are subject to terrorism laws and conventions, not to the law of armed conflict.

S. Rep. No. 107-2, at 39. There can be no serious question that al Qaeda attacks were the sort of attacks being criminalized under § 2332f and over which Congress was giving federal courts jurisdiction.

The majority of defendant's argument in support of his definition of "armed forces" includes statements made by U.S. Government officials after enactment in contexts that do not reference § 2332f. For example, defendant points to a speech by then-Legal Advisor to the Department of State, Harold Koh, where, in discussing U.S. detention at Guantanamo, he said that judges "have accepted the overall proposition that individuals who are part of an organized armed group like al Qaeda can be subject to law-of-war detention for the duration of the current conflict . . . ." Defendant is reading into this statement a definition of "armed forces" that is just

14

not there. A government official's extemporaneous reference to "armed group" cannot seriously support augmenting international law norms regarding the definition of "armed forces."

Even looking at defendant's other references to the Government's use of the term "armed force" – for example, in briefing, the Government has said that al Qaeda supporters "are, in short, 'more or less part of the armed force' and subject to the law-of-war detention for the duration of the conflict" – that is not tantamount to a definition that this Court or any court can permissibly use to define the scope of international law norms.

A "fundamental principle of statutory construction (and, indeed, of language itself)" is "that the meaning of a word cannot be determined in isolation, but must be drawn from the context in which it is used." Deal v. United States, 508 U.S. 129, 132 (1993). "In law as in life . . . the same words placed in different contexts, sometimes mean different things." Yates v. United States, 135 S. Ct. 1074, 1082 (2015). Thus, the use of "law of war" and "armed force" in the same sentence does not connote that such usage does or should inform the usage in § 2332f any more than would a reference to the first lines of The Aeneid, with its reference to *arma* (arms) and *bello* (war). Broadly speaking, al Qaeda can be described, in a context untethered to the statute, as an "armed group" or an "armed force" insofar as it is a group or force that carries arms.[7] Moreover, as to the particular excerpts defendant mentions, the context for the reference to "law-of-war principles" is entirely inapposite – they relate to the U.S.'s compliance with the law of war in its detention of al Qaeda prisoners at Guantanamo as enemy combatants, not to al Qaeda's status as a non-"armed force" under the law of war.

---

[7] Although the Court does not rely on post-enactment statements to define a statutory term, it is worth observing that the Executive Branch, in seeking to implement other treaty obligations, has not departed from a definition of "armed force" that excludes al Qaeda. See S. Rep. 110-23, at 28-29 (Sept. 11, 2008) (Hearing on the International Convention for Suppression of Acts of Nuclear Terrorism) ("Certainly if you are looking at al Qaeda . . . this [clause] would not apply to an organization like al-Qaeda. They are neither an armed force in the general sense of international understanding, such as wearing uniforms and being visible as an armed force, and they do not respect the international treaties that define the limitations of what is an armed force. And so, therefore, that exclusion would not apply to an organization like al Qaeda.").

Finally, consistent with the Court's earlier observation as to "whether and to what extent the lawful combatant immunity doctrine is mirrored in, or interchangeable with, the exemption in 18 U.S.C. § 2332f(d)(1)," see fn. 6, *supra*, the Court agrees with the Government that the "jurisdictional exemption under § 2332f(d)(1) appears coterminous with the principle of combatant immunity." To hold otherwise would be to find that Congress "created a safe harbor whereby al Qaeda terrorists, who are not entitled to combatant immunity, escape criminal prosecution under § 2332f(a) by claiming that they are members of 'armed forces' engaged in 'armed conflict' under § 2332f(d)(1)." The absurdity of that proposition is compounded when one considers that defendant's proposed interpretation would shield al Qaeda terrorists from prosecution for bombing conspiracies in a statute enacted to criminalize, *inter alia*, particular al Qaeda bombing conspiracies. See Salinas v. United States, 522 U.S. 52, 59 (1997) ("No rule of construction . . . requires that a penal statute be strained and distorted in order to exclude conduct clearly intended to be within its scope . . . ." (internal quotation marks omitted)).

It is no response that, according to defendant, al Qaeda terrorists who violate § 2332f can always be prosecuted in military commissions at Guantanamo. There is nothing to support that Congress did – or would – cabin Executive discretion over a core decision like where to prosecute in the way defendant suggests. More than that, several nations, who either object to the use of military tribunals or to the use of Guantanamo generally, could refuse to extradite alleged terrorists to the United States for prosecution if military commissions at Guantanamo were the only venue for prosecution. See, e.g., Treaty Between the United States of America and the Federal Republic of Germany Concerning Extradition, U.S.-Ger., art. 13, June 20, 1978, T.I.A.S. No. 9785 (forbidding extradition if the United States intends to try the defendant in an "extraordinary court"); see also David S. Kris, Law Enforcement As A Counterterrorism Tool, 5

J. Nat'l Security L. & Pol'y 1, 68 n.190-91 (2011) (listing examples of instances where, to obtain extradition, the United States had to provide assurances to other countries that the United States would not try the defendants in military commissions, including the extraditions of (1) Oussama Kassir from the Czech Republic, (2-7) Syed Hashmi, Khalid Al Fawwaz, Adel Mohammed Almagid Abdul Bary, Babar Ahmad, and Haroon Rashid Aswat from the United Kingdom, (8) Mahamud Said Omar from the Netherlands, and (9) Nizar Trabelsi from Belgium). In that way, defendant's suggestion is directly contrary to the reality of Executive discretion over prosecutorial decisions, diplomatic considerations, and extradition relationships.

### III.    Sufficiency of the Evidence Regarding Counts One, Three, Four, and Six

Finally, defendant argues that a judgment of acquittal should be entered on Counts One, Three, and Four, because "the government has failed to offer proof of each element beyond a reasonable doubt," and on Count Six, which requires predicate convictions, because of the Government's alleged failure to prove beyond a reasonable doubt the predicate convictions of Counts One, Three, and Four.

Defendant has not engaged in a review of the trial record with any level of specificity in making this argument, and as a result, the Court need not either. It suffices to say that the Government easily met its evidentiary burden, due in large part to the taped <u>Mirandized</u> interviews in September 2011, during which defendant confessed to the Counts charged. The Government also presented a detailed reconstruction of the attack at FOB Shkin, proven by extensive testimony by U.S. military personnel who were ambushed by defendant and his co-conspirators. This, along with defendant's confession, predictably left no doubt at all of defendant's active participation.

The weight of the evidence was so substantial that defendant's appointed counsel – three of the most respected criminal defense attorneys in this district – made the unusual (but understandable and strategic) decision to waive closing argument because any factual defense they articulated in closing could have only sounded incredible. Nothing defendant raises casts any doubt on the Government having met its evidentiary burden.

## CONCLUSION

Defendant's motions to dismiss the Indictment for lack of jurisdiction [251] and for a judgment of acquittal [252] are denied.

**SO ORDERED.**

_____
U.S.D.J.

Dated: Brooklyn, New York
June 27, 2017