

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

MJJ
F. #2011R01313

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

January 5, 2018

<u>By ECF</u>

The Honorable Brian M. Cogan
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

        Re:    United States v. Ibrahim Suleiman Adnan Adam Harun Hausa
               <u>Criminal Docket No. 12-134 (BMC)</u>

Dear Judge Cogan:

        The government respectfully submits this letter enclosing an unsealed, partially redacted copy of its sealed December 25, 2017 sentencing memorandum.  <u>See</u> Dkt. No. 293.

        Respectfully submitted,

        RICHARD P. DONOGHUE
        United States Attorney

By:    <u>/s/ Matthew J. Jacobs</u>
        Matthew J. Jacobs
        Assistant U.S. Attorney
        (718) 254-6401

Enclosure

cc:    Clerk of Court (BMC) (by ECF)
       Defense Counsel (by ECF)



**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

| | |
|---|---|
| RMT:MJJ | *271 Cadman Plaza East* |
| F. #2011R01313 | *Brooklyn, New York 11201* |

December 25, 2017

By ECF and Hand

The Honorable Brian M. Cogan
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    United States v. Ibrahim Suleiman Adnan Adam Harun Hausa
               Criminal Docket No. 12-134 (BMC)

Dear Judge Cogan:

        The defendant is an unrepentant al-Qaeda terrorist who participated in an attack in Afghanistan that left two U.S. soldiers dead and who plotted to murder many more Americans by bombing the U.S. Embassy in Nigeria.  After a two-week jury trial in March 2017, the defendant was convicted of conspiring to murder U.S. nationals, conspiring to bomb a U.S. government facility, and providing material support to al-Qaeda, among other crimes.  He now faces an advisory Guidelines sentence of life imprisonment, and for the reasons set forth below—namely, the need to protect the public from the defendant, the need for his sentence to reflect the seriousness of his crimes, the need to deter others from following in his footsteps, and the need to justly punish him—a sentence of life imprisonment is necessary.[1]

I.      Background

      A.     Al-Qaeda

        Al-Qaeda is a militant Islamist terror organization that was founded in the late 1980s by Osama bin Laden.  In 1999, the U.S. Department of State formally designated al-

---

      [1] The defendant was not charged with death eligible offenses because, as described more fully below, he was extradited from Italy, and Italian authorities would not have permitted his extradition if he were charged with crimes punishable by death.

Qaeda as a foreign terrorist organization.  (Tr. 225; GX303.[2])  In February 1998, al-Qaeda's leadership issued the following worldwide directive:

> In compliance with God's order, we issue the following fatwa to all Muslims: the ruling to kill the Americans and their allies— civilians and military—is an individual duty for every Muslim who can do it in any country in which it is possible to do it.

(Tr. 579.)

In the years following this decree, al-Qaeda carried out numerous large scale attacks against the United States and other Western interests, from its base in Taliban-controlled Afghanistan, including (1) the 1998 bombings of the U.S. Embassies in Kenya and Tanzania, which resulted over 200 deaths and more than 4,000 injuries; (2) the 2000 bombing of the U.S.S. Cole in Yemen, which resulted in scores of casualties; and (3) the September 11, 2001 attacks on the World Trade Center and the Pentagon, which resulted in thousands of deaths.  (Tr. 579-80.)  In October 2001, less than a month after the attacks of September 11, 2001, the United States began formal military action against al-Qaeda and Taliban forces in Afghanistan.

B.    The Defendant Joins Al-Qaeda

The defendant was born in Saudi Arabia to Nigerien and Nigerian parents, and, shortly before September 11, 2001, he traveled from Saudi Arabia to Afghanistan to join a jihadist fighting group.[3]  (31T at 6, 21, 23.[4])  Upon arriving in Afghanistan, the defendant met and embraced members of al-Qaeda, resided at al-Qaeda's *Anibras* guesthouse, and eventually became a member of that terrorist group.  (Tr. 590; 31T at 26.)  The defendant was present at *Anibras* on September 11, 2001, where he heard celebrations as news of al-Qaeda's attacks on the United States spread.  (31T at 27.)

C.    The Defendant's Terrorist Training

In anticipation of an American invasion of Afghanistan, al-Qaeda leaders sent the defendant and other jihadi fighters to various training camps.  (31T at 30.)  The defendant

---

[2] References to "Tr." are to the trial transcript; references to "GX" are to the government's trial exhibits.

[3] The defendant has no known official citizenship.  He claims to be Nigerien, but a representative of the Nigerien government advised that Niger does not consider him to be a citizen.

[4] References to "31T" are to government exhibit 31T, the English language transcript of statements made by the defendant in Agrigento, Italy on September 14, 15 and 16, 2011.

first attended an al-Qaeda training camp known as al-Farouq near the Taliban stronghold of Kandahar, where he learned how to use a variety of battlefield weapons, including Kalashnikov automatic rifles, Uzi machine guns, rocket propelled grenades and hand grenades. (31T at 31.)

The defendant was then sent to two other al-Qaeda training camps—Malik and Camp 9—where he learned additional military skills, including how to use mines, mortars, surface-to-air missiles, and explosives, and underwent instruction in terrain analysis and geography, among other things. (31T at 33-34; GX16T at 18.) Around this time, the defendant received his nom de guerre "Spin Ghul"—a Pashto name meaning "White Rose," which had previously been used by an al-Qaeda member who had been killed and was considered a martyr. (31T at 73.)

In late 2001, the defendant traveled with other al-Qaeda jihadists to Waziristan—a province in the Federally Administered Tribal Areas ("FATA") of Pakistan— where he operated under the overall command of Abdul Hadi al-Iraqi, one of Osama bin Laden's deputies and al-Qaeda's top military commander in Afghanistan at that time.

D.    The April 25, 2003 Ridgeline Ambush

From their base in Waziristan, the defendant and other al-Qaeda fighters participated in attacks on U.S. and Afghan coalition forces operating just across the border in Afghanistan. In April 2003, the defendant and other al-Qaeda fighters launched a series of rocket attacks at a U.S. forward operating base in Shkin, Afghanistan ("FOB Shkin")—a small base manned by approximately one hundred U.S. soldiers located less than five miles from the Afghanistan-Pakistan border.   (Tr. 314, 322; GX127, 268.) The defendant described participating in multiple rocket attacks, explaining that he was "in control of the Katyusha mechanisms." (31T at 38, 42-44.)

Before dawn on April 25, 2003, the defendant and other al-Qaeda fighters crossed the Pakistan-Afghanistan border and headed toward the elevated ridgeline from which they had previously launched Russian-made Katyusha rockets at FOB Shkin. (31T at 46.) At around the same time, officers at FOB Shkin received reports that 10-to-12 individuals had crossed the border near the ridgeline. (Tr. 329.) After receiving these reports, the commanding officer at FOB Shkin, then-Captain Scott Trahan, dispatched helicopters to surveil the area, but the pilots were unable to spot the al-Qaeda fighters. (Tr. 334.) Captain Trahan then led a quick reaction force of approximately 15-to-20 U.S. soldiers, plus allied Afghan forces, to the ridgeline. (Tr. 333, 339.)

After seeing the helicopters come and go, the defendant heard the sound of vehicles coming from the U.S. base. (31T at 60; Tr. 335.) Before U.S. forces arrived at the ridgeline, he and other al-Qaeda fighters positioned themselves on the downslope of the ridgeline. The defendant explained that "[b]ecause we were at a lower position [the approaching U.S. soldiers] couldn't see us." (31T at 57.) Multiple trial witnesses confirmed that al-Qaeda fighters were lying in wait, out of view, on the downslope of the ridgeline. (Tr.

3

338, 369, 397.)  Meanwhile, many other al-Qaeda fighters, armed with heavy machine guns, were positioned on the next hill over.  (Tr. 358.)

When they arrived at the ridgeline, Captain Trahan and several other soldiers got out of their vehicles and walked toward the crest of the ridgeline.  (Tr. 338-39.)  Captain Trahan saw rockets, canteens and burlap bags at the rocket launch site.  (Tr. 339-40.)  That is when the ambush began.

From their positions on the downslope of the ridgeline and on the next hill over, the defendant and other al-Qaeda fighters began firing at the U.S. and Afghan soldiers. The defendant stated that he fired his machine gun at the U.S. soldiers on the ridgeline while yelling "Alahu Akhbar": "We were face to face and I had a direct shot.  That's when I opened my Kalashnikov and started firing at them. . . .  I started shooting at them and yelling "[Allahu Akhbar!]."  (31T at 56-57.)

