LAW OFFICES OF

## JOSHUA L. DRATEL, P.C.

A PROFESSIONAL CORPORATION

29 BROADWAY
Suite 1412
NEW YORK, NEW YORK 10006
---
TELEPHONE (212) 732-0707
FACSIMILE (212) 571-3792
E-MAIL: JDratel@JoshuaDratel.com

JOSHUA L. DRATEL                                                 STEVEN WRIGHT
—                                                                 *Office Manager*
LINDSAY A. LEWIS
WHITNEY G. SCHLIMBACH

December 12, 2017

## FILED UNDER SEAL

Brian M. Cogan
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re:     *United States v. Adnan Harun Hausa*,
                 12 Cr. 134 (BMC)

Dear Judge Cogan:

        This letter is submitted on behalf of defendant Ibrahim Suleiman Adnan Adam Harun
Hausa (hereinafter "Mr. Harun"), whom  David Stern, Esq., and Susan G. Kellman, Esq., and I
represent in the above-entitled matter, and constitutes the sentencing submission on Mr. Harun's
behalf.  For all the reasons enumerated below, it is respectfully submitted that the Court,
consistent with the analysis and application of the sentencing factors enumerated in 18 U.S.C.
§3553(a) discussed below, should impose a sentence less than life imprisonment, and should
make such recommendations as set forth below (even if the Court imposes a sentence of life
imprisonment) that counsel believe will ameliorate Mr. Harun's mental health condition and
suffering as much as practicable, and render his confinement as humane as possible.  Such a
sentence would represent a sentence "sufficient but not greater than necessary" to achieve the
goals of sentencing listed in 18 U.S.C. §3553(a)(2).[1]

---

        [1]  A version of this letter ████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████████████████
███████████████████████will be filed subsequently via the Electronic Case Filing system.

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Hon. Brian M. Cogan
United States District Judge
Eastern District of New York
December 12, 2017
Page 2 of 78

As detailed below, those reasons include:

(A)    the nature of Mr. Harun's offense conduct, and the motivation and intent underlying that conduct, which the Geneva Convention counsels should be afforded "the widest amnesty possible" because, while not qualifying for combatant immunity, did not constitute a war crime;

(B)    the torture, mistreatment, and confinement Mr. Harun suffered while in custody in Libya for 6½ years;

(C)    as detailed by the accompanying Declarations of counsel as well as a Corrections Officer at MCC, the ongoing mental health problems Mr. Harun has suffered and will continue to suffer as a result of that torture and mistreatment, the deficiencies in Bureau of Prisons treatment of mentally ill inmates, and the potentially ameliorative effects a communal confinement setting would have for Mr. Harun;

(D)    Mr. Harun's acceptance of responsibility as manifested by his ready and willing detailed and accurate debriefing by U.S. government officials on the record in Italy (which formed the principal basis for critical elements of the government's investigation, and ultimately its evidence at trial), ████████████████████████ ██████████████████████████████████████████████████████████;

(E)    the nearly 13 years Mr. Harun has spent in solitary confinement – in Libya, Italy, and now at the Metropolitan Correctional Center (hereinafter "MCC") – particularly in light of the now-recognized adverse impact of prolonged solitary confinement on inmates' mental and physical health;

(F)    the credit Mr. Harun should receive, pursuant to 18 U.S.C. §3585(b)(1), for the 6½ years he spent in extraordinarily harsh confinement in Libya, as well as the 16 months he spent in custody in Italy prior to his extradition to the United States;

(G)    the automatic application of the Guidelines' Draconian 12-point terrorism enhancement in §3A1.4 – both vertically with respect to the offenses level, and horizontally with respect to Criminal History Category – should be remedied by either a downward departure or resort to the §3553(a) sentencing factors;

(H)    the need, pursuant to 18 U.S.C. §3553(a)(6), to "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct[,]" with respect to both the homicide charges as well as the

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Hon. Brian M. Cogan
United States District Judge
Eastern District of New York
December 12, 2017
Page 3 of 78

material support for terrorism charges in light of sentences imposed in scores of terrorism-related cases;  and

(I)     that, for practical, policy, and equitable reasons, including ongoing empirical and academic research, as well as the realities of ideologically motivated conduct committed wholly overseas, and notwithstanding the severity of federal sentences for such conduct, general deterrence does not serve as a basis for enhancing Mr. Harun's sentence.[2]

Mr. Harun's incarceration for more then five years on 10-South at MCC represents the harshest conceivable pretrial detention in the U.S. federal system.  In counsel's opinion, his isolation only aggravates the effects of his prior torture and detention in Libya for 6½  years, and precludes any hope for any form or degree of recovery.

Consequently, it is respectfully submitted that Mr. Harun's sentence – reflected not only in its length but also in the Court's recommendation – be fashioned to permit him to be housed with inmates of similar cultural and religious background, as counsel believes strongly that such an environment, along with appropriate psychiatric care, including counseling and medication, presents the best prospect for Mr. Harun to experience any measure of recovery, any semblance of emotional stability, and any alleviation of the devastating suffering he has endured for well more than a decade.

I.      ***The Principles Governing Federal Sentencing Since* United States v. Booker*,
        543 U.S. 220 (2005), Require the Court to Look Beyond the Guidelines
        In Order to Arrive at a Sentence Sufficient, But Not Greater Than Necessary
        to Achieve the Purposes of Sentencing Set Forth in 18 U.S.C. §3553(a)(2)***

The Pre-Sentence Report (hereinafter "PSR") calculates a total offense level of 65, and places Mr. Harun in Criminal History Category VI – notwithstanding his lack of any criminal record, *see* PSR, at ¶ 70 – because of the terrorism enhancement in U.S.S.G. §3A4.1, resulting in an advisory Guidelines range of life imprisonment.  *See* PSR, at ¶¶ 45-67.

Yet the Guidelines calculation, merely begins the sentencing analysis.  In *Pepper v. United States*, 562 U.S. 476 (2011), the Court *twice* emphasized that a sentencing judge assumes "an overarching duty under § 3553(a) to 'impose a sentence sufficient, but not greater than

---

[2]  Additional information and materials relevant to Mr. Harun's sentencing are provided in the CLASSIFIED December 12, 2017, letter provided earlier today to the Classified Information Security Officer (and to the government).

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Hon. Brian M. Cogan
United States District Judge
Eastern District of New York
December 12, 2017
Page 4 of 78

necessary' to comply with the sentencing purposes set forth in § 3553(a)(2)." *Id*., at 1242, 1243. *See also United States v. Dorvee*, 604 F.3d 84, 93 (2d Cir. 2010) ("[u]nder §3553(a)'s 'parsimony clause,' it is the sentencing court's duty to 'impose a sentence sufficient, but not greater than necessary to comply with the specific purposes set forth' at 18 U.S.C. §3553(a)(2)")), *quoting United States v. Samas,* 561 F.3d 108, 110 (2d Cir. 2009).

As the Second Circuit explained in *Dorvee*,

> [e]ven where a district court has properly calculated the Guidelines, it may not presume that a Guidelines sentence is reasonable for any particular defendant, and accordingly, must conduct its own independent review of the §3553(a) sentencing factors. *See* [*United States v.*] *Cavera*, 550 F.3d [180,]189 [(2d Cir. 2008) (*en banc*)].

604 F.3d at 93. *See also Pepper*, 562 U.S. at 495-96 (statute – 18 U.S.C. §3742(g)(2) – precluding consideration, at re-sentencing, of post-sentence rehabilitation was invalid because it had the effect of making the Guidelines mandatory in "an entire set of cases").

Thus, as the Supreme Court declared in *Nelson v. United States*, 550 U.S. 350 (2009), "[t]he Guidelines are not only *not mandatory* on sentencing courts;  they are also not to be *presumed* reasonable." *Id*., at 351 (emphasis in original).[3] *See also Dorvee*, 604 F.3d at 93 ("[i]n conducting this review [of the §3553(a) sentencing factors], a district court needs to be mindful of the fact that it is 'emphatically clear' that the 'Guidelines are guidelines – that is, they are truly advisory'"), *quoting Cavera,* 550 F.3d at 189.

Indeed, in *Pepper*, Justice Sotomayor again hearkened back to *Koon v. United States*, 518 U.S. 81 (1996) – as Justice Stevens had in *Rita v. United States*, 551 U.S. 338, 364 (2007) (Stevens, J., *concurring*) – repeating that

> "[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings

---

[3]  While the Supreme Court's ruling in *Rita v. United States*, 551 U.S. 338 (2007), established that a within-Guidelines sentence can be presumptively reasonable, *id.* at 347, that presumption is restricted to appellate review and "the sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply." *Id.* at 351 (*citing United States v. Booker*, 543 U.S. 220, 259-60 (2005)). *See also Nelson*, 550 U.S. at 351.

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Brian M. Cogan
United States District Judge
Eastern District of New York
December 12, 2017
Page 5 of 78

that sometimes mitigate, sometimes magnify, the crime and the
punishment to ensue."

562 U.S. at 487, *quoting Koon*, 518 U.S. at 113.

Therefore, while sentencing judges must still consider the Guidelines, *see* 18 U.S.C.
§3553(a)(4), nothing in the statute provides any reason to treat that calculation as more
controlling of the final sentencing decision than any of the other factors a court must consider
under §3553(a) as a whole.  *See United States v. Menyweather*, 431 F.3d 692, 701 (9th Cir.
2005);  *United States v. Lake*, 419 F.3d 111, 114 (2d Cir. 2005), *explaining United States v.
Crosby*, 397 F.3d 103, 111-13 (2d Cir. 2005).

Also, as Justice Scalia noted in his dissent from the "remedial" opinion in *United States
v. Booker,* 543 U.S. 220 (2005):

> [t]he statute provides no order of priority among all those factors,
> but since the three just mentioned [§§3553(a)(2)(A), (B) & (C)] are
> the fundamental criteria governing penology, the statute – absent
> the mandate of § 3553(b)(1) – authorizes the judge to apply his
> own perceptions of just punishment, deterrence, and protection of
> the public even when these differ from the perceptions of the
> Commission members who drew up the Guidelines.

543 U.S. at 304-305 (Scalia, J., *dissenting in part*).

Moreover, the Supreme Court has been vigilant in ensuring that the Guidelines are
genuinely advisory, and not merely a default sentence ratified by appellate courts by rote.  For
example, in *Nelson*, 550 U.S. at 350, the Court reiterated that "district judges, in considering how
the various statutory sentencing factors apply to an individual defendant 'may not presume that
the Guidelines range is reasonable.'"  550 U.S. at 351, *quoting Gall v. United States*, 552 U.S.
38, 50 (2007);  *see also id*. ("[o]ur cases do not allow a sentencing court to presume that a
sentence within the applicable Guidelines range is reasonable").

The broad discretion afforded district courts to determine a sentence also conforms with
18 U.S.C. §3661, which provides that "[n]o limitation shall be placed on the information
concerning the background, character, and conduct of a person convicted of an offense which a
court of the United States may receive and consider for the purpose of imposing an appropriate
sentence." *See also United States v. Murillo*, 902 F.2d 1169, 1172 (5th Cir. 1990);  *Jones*, 531
F.3d at 172, n. 6.

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Brian M. Cogan
United States District Judge
Eastern District of New York
December 12, 2017
Page 6 of 78

In fact, in *Pepper*, the Court cited §3661 as an important means of achieving just sentences: "[p]ermitting sentencing courts to consider the widest possible breadth of information about a defendant 'ensures that the punishment will suit not merely the offense but the individual defendant.'" 562 U.S. at 488, *quoting Wasman v. United States,* 468 U.S. 559, 564 (1984).[4]

The Supreme Court has also pointed out the inherent limitations of the Guidelines, which cannot, and were not, designed to incorporate many factors relevant to an individualized sentencing determination. As Justice Stevens explained in *Rita*,

> [t]he [Sentencing] Commission has not developed any standards or recommendations that affect sentencing ranges for many individual characteristics. Matters such as age, education, mental or emotional condition, medical condition (including drug or alcohol addiction), employment history, lack of guidance as a youth, family ties, or military, civic, charitable, or public service are not ordinarily considered under the Guidelines. *See* United States Sentencing Commission, Guidelines Manual §§ 5H1.1-6, 11, and 12 (Nov.2006).

551 U.S. at 364-65 (footnote omitted) (Stevens, J., concurring).

However, as Justice Stevens noted, "[t]hese are . . . matters that § 3553(a) authorizes the sentencing judge to consider. *See, e.g.,*18 U.S.C. § 3553(a)(1)." *Id*., at 365. Also, as the Court in *Dorvee* reaffirmed, "[r]easonableness is determined instead by the district court's individualized application of the statutory sentencing factors." *Id*., *citing Gall,* 552 U.S. at 46-47.

As the First Circuit has pointed out, "[h]istory shows that the mandatory nature of the

---

[4]  Indeed, the Court's opinion in *Pepper* opened with the following statement:

> [t]his Court has long recognized that sentencing judges "exercise a wide discretion" in the types of evidence they may consider when imposing sentence and that "[h]ighly relevant-if not essential-to [the] selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics."

562 U.S. at 491, *quoting Williams v. New York,* 337 U.S. 241, 246-247 (1949).

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Hon. Brian M. Cogan
United States District Judge
Eastern District of New York
December 12, 2017
Page 7 of 78

Guidelines has produced particular results which led trial judges to express that the sentences imposed were unjust, grossly unfair, or disproportionate to the crime committed, and the judges would otherwise have sentenced differently."  *United States v. Antonakopoulos*, 399 F.3d 68, 81 (1st Cir. 2005).[5]  *See also* The Honorable John Gleeson, *The Sentencing Commission and Prosecutorial Discretion:  The Role of the Courts in Policing Sentencing Bargains*, 36 Hofstra L. Rev. 639, 658 (2008).

In addition, the notion that a "sufficient, but not greater than necessary" sentence exists only within the confines of the advisory Guidelines has been rejected by the courts.  *See, e.g., United States v. Williams*, 372 F. Supp.2d 1335, 1337 (M.D. Fla. 2005) (noting government *always* opposes any sentence outside (below) the Guidelines as "unreasonable."  . . .  "Thus, while paying lip service to *Booker* and the statute, the government flouts the efficacy of the Supreme Court's opinion").

Thus, here, in light of the analysis and application of the §3553(a) factors, the Court possesses sufficient discretion to impose a sentence below life imprisonment.  A sentence premised upon analysis of the Guidelines exclusively, and an implicit but unmistakable presumption that the Guidelines, and *only* the Guidelines, prescribe a reasonable sentence, is in irreconcilable conflict with the Supreme Court's and Second Circuit's direction manifested in the series of cases discussed **ante**.

Accordingly, the sentencing factors in §3553(a) as a whole, rather than being dominated by the Guidelines provisions, provide the proper guidepost for determining for Mr. Harun a sentence "sufficient, but not greater than necessary" to achieve the statutory and traditional objectives of sentencing.

---

[5]  That sentiment expresses more than mere hindsight, instead reflecting a consistent thread that has run throughout the history of the Guidelines' existence.  *See, e.g., United States v. Andruska*, 964 F.2d 640, 646-47 (7th Cir. 1992) (Will, S.J., *concurring*) ("the irrationality and draconian nature of the Guidelines sentencing process is again unhappily reflected in this case"); *United States v. Harrington*, 947 F.2d 956, 964 (D.C. Cir. 1991) (Edwards, J., *concurring*) ([t]he Guidelines "often produce harsh results that are patently unfair because they fail to take account of individual circumstances . . .").  *See also United States v. Adelson*, ___ F. Supp.2d ___, 2006 WL 2008727, at *6 (S.D.N.Y. July 20, 2006) (noting the injustice "that sometimes results from the guidelines' fetish with abstract arithmetic, as well as the harm that guideline calculations can visit on human beings if not cabined by common sense").

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Brian M. Cogan
United States District Judge
Eastern District of New York
December 12, 2017
Page 8 of 78

**II.**     ***Application of the §3553(a) Factors to Mr. Harun***
          ***Compels a Sentence Less Than Life Imprisonment***

As discussed below, in applying to Mr. Harun both § 3553(a)'s mandate that a sentence be "sufficient, but not greater than necessary, to comply with the purposes of sentencing set forth in" § 3553(a)(2), and the sentencing factors set forth in § 3553(a)(1)-(7), it is respectfully submitted that a sentence below the Guidelines range of life imprisonment is appropriate.[6]

---

[6]   The sentencing factors enumerated in §3553(a) are:

(1)     the nature and circumstances of the offense and the history and characteristics of the defendant;

(2)     need for the sentence imposed –

(A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)      to afford adequate deterrence to criminal conduct;

(C)     to protect the public from further crimes of the defendant; and

(D)      to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3)      the kinds of sentences available;

(4)     the kinds of sentence and the sentencing range established for –

(A)     the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines [. . .];

(5)      any pertinent policy statement [. . .];

(6)     the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Brian M. Cogan
United States District Judge
Eastern District of New York
December 12, 2017
Page 9 of 78

In considering those prescribed sentencing factors and identified purposes of sentencing,[7] several aspects of Mr. Harun's circumstances are relevant. Either independently or in combination, they amply justify a sentence for him well below the Guidelines.

> **A.** ***Mr. Harun's Offense Conduct for Count One, While Not Meriting Combatant Immunity, Nevertheless Did Not Constitute a War Crime, Therefore Entitling Him, Under the Geneva Convention, to the "Widest Amnesty Possible"***

As detailed below, while Mr. Harun's conduct with respect to Count One has been determined to have been committed in violation of U.S. law, and notwithstanding Mr. Harun's lack of combatant immunity a privileged combatant would possess, his specific conduct in the April 25, 20003, engagement in Shkin, Afganistan did not constitute a war crime.

As a result, in the context of punishment, his conduct overlaps with conduct governed by the Geneva Convention and, according to that Convention's provisions, is to be afforded the "widest amnesty possible." While that does not absolve Mr. Harun of criminal liability, it should mitigate his sentence on Count One dramatically.

Viewed as the actions of a soldier, albeit without combatant immunity, Mr. Harun's offense conduct in Count One acquires a status far different than murder, and it is respectfully submitted that his sentence should be informed by that distinction.

---

similar conduct; and

    (7)    the need to provide restitution to any victims of the offense.

[7] Section 3553(a)(2) lists the following purposes of sentencing:

(2)    the need for the sentence imposed –

    (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B)    to afford adequate deterrence to criminal conduct;

    (C)    to protect the public from further crimes of the defendant; and

    (D)    to provide the defendant with needed educational or vocational training, medical care, or correctional treatment in the most effective manner.

Hon. Brian M. Cogan
United States District Judge
Eastern District of New York
December 12, 2017
Page 10 of 78

### 1.    *The Provisions of the Geneva Convention*

Unprivileged belligerency – not possessing the protection of combatant immunity, *i.e.*, being an "unlawful combatant" – is not the equivalent of a war crime.  The implications of that distinction are that Rule 159 of the Geneva Convention (hereinafter "GC") applies to Mr. Harun's situation as an unlawful combatant captured by enemy forces.

Rule 159, entitled "Amnesty," states:

> [a]t the end of hostilities, the authorities in power must endeavour to grant the broadest possible amnesty to persons who have participated in a non-international armed conflict, or those deprived of their liberty for reasons related to the armed conflict, with the exception of persons suspected of, accused of or sentenced for war crimes.

Geneva Convention, Additional Protocol II, Article 6(5) (adopted by consensus) (cited in Vol. II, Ch. 44, §651), available at <https://ihl-databases.icrc.org/customary-ihl/eng/docs/v1_rul_rule159>.

Also, "[s]tate practice establishes this rule as a norm of customary international law applicable in non-international armed conflicts" such as that in Afghanistan.  *Id*.  Indeed, "the UN General Assembly adopted resolutions encouraging the granting of such amnesties in relation to the conflicts in Afghanistan and Kosovo[,]" in addition to other conflicts.  *Id*.

Rule 159 includes an exception – "the provision could not be construed to enable war criminals, or those guilty of crimes against humanity to evade punishment."  *Id*. [footnote omitted] – that for the reasons set forth below do not apply to Mr. Harun's offense conduct in Count One.

It is also clear that "unlawful combatants" are covered by Rule 159.  In an article "intended to shed some light on the legal protections of 'unlawful/unprivileged combatants' under international humanitarian law[,]" Knut Dormann, the director of the Legal Division of the International Committee of the Red Cross (hereinafter "ICRC"), wrote that "[t]he fact that a person has unlawfully participated in hostilities is not a criterion for excluding the application of GC IV."  Knut Dormann, "The Legal Situation of 'Unlawful/Unprivileged Combatants,'" *International Review of the Red Cross*, March 2003, Vol. 85, No. 849 (hereinafter "*Dormann*"),

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Brian M. Cogan
United States District Judge
Eastern District of New York
December 12, 2017
Page 11 of 78

at 45, 50, available at <https://www.icrc.org/eng/assets/files/other/irrc_849_dorman.pdf>.[8]

Instead, Mr. Dormann, points out,

> [o]n the contrary, Article 5 of GC IV, which allows for some
> derogations – under strict conditions – from the protections of GC
> IV, uses the term "protected persons" with regard to persons
> detained as spies or saboteurs as well as persons definitely
> suspected of or engaged in activities hostile to the security of the
> State/Occupying Power.

