LAW OFFICES OF

## JOSHUA L. DRATEL, P.C.
A PROFESSIONAL CORPORATION

29 BROADWAY
Suite 1412
NEW YORK, NEW YORK 10006
---
TELEPHONE (212) 732-0707
FACSIMILE (212) 571-3792
E-MAIL: JDratel@JoshuaDratel.com

JOSHUA L. DRATEL
    To   —
LINDSAY A. LEWIS
WHITNEY G. SCHLIMBACH

STEVEN WRIGHT
*Office Manager*

January 2, 2018

**FILED UNDER SEAL**

Brian M. Cogan
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re:    *United States v. Adnan Harun Hausa*,
       12 Cr. 134 (BMC)

Dear Judge Cogan:

    This letter is submitted on behalf of defendant Ibrahim Suleiman Adnan Adam Harun Hausa (hereinafter "Mr. Harun"), whom  David Stern, Esq., and Susan G. Kellman, Esq., and I represent in the above-entitled matter, and constitutes the reply sentencing submission on Mr. Harun's behalf.

    Many of the government's arguments in opposition (Dkt # 293) (hereinafter "Gov't Sentencing Letter") were either addressed and/or anticipated in Mr. Harun's initial December 12, 2017, sentencing submission (hereinafter "Mr. Harun's Initial Sentencing Letter"), and therefore do not require rejoinder.  Nor do any of the undisputed basic legal principles cited in the Gov't Sentencing Letter.  In addition, this Reply Letter does not attempt a point-by-point refutation of the Gov't Sentencing Letter (since in many instances that would involve simply repeating Mr. Harun's Initial Sentencing Letter), but instead addresses certain defects in the government's approach that are designed to be illustrative, but not exhaustive.[1]

---

    [1]  The sub-headings in POINT III of this Reply Letter correspond to those in POINT II of Mr. Harun's Initial Sentencing Letter.

Hon. Brian M. Cogan
United States District Judge
Eastern District of New York
January 2, 2018
Page 2 of 30

**I.      *The Court Should Not Issue a Force Order to Compel Mr. Harun's Attendance***

As a threshold matter, in response to the Court's December 26, 2017, Order, defense counsel reiterate their position (adopted consistently for more than a year) that Mr. Harun should not be compelled to attend court proceedings.  As a result, it is respectfully submitted that the government's request for a force order be denied.  Moreover, the procedures proposed **post**, at 4, will satisfy Rule 32, Fed.R.Crim.P., the prevailing case law, the constitutional requirements, and the government's interests as set forth in its letter.  They are also entirely consistent with this Court's prior rulings that Mr. Harun waived his presence at trial and other pretrial proceedings.

Indeed, the government's request is mystifying because even in its letter it concedes that "in denying the government's request for a force order, the Court expressly took into consideration the risk of harm to correctional officers and the U.S. Marshals that would result from attempting to bring the defendant from MCC to court."  Gov't Sentencing Letter, at 14.  In that context, the government's position is an unnecessary invitation to injury to corrections personnel, U.S. Marshals, and Mr. Harun (in addition, potentially, to court personnel).

Thus, the government's insistence on creating a situation in which such injuries are inevitable is simply inexplicable.  Nor is it supported by the controlling law, which the government fails to address at all.  For example, in *United States v. Salim*, 690 F.3d 115 (2d Cir. 2012), the Court, "assum[ing] without deciding that "presence" requires physical presence and is not satisfied by videoconference[,]" *id*., at 122, nevertheless pointed out that "[i]n a non-capital case, 'a defendant may waive his right to be present as long as that waiver is knowing and voluntary.'"  *Id*., *citing* Fed.R.Crim.P. 43(c)(1)(B) and *United States v. Mera,* 921 F.2d 18, 20 (2d Cir.1990) (per curiam).[2]

In addition, the Court in *Salim* pointed out that while "[t]he government bears the burden of demonstrating by a preponderance of the evidence that a defendant waived his constitutional

---

[2]  In *Salim*, the Court also explained that "[a]lthough it is certainly preferable that the waiver [of presence] come from the defendant directly, there is no constitutional requirement to that effect[,]" 690 F.3d at 122-23, *citing Polizzi v. United States,* 926 F.2d 1311, 1322 (2d Cir.1991), and that "[a] defendant's lawyer may waive presence on the defendant's behalf[,]" as long as "a defendant's waiver through counsel, like all waivers of constitutional rights, . . . be knowing and voluntary on the part of the defendant."  690 F.3d at 123, *citing Polizzi*, 926 F.2d at 1313 (describing a procedure wherein the district court inquired of defense counsel whether, *inter alia,* "the defendant understood his right to be present and whether he was voluntarily and knowingly waiving that right, affirmatively requesting that the trial proceed in his absence and giving up any claim" of prejudice).

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Hon. Brian M. Cogan
United States District Judge
Eastern District of New York
January 2, 2018
Page 3 of 30

rights[,]" 690 F.3d at 122, *quoting United States v. Lynch,* 92 F.3d 62, 65 (2d Cir.1996), the Second Circuit has "held that the erroneous denial of a defendant's right to be present during resentencing is grounds for reversal only if the defendant suffered prejudice as a result of the deprivation." 690 F.3d at 122, *citing United States v. DeMott,* 513 F.3d 55, 58 (2d Cir.2008); *United States v. Arrous,* 320 F.3d 355, 361-62 (2d Cir. 2003); *United States v.Pagan,* 785 F.2d 378, 380–81 (2d Cir.1986).[3]

In *Salim*, the Court held that any error in that case (by proceedings via videoconference even though the defendant claimed his reluctance to appear in person was because he was afraid of mistreatment by personnel at the Metropolitan Correctional Center, where he had assaulted and seriously injured a corrections officer, 690 F.3d at 119) was harmless because

> Salim was not prevented from making any statement he chose to
> the district court.  Against these considerations, Salim has offered
> no explanation for why his physical presence might have led to a
> resentence of less than life imprisonment.

690 F.3d at 125.  *See also id.* ("[n]or has Salim proven the fourth plain error factor – that the district court's acceptance of his waiver of presence seriously affected the fairness, integrity or public reputation of judicial proceedings.  An error that does not affect the outcome of proceedings typically does not meet this prong"), *citing United States v. Marcus,* 560 U.S. 258, 265-66 (2010).

In the context of the circumstances of this case, subsequent cases have established that "[a] defendant who deliberately fails to appear in court does so voluntarily."  *Lue v. Marshall*, Not Reported in F. Supp.3d, 2014 WL 787327 (S.D.N.Y. February 24, 2014), at *19, *quoting United States v. Tortora,* 464 F.2d 1202, 1208 (2d Cir.1972).  *See also Taylor v. United States*, 414 U.S. 17, 20 (1973) (defendant who absconded during trial waived right to be present at trial, even though trial court had not specifically advised him that trial would continue in his absence, because it would be "incredible" for him to think otherwise);  *United States v. Yannai*, 791 F.3d 226 (2d Cir. 2015).

Here, the situation at sentencing is indistinguishable from that at trial, in which the Court, after confirming that the Marshals had offered Mr. Harun the opportunity to appear in Court,

---

[3]  The Court noted in *Salim* that its doctrine disagreed with that of the Tenth Circuit in *United States v. Torres-Palma,* 290 F.3d 1244, 1248 (10th Cir. 2002) (violation of the right to be present at sentencing "is *per se* prejudicial").

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Hon. Brian M. Cogan
United States District Judge
Eastern District of New York
January 2, 2018
Page 4 of 30

made the requisite "finding that the [Mr. Harun] has voluntarily absented himself from the trial."
Transcript, March 6, 2017, at 4.

Regarding alternatives to a force order, defense counsel propose that the Court issue an
Order:

(1)     notifying Mr. Harun of his right to be present at sentencing, and to be heard at the
        January 9, 2018, sentencing proceeding;

(2)     notifying Mr. Harun that the U.S. Marshals will that morning at the Metropolitan
        Correctional Center (hereinafter "MCC") provide him the opportunity to be
        escorted to Court for that purpose.

(3)     informing Mr. Harun that if chooses not to appear, sentencing will proceed that
        day, and that he can monitor the proceedings, and participate, by the same two-
        way audio-video feed that was utilized during trial;

(4)     directing defense counsel to make certain that the Order is delivered to Mr. Harun
        in advance of the sentencing date;

(5)     directing defense counsel and MCC to arrange – as they did at the outset of the
        trial – to have an attorney present at MCC on 10-South to provide the means for
        confidential communications between Mr. Harun and his counsel in court during
        the sentencing proceeding;  and

(6)     directing defense counsel to make certain that Mr. Harun receives a copy of the
        Judgment as well as the transcript of the sentencing proceedings.

