1

```
 1   UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
 2   ------------------------------x
                                     12-CR-134(BMC)
 3   UNITED STATES OF AMERICA,
                                     United States Courthouse
 4          Plaintiff,              Brooklyn, New York

 5          -against-              February 16, 2018
                                    10:00 a.m.
 6   ADNAN IBRAHIM HARUN HAUSA,

 7          Defendant.
     ------------------------------x
 8           TRANSCRIPT OF CRIMINAL CAUSE FOR SENTENCING
              BEFORE THE HONORABLE BRIAN M. COGAN
 9                 UNITED STATES DISTRICT JUDGE

10   APPEARANCES
     For the Government:      UNITED STATES ATTORNEY'S OFFICE
11                           Eastern District of New York
                             271 Cadman Plaza East
12                           Brooklyn, New York 11201
                             BY:  MATTHEW JACOBS
13                                SHREVE ARIAIL
                                  JOSEPH N. KASTER
14                           Assistant United States Attorneys

15   For the Defendant:      ROTHMAN, SCHNEIDER,
                             SOLOWAY & STERN, LLP
16                           100 Lafayette Street
                             Suite 501
17                           New York, New York 10013
                             BY:  DAVID STERN, ESQ.
18
     For the Defendant:      SUSAN G. KELLMAN, ESQ.
19                           25 Eighth Avenue
                             Brooklyn, New York 11217
20
     For the Defendant:      LAW OFFICES OF JOSHUA L. DRATEL, P.C.
21                           29 Broadway
                             Suite 1412
22                           New York, New York
                             BY:  JOSHUA L. DRATEL, ESQ.
23
     Court Reporter:         LINDA D. DANELCZYK, RPR, CSR, OCR
24                           Phone:  718-613-2330
                             Email:  LindaDan226@gmail.com
25   Proceedings recorded by mechanical stenography.  Transcript
     produced by computer-aided transcription.
```

PROCEEDINGS                                    2

1              (In open court.)

2              THE COURTROOM DEPUTY:  *United States versus Hausa*,

3      Docket Number 12-CR-134.

4              Counsel, please state your appearances starting with

5      the government.

6              MR. JACOBS:  Good morning, Your Honor.  Matthew

7      Jacobs, Shreve Ariail, Joseph Kaster for the United States.

8      Here with us is FBI Special Agent Greg Paciorek.

9              THE COURT:  Is anyone here from Probation?

10             THE PROBATION OFFICER:  Yes, I'm here.

11             THE COURT:  All right, good morning, all.

12             MR. STERN:  David Stern, Susan Kellman and Joshua

13     Dratel for Mr. Harun.  Good morning.

14             THE COURT:  Good morning.  I thought one of you were

15     going to be at the facility.

16             MR. STERN:  We have one of my associates is at the

17     facility.  Rachel Perillo is in the facility -- right here on

18     the camera as we speak, actually.  So she's there and she has

19     Mayerlin Ulerio's phone number.  If she wanted to contact us

20     for any reason, she would call us and we can then communicate

21     with them.

22             THE COURT:  All right, let me just state for the

23     record what's going on here.

24             This is the defendant's sentencing, and he's not

25     here, as was the case throughout his trial and some of the

*LINDA D. DANELCZYK, RPR, CSR*
*Official Court Reporter*

PROCEEDINGS                                    3

1    later status conferences prior to the trial.

2           At the defenses' suggestion, I had entered an order

3    setting forth procedures to try to get the defendant to come

4    here but to not do that at the cost of a possible violent

5    episode.

6           We heard from the marshals this morning that the

7    defendant had refused to be produced, and his words to the

8    marshals were "This is not my court, that is not my judge."

9    So it seems to me he has again shown that he is knowingly and

10   willfully not attending these proceedings.

11          Does defense counsel have any different view of it?

12          MR. STERN:  No, we completely agree.  It was our

13   wish that he not be harmed and no one else be harmed, so we

14   explicitly asked that he not be brought here.

15          I wanted to do one thing, Judge, unless you want, of

16   course, I want to make sure Ms. Perillo can hear us.  I'm just

17   going ask her if she can waive or something.

18          Rachel, waive or something if you can hear us.

19          MS. PERILLO:  Oh, I'm sorry.  I can hear you.

20          THE COURT:  All right, we got a waive and a smile.

21          MR. STERN:  We're lucky.

22          MS. KELLMAN:  It's early in the proceedings.

23          THE COURT:  Yes.  And we do have an interpreter for

24   the defendant.  He's been previously sworn.  He is here in the

25   courtroom and can be reached should the defendant indicate to

*LINDA D. DANELCZYK, RPR, CSR*
*Official Court Reporter*

PROCEEDINGS                                    4

1    defense counsel who is there in front of his cell that he

2    wishes to say something or speak to the interpreter.

3              Is also assume, while I don't see the defendant, if

4    he wanted to come to the end of the cell, he could see his

5    video.

6              Is that right, Melonie?

7              THE COURTROOM DEPUTY:  Yes.

8              THE COURT:  So he has video access if he wanted to

9    use that.  It appears at the moment he does not.

10             Okay, just for the sake of good order.  My finding

11   is that he is knowingly and again voluntarily absenting

12   himself from these proceedings.

13             MR. JACOBS:  And just for the sake of the record,

14   Judge, I'll note that in accordance with paragraph 6 of your

15   February 1st order, my understanding is defense counsels'

16   provided a copy of this order in-house to the defendant.