The defendant also stated that he threw grenades at the U.S. soldiers:  "They [the U.S. soldiers] were low, and I had eight grenades with me, and I started throwing one after the other at them."  (31T at 57.)  The defendant specifically described throwing a grenade at a medic rushing to help a U.S. soldier screaming for help, adding that he was "certain both of them were injured."

There was a black individual . . . a very large individual. . .  I heard him yelling out to his friends. . . .  Then one of his friends came to his position.  So he can come and help him. . . .  He was running.  When he got closer to his friend, he got lower on the ground and started moving with his body.

At that time there was a grenade in my hand. . . .  I could see them and they could see me, we could both see each other, and I took that grenade and threw it at them.  When I threw it, I threw it directly at them, and by the time it got there, it blew up in between them.  At that point I am certain that both of them were injured.

(31T at 58-59.)[5]

---

[5] The defendant's description of the ridgeline ambush mirrored the trial testimony of the soldiers.  For example, the large "black individual" the defendant described above was clearly Sergeant Michiru Brown, who accompanied Captain Trahan to the ridgeline.  Sergeant Brown was shot in the kneecap when he was near the crest of the ridgeline, and he was treated by combat medic David Simmons before being evacuated.  (GX84; Tr. 341, 390, 430.)  In addition, the defendant's description of hearing a soldier calling in mortar fire from the ridgeline (31T at 59, 68) parallels Sergeant First Class Konrad Reed's testimony that he radioed for artillery support in a "clear" and "loud" voice as he stood near the ridgeline crest.  (Tr. 367.)  Likewise,

Two U.S. servicemen were killed in the ambush.  Airman First Class Raymond Losano of Arizona died when a bullet struck him in the face.  (Tr. 420-21.)  Private First Class Jerod Dennis of Oklahoma, died from blood loss after a bullet severed his femoral artery.  (Tr. 450-51.)  Three other U.S. soldiers were seriously wounded.  Captain Trahan was shot five times and required numerous surgeries, both in Afghanistan and in the United States.  (Tr. 348.)  Sergeant Michiru Brown was shot in the knee (Tr. 431), and Sergeant Reed suffered extensive shrapnel injuries after a grenade detonated near him, (Tr. 380).

E.   The Defendant's Transition to Al-Qaeda External Operative

Shortly after the ridgeline ambush, the defendant met with senior al-Qaeda officials—including al-Qaeda military commander Abdul Hadi al-Iraqi and al-Qaeda external operations chief Abu Faraj al-Libi—to discuss his future with al-Qaeda.  (31T at 76-77.)  During these meetings, the defendant expressed his desire to carry out terror attacks against U.S. targets outside of Afghanistan.  Specifically, the defendant stated that he wanted to conduct attacks "similar to the [1998 al-Qaeda] attacks on the embassies of the U.S. in Kenya and Tanzania."  (31T at 76.)  Also during this time, the defendant swore "bayat"—or formal allegiance—to bin Laden through Abdul Hadi al-Iraqi.  (31T at 84.)

Abu Faraj al-Libi introduced the defendant to Hamza Rabia, then a senior al-Qaeda external operations official.  (31T at 77-78; Tr. 598.)  Rabia arranged for the defendant to receive additional training in explosives and poisons from Abu Khabab al-Masri, a senior weapons expert working for al-Qaeda.  (31T at 120-21; Tr. 612.)  Then, in August 2003, at Rabia's direction, the defendant left Pakistan and traveled to Nigeria to carry out attacks on U.S. interests there—specifically, the U.S. Embassy in Abuja.  (Tr. 79, 93.)[6]

---

the defendant's description of the artillery fire and U.S. air support mirrors the testimony of Master Sergeant Lee Blackwell.  (31T at 68, 70-71; Tr. 368, 426.)

[6] During his years as an al-Qaeda jihadist in Pakistan and Afghanistan, the defendant interacted with numerous senior jihadist fighters and key al-Qaeda officials.  In addition to Abdul Hadi al-Iraqi and Abu Faraj al-Libi, the defendant came into contact with Ramzi bin al-Shibh, Ahmed Khalfan Ghailani, Abu Zubaydah, and Adam Gadahn, to name a few.  (31T at 116-21.)  Ramzi bin al-Shibh was directly involved in the attacks September 11, 2001, Ghailani was involved in the 1998 bombings of the U.S. Embassies in Kenya and Tanzania, Abu Zubaydah was a senior terrorist facilitator and leader of the Khalden terrorist training camp in Afghanistan, and Gadahn was a top English-speaking member of al-Qaeda's propaganda department.  (Tr. 602-07.)  Ghailani was convicted for his involvement in East Africa Embassy bombings in 2010 and sentenced to life imprisonment.  See United States v. Ghailani, 98 Cr. 1023 (LAK) (S.D.N.Y.).  Abu Zubaydah, Ramzi bin al-Shibh, Abdul Hadi al-Iraqi and Abu Faraj al-Libi are in custody in Guantanamo Bay, Cuba.  Gadahn and Rabia are reportedly deceased.

F.      The Defendant's Plot to Bomb the U.S. Embassy in Nigeria

The defendant's mission in Nigeria was clear: "In Nigeria, I focused on my attacking an embassy—the American Embassy in Nigeria," he stated.  (31T at 123.)  Upon arriving in Nigeria, the defendant recruited a coconspirator—Mohamed Ashafa—and together with Ashafa began casing diplomatic facilities and other potential targets.[7]  During this time, the defendant also recruited another coconspirator and tasked him with obtaining a large quantity of industrial explosives from a company in Kano, Nigeria.  (31T at 80-81, 93.)

An intercepted letter from al-Qaeda leadership in Pakistan, sent specifically from Hamza Rabia to the defendant, described the importance of attacking American interests in Nigeria:

> [T]he Americans are utilizing Nigeria as their own base to control the West African region. . . .  We thank Allah for the presence of jihad awakening in this region.  You know very well the importance of targeting the Jews and the Americans during this stage.  They represent the head of the snake, and they are the devils who kill Muslims in many Islamic countries.

(GX23T at 3.)

Rabia directed the defendant to "prepare for a military action on your end" and instructed him to recruit "two or three individuals . . . devoted to Jihad and martyrdom."  (GX23T at 5.)  He then told the defendant to focus on obtaining "explosives," explaining that "we are in need for at least one ton."  (Id. at 6.)  Rabia further advised the defendant that if:

> the required amount of explosives is not available, we will resort to manufacturing.  Nevertheless, even with manufacturing, an amount of ready explosives at least one hundred kilograms must be available to act as an activator for the manufactured explosives.  We realized through experiment the importance of ready explosives to activate the improvised explosives.

(Id.)

Finally, Rabia instructed the defendant to collect information about potential American "target[s]" in Nigeria, including "locations where Americans congregate, like embassies and some military bases, as well as hotels and amusement centers."  (Id. at 7.)

---

[7] The defendant was unable to find the U.S. Embassy in Abuja because the State Department had recently relocated the embassy from Lagos to Abuja, and in August of 2003—when the defendant arrived in Nigeria—the embassy was operating out of a nondescript, temporary location.  (Tr. 799-801; GX92.)

Toward the end of the letter, Rabia reminded the defendant not to "rush" his work because "[i]t is a long war." (Id. at 8.)

In addition to plotting the embassy bombing, the defendant met with members of other radical Islamic terror groups on behalf of al-Qaeda while he was in Nigeria. (31T at 97.) The defendant coordinated, for example, with members of a group he referred to as the Nigerian Taliban (31T at 83), assessed to be the predecessor of the Nigerian terrorist group Boko Haram. He also met with members of the Algerian terror organization "Groupe Salafiste pour la Predication et le Combat," the Salafist Group for Preaching and Combat ("GSPC"), which eventually became known as al-Qaeda in the Lands of the Islamic Maghreb (or AQIM). (31T at 97-98.)

G.    The Defendant's Flight from Nigeria and Arrest in Libya

In the summer of 2004, the defendant directed Ashafa to travel to Pakistan to deliver messages and materials to senior leadership of al-Qaeda, providing an update on his plan and conveying information from West African terrorist groups with whom he had been liaising. (31T at 99.) Although Ashafa successfully transited to Pakistan and connected with al-Qaeda leadership, including Rabia, he was captured while attempting to return to Nigeria. (31T at 99; GX14.)