*Id*., at 50.[9]

Consequently, "this article would apply in particular to persons who do not fulfil the
criteria of GC I-III and take a direct part in hostilities, *i.e.* persons labelled 'unlawful
combatants.'" *Id*. (footnote omitted). *See also id*., at 51 ("especially unlawful combatants in
occupied territory (*i.e.* protected persons participating directly in hostilities in occupied territory
without being entitled to POW status) are protected by GC IV").

### 2.    *Mr. Harun's Offense Conduct In Count One Was Not a War Crime*

As noted below, a soldier in battle is always a legitimate target under the laws of war.
While the absence of lawful combatant status renders the combatant liable for ordinary criminal
prosecution, it does not make killing a soldier in combat a war crime. As set forth in the
December 12, 2017, Declaration by David J.R. Frakt (which is attached hereto as Exhibit 1, and
is hereinafter "Frakt Declaration"), a law professor with extensive prior legal miliary experience,
and an expert in the law of war,[10]

---

[8]  The article, written in 2003, identifies Mr. Dormann, one of the foremost experts on
International Humanitarian Law, as "a Legal Advisor at the Legal Division of the ICRC[,]" but
he has since assumed the position of Director of the Legal Division. *See*
<https://www.icrc.org/en/author/knut-dormann>.

[9]  The article recognizes the principle that "[i]t is generally accepted that unlawful
combatants may be prosecuted for their mere participation in hostilities, even if they respect all
the rules of international humanitarian law." *Dormann*, at 70 (footnote omitted).

[10]  Mr. Frakt's impeccable credentials are set forth at ¶¶ 1-7 of his Declaration.

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Brian M. Cogan
United States District Judge
Eastern District of New York
December 12, 2017
Page 12 of 78

> [t]here is a popular conception, often repeated by senior leaders of
> the U.S. government, and mentioned more than once by the
> prosecutors in this case, and, indeed, by the Court itself, that al-
> Qaida and associated forces are terrorists who "do not comply with
> the laws of war." In some cases, such as the 9/11 attacks, this is
> clearly true. Hijacking a civilian airliner and using it to attack a
> civilian target like the World Trade Center is a clear and egregious
> violation of the laws of war (assuming, *arguendo*, that the laws of
> war apply to that event, which presumes that it was part of an
> armed conflict). At other times, such as on the battlefields of
> Afghanistan, al-Qaeda militants have complied with the laws of
> war, using lawful military weapons and tactics against lawful
> military targets. The mere fact that al-Qaeda militants are labeled
> as unlawful combatants, and are not members of a national military
> force in uniform, does not mean that that they are not adhering to
> the laws of war. There is no prohibition under the laws of war
> against civilians directly participating in armed conflict., as Mr.
> Harun has been found to have done. Although unlawful
> combatants do not qualify for combatant immunity and prisoner of
> war status, their mere status as unlawful combatants is not itself a
> violation of the laws of war.

December 12, 2017, Affidavit of David J.R. Frakt, at ¶ 8.

Mr. Frakt's Declaration further establishes that Mr. Harun's conduct during the April 25,
2003, engagement in Shkin, Afghanistan, did not violate the laws of war, and represented lawful
military tactics and operations. For example, Mr. Frakt's affidavit states:

> [m]y review of the defendant's actions at the Battle of Angoor
> Ada, near the Skhin Firebase in April 2003, found no evidence that
> Mr. Hausa's conduct in engaging in hostilities violated the laws of
> armed conflict. Or to state it positively, Mr. Hausa's conduct in
> fighting against U.S. forces was in full compliance with the laws of
> armed conflict. He used lawful weapons, against lawful targets, in
> an active theater of armed conflict. Although not in uniform, he
> did not engage in perfidy. He did not conceal himself amongst the
> civilian population or use civilians as a shield. He carried his arms
> openly. He did not target civilians, only uniformed military
> personnel and military equipment and encampments. He did not

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Hon. Brian M. Cogan
United States District Judge
Eastern District of New York
December 12, 2017
Page 13 of 78

use any prohibited means or methods of warfare.  Rather, he engaged in a hard-fought battle against enemy forces, forces which were actively seeking to find al-Qaeda and Taliban militants like him and kill them.  Although he would not be entitled to combatant immunity for his activities there, I cannot discern any basis for charging him with any violations of the law of war for his activities there, even though he participated in a battle that resulted in deaths and injuries to U.S. soldiers.  Although the events were described by several witnesses as an "ambush," it is important to note that "ambushes" – using concealment and surprise to gain a military advantage – is perfectly lawful under the law of war.

*Id.*, at ¶ 9.[11]

The U.S. Department of Defense Law of War Manual (June 2015) (hereinafter "DoD Manual") confirms Mr. Frakt's analysis.  For example, §4.4.1 of the Manual provides that "[i]n general, combatants may engage in hostilities and may be made the object of attack by enemy combatants."[12]  Similarly, §5.8.1 states that "[m]embership in the armed forces or belonging to an armed group makes a person liable to being made the object of attack regardless of whether he or she is taking a direct part in hostilities."   *See also* ICRC Commentary on the Additional Protocols of 8 June 1977 to the Geneva Conventions of 12 August 1949, 1453 (¶ 4789) ("[t]hose who belong to armed forces or armed groups may be attacked at any time").[13]

---

[11]  As trial testimony and material produced pursuant to 18 U.S.C. §3500 established with respect to the events of April 25, 2003, U.S. forces at Forward Operating Base Shkin received reports of 12 enemy forces moving from the Pakistan border, ostensibly to launch rocket attacks on the U.S. base.  The U.S. forces that were dispatched to search for and confront that enemy contingent consisted of a Quick Reaction Force (a platoon not including infantry), several vehicles, a Afghan Military Force of approximately 50 soldiers, two Apache helicopters for reconnaissance (and four additional helicopters), support from personnel with "Other Government Agencies," and air support from A-10 aircraft, two Harrier jets, and a B-1 bomber.

[12]  The U.S. Department of Defense Law of War Manual is available at <https://www.defense.gov/Portals/1/Documents/law_war_manual15.pdf>.

[13]  The ICRC Commentary on the GC Additional Protocols is available at <https://www.icrc.org/en/publication/0421-commentary-additional-protocols-8-june-1977-geneva-conventions-12-august-1949>.

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Brian M. Cogan
United States District Judge
Eastern District of New York
December 12, 2017
Page 14 of 78

Regarding tactics, GC Additional Protocol I, article 37, gives as examples of lawful ruses, "the use of camouflage, decoys, mock operations and misinformation." *See also* DoD Manual, §5.25.2. *See also* DoD Manual, §6.5 Lawful Weapons [listing weapons unrestricted under the law of war, including small arms, cannons, and other guns, including shotguns, . . . large-caliber guns, blast weapons (including rockets) and fragmentation weapons (such as grenades)].

Indeed, statements by the U.S. soldiers involved the April 25, 2003, battle did not, either in their trial testimony or prior statements produced pursuant to 18 U.S.C. §3500, describe anything beyond a conventional military encounter, or make any claim that their enemy engaged in any improper military activity.

Instead, as Lieutenant Jonathan Ray, remarked in an April 25, 2003, written report (produced to the defense March 3, 2017, and attached hereto as Exhibit 2),

> [t]he INS [insurgents] showed the ability to fight the way we do.
> They provided support by fire any time an element was moving.
> They tried to flank when under the cover of fire only to be
> disrupted by the superior's displaced element.

*Id*., at 000022.

Thus, Mr. Harun's offense conduct for Count One, while unlawful because he did not possess combatant immunity, did not constitute a war crime, and for sentencing purposes should be treated *not* as murder, but instead as typical of a military engagement conducted pursuant to and in accordance with the laws of war.

**3.**      ***U.S. Criminal Prosecution for Mr. Harun's Offense Conduct in Count One Is Essentially Unprecedented***

Count One is, essentially, *sui generis*. As Mr. Frakt's Declaration states, "there have literally been tens of thousands, and perhaps hundreds of thousands, of militants who, as members of al Qaida and associated forces, have participated in the ongoing armed conflict against the United States and coalition forces, a conflict commonly known as the Global War on Terror[,]" and "[i]n the Afghan theater of war, the United States has captured and detained several thousand militant fighters, both at the Guantanamo Bay naval base in Cuba, and in detention facilities in Afghanistan." Frakt Declaration, at ¶ 10.

Yet, as Mr. Frakt points out, "[o]f the several thousand enemy fighters detained by the U.S., prosecutions, either in military commissions or in federal courts, for the simple act of

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Hon. Brian M. Cogan
United States District Judge
Eastern District of New York
December 12, 2017
Page 15 of 78

fighting against U.S. coalition forces (as opposed to participating in a successful terrorist attack) are exceedingly rare." *Id*. Indeed, "this appears to be only the second federal prosecution of a foreign militant for fighting in Afghanistan during the entire 16-year war; and there has only been one conviction in a U.S. military commission based on comparable conduct, that of Omar Khadr." *Id*.

In the single federal criminal prosecution, *United States v. Hamidullin*, 114 F. Supp.3d 365 (E.D. Va. 2015), the defendant was charged with, among other offenses, attempted murder, pursuant to 18 U.S.C. §1114, as a result of an attack the defendant led and coordinated on an Afghan Border Police station. 114 F. Supp.3d at 368. That case currently remains on appeal in the Fourth Circuit.

Conversely, John Walker Lindh was *not* charged with responsibility for the death of Johnny Spann, a Central Intelligence Agency agent who had interviewed Mr. Lindh in Afghanistan after Mr. Lindh's capture by Afghan forces in late 2001, and who was killed shortly thereafter during a prison uprising in which Mr. Lindh participated. *See United States v. Lindh*, 212 F. Supp.2d 541 (E.D.Va. 2002). Mr. Lindh was sentenced to a 20-year prison term after pleading guilty to providing assistance to the Taliban and carrying an explosive in connection therewith.

The sole prosecution in the Guantanamo Bay military commissions – of Omar Khadr, resolved by Mr. Khadr's plea of guilty in 2010 – for a U.S. military casualty in combat was for a homicide offense – "murder in violation of the laws of war" – created by the Military Commissions Act of 2006, three years after Mr. Harun's offense conduct in Count One.

Also, more importantly, Mr. Khadr's sentence, after eight years in detention, was eight years of confinement with the prospect of transfer to Canada (his native country) after one year. In 2012, Mr. Khadr was returned to Canada, where in 2015 he was released on bail (following which he was paid damages by the Canadian government). He remains at liberty today. *See* <https://en.wikipedia.org/wiki/Omar_Khadr>. *See also* Frakt Declaration, at ¶ 10.

Here, without the first-degree murder Guidelines used in Count One, Mr. Harun's Guidelines range would be consistent with the typical "material support" case involving an unconsummated terrorist plot: 360 months to life imprisonment. *See* PSR, at ¶¶ 45-67. Given the context in which the offense conduct in Count One occurred, that is a far more appropriate Guidelines range from which to fashion a reasonable sentence "sufficient, but not greater than neccesary" for Mr. Harun.

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Brian M. Cogan
United States District Judge
Eastern District of New York
December 12, 2017
Page 16 of 78

**B.**    *The Torture Mr. Harun Suffered While in Libyan Custody for 6½*
*Years Should Be a Significant Mitigating Factor at His Sentencing*

The torture Mr. Harun suffered while in Libyan custody should be a significant mitigating factor at sentencing. As set forth below, Mr. Harun's account is matched by reports published by the U.S. State Department and Human Rights Watch regarding Libya during the very period Mr. Harun was detained there. Thus, it is indisputably corroborated. *See also* CLASSIFIED December 12, 2017, Letter from Joshua L. Dratel, Esq.[14]

**1.**    *The Torture Mr. Harun Suffered While in Libyan Custody for 6½ Years*

A small sampling of the methods of torture are set forth in the PSR. *See* PSR, at ¶ 77 n.7 (Mr. Harun "informed counsel that while in Libya he had been given a special tea that caused him to lose his mind and that his fingers were broken. Similarly, Mr. Harun reported that he had been 'walled' while in Libyan custody"). *See also* CLASSIFIED December 12, 2017, Letter from Joshua L. Dratel, Esq.

In addition, as the December 12, 2017, joint Declaration by Susan G. Kellman, Esq., and

---

[14]   Nor is it contestable that what Mr. Harun endured constituted torture. The Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (hereinafter "CAT") defines "torture" as follows:

> [f]or the purposes of this Convention, the term "torture" means any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or a third person information or a confession, punishing him for an act he or a third person has committed or is suspected of having committed, or intimidating or coercing him or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity. It does not include pain or suffering arising only from, inherent in or incidental to lawful sanctions.

CAT (1984, effective June 26, 1987), PART I, Article 1 sec 1, available at <http://www.unhcr.org/en-us/protection/migration/49e479d10/convention-against-torture-other-cruel-inhuman-degrading-treatment-punishment.html>.

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Hon. Brian M. Cogan
United States District Judge
Eastern District of New York
December 12, 2017
Page 17 of 78

David Stern, Esq. (attached hereto as Exhibit 3, and hereinafter "Kellman/Stern Declaration")
(who represented Mr. Harun from that period forward) attests,

> Mr. Harun informed counsel that he was held In Libya and tortured
> for a number of years.  He appeared to be too traumatized to
> discuss what had been done to him, but was able to point to his
> disfigured fingers as an example of the abuse he suffered while in
> Libya.

Kellman/Stern Declaration (Exhibit 3), at ¶ 2.

However, particular events revealed some of what Mr. Harun had experienced, and its
effect on him.  As counsel recall,

> Mr. Harun reported one day that his jailers at the Metropolitan
> Correctional Center ("MCC") were "messing" with him because
> they had brought him a brand of tea from the MCC's commissary
> that he had not ordered and was the same tea that he had been
> given while in detention in Libya (which we were aware had been a
> traumatic experience).

*Id*., at ¶ 8.

As a result,

> Mr. Harun was clearly upset, and for the next several days
> obsessed about the tea – and continued to ask why he was being
> given this tea – which he claimed, with increasing panic, that he
> had not ordered from the MCC commissary.  Mr. Harun also
> claimed the tea was the mechanism through which his Libyan
> jailers had monitored his thoughts.

*Id*., at ¶ 9.

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Brian M. Cogan
United States District Judge
Eastern District of New York
December 12, 2017
Page 18 of 78

2.      *Descriptions of Libyan Torture Techniques in U.S.*
         *State Department and Human Rights Watch Publications*

That Libya tortured its prisoners is confirmed by the U.S. State Department's Country Reports regarding Libya during the period Mr. Harun was in custody there (from January 2005, *see* PSR, at ¶ 23, until June 25, 2011, *id.*, at ¶ 24), as well as by Human Rights Watch (hereinafter "HRW") reports covering the same period(s).

For example, the 2005 U.S. State Department Country Report (hereinafter "2005 Country Report") states that among the "human rights problems [] reported" were "torture . . . poor prison conditions . . . [and] incommunicado detention[.]" *Id.*, at 1.[15]  The 2005 Country Report added that while Libyan law "prohibits such practices, [] security personnel routinely tortured prisoners during interrogations or as punishment[,]" although "[r]eports of torture were difficult to corroborate since many prisoners were held incommunicado." *Id.*

Noteworthy with respect to this case is the 2005 Country Report's disclosure that "[t]he reported methods of torture included chaining prisoners to a wall for hours, clubbing, applying electric shock, applying corkscrews to the back, pouring lemon juice in open wounds, breaking fingers and allowing the joints to heal without medical care, suffocating with plastic bags, deprivation of food and water, hanging by the wrists, suspension from a pole inserted between the knees and elbows, cigarette burns, threats of dog attacks, and beatings on the soles of the feet." *Id. See also id.*, at 2 ("[s]ecurity forces reportedly subjected detainees to cruel, inhumane, or degrading conditions and denied adequate medical care, which led to several deaths in custody").[16]

A series of HRW publications reported the same and additional abuses.  For example a 2006 HRW report quoted one victim, a Bulgarian nurse accused of infecting Libyan children with AIDS, as stating, "I confessed [falsely] during torture with electricity.  They put small wires on my toes and on my thumbs.  Sometimes they put one on my thumb and another on my tongue,

---

[15]  The 2005 State Department Country Report for Libya is available at <http://www.state.gov/j/drl/rls/hrrpt/2005/61694.htm>.

[16]  *See also* U.S. State Department 2007 Country Report for Libya, at 2, available at <https://www.state.gov/j/drl/rls/hrrpt/2007/100601.htm> (same);  U.S. State Department 2009 Country Report for Libya, at 2-3, available at <https://www.state.gov/j/drl/rls/hrrpt/2009/nea/136074.htm> (same);  U.S. State Department 2010 Country Report for Libya, at 2-4, available at <https://www.state.gov/j/drl/rls/hrrpt/2010/nea/154467.htm> (same).

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Hon. Brian M. Cogan
United States District Judge
Eastern District of New York
December 12, 2017
Page 19 of 78

neck or ear.  It had a hand crank to make it go.  They had two kinds of machines, one with a crank and one with buttons."  *Libya – Words to Deeds – The Urgent Need for Human Rights Reform*, Human Rights Watch, Volume 18, No. 1, January 2006, at 48 (hereinafter "*Words to Deeds*"), available at <https://www.hrw.org/sites/default/files/reports/libya0106webwcover.pdf>.

Also, a man "from sub-Saharan Africa imprisoned for possession of drugs" informed HRW that his jailers "hung me by a chain from the wall.  There was a stick behind my knees, and my hands were tied to it.  They hung me up on the wall.  I stayed like that for forty-five minutes.  They were beating me during that time."  *Id*., at 50 (footnote omitted).  *See also id*., at 51 (similar account from another sub-Saharan prisoner, interviewed independently).

In addition, four of the Bulgarian nurses "gave [HRW] detailed testimony of being subjected to electric shocks, beatings to the body with cables and wooden sticks, and beatings on the soles of their feet."  *Id*., at 52.  A Palestinian doctor jailed along with the nurses (for the same offense) told HRW that the Libyans "used electric shocks, drugs, beatings, police dogs, sleep prevention."  *Id*.  *See also* "Gaddafi Admits Bulgarian Nurses Were Tortured," *Telegraph*, August 9, 2007, available at <http://www.telegraph.co.uk/news/worldnews/1559878/Gaddafi-admits-Bulgarian-nurses-were-tortured.html>.  *See also  Truth and Justice Can't Wait – Human Rights Developments in Libya Amid Institutional Obstacles*, Human Rights Watch, 2009, at 31, 37 & 44, available at <https://www.hrw.org/sites/default/files/reports/libya1209web.pdf >.

In another HRW report, *Delivered into Enemy Hands:  US-Led Abuse and Rendition of Opponents to Gaddafi's Libya*, Human Rights Watch, 2012 (hereinafter "*Enemy Hands*"), available at <https://www.hrw.org/sites/default/files/report_pdf/libya0912_web_0.pdf >, a prisoner described how sometimes abuse depended on a detainee's performance during interrogations:

> [t]he beatings took place outside the cell and outside the
> interrogation room – it was a room just for beating and torture.  . . .
> The beatings were random, not regular.  For example, after an
> interrogation, if they weren't satisfied, I found myself in a different
> room and the torture and beating would start.  It would be a
> different group doing that [the beating] but sometime the
> interrogators would be there just watching.

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Brian M. Cogan
United States District Judge
Eastern District of New York
December 12, 2017
Page 20 of 78

*Enemy Hands*, at 108.[17]

    In *Enemy Hands*, detainees also discussed the solitary confinement they endured, the difficulties it presented, and its deleterious effects on them.  One detainee noted that

> [e]ven in the cells next to me, there was no one.  For six months I was kept like that, not able to talk.  Every morning they would bring you what you were going to eat and then leave.  . . . I could not even hear people walking to and from the bathroom or hear anyone moving around.  I was totally and completely alone.

*Id.*, at 59.  *See also id.*, at 66 (another detainee recalling "[h]e was also put into solitary confinement for long periods, though for how long was not clear[,]" and "was beaten many times" during his confinement).

    Another detainee was held in solitary confinement for five years, *id.*, at 99, adding that "he went for a year and a half without any sunlight[,]" and that "[h]is treatment depended upon how responsive he was during interrogations."  *Id.  See also id.*, at 100 ("[h]e said he was deprived of sleep and often interrogated at night and forced to stand for long periods of time") (footnote omitted).

    Similarly, Jaballah Matar, a prominent opponent of the Gaddafi regime, and who was imprisoned since the early 1900's wrote in letters smuggled to his family that "[a]t times a whole year will pass by without seeing the sun or being let out of this cell."  Hisham Matar, *The Return* (Random House:  2016), at 25-26, available at <https://itunes.apple.com/WebObjects/MZStore.woa/wa/viewBook?id=1099551616>.

    Mr. Matar described his conditions as follows:

> [t]he cell is a concrete box.  The walls are made of pre-fabricated slabs.  There is a steel door through which no air passes.  A window that is three and a half metres above ground.  As for the furniture, it is in the style of Louis XVI:  an old mattress, worn out by many previous prisoners, torn in several places.  The world here is empty.

---

[17]  That detainee reported that the beatings by Libyan authorities occurred during a time period when he was being interviewed by "American, British, and Italian intelligence agencies[.]"  *Enemy Hands*, at 108.

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Hon. Brian M. Cogan
United States District Judge
Eastern District of New York
December 12, 2017
Page 21 of 78

*Id.*, at 26.[18]

Another prisoner interviewed by Hisham Matar (Jaballah Matar's son, and who wrote *The Return* as account of his attempt to reconstruct his father's fate during his confinement) told of another torture technique:

> the loudspeakers.  . . .  The speakers were not in the corridors but inside each cell, fixed to the high ceiling, where they could not be reached or torn off.  They played speeches by Qaddafi, interrupted only by propaganda songs and slogans expounding the virtues of the regime.  The broadcast was on every day from 6 a.m. to midnight, and at full volume.  "So loud," Ali said, "that it was hard sometimes to make out the words.  You could feel your muscles vibrate.  I used to lie down and watch the small empty plastic bottle tremble on the concrete floor."