The procedure outlined above will also provide any victims who appear and speak at
sentencing to address Mr. Harun directly, but safely (for all), and probably more effectively given
that there will not be the corresponding prospect for disruption or interruption. *See* Gov't
Sentencing Letter, at 27.

## II.     *The Second Circuit's Decision Last Month in* **United States v. Singh**

The day Mr. Harun's Initial Sentencing Letter was filed, the Second Circuit issued its
opinion in *United States v. Singh*, ___ F.3d ___, 2017 WL 6327823 (2d Cir. December 12,
2017), in which it reversed as procedurally and substantively unreasonable a 60-month sentence
imposed on a defendant for a second illegal re-entry conviction [in violation of 8 U.S.C.

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Hon. Brian M. Cogan
United States District Judge
Eastern District of New York
January 2, 2018
Page 5 of 30

§1326(b)] (plus a criminal history of eight prior non-violent convictions) when the prescribed Guidelines range was 15-21 months.  *Id*., at *1.

In *Singh*, the Circuit reaffirmed certain important sentencing principles, including that appellate review for substantive unreasonableness is "particularly deferential[,]" *id*., at *5, *United States v. Broxmeyer*, 699 F.3d 265, 289 (2d Cir. 2012), *citing Gall v. United States*, 552 U.S. 38, 51 (2007).  The Court added that "[t]he Supreme Court has made clear that 'responsibility for sentencing is placed largely in the precincts of the district courts.'"  *Singh*, at *5, *quoting United States v. Cavera*, 550 F.3d 180, 191 (2d Cir. 2008) (*en banc*).  Thus, the Court recognized its "due respect for the sentencing court's 'very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime[.]'"  *Singh*, at *5, *quoting Cavera*, 550 F.3d at 188.

Also, the Court in *Singh* reiterated that while the Guidelines represent a "starting point," a sentencing court must "then make an independent sentencing determination, taking into account the 'nature and circumstances of the offense and the history and characteristics of the defendant,' and all the statutory factors."  *Id*., at *6, *quoting Cavera*, 550 F.3d at 188 [quoting 18 U.S.C. § 3553(a)].  The Guidelines range cannot be presumed reasonable;  rather, the sentencing court "'must make an individualized assessment based on the facts presented.'"  *Singh*, at *6, *quoting Gall*, 552 U.S. at 50.

Also noteworthy in *Singh* was the Circuit's reference to certain factors that are relevant herein, and which were the subject of Mr. Harun's Initial Sentencing Letter.  For instance, in *Singh*, at *6, the Court cited the statistics published by U.S. Sentencing Commission with respect to norms – the median sentence – for the offense at issue.  *See also* Mr. Harun's Initial Sentencing Letter, at 57-59.

In addition, the Court in *Singh* also analyzed the nature of the defendant's criminal history in relation to his Criminal History Category, and how it related to other offenders convicted of the same offense.  *Id*.  *See also* Mr. Harun's Initial Sentencing Letter, at 50-52.  Other aspects of *Singh* that relate to this case are incorporated below where relevant to specific sections of this Reply Letter.

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Brian M. Cogan
United States District Judge
Eastern District of New York
January 2, 2018
Page 6 of 30

**III.** *Application of the §3553(a) Factors to Mr. Harun Compels a Sentence Less Than Life Imprisonment*

**A.** *Mr. Harun's Offense Conduct for Count One, While Not Meriting Combatant Immunity, Nevertheless Did Not Constitute a War Crime, Therefore Entitling Him, Under the Geneva Convention, to the "Widest Amnesty Possible"*

As a threshold matter, the government would reduce sentencing to the generic definition of the offense, and eliminate altogether context and motivation for the conduct. However, in *Singh* the Second Circuit declared that

> [a] defendant's motivation for engaging in criminal conduct is unquestionably a proper consideration at sentencing." *See, e.g.*, [*United States v.*] *Stewart*, [590 F.3d 93, 140–41 (2d Cir. 2009)] ("In evaluating culpability, we cannot discount the relevance of the defendant's motivations – *i.e.*, whether mercenary, *see, e.g.*, 18 U.S.C. § 1958 (murder for hire), or born from a commitment to the use of violence."); *United States v. Hansen*, 701 F.2d 1078, 1083 (2d Cir. 1983) (noting "'the long unbroken tradition of the criminal law that harsh sanctions should not be imposed where moral culpability is lacking'" (quoting *Lennon v. INS*, 527 F.2d 187, 193 (2d Cir. 1975))); *accord Porter v. McCollum*, 558 U.S. 30, 41 (2009) (holding that defense counsel failed to provide effective assistance where "[t]he judge and jury at [defendant's] original sentencing heard almost nothing that would humanize [defendant] or allow them accurately to gauge his moral culpability").

2017 WL 6327823, at *9 (footnote omitted).[4]

In addition, the Gov't Sentencing Letter, at 10-11, fails entirely to distinguish between the defense of combatant immunity – which Mr. Harun did not assert, and on which he does not rely at sentencing, either – and lawful warfare. In so doing, the government conveniently (and necessarily) ignores the December 12, 2017, Declaration of David J.R. Frakt (Exhibit 1 to Mr. Harun's Initial Sentencing Letter), which explains the distinction. *See also* Mr. Harun's Initial

---

[4] *See id.*, at *9 n.7 (demonstrating by comparative set of reasons for a crime why motivation can be important at sentencing), *citing* Douglas A. Berman, *Addressing Why: Developing Principled Rationales for Family–Based Departures*, 13 Fed. Sent'g Rep. 274, 277 (2001).

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Hon. Brian M. Cogan
United States District Judge
Eastern District of New York
January 2, 2018
Page 7 of 30

Sentencing Letter, at 11-14.

     The government also attempts to make much of its claim that the engagement between U.S. forces and those of which Mr. Harun was a part was an "ambush" by the latter. *See* Gov't Sentencing Letter, at 3, 4.[5]  Even if a situation in which a superior force, based on air reconnaissance, learns of the presence of an enemy contingent and proceeds to search for it, encounters it, and engages in combat, constitutes an ambush, that would not render it a war crime or in any way an inappropriate combat technique.

     In fact, the Department of Defense's Law of War Manual, issued in 2015, establishes that beyond any dispute. *See also* Mr. Harun's Initial Sentencing Letter, at 13-14.  For example, the Law of War Manual provides at §5.5.6.1, entitled "Surprise Attacks," that

> [t]he law of war does not prohibit the use of surprise to conduct attacks, such as the use of surprise in ambushes, sniper attacks, air raids, and attacks by special operations forces carried out behind enemy lines.[6]  There is no requirement that an enemy combatant

---

[5]  The Gov't Sentencing Letter, at 4-5 & n.5, is quite carefully drawn yet does not allege that during the engagement Mr. Harun was in contact with Airman First Class Raymond Losano or Private First Class Jerod Dennis, or was directly responsible for their deaths.

[6]  Footnote 95 of the Manual reads as follows:

> *See, e.g.*, W. Hays Parks, Special Assistant for Law of War Matters, Office of the Judge Advocate General, U.S. Army, *Memorandum re: Legality of Silencers/Suppressors* 6 (Jun. 9, 1995) ("There is no law of war requirement that a combatant must be 'warned' before he or she is subject to the application of lawful, lethal force.  A landmine provides no warning;  neither does an ambush, a sniper, a machinegun in a concealed defensive position, a Claymore munition in a defensive perimeter, a delayed action munition, a naval mine, or many other means or methods of warfare.  A sentry or personnel in a listening or observation post lawfully may be killed quietly, preferably through surprise, by garrote or knife attack.  A surface-to-air missile undetected by its targeted aircraft likewise kills by surprise.");  W. Hays Parks, Special Assistant for Law of War Matters, *Memorandum of*

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Hon. Brian M. Cogan
United States District Judge
Eastern District of New York
January 2, 2018
Page 8 of 30

> must be warned before being attacked.[7]  Rather, warning
> requirements only apply with respect to the civilian population.[]

U.S. Department of Defense, Law of War Manual (hereinafter "the Manual"), Office of General Counsel, Department of Defense, June 2015, at 200, available at <https://www.defense.gov/Portals/1/Documents/law_war_manual15.pdf>.

Nor is deception improper.  As the Manual instructs at §5.25, entitled "Ruses of War and Other Lawful Deceptions," "[r]uses of war are considered permissible.[]  In general, a belligerent may resort to those measures for mystifying or misleading the enemy against which the enemy ought to take measures to protect itself.[]"  *Id.*, at 302 (footnotes omitted).