17             THE COURT:  All right.  I've reviewed all of the

18   sentencing memoranda, other documents on the extensive docket

19   here.  The first thing I want to do in terms of what we're

20   going to do today is reject the defendant's request to call

21   Officer Quamina as a live witness.  He has submitted an

22   affidavit that the defendant's obtained from him, defense

23   counsel obtained from him.  The government is not disputing

24   the contents of that affidavit.

25             There is an issue of securing testimony from a

PROCEEDINGS                              5

1   government employee.  That was part of the discussion on this

2   affidavit.  And in my view calling him as a witness to testify

3   would effectively give the defendant a second bite at that

4   apple when the parameters of his testimony have already been

5   agreed upon, and I accept that testimony.

6              In addition, I believe the parties have seen

7   probation's sentencing recommendation; is that right?

8              MR. JACOBS:  The government has not.

9              MS. KELLMAN:  Not yet, Judge.

10             THE COURT:  What we're going to do then is I'm going

11  to ask my deputy to print out a copy for each side and take a

12  look at that, and when you're done, please return it to my

13  deputy and we will go forward from there.

14             For the record, probation's recommendation is life

15  imprisonment on Counts One and Two.  The statutory maximum of

16  15 years on Counts Three and Four to run concurrently.  And

17  then Count Six, of course, is ten years consecutive to the --

18  minimum ten years consecutive to the other counts.

19             MR. JACOBS:  Your Honor.

20             THE COURT:  Yes.

21             MR. JACOBS:  With the Court's permission, I'd also

22  like to advise the Court of the presence of certain

23  individuals here that qualify as victims under the Crime

24  Victims' Rights Act.

25             THE COURT:  Right.

PROCEEDINGS                          6

1          MR. JACOBS:  Present in the gallery is Jane Nelson,

2    who is the mother of Private First Class Jerod Dennis; as well

3    as Jillian Dennis, the sister of Jerod Dennis; and Jordan

4    Dennis, the brother of Jerod Dennis.  Also present is Command

5    Sergeant Major Brian Severino with the U.S. Army, and Sergeant

6    First Class David Cyr of the U.S. Army, Retired.

7          And my understanding, Judge, is that Jordan Dennis,

8    Command Sergeant Major Severino, and Sergeant First Class Cyr

9    would like to make statements orally at this proceeding today.

10          THE COURT:  All right, that's fine.  We will hear

11    from them when I've heard from the parties.

12          MR. STERN:  Judge, we're returning the

13    recommendation.

14          THE COURT:  All right, thank you.

15          All right, both sides have had an opportunity to

16    review that recommendation.

17          With regard to the description of the offense and

18    the offender characteristics in the presentence investigation

19    report, I think the defense has raised two issues as to that.

20          The first is the characterization of the ridgeline

21    incident as a terrorist attack, that's at paragraphs 28 and 30

22    of the PSR.  I understand that defense points that they

23    believe that should be changed to a military engagement or

24    something to designate its military nature.

25          I'm going to deny that request.  I certainly

*LINDA D. DANELCZYK, RPR, CSR*
*Official Court Reporter*

PROCEEDINGS                                7

1   understand the defenses' argument.  I have to deal with that

2   argument.  But I think it's accurate as written in the PSR he

3   has been convicted of material support of terrorist

4   organization, and I don't think the PSR is not inaccurate in

5   that way.

6          The only other point I received from the defense on

7   the description of the offense and the offender

8   characteristics is that the defendant has claimed to his

9   counsel that he's a citizen of Niger and not Nigeria.  The

10  government has proffered that they've spoken to Nigeria,

11  Nigeria says, no, he is not.  So unless the defense has

12  something to back that up, I'm going to leave that unchanged

13  in the PSR as well.

14         MS. KELLMAN:  I don't think there is anything to

15  back it up other than that's what our client's always said,

16  Your Honor.  But I would note that in the recommendation it

17  says that he was born in Saudi Arabia, which I don't think

18  anybody thinks is correct.

19         THE COURT:  What I'm going to do is I am going take

20  those portions of Sections A and C from the PSR that describe

21  the offense and the offender characteristics, I'm going to

22  adopt those as my findings of fact for purposes of the

23  sentence.

24         Okay, let's next turn to the guidelines, which I

25  want to emphasize to the parties are merely advisory and only

*LINDA D. DANELCZYK, RPR, CSR*
*Official Court Reporter*

PROCEEDINGS                                    8

1    one factor for me to consider in determining the appropriate

2    sentence.

3           Before variances, that is based on the literal

4    language of the guidelines, that's the first thing I think I

5    have to establish as a precedent.  In doing that I'm

6    differentiating between the interpretation of the guidelines

7    language:  Does it apply by its terms as opposed to a number

8    of policy and other reasons that the defense has raised as to

9    why I should not apply the guidelines, which, of course, I

10   have the discretion to do.

11          So turning to Count One first.  There doesn't seem

12   to be any dispute as to the base offense level in Count One,

13   what I'll call the raw guideline calculation that starts at

14   43, which even with a criminal history of Category I, and

15   we'll talk about that, it still comes out to life

16   imprisonment.

17          There is one objection to one of the enhancements

18   that's been applied in the PSR that the defense has objected

19   to the four-point role enhancement.  I've read the arguments

20   on that.  Does the defense need to be heard any further on it?

21          MR. STERN:  No, Your Honor.

22          MS. KELLMAN:  No.

23          THE COURT:  All right.  First, I'll note that it

24   really doesn't matter one way or the other because the

25   guideline on Count One comes out to life, whether I add the

PROCEEDINGS                                    9

1    enhancement or not.