After Ashafa's arrest, Rabia told the defendant to leave Nigeria immediately, and the defendant fled north across the border to neighboring Niger before making his way to Libya. (31T at 100.) From Libya, the defendant planned to surreptitiously enter Europe to carry out terrorist attacks against Western interests there. (31T at 124.) In early 2005, however, Libyan law enforcement officials arrested the defendant in Tripoli and placed him in custody, where he remained until his release in 2011. (31T at 124.)

H.    The Defendant's Release from Libya and Arrest in Italy

In 2011, shortly before the fall of Muammar Gaddafi's regime in Libya, in the chaos surrounding Gaddafi's demise, the defendant was released from Libyan custody and placed on a ship bound for Lampedusa, an Italian island in the Mediterranean Sea about 120 miles south of Sicily. (Tr. 50-52; 31T at 7.) In June 2011, the defendant boarded an Italian ship in Lampedusa carrying approximately 1,100 North African refugees to the Italian mainland. (Tr. 107.)

While on the ship, the defendant attracted the attention of several law enforcement officers. After he was confronted by officers, the defendant displayed various scars on his body and admitted that he was a member of al-Qaeda and that he had received the scars fighting American soldiers. (Tr. 58-59.) The defendant eventually became agitated and attacked the officers, while screaming "Alahu Akhbar" and "Osama bin Laden Akhbar." (Tr. 69.) He was placed under arrest, sedated by the ship's doctor and then removed from the ship in Taranto, Italy. (Tr. 70.)

After learning of the defendant's arrest in Italy, the U.S. government requested permission from Italian authorities to interview the defendant.  Italian authorities granted this request, and in September 2011, the government conducted three days of audio-recorded interviews of the defendant in Italy, before an Italian judge and in the presence of defense counsel.  (Tr. 207-09; GX31.)  During these interviews, after waiving his <u>Miranda</u> rights, the defendant described his involvement in al-Qaeda, including his participation in the ridgeline ambush and his plot to bomb the U.S. Embassy in Nigeria.  (31T <u>passim</u>.)

I.      <u>The Defendant's Indictment, Extradition and Trial</u>

In February 2012, a grand jury in this District indicted the defendant for (1) conspiracy to murder U.S. nationals, in violation of 18 U.S.C. § 2332(b)(2); (2) conspiracy to bomb a government facility, in violation of 18 U.S.C. § 2332f; (3) conspiracy to provide material support to al-Qaeda, in violation of 18 U.S.C. § 2339B; (4) provision and attempted provision of material support to al-Qaeda, in violation of 18 U.S.C. § 2339B; (5) illegal use of firearms in relation to crimes of violence, in violation of 18 U.S.C. § 924(c); and (6) illegal use of explosives to commit a federal felony offense, in violation of 18 U.S.C. § 844(h).

In March 2012, the United States formally requested that Italian authorities extradite the defendant to the United States.  Italian authorities granted the request, and in October 2012, the defendant was arraigned on the indictment in Brooklyn. ███████████
███████████████████████████████████████████
█████████████████████  In March 2017, after a two-week trial, the defendant was convicted of Counts One through Four and Six.  (The government did not submit Count Five to the jury.)

II.     <u>Applicable Law</u>

"[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range.  As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark."  <u>Gall v. United States</u>, 552 U.S. 38, 49 (2007) (citation omitted); <u>see also</u> <u>United States v. Booker</u>, 543 U.S. 220, 222 (2005) (although the Guidelines are advisory, district courts are still "require[d] . . . to consider Guidelines ranges" in determining a sentence).

Next, courts should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party.  In so doing, [it] may not presume that the Guidelines range is reasonable.  [It] must make an individualized assessment based on the facts presented."  <u>Gall</u>, 552 U.S. at 50 (citation and footnote omitted).  Section 3553(a) requires courts to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes of [18 U.S.C. § 3553(a)(2)]."  The factors courts shall consider in imposing sentence include "the nature and circumstances of the offense and the history and

characteristics of the defendant," 18 U.S.C. § 3553(a)(1), as well as the need for the sentence imposed:

> (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B)    to afford adequate deterrence to criminal conduct;
>
> (C)    to protect the public from further crimes of the defendant; and
>
> (D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]

18 U.S.C. § 3553(a)(2).

In addition, Section 3553(a)(6) directs courts to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6).

The Crime Victims' Rights Act provides that a crime victim has "[t]he right to be reasonably heard at any public proceeding in the district court involving . . . sentencing." 18 U.S.C. 3771(a)(4).  Likewise, "18 U.S.C. § 3771(a)(4) gives victims' family members the right 'to be reasonably heard' at sentencing."  United States v. Messina, 806 F.3d 55, 65 (2d Cir. 2015).  In addition, Federal Rule of Criminal Procedure 32(i)(4)(B)—titled "Opportunity to Speak"—provides that "[b]efore imposing sentence, the court must address any victim of the crime who is present at sentencing and must permit the victim to be reasonably heard."[8]

III.    <u>Guidelines Calculations</u>

The Probation Department ("Probation") calculated the defendant's advisory Guidelines range to be life imprisonment based on a total offense level of 65.  Because 43 is the highest offense level on the Sentencing Table, "an offense level of more than 43 is to be treated as an offense level of 43."  United States Sentencing Guidelines ("U.S.S.G."), Chapter Five, Pt. A, App. Note 2.

Defense counsel does not dispute that the defendant's Guidelines range is life imprisonment based on a total offense level of more than 43.  While the government agrees

---

[8] The government advises the Court that some victims of the defendant's crimes have requested an opportunity to be heard orally at the defendant's sentencing.  The government anticipates this number to be between one and four.

9

that the defendant's Guidelines range is life imprisonment (based on a total offense level of more than 43), it disagrees with Probation and defense counsel's treatment of Count Two.

A.      The Advisory Guidelines Sentence for Count Two Is Life Imprisonment

Probation calculated the defendant's Guidelines range for Count Two (Conspiracy to Bomb a Government Building) to be 360 months to life imprisonment, based on a total offense level of 40.  In reliance on this estimate, defense counsel claims that "without the first-degree murder Guidelines used in Count One, Mr. Harun's Guidelines range would be consistent with the typical 'material support' case involving an unconsummated terrorist plot: 360 months to life imprisonment."  (Defendant's Sentencing Memorandum ("Def. Mem.") 15.)  The Court should reject this argument because, as explained below, the appropriate advisory Guidelines sentence for Count Two is life imprisonment, based on a total offense level of 65.

Section 2X1.1 provides that the "base offense level" for a conspiracy should come "from the guideline for the substantive offense."  The relevant substantive offense for Count Two is covered by § 2K1.4, titled "Property Damage by Use of Explosives."  While the base offense level under § 2K1.4 is 24 if the offense "created a substantial risk of death," the base offense level is enhanced where, as here, the offense was intended to cause death.  Specifically, § 2K1.4(c)(1) provides that:

> If death resulted, or the offense was intended to cause death or serious bodily injury, [the Court should] apply the most analogous guideline from Chapter Two, Part A (Offenses Against the Person) if the resulting offense level is greater than that determined above [in Section 2K1.4(a)].

Here because the defendant "intended to cause death" by bombing the U.S. Embassy in Nigeria, it is necessary to cross reference § 2A1.1—the Guidelines section for first degree murder.  And because the base offense level of 43 for first degree murder under § 2A1.1 is higher than the base offense level of 24 under § 2K1.4(a), a base offense level of 43 applies to Count Two.

After adding the 6-level victim adjustment (under § 3A1.2), the 12-level terrorism adjustment (under § 3A1.4), and the 4-level role adjustment (under § 3B1.1(a)), the total offense level for Count Two becomes 65.

B.      The Defendant's Objections

Defense counsel raises several objections to the Presentence Investigation Report.  First, he claims that the April 25, 2003 ambush was not a "terrorist attack," but rather a "military engagement."  The Court has previously ruled—on two separate occasions—that the defendant is not entitled to combatant immunity.  See Court's Orders, ECF 185 and 281.  For the reasons set forth in those Orders, the al-Qaeda fighters who took

part in the April 25, 2003 ambush do not qualify as soldiers and their attack should not be deemed a "military engagement"—a label that confers legitimacy and implies the lawful exercise of force.  See Dec. 29, 2016 Order, ECF 185 at 5 ("none of the[] factors [necessary to support the combatant immunity defense] can even be arguably alleged of al Qaeda, which has no leader responsible for its fighters, wears no recognizable uniform or emblem, does not carry its arms openly, and disregards the laws and customs of war").