*Id.*, at 461.  *See id.*, at 469 (Ali further reported that Libyan officials "beat me, deprived me of food and sleep, tied me down, spilled a bucketful of cockroaches on my chest.  There is nothing they didn't do").

Such torture had profound effects on its victims.  In *Words to Deeds* a detainee, a professor and the leader of Libya's Muslim Brotherhood at the time of his arrest, noted that "'[t]hey beat me up and hung me up,' he said.  'When I remember this I can't complete …'" *Words to Deeds*, at 55.

In other cases in the U.S., defendants who suffered far less harrowing conditions received reduced sentences due to those conditions of confinement.  For example, Ali Saleh Kahlah Al-Marri – who conspired to provide material support to *al Qaeda* by providing himself as personnel, attending military training camps to learn how to mix poisons, and committing acts in furtherance of a terrorist plot in the United States, and was held for several years in military custody in the U.S. as an "enemy combatant" – pleaded guilty pursuant to a plea agreement that capped his sentence at 15 years, but ultimately was sentenced to 100 months' imprisonment – 80 months less than the maximum.  *See* Judgment,  *United States v. Al-Marri*, 09 CR 10030 (C.D. Ill.), ECF Docket #47.

Likewise, Jose Padilla, convicted of "material support" involving training in *al*

---

[18]  *The Return* notes the colloquial names of some of Libya's feared prisons:  "The Last Stop," *id.*, at 25, and the "Mouth of Hell."  *Id.*, at 25, 333.

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Hon. Brian M. Cogan
United States District Judge
Eastern District of New York
December 12, 2017
Page 22 of 78

*Qaeda* facilities in Afghanistan, and volunteering for violent activity overseas (and initially held in the U.S. in military custody as an "enemy combatant" on suspicion of traveling to the U.S. to detonate a "dirty bomb"), was sentenced after trial to 208 months (17 years and 4 months) imprisonment, in part because of his conditions of confinement.  Although that sentence was vacated, and the matter remanded for re-sentencing, the Eleventh Circuit did not dispute the sentencing court's discretion to reduce a sentence based on such conditions, but only the amount of the reduction.  *See United States v. Jayyousi*, 657 F.3d 1085, 1117-19 (11th Cir. 2011).

Mr. Padilla was re-sentenced to 252 months' imprisonment (21 years).  *See* Judgment, *United States v. Padilla*, 04 Cr. 60001 (MGC), ECF Docket # 1458.  His co-defendants, Kifan Jayyousi and Adham Hassoun, who also proceeded to trial, were sentenced, respectively, to 152 months and 188 months in prison.  *Id.*

Here, Mr. Harun suffered far worse, and that should be accounted for at sentencing in recognition of the unconscionable, unimaginable, and inexcusable trauma he experienced.  As set forth **post**, in the next Section, and in Exhibit A to the December 12, 2017, CLASSIFIED Letter from Joshua L. Dratel, Esq., that nightmare will continue to haunt him mercilessly.[19]

C.   *Mr. Harun's Mental Health Issues Are Continuing and Will Require Proper Treatment While He Is Incarcerated*

Unfortunately, Mr. Harun's mental health problems have not abated – which is not surprising given not only what he suffered in Libya, but the continuation of solitary confinement for five years on 10-South at MCC – but it is respectfully submitted that any sentence should be cognizant of Mr. Harun's continuing problems, and fashioned in a manner to alleviate them.

The Kellman/Stern Declaration, the Declaration by MCC Corrections Officer Curtis Quamina, and the Declaration by Lindsay A. Lewis, Esq., all describe Mr. Harun's unusual

---

[19]   Article 14 of the Convention Against Torture instructs that

[e]ach State Party shall ensure in its legal system that the victim of an act of torture obtains redress and has an enforceable right to fair and adequate compensation, *including the means for as full rehabilitation as possible*.  In the event of the death of the victim as a result of an act of torture, his dependants shall be entitled to compensation.

(emphasis added).

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Brian M. Cogan
United States District Judge
Eastern District of New York
December 12, 2017
Page 23 of 78

behavior.  The persistence of that conduct establishes that regardless of competency to stand trial, continuing such activity for years strongly indicates that Mr. Harun has authentic mental health issues that require attention during his imprisonment.

### 1.    *The Contents of the Declarations*

Passages from the Kellman/Stern Declaration are set forth **ante**, at 16-17, and **post**, at 22-23.  They trace Mr. Harun's transformation from an engaging and engaged client to an obstreperous, disruptive, and counterproductive client.  As the Kellman/Stern Declaration notes, within a short time after the tea incident, "[f]or reasons which are still unknown to us, something fundamental changed over the following two weeks.  Thereafter his mental health continued to decline until the man▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ was no longer recognizable."  *Id*., at ¶ 10.  *See also* Exhibit A to the CLASSIFIED December 11, 2017, Letter from Joshua L. Dratel, Esq., at ¶ 29.[20]

CO Quamina has observed Mr. Harun for the five years Mr. Harun has spent on 10-South.  His Declaration, attached hereto as Exhibit 4 (and hereinafter "Quamina Affidavit"), describes Mr. Harun's odd and unique behavior on 10-South – which has persisted regardless what was occurring in Mr. Harun's case.  For example, among Mr. Harun's eccentricities, CO Quamina lists the following:

- while he is in his cell, he regularly paces on his bed and does not allow his feet to touch the floor.  *See* Quamina Affidavit, at ¶ 4;

- [CO Quamina has] also observed Mr. Harun having conversations with an "imaginary friend".  Whenever I have observed this, Mr. Harun is looking out the window.  These conversations typically occur when he is agitated and continue loudly and for long periods of time.  During these rants he often claims that the United States government is beaming messages into his head.  *Id*., at ¶ 5;

- Mr. Harun refuses to sleep directly on his mattress.  Instead, he uses his mattress to create huts, lean-tos, or tents and sleeps under them, on the bare cement floor.

---

[20]  As the record has established, Mr. Harun's mental health issues were present at least as soon as he was released from Libyan custody following the demise of the Gaddafi government.  The Italian law enforcement witnesses at trial testified that Mr. Harun was behaving erratically aboard the ship from Libya to Italy, both before and after he was confronted by those officers.  *See, e.g.*, Trial Transcript, March 6, 2017.  *See also* PSR, at ¶ 82 (describing treatment and evaluations Mr. Harun received in Italy).

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Hon. Brian M. Cogan
United States District Judge
Eastern District of New York
December 12, 2017
Page 24 of 78

Even in the winter, Mr. Harun does not request additional blankets or clothing. *Id.*, at ¶ 6; and

● Mr. Harun refuses to wear prison issued jumpsuits. Instead he fashions a sarong or skirt out of his bed sheets. Whenever he is issued a jumpsuit, it quickly disappears. There is no means to dispose of these jumpsuits in his cell, but I have never seen any remnants of these jumpsuits in his cell after they are issued and re-issued. *Id.*, at ¶ 7.

Mr. Harun leads an ascetic life even for 10-South, as he does not avail himself of any of the few privileges – commissary or otherwise, even winter clothing – offered to inmates on 10-South. Nor does he even endeavor to communicate with other inmates, which even inmates on 10-South attempt. *Id.*, at ¶¶ 8-9.

During *voir dire* at trial in this case, Lindsay A. Lewis, Esq., a lawyer from my office, went to 10-South for purposes of serving as liaison with Mr. Harun should he wish to confer with his counsel located in the courtroom. *See* Declaration of Lindsay A. Lewis, Esq. (hereinafter "Lewis Declaration"), at ¶¶ 1-2. A copy the Lewis Declaration is attached hereto as Exhibit 5.

During her six hours on 10-South over a two-day period, Ms. Lewis observed that Mr. Harun

● screamed and banged the walls. None of his audible sounds were in English;

● slept; and

● prayed.

Lewis Declaration, ¶ 3 (Exhibit 5).

In addition, while Ms. Lewis was present on 10-South, she was also "informed by MCC staff, who were observing Mr. Harun on the video feed in 10-South, that Mr. Harun was . . . masturbating; . . . removing his clothing (and yelling . . .)." *Id.*, at ¶ 4. The PSR description of the Probation Officer's attempt to interview Mr. Harun followed the familiar pattern of bizarre actions. *See* PSR, at ¶ 75.

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Brian M. Cogan
United States District Judge
Eastern District of New York
December 12, 2017
Page 25 of 78

2.      *The Bureau of Prisons's Poor Record of Treating Mentally Ill Inmates*

In July 2017 the Office of the Inspector General ("OIG") of the United States Department of Justice issued a report entitled "Review of the Federal Bureau of Prisons' Use of Restrictive Housing for Inmates with Mental Illness" (hereinafter "*OIG Restrictive Housing Review*"), available at <https://oig.justice.gov/reports/2017/e1705.pdf>.

In addition to examining U.S. Bureau of Prisons's (hereinafter "BoP") restrictive housing policies and procedures, discussed **post**, in Section II(E), the OIG Restrictive Housing Review also addressed BoP's handling of mentally ill inmates, citing BoP data that "only 3 percent of BOP's sentenced inmate population was being treated regularly for mental illness," despite "an internal BOP study . . . suggest[ing] that approximately 19 percent of federal inmates had a history of mental illness," as well as discussions with BoP officials and institution staff, who estimate the percentage to be approximately *40 percent*. *OIG Restrictive Housing Review*, at iii, 34 (discrepancies in the estimates of mental illness among inmates derives partly from the fact that "institution staff do not always document mental disorders"). *See also* Beth Reinhard, "Some Mentally Ill Federal Inmates Receive Little to No Treatment, Audit Finds," *The Wall Street Journal*, July 12, 2017, available at <https://www.wsj.com/articles/some-mentally-ill-federal-inmates-receive-little-to-no-treatment-audit-finds-1499897348> (*OIG Restrictive Housing Review* found a "wide disconnect between policy and practice, bolstering longstanding complaints by civil-rights activists that some prisons amount to human warehouses[,]" leading to the conclusion that "many mentally ill inmates are receiving insufficient treatment or none at all").

Following the BoP's adoption of a revised mental health policy in 2014, the number of inmates receiving regular mental health treatment fell by 30 percent overall and by 20 percent in Restrict Housing Units alone, a decrease the OIG concluded was prompted by a dearth of "staffing resources [needed] to meet the policy's increased treatment standards." *Id.*, at iii, 37-38.

In that context, according to the OIG, "the BOP had filled only 57 percent of its authorized full-time Psychiatrist positions nationwide" as of October 2015. *Id.*, at, at iii. The OIG review "found that mental health clinicians may have reduced, or been reluctant to increase, some inmates' MHCLs [Mental Health Care Levels] because of a lack of resources to implement the enhanced treatment standards." *Id.*, at 37.[21]

---

[21]  As BoP's Chief Psychologist cynically, albeit candidly, explained,

[i]f I have [an MHCL] 2, I've got to update them, I've got to to a [CCARE]

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Brian M. Cogan
United States District Judge
Eastern District of New York
December 12, 2017
Page 26 of 78

Also, even if a diagnosis is recognized as legitimate and efforts are made to treat the underlying condition, the ability of federal prisons to effectively and appropriately meet the mental health needs of inmates is seriously limited.  *See Mental Illness, Human Rights, and US Prisons*, Human Rights Watch Statement for the Record, Senate Judiciary Committee, Subcommittee on Human Rights and the Law, at 1-3, 5-10 (September 22, 2009), available at <http://www.hrw.org/news/2009/ 09/22/mental-illness-human-rights-and-us-prisons>.

The *OIG Restrictive Housing Review* also described steps taken by the BoP to "mitigate" the mental health concerns which arise from RHU stays, but again noted that the two programs developed in October 2013 to address the issue continued to be hampered by a lack of resources, which has prevented any meaningful expansion beyond the 67 inmates being treated as of November 2016.  *OIG Restrictive Housing Review*, at 53.

The understaffing of mental health treatment falls within the BOP's larger difficulty with recruiting and retaining medical staff across the board, as reported by the OIG in its March 2016 "Review of the Federal Bureau of Prisons' Medical Staffing Challenges" (hereinafter "*OIG Medical Staffing Review*"), also cited in the *OIG Restrictive Housing Review*, at 45.

As of September 2014, the BOP had filled only 83 percent of all institutional medical staff positions, with only 24 institutions at a staffing rate of 90 percent or higher, and 12 institutions at 71 percent or below, which was described by the BOP's former Assistant Director for Health Services and Medical Director as "crisis level."  *OIG Medical Staffing Review*, at i, 1.

Unsurprisingly, the OIG found that "staffing shortages lower staff morale, increase staff workload, and ultimately can reduce inmates' access to routine medical care." *Id.*, at 15.  Less staff means more overtime and double shifts among regular employees, which results in a "drain[ed] staff, which . . .makes some of the routine care a lower priority," and increased reliance on outside medical care. *Id.*, at 15-16.

In addition to limited access and resources caused by a prison system generally overburdened with inmates, the prevalence of mental health problems in U.S. prisons is

---

meeting, . . . that's a lot of dominoes to fall down.  So what do you think human nature is?  Well, I am going to lower my threshold and have less [MHCL] 2's . . . I don't want to lower my threshold but I know that when staff are overwhelmed . . . there may have been sometime where people are reducing care levels in order to survive.

*OIG Restrictive Housing Review*, at 41.

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Brian M. Cogan
United States District Judge
Eastern District of New York
December 12, 2017
Page 27 of 78

staggering.  *See* Doris J. James and Lauren E. Glaze, *Mental Health Problems of Prison and Jail Inmates*, U.S. Department of Justice: Office of Justice Programs, at Tables 1&2 (September 2006, revised December 14, 2006).

Thus, while Mr. Harun needs mental health treatment, BoP has an unfortunate history of inadequate treatment.  Certainly it would not be an acceptable objective of sentencing to incarcerate Mr. Harun for a longer period (and surely not life imprisonment) because BoP cannot treat him in a manner that would resolve his mental health issues in a satisfactory manner.

**D.**     ***Mr. Harun's Extraordinary Acceptance of Responsibility, Manifested By His Willingness to Provide Valuable, Accurate, and Detailed Information to U.S. Officials, Should Be a Mitigating Factor at Sentencing Pursuant to §3553(a)***

Mr. Harun has demonstrated extraordinary acceptance of responsibility through his provision of detailed and accurate information to U.S. government officials on the record in Italy ████████████████████████████████████████████████████████████.  That information encompassed the entirety of his involvement with *al Qaeda* and other organizations, and formed the principal basis for critical elements of the government's investigation, and ultimately its evidence at trial.

███████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
███████████████████

███████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████████████████████████████
████████████████████████████

The quality and completeness of Mr. Harun's debriefings on the record in Italy – with U.S. representatives in attendance – is best demonstrated by the fact that they constituted the government's most compelling evidence at trial.  *See* Government Exhibits 30 (full 16-hour audio recording of Mr. Harun's three days of interviews in Italy) & 31-T (translation of

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Brian M. Cogan
United States District Judge
Eastern District of New York
December 12, 2017
Page 28 of 78

condensed version of those interviews).  Mr. Harun provided a detailed chronology of his own activities in Afghanistan and Africa, as well as a catalogue of relevant names with whom he interacted in both locales, and a precise list of places he visited and in which he and his confederates operated.

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Brian M. Cogan
United States District Judge
Eastern District of New York
December 12, 2017
Page 29 of 78

███████████████████████████████████████████████████████████
███████████████████████████████████████████████████
██████████████████

███████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████
███████████████████████████████████████████████
█████████[22]

### E.      *Mr. Harun's More Than a Decade in Solitary Confinement, With the Prospect of More, Should Serve as a Significant Mitigating Factor at Sentencing*

Mr. Harun has spent almost the entire past 13 years in solitary confinement:  6½ years in Libya and five years here in the U.S.[23]  The effects of even relatively brief or intermittent solitary confinement are debilitating, but the impact of such prolonged solitary confinement can be degenerative on a systemic level.  Compounded by the torture Mr. Harun suffered in Libya, continued solitary confinement represents a cruel enhancement of Mr. Harun's chronic trauma.  As a result, it should be a material mitigating factor at sentencing.

### 1.      *The Abundant Literature and Research Detailing the Deleterious Effects of Solitary Confinement*

The literature and research regarding solitary confinement is vast and conclusive.  Beyond the physical restrictions solitary confinement imposes, its physiological and psychological effects are well documented.  For example, as reported in *The New Yorker*, "[a] U.S. military study of almost a hundred and fifty naval aviators returned from imprisonment in Vietnam, many of whom were treated even worse than [Sen. John] McCain, reported that they found social isolation to be as torturous and agonizing as any physical abuse they suffered."  Atul Gawande, "Hellhole," *The New Yorker*, March 30, 2009 (hereinafter "*Hellhole*"), at 3, available at

---

[22] 

[23]  It is unclear whether Mr. Harun spent time, or if so, how much, in solitary confinement during his 16 months in Italian custody.

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Hon. Brian M. Cogan
United States District Judge
Eastern District of New York
December 12, 2017
Page 30 of 78

<http://www.newyorker.com/reporting/2009/03/30/090330fa_fact_gawande>.

The article added that

> [a]nd what happened to them was physical.  EEG studies going
> back to the nineteen-sixties have shown diffuse slowing of brain
> waves in prisoners after a week or more of solitary confinement.
> In 1992, fifty-seven prisoners of war, released after an average of
> six months in detention camps in the former Yugoslavia, were
> examined using EEG-like tests.  The recordings revealed brain
> abnormalities months afterward;  the most severe were found in
> prisoners who had endured either head trauma sufficient to render
> them unconscious or, yes, solitary confinement.  Without sustained
> social interaction, the human brain may become as impaired as one
> that has incurred a traumatic injury.

*Id.  See also* Michael Bauer et al., *Long-Term Mental Sequelae of Political Imprisonment in East
Germany*, 181 J. NERVOUS & MENTAL DISEASE 257, 258-61 (1993);  Peter Suedfeld et al.,
*Reactions and Attributes of Prisoners in Solitary Confinement*, 9 CRIM. JUST. & BEHAV. 303,
315-18 (1982).

Similarly, as reported in *Hellhole*,

> Craig Haney, a psychology professor at the University of California
> at Santa Cruz, received rare permission to study a hundred
> randomly selected inmates at California's Pelican Bay supermax,
> and noted a number of phenomena.  First, after months or years of
> complete isolation, many prisoners "begin to lose the ability to
> initiate behavior of any kind – to organize their own lives around
> activity and purpose," he writes.  "Chronic apathy, lethargy,
> depression, and despair often result. . . .  In extreme cases,
> prisoners may literally stop behaving," becoming essentially
> catatonic.

*Hellhole*, at 5.[24]

---

[24]   *See also* Haney, Craig, "Mental Health Issues in Long-Term Solitary and 'Supermax'
Confinement," *Crime & Delinquency*, Vol. 49, No. 1, January 2003, 124-56.  The *New
Yorker* article also stated that "in June of 2006, a bipartisan national task force, the Commission

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Hon. Brian M. Cogan
United States District Judge
Eastern District of New York
December 12, 2017
Page 31 of 78

Stuart Grassian, M.D., a former Professor at the Harvard Medical School of Psychiatry (for more than 25 years) and an expert on solitary confinement, reports that "[i]t has indeed long been known that severe restriction of environmental and social stimulation has a profoundly deleterious effect on mental functioning[.]"  Grassian, Stuart, M.D., "Psychiatric Effects of Solitary Confinement," 22 WASH. U. J.L. & POL'Y 325, 327 (2006) (hereinafter "*Grassian – Psychiatric Effects*").  *See also* Exhibit A to the CLASSIFIED December 12, 2017, Letter.

According to Dr. Grassian, "[a]fter even a relatively brief period of time in such a situation [as solitary confinement] an individual is likely to descend into a mental torpor or 'fog,' in which alertness, attention, and concentration all become impaired."  *Id.*, at 331.  Elaborating, Dr. Grassian explains that

> [a]n adequate state of responsiveness to the environment requires both the ability to achieve and maintain an attentional set and the ability to shift attention.  The impairment of alertness and concentration in solitary confinement leads to two related abnormalities:  the inability to focus, and the inability to shift attention.  The inability to focus (to achieve and maintain attention) is experienced as a kind of dissociative stupor – a mental "fog" in which the individual cannot focus attention, and cannot, for example, grasp or recall when he attempts to read or to think.

*Id*.

Even the more mundane aspects of the physical surroundings often contribute to the mental deterioration that attends long-term solitary confinement.[25]  For example, Dr. Grassian points out that

---

on Safety and Abuse in America's Prisons, released its recommendations after a yearlong investigation.  It called for ending long-term isolation of prisoners.  Beyond about ten days, the report noted, practically no benefits can be found and the harm is clear—not just for inmates but for the public as well."  *See Hellhole*, at 9.  *See also* **post**, at 38.

[25]  The solitary confinement need not be long-term for it to exert a deleterious effect.  As Dr. Grassian notes, "[a]fter even a relatively brief period of time in such a situation an individual is likely to descend into a mental torpor or "fog," in which alertness, attention, and concentration all become impaired."  *Grassian – Psychiatric Effects*, at 331.