A "ruse of war" is defined in the Manual, at §5.25.1, as

---

> *Law—Legality of Snipers* (Sept. 29, 1992), *reprinted in* THE ARMY LAWYER 3 (Dec. 1992) ("The element of surprise is a fundamental principle of war, and does not make an otherwise legitimate act of violence unlawful.").

[7]  Footnote 96 of the Manual reads as follows:

> *For example*, 1958 UK MANUAL ¶115 note 2 ("It is not forbidden to send a detachment or individual members of the armed forces to kill, by sudden attack, members or a member of the enemy armed forces.  Thus, for instance, the raid by a British commando party on the headquarters of General Rommel's African Army at Beda Littoria in 1943 was not contrary to the provisions of the Hague Rules.  The operation was carried out by military personnel in uniform; it had as part of its objective the seizure of Rommel's operational headquarters, including his own residence, and the capture or killing of enemy personnel therein, … .");  SPAIGHT, WAR RIGHTS ON LAND 87-88 ("A surprise attack is a very different thing [from a treacherous one].  When a body of Federal cavalrymen made a sudden descent on 'Hickory Hill' farm, in which the young Confederate General, W. F. H. Lee (son of the great commander, R. E. Lee), was convalescing from a wound, and carried him off as a prisoner of war to Fortress Munroe, they were guilty of no treachery under the laws of war.  It was a fair and open raid.").

> acts that are intended to mislead an adversary or to induce him to
> act recklessly, but that do not infringe upon any rule of
> international law applicable in armed conflict and that are not
> perfidious because they do not invite the confidence of an
> adversary with respect to protection under that law.[] Ruses of war
> are methods, resources, and techniques that can be used either to
> convey false information or deny information to opposing forces.
> They can include physical, technical, or administrative means, such
> as electronic warfare measures, flares, smoke, chaff, aerosol
> material, or dissemination devices.

*Id*., at 302.[8]

Among the "*Acts That Are Intended to Mislead an Adversary or to Induce an Adversary to Act Recklessly*," set forth in §5.25.1.1 of the Manual, are "facilitating surprise attacks or ambushes,[] such as by [1] misleading the enemy as to the planned targets or locations of military operations;[] (2) baiting the enemy into a trap; or [3] distracting or disorienting the enemy[.]" *Id*., at 302-03.  *See id*., at 303, §5.25.1.2 (according to the definition in the Geneva Convention, "*ruses* do not infringe upon any rule of international law applicable in armed conflict") (emphasis in original).

The government's position herein – seeking to punish as common murder a fatality suffered on the battlefield absent any war crime – also raises problems of reciprocity for U.S. special forces and other personnel that operate out of uniform.  A recent critique of the Manual pointed out that

---

[8] Footnote 687 of the Manual reads as follows:

> *Consider* AP I art. 37(2) ("Such ruses are acts which are intended
> to mislead an adversary or to induce him to act recklessly but
> which infringe no rule of international law applicable in armed
> conflict and which are not perfidious because they do not invite thé
> confidence of an adversary  with respect to protection under that
> law."). *Refer to* § 5.22.1 (Definition of Perfidy).

"AP I" is Protocol (I) Additional to the Geneva Conventions of August 12, 1949, and Relating to the Protection of Victims of International Armed Conflicts, Jun. 8, 1977, 1125 UNTS 3.

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Hon. Brian M. Cogan
United States District Judge
Eastern District of New York
January 2, 2018
Page 10 of 30

> [t]he Manual's hard line with respect to unprivileged belligerency
> also risks hoisting the U.S. Government on its own petard thanks
> to post-9/11 U.S. conduct.  The significant expansion of U.S.
> civilian participation in conflict, from CIA drone strikes to the
> extensive use of contractors in traditional military roles, is legally
> dubious.  So, too, is the use of CIA paramilitary, and even U.S.
> special forces personnel, fighting out of uniform.  Although not
> war crimes per se, these activities logically cost military personnel
> their belligerent immunity, thus subjecting them – along with their
> civilian counterparts – to ordinary criminal liability for any acts of
> violence they participate in.

David W. Glazier, Zora Colakovic, Alexandra Gonzalez, and Zacharias Tripodes, "Failing Our
Troops:  A Critical Assessment of the Department of Defense Law of War Manual," 42 Yale J.
Int'l L. 215, 245 (2017) (footnote omitted), available at
<https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3088061>.

## B.   *The Torture Mr. Harun Suffered While in Libyan Custody for 6½ Years Should Be a Significant Mitigating Factor at His Sentencing*

The Gov't Sentencing Letter represents a disturbing failure to acknowledge the
categorical illegality (both under U.S. law and internationally) – and immorality – of torture, and
the provisions of the Convention Against Torture (hereinafter "CAT").  *See* Mr. Harun's Initial
Sentencing Letter, at 18-22.

It ignores as well as the continuing adverse effects of torture both psychologically and
physiologically, and the CAT's directive that signatories to the CAT provide "the means for as
full rehabilitation as possible."  *See also* Mr. Harun's Initial Sentencing Letter, at 22 n.19.
Callous and indifferent with respect to torture generally (and the mental illness it generates), the
government essentially asserts that because Mr. Harun was lucid in Italy (where he was treated
with appropriate medication and not, to defense counsel's knowledge, confined in isolation from
other detainees), the effects of six years of torture, as well as another five years of solitary
confinement in the U.S. (which itself has been described as torture by physicians and even state
prison officials, *see* Mr. Harun's Initial Sentencing Letter, at 39, 42-43, and which presents
serious Eighth Amendment issues, *see* **post**, at 19-23, and Mr. Harun's Initial Sentencing Letter,
at 36), are somehow not an issue for sentencing.[9]

---

[9]  The government's remark that "even assuming that every claim and supposition defense
counsel makes (in both [their] memorandum and classified supplement) concerning the

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Brian M. Cogan
United States District Judge
Eastern District of New York
January 2, 2018
Page 11 of 30

In what the authors describe as "the largest database of torture survivors in one country ever documented in a professional publication[,]" the National Consortium of Torture Treatment Programs conducted a voluntary study of torture survivors in the U.S. *"*Descriptive, inferential, functional outcome data on 9,025 torture survivors over six years in the United States," Member Centers of the National Consortium of Torture Treatment Programs (NCTTP), *TORTURE*, Vol. 25 No. 2 (2015) 34, 51, available at <http://irct.org/publications/torture-journal/119>.

The study found that "[o]ver 90% of individuals for whom we have diagnostic information had diagnoses of PTSD [Post-Traumatic Stress Disorder], major depressive disorder (MDD), or PTSD co-morbid with depression, indicating significant psychiatric impairment." *Id.*, at 52.

Further delineating the diagnoses, the study noted that "[s]ixty-nine percent were diagnosed with PTSD, while 52.4% had a diagnosis of MDD. Thirty-five percent were diagnosed with PTSD co-morbid with MDD." *Id.*, at 46. In addition, "[t]he rates of PTSD were significantly related to number of types of torture reported . . ." *Id.*, at 47. More than four types of torture produced a PTSD rate of 80.9%. *Id.*

As the authors concluded, "'[t]he very high rates of PTSD and MDD for the torture survivors in our study show the severe repercussions of torture on health and mental health and demonstrate the need for access to effective rehabilitative services." *Id.*, at 52. It is respectfully submitted that it is *that* conclusion, rather than the government's obtuseness, that merits serious consideration at sentencing.[10]

---

defendant's incarceration and treatment are true[,]" *see* Gov't Sentencing Letter, at 22, is extraordinary given that the government well knows that the facts presented in Mr. Harun's Initial Sentencing Letter, as well as the accompanying December 12, 2017, CLASSIFIED Letter, are both completely accurate and fully documented.

[10] In the context of torture and solitary confinement, an important facet is the general recognition that "[o]f particular concern is the high incidence of posttraumatic stress disorder (PTSD) among the population of serious offenders – a condition triggered, in some instances, by the circumstances that led to incarceration in the first place." J. Vincent Aprile II, *PTSD: When the Crime Punishes the Perpetrator*, 23 CRIM. JUST., no. 4, Winter 2009, at 39

Hon. Brian M. Cogan
United States District Judge
Eastern District of New York
January 2, 2018
Page 12 of 30

    **C.**    *Mr. Harun's Mental Health Issues Are Continuing and*
          *Will Require Proper Treatment While He Is Incarcerated*

    Regarding Mr. Harun's ongoing mental health issues, and the need for his sentence to avoid exacerbating those problems, the government contends that ███████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████████ ████████████████████████████

    That of course is a woefully simplistic and uninformed view of mental illness, as well as the impact of torture, which can wax and wane absent any formula or schedule.  *See* Exhibit A to December 12, 2017, CLASSIFIED Letter on Mr. Harun's behalf. ██████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████[11]

    Indeed, Mr. Harun's prior history demonstrates the unstable and unpredictable nature of his behavior and mental state.  While he was lucid and cooperative in Italy, that was not the case when Italian authorities first encountered him in June 2011 en route by boat from the island of Lampedusa (the island of Italian territory closest to North Africa), to Taranto, Italy.  As even the Gov't Sentencing Letter acknowledges, at 7, "[w]hile on the ship, [Mr. Harun] attracted the attention of several law enforcement officers."