2              But I do think that the enhancement is appropriate

3    here.  I have to reject the defense characterization that the

4    defendant was a, quote, mere soldier, close quote.

5              Putting aside the dispute over whether he should be

6    considered a soldier, I don't think there was anything mere

7    about this defendant.  It seems to me he is at least middle

8    management and maybe upper middle management in al-Qaeda.

9              It is not disputed that he had a meaningful

10   relationship with senior terrorists within the organization.

11   I don't think privates generally have relationships with

12   generals or even colonels.  And he served as an envoy between

13   al-Qaeda and other terrorist groups.  He also recruited

14   people to participate in his planned bombing of the American

15   Embassy in Nigeria.  So I am quite sure the enhancement is

16   correct as to those four points.

17             Now on Counts Two, there's a dispute as to whether

18   to use guideline 2K1.4(c), which enhances the guidelines to

19   life if there was an intent to cause death.  Probation and the

20   defendants were on the same side for this to say the

21   enhancement -- that the cross reference to murder should not

22   apply and the government thinks that it should.

23             Let me ask -- again, I've read these arguments,

24   anybody want to add anything else to them?

25             MR. STERN:  No.

LINDA D. DANELCZYK, RPR, CSR
Official Court Reporter

PROCEEDINGS                                    10

1          MR. JACOBS:  No, Your Honor.

2          THE COURT:  Okay.

3          I think the government is right.  If the intent of

4    the defendant under this guideline is to cause death as well

5    as property damage, then the cross reference is appropriate.

6    That's what the guideline says.

7          Probation has placed a gloss on it to effectively

8    say that the plan has to reach a certain level of fruition

9    before the cross reference is triggered.  But I don't see that

10   anywhere in the guideline.  It seems to me if the defendant

11   has done enough to get convicted for conspiracy then it has

12   gone far enough to trigger the guideline.  And I think the

13   guideline clearly differentiates between a bombing that

14   carries with it a risk of death, whether it is intended by the

15   defendant or not, and a bombing that has the intent of causing

16   death.  I think that's the distinction.  And I don't think it

17   can be seriously argued that this defendant did not intend to

18   cause death in the bombing that he was planning.

19         So my conclusion is that the base offense level,

20   again, is 43, with the enhancements it comes out the same as

21   Count One, which brings us to an offense level of 65 for both

22   counts.

23         Now I did want to ask probation something, though.

24   The offense level for Count Two still comes out to 65, but

25   it's got a 15-year maximum -- oh, no, that's Counts Three and

PROCEEDINGS                                11

1  Four.  Okay.  That's fine.  Never mind.

2           Next, in terms of the criminal history --

3           MR. JACOBS:  Your Honor, if I may interrupt for a

4  moment.

5           THE COURT:  Yes.

6           MR. JACOBS:  Apologies.  The government made a small

7  error in its calculation.  I believe that the offense level of

8  65 should be reduced by three levels pursuant 2X1.1 because

9  the offense charge was a conspiracy.

10          THE COURT:  Oh, I missed that.  Okay.

11          So it's 62 on Count Two.

12          MR. JACOBS:  Thank you, Your Honor.

13          THE COURT:  Okay.

14          On criminal history, there is a provision of the

15 guidelines that allows a horizontal departure.  The defense

16 has requested that because this is the only conviction that

17 the defendant has.

18          I recognize that, you know, it's a Category VI by

19 reason of the enhancement, but it's based on one conviction.

20 I don't think it makes a great deal of difference.  I don't

21 think it makes any difference whether I horizontally depart or

22 not as long as I remain aware that there are no prior

23 convictions, which, of course, I do.  So I'm not going to go

24 through what would be an exercise of determining whether and

25 how much to horizontally depart because I understand why that

PROCEEDINGS                                    12

1    argument applies to the guidelines.

2              So my finding on the guidelines, unless there's any

3    other issues I've missed, I think is offense level of 65,

4    Criminal History Category of VI, and that would give an

5    advisory guideline range of life imprisonment.

6              The statute also requires and the guidelines pick up

7    the mandatory ten years to be run consecutively as to Count

8    Six.

9              Anybody think that, aside from the objections the

10   defendant has raised, anyone think I computed it wrong?

11             MR. STERN:  No.

12             MR. JACOBS:  No, Your Honor.

13             THE COURT:  Okay.  That's my finding on the

14   guidelines.

15             Let me then hear from the parties as to the

16   application of all of the statutory sentencing factors.  The

17   way I will proceed is to hear from defense counsel first.

18             I will advise all the parties I really did study

19   these papers.  So don't feel that you're hitting me for the

20   first time with these arguments.

21             Then after that, if the defendant wants to speak,

22   which it still does not look like he does, I will hear from

23   him.  I will then hear from the government.  And then I will

24   here from the victims or victims' representatives that have

25   identified themselves in court today.

*LINDA D. DANELCZYK, RPR, CSR*
*Official Court Reporter*

PROCEEDINGS                                13

1          So let me hear from the defense first.

2          MR. STERN:  We will rely on our papers.  I think

3     they say all we have to say.

4          THE COURT:  Thank you.

5          What's your associate's name?

6          MR. STERN:  Rachel.

7          MS. KELLMAN:  Perillo.

8          THE COURT:  Ms. Perillo, can you see if there is any

9     way you can determine whether the defendant wishes to make a

10    statement?