Defense counsel next argues that the defendant should not qualify for a role enhancement with respect to Counts One, Three, or Four because he served as a "mere soldier" during the April 25, 2003 ambush.  (Def. Mem. 76.)  Again, the government disagrees with defense counsel's characterization of the defendant—a convicted terrorist—as a "mere soldier."  Regardless, the role enhancement is appropriate for various reasons, including the defendant's responsibility for the operation of sophisticated weapons systems in Afghanistan; his substantiated relationship with many senior jihadists and al-Qaeda leaders; his significant liaison role between al-Qaeda and the leaders of two West African terrorist groups, GSPC (later AQIM) and the Nigerian Taliban (later Boko Haram); the fact that he reported directly to senior al-Qaeda leadership; and the fact that he recruited and supervised at least two individuals in Nigeria in connection with his embassy bombing plot.  Nonetheless, even without this role adjustment the defendant's advisory Guidelines sentence on Counts One, Three and Four is life imprisonment.

Finally, defense counsel claims that the defendant is a citizen of Niger, not Nigeria.  (Def. Mem. 76.)  As noted above, a representative of the Nigerien government has advised the government that it does not consider the defendant to be a citizen of Niger.  The government is aware of no information suggesting that the defendant is a citizen of Nigeria, or any other country, for that matter.

IV.   Discussion

Defense counsel's discursive sentencing memorandum covers a wide range of subjects (some of questionable relevance to these proceedings), but it is most notable for a subject it fails to address altogether: the Court's obligation under 18 U.S.C. § 3553(a)(2)(C) to consider the need for the sentence imposed to protect the public from the defendant.  For this reason and others enumerated in § 3553(a)—namely, the need for the defendant's sentence to reflect the seriousness of his crimes, the need to deter others from committing similar crimes, and the need to justly punish the defendant—a sentence of life imprisonment is necessary.  18 U.S.C. § 3553(a)(2)(A)-(B).

A.   Life Imprisonment Is Necessary to Protect the Public from the Defendant

The defendant is an al-Qaeda terrorist who conspired to murder Americans on two continents.  He participated in an attack in Afghanistan that left two U.S. servicemen dead, and he attempted to murder many more Americans by bombing the U.S. Embassy in Nigeria.  His conduct in recent years demonstrates that he is unrepentant, unremorseful and

still firmly devoted to violent jihad.  A life sentence is therefore necessary to protect the public from the defendant.  See 18 U.S.C. § 3553(a)(2)(C).

1.     The Defendant's History of Terrorism

The defendant is a lifelong jihadist.  During his 2011 confession in Italy, he explained that he was drawn to terrorism at an early age:

> My intention to join a jihad did not start out on my trip to Afghanistan [in 2001].  It started out . . . long ago.  All the way back to my elementary school days . . . at the time of the Afghan war against the Soviets [from 1980 to 1989].  That's when I first decided to join jihad.

(GX31T at 23.)  The defendant made good on these intentions in the summer of 2001, when he traveled to Afghanistan to join a jihadist group.  The attacks of September 11, 2001—occurring just weeks after his arrival in Afghanistan—did not dissuade the defendant from pursuing jihad.  On the contrary, they inspired him to become a full-fledged member of al-Qaeda and eventually swear allegiance to Osama bin Laden.

As noted above, the defendant underwent extensive weapons and explosives training in al-Qaeda terror camps.  He then put that training to use against U.S. and Afghan soldiers in Afghanistan.  In the spring of 2003, he launched rockets at U.S. forces near the Afghanistan-Pakistan border, and on April 25, 2003, he participated in an ambush that left two U.S. soldiers dead.

Significantly, attacking U.S. forces did not satisfy the defendant's ambitions; he wanted to murder Americans on a much larger scale.  So shortly after the April 25, 2003 ambush, the defendant sought out al-Qaeda leaders and asked their permission to carry about terrorist attacks—he called them "operations"—against Americans in other parts of the world.

Two key facts underlying the defendant's transition to al-Qaeda external operative underscore his dangerousness and evil intent.  First, al-Qaeda leaders did not recruit, request or order the defendant to conduct mass murder terror attacks on civilians.  To the contrary, the defendant proactively approached al-Qaeda leaders and volunteered to conduct these attacks: "I told [al-Qaeda external operations chief] Abu Faraj al-Libi I wanted to conduct operations," the defendant said.  "I told him that I wanted to attack any installations, any American installations outside [the Afghanistan-Pakistan region]."  (31T at 77-78.)

Second, as the defendant himself proudly admitted, he sought to carry out an attack in Nigeria "similar to the attacks that were done on the embassies of the U.S. in Kenya and Tanzania."  (31T at 76.)  It is nearly impossible to overstate the horror and destruction caused by al-Qaeda's simultaneous truck bombings of the U.S. Embassies in Kenya and Tanzania on August 7, 1998—bombings the defendant hoped to emulate in Nigeria.  Two-

hundred and twenty-four people were murdered in East Africa Embassy bombings, and more than 4,000 suffered injuries, including permanent blindness and disfigurement.

Significantly, the defendant did not just talk about bombing the U.S. Embassy in Nigeria; he took concrete steps to carry out the attack. He obtained additional explosives training from notorious weapons expert Abu Khabab al-Masri and then flew from Pakistan to Nigeria, where he recruited accomplices and attempted to purchase hundreds of pounds of industrial grade explosives. The risk that senior al-Qaeda leaders assumed by dispatching the defendant to Nigeria—a risk that materialized when Mohamed Ashafa was arrested—underscores the seriousness of the defendant's plot and the faith al-Qaeda leadership had in his ability to carry it out.

Also significant is the fact that Ashafa's arrest and the failure of the embassy bombing plot did nothing to diminish the defendant's commitment to terrorism. He simply changed targets. After fleeing Nigeria, the defendant traveled north through Africa for the express purpose of reaching Europe and carrying out terror attacks against Western interests there. "My intent," said the defendant, "was to come to a place like Italy or another place in Europe and gain trust in the area, and once I knew the area, then I would formulate a plan of attack." (31T a 124.)

2. The Defendant Remains Firmly Committed to Jihad

The defendant's commitment to jihad survived his release from Libyan custody in 2011. In August 2011, when Italian authorities asked the defendant about his motives for seeking to enter Europe in 2005, he responded that he sought carry out a terror attack "superior to the September 11, 2001 attacks in the United States." And when asked if he still harbored such intent, the defendant replied "even now, if I had the opportunity to organize an attack in Europe I would do it, because Europe agrees with American politics."

The defendant's behavior since his extradition to the United States reinforces the conclusion that he remains devoted to jihad and, thus, an extraordinary danger to the community. During appearances before the Court, the defendant has been hostile and belligerent. He has openly challenged the Court's authority, demanding to be tried in an "international" or "military" court. On one occasion, the defendant lashed out at Judge Korman, yelling, "Fuck you, Judge. Judge, you bad [indiscernible]." (Transcript of June 28 2013 Status Conference at 19.)

In recent years, the defendant has expressly proclaimed his enduring loyalty to al-Qaeda and commitment to its jihadist mission. During a court conference in May 2013, the defendant declared: "I am a warrior and the war is not over. . . . Our terrorism is not over." (Transcript of May 3, 2013 Status Conference at 8.) Later during that proceeding, the defendant stated, "I want to remind you I am still in battle." (Id. at 9.) In an August 2013 letter to the U.N. Secretary General Ban Ki Moon, the defendant reiterated his commitment to jihad: "I have not declared it nor have I abandoned the idea of Jihad for the sake of Allah." The Court has observed the defendant's obstructionism on numerous occasions, and has variously referred to his behavior as "contempt[uous]," deliberately

"obstructive," "narcissis[tic]," and "calculating."  (See ECF 228 at 4; ECF 118 at 1; Transcript of March 12, 2015 Competency Hearing.)  The defendant has also expressly threatened to kill court and government personnel.[9]

        The defendant's belligerence and obstructionism in court is consistent with his violent and destructive behavior at the Metropolitan Correctional Center ("MCC").  Over the past several years, he has attacked and physically resisted correctional officers on numerous occasions.  Indeed, in denying the government's request for a force order, the Court expressly took into consideration the risk of harm to correctional officers and the U.S. Marshals that would result from attempting to bring the defendant from MCC to court.