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Brian M. Cogan
United States District Judge
Eastern District of New York
December 12, 2017
Page 32 of 78

> [i]ndividuals experiencing such environmental restriction find it
> difficult to maintain a normal pattern of daytime alertness and
> nighttime sleep.  They often find themselves incapable of resisting
> their bed during the day – incapable of resisting the paralyzing
> effect of their stupor – and yet incapable of any restful sleep at
> night.  The lack of meaningful activity is further compounded by
> the effect of continual exposure to artificial light and diminished
> opportunity to experience natural daylight.  And the individual's
> difficulty in maintaining a normal day-night sleep cycle is often far
> worsened by constant intrusions on nighttime dark and quiet, such
> as steel doors slamming shut, flashlights shining in their face, and
> so forth.

*Id*., at 332.[26]

Consequently, it is not surprising that Dr. Grassian concludes that "the use of solitary
confinement carries major psychiatric risks."  Grassian, Stuart, M.D., "Psychopathological
Effects of Solitary Confinement," *Am J Psychiatry*, 140:11, November 1983, 1450, 1454.
Similarly, Craig W. Haney, Ph.D., Professor of Psychology at U.C. Santa Cruz (and a lawyer),
another expert in the field, reports that "there is not a single published study of solitary or
supermax-like confinement in which nonvoluntary confinement lasting for longer than 10 days,
where participants were unable to terminate their isolation at will, that failed to result in negative
psychological effects."  Haney, Craig, "Mental Health Issues in Long-Term Solitary and
'Supermax' Confinement," *Crime & Delinquency*, vol. 49, no. 1, Jan. 2003, 124-156, at 132
(hereinafter "*Haney – Mental Health*").

---

[26]  Nor are the adverse effects of solitary confinement limited to those with pre-existing
mental health conditions.  As Dr. Grassian states,

> [g]enerally, individuals with more stable personalities and greater
> ability to modulate their emotional expression and behavior and
> individuals with stronger cognitive functioning are less severely
> affected. However, all of these individuals will still experience a
> degree of stupor, difficulties with thinking and concentration,
> obsessional thinking, agitation, irritability, and difficulty tolerating
> external stimuli (especially noxious stimuli).

*Grassian – Psychiatric Effects*, at 332.

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Brian M. Cogan
United States District Judge
Eastern District of New York
December 12, 2017
Page 33 of 78

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Hon. Brian M. Cogan
United States District Judge
Eastern District of New York
December 12, 2017
Page 34 of 78

2. *Judicial Recognition of the Serious and Potentially*
*Constitutional Problems Presented by Solitary Confinement*

Judges have recognized the adverse and inhumane impact of extended solitary
confinement.  In *United States v. Corozzo*, 256 F.R.D. 398 (E.D.N.Y. 2009), Judge Weinstein,
denying the government's motion for pretrial restrictions, authorized under 18 U.S.C. §3582(d),
on an organized crime defendant's associations, noted that such restrictions related to
imprisonment and supervised release that "would probably result in long-term solitary
confinement, onerous segregation, and alienation from natural family."  *Id*., at 399.

In *Corozzo*, *id*., at 399-400, in which the defendant faced a prison term of 13½ years,
Judge Weinstein, referencing conditions imposed on prisoners of war in Andersonville and by
the Axis powers in World War II, declared that

> when the government seeks to impose terms that make life in
> prison and on supervised release harsher than necessary, the United
> States District Court for this district cannot ignore history and this
> country's aspiration to provide justice for all.  It must seriously
> consider whether it would be justified in granting the government's
> motion to impose cruel prison conditions.

*Id*., at 400.

In *Corozzo*, Judge Weinstein added that "[w]hether for religious or secular reasons,
human beings require the company of other humans to stay healthy."  *Id*., at 401, *citing cf., e.g.,*
*Wilson v. Beame*, 380 F. Supp. 1232, 1238-42 (E.D.N.Y. 1974) (prison and communal nature of
organized religion).  Judge Weinstein also cited to the work of Professor Haney[27] and Dr.

---

[27]  For example,

> Supermax prisons[, solitary confinement and segregation] inflict
> varying amounts of psychological pain and emotional trauma on
> prisoners confined in them.  The range of psychopathological
> reactions to this form of confinement is broad, many of the
> reactions are serious, and the existing evidence on the prevalence
> of trauma and symptomatology indicates that they are widespread.
> The mental health risks posed by this new form of imprisonment
> are clear and direct.

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Brian M. Cogan
United States District Judge
Eastern District of New York
December 12, 2017
Page 35 of 78

Grassian ("[t]he restriction of environmental stimulation and social isolation associated with confinement in solitary are strikingly toxic to mental functioning, . . ."),[28] *id*., at 6-7, concluding that "[h]arms resulting from these forms of punishment may seriously inhibit rehabilitation." *Id*., at 6.[29]

Moreover, the quality of life – or, more appropriately, the *lack* thereof – under a supermax regime, augmented by the Special Administrative Measures (hereinafter "S.A.M.'s"), under which Mr. Harun exists, and which immeasurably reinforce and amplify the isolation, cannot fully be appreciated by resort to mere sterile descriptions of logistics, physical space, schedules, or constraints on movement and activity. Even diagnoses are insufficient to drive home the extent to which supermax incarceration imposes punishment well beyond that experienced by ordinary inmates in ordinary institutions.

As another jurist, Ninth Circuit Judge Alex Kozinski, points out, "we hear remarkably little about what may be the most severe punishment of all: solitary confinement. Lurking in the shadows of the conversation about inhumane punishments are some 100,000 souls who spend 23 hours a day alone in a cell the size of a parking space." Alex Kozinski, *Worse than Death*, 125 YALE L.J. F. 230 (2016), available at <http://www.yalelawjournal.org/forum/worse-than-death> ("*Worse Than Death*").

As a result, Judge Kozinski urges that "we should all be asking more questions about how prisoners get into solitary confinement, what 'life' is like once they get there, and how they can

---

*Haney – Mental Health*, at 148.

[28]  *Grassian – Psychiatric Effects*, at 354.  *See also id*., ("even those inmate(s) who are more psychologically resilient inevitably suffer severe psychological pain as a result of such confinement, especially when the confinement is prolonged, and especially when the individual experiences this confinement as being the product of an arbitrary exercise of power and intimidation").

[29]  Additional literature cited by Judge Weinstein included:  Bruce A. Arrigo & Jennifer Leslie Bullock, *The Psychological Effects of Solitary Confinement on Prisoners in Supermax Units; Reviewing What We Know and Recommending What Should Change*, 52 Int'l J. of Offender Therapy & Comp. Criminology 622 (2008) (collecting research on long-term solitary isolation and recommending reform);  Tracy Hresko, *In the Cellars of the Hollow Men: Use of Solitary Confinement in U.S. Prisons and its Implications Under International Laws Against Torture*, 18 Pace Int'l L. Rev. 1 (2006) (arguing for reform in the use of solitary confinement in the United States); and *Hellhole*.

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Hon. Brian M. Cogan
United States District Judge
Eastern District of New York
December 12, 2017
Page 36 of 78

get out." *Id.*  Judge Kozinski also cites Yale Law School's *The Liman Program's Time-In-Cell Report*,[30] and its "shuddersome findings confirm what I have long suspected:  Solitary confinement is just as bad as the death penalty, if not worse." *Id.*

As a result, in comparing solitary confinement to capital punishment, Judge Kozinski concludes that the former "merely swaps one type of death for another." *Id.  Cf.  Kirkpatrick v. Chappell*, 872 F.3d 1047, 1062-63 (9th Cir. 2017) (Kozinski, J., *dissenting*) (noting that the length of time California state prisoners have spent on death row has rendered capital punishment functionally inoperable in the state).

As Judge Kozinski, echoing Judge Weinstein, explains,

> man is a social animal.  The human mind craves interaction with other people, and being deprived of human companionship is as damaging to the psyche as deprivation of food and water is to the body.  Psychologists now understand that "much of who we are depends on our contact with other people, the social context in which we function, and when you remove people from that context, they begin to lose their very sense of self."

*Id.*, *citing* Maclyn Willigan, "What Solitary Confinement Does to the Human Brain," *Solitary Watch* (Aug. 4, 2014), available at <http://perma.cc/B5MB-F4LC>.

Judge Kozinski also mentioned Justice Anthony Kennedy's concurrence in *Davis v. Ayala*, 135 S.Ct. 2187 *reh'g denied*, 136 S.Ct. 14 (2015), which noted that "despite scholarly discussion and some commentary from other sources, the condition in which prisoners are kept simply has not been a matter of sufficient public inquiry or interest."  Judge Kozinski further pointed out that Justice Kennedy emphasized that "consideration of these issues is needed" because "so stark an outcome [as solitary confinement] ought not to be the result of society's simple unawareness or indifference."  135 S. Ct. at 2209 (Kennedy, J., *concurring*).

Indeed, in *Davis v. Ayala*, Justice Kennedy admonished that,

> [i]n a case that presented the issue, the judiciary may be required,

---

[30]   The *Liman Report* is from the Liman Program, Yale Law School & Association of State Correctional Administrators, TIME-IN-CELL: THE ASCA-LIMAN 2014 NATIONAL SURVEY OF ADMINISTRATIVE SEGREGATION IN PRISON (Aug. 2015), available at <https://law.yale. edu/system/files/area/center/liman/document/asca-liman_administrativesegregationreport. pdf>.

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Hon. Brian M. Cogan
United States District Judge
Eastern District of New York
December 12, 2017
Page 37 of 78

> within its proper jurisdiction and authority, to determine whether
> workable alternative systems for long-term confinement exist, and,
> if so, whether a correctional system should be required to adopt
> them.

135 S. Ct. at 2210 (Kennedy, J., *concurring*).

Similarly, Justice Breyer, in dissent in *Glossip v. Gross*, 135 S. Ct. 2726, 2765 (2015) (Breyer, J., *disssenting*), lamented "the dehumanizing effect of solitary confinement." Also, again in dissent (from the denial of a motion for a stay of execution) in *Ruiz v. Texas*, 580 U.S. ___, 137 S. Ct. 1246 (2017) (Breyer, J., *dissenting*), Justice Breyer challenged the Court to determine "whether extended solitary confinement survives Eighth Amendment scrutiny." Elaborating, Justice Breyer reasoned that "[if extended solitary confinement alone raises serious constitutional questions, then 20 years of solitary confinement, all the while under threat of execution, must raise similar questions, and to a rare degree, and with particular intensity." *Id.*[31]

Political figures, too, have expressed dismay over solitary confinement and its effect. Then-President Barack Obama, in an Op-Ed article published in *The Washington Post*, announced executive actions designed to limit solitary confinement in the federal prison system. *See* Barack Obama, Op-Ed, "Why We Must Rethink Solitary Confinement," *The Washington Post*, January 25, 2016, available at <http://wapo.st/1ZONjUV>.

In that article, in which the President characterized solitary confinement as "an affront to our common humanity[,]" and which should be "[u]sed only as a measure of last resort[,]" he explained that

> [r]esearch suggests that solitary confinement has the potential to
> lead to devastating, lasting psychological consequences. It has
> been linked to depression, alienation, withdrawal, a reduced ability
> to interact with others and the potential for violent behavior. Some
> studies indicate that it can worsen existing mental illnesses and
> even trigger new ones. Prisoners in solitary are more likely to
> commit suicide, especially juveniles and people with mental

---

[31] The Court has previously acknowledged the Eighth Amendment implications of solitary confinement. *Hutto v. Finney*, 437 U.S. 678, 685 (2006) ("[c]onfinement in . . . an isolation cell is a form of punishment subject to scrutiny under Eighth Amendment standards"); *Wilkinson v. Austin*, 545 U.S. 209, 220-21 (2005) (prisoners had liberty interest in avoiding harsh and restrictive conditions at state's supermax facility).

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Hon. Brian M. Cogan
United States District Judge
Eastern District of New York
December 12, 2017
Page 38 of 78

illnesses.

*Id*.

Judge Kozinski also reflected on the impact of solitary confinement:

> [g]iven these conditions, it should come as no surprise that
> "incarceration in solitary cause[s] either severe exacerbation or
> recurrence of preexisting illness, or the appearance of an acute
> mental illness in individuals who had previously been free of any
> such illness."

*Id*., *citing Grassian – Psychiatric Effects*, at 333.[32]
.

Indeed, Judge Kozinski stated that "[t]he empirical literature on the effects of solitary
confinement is horrifying[,]" *id*. (footnote omitted), and "shows that prisoners exposed to solitary
confinement become verbally and physically aggressive;[] develop fantasy worlds and other
paranoid psychoses;[] and grow anxious, withdrawn, and hopeless.[]" *Id*. (footnotes omitted).

**3.      *American Bar Association and Other Organizations'
Standards Proscribing Prolonged Solitary Confinement***

**a.      *The Relevant American Bar Association Standards***

The American Bar Association (hereinafter "ABA") has adopted strong standards
condemning prolonged solitary confinement.  For example, the *ABA Standards for Criminal
Justice: Treatment of Prisoners* (3d Ed. 2011) provide that "[s]egregated housing should be for
the briefest term and under the least restrictive conditions practicable and consistent with the
rationale for placement and with the progress achieved by the prisoner." *Id*., at intro.  Those

---

[32] *See also United States v. Brooks*, 2008 WL 4693335, at *4 (E.D.N.Y. Oct. 23, 2008)
("[d]efendant's descriptions of the negative psychological consequences he has suffered comport
with cases and studies addressing the harsh impact that prolonged solitary confinement may have
on an inmate's mental health");  *McClary v. Kelly*, 4 F.Supp.2d 195, 208 (W.D.N.Y.1998) (citing
cases discussing the negative psychological impact on inmates who are subject to prolonged
periods of solitary confinement);  *The Istanbul Statement on the Use of and Effects of Solitary
Confinement, Torture*, Vol. 18, No. 1, 2008, 64 ("solitary confinement may cause serious
psychological . . . ill effects");  The SHU Syndrome and Community Mental Health, American
Association of Community Psychiatrists Newsletter, Summer 1998.

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Hon. Brian M. Cogan
United States District Judge
Eastern District of New York
December 12, 2017
Page 39 of 78

Standards themselves forbid "extreme isolation" which is defined to "include[] a combination of sensory deprivation, lack of contact with other persons, enforced idleness, minimal out-of-cell time, and lack of outdoor recreation." *Id.*, at 23-3.8.[33]

Likewise, Standard 7-10.1(c) of the *ABA Criminal Justice Mental Health Standards* (4th Ed. 2016),[34] prescribe that "segregated housing of persons with mental disorder should only occur under the circumstances defined in Standard 23-2.8[,]" of the *ABA Standards for Criminal Justice: Treatment of Prisoners*, which includes the categorical prohibition that "(a) No prisoner diagnosed with serious mental illness should be placed in long-term segregated housing."

**b.    *The American Psychiatric Association Provisions***

The American Psychiatric Association has also addressed solitary confinement, maintaining that "prolonged segregation of adult inmates with serious mental illness, with rare exceptions, should be avoided due to the potential for harm to such inmates." *Am. Psychiatric Ass'n, Position Statement on Segregation of Prisoners with Mental Illness* (December 2012), available at <https://www.psychiatry.org/file%20library/about-apa/organization-documents-policies/policies/position-2012-prisoners-segregation.pdf>.

**c.    *The United Nations' "Mandela Rules"***

The United Nations *Minimum Rules on the Treatment of Prisoners*, dating from 1955, were updated in 2015 to comprise what are now referenced colloquially as the "Mandela Rules." Rule 43(a) prohibits "[i]ndefinite solitary confinement[,]" while Rule 43(b) prohibits "[p]rolonged solitary confinement."[35]  Rule 44 defines "prolonged solitary confinement" as "in excess of 15 consecutive days."

---

[33]    The ABA's Treatment of Prisoners Standards are available at <https://www.americanbar.org/content/dam/aba/publications/criminal_justice_standards_/Treatment_of_Prisoners.authcheckdam.pdf>.

[34]    The ABA's Mental Health Standards are available at <https://www.americanbar.org/content/dam/aba/publications/criminal_justice_standards_/mental_health_standards_2016.authcheckdam.pdf>.

[35]    The Mandela Rules are available at <http://www.solitaryconfinement.org/mandela-rules>.  The full text is accessible at <http://solitaryconfinement.org/uploads/MandelaRules2015UNdocRev.1.pdf>.

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Brian M. Cogan
United States District Judge
Eastern District of New York
December 12, 2017
Page 40 of 78

    **4.**    ***The BoP's Solitary Confinement Policies Have Been Roundly Criticized***

Solitary confinement in the federal prison system is a problem not only of language – as detailed below, BoP has persistently claimed, falsely, as its own Inspector General has concluded, that it does not use solitary confinement – but also of policy and practice, and repeated studies and reports have not managed to produce appropriate progress or reforms.

In recent months, the Department of Justice itself has revealed the inadequate conditions of confinement of federal inmates, including the use of solitary confinement or "restrictive housing units" (hereinafter "RHUs"), particularly as related to inmates suffering from mental illness. This includes a July 2017 report issued by the Office of the Inspector General (hereinafter "OIG") of the United States Department of Justice entitled "Review of the Federal Bureau of Prisons' Use of Restrictive Housing for Inmates with Mental Illness" (hereinafter "*OIG Restrictive Housing Review*"),

The authors of *OIG Restrictive Housing Review*'s "observed single-cell inmates, many of whom had a serious mental illness." *Id*., at 17. Some were isolated for years. Also, the *Review* noted that "research suggests that 'isolation can be psychologically harmful to any prisoner – psychological effects can include anxiety, depression, anger, cognitive disturbances, perceptual disorders, obsessive thoughts, paranoia, and psychosis – which may be long-lasting." *Id*., at 1.

According to the *OIG Restrictive Housing Review*, regarding solitary confinement, a psychologist at ADX Florence, the federal "supermax" facility in Florence, Colorado, commented from the inmate's perspective: "you have no contact, you don't speak to anybody, and it's a form of torture on some level . . ." *Id*., at 16. *See also* Jeffrey L. Metzner & Jamie Fellner, *Solitary Confinement and Mental Illness in U.S. Prisons: A Challenge for Medical Ethics*, 38 J. Am. Acad. Psychiatry & L. 104, 104 (2010) ("solitary confinement is recognized as difficult to withstand; indeed, psychological stressors such as isolation can be as clinically distressing as physical torture").[36]

While BoP continues to deny the use of "solitary confinement" in federal prison, its plain practices demonstrate otherwise. For instance, in August 2015, then-Director of the Federal

---

[36] Article 11 of the Convention Against Torture directs that:

> [e]ach State Party shall keep under systematic review interrogation rules, instructions, methods and practices as well as arrangements for the custody and treatment of persons subjected to any form of arrest, detention or imprisonment in any territory under its jurisdiction, with a view to preventing any cases of torture.

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Hon. Brian M. Cogan
United States District Judge
Eastern District of New York
December 12, 2017
Page 41 of 78

Bureau of Prisons, Charles Samuels, even testified under oath during a hearing of the Senate Committee on Homeland Security and Governmental Affairs that the BOP does "not practice solitary confinement." *See* Emma Roller, "The Problem with Defining Solitary Confinement," *The Atlantic*, Aug. 4, 2015, available at <https://www.theatlantic.com/politics/archive/2015/08/the-problem-with-defining-solitary-confinement/455700/>.[37]

However, in its review of restrictive housing in federal prisons, the OIG noted that although the BoP continues to "state[] that it does not practice solitary confinement, or even recognize the term," the OIG "found inmates, including those with mental illness, who were housed in single-cell confinement for long periods of time, isolated from other inmates and with limited human contact." *OIG Restrictive Housing Review*, at i.

Therefore, the *OIG Restrictive Housing Review* concluded that BoP houses inmates in "conditions of confinement that could constitute solitary confinement according to the Civil Rights Divisions's definition, as well as the Mandela Rules," also noting that the "Office of the Deputy Attorney General's former Acting Chief of Staff . . . [stated] that in reality restrictive housing and solitary confinement are the same." *OIG Restrictive Housing Review*, at 19-21.

This contradiction between BoP's public statements and its continued practices reflects BoP's continued lack of candor and reliability when reporting on the quality – or more accurately, lack thereof – of services provided to inmates generally, and those subject to solitary confinement in particular.

As of June 2016, approximately 7 percent of 148,227 sentenced inmates were housed in RHUs of three types ("Special Housing Units," "Special Management Units," and the segregated housing at the Florence, Colorado USP Administrative Maximum Security Facility, ADX). *Id.*, at i. The OIG review further found that "BOP does not have explicit guidance and policy to define or address solitary confinement, extended placement or restrictive housing," and although the BoP recognizes that inmate mental health may be negatively impacted by extended periods of isolation, there is no maximum time limit imposed on stays in RHUs. Nor does BoP "track inmates' single-cell confinement or assess cumulative time in RHUs." *Id.*, at 15.

In addition to finding BoP's policies regarding RHUs "inadequate to address conditions amounting to solitary confinement," the OIG recommended that the BoP improve its tracking and

---

[37]   BoP's semantic charade has been dispositively repudiated by Judge Alex Kozinski, who, in his essay in the *Yale Law Journal*, noted that "[y]ou can call it administrative segregation or special housing or a long walk on a sandy beach.  But it will always be the box." *Worse than Death*.