    The reason for such attention was Mr. Harun's bizarre behavior.  As Police Commissioner Chief Guglielmo Battisti testified in Italy September 15, 2011 (in response to a request from the U.S. Department of Justice for legal assistance) in the Court of Agrigento, Office of the Judge for Preliminary Investigations, Summary Report of Hearing in Chambers (and produced as 3500-GB-6e),

> Marshal MORGESE of the Financial Police [GDF], who had to
> keep watch over unaccompanied men, called me.  He called
> because a man had intrigued him due to the fact that he kept apart
> from the rest of the passengers, who walked around reading a sort
> of prayer-book, talking to himself, and due to the fact that the man

---

[11] ████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████████

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Brian M. Cogan
United States District Judge
Eastern District of New York
January 2, 2018
Page 13 of 30

> had approached him several times to ask insistently for water,
> saying that he would have nothing to do with the other passengers
> because he was different.

3500-GB-6e, at 5 (a copy of which is attached hereto as Exhibit 1).

Chief Battisi (who also testified March 6, 2017, as a government witness at trial here) further testified in Italy that Mr. Harun "told us that he was collected by the Libyan jail guards and put forcibly aboard the ship which then docked at Lampedusa with two or three hundred people." *Id.*, at 6.

As Chief Battisti's (and Marshal Morghese's) testimony at trial here established, Mr. Harun accompanied them to a room where he voluntarily made a complete handwritten statement. At that point, according to Chief Battisti's trial testimony, Mr. Harun

> put his pen down and he said, Now, I'm done and now I'm getting
> off. He stood up, we stood up with him. He said I'm getting off no
> matter what I'm jumping off the ship and I will swim back to
> Libya. He grabbed a door handle. We approached him in order to
> stop him. He started to become violent. He managed to open the
> door. While doing that, he hit us repeatedly and he kept screaming.
> Up to the point where we were in the corridor outside, we were
> able to pin him down, and we handcuffed him while he kept
> screaming.

Transcript, March 6, 2017, at 112. *See also id.*, at 112-14, 68-70.

Mr. Harun would not stop screaming; as a result, Chief Battisti summoned the ship's physician, who administered a sedative to Mr. Harun. However, despite Mr. Harun's uncontrollable outburst, as Chief Battisti testified in Italy, "[t]he next morning, after praying and breakfast, our colleagues from DIGOS in Taranto came to arrest [Mr. Harun]. At that point the effect of the sedative had worn off and he was perfectly lucid." 3500-GB-6e, at 6 (Exhibit 1).

Thus, Mr. Harun has been prone to erratic and extreme behavior, and the waxing and waning of numerous psychological conditions, since his spontaneous release from Libyan custody. Also, in Italy, he was treated with psychotropic drugs, and was stabilized, a condition that lasted for the first couple of months of his detention in the U.S. What followed is described in the December 12, 2017 Declaration by Susan G. Kellman, Esq., and David Stern, Esq.,

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Hon. Brian M. Cogan
United States District Judge
Eastern District of New York
January 2, 2018
Page 14 of 30

attached as Exhibit 3 to Mr. Harun's Initial Sentencing Letter (hereinafter the "Kellman/Stern Declaration").

In his August 22, 2013, Report, Dr. Mark J. Mills, J.D., M.D., based on his review of available medical records, reported the following history for Mr. Harun while in Italy:

> [o]nce he was incarcerated in Italy, again for terrorism, he was presumably treated in a more civilized manner. There, his behavior varied between cooperative, uncooperative and bizarre (manic-like and depressed in atypically rapid cycles), resulting in his receiving psychiatric evaluation and pharmacologic treatment. These changes, whether as a result of PTSD, hyper-religious attitudes, psychotic level mental illness, problems in communication, anger or anxiety, were never adequately parsed. Some Italian doctors came to believe he was seriously disturbed, ultimately diagnosing him as psychotic, and medicated him; other physicians, however, writing a few days later, perceived him as essentially normal.

Dr. Mills's August 22, 2013, Report, at 2.

Indeed, multiple experts have detailed a complex clinical profile of Mr. Harun, informed by a six-year confinement punctuated by diverse torture, and periodic bouts of psychotic symptoms, thought disorder, and behavioral issues. That Mr. Harun has had intervals of cogency do not diminish his steady manifestation of mental health issues over time, which currently are in full bloom, and which are destined to continue. *See also* Exhibit A to the December 12, 2017, CLASSIFIED Letter on Mr. Harun's behalf.

Both Dr. Mills and Richard L. DeMier, Ph.D. initially detected paranoia and/or psychotic symptoms upon evaluating Mr. Harun. In his second (February 3, 2014) Report, at 26, Dr. DeMier stated that "[t]here remains a possibility that [Mr. Harun] has had (and will continue to have) a thought disorder, despite the the current absence of apparent symptoms." Dr. DeMier cautioned, too, that "[m]ental state can change over time, and if he has an illness, it is possible he could become symptomatic at some point in the future . . ." *Id.*[12]

---

[12] In fact, Dr. Mills – who initially saw elements of paranoia and psychosis in Mr. Harun – noted, upon learning that Mr. Harun had been treated with success in Italy with antipsychotic medication, that it "tended to bolster my impression of his probably suffering from a psychotic disorder." *See* Dr. Mills's August 22, 2013, Report, at 3-4. Similarly, in his first report, dated

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Brian M. Cogan
United States District Judge
Eastern District of New York
January 2, 2018
Page 15 of 30

Nor does it take an expert to recognize, as Correctional Officer Quamina's Declaration (Exhibit 4 to Mr. Harun's Initial Sentencing Letter) attests, that regardless of technical issues of legal competency, *there is something very wrong with Mr. Harun*, and given the duration of the torture he suffered, it is not just disingenuous but inhumane for the government to dispute it, or seek to aggravate his punishment by ignoring it.

Also, the government claims that "it is unclear how the [Bureau of Prisons] would determine which inmates share the defendant's 'religious and cultural affinities,' particularly given the twisted and violent version of Islam he practices." Gov't Sentencing Letter, at 26, *quoting* Mr. Harun's Initial Sentencing Letter, at 76.

Yet the U.S. Bureau of Prisons (hereinafter "BoP") has already created such enclaves within its system. Mr. Harun could be designated to serve his sentence at the Communications Management Unit at either FCI Terre Haute or FCI Marion, at which a significant number of Muslims convicted of terrorism-related offenses are confined. *See, e.g., Facility Holding Terrorism Inmates Limits Communication*, Washington Post, February 5, 2007, available at <http://www.washingtonpost.com/wp-dyn/content/article/2007/02/24/AR2007022401231.html>; Christopher S. Stewart, "'Little Gitmo,'" *New York Magazine*, July 10, 2011, available at <http://nymag.com/news/features/yassin-aref-2011-7/>; Scott Shane, "Beyond Guantanamo, a Web of Prisons for Terrorism Inmates," *The New York Times*, December 10, 2011, available at <http://www.nytimes.com/2011/12/11/us/beyond-guantanamo-bay-a-web-of-federal-prisons.html?pagewanted=4&n=Top/Reference/Times%20Topics/Subjects/I/Islam?ref=islam>.

In addition, even a convicted terrorist as notorious as Abdullah Öcalan – the leader of the Kurdistan Workers' Party who had been convicted in Turkey of responsibility in the killings of thousands of people – merited some measure of socialization. The European Committee for the Prevention of Torture (CPT), an official organ of the Council of Europe, visited Mr. Öcalan and reported that 8½ years in solitary confinement "had caused a marked deterioration of Mr. Öcalan's mental state" and "called upon the Turkish government to integrate him into a setting – either on the island prison or at another prison – "where contacts with other inmates and a wider range of activities are possible." Jules Lobel, "Prolonged Solitary Confinement and the Constitution," JOURNAL OF CONSTITUTIONAL LAW, Vol. 11:1 (December 2008) 115, 124-25

---

February 3, 2014, at 22, Dr. DeMier was uncertain whether Mr. Harun was competent, as he made a tentative diagnosis of schizophrenia, but advised that the "conservative course" was to consider him "not competent to proceed." In his subsequent August 27, 2014, report, at 26, Dr. DeMaier, after noting that "Mr. Harun's prognosis depends on whether he has a genuine mental illness[,]" found "insufficient evidence to conclude that he has a mental illness."