11         MS. PERILLO:  I can try, Your Honor.  Hold on.

12         Do you want to speak?  Do you want to speak?

13         It does not appear so, Your Honor.

14         THE COURT:  All right.  Thank you.

15         All right, I'll hear from the government.

16         MR. JACOBS:  Thank you, Your Honor.

17         The defendant is an unrepentant al-Qaeda terrorist

18    with American blood on his hands.  His crimes could not have

19    been more serious.  He represents an extreme danger to this

20    day and for that reason, for those reasons, Judge, we think a

21    life sentence is necessary.

22         The Court is extremely familiar with the facts of

23    this case and has thoroughly reviewed our papers, so I'll try

24    not to be too repetitive, but I do think it's important to

25    underscore a few points here today in open court.

PROCEEDINGS                                    14

1          First, the defendant is a lifelong jihadist.  He

2     traveled to Afghanistan just before 9/11.  And his response to

3     the attacks of 9/11 was significant.  He wasn't horrified by

4     those attacks.  Just the opposite.  He was inspired to join

5     al-Qaeda.  To sware allegiance to Usama Bin Laden.  And to

6     attack the brave men and women of our armed forces who were

7     deployed there after 9/11.

8          The Court, of course, is familiar with the events of

9     April 25th, 2003.  I won't go into them in detail except to

10    say that the defendant and his al-Qaeda fellow fighters

11    ambushed U.S. soldiers.  The defendant explained proudly how

12    he opened fire with his collection of cargo and threw grenades

13    one after the other.

14          Tragically two U.S. service members died that day,

15    and I'd like to state their names on the record.  19-year-old

16    private first class Jerod Dennis of Antlers, Oklahoma, and

17    24-year-old airman first class Raymond Losano of Del Rio,

18    Texas.

19          They're going to speak about the affects of that,

20    the victims and the victim's representative, so I'll leave --

21    I think they can say it better than I ever could.

22          Significantly, Judge, the killing of service men in

23    Afghanistan didn't satisfy this defendant.  He had bigger

24    ambitious.  After the ambush in 2003, he went to al-Qaeda

25    leaders and he told them he wanted to carry out what can only

1    be described as mass murder terror attacks against Americans

2    elsewhere in the world; specifically attacks like the embassy

3    bombing in East Africa.

4              And two things are significant there, Judge, that he

5    wasn't recruited or conscripted for this, he wanted to carry

6    these out.  And the second thing, his model.  The East Africa

7    embassy bombings.  Hundreds of people dead.  Thousands

8    horrifically injured.  Many horrifically injured.

9              You know, it's tough to imagine a plan more evil

10   than that.  It's hard to imagine an offense conduct more

11   serious than the crimes the defendant in this case was

12   convicted of.  For that reason alone, a life sentence is

13   warranted.

14             But there's another important reason why the

15   defendant should spend the rest of his life in jail in that he

16   remains firmly committed to jihad today.  He stated in open

17   court, quote, I'm a warrior and the war is not over, our

18   terrorism is not over.  He's threatened to kill court

19   personnel.  He is so obstructive and potentially violent he

20   can't come to court.

21             I think he's beyond just being unrepentant and

22   unremorseful and I think everything he's done before his

23   arrest and afterwards leads to the conclusion that he will

24   commit more crimes if he is ever released.  He's beyond

25   deterrence, and the only way to protect the public is to keep

PROCEEDINGS                                    16

1    him incarcerated.

2              In conclusion, Judge, a life sentence here justly

3    punishes the defendant for the crimes he committed.  It sends

4    a powerful and unambiguous message that if you conspire to

5    kill Americans around the world and you're arrested and you're

6    convicted after being afforded all the protections our

7    constitution and the laws provide, you're going to spend of

8    rest of your life in jail.

9              For those reasons, Judge, and the others in our

10   papers, we respectfully submit that the Court impose a

11   guideline sentence of life.

12             THE COURT:  All right.

13             I'll hear from Mr. Dennis.

14             MR. JACOBS:  And, Judge, if you'll allow, Mr. Dennis

15   has requested to go last in the order of victims.

16             THE COURT:  Whichever order you would like to hear

17   them, I will hear them that way.

18             MR. JACOBS:  I will start with Command Sergeant

19   Major Severino.

20             THE COURT:  All right.

21             THE COURTROOM DEPUTY:  Just give us one moment.

22             COMMAND SERGEANT MAJOR SEVERINO:  Good morning, Your

23   Honor.  I am Command Sergeant Major Brian Severino.  I'm

24   currently assigned to Fort Bragg, North Carolina.  I'm a

25   30-year career soldier.  I've deployed multiple times to

1    Afghanistan and Iraq.  I've been in multiple combat patrols

2    and operations in my career.  I just wanted to come here today

3    to talk to the Court about how this has affected my life.

4            Prior to this, 25 April of 2003, I've been in combat

5    operations and patrols.  Multiple times after 25 April, I've

6    been exposed to combat.  But this day had the most significant

7    impact on my life; not just as a soldier but personally as an

8    individual.

9            On this day, how it has affected me since then is

10   when I came home, I've disassociated myself from my family,

11   removed myself from my family it had such an impact on me.  I

12   lost simple pleasures in dealing with things of normal people

13   enjoying life.  My family has suffered.  So it's just not

14   myself that was suffering from this event, but my family

15   suffered.  I did not participate in normal family events.  In

16   turn, eventually I lost my family and I got divorced after 19

17   years of marriage.