        Courts across the country have recognized the significant risk of future dangerousness that terrorists like the defendant pose.  In United States v. Jayyousi, 657 F.3d 1085, 1117-19 (11th Cir. 2011), for example, the Eleventh Circuit found that defendant Jose Padilla's sentence of 17 years and 4 months (for conspiring to murder and conspiracy to provide material support to a terrorist group) was substantively unreasonable, in large part, because it failed to protect the public from further crimes of the defendant.  The court noted that

> [a]lthough recidivism ordinarily decreases with age, we have rejected this reasoning as a basis for a sentencing departure for certain classes of criminal, namely sex offenders.  We also reject this reasoning here.  "Terrorists, even those with no prior criminal behavior, are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation."  United States v. Meskini, 319 F.3d 88, 92 (2d Cir. 2003).  Padilla poses a heightened risk of future dangerousness due to his al-Qaeda training.  He is far more sophisticated than an individual convicted of an ordinary street crime.

Id.; see also United States v. Abu Ali, 528 F.3d 210, 258-65 (4th Cir. 2008) (holding 30-year sentence to be substantively unreasonable after conviction for conspiracy to inflict mass civilian casualties and assassination of high public officials in the United States, because of recidivism concerns and impermissible comparisons to other terrorism-related cases), resentencing aff'd, 410 Fed. Appx. 673, 682 (4th Cir. 2011) (per curium) (affirming the district court's imposition of a life sentence).

        Similarly, in United States v. Ressam, 679 F.3d 1069 (9th Cir. 2012), the Ninth Circuit sitting en banc held that a 22-year sentence for a defendant convicted of conspiring to bomb Los Angeles International Airport was substantively unreasonable.  The

---

        [9] For security reasons, the government will not identify the names of individuals the defendant has threatened.

court based its decision largely on the need to protect the public and on the "horrific" nature of the crimes the defendant sought to commit.  Id. at 1090.

In light of the defendant's heinous crimes, the need to protect the public would justify a life sentence even if he had subsequently expressed remorse or disavowed terrorism. But he has not done either.  The defendant's conduct in recent years shows that he is not only unremorseful and unrepentant, but that he remains deeply committed to jihad.  His criminal history and more recent conduct demonstrate that he is beyond deterrence and rehabilitation, and that the only way to protect the public from the defendant is to incarcerate him.  Section 3553(a)(2)(C) therefore requires imposition of a life sentence.

B.  A Life Sentence Is Necessary Given the Seriousness of the Defendant's Crimes, the Need to Justly Punish the Defendant and the Need to Promote Respect for the Law

The defendant's crimes are indisputably serious.  He provided material support to al-Qaeda in the months and years after September 11, 2001.  He conspired to murder U.S. nationals and, along with his fellow al-Qaeda fighters, succeeded in killing two Americans and severely wounding several others.  And he conspired to bomb the U.S. Embassy in Nigeria in hopes of murdering scores (if not hundreds) of innocent people.  A sentence of life imprisonment is necessary given the seriousness of these crimes and the need to justly punish the defendant and promote respect for the law.  See 18 U.S.C. § 3553(a)(2)(A).

Defense counsel claims that the "nature of Mr. Harun's offense conduct, and the motivation and intent underlying that conduct" weigh in favor of a below-Guidelines sentence.  (Def. Mem. 2; see also id. at 9-15.)  This argument rests primarily on the fiction that the defendant is a "soldier"—not a terrorist—and, therefore, for sentencing purposes, his conviction on Count One "should be treated *not* as murder."  (Def. Mem. 9, 14 (emphasis in original).)  While conceding that the defendant is not entitled to combatant immunity, defense counsel nevertheless claims that "in the context of punishment" his actions should be "[v]iewed as the actions of a soldier."  (Def. Mem. 9.)  According to defense counsel, when viewed as a soldier, the defendant's actions "acquire[] a status far different than murder." (Id.)  For several reasons, the Court should reject this backdoor attempt to clothe the defendant in combatant immunity.

First, the Court has already twice rejected the defendant's request to treat the defendant as a "soldier" instead of a terrorist.  (Def. Mem. 9).  In its Order granting the government's pretrial motion to preclude the combatant immunity defense, the Court held that "the lawful combatant immunity defense is inapplicable to defendant and cannot be offered or argued at trial," explaining that "none of [the four factors necessary to establish the defense] can even be arguably alleged of al Qaeda."  ECF 185 at 5.  The Court reached precisely the same conclusion in its post-trial Order denying defense counsel's motions for acquittal.  See ECF 281. The defendant is not entitled to the dignity and protection of combatant status at sentencing for the same reasons he was not entitled to the benefits of such status during trial.

Second, pretending that the defendant is a "soldier" would require the Court to ignore his plot to murder numerous civilians by bombing the U.S. Embassy in Nigeria—not to mention his lifelong devotion to jihad and his enduring loyalty to al-Qaeda.  Defense counsel essentially asks the Court to sentence the defendant on Count One without considering the defendant's conviction on Count Two or the "history or characteristics of the defendant" as required by 18 U.S.C. § 3553(a)(1).

Third, while the Court may consider under § 3553(a) the identity of the defendant's victims and the circumstances surrounding their murders when imposing sentence, the fact that the defendant's victims understood the risk inherent in military service when they volunteered to serve does not transform their killing by the defendant and other al-Qaeda fighters, operating in contravention to the laws of war, into anything other than murder.

Defense counsel also appears to claim that a lenient sentence is warranted because the defendant's conspiracy to murder U.S. nationals in Afghanistan "did not constitute a war crime."  (Def. Mem. 11.)  This argument is unpersuasive, in part, because the defendant was not charged with war crimes.  He was charged with (and convicted of) violating a criminal statute that prohibits conspiring to murder U.S. nationals and he should be "just[ly] punish[ed]" for that offense.  18 U.S.C. § 3553(a)(2)(A).

Just as defense counsel asks the Court to ignore the defendant's conviction on Count Two when imposing sentence on Court One, he also asks the Court to ignore the defendant's conviction on Count One when imposing sentence on Count Two.  Defense counsel claims the defendant's offense conduct "other than in Count One" caused no actual harm (Def. Mem. 60), and then devotes nine pages of his memorandum to explaining why terrorists who cause no actual harm should receive lenient sentences,  (id. 60-68.)  This argument is not relevant—much less persuasive—in light of the fact that the defendant's actions caused substantial harm.[10]  Moreover, this argument minimizes the fact that the defendant did not voluntarily abandon his embassy bombing plot.  Rather, the disruption of the plot (and prevention of the substantial loss of life that would have resulted from it) is attributable most directly to Ashafa's timely arrest.

C.    General Deterrence Requires Imposition of a Life Sentence

In addition to protecting the public and appropriately reflecting the seriousness of the defendant's crimes, a life sentence would deter others from committing similar crimes in the future.  See 18 U.S.C. § 3553(a)(2)(B).

---

[10] Even if the defendant were not responsible for the deaths of two U.S. soldiers (and the attempted murder of many others), his support for al-Qaeda and his plot to commit indiscriminate mass murder by bombing the U.S. embassy in Nigeria would impel a life sentence.

Defense counsel argues that "General Deterrence Should Not Be a Factor In Mr. Harun's Sentence." (Def. Mem. 69; see also id. 75.) The problem with this argument is that the Second Circuit expressly rejected it seven months ago when defense counsel made it in an unrelated case. See United States v. Ulbricht, 858 F.3d 71, 133 (2d Cir. 2017). In Ulbricht, a case not cited in the defendant's brief, defense counsel made the very same argument he makes here—specifically, that "General Deterrence Should Not Be a Factor In Mr. Ulbricht's Sentence." See Sentencing Memorandum of Joshua L. Dratel, Esq., on behalf of defendant Ross Ulbricht, United States v. Ulbricht, 14-CR-68 (KBF), ECF 252 at 50 (S.D.N.Y. May 26, 2015).

On appeal, the Second Circuit rejected defense counsel's argument. Writing for a unanimous three-judge panel, Judge Lynch stated that

> Although those arguments [suggesting that lengthy sentences do not deter crime] have some support among scholars and researchers, the ability of a sentence to "afford adequate deterrence to criminal conduct" is a factor that district courts are *required* by Congress to consider in arriving at the appropriate sentence. 18 U.S.C. § 3553(a)(2)(B).

United States v. Ulbricht, 858 F.3d 71, 133 (2d Cir. 2017) (emphasis in original) (affirming sentence of life imprisonment for 33-year-old founder of Silk Road, a dark web drug market).