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Hon. Brian M. Cogan
United States District Judge
Eastern District of New York
December 12, 2017
Page 42 of 78

monitoring of inmates housed in RHUs, and expressed concern over the fact that BoP does not restrict the length of time (consecutive or cumulative) that an inmate can spend in RHUs. *Id.*, at 22, 25-26, 65-66 (the *Review* cites three examples of inmates with diagnosed mental illness who respectively spent 5 years, 6 years, and 19 years in RHUs, citing the negative impact of long term isolation on mental health and also on the rate of recidivism).

As a result of understaffed mental health services, misdiagnosis of mental illness, and the widespread lack of monitoring of RHU confinement, the OIG report expressed concern that the "approximately 22 percent of inmates in RHUs [with] a history of mental illness" are "not receiving adequate mental health care," and recommended improvements in (1) the performance metrics used to measure mental health treatment program outcomes; (2) "mental health training for RHU correctional staff[;]" (3) alternatives to placing inmates with serious mental illness in RHUs; and (4) guidance and training to discern malingering. *Id.*, at 35, 51 (percentage of mentally ill inmates housed in RHUs was determined using the BoP's own data, which the OIG "believe[s] . . . may well be underinclusive").

Despite the recommendations to the BoP to improve the conditions of RHU confinement and to better monitor inmates (particularly those who are mentally ill) housed in RHUs, within the *OIG Restrictive Housing Review* are brief summaries of three previous reports on the BoP's policies and use of restrictive or segregated housing, which made similar findings and recommendations as far back as 2013.

For example, a report issued to Congress by the U.S. Government Office of Accountability (hereinafter "GOA") in May 2013, was in fact titled "Improvements Needed in Bureau of Prisons' Monitoring and Evaluation of Impact of Segregated Housing" (hereinafter "*GOA Segregated Housing Report*"), available at <http://www.gao.gov/products/GAO-13-429>. That report also found that 7 percent of the total inmate population (217,000) was held in segregated housing as of February 2013, and made four recommendations:

> (1) develop ADX-specific monitoring requirements . . . (2) develop a plan . . . that explains the extent to which the new software program will address documentation concerns [GOA] identified . . . [3] ensure that any current study to assess segregated housing units also includes as assessment of the extent that segregated housing contributes to institutional safety . . . [4] assess the impact of long-term segregation on inmates in SHUs, SMUs, and ADX.

*GOA Segregated Housing Report*, at 42.

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Hon. Brian M. Cogan
United States District Judge
Eastern District of New York
December 12, 2017
Page 43 of 78

In response, "BOP agreed . . . and reported it would take actions to address" the recommendations. *Id.* Yet the subsequent *OIG Restrictive Housing Review* addressed the BoP's continuing failure to monitor the cumulative time spent by inmates in ADX, although the BOP tracked the consecutive days spent there. The OIG reported an average of almost four consecutive years for all inmates, while the average for inmates with mental illness was more than 17 months longer. *OIG Restrictive Housing Review*, at 29.

Also, in 2013, the Center of Naval Analysis (hereinafter "CNA") conducted a BoP-funded assessment of its use of RHUs. That CNA assessment not only disagreed with BoP diagnoses of mental illness in almost two-thirds of cases, but found that mental health treatment was "insufficient or inappropriate in over half" of reviewed cases. *Id.*, at 12.

The 2013 CNA Report further found a widespread shortage of mental health staff, as well as concluded that the mental health conditions of numerous inmates in RHUs should have precluded them from placement there and further that "a number of inmates in RHUs had symptoms of serious mental illness that BOP psychology staff had failed to detect." *OIG Restrictive Housing Review*, at 12-13.

Finally, a report issued in January 2016 by the Department of Justice, *U.S. Department of Justice Report and Recommendations Concerning the Use of Restrictive Housing: Final Report*, (January 2016),[38] recommended that BoP "increase[] the capacity of existing secure mental health units" in order to avoid placing seriously mentally ill inmates in RHUs and also to build less restrictive forms of housing to accommodate inmates in need of "protective custody," as well as providing plans for "expanding out-of-cell time" in RHUs and "improve tracking of inmates in restrictive housing." *OIG Restrictive Housing Review*, at 13.

This failure by BoP to correct defects that have been identified by successive periodic government reports demonstrates that BoP simply remains unresponsive to constructive efforts even by sister agencies and administrators to improve conditions for inmates with mental health issues, and is impervious to recommendations for positive change in this respect notwithstanding its pledges to correct the deficiencies.

In response to the *OIG Restrictive Housing Review*, the *Washington Post* published an editorial entitled "Solitary Confinement Is Torture. Will the Bureau of Prisons Finally Stop

---

[38] The 2016 Department of Justice Report is available at <https://docs.google.com/viewer?url=https%3A%2F%2Fwww.justice.gov%2Farchives%2Fdag%2Ffile%2F815551%2Fdownload&fname=restrictive_housing_-_final_report.pdf&pdf=true>.

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Brian M. Cogan
United States District Judge
Eastern District of New York
December 12, 2017
Page 44 of 78

Using It?" *The Washington Post*, July 15, 2017, available at
<https://washingtonpost.com/opinions/solitary-confinement-is-torture-will-the-bureau-of-prisons-finally-stop-using-it/2017/07/15/f719de20-68c6-11e7-8eb5-cbccc2e7bfbf_story.html>.
Regarding BoP's practice of keeping inmates in isolation cells for 22 hours per day the editorial
stated, "[i]t would also be accurate to call it torture."[39]

### 5.    *Trending Reforms in Solitary Confinement Policy*

BoP's continued imposition of solitary confinement runs counter to reforms in several
state penal systems that are eliminating extended solitary confinement.  *See, e.g.,* Rick Raemisch,
"Why We Ended Long-Term Solitary Confinement in Colorado," *The New York Times*, October
12, 2017, available at <https://nyti.ms/2kJuHx3>.

Mr. Raemisch, who became Executive Director of the Colorado Deparment of
Corrections in 2013, asks, "[w]hen did it become O.K. to lock up someone who is severely
mentally ill and let the demons chase him around in the cell?"  *Id*.  Mr. Raemisch, who
participated as a U.S. representative in the U.N.'s formulation of the Mandela Rules, recounts
that "[d]uring the debates about the wording of the new standards, it was decided that keeping
someone for more than 15 days in solitary was torture."  *Id*.

Drawing on his direct experience and his study of the issue, Mr. Raemisch concludes that
"[t]here now is enough data to convince me that long-term isolation manufactures and aggravates
mental illness.  It has not solved any problems;  at best it has maintained them."  *Id*.  Thus, he
urges, "[i]t is time for this unethical tool to be removed from the penal toolbox."  *Id*.  *See also*
Margo Schlanger & Amy Fettig, *Eight Principles for Reforming Solitary Confinement*, AM.
PROSPECT (Fall 2015), <http://prospect.org/article/eight-principles-reforming-solitary-confinement-0>.

In Nevada, too, administrators are acting to reduce solitary confinement.  After the
gathering of "momentum to end the practice following the 2015 admission from the Association
of State Correctional Administrators that the prolonged isolation of inmates in prisons is a 'grave
problem[,]'" the director of the Nevada Department of Corrections, after legislative inaction,

---

[39]    This Court has recognized the impact of the solitary confinement experienced by
inmates on MCC's 10-South unit whose tenure there has been but a small fraction of Mr.
Harun's more than a decade of isolation.  In *United States v. Guzmán*, 09 Cr. 466 (BMC),
according to reports, the defendant's mental state "has declined to such a point that [the Court]
recently agreed to let a psychiatrist assess him."  *See* Alan Feuer, "Restrictions Make Building a
Team of Lawyers a Challenge for El Chapo," *The New York Times*, November 15, 2017,
available at <https://nyti.ms/2hFIcgt>.

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Hon. Brian M. Cogan
United States District Judge
Eastern District of New York
December 12, 2017
Page 45 of 78

"ended the practice in Nevada of putting severely mentally ill prisoners in isolation by making administrative policy changes and also created programs where inmates have a gradual transition from solitary confinement back to the general prison population."  Joseph De Avila, "Prison Officials Resist Push to Curb Solitary Confinement," *The Wall Street Journal*, April 28, 2017, available at <https://www.wsj.com/articles/bid-to-curb-solitary-confinement-faces-pushback-1493384400>.

The reforms in Colorado and Nevada are also being implemented to various degrees in other states, such as New York, North Dakota, Washington, and Illinois, as well as Maine and Pennsylvania, which have both also (like Colorado and Nevada) "barred the practice for inmates with serous mental illness in their state prisons."  Beth Reinhard, "Some Mentally Ill Federal Inmates Receive Little to No Treatment, Audit Finds," *The Wall Street Journal*, July 12, 2017, available at <https://www.wsj.com/articles/some-mentally-ill-federal-inmates-receive-little-to-no-treatment-audit-finds-1499897348>.  *See also* Rebecca Davis O'Brien, "New York Moves to Curtail Use of Solitary Confinement," *The Wall Street Journal*, December 16, 2015, available at <http://www.wsj.com/articles/new-york-state-moves-to-curtailuse-of-solitary-confinement-1450318412>;  *see also* coverage located at <https://apnews.com/46ea5b09b595486884542e4568948ca2/illinois-seeks-limit-use-solitary-confinement>.[40]

---

[40]  On the federal level, in June 2012, the U.S. Senate Subcommittee on the Constitution, Civil Rights and Human Rights conducted hearings with respect to solitary confinement.  *See* Erica Goode, "Senators Start a Review of Solitary Confinement," *The New York Times*, June 19, 2012, available at <http://www.nytimes.com/2012/06/20/us/senators-start-a-review-of-solitary-confinement.html?_r=1&>;  "Senators Get Time In Solitary Confinement," *National Public Radio*, June 19, 2012, available at <http://www.npr.org/templates/transcript/transcript.php?storyId=155369432>.  *See also* <http://solitarywatch.com/resources/testimony/> (collecting testimony from the hearings).

According to *The New York Times* article (the link to which is provided above), Senator Richard J. Durbin (D – Ill.) noted that "more prisoners are held in isolation in the United States than in any other democracy . . ."  Sen. Durbin added that the hearings were well-attended, indicating "'that the time is due for us to have this conversation about where we're going."  *Id.* During the hearings, Sen. Durbin asked Charles E. Samuels, Jr., director of the U.S. Bureau of Prisons, "Do you believe you could live in a box like that [which was on display in the hearing room] 23 hours a day, a person who goes in normal, and it wouldn't have any negative impact on you?"  Ultimately, Director Samuels replied, "I would say I don't believe it is the preferred option, and that there would be some concerns with prolonged confinement."  *Id.*

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**
 

Hon. Brian M. Cogan
United States District Judge
Eastern District of New York
December 12, 2017
Page 46 of 78

Mr. Harun has spent his confinement in as severe a state of deprivation as anyone in the U.S. during the past 13 years.  Any future reforms recognizing that prolonged solitary confinement is cruel and unusual, and in many ways counterproductive, will not recapture for him those years.  Yet a sentence that factors in the level of punishment such conditions impose, so much so that there have been widespread recent efforts to ameliorate them, would be appropriate.[41]

> ### F.     *Mr. Harun Should Receive Credit for the Seven Years and Ten Months He Spent in Custody in Libya and Italy*

Mr. Harun should be credited with the the 6½ years he spent in Libyan detention (described **ante** in Section II(B);  *see also* CLASSIFIED December 12, 2017, Letter), as well as the 16 months he was in Italian custody prior to his October 2012 extradition to the U.S. for the charges upon which he was convicted here at trial.

Regarding both prior segments of Mr. Harun's detention, 18 U.S.C. §3585(b) provides that

> b)     Credit for Prior Custody.—A defendant shall be given credit toward the service of a term of imprisonment for any time he has spent in official detention prior to the date the sentence commences—
>
> (1)     as a result of the offense for which the sentence was imposed;  or
>
> (2)     as a result of any other charge for which the defendant was arrested after the commission of the offense for which the sentence was imposed;

Here, §3585(b)(1) applies to Mr. Harun because he was in official detention "as a result of the offense for which" this sentence is being imposed.  Subsection (b)(2) applies because Mr. Harun was imprisoned in Libya and Italy "as a result of [] other charge[s] for which [Mr. Harun] was arrested after the commission of the offense" for which this sentence will be imposed.

---

[41]     In ironic contrast, detainees at the U.S. Naval Base at Guantanamo Bay, Cuba, enjoy far less strict conditions.  Although they were ostensibly engaged in armed conflict with U.S. and/or associated forces overseas, 90 per cent of Guantanamo detainees are in communal living quarters, and can be outside those quarters 20 hours per day.  As an article in *The Miami Herald* related, "[t]he majority of the 176 men left behind here spent the past months watching day-old recordings of World Cup matches, playing PlaySTation 3, taking life-skills courses and occasionally seeing and chatting with their families via Skype."  Francis Robles, "Guantanamo Detainees Still Waiting for Day In Court," *The Miami Herald*, July 26, 2010.

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Brian M. Cogan
United States District Judge
Eastern District of New York
December 12, 2017
Page 47 of 78

Consequently, he should receive credit for the seven years and ten months total detention time in Libya and Italy prior to his transfer to the U.S.

> **G.    The Automatic Application of the Guidelines' Terrorism**
> **Enhancement Should Be Remedied By Either a Downward**
> **Departure and/or Resort to the §3553(a) Sentencing Factors**

The automatic application of the Guidelines' Draconian 12-point terrorism enhancement in §3A1.4 – both vertically with respect to the offenses level, and horizontally with respect to Criminal History Category – should be remedied by either a downward departure or resort to the §3553(a) sentencing factors.

> **1.    The Automatic 12-Point Increase in Offense Level Should**
> **Be Offset By Consideration of the §3553(a) Sentencing Factors**

The mere applicability of §3A1.4 does not end the analysis or dictate the sentence, as the other §3553(a) sentencing factors, and the parsimony clause,[42] must be considered in counterpoint to the drastic impact of §3A1.4.

In that context, the Second Circuit's decision in *United States v. Dorvee*, 616 F.3d 174 (2d Cir. 2010) – an opinion endorsed by the Ninth Circuit in *United States v. Henderson*, 649 F.3d 955 (9th Cir. 2011) – in which the Court addressed essentially automatic but severe Guidelines enhancements in child pornography cases that placed Guidelines ranges at or near the statutory maximum(s) is particularly pertinent here, too.

In *Dorvee* the Second Circuit noted the high frequency with which §2G2.2's component enhancements applied in child pornography cases ("to the vast majority of defendants sentenced under §2G2.2"), "resulting in a typical total offense level of 35[,]" which in turn led to Guidelines ranges at or beyond the statutory maximum even in routine cases. 616 F.3d at 186. In the terrorism context, too, the scope of the terrorism enhancement in §3A1.4, is so broad that it invariably applies in every terrorism case. *See, e.g., United States v. Stewart*, 590 F.3d 93 (2d Cir. 2009).

Both the Second Circuit, in *Dorvee*, and the Ninth Circuit, in *Henderson*, have explained

---

[42]    In *United States v. Dorvee*, 616 F.3d 174, 184 (2d Cir. 2010), in discussing the "parsimony clause," the Second Circuit reiterated that "[p]lainly, if a district court were explicitly to conclude that two sentences equally served the statutory purpose of §3553, it could not . . . impose the higher." 616 F.3d at 184, *quoting United States v. Ministro-Tapia,* 470 F.3d 137, 142 (2d Cir. 2006).

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Hon. Brian M. Cogan
United States District Judge
Eastern District of New York
December 12, 2017
Page 48 of 78

that §2G2.2 is different from most Guidelines in that it is not based on empirical data.  *See Dorvee*, 616 F.3d at 186.  *See also Henderson*, 649 F.3d at 962- 963 ("[a]s the history and the Commission's own reports and assessments of these Guidelines demonstrate, the child pornography Guidelines are, to a large extent, not the result of the Commission's 'exercise of its characteristic institutional role,' which requires that it base its determinations on 'empirical data and national experience,' but of frequent mandatory minimum legislation and specific congressional directives to the Commission to amend the Guidelines"), *quoting Kimbrough v. United States*, 552 U.S. 85, 109 (2007) (discussing the same defect with regard to the crack-cocaine Guidelines at issue in that case).

The same is true with respect to §3A1.4 as well:  it represents merely a point in space chosen arbitrarily, and is not the result of the Sentencing Commission's core function, *i.e.*, assigning Guidelines levels that conform with conclusions based on data compiled from a statistically significant number of cases.

In *Dorvee*, the Second Circuit further examined the extent to which a sentencing court owes deference to the Guidelines when a particular enhancement is not the product of empirical evidence, explaining that the ordinary

> deference to the Guidelines is not absolute or even controlling; rather, like our review of many agency determinations, "[t]he weight of such a judgment in a particular case will depend upon the thoroughness evident in [the agency's] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control."  *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 [] (1944);  *see Kimbrough*, 552 U.S. at 109 [] (citing the crack cocaine Guidelines as an example of Guidelines that "do not exemplify the Commission's exercise of its characteristic institutional role").

616 F.3d at 188.  *See also Henderson*, 649 F.3d at 963 and n.4 (noting that "similar to the crack cocaine Guidelines, district courts may vary from the child pornography Guidelines, §2G2.2, based on policy disagreement with them[,]" and adding that "in so holding we join several of our sister circuits" including the Second Circuit), *quoting Dorvee*, 616 F.3d at 184-86 (for the proposition that §2G2.2, which imposes enhancements relating to possession of child pornography, is "fundamentally different" from other Guidelines and, unless it is "applied with great care, can lead to unreasonable sentences that are inconsistent with what § 3553 requires").

Hon. Brian M. Cogan
United States District Judge
Eastern District of New York
December 12, 2017
Page 49 of 78

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

In evaluating §2G2.2 in *Dorvee*, the Court identified specific problems with such enhancements.  For example,

> [a]n ordinary first-time offender is therefore likely to qualify for a sentence of at least 168 to 210 months, rapidly approaching the statutory maximum, based solely on sentencing enhancements that are all but inherent to the crime of conviction.

*Id*., at 186.

> As a result, the Court in *Dorvee* recognized that under such circumstances

> adherence to the Guidelines results in virtually no distinction between the sentences for defendants like Dorvee, and the sentences for the most dangerous offenders who, for example, distribute child pornography for pecuniary gain and who fall in higher criminal history categories.

*Id.*, at 187.

Confronted with that situation in *Dorvee*, the Second Circuit concluded that "[t]his result is fundamentally incompatible with § 3553(a)[,]" because "[b]y concentrating all offenders at or near the statutory maximum, §2G2.2 eviscerates the fundamental statutory requirement in §3553(a) that district courts consider 'the nature and circumstances of the offense and the history and characteristics of the defendant[.]'" *Id*.

The Court in *Dorvee* added that mechanical application of such Guidelines enhancements

> violates the principle, reinforced in *Gall,* that courts must guard against unwarranted similarities among sentences for defendants who have been found guilty of dissimilar conduct.  *See Gall,* 552 U.S. at 55 [] (affirming a sentence where "it is perfectly clear that the District Judge considered the need to avoid unwarranted disparities, but also considered the need to avoid unwarranted *similarities* among other co-conspirators who were not similarly situated" (emphasis in original)).

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Brian M. Cogan
United States District Judge
Eastern District of New York
December 12, 2017
Page 50 of 78

*Id*.[43]

Thus, as the Court in *Dorvee* lamented with respect to §2G2.2, "sentencing enhancements cobbled together through this process routinely result in Guidelines projections near or exceeding the statutory maximum, even in run-of-the-mill cases." 616 F.3d at 186. Yet, as the Court cautioned, "[i]n all events, even a statutory maximum sentence must be analyzed using the §3553(a) factors." 616 F.3d at 184.

Ultimately, the Court in *Dorvee* reminded that

[d]istrict judges are encouraged to take seriously the broad discretion they possess in fashioning sentences under §2G2.2 – ones that can range from non-custodial sentences to the statutory maximum-bearing in mind that they are dealing with an eccentric Guideline of highly unusual provenance which, unless carefully applied, can easily generate unreasonable results.

616 F.3d at 188.

That "broad discretion" exists here as well, even when the specter of terrorism is present. As the Court concluded in *Dorvee*, "[w]hile we recognize that enforcing federal prohibitions on child pornography is of the utmost importance, it would be manifestly unjust to let [the defendant's] sentence stand." *Id*. Here, the same is true with respect to applying §3A1.4 to Mr. Harun, notwithstanding the importance of counterterrorism policy and practice, particularly, for the reasons detailed **ante**, in Section II(A), with respect to Count One and to the extent that Count's conduct is incorporated in Counts Three and Four.

Here, as in *Dorvee*, "adherence to the Guidelines results in virtually no distinction between sentences for the most dangerous offenders," and someone like Mr. Harun whose conduct, particularly with respect to the charges related to combat in Afghanistan, occurred in a decidedly military and non-terrorist context, and did not commit any offenses prior to those

---

[43] In *Dorvee*, the Court offered an example of how Guidelines like §2G2.2 create – via automatic substantial enhancements applied across a broad spectrum of a specific offense conduct – unwarranted *similarities* among dissimilar defendants: "[e]ven with no criminal history, this [defendant's] total offense level of 23 would result in a Guidelines sentence of 46 to 57 months. This is the same Guidelines sentence as that for an individual with prior criminal convictions placing him in a criminal history category of II, who has been convicted of an aggravated assault with a firearm that resulted in bodily injury.[]" 616 F.3d at 187 (footnote omitted). *See also* **post**, at 49-52.