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Hon. Brian M. Cogan
United States District Judge
Eastern District of New York
January 2, 2018
Page 16 of 30

(footnote omitted) (hereinafter "*Prolonged Solitary*"), available at
<http://scholarship.law.upenn.edu/cgi/viewcontent.cgi?article=1145&context=jcl>, *citing* Eur.
Comm. for the Prevention of Torture & Inhuman or Degrading Treatment or Punishment, *Report
to the Turkish Government on the Visit to Turkey*, CPT/Inf (2008), ¶ 33.

Ultimately, the Gov't Sentencing Letter, at 27, urges the Court to "reject defense
counsel's request that it recommend that the defendant 'receive appropriate psychiatric treatment,
including medication and counseling.'" Yet such recommendations are made by sentencing
courts *all the time*, notwithstanding BoP's claims that it would naturally do so.

Thus, again, the government's reveals its position that Mr. Harun should suffer as much
as humanly – perhaps as inhumanly – as possible, a concept not recognized nor tolerated by the
Eighth Amendment or international law. Indeed, the government, in its patent disregard for Mr.
Harun's mental health, and blind pursuit of gratuitous vengeance, would send at sentencing a
very different, but equally and abundantly clear message about the U.S. criminal justice system
that would not only contravene constitutional principles, but also impair U.S. national security
and standing in the world.

In contrast with the government's *gulag* approach, Mr. Harun's chronic condition and
impairment warrant full evaluation and treatment. That is the minimum standard, and Mr.
Harun's sentence should not exacerbate those difficulties. That is the purpose of counsel's
request for a communal environment for Mr. Harun while incarcerated, because further continued
isolation of a person who has demonstrated a steady deterioration would be both inhumane and
unnecessary. *See also* **post**, at section III(E) (pp. 19-24); Mr. Harun's Initial Sentencing Letter,
at 29-45.

In *Singh*, in language pertinent here, the Second Circuit restated the fundamental doctrine
that guides and informs sentencing, mathematical calculations notwithstanding:

> [w]hile there are many competing considerations in every
> sentencing decision, a sentencing judge must have some
> understanding of "the diverse frailties of humankind." *See
> Woodson v. North Carolina*, 428 U.S. 280, 304 (1976) (plurality
> opinion). In deciding what sentence will be "sufficient, but not
> greater than necessary" to further the goals of punishment, 18
> U.S.C. §3553(a), a sentencing judge must have a "generosity of
> spirit, that compassion which causes one to know what it is like to
> be in trouble and in pain." Guido Calabresi, *What Makes a Judge
> Great: To A. Leon Higginbotham, Jr.*, 142 U. Pa. L. Rev. 513, 513

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Brian M. Cogan
United States District Judge
Eastern District of New York
January 2, 2018
Page 17 of 30

(1993);  *see also* Edward J. Devitt, *Ten Commandments for the New Judge*, 65 A.B.A. J. 574 (1979), *reprinted in* 82 F.R.D. 209, 209 (1979) ("Be kind.  If we judges could possess but one attribute, it should be a kind and understanding heart.  The bench is no place for cruel or callous people regardless of their other qualities and abilities.  There is no burden more onerous than imposing sentence in criminal cases.").

2017 WL 6327823, at *10.

> **D.**  *Mr. Harun's Extraordinary Acceptance of Responsibility, Manifested By His Willingness to Provide Valuable, Accurate, and Detailed Information to U.S. Officials, Should Be a Mitigating Factor at Sentencing Pursuant to §3553(a)*

The government attempts to minimize Mr. Harun's cooperation in Italy ██████████ ███████████████████but that effort is contradicted elsewhere in the government's submission.  For example, at 8, the Gov't Sentencing Letter concedes that "the government conducted three days of audio-recorded interviews of [Mr. Harun] in Italy, before an Italian judge, and in the presence of defense counsel." (Citations omitted).

In fact, in its recitation of the facts and otherwise, the government's cites those interviews *43 times* – 42 times to Government Exhibit (at trial) 31T, and once to GX 31.  The inescapable fact is that the essence of the government's proof came from Mr. Harun himself through his detailed, specific, and accurate debriefings.  *See* Mr. Harun's Initial Sentencing Letter, at 27-29 ███████████████████.

Also, Mr. Harun spoke with U.S. authorities while he was in Italy without any formal or informal agreements, or in return for any promises or benefits.  His extensive self-incriminating statements were therefore made in a context more pristine of purpose and reward than almost every defendant or suspect in the U.S. who cooperates with authorities.[13]

---

[13]  Ms. Kellman was appointed to represent Mr. Harun while he was still in Italy, and was granted authority to travel to meet and advise him there, only to be informed by the U.S. prosecutors prior to her departure that Mr. Harun had waived his right to counsel and had already been fully debriefed by government counsel and had testified in the Italian court.  Ms. Kellman learned further that Mr. Harun was on his way to the United States, in the custody of American law enforcement.

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Hon. Brian M. Cogan
United States District Judge
Eastern District of New York
January 2, 2018
Page 18 of 30

The government also again misapprehends the defense's position in arguing against a Guidelines level reduction pursuant to §3E1.1.  *See* Gov't Sentencing Letter, at 21-22.  Mr. Harun is not seeking application of §3E1.1,███████████████████████████████████████████ █████████████████████████████████████████████████████████████████████████████████████ █ ███████████████████████████████████████████████████████████████████████████████████ ██████████████████████[14]

In addition, repeating a procedural error the Court identified in *Singh*, the government mistakenly conflates "acceptance of responsibility" with remorse.  *See* Gov't Sentencing Letter, at 21-22.  As the Court in *Singh* explained, "[a] defendant's acceptance of responsibility and his assertion of mitigating circumstances are not necessarily inconsistent or incompatible."  2017 WL 6327823, at *8.

Instead, as the Court elaborated, "[t]he concepts are related but independent."  *Id., citing cf. United States v. Douglas*, 569 F.3d 523, 527 (5th Cir. 2009) ("We hold that 'lack of remorse' and 'acceptance of responsibility' can be separate factors and that a district court may consider each independently of the other.") (other citation omitted).

Once again emphasizing foundational sentencing principles, the Court in *Singh* added that

> [a] defendant's right to "attempt to mitigate punishment" has "historical roots in the common law," and "the opportunity to plead for mercy is another provision in a procedural body of law designed to enable our system of justice to mete out punishment in the most equitable fashion possible, to help ensure that sentencing is particularized and reflects individual circumstances."  *United States v. Feng Li*, 115 F.3d 125, 133 (2d Cir. 1997), *quoting United States v. Barnes*, 948 F.2d 325, 328 (7th Cir. 1991) (internal quotation marks omitted).

---

[14]  Moreover, contrary to the government's contention, in the Gov't Sentencing Letter, at 11, defense counsel does not "claim[] that [Mr. Harun] is a citizen of Niger[;]"  rather, as stated in Mr. Harun's Initial Sentencing Letter, at 76, counsel reports that Mr. Harun has claimed to be a citizen of Niger, *not* Nigeria, and seeks correction of ¶¶ 8, 76 of the Pre-Sentence Report to that effect.

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Brian M. Cogan
United States District Judge
Eastern District of New York
January 2, 2018
Page 19 of 30

2017 WL 6327823, at *9 (footnote omitted).[15]

**E.      *Mr. Harun's More Than a Decade in Solitary Confinement, With the Prospect of More, Should Serve as a Significant Mitigating Factor at Sentencing***

---

[15]  The footnote in *Singh* cited 18 U.S.C. §3661's breadth of information relevant to sentencing.  2017 WL 6327823, at *9 n.6.

[16]

[17]

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Brian M. Cogan
United States District Judge
Eastern District of New York
January 2, 2018
Page 20 of 30

The government's position with respect to the prospect of Mr. Harun remaining in solitary confinement for the remainder of his life is consistent with the rest of its sentencing letter: that Mr. Harun should endure the maximum suffering regardless of his mental health condition.

However, that is not the law. While solitary confinement itself does not necessarily rise to the level of "cruel and unusual punishment," and therefore violative of the Eighth Amendment, there are two elements of solitary confinement – both of which are present here – that do implicate the constitutional proscription: (1) whether it is imposed on inmates with pre-existing mental health problems; and (2) the duration of the solitary confinement.