18           It has an emotional impact on the way I've done

19   things since then.  As a soldier, I felt this day has more

20   impact on me, because I feel like I was not there to take care

21   of my duties and protect the soldiers.  I let down Jerod and

22   Ray Losano.  I failed them and their families by not

23   protecting them and bringing them home like I was supposed to

24   as a leader.

25           I'm sworn -- parents give leaders in the military

1    their sons and daughters and they trust us to take care of

2    them and protect them, and on this day I failed, and it has

3    weighed on me.

4            It has weighed on me because all the combat after

5    that I've never lost another soldier.  And I did my job as a

6    soldier for 30 years and I've taken care all of them and

7    protected and brought all my men home.  And I just failed on

8    one day and it has been hitting me hard.  For the last 15

9    years it's been working on me.

10           I'm trying to move on with my life.  I'm nearing my

11   time in the Army is almost complete, but it has worn all this

12   time and affected my career and my family the most.  And I've

13   let too many people down, specifically the families of Jerod

14   Dennis and Ray Losano.

15           That's all I have to say, Your Honor.

16           THE COURT:  Thank you, Command Sergeant.

17           Who is next.

18           MR. JACOBS:  Sergeant First Class David Cyr, U.S.

19   Army, Retired, Your Honor.

20           SERGEANT FIRST CLASS CYR:  Good morning, Your Honor.

21           THE COURT:  Good morning.

22           SERGEANT FIRST CLASS CYR:  Good morning to all those

23   here present to hear my words.

24           I'm United States Army Retired Sergeant First Class

25   David F. Cyr, Jr.  As we sit here in realtime, we are two

PROCEEDINGS                          19

1    months short of the 15-year anniversary of this deadly ambush.

2          My experience, my injuries, my memories, the loss of

3    my comrades make it feel like it's happened yesterday.  Not

4    one second, minute, hour or day goes by where the tragic

5    events of that fateful morning is not at the forefront on my

6    thoughts and mind.  There's no replacing the lives of those

7    who crawled, walk, ran, and fought to my left and right to

8    preserve our very lives so we can return home to our families.

9          The events of that day continuously haunt me with

10   meticulous clarity.  I will never forget the expression on

11   Private First Class Jerod Dennis' face the last time I looked

12   at him or looked upon him.  It was a face of a confident and

13   courageous warrior.  Nor have I forgotten all the times we

14   shared jokes, but then I'm quickly reminded he is no longer

15   here but not forgotten.

16         In the days and years since the murders that took

17   the lives of so many of my comrades, I've been given the

18   opportunity to share the story of the legacies of my brothers

19   in arms and what happened to us that morning.  Despite all

20   those opportunities, I fight through emotions to contemplate

21   what I should speak about today in the presence of the

22   adversary who tried with all his might to take my life, as he

23   did those I was serving with.

24         Should I speak about the survivor's guilt that is my

25   burden ever since that day, or my inability to appreciate

1    joyous occasions shared between family, friends, brothers in

2    arms and loved ones, because in those moments is when I'm

3    overwhelmed but not defeated by a guilt-ridden depression.

4            Maybe I should speak how it took six years after

5    this ambush that my own sisters, Jenna and Nancy, to open up

6    and admit their fear they harbor towards me thinking that I

7    was so angry that I was going to loss my sanity and kill

8    someone.

9            Should I speak of the wounds, although not visible

10   to the untrained eye but no less existent?  Despite not dying

11   on the battlefield with my brothers in arms, I am faithful

12   that I am here before you today, even though I live with

13   bilateral hearing loss from the grenades that detonated in

14   such close proximity to me that day, and the invisible wound

15   of posttraumatic stress disorder.

16           Being able to come home to my family is a blessing

17   that I will never take for granted and that he, nor anyone,

18   can ever take away.  I found the strength and courage to seek

19   professional counseling in February 2014, which I still attend

20   to this day.  A characteristic and strength that no matter

21   what atrocity you commit against me, I am, and forever will

22   be, a United States Army soldier at heart, mind, body, and

23   soul, and that you cannot defeat that.

24           It is my mission to live as long as it takes to be

25   there for my family, my former comrades, my brothers in arms,

PROCEEDINGS                                21

1   and myself to see your isolation from society for the rest of

2   your life.

3          You may have some moral victory in your mind about

4   what you did that day.  But today you will forever endure the

5   loss of not successfully taking my life.  And I stand here in

6   victory over you, and you will never take away from me my will

7   to fight, live, and the love I have for my brothers and my

8   country.

9          That is all I have, Your Honor.

10          THE COURT:  Thank you.  All right.

11          MR. JACOBS:  And finally, Your Honor, Jordan Dennis,

12   the brother of Private First Class Jerod Dennis.

13          THE COURT:  Good morning, Mr. Dennis.

14          MR. DENNIS:  Good morning, Your Honor.

15          If it's okay with the Court, my comments are

16   directed more towards the defendant, if that's okay.

17          THE COURT:  It's okay.

18          MR. DENNIS:  In July of 1987, Jerod Rhoton Dennis

19   became a leader.  At almost four years old he became a big

20   brother.  His ability to love and care for another was

21   immediate.  Social and outspoken, Jerod would translate his

22   new brother's cries and grunts for the adults so they can warm

23   the milk and change the diaper.  His little brother depended

24   on him for basketball and fishing lessons and all those

25   important things young kids need to learn.  Jerod would also

Case 1:12-cr-00134-BMC-MDG   Document 309   Filed 03/06/18   Page 22 of 35 PageID #: 7546

1    provide leadership for his little brother.

2               Jerod was more than just a big brother.  He would

3    walk into any room and flood it with laughter and smiles.