As the Second Circuit explained in Ulbricht, "Congress . . . has not concluded that the persistence of narcotics crimes is a reason to abandon the efforts to deter them by lengthy sentences" Ulbricht, 858 F.3d at 133. Likewise, Congress has not concluded that the persistence of terrorism is a reason to abandon efforts to deter terrorists with lengthy sentences. A sentence of life imprisonment would send an unambiguous message that would-be terrorists who conspire to murder U.S. citizens or bomb U.S. government buildings can expect to spend the rest of their lives in jail. A sentence of less than life imprisonment would have likely have the opposite effect.[11]

---

[11] Relatedly, defense counsel argues that "[a]nyone who jeopardizes their safety on the battlefield against a military as powerful and well-equipped as the U.S.'s is not concerned with potential prison time." (Def. Mem. 74.) This argument reflects his misunderstanding of terrorism and terrorist ideology. For many jihadists, the prospect of spending a lifetime imprisoned in the United States is far worse than the prospect of a dying as a martyr on the battlefield.

D.      A Life Sentence Would Avoid Unwarranted Sentence Disparities

Defense counsel claims that a life sentence for the defendant would create unwarranted disparities.  (Def. Mem. 53-69.)  The opposite is true.  For a defendant convicted at trial of participating in the murder of U.S. nationals abroad, plotting to bomb a major U.S. government building, and providing material support to al-Qaeda, a sentence less than life imprisonment would be an outlier.

As an initial matter, defense counsel's § 3553(a)(6) argument is based on the fiction that the defendant's "offense conduct is consistent with typical 'material support' terrorism cases in which terrorist plots may have been planned, but not effectuated."  For the reasons discussed in Section IV.B, supra—namely the fact that the defendant's crimes resulted in the deaths of two Americans and severe injuries to others; the nature of the extraordinary chemical and weapons training the defendant received; his substantiated relationship with so many senior jihadists and al-Qaeda leaders, his role as an external operative for al-Qaeda; and his liaison role for al-Qaeda with GSPC and the Nigerian Taliban—this argument is meritless.

Defense counsel's § 3553(a)(6) argument suffers from additional flaws.  For example, defense counsel cites numerous abstract statistics about "terrorism-related sentences" (Def. Mem. 53-59), but he provides only "average sentences," making it impossible to determine how many defendants were sentenced to life imprisonment.  Relatedly, the defendant claims that the "average sentence" for "material support of terrorism" convictions is less than 20 years, without bothering to mention that, unless death results from such offenses, the statutory maximum sentence is less than life imprisonment.  (Def. Mem. 54 (citing 18 U.S.C. §§ 2339A and 2339B; see also id. at 55.)  Notably, defense counsel provides almost no information about the facts of the cases underlying his myriad statistics, the nature of the plea agreements (including whether they were made pursuant to Rule 11(c)(1)(C)), mitigating circumstances, or substantial assistance to the government, which may have played a role in the sentencing analyses.

The few concrete examples defense counsel cites in which defendants convicted of similar crimes received sentences less than life imprisonment are easily distinguishable.  For instance, defense counsel cites the case of Omar Khadr as an example of a terrorist convicted of killing s U.S. soldier who received a sentence less than life imprisonment.  (Def. Mem. 15.)  But while defense counsel acknowledges that Khadr, unlike the defendant, pled guilty pursuant to a plea agreement, he omits the fact that Khadr was 15 years old when he committed the murder.  (Def. Mem. 15.)  Defense counsel also cites United States v. Mohamed, 13-CR-527 (WFK) (E.D.N.Y.), as an example of a case in which a terrorist received a sentence less than life imprisonment for killing a U.S. citizen abroad.  (Def. Mem. 56.)  But Mohamed's plea agreement stipulated a sentence of 25 years' imprisonment pursuant to Rule 11(c)(1)(C).  Finally, while Khadr and Mohamed—like the defendant—were responsible for killing U.S. nationals abroad, only the defendant was also charged with conspiring to destroy a U.S. embassy.

The statistics and citations in defense counsel's submission do not change the fact that sentences of life imprisonment are regularly imposed in terrorism cases, like this one, involving completed plots to murder U.S. nationals or unconsummated conspiracies to bomb U.S. government buildings or public infrastructure. Significantly, defense counsel fails to cite the following relatively recent terrorism cases in this District resulting in life sentences:

- United States v. Adis Medunjanin, 10 Cr. 19 (JG) (E.D.N.Y. 2012) (defendant sentenced to life imprisonment after traveling overseas and receiving training and direction from al-Qaeda and conspiring to detonate bombs on New York City subways); and

- United States v. Russell Defreitas, Abdul Kadir and Kareem Ibrahim, 07 Cr. 543 (DLI) (E.D.N.Y. 2011) (all three defendants sentenced to life imprisonment for their roles in a plot to destroy infrastructure at John F. Kennedy International Airport).

Notably, the bombings of the New York City subway and JFK Airport that Medunjanin, Defreitas, Kadir and Ibrahim plotted—like the defendant's plot to bomb the U.S. Embassy in Nigeria—were unconsummated. Unlike these other terrorists, however, the defendant was also found guilty of carrying out an attack that resulted in actual deaths.

Nor does defense counsel cite any of the following cases in which courts imposed life sentences on terrorists convicted of crimes similar to (or less serious than) the crimes of which the defendant was convicted:

- United States v. Mustafa Kamel Musta ("Abu Hamza"), 04 Cr. 356 (KBF) (S.D.N.Y. 2015) (defendant who worked as al-Qaeda cleric and recruiter who facilitated hostage-taking in Yemen, sentenced to life imprisonment);

- United States v. Sulaiman Abu Ghayth, 98 Cr. 1023 (LAK) (S.D.N.Y. 2014) (al-Qaeda spokesperson sentenced to life for conspiring to kill Americans and conspiring to provide material support to terrorists);

- United States v. Faisal Shahzad, 10 Cr. 541 (MGC) (S.D.N.Y. 2010) (defendant sentenced to life imprisonment for failed attempt to bomb Times Square, New York);

- United States v. Mohammed Mansour Jabarah, 02 Cr. 1560 (BSJ) (S.D.N.Y. 2008) (defendant sentenced to life imprisonment upon a guilty plea to conspiring to bomb U.S. Embassies in Singapore and the Philippines); and

- United States v. Richard Reid, 02 Cr. 10013 (WGY) (D. Mass. 2003) (defendant sentenced to three life terms upon a guilty plea to attempting to destroy with explosives an in-flight commercial aircraft).

A Guidelines sentence of life imprisonment would be consistent with these and other sentences imposed on terrorists convicted of similar (and even less serious) crimes.

Indeed, a sentence less than life imprisonment would be extraordinary for a defendant in these circumstances—that is, an unrepentant trial defendant responsible for the extraterritorial murder of U.S. citizens and a plot to bomb a U.S. embassy.

E.    Defense Counsel's Remaining Arguments Do Not Justify a Sentence Less Than Life Imprisonment

1.    The Terrorism Enhancement Is Warranted

Defense counsel argues that it would be "manifestly unjust" to apply the 12-point terrorism enhancement under U.S.S.G. § 3A1.4(a) to the defendant, at least with respect to Counts One, Three and Four.  (Def. Mem. 49 (quoting United States v. Dorvee, 604 F.3d 84 (2d. Cir. 2010)).[12]  He also argues that this "Draconian" enhancement should be "remedied" with a below-Guidelines sentence.  (Def. Mem. 46.)  The government disagrees.[13]

Defense counsel's position is inconsistent with judgments made by the Sentencing Commission and Congress—embodied in U.S.S.G. § 3A1.4—that every terrorism crime should be punished seriously.  As the Second Circuit explained in United States v. Stewart, for example, § 3A1.4(a) of "the Guidelines signal[s] that *any* crime promoting terrorism is to be viewed as extremely serious by providing for a minimum base offense level of 32" or a 12-point enhancement.  597 F.3d 514, 521 n.4 (2d Cir. 2010) (emphasis in original). Similarly, in United States v. Meskini, the Second Circuit explained that:

> Congress and the Sentencing Commission had a rational basis for creating a uniform criminal history category for all terrorists under §3A1.4(b), because even terrorists with no prior criminal behavior are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation.