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Brian M. Cogan
United States District Judge
Eastern District of New York
December 12, 2017
Page 51 of 78

charged in this case. 616 F.3d at 187. Thus, sentencing Mr. Harun within the Guidelines range dictated by §3A1.4 would result in a sentence that is "fundamentally incompatible with §3553(a)." *Id*.

> **2.** *Increasing Mr. Harun's Criminal History Category From Category I to Category VI Grossly Overstates His Criminal History*

Notwithstanding application of the enhancement in §3A1.4 to Mr. Harun, the Court should depart downward a significant amount, or impose a non-Guidelines sentence less than life imprisonment, because the prong of the enhancement that assigns Mr. Harun to Criminal History Category VI, §3A1.4(b), constitutes a gross overstatement of his criminal history, which otherwise would be Category I (lacking any prior criminal history, and therefore having zero criminal history points). Also, as discussed below, the enhancement undermines the structure of the Guidelines, and the role and purpose of the Criminal History Category in maintaining individualized sentencing determinations.

As a result, the Court should correct the inequity created by §3A1.4(b) with a substantial "horizontal" downward departure with respect to Mr. Harun's Criminal History Category. As the Guidelines instruct, the Court may depart downward if:

> reliable information indicates that the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes[.]

U.S.S.G. § 4A1.3(b)(1).

In addition, even without a formal departure on that ground, the distortion created by §3A1.4(b) provides further compelling justification for a non-Guidelines sentence, dramatically below the Guidelines range, based on the factors set forth in 18 U.S.C. §3553(a).

As one District Court has recognized, "[a]fter applying § 3A1.4, Defendant's criminal history is maximized at category VI. For an individual with no criminal record and no evidence of ever having committed an illegal act in his life outside of the conduct for which he is convicted, this clearly over-represents the seriousness of his criminal history." *United States v. Benkahla*, 501 F.Supp.2d 748, 759 (E.D.VA 2007) (granting a departure pursuant to USSG §4A1.3, and reducing the defendant's criminal history category from VI to I), *affirmed*, 530 F.3d 300 (4th Cir. 2008).

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Brian M. Cogan
United States District Judge
Eastern District of New York
December 12, 2017
Page 52 of 78

Encouraging flexibility in addressing the impact of §3A1.4 on a defendant's Criminal History, the Second Circuit has instructed that "[a] judge determining that §3A1.4(b) over-represents 'the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes' always has the discretion under §4A1.3 to depart downward in sentencing." *United States v. Meskini*, 319 F. 3d 88, 92 (2d Cir. 2003).

Moreover, as the Introductory Commentary to Chapter Four of the Sentencing Guidelines (entitled "Criminal History and Criminal Livelihood") states, "[t]he Comprehensive Crime Control Act sets forth four purposes of sentencing. (*See* 18 U.S.C. § 3553(a)(2).) *A defendant's record of past criminal conduct is directly relevant to those purposes.* A defendant with a record of prior criminal behavior is more culpable than a first offender and thus deserving of greater punishment." (Emphasis added).

Here, the balance between the offense and the offender has been irremediably disrupted by the PSR's reflexive placement of Mr. Harun in Criminal History Category VI. In addition to ignoring the mandate of §3553(a)(1), and overstating Mr. Harun's Criminal History score as much as possible under the Guidelines (from zero to the maximum), the enhancement precludes any retention of individualized sentencing of Mr. Harun because it effectively removes from advisory Guidelines consideration the only axis that integrates a defendant's background and history into the advisory Guidelines equation.[44]

---

[44] Justice Breyer, who chaired the Sentencing Commission, recounted the "trade-offs" that were part of the initial Sentencing Commission's compromises in formulating the Guidelines and their framework, including how the Criminal History Category was designed as the sole element that considered *offender* characteristics:

> [o]ne important area of such compromise concerns "offender" characteristics. The Commission extensively debated which offender characteristics should make a difference in sentencing; that is, which characteristics were important enough to warrant formal reflection within the Guidelines and which should constitute possible grounds for departure. Some argued in favor of taking past arrest records into account as an aggravating factor, on the ground that they generally were accurate predictors of recidivism.[] Others argued that factors such as age, employment history, and family ties should be treated as mitigating factors.[] Eventually, in light of the arguments based in part on considerations of fairness and in part on the uncertainty as to how a sentencing judge would actually account for the aggravating and/or mitigating factors, the Commission decided to write its offender

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Hon. Brian M. Cogan
United States District Judge
Eastern District of New York
December 12, 2017
Page 53 of 78

The only means of restoring any equilibrium to Mr. Harun's sentencing, and complying with the dictates of §3553(a)(1), is by departing downward based on Mr. Harun's lack of any prior criminal record, and/or imposing a non-Guidelines sentence, grounded in the other §3553(a) sentencing factors, below life imprisonment.

Ordinarily, the exclusion of consideration of the defendant's background and history in the ordinary advisory Guidelines calculation is offset by the Criminal History score.  Here, though, it is respectfully submitted that the imbalance created by assigning Mr. Harun to Criminal History Category VI can be rectified only by a substantial "horizontal" downward departure.  *See, e.g.*, *United States v. Landa*, 281 F.Supp.2d 1139, 1141 (N.D.Cal. 2003) (downward departure granted upon a finding that the Criminal History Category had overstated the defendant's criminal history); *Czernicki v. United States*, 270 F.Supp.2d 391, 393 (S.D.N.Y. 2003) (downward departure granted upon a finding that the Criminal History Category had overstated the defendant's criminal history).

In the alternative, the automatic placement of Mr. Harun in Category VI should be remedied by a non-Guidelines sentence, below life imprisonment, that accounts for the other §3553(a) factors that greatly outweigh the arbitrary application of the absolute and extreme horizontal Guidelines enhancement applied via §3A1.4(b).  *See also* United States Sentencing Commission March 2006 *Final Report on the Impact of* United States v. Booker *on Federal Sentencing* , at 78 (excessive Criminal  History Category constitutes one of the four most common reasons post-*Booker* for non-Guidelines sentences imposed below the calculated range).

Accordingly, the effect of the terrorism enhancement, §3A1.4 on Mr. Harun should be neutralized, both vertically (regarding his offense level) and/or horizontally (regarding his Criminal History Category), through a downward departure and/or consideration of the §3553(a)

characteristics rules with an eye towards the Parole Commission's previous work in the area.[] As a result, the current offender characteristics rules look primarily to past records of convictions. They examine the frequency, recency, and seriousness of past crimes, as well as age, treating youth as a mitigating factor. The rules do not take formal account of past arrest records or drug use, or the other offender characteristics which Congress suggested that the Commission should, but was not required to, consider.[] In a word, the offender characteristics rules reflect traditional compromise.

*See* Breyer, *The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest*, 17 Hofstra L. Rev. 1 (Fall 1988), at 19-20 (footnotes omitted).

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Brian M. Cogan
United States District Judge
Eastern District of New York
December 12, 2017
Page 54 of 78

factors consistent with the principles and concerns expressed in *Dorvee*.

### 3. *The Above Analysis Also Applies to Other Guidelines Enhancements Present in the PSR*

The PSR includes in its calculations other enhancements that either fall into the same category as in *Dorvee*, discussed above, or that simply provide an alternative basis for enhancing the same conduct for predominantly the same reason. Also, as discussed above, the specific context of Count One's conduct, and to the extent it affects the computations for Counts Three and Four, renders these enhancements inapplicable to Mr. Harun.

Those other enhancements include:

(a)  the use of the offense level – 43 – for first-degree murder. *See* PSR, at ¶¶ 28, 30 & 48;

(b)  the use of the attempted first-degree murder offense level for all 34 U.S. military personnel (in addition to the two soldiers who died) who suffered any injury during the April 25, 2003, engagement in Shkin, Afghanistan. *See* PSR, at ¶ 32;

(c)  the six-level adjustment, pursuant to §3A1.2(b) for the death of a government employee, which is not only is inapplicable in this context, but which also should be subsumed within the 12-level terrorism enhancement. *See* ¶¶ 29, 31 & 33.

### H. *The Need, Pursuant to 18 U.S.C. §3553(a)(6), to "Avoid Unwarranted Sentence Disparities Among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct" Compels a Sentence Less Than Life Imprisonment*

As explained **ante**, at 9-15, it is respectfully submitted that because of the unique circumstances of the actions penalized in Count One, Mr. Harun's offense conduct is more consistent with typical "material support" terrorism cases in which terrorist plots may have been planned, but not effectuated.

As a result, it is respectfully submitted that Mr. Harun's sentence should also be commensurate with those in such unconsummated material support cases. Moreover, even if the acts in Count One are considered homicide in a conventional sense, the statistics establish that a sentence less than life imprisonment would still be the most reasonable and appropriate for Mr. Harun.

Hon. Brian M. Cogan
United States District Judge
Eastern District of New York
December 12, 2017
Page 55 of 78

1.      *Analysis of Terrorism-Related Sentences Since September 11, 2001*

New York University's Center on Law and Security, subsequently reconstituted as the Center on National Security at Fordham University Law School (hereinafter "the Center"), periodically publishes comprehensive statistical treatments of post-September 11th terrorism prosecutions in the U.S.  The analysis in those reports dispositively demonstrates that a life sentence for Mr. Harun would be disproportionate and create an unwarranted sentencing disparity in contravention of §3553(a)(6).

Even as a whole, the statistics establish that a sentence of even 20 years' imprisonment well exceeded the average for terrorism-related charges and cases.  The Center's three most recent versions of its "Terrorist Trial Report Card," which examined terrorism-related prosecutions and their results and were published in 2006, 2010, and 2011, each analyzed the data somewhat differently, but provided illuminating figures.

For example, the September 11, 2008, edition of that Terrorist Trial Report Card, based on the sentences imposed on the 370 defendants convicted of terrorism offenses (and sentenced) between September 11, 2001, and September 2008 reported that the average sentence for all defendants convicted of terrorism charges was approximately twelve years and eight months (12.67 years),[45] and the average sentence for convictions for material support for terrorism were 14.75 years (18 U.S.C. §2339A) and 11.92 years (§2339B).  Even for violations of 18 U.S.C. §2332 (murder of U.S. nationals outside the U.S. – Count One), the average sentence was 26 years.[46]

The 2010 version of the Terrorist Trial Report Card, which covered U.S. federal prosecutions between September 11, 2001, and September 11, 2009, provided slightly different nomenclature:  (i)  the "average sentence for persons convicted of terrorism" was 16 years (191.9 months);  (ii)  the "average sentence for persons charged with terrorism" was 19.7 years (236 months);  (iii)  the "average sentence for persons charged with national security violations but not terrorism" was 10.4 years (124.5 months);  and (iv)  the "average sentence for persons convicted of national security violations and not charged with terrorism" was 7.5 years (90.3 months).[47]

---

[45]  *Terrorist Trial Report Card, September 11, 2008*, available at <http://www.lawandsecurity.org/Portals/0/documents/03_Sept08TTRCFinal1.pdf>.

[46]  *Id.*

[47]  *Terrorism Trial Report Card, September 11, 2001-September 11, 2009* (published January 2010), at 13, available at <http://www.lawandsecurity.org/Portals/0/documents/01_TTRC2010Final1.pdf>.  *See also*

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Brian M. Cogan
United States District Judge
Eastern District of New York
December 12, 2017
Page 56 of 78

The September 2011 edition of the Terrorist Trial Report Card, covering September 11, 2001, through September 11, 2011, again alters the characterization, and provides the following average sentences graphically (and not in precise numbers):

    (i)      for "Terror or National Security Top Charge":  between 10 and 15 years;

    (ii)     for "Material Support Top Charge":  also between 10 and 15 years, but less than for "Terror or National Security Top Charge;"

    (iii)    for "Material Support Lesser Charge":  slightly less than 15 years;

    (iv)    for "National Security Charge Conviction":  slightly more than 15 years;

    (v)     for "Terror Charge Conviction":  also slightly more than 15 years, but slightly more than for "National Security Charge Conviction;" and

    (vi)    for "Terror and National Security Charge Conviction":  25 years.[48]

In 2013, the Center also published "By the Numbers – U.S. Prosecutions of Jihadist Terror Crimes, 2001-2013,"[49] digesting 368 cases, 297 convictions (209 by guilty plea and 89 after trial).  The average sentence for all cases was 181 months (15 years, one month), and 201 months (16 years, 9 months) for convictions pursuant to 18 U.S.C. §2339A, and 199 months (16 years, 7 months) for convictions pursuant to 18 U.S.C. §2339B – the material support offenses for which Mr. Harun was convicted at trial.[50]

---

*Terrorist Trial Report Card: U.S. Edition*, Appendix B at 10, New York University School of Law Center on Law and Security, available at <http://www.lawandsecurity.org/publications/TTRCComplete.pdf>.

[48]  *Terrorism Trial Report Card, September 11, 2001-September 11, 2011*, at 7, available at <http://www.lawandsecurity.org/Portals/0/Documents/TTRC%20Ten%20Year%20Issue.pdf>.

[49]  That report is available at <https://static1.squarespace.com/static/55dc76f7e4b013c872183fea/t/56b88ef1356fb0ff251aa15a/1454935794120/JihadistFactSheet2001-13.pdf>.

[50]  The Center has continued to publish periodic reports on terrorism prosecutions, particularly those involving persons charged with offenses connected to the Islamic State (hereinafter "ISIS").  *See, e.g., The American Exception:  Terrorism Prosecutions in the United States – The ISIS Cases*, September 13, 2017, available at

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Hon. Brian M. Cogan
United States District Judge
Eastern District of New York
December 12, 2017
Page 57 of 78

Another useful, more specific comparison is the sentence imposed on Alhassane Ould Mohamed, the defendant in *United States v. Mohamed*, 13 Cr. 527 (WFK) (E.D.N.Y.), in which the defendant's plea agreement limited him to a 25-year prison sentence, which he received. *See* ECF Docket #155 (Judgment). In 2013, Mr. Mohamed was charged with the murder and attempted murder of U.S. Embassy personnel in Niger in December 2000, but, *unlike* Mr. Harun, *outside* the battlefield context, and not in conformity with the laws of armed conflict.*See* Indictment, *United States v. Mohamed*, at ¶¶ 20-22 (ECF Docket #1).[51]

Compared to Mr. Mohamed's case, as well as the hundreds of other cases that comprise the data set evaluated in the Center reports discussed above, Mr. Harun does not present offense conduct warranting a more severe sentence.

---

<https://docs.google.com/viewer?url=https%3A%2F%2Fstatic1.squarespace.com%2Fstatic%2F5 5dc76f7e4b013c872183fea%2Ft%2F59cf980ae45a7c855f673bca%2F1506777101200%2FThe% 2BAmerican%2BException%2B9-17.pdf&pdf=true>; *Case by Case: ISIS Prosecutions in the United States*, July 6, 2016, available at <https://docs.google.com/viewer?url=https%3A%2F%2Fstatic1.squarespace.com%2Fstatic%2F5 5dc76f7e4b013c872183fea%2Ft%2F577c5b43197aea832bd486c0%2F1467767622315%2FISIS %2BReport%2B-%2BCase%2Bby%2BCase%2B-%2BJuly2016.pdf&pdf=true>; *May 2017 Update: ISIS in the U.S.,* May 8, 2017, available at <https://docs.google.com/viewer?url=https%3A%2F%2Fstatic1.squarespace.com%2Fstatic%2F5 5dc76f7e4b013c872183fea%2Ft%2F591095c89de4bb0a23961069%2F1494259145920%2FISIS %2BCase%2BUpdate%2B5-8-2017.pdf&pdf=true>; *Statistical Overview*, February 24, 2017, available at <https://docs.google.com/viewer?url=https%3A%2F%2Fstatic1.squarespace.com%2Fstatic%2F5 5dc76f7e4b013c872183fea%2Ft%2F58b0a7145016e199ea7677c3%2F1487972117194%2FFS-5 %2BISIS_AQ%2BOverview.pdf&pdf=true>; *By the Numbers: ISIS Cases in the United States*, June 22, 2015, available at <https://static1.squarespace.com/static/55dc76f7e4b013c872183fea/t/56b3aae8f8baf3bfd460ecb5 /1454615277175/ISIS+Cases+in+the+U.S.+-+June+2015.pdf>.

[51]   Certainly, there should not be a distinction in sentencing – nor does §3553(a)(6) prescribe one – based on Mr. Harun's availing himself of his Sixth Amendment right to trial. *See, e.g.,* J. Vincent Aprile II, "Criminal Justice:  Judicial Imposition of the Trial Tax," *GP Solo*, American Bar Association, Vol. 32, No. 1, January/February 2015, available at <https://www.americanbar.org/publications/gp_solo/2015/january-february/criminal_justice_judicial_imposition_the_trial_tax.html>;  Andrew Chongseh Kim, *Underestimating the Trial Penalty: An Empirical Analysis of the Federal Trial Penalty and Critique of the Abrams Study*, Mississippi Law Journal, Vol. 84, No. 5, 2015, available at <https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2635657>.

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Hon. Brian M. Cogan
United States District Judge
Eastern District of New York
December 12, 2017
Page 58 of 78

> 2.      *The Sentencing Commission's Most Recently Published*
> *Sentencing Statistics Demonstrate That a Life Sentence*
> *Here for Mr. Harun Would Create An Unwarranted Disparity*

The United States Sentencing Commission (hereinafter "the Sentencing Commission") publishes each quarter an abstract of federal sentencing statistics entitled *U.S. Sentencing Commission Preliminary Quarterly Data Report*.  The most recent figures are contained in the *Quarterly Data Report, Preliminary Fiscal Year 2017 Data, Through June 30, 2017* (hereinafter "*Preliminary Data Report 2017*"), which covers sentences imposed between October 1, 2016 and June 30, 2017, and demonstrates that the Guidelines no longer constitute the predominant factor in a decisive majority of sentences in the Eastern District of New York (or the Southern District of New York, either).[52]

For example, the *Preliminary Data Report 2017* reveals that between October 1, 2016 and June 30, 2017, within the Second Circuit, 67.7% of sentences were *below* the calculated Guidelines range.  *See Preliminary Data Report 2017*, at 12.[53]  In EDNY, with only 23.4% of sentences within range,[54] a clear majority of sentences, 74.9%, were below the Guidelines range (along with 74.3% in the Southern District of New York).  *Id*.  Thus, in EDNY, a sentence *below* the Guidelines range is the overriding *norm*, and *not* the exception.

Those numbers represent a continuing trend since *Booker* was decided January 12, 2005. In the first quarter of 2005, 70.5% of sentences nationally were *within* the Guidelines range. *Sourcebook of Federal Sentencing Statistics*, U.S. Sentencing Commission, Section 2, Fig. G & Section 3, Fig. G (2005), available at <http://www.ussc.gov/research-and-publications/annual-reports-sourcebooks/2005/sourcebook-2005>.  That number initially decreased to 61.8% by the first quarter of 2006, then remained essentially steady (60.7% for first quarter 2007, and 60.0% for first quarter 2008),

---

[52]  The *Preliminary Data Report 2017* is available at <https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/quarterly-sentencing-updates/USSC_Quarter_Report_3rd_FY17.pdf>.  Prior *Quarterly Data Reports* are also available on the Sentencing Commission's web site, www.ussc.gov.

[53]  Nationally, for that time period, only 49% of sentences were *within* the Guidelines range.  *Preliminary Data Report 2017*, at 12.

[54]   The only other districts with a lower percentage of sentences within the Guidelines range were the District of Vermont, at 21.3%, the District of Rhode Island, at 19.2%, Eastern District of Wisconsin, at 15%, and the Southern District of California, at 15%.  *See Preliminary Data Report 2017*, at 12-14.

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Hon. Brian M. Cogan
United States District Judge
Eastern District of New York
December 12, 2017
Page 59 of 78

before resuming its decline in 2009 and thereafter.  *Id*.

In addition, only a minute fraction – 1.7% – of all EDNY sentences were *above* the Guidelines range.  *See Preliminary Data Report 2017*, at 12.  Even excluding those below-Guidelines sentences based on government-sponsored motions – 30.6% of EDNY sentences,[55] including motions pursuant to §5K1.1 and §5K3.1 – the trend of imposing below-Guidelines sentences in EDNY is still apparent.

Non-government sponsored factors, including §3553(a) factors, Guidelines downward departures, and/or a combination thereof, were responsible for 44.3% of sentences.  *See Preliminary Data Report 2017*, at 12.  Therefore, of all the below-Guidelines sentences imposed in EDNY between October 2016 and June 2017, well more than half (approximately 59%) were imposed based on non-government sponsored factors.

Notably, the sentencing statistics for Fiscal Year 2016 (spanning October 1, 2015 to September 30, 2016), reveal that the trend of imposing below-Guidelines sentences is even more robust when the statistics are drawn from a full year of sentences, rather than the nine months covered in the most recent statistical report (*Preliminary Data Report 2017*).  *See 2016 Sourcebook of Federal Sentencing Statistics*, Fiscal Year 2016 (hereinafter "*Sourcebook*"), available at <https://www.ussc.gov/research/sourcebook-2016>.

In fact, the *Sourcebook* provides significantly more detailed information on the sentences imposed.  In the Second Circuit as a whole in Fiscal Year 2016, only 27.8% of sentences in the Second Circuit were within the Guidelines, with just 2.5% above the Guidelines range, and 70.9% of all sentences were below the calculated Guidelines range, with slightly more than half (51%) of all below-Guidelines sentences attributable to *Booker* factors alone – 36.3% of *all* sentences imposed in the Second Circuit were categorized as "below range w/ *Booker*." *Sourcebook*, Table 26, at S71-S72.