As the Supreme Court held in *Hutto v. Finney*, 437 U.S. 678 (1978), "[c]onfinement in . . . an isolation cell is a form of punishment subject to scrutiny under Eighth Amendment standards." *Id*., at 685. *See also* Mr. Harun's Initial Sentencing Letter, at 36 & n.31. Nearly a century earlier, in *In re Medley*, 134 U.S. 160 (1890), the Court had summarized the prior century's experience with solitary confinement:

> [a] considerable number of the prisoners fell, after even a short confinement, into a semi-fatuous condition, from which it was next to impossible to arouse them, and others became violently insane, others, still, committed suicide, while those who stood the ordeal better were not generally reformed, and in most cases did not recover sufficient mental activity to be of any subsequent service to the community.

*Id.*, at 168. *See also Johnson v. Wetzel*, 209 F. Supp.3d 766, 779 (M.D. Pa. 2016) ("even for prisoners sentenced to death, solitary confinement bears 'a further terror and peculiar mark of infamy'") *Id*., *quoting In re Medley*, 134 U.S. at 170.[18]

---

[18] The Quaker reform of penal institutions, embodied in the "penitentiary," in which an offender would be isolated in order to contemplate his crimes and do penitence, grew popular in the mid-19th century. Many jurisdictions adopted that model, "only to abandon the practice because of its harmful effects on prisoners." *Prolonged Solitary*, at 118. In fact, according to *Prolonged Solitary*, "sociologist Alexis de Tocqueville and his colleague Gustav Beaumont observed that a similar form of solitary confinement tried in Auburn, New York, 'proved fatal for the majority of prisoners. It devours the victim incessantly and unmercifully; it does not reform, it kills. The unfortunate creatures submitted to this experiment wasted away . . . .'" *Id*. (footnote and citations omitted).

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Hon. Brian M. Cogan
United States District Judge
Eastern District of New York
January 2, 2018
Page 21 of 30

Moreover, as detailed in Mr. Harun's Initial Sentencing Letter, at 29-32, "there is plenty of medical and psychological literature concerning the ill effects of solitary confinement[.]" *Davenport v. DeRobertis*, 844 F.2d 1310, 1316 (7th Cir. 1988). *See also Johnson v. Wetzel*, 209 F. Supp.3d at 779.

Regarding the prohibition on isolating mentally ill inmates, in *Prolonged Solitary*, at 120, Professor Lobel notes that in *Madrid v. Gomez*, 889 F. Supp. 1146, 1265 (N.D. Cal. 1995), while the Court held "that while there was a risk of serious psychological injury to inmates, that risk was not of 'sufficiently serious magnitude' to find a '*per se*' violation of the Eighth Amendment for all prisoners placed in long-term solitary confinement[,]" the Court in *Madrid* "did find that it would violate the Eighth Amendment to subject prisoners who already had serious mental illnesses to prolonged solitary confinement, because such prolonged social isolation was very likely to inflict serious psychological pain on that subclass of prisoners."[19]

As noted above, duration of solitary confinement is also a factor in the constitutional analysis, and courts have granted injunctive relief to inmates solely on that basis. *See, e,.g., Johnson v. Wetzel*, 209 F. Supp.3d 766 (M.D.Pa. 2016); *Ashker v. Brown*, Not Reported in F. Supp.2d, 2013 WL 1435148 (N.D.Cal. April 9, 2013); *Shoatz v. Wetzel*, Not Reported in F. Supp.3d, 2016 WL 595337 (M.D.Pa. February 12, 2016); *Wilkerson v. Stalder*, 639 F. Supp.2d 654(M.D.La. 2007).

In *Johson v. Wetzel*, in which the inmate had been in solitary confinement for 36 years, 209 F. Supp.3d at 770, the Court pointed out that "the Supreme Court of the United States has admonished that *duration* of confinement 'cannot be ignored' in determining whether challenged

_____

[19] As *Prolonged Solitary* notes, "the courts have clearly recognized that psychological harm inflicted by prison officials can constitute an Eighth Amendment violation[.]" *Id.*, at 133, *citing Calhoun v. DeTella*, 319 F.3d 936, 939 (7th Cir. 2003), and other cases and authorities cited in n. 76. *See also Johnson v. Wetzel*, 209 F. Supp.3d at 777-78 (finding that plaintiff "has suffered – and continues to suffer – psychological deterioration as a direct result of his continued isolation. The Eighth Amendment protects an inmate's physical *and* mental health") (emphasis in original), *citing Farmer v. Brennan*, 511 U.S. 825, 852 (1994), and *Gregg v. Georgia*, 428 U.S. 153, 183, (1976).

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Hon. Brian M. Cogan
United States District Judge
Eastern District of New York
January 2, 2018
Page 22 of 30

conditions withstand constitutional scrutiny." *Id*., at 777 (emphasis in original), *qouting Hutto v. Finney*, 437 U.S. 678, 686 (1978) (other citation omitted).[20]

Examining the plaintiff's claim in *Johnson*, the Court noted that the plaintiff

> maintains that the extraordinary duration of his confinement
> combines with the harsh consequences of involuntary isolation to
> impel its effects across constitutional boundaries. (*See id*. at 3–6;
> Doc. 4 at 8-13).  He contends that his prolonged confinement in the
> RHU denies him social interaction, environmental stimuli, sleep,
> and exercise, culminating in a collective deprivation of
> constitutional proportion.  (*See* Doc. 4 at 7-13; Doc. 65 ¶ 93).  The
> court agrees.

209 F. Supp.3d at 776.

In *Johnson*, the Court granted relief even though none of the examining experts "diagnosed Johnson with a mental health disorder." *Id*., at 778 (citation omitted).  *See also Prolonged Solitary*, at 133 ("many ordinary prisoners also face the risk of suffering serious mental pain when placed in long-term supermax confinement").

Also, the Court in *Johnson* pointed out that "the fact that one or more conditions would not independently constitute an Eighth Amendment violation is not dispositive when the conditions, in combination, have a 'mutually enforcing effect' of producing an unconstitutional deprivation." 209 F. Supp.3d at 776, *quoting Wilson v. Seiter*, 501 U.S. 294, 304 (1991).  In addition, the Court in *Johnson* viewed the issue prospectively:  "[t]he Supreme Court has long

---

[20] The Court in *Johnson*, in subjecting solitary confinement to constitutional analysis, explained that

> in *Farmer v. Brennan*, 511 U.S. 825 (1994), the United States
> Supreme Court observed that this constitutional proscription
> requires prison officials to provide "humane conditions of
> confinement" to their charges.  *Id*. at 832.  Prison officials violate
> this guarantee when they "deprive inmates of the minimal civilized
> measure of life's necessities."  *Rhodes v. Chapman*, 452 U.S. 337,
> 347 (1981).

209 F. Supp.3d at 776 (other citation omitted).

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Hon. Brian M. Cogan
United States District Judge
Eastern District of New York
January 2, 2018
Page 23 of 30

held that 'the Eighth Amendment protects against *future* harm to inmates' as well as extant and manifest harm."  209 F. Supp.3d at 778, *quoting Helling v. McKinney*, 509 U.S. 25, 33 (1993) (emphasis added by the Court in *Johnson*).  *See also* 209 F. Supp.3d at 778 ("[t]he Court rejects defendants' contention that Mr. Johnson cannot attain relief until his condition devolves below some arbitrary threshold of mental illness").

Nor was the Court in *Johnson* dissuaded by the inmate's three prior escape attempts and 90 "class 1 misconducts" in the early days of his incarceration.  *Id.*, at 780.  Similarly, even for the convicted infamous international terrorist "Carlos the Jackal," the European Court for Human Rights ruled "that solitary confinement, even in cases entailing only relative isolation, cannot be imposed on a prisoner indefinitely."  *Ramirez Sanchez v. France*, App. No. 59450/00, 45 Eur. H.R. Rep. 49, ¶¶ 125, 136, 145, 150 (2007).  *See also* **ante**, at 15 (regarding Abdullah Öcalan).