4    Jerod can make anyone laugh and anyone smile.  His gift was

5    love and laughter.  His family and friends depended on him for

6    that.

7               April 25th, 2003, could have been a normal day that

8    ended like a normal night, but sometime before then you felt

9    the pain of the world, a pain we've all encountered; loss of

10   something or someone, and you chose to react to that pain with

11   anger and rage.  April 25th, 2003 could have been a normal

12   day, but someone you follow delivered a verdict and you and

13   your rage came to deliver a sentence.

14              Since that day, I have not stopped looking for him

15   everywhere I go and in every face I encounter since those

16   first hellish moments in this new reality.

17              I have every right to hate you, to curse you.  I

18   have every right to be angry, to use my tongue like a dagger

19   in an attempt to get even, and no one would blame me.

20              But I must share a truth that I have learned.  You,

21   your anger, your rage, your malicious intent, your weapon of

22   my hero's destruction, your guns, your violence, your bullets,

23   your tools of harm, all of that is just background noise to

24   the true tragedy here.  Jerod's absence.  Our loss.

25              Your expanse and Jerod's last moments made you feel

PROCEEDINGS                                    23

1    like you were at Ground Zero.  But you have no idea.  Ground

2    Zero was on the other side of the world in a small town in

3    Oklahoma.  Today I'm often distracted by my brother's absence,

4    always half listening while half mourning.  But I talk to him

5    often and still have his leadership.  Jerod lives on more than

6    ever.

7              My sister, my mother, and father, my family and

8    friends see him in me and I see him in them.  It is in our

9    lives you will see Jerod's legacy of love, laughter, and

10   caring.

11             On April 26th, 2003, we all woke up in a cold world

12   but Jerod is the warm sunshine that brightens it.  And in that

13   light we will not be blind to the world, we will be active and

14   we will make a place for Jerod's memory, legacy, and love to

15   live on.

16             Jerod's 19 years of impact on this world was far

17   stronger and more powerful than your few seconds you spent

18   trying to destroy it.  Your few seconds may have caused mass

19   destruction, but soon after, at Ground Zero, Jerod brought us

20   together and we began to rebuild, and Jerod's story did not

21   end with your few seconds.  There have been many chapters

22   since then and he is still the main character.

23             My over 15 years with my brother learning and

24   following his lead taught me more than your few seconds did.

25   I will not join you in your cyclical hatred.  I will not give

PROCEEDINGS                              24

1    in to your systemic terrorism with hatred and anger.  You may

2    have caused my pain, but Jerod caused my forgiveness.  Because

3    of Jerod, I say to you that I hold no ill will towards you.

4             I do not seek to indemnify you for your actions, but

5    know that you are the only person that is angry -- I'm

6    sorry -- but know that the only person that is angry now is

7    you.  I wish our circumstances were different so that neither

8    of us were here.  But Jerod is still with us and I feel so

9    sorry for you.  You see, Jerod is only concerned with those he

10   loves now and I know that.

11            So I will do what I have done since July of 1987;

12   follow his lead.  You and your few seconds are not my concern.

13   My family, friends, Jerod's memory and legacy are.  Those are

14   the people and things that carry me forward.  Everywhere I am

15   present, there will always be at least two, my brother and me.

16   As for you, I hope you let go of your anger and rage and find

17   peace in your life.

18            Thank you for your time.

19            THE COURT:  Thank you, Mr. Dennis.

20            I need about five or ten minutes and we will

21   reconvene then.

22            (Whereupon, a recess was taken at 10:36 a.m.)

23            THE COURTROOM DEPUTY:  All rise.

24            THE COURT:  Be seated, please.

25            I've considered all of the applicable sentencing

PROCEEDINGS                              25

1    factors under the statute, including the advisory guidelines.

2            The first thing I want to do is to thank the family

3    members and friends who came today, and particularly those who

4    spoke.  I want to tell you that, you know, as I articulate the

5    sentence here it might sound very technical and legal to you,

6    and that's because we have to make sure that sentence is

7    pronounced dispassionately, according to the law, but I don't

8    want you to think for a second that I didn't hear what you

9    said and that I don't appreciate the human element here and

10   that I haven't been influenced by what you said, because I

11   have.  I have taken it to heart in just the way you intended

12   it and I appreciate the real costs here.

13           Having said that, let me turn to the sentencing

14   factors and the higher courts have said that the place I am to

15   start is with the sentencing guidelines.

16           I will tell you, this is, again, a technical point

17   for the lawyers mostly, that I don't think the guidelines are

18   all that helpful in a case like this.  For some but not all of

19   the reasons that defense counsel has stated, it's just that

20   when you add together so many numbers for so many

21   enhancements, you lose track of what actually happened and

22   what a depraved individual this defendant is and the terrible

23   affect that he's had on people, you get lost in the numbers.

24           I don't think this is the kind of crime or the kind

25   of defendant that lends itself very easily to mathematization

PROCEEDINGS                                    26

1    where you just put numbers on everything and look at that as a

2    proxy for how horrible it was.

3             What I take from the guidelines is that Congress and

4    the Commission considered this kind of crime under these

5    circumstances with these results by a defendant like this to

6    be as severe a federal crime as there is.  And that's what I'm

7    taking from the guidelines, but that's all I'm taking from the

8    guidelines.

9             Having said that, you know, I don't have any doubt

10   that the other sentencing factors that the law requires me to

11   consider, independently without even considering the

12   guidelines, compel a sentence of life imprisonment.