319 F.3d 88, 92 (2d Cir. 2003).  Indeed, "[c]onsidering the serious dangers posed by all forms of terrorism, the Guidelines are in no way irrational in setting the default for criminal history at a very high level."  Id.; see also Stewart, 597 F.3d at 521 n.4 ("the strong need to deter terrorism is evident from the Guidelines recommendation [in U.S.S.G. § 3A1.4(b)] that

---

[12] By omitting Count Two from this argument, defense counsel effectively concedes the appropriateness of applying the 12-point terrorism enhancement to the defendant's conspiracy to bomb the U.S. Embassy in Nigeria.

[13] As a practical matter, removing the 12-point terrorism enhancement from Counts One, Three and Four would still result in a total offense level well above 43 and a Guidelines range of life imprisonment.  U.S.S.G. Chapter Five, Pt. A, App. Note 2 ("an offense level of more than 43 is to be treated as an offense level of 43").

a terrorism defendant be accorded a criminal history of VI, the highest level possible, without regard to [a defendant's] actual criminal record").

Defense counsel argues that "the Court should correct the inequity created by § 3A1.4(b) with a substantial 'horizontal' downward departure with respect to Mr. Harun's Criminal History Category." (Def. Mem. 50.) In support of this argument, defense counsel cites § 4A1.3, which states that such a departure may be warranted:

> [i]f reliable information indicates that the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes.

U.S.S.G. § 4A1.3. Here, regardless of the defendant's criminal history, he does not qualify for such relief because of the substantial "likelihood that the defendant will commit other crimes" if released. Id.

### 2.     The Defendant Did Not Accept Responsibility

Defense counsel also argues that the Court should impose a below-Guidelines sentence because the defendant "demonstrated extraordinary acceptance of responsibility." (Def. Mem. 27.) While the defendant certainly *took credit* for the crimes he committed as a member of al-Qaeda, he never accepted criminal responsibility for them.

The defendant's statements and demeanor in Italy—where he proudly recounted his history as an al-Qaeda fighter in Afghanistan and external operative in Nigeria—demonstrate this crucial distinction. The defendant "answered questions very willingly" (Tr. 231), stating that he wanted to "give a history of how he entered into terrorism." (31T at 23.) Moreover, he became indignant when the presiding judge tried to interrupt him: "It's my right to speak as long . . . or as short as I want. If you're not please with my answers, we can go to a higher court, a court that's higher than this one . . . court, a court that's higher than all the Italian courts . . . a world court." (31T at 9.)

Dr. Mark Mills—who assessed the defendant's mental state in 2013—came to essentially the same conclusion, noting that the defendant wants to be viewed as a participant and "witness to some very important history"—namely, al-Qaeda terrorist attacks against the United States in the early 2000s. The defendant's high self-regard came across in his demands for exceptional treatment. At an appearance before Judge Korman, for example, the defendant demanded to be tried in an "international court" like "[Abdelbaset] al-Magrebi who did the Lockerbie [bombing]." (June 28, 2013 Transcript at 7.)

The Guidelines confirm that the defendant does not deserve acceptance of responsibility credit. The commentary to § 3E1.1 makes clear that acceptance credit is generally not provided to defendants who exercise their constitutional right to put the government to its proof at trial—much less convicted defendants who refuse to express

remorse.  U.S.S.G. § 3E1.1 Note 2.  Moreover, "voluntary termination or withdrawal from criminal conduct or associations" is an important consideration when assessing a defendant's acceptance of responsibility, and the defendant remains a committed jihadist.  As noted above, during a status conference in mid-2013, the defendant declared, "I am a warrior and the war is not over. . . .  Our terrorism is not over. . . .  I am still in battle."  (Transcript of May 3, 2013 Status Conference at 8-9.)[14]

> 3.   The Defendant's Prior Incarceration and Treatment Do Not Justify a Sentence Less than Life Imprisonment

Defense counsel does not dispute that the defendant joined al-Qaeda, participated in the murder of two U.S. citizens, and plotted to bomb the U.S. Embassy in Nigeria all <u>before</u> he was arrested and incarcerated in Libya.  Nonetheless, defense counsel claims that this incarceration and the treatment the defendant received during this period compel a sentence less than life imprisonment.  The government disagrees.

To be sure, the Court may consider the defendant's prior incarceration and his treatment during this period under 18 U.S.C. §§ 3553(a) and 3661.  But even assuming that every claim and supposition defense counsel makes (in both his memorandum and classified supplement) concerning the defendant's incarceration and treatment are true, a life sentence would still be necessary in light of the § 3553(a) factors described above—namely, the need to protect the public from future terrorism by the defendant, the need for the sentence to reflect the seriousness of the defendant's offenses, the need to deter the commission of similar crimes in the future.

> 4.   The Defendant's Purported "Mental Health Problems" Do Not Justify a Sentence Less than Life Imprisonment

Defense counsel argues that the defendant should not be sentenced to life imprisonment, in part, because of his "ongoing mental health problems."  (Def. Mem. 27.)  While the government does not dispute that the defendant likely has some mental issues, any such issues would not justify a sentence less than life imprisonment.  Moreover, and as summarized below, mental health professionals and the Court have repeatedly observed that many of the behaviors defense counsel continues to attribute to some sort of mental illness are, in reality, the volitional acts of a committed terrorist.

---

[14] Even if ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ he accepted responsibility for his crimes, such acceptance would not warrant a below-Guidelines sentence—especially in light of the defendant's dangerousness and the seriousness of the crimes he committed.



in late 2012, Dr. Mills was retained to evaluate his competence.  In August 2013, Dr. Mills issued a report finding the defendant competent.  In his report, Dr. Mills stated that:

> When [the defendant] is in what he considers a supportive environment without noticeable irritants, he is rational, thoughtful, convivial and seemingly blessed with a remarkable memory.  When he is unsure of getting his way, and/or when he feels challenged he sometimes become angry, uncooperative and (arguably) self-defeating.  The former conclusions strongly suggest that his outbursts are volitional: he wants to be listened to, deferred to and acknowledged as a witness to some very important history.  He can be obstructionist and manipulative, sometimes to no apparent end, but his response [during his third interview] was so dramatic as to convince me that his behaviors are essentially rational, when viewed with regard to his inflexible point of view.

(2013 Mills Report at 6.)

The Court held a competency hearing on March 12, 2015, during which the defendant asked to be heard by the Court and demanded to be tried before an international tribunal.  When the Court instructed the defendant to stop talking so that he could hear his interpreter, the defendant refused.  He stated, "I'm not going to hear anything" and proceeded to hum.  The Court ordered the defendant removed from the courtroom and then pronounced its ruling:

> [I]t is clear that [the defendant] is competent.  I find it well beyond a preponderance of the evidence. . . .  It was difficult for the psychiatrist because of his refusal to cooperate, but I have

observed that refusal to cooperate in the proceedings before me
and it is very clear that Mr. Hausa is making a deliberate and
conscious choice not to cooperate.  He is well aware of how to
answer questions.  When he's getting answers he likes, then he
listens; and when he's getting answers that he doesn't like, then
he refuses to participate at all.  But narcissism is not mental
incompetence. . . .  He has his own agenda and he may not want
to do so, but I see nothing that would call his competence into
question for these proceedings.  I find him to be quite
calculating and aware of how to get where he wants.

More than a year later, in June 2016, the defense moved for the appointment of
new mental health experts to evaluate the defendant's competence.  (ECF 118.)  The Court
largely granted this request, while noting that the defendant's "obstructive conduct is
deliberate and part of his strategy of escaping prosecution by refusing to acknowledge the
authority of the Court or to participate in the proceedings in any way."  (ECF 118 at 1-2.)

The Court held a second competency hearing on February 21, 2017—two
weeks before trial—at which purported defense expert Dr. Jess Ghannam and Dr. Mills
offered competing testimony about the defendant's competence.  Dr. Ghannam, who had
previously been found not credible by a Canadian court, argued that the defendant was
incompetent; this assessment was thoroughly discredited on cross-examination, and the
Court affirmed its previous ruling finding the defendant competent to stand trial, stating that:

the issue is volition, and time and again, I have observed that
Harun chooses when to be respectful and cooperative.  The last
time that I saw him, on a video link from his cell for a court
conference, he could not have been clearer and more deliberate
in demonstrating contempt for me, if not personally, then as a
symbol of an institution he detests.