For Fiscal Year 2016, 76.3% of EDNY sentences were below the Guidelines range.  *See Sourcebook*, Table 26, at S71-S72.  The proportion of those sentences in EDNY attributable exclusively to "below range w/ *Booker*" was 32.4%.  *See Sourcebook*, Table 26, at S74. Furthermore, just 34% of all sentences were below-Guidelines *and* attributable to government sponsored motions or downward departures, demonstrating that the proportion of §3553(a)-based below-Guidelines sentences relative to government-sponsored below-Guidelines sentences has increased dramatically since *Booker*.  *See Sourcebook*, Table 26, at S72.  *Compare, U.S. Sentencing Commission Preliminary Quarterly Data Report, 3rd Quarter Release*, Preliminary

---

[55] The percentages are of *all* sentences within the District, as that is how the figures are presented in the *Data Report*.

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Brian M. Cogan
United States District Judge
Eastern District of New York
December 12, 2017
Page 60 of 78

Fiscal Year 2006 Data, Through July 30, 2006, at 3 (in Fiscal Year 2006, just 15% of sentences were "below range w/*Booker*," while 15.2% of sentences were below the Guidelines range and attributable to government-sponsored downward departures).

Also, Table 13 of the *2016 Sourcebook*, at S-30, entitled "Sentence Length In Each Primary Offense Category," provides the mean and median sentence nationally in each offense category for all of Fiscal Year 2016. Terrorism offenses are not delineated separately. However, a life sentence for Mr. Harun would be dramatically longer than either the mean or median for *any* offense category by a considerable margin – including murder (mean: 241 months; median 210 months), kidnaping/hostage taking (mean: 239 months; median: 213 months); sexual abuse (mean: 144 months; median: 120 months), child pornography (mean: 145 months; median: 97 months), and manslaughter (mean: 69 months; median: 60 months).

These statistics demonstrate that across the country, and especially within the Second Circuit and the Eastern District of New York, imposing a sentence within the Guidelines range is no longer the norm, and increasingly, below Guidelines sentences are attributable to the factors outlined in *Booker* and 18 U.S.C. §3553(a).

Thus, a Guidelines sentence – a life sentence – pursuant to the applicable advisory range for Mr. Harun in this case not only ignores all §3553(a) factors other than the Guidelines (and particularly as they relate to him), but also defies empirical reality in this Circuit, and particularly, in this district. As a result, the Guidelines do not represent a sentence "sufficient, but not greater than necessary" to accomplish the objectives of sentencing with respect to Mr. Harun, and therefore, a sentence below life imprisonment more than adequately serves that purpose.

These collective statistics demonstrate that a sentence in this case below life imprisonment would certainly be "sufficient, but not greater than necessary," to achieve 18 U.S.C. §3553(a)(2)'s stated goals of sentencing, and would, as required by 18 U.S.C. §3553(a)(6), avoid creating an unwarranted sentencing disparity between Mr. Harun and other defendants whose offense conduct was either equivalent or demonstrably worse.

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Hon. Brian M. Cogan
United States District Judge
Eastern District of New York
December 12, 2017
Page 61 of 78

> 3.  ***The Lack of Harm Caused By Mr. Harun's Offense
> Conduct Other Than In Count One Is A Factor
> Contributing to a Sentence Less Than Life Imprisonment***

As noted above, among the problems identified by the Second Circuit in *Dorvee* is the manner in which enhancement applied in every instance with respect to a certain offense eliminates distinctions in the nature and severity of offense conduct by different defendants in different cases. 616 F.3d at 186-187.  *See also* **ante**, at 45-49.

Even at the inception of the Guidelines, Justice Breyer, in his capacity as Chair of the Sentencing Commission, assured the legal community that the system was intended to recognize that "particular crimes may be committed in different ways, which in the past have made, and still should make, an important difference in terms of the punishment imposed."  *See* Breyer, *The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest*, 17 Hofstra L. Rev. at 9.

Yet, here, the onerous and automatic character of the terrorism enhancement obscures any variance between Mr. Harun's offense conduct (other than that in Count One) and that in which harm occurred as a result.  In fact, other than Count One, the remainder of Mr. Harun's offense conduct was predominantly inchoate and, in terms of violent acts, entirely unconsummated. Indeed, the evidence established that Mr. Harun made very little tangible progress toward the plots he contemplated in West and/or North Africa.

That distinction is a legitimate basis for a lower sentence, even in a case involving terrorism offenses.  For example, in *United States v. Stewart*, 590 F.3d 93 (2d Cir. 2009), Judge Sack, writing for the majority, concluded that "it was not unreasonable for the district judge to decide that the fact that no injury occurred in the case mitigated the gravity of [a defendant's] offense."  *Id*., at 139 (footnote omitted).

As Judge Sack explained,

> [t]he criminal law often punishes the substantive commission of a crime more severely than an attempt to commit the same crime, even when that which separates an attempt from the substantive commission of an offense is not culpability but fortuity.  Fortuitous events are not categorically irrelevant to the determination of a just punishment nor is their consideration necessarily inappropriate.

*Id*., at 139-140.

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Brian M. Cogan
United States District Judge
Eastern District of New York
December 12, 2017
Page 62 of 78

Elaborating, Judge Sack pointed out that the Supreme Court had recently noted that

> although "[i]t is unusual to impose criminal punishment for the
> consequences of purely accidental conduct[,] it is not unusual to
> punish individuals for the unintended consequences of their
> unlawful acts." *See, e.g., Dean v. United States,* 556 U.S. 568, 129
> S.Ct. 1849, 1857-58 (2009); *id*. at 1852 (concluding that a
> defendant who carried a firearm during and in relation to a bank
> robbery in violation of 18 U.S.C. § 924(c)(1)(A) is subject to a ten-
> year mandatory minimum pursuant to 18 U.S.C. §924(c)(1)(A)(iii)
> because his "firearm [was] discharged" in the course of the
> robbery, even though "the gun [went] off accidentally," was not
> pointed at anyone when it discharged, and nobody was hurt).

*Id*., at 140 (brackets added by opinion in *Stewart*).

Concurring, Judge Calabresi agreed that while grounds propounded by the defendant did
not "render the terrorism enhancement inapplicable in determining the relevant Guidelines
range," nonetheless "the lack of evidence that any victim was harmed as a result of the charged
offense[,] . . . if properly articulated, is, as a procedural matter, within the district court's
discretion to consider in its application of the §3553(a) factors." *Id*., at 153 (Calabresi, J.,
*concurring*) (footnote omitted).

Judge Calabresi noted he was "more ambivalent about the degree to which absence of
harm is a valid ground on which to mitigate a sentence[,]" stating his "general view . . . that
while a district court ought to be careful about giving too much weight to a factor like harm that
might vary based on events beyond the defendant's control, we should not preclude a district
court from giving lack of harm some weight, even for some crimes of terrorism." *Id*., at 155
(Calabresi, J., *concurring*). *See also id*., at 139, n. 33 (Judge Sack commenting that "[t]he weight
that such a factor can bear in any particular instance, however, is an analytically separate, and
substantive, question" from whether lack of harm can be considered).

Examining the issue conceptually, Judge Calabresi pointed out that

> [w]hether it is fair to assign different levels of culpability in
> criminal sentencing to the same criminal conduct based on the
> fortuity of whether harm results has long been a contested question
> in Anglo-American jurisprudence. *See* H.L.A. HART, THE
> CONCEPT OF LAW 131 (1968) ("Why should the accidental fact

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Hon. Brian M. Cogan
United States District Judge
Eastern District of New York
December 12, 2017
Page 63 of 78

> that an intended harmful outcome has not occurred be ground for
> punishing less a criminal who may be equally dangerous and
> equally wicked?").

*Id.*, at 155 (Calabresi, J., *concurring*).

However, turning to the practical, Judge Calabresi recognized that "whatever significance the consequences of a defendant's actions ought to have, it is an inevitable part of human nature – and our law – that we as a society *do* give consequences considerable weight when we mete out punishment and blame." *Id.* (emphasis in original) (footnote omitted).[56] Judge Calabresi noted that "[t]his is deeply entrenched in our legal system," adding that "[t]he majority opinion identifies the law of attempts as one generally accepted instantiation of this tendency, Maj. Op. at 139-140**,** but there are many others – such as crimes of culpable risk creation, like vehicular homicide." *Id.*

Regarding the offense at issue in *Stewart*, and here as well, Judge Calabresi reasoned that

> while it is true that material support to terrorism is a complete
> crime rather than an inchoate one, and so fully punishable even if
> no further harm results, it simply does not follow that the amount
> of punishment may not at least in part depend on the harm that
> occurred.  The level of punishment for a completed crime varies all
> the time based on the amount of harm that has occurred, and the
> Guidelines themselves often directly embrace such a policy.

*Id.* (footnote omitted).[57]

---

[56]  The footnote cited the following sources:  Sanford H. Kadish, *The Criminal Law and the Luck of the Draw*, 84 J. CRIM. L & CRIMINOLOGY 679, 688 (1994) ("[w]hile in principle it's difficult to find good reasons for making desert turn on chance, here's the rub:  most of us do in fact make judgments precisely of this kind"); *see generally* PAUL H. ROBINSON & JOHN DARLEY, JUSTICE, LIABILITY AND BLAME: COMMUNITY VIEWS AND THE CRIMINAL LAW (1995) (presenting studies suggesting public judgments about criminal culpability turn significantly on the level of harm that results from an action).

[57]  Judge Calabresi acknowledged that Judge Walker, in partial dissent, "identifies several [Guidelines] examples in his opinion, though he reaches a different conclusion about their import."  590 F.3d at 155, n.5 (Calabresi, J., *concurring*), *citing id.*, at 175, n.11 (Walker, J., *dissenting in part*).

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Brian M. Cogan
United States District Judge
Eastern District of New York
December 12, 2017
Page 64 of 78

In answer to Judge Walker's dissent that "suggests terrorism is different[,]" Judge Calabresi responded that

> [e]ven if the Guidelines do not themselves make lack of harm relevant for the application of the terrorism enhancement – and they fail to do so only in the narrow sense that the enhancement does not positively reflect the existence of injury – the Supreme Court has made clear that a district court, which has "greater familiarity with [ ] the individual case and the individual defendant," may properly decide that sentencing judgments made by the Guidelines fail properly to reflect the § 3553(a) considerations. *See Rita v. United States,* 551 U.S. 338, 351 (2007).

*Id*., at 156 (Calabresi, J., *concurring*).

In addition, Judge Calabresi pointed out that "it is not at all unprecedented for a district court to consider lack of harm relevant to sentencing in a terrorism case." *Id*., at 156, n.6. As Judge Calabresi continued, "[i]ndeed, in a case that Judge Walker cites, the Eleventh Circuit affirmed a district court decision that did just that." *Id*., *citing United States v. Garey,* 546 F.3d 1359, 1363-64 (11th Cir.2008) (per curiam).

As Judge Calabresi recounted, in *Garey*, "the district court found that the terrorism enhancement applied, but then granted a downward variance based in part on the fact that the defendant had not carried out any violent acts at the time of his apprehension." *Id*. (Calabresi, J., *concurring*), *citing United States v. Garey,* 383 F.Supp.2d 1374, 1379 (M.D.Ga.2005) ("[i]t is . . . troubling that another defendant who carried out a threat to bomb public facilities, injuring and maiming (but not killing) thousands of people, would face the same sentence as this Defendant who did not cause physical injury to a single person").

Moreover, "[i]n upholding the defendant's sentence as not unreasonable, the Eleventh Circuit specifically noted that the district court had already considered the defendant's arguments about the lack of actual harm and, on the basis of the §3553(a) factors, imposed a reasonable sentence below the advisory Guidelines range." *Id*. (Calabresi, J., *concurring*), *citing Garey,* 546 F.3d at 1364.

Expanding the analytical framework, Judge Calabresi cautioned that,

> [w]hat is more, the Court has evidenced profound skepticism

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Hon. Brian M. Cogan
United States District Judge
Eastern District of New York
December 12, 2017
Page 65 of 78

> toward arguments that certain policy judgments, which require
> departing from the Guidelines, have implicitly been taken off the
> table as a result of congressional silence or inaction. *See*
> *Kimbrough v. United States,* 552 U.S.85, 102-106 (2007).

590 F.3d at 156-57 (Calabresi, J., *concurring*).

Again citing *Kimbrough*, Judge Calabresi commented that "[a]s the Court [in *Kimbrough*]
explained, it is usually inappropriate to draw inferences from congressional silence on sentencing
practices because Congress has shown that, when it wants to, it knows how to direct levels of
sentencing in express terms."  590 F.3d at 156 (Calabresi, J., *concurring*), *citing Kimbrough*, 552
U.S. at 103 (citing 28 U.S.C. §994(h), which required Sentencing Commission to set Guidelines
sentences for recidivist offenders at or near the statutory maximum).

Thus, as Judge Calabresi concluded,

> the fact that Congress increased the statutory maximum in 2001 for
> material support convictions that caused death, *see* Op. of J.
> Walker at 175**,** and did so without saying anything whatever about
> how a district court may treat harm when issuing a sentence that is
> less than the applicable maximum, cannot be read to diminish the
> discretion the district court otherwise has under §3553(a).

*Id*.  (footnote omitted).

"Indeed," Judge Calabresi continued, "that Congress saw fit to increase the maximum
sentence for material support based solely on whether death results can easily be understood to
suggest that Congress thought amount of harm *does* matter in this context, even if, at times, that
harm is largely fortuitous."  *Id*., at 157, n. 7 (emphasis in original).

Drawing on the Circuit's *en banc* reminder that "sentencing discretion is like an elevator
in that it must run in both directions[,]" *United States v. Cavera,* 550 F.3d 180, 194 (2010) (*en
banc*), in *Stewart* Judge Calabresi determined that, in the context of evaluating the impact of
harm, or lack thereof, on sentencing in terrorism cases,

> [t]o concede, as I think we must, that when hundreds of people are
> injured or killed rather than just one a district court may take the
> amount of harm into account and impose a higher sentence, but
> then to deny the court that same discretion to reach a lower

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Brian M. Cogan
United States District Judge
Eastern District of New York
December 12, 2017
Page 66 of 78

sentence when, through fortuity, no harm results, would manifestly
contravene that principle [set forth in *Cavera*].

*Id.*, at 157, n. 8 (Calabresi, J., *concurring*).

Indeed, unwarranted *uniformity* is just as antithetical to a just and individualized
sentencing system as is the unwarranted disparity condemned in 18 U.S.C. §3553(a)(6).  *See,
e.g., Kimbrough*, 552 U.S. at 88 (noting that its opinion in *Booker*, 543 U.S. at 263, "recognized
that some departures from uniformity were a necessary cost of the remedy [] adopted").  *See also*
Paul J. Hofer & Mark H. Allenbaugh, *The Reason Behind the Rules: Finding and Using the
Philosophy of the Federal Sentencing Guidelines*, 40 AM. CRIM. L. REV. 19, 20-21, 24, 83 (2003)
(appellate courts have enforced the Sentencing Guidelines more rigidly than expected or
required, creating "'unwarranted uniformity,' which is really just another type of unwarranted
disparity").

### 3.    *A Sentence of Life Imprisonment Would Be Disproportionate*

Proportionality, and/or gradation of sentences, accomplishes several objectives without
compromising any of the statutory purposes of sentencing (incapacitation, punishment,
deterrence, and rehabilitation):[58]  (1) achieving individualized sentencing that matches the
punishment to the offender as well as the offense;  (2) recognizing the connection between
relative culpability (and responsibility) for criminal conduct and severity of punishment;  (3)
matching relative penalty to relative profit from the criminal activity;  and (4) serving notice
upon offenders and the public that once a single serious crime is committed, there are
disincentives to commit further crimes (as opposed to the belief that since the maximum sentence
will be imposed for the initial offense, there is no advantage to forgoing subsequent crimes
because, if committed, they will not generate further punishment).

In that context, the influential 18th Century Italian philosopher and criminologist Cesare
Beccaria, whose analysis was praised and quoted with favor by such varied readers as Voltaire,
Jeremy Bentham, and John Adams, provided three incontestable reasons why proportionality in
punishment represents an essential component of any justice system:

---

[58]  *See United States v. Shortt*, 485 F.3d 283 (4th Cir. 2007).  *See also* §3553(a)(2)(A)-(D);
*United States v. Siegel*, 271 Fed. Appx. 115, 118 (2d Cir. 2008) (internal quotations omitted)
("the purposes [of sentencing] to be considered include punishment, deterrence, incapacitation,
and the provision of necessary medical care or other correctional treatment");  *United States v.
Denardi*, 892 F.2d 269, 276 (3d Cir. 1989) (Becker, J., *separate opinion*) ("the four purposes of
sentencing set forth in subsection 3553(a)(2)"are "retribution, deterrence, incapacitation, and
rehabilitation").

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Hon. Brian M. Cogan
United States District Judge
Eastern District of New York
December 12, 2017
Page 67 of 78

(1)     punishment should be only that severe enough necessary to deter crime, and any penalty in excess of that objective constitutes an abuse of power by the state;

(2)     the lack of any distinction between punishments for crimes of inequal kind or degree creates a dangerous and counterproductive equation:  an offender contemplating two offenses, a greater and a lesser, that are punished alike is presented no disincentive to forego the greater for the lesser.  If the punishments are identical, there is no greater risk in attempting the greater;[59]  and

(3)     the punishment should fit the crime, *i.e.*, those who defraud the public should build public works.

Cesare Beccaria, *On Crimes and Punishments* (1764), translated from the French edition by Edward D. Ingraham (Seven Treasures Publications: Lexington, Kentucky 2009), at 70-71, 97.[60] *See also United States v. Canova,* 412 F. 3d 331, 351 (2d Cir. 2005) (citing *Booker*, 541 U.S. at 263, for the proposition "that post-*Booker* sentencing contemplates consideration of Guidelines to serve goals of 'avoiding unwarranted sentencing disparities' and 'proportionality'").

Also, it is commonplace for courts to impose a greater sentence upon the leader of a criminal enterprise than upon a member of that enterprise.  In fact, the Second Circuit has remanded cases to the district court when a member received a greater sentence than a leader. For example, the Circuit has instructed that "[o]n remand, we also invite the district court to consider [the defendant's] claim that it was inappropriate to sentence him to 20 months more

---

[59]   *See also* Richard Posner, *An Economic Theory of the Criminal Law*, 85 Colum.L.Rev. 1193 (1985), at 1207 (footnote omitted) (noting, in regard to punishment of different crimes by the same, severe fine[,]" that "[t]his uniformity, however, eliminates marginal deterrence the incentive to substitute less for more serious crimes.[ ]  If robbery is punished as severely as murder, the robber might as well kill his victim to eliminate a witness.  Thus, one cost of making the punishment of a crime more severe is that it reduces the criminal's incentive to substitute that crime for a more serious one.  To put this differently, reducing the penalty for a lesser crime may reduce the incidence of a greater crime.  If it were not for considerations of marginal deterrence, more serious crimes might not always be punishable by more severe penalties than less serious ones").  *See also id*., at 1206 n. 25 (noting that an increase in the length of prison sentences would not correspond to a commensurate decrease in the crime rate, and that the larger the increase in sentences, the larger the gap in crime reduction).

[60]   Beccaria also postulated that it was *certainty* of punishment, and not its *severity*, that deterred crime.  *Id*., at 69-70.  *See also* Bernard E. Harcourt, *The Illusion of Free Markets: Punishment and the Myth of Natural Order* (Harvard University Press:  2011), at 106.

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Hon. Brian M. Cogan
United States District Judge
Eastern District of New York
December 12, 2017
Page 68 of 78

imprisonment than his brother, Charles, given that Charles had a higher adjusted offense level, a
higher criminal history category, and an equal or greater role in the drug conspiracy at issue."
*United States v. Rosario*, 280 Fed.Appx. 78 (2d Cir 2008).

Conversely, the Second Circuit has declined to remand in cases when a leader seeks re-
sentencing based on disparity between his sentence and the lesser sentence meted out to
subordinates:

> [the defendant] asserts that the district court did not give adequate
> consideration to the disparity between his sentence of 210-months'
> imprisonment and his co-defendants' sentences ranging from 12
> months to 120-months' imprisonment.  This argument fails
> because the district court considered the disparities among other
> relevant factors in arriving at a sentence of 210-months
> imprisonment that was reasonable under the circumstances. . . .
> The district court was entitled to impose this sentence because [the
> defendant] had a more substantial role in the conspiracy than his
> co-defendants, and thus was not similarly situated to his
> co-defendants for sentencing purposes.

*United States v. Ford*, 320 Fed.Appx. 50, 52-53 (2d Cir. 2009).

In addition, the increase in sentences of life imprisonment – either formally or in function
(by imposing a sentence substantially outdistancing any rational life expectancy, *i.e.*, more than
50 years) – in the U.S. was the subject of a study earlier this year by The Sentencing Project.  *See
Still Life – America's Increasing Use of Life and Long-Term Sentences*, The Sentencing Project,
2017 (hereinafter "*Still Life*"), available at
<https://docs.google.com/viewer?url=http%3A%2F%2Fwww.sentencingproject.org%2Fwp-cont
ent%2Fuploads%2F2017%2F05%2FStill-Life.pdf&pdf=true>.