As discussed in Mr. Harun's Initial Sentencing Letter, at 38, international standards also restrict the use of solitary confinement to short (15-day) periods.  In that context, as the Court in *Johnson* observed, "courts must measure alleged deprivations against an evolving metric, determining on a case by case basis whether challenged conditions offend 'contemporary standards of decency.'" 209 F. Supp.3d, at 777, *citing Helling*, 509 U.S. at 32, 36;  *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981).[21]

According to the Inter-American Court of Human Rights, "prolonged isolation and coercive solitary confinement are, in themselves, cruel and inhuman treatments, damaging to the person's psychic and moral integrity and the right to respect of the dignity inherent to the human person." *Case of the Miguel Castro-Castro Prison v. Peru*, Inter-Am. Ct. H.R. (ser. C) No. 160, at ¶ 323 (Nov. 25, 2006);  *see also Velasquez Rodriguez Case*, Inter-Am. Ct. H.R. (ser. C) No. 4, at 9 ¶ 156 (1988) (finding that "prolonged isolation and deprivation of communication are in themselves cruel and inhuman treatment").  *See also Prolonged Solitary*, at 123-24.

Craig Haney, Ph.D. (and a lawyer), a recognized expert with respect to solitary confinement (*see* Mr. Harun's Initial Sentencing Letter, at 30 & n.24, 32-33 & n.37), told an interviewer last year that while the damage solitary confinement inflicts has been recognized, "[i]nertia keeps the practice in place, . . . despite the lack of evidence for cost, prisoner rehabilitation, or prison management benefits. 'When the scientific and human rights consensus changes, it's hard for people who have been doing things one way – and thinking that way was

---

[21]  *See also Roper v. Simmons*, 543 U.S. 551, 575 (2005) ("at least from the time of the Court's decision in *Trop* [*v. Dulles*, 356 U.S. 86 (1958)], the Court has referred to the laws of other countries and to international authorities as instructive for its interpretation of the Eighth Amendment's prohibition of 'cruel and unusual punishments'").

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Hon. Brian M. Cogan
United States District Judge
Eastern District of New York
January 2, 2018
Page 24 of 30

"right" for years on end – to change their thinking and behavior.'"  Robin Lloyd, "A Growing Trend to Ban Solitary Confinement of U.S. Prisoners," undark.org, December 14, 2017, available at <https://undark.org/2017/12/14/solitary-confinement-torture-prison/>.

In an article to be published this year, Dr. Haney further challenges the continuing rationales – including those asserted by the government herein – for solitary confinement:

> [i]n addition to the scientific evidence on the harmful psychological consequences of denying people opportunities for meaningful social contact and the consensus that has emerged among professional groups that solitary confinement is so dangerous that it must be significantly restricted, correctional systems around the country are themselves rethinking the justification for its continued use.  In addition to its comparative expenses, there is little or no evidence that solitary confinement effectively accomplishes any of the goals for which it is allegedly employed.  As I noted earlier, its record in reducing various forms of inmate misbehavior or in stemming the proliferation or influence of prison gangs is, at best, mixed, problematic, and may be counterproductive.

Craig Haney, "Restricting the Use of Solitary Confinement," *Annual Review of Criminology*, 2018, at 21.18, available at <http://www.annualreviews.org/doi/pdf/10.1146/annurev-criminol-032317-092326>.

Here, the government's insensitivity to Mr. Harun's history of torture, and past and future solitary confinement are evident in its response.[22]  Most people grow anxious at even the *prospect* of being trapped in an elevator for even a brief period of time.  For Mr. Harun, a space not appreciably larger than that elevator has constituted his entire world for more than 13 of the past 15 years, and may very well do so for the rest of his life.

F.      ***Mr. Harun Should Receive Credit for the Seven Years
        and Ten Months He Spent in Custody in Libya and Italy***

---

[22]  As Professor Lobel opines in *Prolonged Solitary*, "the unfortunate trend in the United States has been to downplay and ignore the cruel and inhuman effects of psychological abuse to prisoners where there is no long-term physical injury."  *Prolonged Solitary*, at 117.

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Brian M. Cogan
United States District Judge
Eastern District of New York
January 2, 2018
Page 25 of 30

The Gov't Sentencing Letter neither addresses nor disputes that Mr. Harun should received credit for the seven years and ten months he spent in custody in Libya and Italy prior to his transfer to the United States. *See* Mr. Harun's Initial Sentencing Letter, at 45-46.

G.   ***The Automatic Application of the Guidelines' Terrorism Enhancement Should Be Remedied By Either a Downward Departure and/or Resort to the §3553(a) Sentencing Factors***

The Gov't Sentencing Letter, at 20-21, misapprehends Mr. Harun's position with respect to the Sentencing Guidelines' terrorism enhancement embodied in §3A1.4 argument. Mr. Harun does not argue that §3A1.4, but rather that its effect with respect to offense level, particularly with respect to the circumstances of Count One (and its incorporation in Counts Three and Four), should be ameliorated by either a downward departure or reference to the §3553(a) factors, and that its assignment of Criminal History Category VI vastly overstates Mr. Harun's criminal history. *See* Mr. Harun's Initial Sentencing Letter, at 46-53.

H.   ***The Need, Pursuant to 18 U.S.C. §3553(a)(6), to "Avoid Unwarranted Sentence Disparities Among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct" Compels a Sentence Less Than Life Imprisonment***

Regarding §3553(6) and the need to avoid unwarranted sentencing disparities, as noted **ante**, in *Singh* the Second Circuit consulted the U.S. Sentencing Commissions statistics in evaluating the substantive reasonableness of the sentence. *See* Mr. Harun's Initial Sentencing Letter, at 57-59.

Instead of that broad analysis, the government concentrates on a small sample of cases in which life sentences were imposed. *See* Gov't Sentencing Letter, at 19. In addition, in discussing the few specific cases cited in Mr. Harun's Initial Sentencing Letter – which were mentioned in a different context, *see* Mr. Harun's Initial Sentencing Letter, at 21-22 – the government, in noting certain language with respect to Jose Padilla in *United States v. Jayyousi*, 657 F.3d 1085 (11th Cir. 2011), ignores entirely the sentence Mr. Padilla ultimately received after remand (and that which his co-defendants received and which the government did not appeal): 252 months for Mr. Padilla, and 152 and 188 months for his two co-defendants. *See* Gov't Sentencing Letter, at 14. *See* Mr. Harun's Initial Sentencing Letter, at 22.

Also, in attempting to distinguish the 25-year sentence imposed upon Alhassane Ould Mohamed in *United States v. Mohamed*, 13 Cr. 527 (WFK) (E.D.N.Y.), *see* Mr. Harun's Initial Sentencing Letter, at 56, the government argues merely that Mr. Mohamed's "plea agreement

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Brian M. Cogan
United States District Judge
Eastern District of New York
January 2, 2018
Page 26 of 30

stipulated a sentence of 25 years' imprisonment pursuant to Rule 11(c)(1)(C)."  Gov't Sentencing Letter, at 18.

However, that of course begs the question because in *Mohamed*, despite the defendant's killing of U.S. nationals abroad – outside the field of battle, in a planned street encounter, *see* Mr. Harun's Initial Sentencing Letter, at 56 – in agreeing to a disposition limiting the sentence to 25 years, *the government* deemed a 25-year prison term "sufficient, but not greater than necessary" to achieve the purposes of sentencing.

Nor could Mr. Mohamed's decision (or Omar Khadr's, *see* Mr. Harun's Initial Sentencing Letter, at 15) to plead guilty be a distinguishing factor that could increase Mr. Harun's sentence from 25 years to *life imprisonment*.  That would simply constitute an improper penalty for Mr. Harun exercising his constitutional right to trial.  *See* Mr. Harun's Initial Sentencing Letter, at 56 & n. 51.[23]

Also, while the government notes that unlike Messrs. Khadr and Mohamed, "only [Mr. Harun] was also charged with conspiring to destroy a U.S. embassy[,]" Gov't Sentencing Letter, at 18, it fails to offer any rationale why that conduct, which the government's own description establishes did not progress very far, *see* Gov't Sentencing Letter, at 6-7;  *see also* Mr. Harun's Initial Sentencing Letter, at 15, 60, and which typically results in a 15-20 year sentence, *see* Mr. Harun's Initial Sentencing Letter, at 54-55, should increase Mr. Harun's sentence to life imprisonment.

I.      *For a Number of Reasons Both Practical and Empirical, General Deterrence Should Not Be a Factor In Mr. Harun's Sentence*

In maintaining that general deterrence should be a factor in Mr. Harun's sentencing, the Gov't Sentencing Letter, at 17, cites the Second Circuit's opinion in *United States v. Ulbricht*, 858 F.3d 71 (2d Cir. 2017), for the unremarkable proposition that general deterrence is mong the factors "that district courts are *required* by Congress to consider in arriving at the appropriate sentence. 18 U.S.C. §3553(a)(2)(B)."  *Id.*, at 133 (emphasis in original).