13            I understand that's the most severe sentence I could

14   impose.  I don't know that I've ever done it before.  I

15   certainly do not do it lightly.  But I think that all of the

16   relevant non-guideline sentencing factors as well as the

17   guidelines strongly point to that conclusion.

18            Not that the factors and the statute are listed in

19   any kind of priority, but it just so happens that the first

20   one that I am instructed to consider is the nature of the

21   crime and the circumstances of the offense.

22            This defendant killed two young men.  He wanted to

23   kill other young men, and he wanted to kill dozens or maybe

24   hundreds of other Americans and other nationalities who were

25   civilians.  I can't think of a more serious crime.  And as the

PROCEEDINGS                               27

1    raison d'être of al-Qaeda to do things like that, it

2    occurred under the most aggravated circumstances that it

3    possibly could.

4              And I think it says something when the very

5    able-defense counsel, and I want to commend them for the

6    yeoman job they did here under the most difficult

7    circumstances, but they were forced to argue as one of their

8    lead arguments that, well, at least it isn't a war crime.

9              Now implicit in that is the suggestion that maybe

10   it's not as bad killing soldiers as it is killing civilians

11   because it's not a war crime to kill soldiers.  That's a

12   degree of relativism that really does not have any meaning for

13   me.  And, frankly, I am confident that the defendant does not

14   differentiate between whether his victims are American

15   civilians who are American soldiers.  We know that from his

16   plot to bomb the embassy, which would have had many civilian

17   casualties.  Now I understand that what defense counsel is

18   really arguing is that the defendant should be treated as a

19   soldier rather than as a criminal, even if he's an unlawful

20   soldier under the laws of war.

21             Putting aside the fact that that does not

22   accommodate the bombing conspiracy, soldiers in war time do

23   not target embassies located in third countries.

24             I reject it because Congress has rejected it.  It

25   has given the Executive Branch discretion as to whether to

PROCEEDINGS                           28

1   prosecute these crimes in district court or not, and it's not

2   for me to second guess the Executive as a mitigating factor in

3   determining the appropriate sentence for a federal crime.

4           I do agree with the government that defense

5   counsels' attempt to present this in a war context is really a

6   backdoor way of arguing that the case shouldn't have been

7   tried in this court.  And since it was, I guess the meaning is

8   it should be a mitigating factor.

9           It's kind of like when the defendant kept saying to

10  me at the beginning of the case, and it's consistent with what

11  he said to the marshals today, that he wanted to be tried in

12  the World Court and he wouldn't recognize any court other than

13  the World Court.

14          Now, you know, I rejected the enemy combatant

15  defense, which is a recognized defense to certain criminal

16  charges.  There is such a defense.  But none of its

17  prerequisites were met here, and I don't think they are any

18  more applicable or the defense is any more applicable at

19  sentencing.  I know there's an academic opinion on which the

20  defendant's relied that says this ought to be treated under

21  the Geneva Convention.  I think Congress has given the

22  Executive the choice of whether to do that or not.

23          So I'm not expressing a view on whether a case like

24  this ought to be tried in a civilian court or a military

25  court.  That's not my issue.  Congress has criminalized this

*LINDA D. DANELCZYK, RPR, CSR*
*Official Court Reporter*

PROCEEDINGS                                29

1   conduct, equated it or elevated it above or is equal to the

2   all the other --

3              MR. STERN:  Judge, I'm sorry, we lost the video

4   feed.

5              THE COURT:  All right, we'll wait.

6              (Pause.)

7              THE COURTROOM DEPUTY:  One moment.

8              THE COURT:  All right, we're going to take a recess

9   until we can restore the connection.

10             (Whereupon, a recess was taken at 10:51 a.m.)

11             THE COURTROOM DEPUTY:  All rise.

12             THE COURT:  Be seated, please.

13             All right, I think I've said everything I had to say

14  about the nature of the crime and the circumstances of the

15  offense.

16             The next factor in the statute is the history and

17  characteristics of the defendant.  This is usually and it is

18  here a very important factor to look at in determining the

19  appropriate sentence.  All I can say about this defendant is

20  he is a person of murderous zeal.  He is totally self-absorbed

21  and it eliminates any moral system that governs him, except

22  his single-minded desire to kill Americans.

23             Now at the earlier stages of this case, the

24  characteristic was on full display.  He was quite willing to

25  talk to me, and I think he was quite willing to talk to his

PROCEEDINGS                                      30

1   lawyers as well, when he thought he had a chance of persuading

2   us of his point of view.  But when it became clear that that

3   wasn't going to happen, then he just decided to boycott, and

4   that continues to this morning.

5            And his statement to the marshal "This is not my

6   court, that is not my judge," that is his attitude from day

7   one in this proceeding.  I don't see him caring about anything

8   or anyone except what he wants to do.  He has one here and

9   that's to kill Americans.  That's all there is to his history

10  and characteristics, as far as I'm concerned.

11           Another factor the statute requires me to consider

12  is deterrence, both general and specific.

13           Now I think the government's point is accurate.  If

14  this man ever walks the street again, the first thing he will

15  do is try to kill Americans.

16           There's no mental health treatment I think that can

17  solve that.  That is just the way he is wired.  Everything in

18  his background and the training he sought suggests that that

19  is a risk that we have to take very seriously.