(ECF 228 at 1.)[16]

In short, over the course of years—on the basis of expert medical testimony
and its own observations—the Court concluded that the defendant's violent and
obstructionist behavior was volitional.  Accordingly, the Court should place little stock in
defense counsel's many arguments based on their perception of the defendant's purported
"mental health problems"—including that: ██████████████████████████████████████

_____

[16] The Court found Dr. Ghannam's "opinion [that the defendant is not competent] to be
wholly unconvincingly" and "fundamentally unreliable because Dr. Ghannam is not credible."
(ECF 238 at 4 (noting that Dr. Ghannam's "bias is so significant that, in case like this, his
credibility is irrevocably compromised. . . .  His opinion cannot be divorced from his bias
because his bias is so pervasive").)

(2) the defendant's "mental health issues were insurmountable, and remain so" (Def. Mem. 28); and (3) "any sentence should be cognizant of Mr. Harun's continuing [mental health] problems, and fashioned in a manner to alleviate them," (Def. Mem. 22).  Rather the Court should consider only the credible assessments of the defendant's mental health—that is, those provided by Dr. Mills and Dr. Richart L. DeMier—in determining an appropriate sentence. For the same reasons, the Court should reject defense counsel's request that the Court make extraordinary recommendations to the BOP to "ameliorate" defense counsel's perception of the defendant's "mental health condition."  (Def. Mem. 1.)

5.     The Defendant's Solitary Confinement Is Not a Mitigating Factor

Defense counsel spends considerable time—more than 15 pages in total—expounding his views on solitary confinement.  (See Def. Mem. 29-45.)  The length of his exposition on this topic does not, however, make it any more relevant to the issue before the Court—namely, determining the "sentence sufficient, but not greater than necessary, to comply with the purposes of [§ 3553(a)(2)]."  18 U.S.C. § 3553(a).  Indeed, in an analogous situation, this Court rejected an attempt by lawyers for a defendant housed in solitary confinement to convert a motion for specific relief into a "referendum" on solitary confinement.  See United States v. Guzman, 09 Cr. 466 (BMC) ECF 71 at 6 (E.D.N.Y. May 4, 2017) ("[Guzman's] motion [for modification of the Special Administrative Measures], to the extent it intends to be a referendum on the use of solitary confinement, is denied.").

Defense counsel is particularly critical of conditions on 10-South—the section of MCC where the defendant is presently housed, characterizing it as "the harshest conceivable pretrial detention in the U.S. federal system."  (Def. Mem. 3.)  But as the Court recently noted in Guzman, "[t]he fact is that the general conditions at 10-South do not depart from a reasonable expectation of what solitary confinement entails."  Guzman, 09 Cr. 466 (BMC) ECF 71 at 7 (E.D.N.Y. May 4, 2017).[17]

The defendant is housed on 10-South because he has repeatedly demonstrated, through violent and obstructive conduct, that he would pose an unacceptable danger if housed under less restrictive conditions.  The BOP's use of solitary confinement in general, and on 10-South in particular, is lawful and constitutional, and the Court should not consider the defendant's solitary confinement to be a mitigating factor when imposing sentence.

---

[17] Defense counsel's characterization of the Court's position in Guzman is inaccurate. Contrary to defense counsel's suggestion, the Court did not recognize any adverse impact of solitary confinement at 10-South at MCC on Guzman's mental state, much less hold that Guzman's mental state "had declined to such a point that [the Court] recently agreed to let a psychiatrist assess him."  (See Def. Mem. 43 n.39 (quoting a New York Times article referencing the Court's ruling).)  Rather, Guzman requested a psychologist, the government did not object, and the Court granted the request, without commenting on Guzman's mental state.

6.      The Defendant's Post-Sentencing Requests

      i.      *The Court Should Deny the Defendant's Extraordinary*
           *Designation Requests*

Defense counsel requests that the Court recommend that the "BOP designate Mr. Harun to a facility in which he can exist in a communal atmosphere of inmates with whom he shares religious and cultural affinity." (Def. Mem. 76.)  The Court should reject this extraordinary request.

The Second Circuit has made clear that "[a] sentencing court has no authority to order that a convicted defendant be confined in a particular facility." United States v. Williams, 65 F.3d 301, 307 (2d Cir. 1995).  It follows from this that sentencing courts have no authority to order where (or with whom) within a particular facility a convicted defendant may be confined.  But district courts have wide discretion to make designation recommendations to the Bureau of Prisons ("BOP"), and a district court's recommendation is often treated as a de facto order.

For this reason—and in light of the defendant's history of violence toward BOP officials, destruction of BOP property, refusal to cooperation with BOP personnel, prior assaults on law enforcement, and issuance of death threats—the Court should decline to make any recommendations to BOP.[18]  Instead, the Court, in its discretion, should permit BOP officials to draw on their particularized experience and expertise in designating and housing the defendant in the lawful manner they deem most appropriate.

Moreover, defense counsel's request that the BOP designate the defendant "to a facility in which he can exist in a communal atmosphere of inmates with whom he shares religious and cultural affinity" appears to be a backdoor request that the Court order that the defendant not be held in solitary confinement. (Def. Mem. 76.)  While at first blush, this request appears designed to accommodate the defendant's religious and cultural preferences, a recommendation to place the defendant "in a communal atmosphere" could well be interpreted as a recommendation to not house the defendant alone—where BOP officials may continue to determine he belongs.

Defense counsel's designation request is impractical and unworkable for other reasons as well.  For example, it is unclear how the BOP would determine which inmates share the defendant's "religious and cultural affinities," particularly given the twisted and violent version of Islam he practices. (Def. Mem. 76.)  And to the extent defense counsel requests that the defendant be designated with fellow jihadists—or other who have "affinities" for extremist ideologies—the government oppose this request on security grounds.   Notably, the defendant cites no support for these extraordinary requests.

---

[18] Given his dangerousness, the conditions of the defendant's present incarceration are governed by Special Administrative Measures issued by the Office of the Attorney General.

The Court should reject defense counsel's request that it recommend that the defendant "receive appropriate psychiatric treatment, including medication and counseling." Notwithstanding defense counsel's beliefs about BOP treatment of prisoners, BOP policies and procedures specifically require the provision of such treatment.  Thus, the request—essentially, a request that the Court recommend that BOP officials follow the law—implies that BOP officials will illegally deprive the defendant of medical and psychiatric treatment in the absence of a Court order.  The recommendation is unnecessary and, in the government's view, should not be given.

> ii.   *The Court Should Deny Defense Counsel's Request to Call His Own Declarant to Testify at the Defendant's Sentencing*

Defense counsel requests permission call BOP Corrections Officer Curtis Quamina as a witness at the defendant's sentencing.  Officer Quamina's live testimony is unnecessary given that he already provided defense counsel a sworn affidavit (appended to defense counsel's memorandum), and the government does not intend to challenge any of Officer Quamina's statements.

> iii.   *The Court Should Deny Defense Counsel's Extraordinary Request that the Court Advise the Defendant of His Sentence at MCC*

The defendant has a constitutional right to be present at his sentencing.  If he chooses not to attend, the Court should not reward him by pronouncing the sentence a second time at MCC.  Relatedly, in light of the defendant's prior refusals to attend court proceedings, and because the Crime Victims' Rights Act "gives victims the right to confront [a] defendant who has wronged them"—that is, the right "to look [a] defendant in the eye and let him know the suffering his misconduct has caused,"  Kenna v. U.S. Dist. Court for C.D. Cal., 435 F.3d 1011, 1017 (9th Cir. 2006)—the government hereby requests that the Court issue an order authorizing the use of all necessary force to secure the defendant's presence at sentencing. [19]

---

[19] A proposed order is attached for the Court's consideration.

V.     Conclusion

      As explained above, the defendant is an unrepentant al-Qaeda terrorist who participated in an attack in Afghanistan that left two U.S. soldiers dead and many others injured.  He also plotted to murder many more Americans by bombing the U.S. Embassy in Nigeria.  Because of the danger he poses to the public, the seriousness of his crimes, the need to deter others from committing similar crimes in the future, and the need to justly punish the defendant, a term of life imprisonment is necessary.  In addition, given the danger the defendant poses even while incarcerated, the Court should deny in full defense counsel's post-sentencing requests.

Respectfully submitted,

BRIDGET M. ROHDE
Acting United States Attorney

By:     _____/s/_____

Matthew J. Jacobs
Assistant U.S. Attorney
(718) 254-6401

Joseph Kaster
Trial Attorney
Counterterrorism Section
National Security Division

cc:     Clerk of Court (by ECF)
      David Stern (counsel for defendant) (by email)
      Susan G. Kellman (counsel for defendant) (by email)
      Joshua L. Dratel (counsel for defendant) (by email)
      Shayna Bryant, U.S.P.O.  (by email)