As *Still Life* reports, the number of life sentences has more than quadrupled since 1984
(and concurrently the increase in sentences of life without parole has far outpaced those of life
imprisonment with the possibility of parole).  *See Still Life*, at 5.  Moreover, inmates serving life
sentences or those that are for practical purposes life sentences (denominated in *Still Life* as
"virtual life" sentences), now represent 13.9% of U.S. prison population – one-seventh of the
prison population.  *Id*.  Federal inmates with life sentences comprise 7.2% of the population of
life sentences – less than only four states.  *Id*., at 9.[61]

---

[61]   It is unclear what proportion of the federal life sentences are as a result of mandatory
sentences of life, *i.e.*, for violations of 18 U.S.C. §1959(a)(1), or as a result of a jury choosing life

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Brian M. Cogan
United States District Judge
Eastern District of New York
December 12, 2017
Page 69 of 78

Also, nearly half – 48.3% – of those serving life and virtual life sentences are Black, equal to one-fifth of the Black prison population overall.  *Id.*  Overall, the U.S. incarcerates defendants for life sentences at a rate of 50 per 100,000, roughly equivalent to the entire incarceration rates of the Scandinavian nations of Denmark, Finland, and Sweden.  *Id.*

*Still Life*, while recognizing that "[i]mprisonment for those commit serious crimes can serve to protect society as well as apply an appropriate level of punishment for the offense[,]" also points out that "[i]t is not 'tough' [on crime] to imprison people long past their productivity – or even physical ability – to commit crime[.]" *Id.*, at 6.

Rather, as *Still Life* states, "it is a poor use of resources that could be put toward prevention."  *Id.*  As *Still Life* concludes, "there are diminishing benefits for high levels of incarceration on public safety[,]" and "[l]ifelong imprisonment with limited or no chance for review only serves a retributive purpose and is often counterproductive for purposes of crime control."  *Id.*  As a result, *Still Life*'s principal reform recommendation is "eliminate life without parole and dramatically scale back other life sentences."  *Id.*, at 26.[62]

Here, the lack of any negative consequences resulting from Mr. Harun's offense conduct (other than in Count One) constitutes a valid and compelling basis for a sentence that distinguishes his conduct from that generating any harm, much less *serious* harm.  As the sentences in other terrorism-related cases, discussed **ante**, at 14-15, 21, 53-56, demonstrate, Mr. Harun's offense conduct does not warrant a sentence of life imprisonment.  As a result, Mr.

---

without parole as the alternative to the death penalty (which could also apply in state systems).

[62]  Among the reasons cited by *Still Life* is the economic cost of life without parole, due in large part to rising health care costs for older inmates:

> [t]he cost for life imprisonment is high, in the range of $1 million per adult prisoner, with prison expenses rising precipitously after middle-age.  A partial cause of the eventual doubling of expenses as prisoners age is the heavy toll that prison itself has on human health.  Typically, people entering incarceration already exhibit poorer health compared to the general population, but the harsh prison environment, accompanied by inadequate treatment, exacerbates prisoners' health status and accelerates the aging process.  People in prison experience higher rates of both chronic and infectious diseases as compared to the general population.

*Still Life*, at 26 (footnote omitted).

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Brian M. Cogan
United States District Judge
Eastern District of New York
December 12, 2017
Page 70 of 78

Harun's sentence should reflect that placement along the conduct continuum.

I.      ***For a Number of Reasons Both Practical and Empirical, General Deterrence Should Not Be a Factor In Mr. Harun's Sentence***

For practical, policy, and equitable reasons, including ongoing empirical and academic research, as well as the realities of politically and/or ideologically motivated conduct committed wholly overseas, and notwithstanding the severity of federal sentences for such conduct, general deterrence does not serve as a basis for enhancing Mr. Harun's sentence.

Indeed, while general deterrence is an express component of so many sentences, including terrorism cases in which defendants lack any previous experience with the United States and/or its criminal justice system, there is not any research or clinical evidence that justifies enhancing a particular defendant's sentence based on general deterrence.[63]

Earlier this year, in In *United States v. Lawrence*, 254 F. Supp.3d 441 (E.D.N.Y. 2017), Judge Weinstein conducted an evidentiary sentencing hearing directed in part at determining the efficacy of general deterrence in the context of firearms possession offenses.

Judge Weinstein explained that "[t]he theory of general deterrence is that imposing a penalty on one person will demonstrate to others the costs of committing a crime, thus discouraging criminal behavior." *Id.*, at 442. Yet in *Lawrence* Judge Weinstein heard, and credited, expert testimony that general deterrence does not accomplish its purpose.

Citing that expert testimony from the hearing, Judge Weinstein noted that

> [a] decision not to commit the crime requires knowledge by the would-be offender of the law prohibiting the act, the risks of detection, and the risks of punishment; it assumes that each potential offender is capable of rationally weighing the costs and benefits of a decision.

---

[63] *See* Michael J. Lynch, *Beating a dead horse: Is there any basic empirical evidence for the deterrent effect of punishment?*, 31 Crime, Law & Social Change 347 (1999) (hereinafter "*Beating a dead horse*"), at 355 ("[m]ost assuredly, the assumption that a lesser increase in the rate of incarceration would have caused an inflated rate of offending *is just that* – an *assumption* or assertion *which cannot be demonstrated* except with data that make a great many assumptions about how individuals *might* behave given some set of *hypothetical* circumstances") (emphasis in original).

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Brian M. Cogan
United States District Judge
Eastern District of New York
December 12, 2017
Page 71 of 78

*Id*., at 443 (citation omitted).[64]

Yet after hearing the expert testimony, which was based in part on academic research and studies, and weighing the issues, including the conceptual objectives of general deterrence, Judge Weinstein concluded that "imposing a long incarcerative sentence on [the defendant] in order to deter future gun violence by members of the community seems futile." *Id*., at 446.

That conclusion applies here as well. Academic literature and clinical research concur that no greater degree of deterrence would be attained by a life sentence compared with a sentence even well below that term. Research has consistently established that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006).[65]

As Michael J. Lynch has noted, "[d]espite the paucity of evidence favoring a connection betweeen punishment and deterrence, there is, it seems, a desire or hope that deterrence works[.]" *Beating a dead horse*, at 348-49. Yet, as his article demonstrates, "[a]n examination of the incarceration and crime data from 1972-1993 reveals *no evidence of deterrence* at the aggregate level for the U.S. Additional analysis of cross-sectional crime and imprisonment trends for 1980 through 1991 also failed to provide any basic support for the deterrence hypothesis." *Id*., at 359 (emphasis in original). *See also id*. ("[c]onservatively, we can say that imprisonment does not appear to deter most criminals").

In fact, "[t]hree National Academy of Science panels . . . reached that conclusion, as has every major survey of the evidence." *Id*. *See also* Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 447-48 (2007) ("certainty of punishment is empirically known to be a far better deterrent than its severity").

Typical of the findings on general deterrence are those of the Institute of Criminology at Cambridge University. *See* Andrew von Hirsch *et al.*, *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999), summary available at http://members.lycos.co.uk/lawnet/SENTENCE.PDF (hereinafter "Cambridge Report").

---

[64] The expert, called by the defense, was Professor Jeffrey Fagan, Ph.D., the Isidor and Seville Sulzbacher Professor of Law at Columbia Law School and a Professor in the Department of Epidemiology at the Mailman School of Public Health at Columbia University. *Lawrence*, 254 F. Supp.3d at 443.

[65] *See also* **ante**, at 65-66, discussing Cesare Beccaria.

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Brian M. Cogan
United States District Judge
Eastern District of New York
December 12, 2017
Page 72 of 78

The Cambridge Report, commissioned by the British Home Office, examined penalties in the United States as well as several European countries. *Id*. at 1. It examined the effects of changes to both the certainty and severity of punishment. *Id*. While there existed significant correlations between the *certainty* of punishment and crime rates, the "correlations between sentence severity and crime rates . . . were not sufficient to achieve statistical significance." *Id*. at 2.

As a result, the Cambridge Report concluded that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences is capable of enhancing deterrent effects." *Id*. at 1. *See also Beating a dead horse*, at 354 ("[f]rom these data, it appears that over the long run, imprisonment has no suppression effect on the rate of criminal offending in the aggregate. The implication of this finding is that criminal offending has much less to do with levels of imprisonment than with other independent variables or causal processes related to criminal offending").[66] Consequently, here, a life sentence for Mr. Harun, in contrast with one below that, likely would not achieve any additional general deterrence.

Similarly, an extensive report issued earlier this year by the Brennan Center for Justice (at New York University School of Law) concluded that, controlling for other variables, incarceration rates have increased to such an extent in the United States that they have not played a role in crime reduction for many years. *See* Dr. Oliver Roeder, Lauren-Brooke Eisen & Julia Bowling, *What Caused the Crime Decline?*, Brennan Center for Justice, at 7 (February 12, 2015) (hereinafter "*Brennan Report*") ("the current exorbitant level of incarceration has reached a point where diminishing returns have rendered the crime reduction effect of incarceration so small, it has become nil"). Synthesizing data from the past few decades with recently collected data, the *Brennan Report* determined that "incarceration has been decreasing as a crime fighting tactic since at least 1980 . . . [and s]ince approximately 1990, the effectiveness of increased incarceration on bringing down crime has been essentially zero." *Id*., at 23.[67]

This lack of correlation between crime reduction and heightened incarceration rates is

---

[66] In evaluating the data discussed in *Beating a dead horse*, Mr. Lynch calculated a "series of additional correlation coefficients" to "address the question of a time lag effect between rising rates of incarceration and decreases in criminal offending – the idea that increased rates of incarceration have a positive effect on knowledge of the increased tendency to send people to prison, which in turn decreases criminal offending . . ." *Id*., at 357 (citation omitted). However, "none of the three cross-sectional correlation tests provided support for the deterrence argument." *Id*., at 359.

[67] The *Brennan Report* is available at <www.brennancenter.org/sites/default/files/analysis/What_Caused_The_Crime_Decline.pdf>.

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Brian M. Cogan
United States District Judge
Eastern District of New York
December 12, 2017
Page 73 of 78

apparent from the simultaneous declines in state prison populations and crime rates in those states.  *See Brennan Report*, at 27 (imprisonment and crime decreased by more than 15% in New York, California, Maryland, New Jersey, and Texas, which account for "more than 30 percent of the US population").  The *Brennan Report* cites the overestimation of the deterrent effect of heavy penalties as one possible factor in the ineffectiveness of incarceration as a crime reduction tool.  *See id.*, at 26 (relying in part on the National Academy of Sciences report, discussed below, that concluded that "insufficient evidence exists to justify predicating policy choices on the general assumption that harsher punishments yield measurable deterrent effects").

While the *Brennan Report* explored the various factors contributing to the conclusion that heavy incarceration (and accompanying lengthy sentences) has minimal impact on crime reduction, the 2014 report by the National Academy of Sciences (hereinafter "NAS") provided an even more in-depth treatment of the issue, focusing on the law enforcement policies that have resulted in the current state of mass, prolonged incarceration, and how those policies have diluted the effectiveness of incarceration as a crime-fighting tool.  *See The Growth of Incarceration in the United States: Exploring Causes and Consequences*, National Research Council (hereinafter "*NAS Report*"), 2014, available at <http://www.nap.edu/download.php?record_id=18613>, at 130-156.  In particular, the *NAS Report* examined the diminution of deterrence as sentence length increased across various crimes, including those imposed on low level offenders.  *See id.*, at 155-56.

Summarizing the findings of several studies focused on determining whether there is an appreciable improvement in deterrence as sentence length increases, the NAS report concluded that the "deterrent effect of sentence length may be subject to decreasing returns."  *NAS Report*, at 154.  As sentences grow longer and thus, more costly, the deterrent effect decreases to the point of irrelevance to crime rates, simultaneously mooting the achievement of crime reduction through incapacitation of those individuals, and draining resources better aimed at crime prevention.  *See id.*, at 155-56.

Nor has the inefficacy of longer terms of imprisonment been lost on national public officials.  In 2015, Supreme Court Justices Anthony Kennedy and Stephen Breyer appeared before Congress.  In response to a question from Rep. Steve Womack (R-AR) regarding whether the United States possessed the "capacity to deal with people with our current prison and jail overcrowding," Justice Kennedy testified, with respect to the corrections system, that "[i]n many respects, I think it's broken."  *See, e.g.,* Jess Bravin, "Two Supreme Court Justices Say Criminal-Justice System Isn't Working," *The Wall Street Journal*, March 24, 2015, available at <http://www.wsj.com/article_email/two-supreme-court-justices-say-criminal-justice-system-isnt-working-1427197613-lMyQjAxMTA1NTIzNDUyNTQyWj>.  *See also* <sentencing.typepad.com/sentencing_law_and_policy/2015/03/justices-kennedy-and-breyer-urge

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Hon. Brian M. Cogan
United States District Judge
Eastern District of New York
December 12, 2017
Page 74 of 78

-congress-to-reform-broken-federal-criminal-justice-system.html>.  Video of the Justices'
testimony is available from C-SPAN at <www.c-span.org/video/?324970-1/supreme-court-
budget-fiscal-year-2016>.

Justice Kennedy added that "[a]nd this idea of total incarceration just isn't working, and
it's not humane." *Id*.  Yet, the results of mass, prolonged incarceration have not exerted an
impact on crime rates. *See Beating a dead horse*, at 356 (data "also provides evidence that a
consistently increasing rate of incarceration appears to have little or no effect on the amount of
crime in the U.S. from 1972-1993").  Consequently, one of the *Brennan Report*'s three central
findings was that "[i]ncreased incarceration at today's levels has a negligible crime control
benefit[.]"  *Brennan Report*, at 4.[68]

In that context, a sentence for Mr. Harun below life imprisonment would also be fully

_____

[68]  The *Brennan Report* notes, at 13, that it did not include federal inmates in its analysis.
However, the *Report* also explained why adding federal inmates would likely only amplify the
findings:

> [t]o study the incarceration variable the authors first sought to
> include the total incarceration rate, including federal prisons, state
> prisons, and local jails.  As explained further in Appendix B,
> federal prison data and local jail data were not available for all the
> years analyzed and for all states.  For that reason, the authors used
> state imprisonment data. . . . The exclusion of federal prisoners,
> juvenile detainees, and the majority of the jail population does not
> affect the core findings of this report.  If that data were included,
> the rate of incarceration would be even higher than that in the
> authors' regression.  A higher incarceration rate would likely show
> more dramatic diminishing returns on crime reduction.
> Accordingly, this report's empirical findings are likely
> conservative compared to what a more inclusive definition of
> "incarceration" would produce.

*See also Beating a dead horse*, at 351 (also not including federal inmate in the study's data set,
but noting that "the exclusion of the federal data will not have a significant impact on the
analysis since most crimes and most inmates are under state jurisdiction.  For example, in 1994
federal inmates made up 5.8 percent of all persons incarcerated at the state and federal level in
the U.S. [ ] . . .  This figure is relatively stable over time") (citations omitted).

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Brian M. Cogan
United States District Judge
Eastern District of New York
December 12, 2017
Page 75 of 78

consistent with 18 U.S.C. §3553(a)(2)'s sentencing purposes.[69]  The Second Circuit and Eastern District of New York figures since *Booker*, discussed **ante**, in Section II(G)(2), reflect that reality, as well as the reality that prison overcrowding as a result of reflexive Guidelines sentences needs to be addressed.

In addition, it is difficult to conceive how a harsher sentence for Mr. Harun could deter anyone considering replicating his conduct.  Anyone who jeopardizes their safety on the battlefield against a military as powerful and well-equipped as the U.S.'s is not concerned with potential prison time.  Nor is there any evidence that sentencing results are communicated in any meaningful manner overseas to potential offenders.  Thus, any general deterrence attempted in this case would be illusory.

As Judge Weinstein reasoned in *Lawrence*,

> [t]o be effectively deterred by a sentence in the instant case, future possible offenders would have to have some idea of what sentence was ultimately imposed on [the defendant], appreciate the likelihood of detection and of the federal sentencing guidelines, and engage in a rational cost-benefit analysis.

254 F. Supp.3d at 446.

Also, as the expert in *Lawrence* pointed out,

> [d]eterrence relies very heavily on rational offenders, and the assumption is that they will make an accurate perception and calculation of those costs.  They would engage in an accurate decision-making process that rationally weighs those costs, costs of punishment against benefits of doing the crime.  They will arrive at a net cost benefit that would persuade them not to engage in the crime.

*Id.*, at 443-44 (citation omitted).[70]

---

[69]  Also, 18 U.S.C. §3582(a) requires that a sentencing court "recognize [that] imprisonment is not an appropriate means of promoting correction or rehabilitation."

[70]  Nor is the failure of general deterrence to achieve its objective limited to firearms offenses.  For example, with respect to white collar offenses, a law school professor has mused that

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Brian M. Cogan
United States District Judge
Eastern District of New York
December 12, 2017
Page 76 of 78

Those requisite elements of general deterrence are simply not present here.  Thus, the prospect, entirely speculative and inchoate, of influencing some putative future wrongdoer, unidentified in any fashion, who has yet to commit, and perhaps even contemplate, a crime completely eludes reliable or consistent measurement.  Such a person's knowledge, motivation, and compelling factors that would lead to criminal conduct are simply unknown.  Defendants should receive the sentence *they* deserve, and not have as a component of their sentence what some other, future, unknown defendant deserves.

Indeed, general deterrence *creates* disparity because of its entirely subjective character.  It is not standardized in the Guidelines or anywhere else;  what one district court determines is sufficient to achieve general deterrence may be twice as much or half as much as another court's determination.

Nor is an enhancement for general deterrence quantifiable based on any rational or measurable metric.  Relying on "general deterrence" to impose a Draconian sentence, without calibrating the point at which any prospect of general deterrence is exhausted, is bound to create a disparity to Mr. Harun's detriment and heap further unnecessary and unwarranted punishment upon him.

As a result, general deterrence represents a recipe for disparity untethered to any objective standard or ability to compare to other cases and defendants, and, consequently, contravenes §3553(a)(6).  Therefore, it should not be a factor in Mr. Harun's sentencing.

---

[i]t is certainly questionable whether a punishment imposed on one white-collar criminal has an impact on others because the violations are usually the product of a unique set of circumstances that allowed the crime to occur, and the offenders often do not believe they engaged in wrongdoing that needs to be deterred.

Peter J. Henning, *Is Deterrence Relevant in Sentencing White-Collar Criminals?*, 61 Wayne L. Rev. 27 (2015), at 31, available at <http://digitalcommons.wayne.edu/cgi/viewcontent.cgi?article=1099&context=lawfrp>.

As Professor Henning cautions – applicable here as well – "[g]eneral deterrence is about sending out a message, but it is one that may not be heard by its intended audience." *Id.*

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Hon. Brian M. Cogan
United States District Judge
Eastern District of New York
December 12, 2017
Page 77 of 78

**III.    *Counsel's Objections, Corrections, and Additions to the PSR on Behalf of Mr. Harun***

Counsel's objections, corrections, and additions to the PSR consist of the following:

(1)    at ¶¶ 28 & 30, the description of the events of April 25, 2003, as a "terrorist attack" is inaccurate for the reasons detailed **ante**, in Section II(A), and should be changed to "military engagement" or "military combat;"

(2)    at ¶ 39, the PSR adds a four-level enhancement for Mr. Harun's role in the offense with respect to Counts One through Four, characterizing him as "an organizer of a criminal activity that involved five or more participants and was otherwise extensive" pursuant to §3B1.1(a).  However, Mr. Harun's role in Count One – and to the extent the activity in Count One is included in Counts Three and Four and contributes to the Guidelines computation therefor – does not qualify for a leadership role, because he served as a mere soldier, as well as for the reasons set forth in section II(A);  and

(3)    at ¶ 8, n.2 and ¶ 76, the PSR claims Mr. Harun has previously claimed "Nigerian" citizenship.  However, in counsel's experience, Mr. Harun has always claimed to be from Niger, and not Nigeria, and has not claimed Nigerian citizenship.

**IV.    *Procedural and Post-Sentencing Issues***

Counsel respectfully request the following with respect to sentencing:

(1)    that counsel be permitted to call as a witness BoP Corrections Officer Curtis Quamina to testify about Mr. Harun's behavior for the five years (and, by the time of sentencing, three additional months) he has been confined on MCC's 10-South unit;  and

(2)    that subsequent to the sentencing proceeding in court, the Court impose sentence orally on 10-South so that Mr. Harun is aware of the sentence he receives in this case.

Regarding designation, as set forth **ante**, it is respectfully requested that the Court recommend that BoP designate Mr. Harun to a facility in which he can exist in a communal atmosphere of inmates with whom he shares religious and cultural affinity, and that he receive appropriate psychiatric treatment, including medication and counseling.

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Hon. Brian M. Cogan
United States District Judge
Eastern District of New York
December 12, 2017
Page 78 of 78

**Conclusion**

Stripped to its essence, and an authentic characterization of Mr. Harun's offense conduct, this case represents a classic "material support" prosecution involving a soldier, and subsequent terrorist operative, who has already suffered gravely, physically and psychologically, and whose ongoing severe trauma should not be exacerbated by this sentence, but instead alleviated by it as much as humanly possible.

Accordingly, for all the reasons set forth above, it is respectfully requested that the Court sentence Mr. Harun to a term of imprisonment less than life imprisonment, and that the Court recommend he be designated to a facility in which he can interact with inmates of similar religious and cultural background, and that he receive appropriate psychiatric treatment, including counseling and medication.

Respectfully submitted,

Joshua L. Dratel
David Stern
Susan G. Kellman

JLD/
Encls.

cc:    Matthew Jacobs
       Assistant United States Attorney