Yet that does not mean that it is a factor that can achieve the objectives of sentencing in every case, or that it should contribute to a sentence in specific cases in which an additional

---

[23]  The same is true for the government's not-so-thinly-veiled argument that because Mr. Harun proceeded to trial, that can be equated with a lack of remorse that would justify a higher sentence.  *See* Gov't Sentencing Letter, at 11, 15 & 22.  That is merely an indirect route to the same unconstitutional enhancement of a sentence in retaliation for invoking the right to trial.

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Brian M. Cogan
United States District Judge
Eastern District of New York
January 2, 2018
Page 27 of 30

period of imprisonment would not accomplish general deterrence.  In that regard, district courts are *required* to consider the Guidelines themselves, but in three-quarters of the cases in this District, they do not reflect the appropriate or "reasonable" sentence.  *See* Mr. Harun's Initial Sentencing Letter, at 57.

Indeed, as the Court pointed out in *Singh*, "[t]he particular weight to be afforded aggravating and mitigating factors 'is a matter firmly committed to the discretion of the sentencing judge.'" 2017 WL 6327823, at 6 n.4, *quoting United States v. Broxmeyer*, 699 F.3d at 289 (other citation omitted).[24]

Here, the government asserts that "[a] sentence of life imprisonment would send an unambiguous message that would-be terrorists who conspire to murder U.S. citizens or bomb U.S. government buildings can expect to spend the rest of their lives in jail."  Gov't Sentencing Letter, at 17.

The Gov't Sentencing Letter also marshalls all of the academic, social sicence, empirical, or other literature and studies establishing that claim – which, of course, is *none*.  Indeed, the Gov't Sentencing Letter, in listing just two pages later, at 19, the several life sentences imposed in other cases dispositively undermines its argument.  Either those prior sentences sent that very message effectively, or those sentences failed to send any message *at all* to the target audience.

Moreover, what then would be the message sent by the 25-year sentence in *United States v. Mohamed* (*see* **ante**, at 25-26;  Mr. Harun's Initial Sentencing Letter, at 60)?  That for killing a U.S. national overseas you do *not* get a life sentence, but instead a 25-year term?  Similarly, the analyses of sentencing *hundreds* of terrorism cases (and also in federal homicide cases) discussed in Mr. Harun's Initial Sentencing Letter, at 59, demonstrates that "messaging" through this case is a canard.  The misplaced reliance on general deterrence is manifest from the government's own inconsistent positions.

The Seventh Circuit, in *United States v. Warner*, 792 F.3d 847 (7th Cir. 2015), identified another problem with general deterrence.  As the Court in *Warner* recognized, even the probationary sentence in that case – coupled with the restitution judgment (and attendant collateral consequences, including the defendant's shame, humiliation, and professional damage) – sent a *sufficiently* strong message even if a prison sentence might have imparted a stronger message.  *Id.*, at 861-62.

---

[24]  The government also completely fails to address Judge Weinstein's studied approach to the concept of general deterrence in his opinion in *United States v. Lawrence*, 254 F. Supp.3d 441 (E.D.N.Y. 2017).  *See* Mr. Harun's Initial Sentencing Letter, at 69-70, 74.

Hon. Brian M. Cogan
United States District Judge
Eastern District of New York
January 2, 2018
Page 28 of 30

Here, there is not any viable evidence that a sentence a few months or even a year longer than another sentence of imprisonment – or that a sentence within a prescribed Guidelines range as opposed to a sentence below that range – much less one of life imprisonment, achieves *any* measure of general deterrence.

Nor is that different in the context of terrorism, notwithstanding the Gov't Sentencing Letter's claim, at 17 n.11 – again bereft of the slightest support – that "[f]or many jihadists, the prospect of spending a lifetime imprisoned in the United States is far worse than the prospect of a dying as a martyr on the battlefield."

In fact, the only evidence is to the contrary. Two defendants in the Embassy Bombings case, *In re Terrorist Bombings*, 552 F.3d 93 (2d Cir. 2008), who were the subject of a capital prosecution each separately interposed vigorous and successful penalty phase presentations that resulted in life imprisonment without parole rather than the death penalty. Even in other capital-eligible prosecutions, *i.e.*, *United States v. Ghailani*, 733 F.3d 29 (2d Cir. 2013); *United States v. Nidal Hasan*, United States Army Trial Judiciary, Third Judicial Circuit, not a single defendant charged with a terrorism offense in the U.S. has chosen the death penalty over life imprisonment.

Regarding specific deterrence, the government in part relies on the claim that terrorism defendants pose a greater danger of recidivism. *See* Gov't Sentencing Letter, at 14. In support of that proposition, the government quotes the Eleventh Circuit in *United States v. Jayyousi*, 657 F.3d 1085 (11th Cir. 2011), which in turn quoted the Second Circuit:

"Terrorists, even those with no prior criminal behavior, are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation." *United States v. Meskini*, 319 F.3d 88, 92 (2d Cir. 2003).

657 F.3d at 1117-19. *See also* Gov't Sentencing Letter, at 14.

Yet there is not a single fact, much less analysis of data, to support that claim in the now nearly 15 years since *Meskini*. The Circuit's *dicta* in *Meskini* (repeated in *Jayyousi*) notwithstanding, there is simply no factual authority, empirical basis, study, or statistical analysis to substantiate that contention, much less to rely upon it to impose a sentence as onerous as that which the government seeks here.

Ironically, the only information available indicates that "terrorists" have *lower* rates of recidivism than those convicted of ordinary offenses. The Director of National Intelligence has maintained records of what it terms "re-engagement" of former detainees released from the

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Hon. Brian M. Cogan
United States District Judge
Eastern District of New York
January 2, 2018
Page 29 of 30

detention operation at the U.S. Naval Base at Guantanamo Bay, Cuba, and periodically releases analyses of that population's post-release conduct.

The most recent analysis, released October 13, 2017, posits that 16.7% of released detainees have re-engaged – 21.4% of those released before 2009, prior to any established vetting procedures, and 4.1% of those released since 2009 pursuant to the evaluative mechanisms implemented during the Obama administration. *See* "Summary of the Reengagement of Detainees Formerly Held at Guantanamo Bay, Cuba," U.S. Director of National Intelligence, October 13, 2017, available at <https://www.dni.gov/index.php/newsroom/reports-publications/item/1742-summary-of-the-reengagement-of-detainees-formerly-held-at-guantanamo-bay-cuba>.[25]

By comparison, a June 21, 2016, Bureau of Justice Statistics press release and report found that "[o]f the nearly 43,000 federal offenders who were placed on federal community supervision in fiscal year 2005, an estimated 43 percent were arrested at least once within five years of their placement," and "[a]n estimated 18 percent of these offenders were arrested at least once within one year of placement on community supervision and 35 percent were arrested at least once within three years of placement." Joshua A. Markman, Matthew R. Durose, Andrew D. Tiedt, and Ramona R. Rantala, "Recidivism of Offenders Placed on Federal Community Supervision in 2005: Patterns from 2005 to 2010," (NCJ 249743), Bureau of Justice Statistics, June 21, 2016, available at <https://www.bjs.gov/content/pub/press/ropfcs05p0510pr.cfm>.

Thus, judged by performance rather than rhetoric, the government's position is without merit.

---

[25] Other analyses place the pre-2009 rate at slightly lower (20.9%) and also disputes some of the criteria for categorizing "re-engagement" as too equivocal and inclusive. *See, e.g.*, Scott Roehm, "What Gordon England Didn't Tell You About Guantanamo Transfers," *lawfareblog.com*, February 15, 2016, available at <https://www.lawfareblog.com/what-gordon-england-didnt-tell-you-about-guantanamo-transfers>; The Constitution Project, "Understanding Claims About Recidivism and Guantanamo," available at <https://docs.google.com/viewer?url=http%3A%2F%2Fconstitutionproject.org%2Fwp-content%2Fuploads%2F2015%2F02%2FTCP-GTMO-Recidivism-Analysis-9-4.pdf&pdf=true>.

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Hon. Brian M. Cogan
United States District Judge
Eastern District of New York
January 2, 2018
Page 30 of 30

### Conclusion

Accordingly, for all the reasons set forth above, as well as in Mr. Harun's Initial Sentencing Letter, it is respectfully requested that the Court sentence Mr. Harun to a term of imprisonment less than life imprisonment, and that the Court recommend he be designated to a facility in which he can interact with inmates of similar religious and cultural background, and that he receive appropriate psychiatric treatment, including counseling and medication.

Respectfully submitted,

Joshua L. Dratel
David Stern
Susan G. Kellman

JLD/
Encl.

cc:     Matthew Jacobs
        Assistant United States Attorney