20           There's not an ounce of remorse.  There is not a

21  smidgen of self-doubt about what has done with his life.  I

22  think defense counsel is right that a large part of that is

23  one of their experts I think said narcissism, it is, but lots

24  of criminals have mental illness without being legally

25  incompetent.  I think what we heard this morning again

PROCEEDINGS                                    31

1   confirms that he's making choices.  And the bottom line is he

2   needs to be deterred because the risk of death to more

3   Americans is very real if he is not deterred.

4           As to general deterrence, you know, I understand

5   defense counsels' point that whatever sentence I pronounce

6   here is not going to end terrorist attacks.  That is clearly

7   true.

8           On the other hand, I think what we have to recognize

9   is that general deterrence in many cases, and particularly in

10  this one, works best at the margins.  You have to keep in mind

11  that if it becomes known that the consequences I'm going to

12  impose on this defendant today are the consequences for this

13  conduct, well then maybe that will deter one person, maybe it

14  will deter ten people.  It won't end terror, but it might

15  deter somebody.  And even one person who gets deterred, that

16  could mean the continuation of any number of American lives

17  that might be at risk if that person were not deterred, and

18  that to me is a worthwhile consideration for sentence.

19          Now, the defense has raised a number of mitigating

20  factors.  And I will tell you that several of those, not all

21  of them, but several of those I think are perfectly valid and

22  I relied on them in the right case.  The fact that he was

23  tortured in Libya.  The fact that he had very difficult

24  conditions of confinement and served a lot of time, both here

25  and prior to coming here.  And that his confinement here will

PROCEEDINGS                              32

1     continue to be more difficult.

2              Now, in the right case, those are perfectly valid

3     things for me to consider.  And I think the defense has done a

4     fine job of presenting those.  But they are so grossly

5     overshadowed and overwhelmed by the other sentencing factors

6     that I've articulated; deterrence, seriousness of the crime,

7     history and characteristics of this defendant that, you know,

8     I'm considering them and I think they're valid, but they don't

9     reduce the sentence be it below what those factors compel.

10             The only other thing I will also say, I'm not seeing

11    the defenses' argument on acceptance of responsibility.

12    Boasting is not accepting responsibility.  Acknowledging evil

13    while being proud of doing evil is not acceptance of

14    responsibility.  So I'm not taking that into account as a

15    serious factor I need to consider.

16             And then I think the last thing the defense counsel

17    raised was that a life sentence here would not match or at

18    least would not be in the same ballpark as sentences handed

19    out in similar cases.

20             I'm convinced by the government's submission that

21    there is no issue of sentencing disparity here because these

22    crimes are each so sui generis that it's very hard to compare

23    them across the board.  I do not see a life sentence here as

24    an outlier in any way.  For those reasons, the sentence is as

25    follows:

PROCEEDINGS                                    33

1          As to Counts One and Two, life imprisonment on each

2     counts to run concurrently.

3          As to Counts Three and Four, 15 years on each counts

4     to run concurrently with each other.

5          And with Counts One and Two, and as to Count Six,

6     ten years to run consecutively to the Counts One and Two.

7          I will impose the mandatory I believe it's a

8     600-dollar special assessment.

9          I'm not going to impose supervised release because I

10    don't think this defendant should ever get out.

11         And I'm not going to grant defense counsels' request

12    for a sentencing recommendation to the BOP.  I think the BOP

13    is going to have its hands full with this violent and

14    uncooperative defendant and it's got to allocate such

15    resources in a manner it deems appropriate to effectuate

16    sentence.

17         Now technically I don't think the defendant's been

18    listening to me, but again for the sake of good order, I will

19    tell him if he wants to appeal his conviction or the sentence,

20    he has got to get a notice of appeal filed within 14 days.

21    His lawyers will do for him.  The clerk will do it if he is

22    certifies he can't afford a lawyer, or he can get a form and

23    do to himself.  But if he doesn't see to it that it gets filed

24    in 14 days, he will have waived any right to appeal that he

25    may have.

PROCEEDINGS                              34

1          Is there anything further?

2          MR. JACOBS:  Nothing from the government, Your

3     Honor.

4          MR. DRATEL:  Your Honor, just one thing.  It's a

5     500-dollar special assessment.

6          THE COURT:  Not 6?

7          MR. DRATEL:  Right, there's one count that the

8     government did not dispute.

9          THE COURT:  Oh, I forgot that.  That's right.

10    Five-hundred-dollar special assessment.

11         Thank you, Mr. Dratel.

12         MR. STERN:  We are going to file the notice of

13    appeal on his behalf.

14         And with Your Honor's permission, we are seeking to

15    be relieved because I think he may want to make claims about

16    us.  And we're going to suggest, with your permission, not the

17    lawyer from the CJA panel but other lawyers, because I think

18    there are complicated unusual issues in this case.

19         THE COURT:  Well there are, but I need to leave the

20    decision on that up to the Second Circuit.  They'll decide who

21    they want to appoint.

22         I will tell you I agree with you that you all should

23    be relieved so that someone can have a full look at the

24    record, and I also think you have gone way beyond what usual

25    professional commitment requires in handling this case and you

PROCEEDINGS                                      35

1   ought to be relieved just for that reason, too.

2            MR. STERN:  Thank you.

3            THE COURT:  All right, thank you, all.  We are

4   adjourned.

5            MS. KELLMAN:  Thank you, Judge.

6

7            (Whereupon, the matter was concluded.)

8

9                      *    *    *    *    *

10

11

12  I certify that the foregoing is a correct transcript from the
    record of proceedings in the above-entitled matter.

13

14  s/ Linda D. Danelczyk                March 2, 2018

15

16    LINDA D. DANELCZYK                    DATE

17

18

19

20

21

22

23

24

25