

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

| | |
|---|---|
| DJ/MJJ | *271 Cadman Plaza East* |
| F. #2011F01331 | *Brooklyn, New York 11201* |

September 18, 2018

By ECF

The Honorable Brian M. Cogan
United States Magistrate Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

            Re:    United States v. Adnan Ibrahim Harun Adam Hausa
                   Criminal Docket No. 12-134 (BMC)

Dear Judge Cogan:

            The government respectfully submits this letter to request that the Court order that the sealed portions of the March 22, 2013 and June 28, 2013 status conference transcripts in the above-captioned matter be unsealed.[1]  Defense counsel does not object to this request.  Unsealing is warranted because the sealed material is now publicly known.  The government requests unsealing at this time because it intends to refer to these transcripts in an appellate brief due September 27, 2018.

            At a status conference on March 22, 2013, defense counsel made statements at a sidebar concerning the defendant's mental health.  Defense counsel moved to seal that sidebar, and the Court granted that request.  At a status conference on June 28, 2013, defense counsel made additional statements regarding the defendant's mental health and requested that those statements be sealed.  While is unclear from the face of the transcript whether the Court expressly granted the sealing request, the transcript cover page is marked "sealed."

            In the years following these status conferences, the parties engaged in frequent litigation concerning the defendant's mental health, culminating in an evidentiary hearing on February 21, 2017 in open court.  During the course of this litigation, information about the defendant's mental health was disclosed publicly by defense counsel, including information much more detailed than that disclosed at the March 22, 2013 and June 28, 2013 status

---

            [1] The sealed and unsealed portions of the March 22, 2013 transcript are attached as Exhibits A and B, respectively.  The June 28, 2013 transcript is attached as the Exhibit C.

conferences.  Because the disclosures made at those conferences are no longer confidential, the defendant's privacy interests no longer outweighs the public's right to access the content of those proceedings.  See e.g., United States v. Aref, 533 F.3d 72, 83 (2d Cir. 2008) (noting "the requirement that district courts avoid sealing judicial documents in their entirety unless necessary"); Lugosch v. Pyramid Co., 435 F.3d 110, 119-20 (2d Cir. 2006) (noting that sealing orders should be "narrowly tailored").

Accordingly, the government respectfully requests that the sealed portions of the March 22, 2013 and June 28, 2013 status conference transcripts be unsealed.  The government also requests unsealing of this letter.

Respectfully submitted,

RICHARD P. DONOGHUE
United States Attorney

By:     _____/s/_____
Matthew Jacobs
Assistant U.S. Attorney
(718) 254-6401

2

**Exhibit A**

```
              UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF NEW YORK

-----------------------------X Docket#
UNITED STATES OF AMERICA,     : 12-cr-00134-BMC-MDG-1
                              :
      - versus -             : U.S. Courthouse
                              : Brooklyn, New York
ADNAN IBRAHIM HARUN A. HAUSA, :
            Defendant        : March 22, 2013
-----------------------------X
           S E A L E D   P R O C E E D I N G
   TRANSCRIPT OF CRIMINAL CAUSE FOR STATUS CONFERENCE
         BEFORE THE HONORABLE BRIAN M. COGAN
            UNITED STATES DISTRICT JUDGE
```

**A   P   P   E   A   R   A   N   C   E   S:**

**For the Government**:            **Robert L. Capers, Esq.**
                                   United States Attorney

                          BY:      **David Bitkower, Esq.**
                                   **Shreve Ariail, Esq.**
                                   **Amanda Hector, Esq.**
                                   Assistant U.S. Attorney
                                   271 Cadman Plaza East
                                   Brooklyn, New York  11201


**For the Defendant**:             **Susan Gail Kellman, Esq.**
                                   25 Eighth Avenue
                                   Brooklyn, NY 11217

                                   **David Stern, Esq.**
                                   Rothman, Schneider, Soloway
                                   & Stern, P.C.
                                   100 Lafayette Street,
                                   Suite 501
                                   New York, NY 10013

**Transcription Service**:         **Transcriptions Plus II, Inc.**
                                   61 Beatrice Avenue
                                   West Islip, New York 11795
                                   laferrara44@gmail.com


Proceedings recorded by electronic sound-recording,
transcript produced by transcription service

2

Proceedings

1   (Sealed sidebar conference begins at 2:34 p.m.)

2             THE COURT:  Okay.  What's up?

3             MS. KELLMAN:  Your Honor, we had an opportunity

4   to meet with our client earlier today and he's in a

5   fairly agitated state.  We learned just recently, in the

6   last forty-eight hours, that he had been taking certain

7   medication and we have reason to think that the

8   medication may have worn off.  He's been difficult to

9   communicate with and we think it would be appropriate to

10  have him evaluated before we actually -- and get the

11  wisdom of a more-trained professional than we are at what

12  his situation might be and whether or not he needs the

13  medication that he was previously taking.

14            THE COURT:  Okay.  You've got to give me

15  something more specific to seal the record than that.

16            MS. KELLMAN:  Judge --

17            THE COURT:  What is going on with him medically

18  that should not be disclosed?

19            MS. KELLMAN:  I --

20            MR. STERN:  Judge, specifically, this condition

21  is such now that he is saying things that don't make

22  sense.  He is saying things that are self-destructive.

23  He's saying things make it clear to us that he cannot

24  make any legal decision for himself or with the help of

25  counsel.

3

Proceedings

1        We can't really communicate to him things that

2   he needs to understand.  He has made specific requests

3   and those requests, which I think the government intends

4   to put on the record, some of them are impossible to

5   comply with.  Some of them he is incapable of making

6   himself -- he also makes various threats, both against --

7   well, I am not going to characterize them as such.  He

8   says things to denigrate the United States, you, all

9   kinds of things, that make us think that he is incapable

10  either of appearing in court and accomplishing anything

11  meaningful or of helping us help him make decisions.  And

12  without treatment, we don't think he's capable of doing

13  anything that would move this case forward.

14        THE COURT:  What, if anything, do you know

15  about his medical condition that would explain this

16  behavior, other than you think he's thinking

17  irrationally?

18        MR. STERN:  Well --

19        MS. KELLMAN:  Well, your Honor, in the -- when

20  we've had -- Mr. Stern and I have had several months of

21  communication with him that have been productive and

22  articulate and quite successful and we haven't until very

23  recently had difficulty communicating with him.

24        We learned only forty-eight hours ago that he

25  was taking a long-acting medication that he was -- that

4

Proceedings

1   was given to him, we believe, at the end of September.

2   And we've communicated with our own forensic physician

3   who told us that the nature of the medicine we described

4   to him is something that could last as long as three or

5   four months.

6        Now that -- the expiration of three or four

7   months from the end of September coincides with the

8   middle of December which is essentially when we started

9   to have difficulty communicating with him and it is when

10  he started making irrational demands.  It is when he

11  started to ask for, among other things, new counsel and

12  to represent himself, to be tried by the world court, to

13  be tried by a military tribunal, to be represented by

14  somebody from his country, Niger.  He had an opportunity

15  to meet with the ambassador to Niger, not a

16  representative but the ambassador to Niger, who he

17  believes is a CIA operative.

18        He has said things that are so beyond rational

19  and so inconsistent with the things that he said when he

20  was superbly rational and superbly focused and appeared

21  to us to have a mind -- a memory that was terrifyingly

22  accurate.

23        So he doesn't seem to be able to do that

24  anymore.  He doesn't seem to be able to communicate in

25  any rational thought processes and when we believe he was

5

                                Proceedings

1   medicated, he was able to successfully communicate.

2            THE COURT:  Do you know what kind of medication

3   he is taking?

4            MS. KELLMAN:  No, we've asked -- he's not

5   taking any medication right now.  We asked the -- he was

6   prescribed the medication that he took, as far as we know

7   in Italy and we've asked the government to get the name

8   of that medication but because it's the Italian

9   government and it's not our government, they've

10  apparently -- and I'm sure they'll speak to this, we've

11  asked an attache in Italy to reach out to the doctors

12  there to find out the name of the medication.  In the

13  interim, they've asked the MDC or MCC -- MDC rather, to

14  try to --

15           MR. STERN:  MCC.

16           MS. KELLMAN:  -- MCC to medicate him and they

17  apparently -- somebody prescribed something for him

18  yesterday but they haven't filled the prescription yet.

19  And so he has not had any medication as far as we're

20  aware.

21           MR. BITKOWER:  I just want to clarify one part.

22  We didn't ask the MCC to medicate him but they did

23  evaluate him.

24           MS. KELLMAN:  I'm sorry.

25           MR. BITKOWER:  And they did prescribe treatment

6

Proceedings

1   in the form of medication for him.  I think Ms. Kellman

2   is correct that he hasn't yet taken or even offered that

3   medication just because they had not procured the actual

4   medication.

5          MS. KELLMAN:  And nobody can tell us what the

6   medication is, Judge, because we don't have the valid

7   HIPAA form to waive his --

8          THE COURT:  Can you tell me more specifically

9   what behavioral manifestations he has exhibited that you

10  think would be destructive to him appearing here today?

11  What has he done that concerns you?

12         MS. KELLMAN:  Your Honor, he is not able to

13  moderate his voice at all.  He speaks at only one level

14  and that's screaming.  He is cursing and he is spitting

15  and he is saying derogatory things against the United

16  States and against the Court and against his lawyers and

17  against pretty much every -- and we've also had

18  difficulty, although his English is sufficient to

19  marginally communicate with him, he's refused to use an

20  Arabic interpreter.  In our experience, he's insisting on

21  us using a Hausa interpreter and we have not been able to

22  find a Hausa interpreter that satisfies his ability to

23  speak Hausa.

24          And at that point, frankly, I didn't think he

25  was being irrational.  It appeared in his communications

7

Proceedings

1  with the interpreter, who interpreted for him when he was

2  speaking to the Ambassador from his country, that it was

3  the interpreter who was not up to speed because the

4  Ambassador then spoke Hausa and they had no difficulty

5  communicating.

6          MR. STERN:  Well, we also know it's true

7  because the Ambassador kept correcting the interpreter.

8          MS. KELLMAN:  Right.

9          THE COURT:  Okay.  Does the government have any

10  idea how long it will take the MCC to complete its

11  medical evaluation of him and at least propose a course

12  of therapy?

13          MR. BITKOWER:  Your Honor, I think they have

14  proposed a course of therapy for the time being.  It's

15  just a question of actually obtaining the pills and

16  providing them to him, which I understand would happen

17  today.

18          MR. STERN:  That's --

19          MS. KELLMAN:  It could take a few months.

20          MR. STERN:  -- our understanding is he could

21  receive the initial dose today.

22          MR. BITKOWER:  The initial dose would be taken

23  today.

24          MR. STERN:  Yeah.

25          MR. BITKOWER:  I have no idea what the length

8

Proceedings

1   of the course of treatment would be and I would imagine

2   that would be informed further by whatever information we

3   can obtain from the Italian government and provide to

4   everyone.

5        THE COURT:  All right.  Does the government

6   have any position as to whether this sidebar should be

7   sealed?  That's my first question.

8        MR. BITKOWER:  Your Honor, I think if we could

9   just add two things to the record before we get to that

10  point --

11       THE COURT:  Yeah.

12       MR. BITKOWER:  -- which is that -- and as Ms.

13  Kellman pointed out, he had made a request previously to

14  see a judge and also to potentially have different

15  counsel assigned in the case to represent him or to

16  potentially proceed pro se.  So that's all.  I just want

17  to add that to the record and otherwise, Ms. Kellman

18  makes some valid points and we take no position on her

19  application.

20       MS. KELLMAN:  Your Honor, before you rule as

21  well, it was our intention -- it would be our intention

22  to submit a separate application to the Court ex parte

23  requesting that he be evaluated by somebody not employed

24  by the MDC or MCC and that that person be entitled --

25  forensic expert be entitled to review the findings of the

9

Proceedings

1    MCC doctor and make other recommendations if they're

2    necessary, at least to review.

3            I think we all have the same objective here and

4    we've dealt with this man when he was medicated -- when

5    we have every reason to think he was medicated.  He was

6    clear-headed and clear thinking.  We would like help

7    restore that individual.  The person who is downstairs is

8    absolutely out of control and can only do harm to his own

9    legal status here in this courtroom.  We would like to do

10   everything we could to try to restore him and that's why

11   we think it's appropriate to make this application to

12   proceed without him and to seal the record.

13           THE COURT:  All right.  Thank you.  You can

14   step back.

15           MS. KELLMAN:  Thank you, Judge.

16   (Sealed sidebar conference concludes at 2:43 p.m.)

17                     (Matter concluded)

18                          -oOo-

19

20

21

22

23

24

25

10

# C E R T I F I C A T E

I, LINDA FERRARA, hereby certify that the foregoing transcript of the said proceedings is a true and accurate transcript from the electronic sound-recording of the proceedings reduced to typewriting in the above-entitled matter.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I hereunto set my hand this **2nd** day of **June**, 2016.

*Linda Ferrara*
Linda Ferrara

CET**D 656
Transcriptions Plus II, Inc.

**Exhibit B**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

```
-----------------------------X  Docket#
UNITED STATES OF AMERICA,     : 12-cr-00134-BMC-MDG-1
                              :
     - versus -               : U.S. Courthouse
                              : Brooklyn, New York
ADNAN IBRAHIM HARUN A. HAUSA, :
            Defendant         : March 22, 2013
-----------------------------X
```

TRANSCRIPT OF CRIMINAL CAUSE FOR STATUS CONFERENCE
BEFORE THE HONORABLE BRIAN M. COGAN
UNITED STATES DISTRICT JUDGE

A   P   P   E   A   R   A   N   C   E   S:


**For the Government:**          **Robert L. Capers, Esq.**
                                 United States Attorney

                       BY:       **David Bitkower, Esq.**
                                 **Shreve Ariail, Esq.**
                                 **Amanda Hector, Esq.**
                                 Assistant U.S. Attorney
                                 271 Cadman Plaza East
                                 Brooklyn, New York  11201


**For the Defendant:**           **Susan Gail Kellman, Esq.**
                                 25 Eighth Avenue
                                 Brooklyn, NY 11217

                                 **David Stern, Esq.**
                                 Rothman, Schneider, Soloway
                                 & Stern, P.C.
                                 100 Lafayette Street,
                                 Suite 501
                                 New York, NY 10013

**Transcription Service:**       **Transcriptions Plus II, Inc.**
                                 61 Beatrice Avenue
                                 West Islip, New York 11795
                                 laferrara44@gmail.com


Proceedings recorded by electronic sound-recording,
transcript produced by transcription service

2

                    Proceedings

1               THE CLERK:  United States v. Ibrahim Harun.

2               Your appearances, counsel?

3               MR. BITKOWER:  For the government, David

4    Bitkower, Shreve Ariail, Amanda Hector and Alumbar Hanai

5    (ph.)

6               Good afternoon, your Honor.

7               THE COURT:  Good afternoon.

8               MS. KELLMAN:  Good afternoon, your Honor.

9               Susan Kellman for Mr. Harun and I'm assisted at

10   counsel table by David Stern.

11              THE COURT:  Good afternoon.

12              All right.  As you know, this is not my case.

13   Judge Korman is a little under the weather and asked me

14   to cover it for him.  I understand this is the initial

15   status conference.  What's going on here?

16              MR. STERN:  Judge, we would like to approach

17   and discuss something that pertains to this case.

18              THE COURT:  Do you mean approach at sidebar?

19              MR. STERN:  Yes.

20              MS. KELLMAN:  Yes, your Honor, if we could.

21              THE COURT:  Why does it have to be at sidebar?

22              MS. KELLMAN:  Well, your Honor, at this moment

23   our client, as the Court can see, obviously is not

24   present.  He is also not feeling well today and we had

25   some concerns because they relate to this health, we were

3

Proceedings

1    hoping to be able to do it at sidebar because they are of

2    a personal nature.

3              THE COURT:  Okay.  So this sidebar, you're

4    proffering, is going to require disclosure of personal

5    medical information pertaining to the defendant?

6              MS. KELLMAN:  Yes, your Honor.

7              THE COURT:  All right.  And if it does --

8              MS. KELLMAN:  We prefer not to do that in open

9    court.

10             THE COURT:  Right.  But I also assume you're

11   going to ask me then if you disclose that information,

12   that I seal the transcript, so that it's not publicly

13   available, is that right?

14             MS. KELLMAN:  Yes, your Honor.  I think we can

15   get to that after we make the application.  Yes.

16             THE COURT:  All right.  Well, I will hear your

17   application at sidebar and then I will determine whether

18   I am going to seal the sidebar after I've heard what it

19   is you had to say and I can make an assessment as to

20   whether it would be unduly prejudicial to the defendant

21   to have it disclosed.  So let's have the sidebar and

22   we'll see what you have to say.

23   (Sidebar conference from 2:34 p.m. until 2:43 p.m.)

24             THE COURT:  All right.  Based on what I just

25   heard at sidebar, I think there are substantial questions

4

Proceedings

1    as to the defendant's medical condition and his ability

2    to knowingly and intelligently participate in these

3    proceedings.  Because his medical condition was discussed

4    in considerable detail, I think that is grounds to seal

5    the record.  I find that his interest in his personal

6    privacy outweighs the qualified right of access that the

7    public has to these proceedings.  So the sidebar shall

8    remain sealed, available only to the parties -- the

9    attorneys for the parties in the case.

10              Now where do the parties want to go forward?  I

11   see we've been talking about a date.  The date may be too

12   long.  Based on what you've described to me, we would

13   hopefully know more about the defendant's medical

14   condition within thirty days and since I am finding

15   there's cause for him to be in the courtroom today, I

16   don't think we should wait any longer than the minimum

17   amount of time necessary to reassess and see if his

18   condition has improved to a point where he can be in the

19   courtroom.

20              Based on my experience and based on what you

21   told me at sidebar, I think we ought in thirty days if

22   that's the case.  So I don't want to give you as long as

23   you've requested here and I think we ought to look for a

24   date at the end of April.

25              Paula, what do you have?

5

Proceedings

1          THE CLERK:  April 26th or May 3rd, either day

2    at 2:30.

3          THE COURT:  How does that sound to counsel?

4          MR. BITKOWER:  Either date is fine with the

5    government, your Honor.

6          MS. KELLMAN:  That's fine with the defendant --

7    May 3rd would be fine.

8          THE COURT:  Okay.  What time, Paula?

9          THE CLERK:  2:30.

10          THE COURT:  All right.  Anything further?

11          MR. STERN:  No.

12          MR. BITKOWER:  Yes, your Honor.  On the basis

13    articulated at sidebar, and as well as to permit

14    continued discussions between the government and defense

15    counsel, we would ask that the time between today and May

16    3rd be excluded from the speedy trial clock.

17          THE COURT:  Yes, I will exclude time.

18    Obviously, there needs to be an evaluation of the

19    defendant's ability to participate in these proceedings.

20    I think that's grounds enough for an exclusion.  I assume

21    the government is also going to be presenting discovery

22    during this period to counsel.

23          Is that right?

24          MR. BITKOWER:  We began the process of

25    discovery back in October actually, your Honor, and we're

6

Proceedings

1  going to have conversations with the defendant about how

2  to proceed further.

3         THE COURT:  All right.  I will exclude time

4  until the next conference.  I find that the ends of

5  justice outweigh the interest of the public and the

6  defendant in the speedy trial, so that we can determine

7  the defendant's ability to proceed and that discovery can

8  be exchanged.

9         Anything else?

10        MR. BITKOWER:  Not from the government, your

11 Honor.

12        MS. KELLMAN:  Can I have one moment, Judge.

13        THE COURT:  Yes.

14        MS. KELLMAN:  No, nothing further.  Thank you,

15 Judge.

16        THE COURT:  All right.  Thank you.  We are

17 adjourned.

18        MR. BITKOWER:  Thank you.

19        MS. KELLMAN:  Thank you.

20        THE CLERK:  All rise.

21              (Matter concluded)

22                   -oOo-

23

24

25

7

# C E R T I F I C A T E

I, LINDA FERRARA, hereby certify that the foregoing transcript of the said proceedings is a true and accurate transcript from the electronic sound-recording of the proceedings reduced to typewriting in the above-entitled matter.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I hereunto set my hand this **2nd** day of **June**, 2016.

*Linda Ferrara*
Linda Ferrara

CET**D 656
Transcriptions Plus II, Inc.

**Exhibit C**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

```
------------------------------X   Docket#
UNITED STATES OF AMERICA,     :   12-cr-00134-ERK-MDG
                              :
    - versus -                :   U.S. Courthouse
                              :   Brooklyn, New York
ADNAN IBRAHIM HARUN A HAUSA,  :
also known as "Spin Ghul",    :
also known as "Esbin Gol",    :
also known as "Isbungoul",    :
also known as "Abu Tamim",    :
also known as "Joseph Johnson",: June 28, 2013
also known as                 :
"Mortala Mohamed Adam",       :
                Defendant     :
------------------------------X
```

**S E A L E D   P R O C E E D I N G**

TRANSCRIPT OF CRIMINAL CAUSE FOR CONFERENCE
BEFORE THE HONORABLE EDWARD R. KORMAN
UNITED STATES MAGISTRATE JUDGE

A   P   P   E   A   R   A   N   C   E   S:

<u>For the Government</u>:          **Loretta E. Lynch, Esq.**
                              United States Attorney

                          BY: **Shreve Ariail, Esq.**
                              **Amanda Hector, Esq.**
                              Assistant U.S. Attorney
                              271 Cadman Plaza East
                              Brooklyn, New York  11201


<u>For the Defendant</u>:          **Susan G. Kellman, Esq.**
                              25 Eighth Avenue
                              Brooklyn, NY 11217



<u>Transcription Service</u>:       **Transcriptions Plus II, Inc.**
                              740 Sharon Road
                              Copiague, New York 11726
                              <u>Transcriptions2@verizon.net</u>


Proceedings recorded by electronic sound-recording,
transcript produced by transcription service

2

Proceedings

1          THE CLERK:  United States v. Adnan Hausa.

2          Your appearances, counsel.

3          MR. ARIAIL:  Good afternoon, your Honor.

4          Shreve Ariail and Amanda Hector for the United

5   States.

6          MS. KELLMAN:  Good afternoon, your Honor.

7          Susan Kellman for Mr. Hausa.  My client is

8   seated beside me with a Housa interpreter.

9          THE CLERK:  The interpreter is still under

10  oath.  Please state your name for the record.

11         THE INTERPRETER:  Mohammed Albakaye.

12  (INTERPRETER PREVIOUSLY SWORN)

13         THE COURT:  On for status, Judge.

14         THE DEFENDANT:  I have something to say before

15  we start work.  I sent you two letters, meaning the

16  Judge.  I sent you two letters  regarding my lawyer.

17         THE COURT:  I haven't seen them.  If you sent

18  them, I haven't gotten them.

19         THE DEFENDANT:  Four days after we met last

20  time; the second letter I sent was maybe two days ago or

21  three days ago and they were all in the Arabic language.

22         THE COURT:  Well, I would have to get them

23  translated but I don't recall seeing any letters.

24         THE DEFENDANT:  Because I have an issue with

25  the lawyer.

3

Proceedings

1          THE COURT:  What is your issue?

2          THE DEFENDANT:  That last time when I said I

3  didn't want her --

4          THE COURT:  You have to speak up, the

5  interpreter.

6          THE DEFENDANT:  The last time I said I didn't

7  want -- I no longer wanted her.  I didn't want to get

8  into any details on why -- whether or not -- on the

9  reason why I didn't want her but because you refused to

10  act regarding my statement that I did not want her, now I

11  have to say something -- I have to elaborate more on why

12  I don't want her.

13          THE COURT:  Before you do that, I don't have a

14  clear recollection of what happened the last time.  I

15  mean, what -- wait, wait, wait.  Why don't you tell me

16  what happened the last time.

17          MR. ARIAIL:  Your Honor, at the last status

18  conference, I believe the defendant indicated to the

19  Court that he was having some issues with his defense

20  counsel and that he no longer wanted to work with them.

21  And then your Honor talked it over, indicated to the

22  defendant that Ms. Kellman would stay on as his defense

23  counsel in this case.

24          THE COURT:  With his agreement or not?  I

25  thought it ended on a --

4

Proceedings

1          THE DEFENDANT:  I said I didn't want her and I

2     met with them at the office.  They sent David Stern's

3     assistant, Lucas Anderson (ph.).  He worked with us when

4     they collected the report and he said there was a meeting

5     that was going to take place with Pentagon officials.  I

6     said I wasn't going to give any information.  I'm not

7     going to give you any information.  The information

8     should go to David Stern and David Stern's

9     (indiscernible).

10          I said all of these things.  I already said in

11     court that I did not want them as my lawyers.  They

12     should be kicked out.  And he said since the judge did

13     not order them to stop working with me, they will

14     continue to come.

15          Judge, the -- that's the first thing.  The

16     second thing is there was a time when they were

17     collecting information or gathering a report.  He was

18     talking about a story.  She worked with a certain

19     prisoner who hijacked a plane but it's a small plane.

20          THE COURT:  Who is the "she" that he is talking

21     about?

22          THE INTERPRETER:  She is the attorney.

23          THE COURT:  Ms. Kellman.

24          THE DEFENDANT:  And during the process or

25     during the time the case was going on, they took him out

5

Proceedings

1   of prison.  The individual was released under her care.

2   He stayed in her house because he was released under the

3   condition that he remains with her.

4         The Court ordered that she has to keep close

5   track of him and to see everything that he does.  At that

6   time, she also stated in her house there's alcohol in her

7   house at that time and it's her alcohol.  And it's -- the

8   alcohol belonged to her.  When the prisoner saw the

9   alcohol, he was happy and he thought okay, this -- he

10  could have something.  She told him that during this

11  period of time it's -- you should not be drinking

12  alcohol.

13        She drinks alcohol and she can become my

14  attorney?  As long -- in my understanding, a person who

15  drinks alcohol should not be -- is not -- does not have

16  the capacity to be a witness or a lawyer.

17        It should -- it is in my understanding, a

18  person who comes in front of a judge should be a clean

19  person and should not have any -- what's the word --

20  vices.  I didn't want -- I did not want to discuss that

21  but now that I am pressed, I am forced to discuss this.

22  That's the first thing.

23        When we -- last time we discussed the United

24  Nations.  The Judge said he could not send me to the

25  United Nations court unless the higher-ups or the

6

Proceedings

1   Executive Branch decides to send me and I wrote a letter

2   to Ban ki-Moon.  When I was in Libya I wrote a letter to

3   Mr. Ban ki-Moon.  Libya didn't send it.  I did it.  I

4   sent it to the United Nations office in Libya looking for

5   help but that letter didn't reach them.

6           In Italy, when I was taken to Lampedusa, I also

7   spoke to the United Nations but the Italian police

8   different and I -- it took some time before they turned

9   me over to the FBI.  So, the government of the United

10  States does not know how I got -- I was taken -- I got in

11  the hands of the Italian government.  I wrote -- I

12  explained all of this in my letter, so the Judge knows

13  how I got -- how I was -- I got in the hands of the

14  Italian.

15          When Libya arrested me -- when Libya arrested

16  me, they broke United Nations law and even the FBI when

17  they released me and even the FBI, to tell you the truth,

18  broke international laws, because I am not an Italian and

19  I did not go to Italy under my own volition.  I did not

20  meet anyone in Italy who was a representative of the

21  Nigerian government because when I was in Libya, I had a

22  passport.  They took my passport away and even when --

23  after the war -- until the war took place and I still

24  didn't know where my passport was.

25          I have -- with my passport, I have a right to

7

Proceedings

1    be under umbrella of the United Nations.  Even here in

2    America, I said I wanted to see some representative of

3    the Nigerian government.  David Bitkower connected me

4    with someone whose name is Mohammed Sadiq (ph.) but I did

5    not see his identification card.  And he also said he's a

6    representative of the Nigerian government.

7          I said I wanted to help -- I said I wanted help

8    from the intelligence representatives of the Nigerian

9    government, so they could come and see my condition.

10   Similar to the case of el-Magrahie who did the Lockerbie,

11   he was taken to an international court but Mohammed Sadiq

12   said he wasn't very straight and he said he would return

13   and he never returned.

14         Susan and David Stern and their translator,

15   they told me the last time I met with them -- one of the

16   last times I met with them, even if -- they told me even

17   if the Nigerian government official were to come, they

18   would not speak to you.

19         Also, when I said I wanted to meet with the

20   military representatives and Pentagon officials, she said

21   even if military lawyers come, they will not talk to you.

22   The truth is, I can't understand them.  I told you I

23   don't know the system in America, the government -- of

24   the government.

25         What I want is here's my letter, read it.

8

Proceedings

1   You'll read -- if you read it, you'll understand the
2   things I've gotten written in it.  There are things that
3   happened in Libya when I met with the CIA and a French
4   journalist and representatives of the Nigerian embassy
5   and an intelligence representative of the Nigerian
6   government and an Italian embassy.  All of these
7   officials I met with in Libya.  I met with them
8   individually.  Libya wasted my time.  They refused to
9   hand me over and they're the ones who took me to Italy.
10          The truth is -- the truth is Italy hid the
11   truth to find a way to hand me over to the American
12   government.  Yes, I am the one who said speak to the
13   American authorities because the CIA spoke with me in
14   Libya but when -- my understanding was when I arrived
15   here, I would be connected with the Nigerian government,
16   so that the work -- the case against me will be done with
17   the -- involving the Nigerian government.
18          From what I am seeing is as time goes on, there
19   -- the situation is not very orderly or straight and the
20   -- David Bitkower was saying that they don't want the
21   story to get out in the media, so that other el-Qaeda
22   individuals would know that I have been arrested.
23          That might help them escape or -- others escape
24   or -- but if I remained quiet until the case is done on
25   time, even if it might help to arrest others, the Judge

9

Proceedings

 1    might take that into consideration in my case.

 2             He also wanted me to work with him on cases

 3    involving individuals who are at Guantanamo to give -- to

 4    bear witness or to be a witness or to discuss the cases

 5    against them.  I said I did not have a problem with any

 6    of that but the government of Niger has to be aware of

 7    all that but not just the Nigerian intelligence but --

 8             THE COURT:  You know, this is not -- I don't --

 9    Mr. --

10             THE DEFENDANT:  But they --

11             THE COURT:  Listen, we have to stop.  We have

12    to stop because none of this really -- how you got here,

13    how you got to Italy, how you got to the United States,

14    the Supreme Court has said as a general rule that it

15    doesn't matter how somebody is brought into a United

16    States court.  The critical issue is whether they get a

17    fair trial in the United States court and they're not

18    entitled to a remedy simply because, for example, the

19    United States could have sent somebody and kidnaped them

20    and brought them to the United States.  So, how you got

21    here, what happened in Italy, is all not relevant.

22             Now I assume that you are -- there is some

23    treaty, the name of which I forget that requires the

24    United States to notify the embassy of your country.  Now

25    I assume you --

Proceedings

1          MS. KELLMAN:  Your Honor, his embassy was

2     notified by the government and in fact, we spoke with the

3     Ambassador, not his assistant, but the actual Ambassador

4     to the -- we spoke with the actual Ambassador to the

5     country of Niger.  We met with him.  By we, I mean myself

6     and the government lawyers and Mr. Stern met with the

7     Ambassador and after we met with him, we arranged for the

8     Ambassador to meet with Mr. Hausa and we had a meeting

9     that lasted several hours and Mr. Hausa after the

10    meeting, did not wish to meet with the Ambassador again.

11    He decided that the Ambassador was likely an imposter and

12    he had no way of being assured that it was actually the

13    Ambassador.  Of course we produced and he produced his

14    credentials but Mr. Hausa believed that he was just a

15    front for the CIA.  But he wasn't -- the government of

16    Niger was notified.  We met with him and Mr. Hausa met

17    with him, as well for several hours in our presence.

18          THE COURT:  And the other thing -- okay.  And

19    the other thing, Mr. Hausa, is just because -- I don't

20    know what -- assuming it's true that --

21          MR. ARIAIL:  Your Honor?

22          THE COURT:  -- Ms. Kellman occasionally has a

23    drink of alcohol doesn't disqualify her from being a

24    lawyer or provide a ground for me to remove her as your

25    lawyer, anymore than I should recuse myself as a judge in

Proceedings

1   this case because I have a couple of glasses of wine a

2   week.  I mean she happens to be -- you know, she happens

3   to be an excellent lawyer.  I told you this is why I

4   appointed her and you can't -- you don't have enough --

5   you have no familiarity with the system.  As I understand

6   it, it's not that you don't want a lawyer, it's that you

7   don't want her because she has a drink occasionally.

8             MS. KELLMAN:  Just for the record, Judge, most

9   of the incident is not exactly correctly recited but for

10  what it's worth, it was twenty-three years ago and I was

11  being mocked because there was a bottle of vodka in my

12  refrigerator which I don't drink; just for the record.

13            THE DEFENDANT:  Even if it's a hundred years, I

14  don't want you to be my attorney.

15            THE COURT:  I understand that but you have to

16  come up with a better reason and right now, I am not --

17  and you also have Mr. Stern.  I'm trying to help you.

18  You're in a -- I'll read your letter but you're in a

19  strange -- to you, what is a strange country and a

20  strange court and a strange legal system and I'm trying

21  to get you help, so that you could deal with serious

22  charges that have been filed against you.

23            THE DEFENDANT:  I don't want help.  I

24  understand Osama bin Laden (indiscernible) -- and I want

25  the international court if you are not going to listen to

12

Proceedings

1   me or speak to me --

2           THE COURT:  You can't have it.  There's no

3   international court.  This is the court.  You can't --

4   no, no, no.  There's no international court.  There's no

5   international court.

6           (Defendant is rambling without allowing for

7   interpretation).

8           THE DEFENDANT:  The CIA has people who work

9   with Osama bin Laden.  There's -- do you know about that?

10  Do you know --

11          THE COURT:  Do I know what?

12          THE DEFENDANT:  Do you know that the CIA also

13  worked with Osama bin Laden and I want the international

14  court?

15          THE COURT:  There is no international court.

16          THE DEFENDANT:  I have a right to send a letter

17  to Mr. Ban ki-Moon.

18          THE COURT:  Send a letter to Ban ki-Moon.  If

19  he answers it, good for you.  You could -- it's all

20  right.  Send a letter to him.

21          THE DEFENDANT:  Judge, I have a right to

22  complain against you and a right to a complaint against

23  the United States government.

24          THE COURT:  You have it.  In the United States

25  you have all the rights you want to complain.  It's right

13

Proceedings

1    in the First Amendment.

2           THE DEFENDANT:  I don't have an American

3    passport.  I am from Niger.  I'm from Niger.  I have a

4    right to speak.  The first judge was the female -- the

5    female -- the first female judge said --

6           MS. KELLMAN:  Magistrate Go, your Honor.

7           THE DEFENDANT:  She asked -- she asked -- there

8    was a Housa translator, she asked if I was taking -- if I

9    was brought here as a hostage under duress or not or were

10   you stolen from the (indiscernible) Avila Ojilad (ph.),

11   the Turk, when he was taken.  It's not -- it's not your

12   -- if I have a problem with the United States, I can take

13   it up with the United Nations.  I'm a terrorist.  I'm a

14   terrorist.

15          THE COURT:  Take it up -- listen, we can't go

16   on with this.  You could take it up with the United

17   Nations.  Do whatever you want.

18          What is the status of this case?

19          MR. ARIAIL:  Your Honor, just to give you an

20   update in terms of what's been going on with the case.

21   The government has been providing discovery to defense

22   counsel on a rolling basis and we continue to provide

23   discovery to defense counsel.

24          Additionally --

25          THE DEFENDANT:  I don't care.  I don't care

14

Proceedings

1    about her.  I don't care what she has received.

2             THE COURT:  Okay.  Then let him finish talking.

3             MR. ARIAIL:  Additionally, your Honor, we

4    recently filed a motion with respect to the Classified

5    Information Procedures Act just alerting the Court and

6    defense counsel and the defendant know that there may be

7    information related to classified material in this case.

8             THE COURT:  That hasn't been leaked already by

9    somebody else?

10            MR. ARIAIL:  Your Honor, obviously given the

11   fact that there is potentially classified information

12   related to this case, regardless of how the defendant

13   proceeds in this case, some attorney will have to remain

14   involved in the case to handle that aspect of the case.

15            And as Ms. Kellman indicated or I -- and the

16   defendant indicated, we have had continued meetings in

17   the hopes of resolving any disputes between defense

18   counsel and the defendant and we haven't had a lot of

19   luck on that.

20            And at this point, just in terms of talking to

21   defense counsel, I think there's good reason to put this

22   over for another two months, to continue providing

23   discovery and then to come back after that period of time

24   and to see where we stand and then to go from there.

25            THE COURT:  What's taking so long to get her

15

Proceedings

1   all the --

2           Let him speak.  I will let you talk.

3           (Defendant is rambling without allowing for

4   interpretation).

5           THE COURT:  I can't -- you're talking and --

6           (Defendant rambling in English and Housa)

7           THE DEFENDANT:  (Indiscernible).  I see from

8   2005, I was in Libya.  While I (indiscernible).  I see

9   CIA was only in Libya.  What happened in Libya?  What

10  happened?  What CIA doing in Libya?  More than this B-52

11  in Libya and (indiscernible) one, bomb, you no see this

12  what happened (indiscernible) in Libya.  You no see

13  entire oppression in Libya.  The B-52 a powerful bomb

14  sent in my prison -- in my area.  And I see in this area

15  and I hear radio -- radio for military -- radio for

16  military, (indiscernible), American radio military.  I

17  hear this in Libya, in Tripoli.  You don't know this.

18  You don't see this.  Talking to me only, I am crazy.  Me

19  no crazy.  I know what to -- I want you understand what

20  is happened.  What is caused.  What it is just.

21  (Indiscernible) is the truth.  Government

22  (indiscernible).  The government (indiscernible).  I

23  break because I (indiscernible) some my story.  I want to

24  international -- the international court says

25  (indiscernible) --

16

Proceedings

1      THE COURT:  I will read your letter but, you

2   know, you can't --

3      THE DEFENDANT:  -- the international court.

4   Why no international court?  Why you say that?  Why

5   America, FBI, to all these stick me -- to Africa, they

6   say you cannot go to international court?  It is there

7   when all this -- when talking (indiscernible) Islamic,

8   Algiers, Turkey; the American people has this.  Why the

9   United States be quiet?  You just said no be quiet.  He

10  let you no be quiet.  Osama no be quiet or this -- and

11  this truth for you.  (Indiscernible) okay, for me.  I

12  don't need him.  You know, no American, no Libya, no

13  Arab; just for me.  I have that from 2005, I see CIA.  No

14  see my (indiscernible).  You CIA said this problem -- to

15  CIA from 2005, CIA asked me how you want American

16  passport.  He's talking American passport.  From 2005,

17  CIA talking with me, on what with him.

18      (Indiscernible) said some very -- in Pakistan,

19  what you want with al-Qaeda, hurt you with -- hurt him

20  and the CIA and intelligence in Pakistan were accusing

21  him on al-Qaeda.  You don't know this.  What happened

22  when I see CIA in Libya.  You don't know how -- you don't

23  know this --

24      THE COURT:  All right, look --

25      THE DEFENDANT:  -- what it is great CIA, great

17

Proceedings

1   and secret how it shadow -- okay, this is the

2   (indiscernible) the rule of the people.

3            THE COURT:  You'll have a trial where you could

4   introduce whatever you want to introduce.

5            THE DEFENDANT:  Yes, I have (indiscernible) in

6   United States.

7            THE COURT:  This is not --

8            THE DEFENDANT:  I have (indiscernible) in

9   United States.  I am fight.  Me no afraid America.  No

10  afraid to this notice and (indiscernible) still me

11  remember, this government no you afraid.  I kill him

12  right now.  It's my honor.  And me, I am honor in United

13  States.  I am (indiscernible) because have court but what

14  is this court -- this no court.  I am sorry.  It's no

15  court.  It's no court.  This no court.  Want kill me,

16  kill me.  Want (indiscernible), okay, why do same thing.

17  (Indiscernible), okay.  But this, I am sorry.  This no

18  court.  This no court.  This no court.  Why am I here.

19  This no court.  This no court.  This not to --

20           THE COURT:  Okay.  Now I need you to be --

21           THE DEFENDANT:  No (indiscernible).

22           THE COURT:  I need you to be quiet, so I can

23  finish listening to the Assistant United States Attorney.

24           MR. ARIAIL:  Your Honor, obviously I indicated

25  to the Court about the potential classified information

Transcriptions Plus II, Inc.

18

Proceedings

1  but given the nature of the case and the types of
2  evidence that we're talking about, it is a fairly
3  complex --
4          THE DEFENDANT:  (Indiscernible rambling).
5          THE COURT:  Mr. Hausa?  Mr. Hausa, if you don't
6  -- Mr. Hausa?
7          THE DEFENDANT:  It is no secret.  I am telling
8  you (indiscernible) me and office, kill me.  Don't say
9  this (indiscernible).
10         THE COURT:  Mr. Hausa?
11         THE DEFENDANT:  No, why everything this
12  information.
13         THE COURT:  Mr. Hausa?
14         THE DEFENDANT:  No matter (indiscernible) was
15  in court.
16         THE COURT:  If you don't --
17         THE DEFENDANT:  Oh, come on please.  That you
18  no for court --
19         THE COURT:  If you keep --
20         THE DEFENDANT:  You not my God, no my
21  (indiscernible) Allah.  You no God.  You no Allah.  You
22  only judge.  You want all truth?  Bring him to me.
23         THE COURT:  If you --
24         THE DEFENDANT:  The last, for me I talk to him.
25  For me, I talk to him.  Then there's no talking.  Do what

19

                              Proceedings

1    you doing.   This is no court.  Finish.

2              THE COURT:  All right.

3              THE DEFENDANT:  This is no court.  Finish.

4              THE COURT:  All right.  Are you finished?

5              THE DEFENDANT:  It is no court.  Thank you, on

6    this scenario.  Fuck you, Judge.  Judge.  You bad

7    (indiscernible).

8              (Defendant exits courtroom.)

9              THE COURT:  The record should reflect that the

10   defendant was escorted out by the marshals because of his

11   conduct.  There was no way to conduct this proceeding in

12   a normal way and since we're only dealing with a status

13   conference, he doesn't -- his presence is not required.

14             Now finish what you were saying.

15             MR. ARIAIL:  Certainly, your Honor. Given the

16   nature of the case, obviously I had indicated to the

17   Court that there's potential classified information at

18   issue here but just in general, the types of evidence

19   that we're talking about in this case whether or not it's

20   classified, it's very complicated and we're coordinating

21   with a lot of different agencies.

22             THE COURT:  I don't understand whether or not

23   it's classified is a complicated.

24             MR. ARIAIL:  In terms of the types of evidence

25   we're talking about which is battlefield evidence seized

20

Proceedings

1   in Afghanistan that's been transported in custody to the

2   United States.  That's one aspect of it.

3           THE COURT:  I don't understand.  Battlefield

4   evidence that was seized in Afghanistan from whom?

5           MR. ARIAIL:  On the battlefield in Afghanistan,

6   there was evidence that was seized by military -- by

7   United States military --

8           THE COURT:  From whom?

9           MR. ARIAIL:  From a battlefield, your Honor.

10          THE COURT:  I don't know, battlefield.  You

11  know, this is ridiculous.

12          MR. ARIAIL:  I'm sorry?

13          THE COURT:  It's not seized from a battlefield.

14  It must have been in somebody's possession.

15          MR. ARIAIL:  Your Honor, there was an

16  engagement, a military engagement in Afghanistan that the

17  defendant participated in.

18          THE COURT:  And who had the --

19          MR. ARIAIL:  After the --

20          THE COURT:  Who had the documents?  Are they

21  United States documents or are they documents of some

22  foreign entity or government?

23          MR. ARIAIL:  A foreign entity, your Honor, that

24  is al-Qaeda.  There were --

25          THE COURT:  So you're classifying those

21

Proceedings

1   documents?

2        MR. ARIAIL:  No, I am not, your Honor.  I'm

3   actually saying that those documents are not classified

4   but it just requires a significant amount of coordination

5   with the different types of entities that we're working

6   with including the United States military and other

7   government --

8        THE COURT:  You know, this case has a 12-cr-

9   134, which means that based on the number, it must have

10  been indicted in January or February of 2012.

11       MR. ARIAIL:  That's correct, your Honor, but

12  the defendant was not extradited to the United States

13  until late in October and subsequent to his arrival in

14  the United States, the defendant was meeting with the

15  United States Attorney's Office and the FBI repeatedly

16  for several months and providing substantial information

17  to the United States government regarding his involvement

18  in al-Qaeda and his involvement in attacks on United

19  States military personnel overseas.

20       It is only subsequent to that process that we

21  actually had a -- we had a breakdown, obviously in terms

22  of the relationship between Ms. Kellman --

23       THE COURT:  Well, when was he arraigned?

24       MR. ARIAIL:  He was arraigned in October of

25  2012, your Honor.

22

Proceedings

1          THE COURT:  And what's happened to the Speedy

2   Trial Act in all this time?

3          MS. KELLMAN:  Your Honor, we waived Speedy

4   Trial because I would --

5          THE COURT:  You can't waive Speedy Trial.

6          MR. ARIAIL:  The case was declared complex,

7   your Honor and also we've been in extended plea

8   negotiations with respect to this defendant for a

9   substantial period of that time and --

10         THE COURT:  Who declared the case complex, did

11  I?

12         MR. ARIAIL:  Yes, I believe you did,

13  your Honor.

14         THE COURT:  And when did I declare it complex?

15         MR. ARIAIL:  Yes, Judge Cogan actually declared

16  it complex at his first appearance in front of

17  Judge Cogan.

18         THE COURT:  And that was when?

19         MR. ARIAIL:  In March of this year, your Honor;

20  March 22.

21         THE COURT:  So, we're going into the fourth

22  month.  You know, the complex case designation doesn't

23  last forever.

24         MR. ARIAIL:  Certainly not, your Honor, but --

25         THE COURT:  And when do you expect to be

Transcriptions Plus II, Inc.

23

Proceedings

1    finished?  What exactly is he charged with?

2         MR. ARIAIL:  Your Honor, in terms of the actual

3    charges in the case, the defendant has been charged

4    particularly with his involvement; conspiracy to murder

5    United States nationals in violation of 18 USC 2332(b),

6    conspiracy to bomb United States government facilities in

7    violation of Title 18 2332(f) and (f)(C) and (b)(2),

8    conspiring to provide material support to al Qaeda in

9    violation of Title 18 USC Section 2339(b), providing

10   material support to al Qaeda in violation of Title 18 USC

11   Section 2339(b), using firearms in furtherance of crimes

12   of violence and using explosives in furtherance in crimes

13   of violence in violation of Title 18 Section 844(h).

14        I mean, essentially, your Honor, the

15   defendant's been a member of al Qaeda since around

16   September 11, 2001 and he's been engaged in military

17   fighting in Afghanistan on the Afghanistan-Pakistan

18   border and then in 2003, he was dispatched by al Qaeda's

19   senior leadership to carry out attacks on United States

20   facilities in Nigeria.

21        And about that time, he traveled to Nigeria,

22   scouted and made attempts to carry out attacks on U.S.

23   Diplomatic facilities in that country.  Ultimately, his

24   plot there was disrupted and he fled Nigeria and was

25   later arrested by anther government which was the Libyan

24

Proceedings

1  government who subsequently released the defendant after

2  the fall of Muammar Gaddafi or right around the time

3  Muammar Gaddafi's government collapsed and he ended up on

4  a boat headed to Italy, landed in Lampedusa, Italy where

5  he was processed with other refugees who were seeking to

6  return or seeking to get to Europe and then upon his

7  arrival in Palermo, Italy, he was arrested for assaulting

8  several officers on a ship on the way from Lampedusa.

9          Subsequent to that, we learned about his arrest

10  there.  We issued an MLAT to the Italian government to

11  seek evidence regarding the defendant and shortly

12  thereafter, we traveled overseas to interview him and for

13  several days in open court with his attorney present, he

14  waived his Miranda rights, admitted his involvement in al

15  Qaeda and we ultimately charged and it's been a process

16  that's taken a while but he ultimately got here in

17  October and as I said before, up until the beginning of

18  the spring, he was seeking to resolve his case through a

19  plea.

20          That's where we are.  As I said, your Honor,

21  there's a lot of evidence that we turned over thus far

22  including hundreds of pages of reports regarding his

23  statements.  We've started turning over evidence

24  regarding his interview in Italy and there's all sorts of

25  other types of evidence that -- as I indicated to the

25

Proceedings

1    Court, it's just complex stuff to deal with because of

2    the fact that it's coming through various different --

3    from various different governments and U.S. government

4    entities.

5             THE COURT:  How long is it going to -- first of

6    all, how long is it going to take to get this all done?

7             MR. ARIAIL:  To get this all done?  I don't

8    think at this time, your Honor, I could give you an

9    answer to that.  Before I gave you an answer, I would

10   have to go back to other departments within the United

11   States government to understand what sorts of classified

12   or potential classified discovery we might have to deal

13   with and that's a very complex process that takes at

14   least four to five months to get through.

15            In terms of the unclassified discovery, I think

16   we have a good chance to get ninety-nine percent of that

17   out in the next sixty to ninety days but any classified

18   issues will take a substantial amount of time to deal

19   with, your Honor.

20            THE COURT:  Is he competent?

21            MR. ARIAIL:  Your Honor, in terms of

22   competency, as your Honor is aware, the Court has

23   designated a doctor to evaluate him and we were

24   anticipating receiving a report regarding his competency

25   earlier this week and we haven't received it.  But again,

Proceedings

1   we're waiting for that.  The initial indications are that

2   he is competent to stand trial, your Honor.

3           THE COURT:  It doesn't appear to me that he's

4   competent.  Where is the report from this doctor?

5           MS. KELLMAN:  We're waiting for it.

6           MR. ARIAIL:  We're waiting for the report from

7   the doctor.

8           MS. KELLMAN:  We expected to have it this week

9   and I understand that the doctor got jammed up with

10  another report and he assured that we would have it by

11  the beginning of the week.

12          MR. ARIAIL:  There's a secondary issue though,

13  your Honor, in terms of if he actually proceeds pro se,

14  there may be could be some additional evaluation done

15  with respect to his ability to proceed pro se.  So, we

16  may have to have further analysis done after we've

17  received the report.

18          And also, just to give your Honor a sense of

19  the case, I mean should we actually go to trial, I think

20  we can assume a minimum of five to seven weeks of trial

21  of witnesses and evidence.  I think it's just going to be

22  a very long, complex process.

23          THE COURT:  Is it your view, Ms. Kellman, is

24  there an issue of his competence?  I mean he seems to me

25  to be totally irrational.

27

Proceedings

1          MS. KELLMAN:  Your Honor, when he's competent,

2    he's very competent and when he's not, he's not.  My

3    expectation is that -- and I haven't seen the report, but

4    my expectation is that we may see a report that says a

5    good deal of this is manipulative because when he was

6    competent, he was extraordinarily right and

7    extraordinarily coherent and extraordinarily competent.

8    I'm not a psychiatrist but that was Dr. Mills' (ph.)

9    initial response, as well and when he doesn't get his

10   way, he gets volatile and irrational.

11          THE COURT:  Is he on any medications?

12          MS. KELLMAN:  My understanding, your Honor, was

13   that he was medicated.  The MDC -- MCC rather would not

14   share his medication information with me.  I don't know

15   if they've shared it with the government.

16          MR. ARIAIL:  I believe actually, your Honor

17   ordered the medical records at the MDC be disclosed and

18   we learned that but he subsequently -- he's refusing to

19   take his -- any medications that may be issued to him.

20          THE COURT:  And what medications was he taking?

21   Did it have --

22          MS. KELLMAN:  He's taking anti -- I don't know

23   the names, Judge.  My understanding from --

24          THE COURT:  Well, what is it -- what was it

25   designed to deal with?

28

Proceedings

1          MS. KELLMAN:  I'm not a doctor, Judge.  I

2    apologize.  I mean, definitely his mental state but

3    exactly --

4          MR. ARIAIL:  I think, your Honor, Dr. Mills,

5    who is the appointed doctor for the -- by the Court,

6    deals with all these issues and hopefully we'll have

7    enough information for the Court on these issues as soon

8    as his report is done.

9          THE COURT:  So, what should I -- I'm going to

10   put it down for another status conference.  We need his

11   report.  When is he going to have his report?

12         MS. KELLMAN:  Hopefully next week, your Honor.

13   And what we could do is get the report to the Court and

14   then if the Court thinks it's appropriate, either have an

15   earlier conference -- well, why don't we take it one step

16   at a time.  We can look at the report next week and then

17   figure out the next step.

18         THE COURT:  Well, I can't leave things open-

19   ended.

20         MS. KELLMAN:  Well, we have another date, I

21   think, in September but we might want to advance that

22   date once we have the report.

23         THE COURT:  All right.  I am going to -- we'll

24   put this down on August 2 for a status conference.

25         THE CLERK:  Is 12:30 acceptable, counsel?

29

Proceedings

1          MR. ARIAIL:  That's fine with the government.

2          MS. KELLMAN:  Yes, your Honor.

3          THE COURT:  I don't know whether he -- in what

4   mental state he is when he communicates with you outside

5   the courtroom but you could tell him if he doesn't -- if

6   he is going to behave as he did today and just keep

7   talking and not allow me to conduct any business here,

8   I'm going to ask him to be taken out of the courtroom.

9          MS. KELLMAN:  Your Honor, he's refused --

10          THE COURT:  Or we could do without him all

11   together.

12          MS. KELLMAN:  He's refused to talk to any

13   civilian attorneys.  He wants a military attorney.  He

14   wants to be tried in a military tribunal.  He is probably

15   the only person who wants to go to Guantanamo?

16          THE COURT:  Well, can you arrange it?

17          MR. ARIAIL:  I cannot, your Honor.

18          MS. KELLMAN:  But he has otherwise, short of a

19   military attorney, he has refused to speak to civilian

20   counsel.

21          THE COURT:  I can't --

22          MS. KELLMAN:  And that's because he believes

23   that he met with military -- the military representative

24   when he first arrived here but that was pretrial.

25          THE COURT:  Is he still here, Paula?

30

Proceedings

1           THE CLERK:  He's downstairs being processed for

2   return.

3           THE COURT:  Well, with the help of an

4   interpreter, you should send him a letter saying what I

5   just said.

6           MS. KELLMAN:  That I am happy to do, Judge.

7           THE COURT:  I don't even know if he doesn't

8   speak English, by the way.

9           MS. KELLMAN:  He was speaking English most of

10  the time if you --

11          THE COURT:  Because when he -- yes, I

12  understand that.

13          MS. KELLMAN:  Yes.

14          THE COURT:  I mean the whole notion of an

15  interpreter is ridiculous.

16          THE INTERPRETER:  Your Honor he speaks English.

17          THE COURT:  Well, I mean you know, this is all

18  silly.

19          MR. ARIAIL:  You know, just to put a finer

20  point on it though, your Honor, his English is rapidly

21  improved since he has arrived in the United States and

22  he's an extremely smart individual and has picked this

23  all up -- actually, a lot of this up since he's actually

24  been here, but just so your Honor is aware of that.

25          MS. KELLMAN:  And actually, while we're on the

31

Proceedings

1   topic of his intelligence, he wanted me to be teaching

2   him Hebrew which I was doing and he greeted me in Hebrew.

3   He asked me how I felt every day in Hebrew.  He wrote

4   down all the words I taught him in Hebrew and that was at

5   his request, just so we're clear.

6           THE COURT:  All right.  Listen, you're going to

7   have to -- I am not going to have an endless delay with

8   this business of classified documents, particularly when

9   you're telling me, you know, documents that you found on

10  the battlefield that didn't even originate with the

11  United States, there's some concern about whether it

12  should be classified when it was prepared by some foreign

13  entity.  I mean --

14          MR. ARIAIL:  Your Honor, I didn't suggest that

15  those documents were classified.  I just meant that it's

16  a complex process of dealing with different government

17  agencies than we're used to dealing with.

18          THE COURT:  Well, you'll have to move it up.

19          MR. ARIAIL:  Understood.

20          THE COURT:  I mean, you know, first of all --

21          MR. ARIAIL:  We will --

22          THE COURT:  -- they probably -- we all know,

23  you can almost take judicial notice that they over

24  classify the stuff that's classified that probably

25  doesn't need to be classified.

32

Proceedings

1          MR. ARIAL:  I mean, I think part of the

2    problem here is, your Honor, it's not the United States

3    Attorney's Office that has control over that.  The United

4    States intelligence community and the greater United

5    States government has control over that.

6          THE COURT:  Well --

7          MR. ARIAL:  So, in many ways the United States

8    Attorney or the Assistant United States Attorney in these

9    types of cases becomes the man in the middle, of course.

10          THE COURT:  Well --

11          MR. ARIAL:  But we will do everything we can

12    to move it up.

13          THE COURT:  Because, you know, basically

14    there's a United States Attorney, who is a presidential

15    appointee and there's the Attorney General, who is a

16    presidential appointee and a member of the President's

17    cabinet and not -- the department is not totally helpless

18    in this matter.  It's not just simply, you know, some

19    Assistant United States Attorney in Brooklyn trying to

20    resolve the problem.

21          MR. ARIAL:  Certainly not, your Honor.

22          THE COURT:  And so, this could be dealt with if

23    need be by people in the department in Washington.

24          MR. ARIAL:  Certainly.  And what I would

25    propose, your Honor, is that defense counsel --

33

                              Proceedings

1          THE COURT:  I am not going to give you endless

2   complex case designations because of, you know,

3   bureaucracies in various agencies of the government are

4   not being cooperative.

5          MR. ARIAIL:  I understand, your Honor.  I am --

6   what I would propose, your Honor, is that defense counsel

7   and the government sit down and see if we can map out a

8   schedule in terms of any classified issues, in terms of

9   briefing and dates that we could propose to the Court at

10  possibly the next status conference.

11         THE COURT:  Okay.  For the moment, I am going

12  to continue the complex case designation and because I --

13  until I get a psychiatric report, I can't really make a

14  judgment on his competence.  He Certainly -- his behavior

15  in the Court today struck me as completely irrational.

16         Now that may all be an act or it may not be but

17  in any event, the delay between now and our next status

18  conference is excludable.

19         MS. KELLMAN:  Your Honor, with the Court's

20  permission --

21         THE CLERK:  Are you available on that date?

22         THE INTERPRETER:  I am available whenever you

23  need the help.

24         THE CLERK:  Just asking.  If you're not, I

25  would order another interpreter.

34

Proceedings

1    THE INTERPRETER:  I'm good this time.

2    MS. KELLMAN:  Your Honor, also I have -- my
3  client left the letter that he said that he sent to the
4  Court.  I will say that there's been difficulty getting
5  the mail and many of things I've sent to him have been
6  returned.  We're not sure if that's SAM's related or not.
7  We're hoping we can -- between myself and the government,
8  we can resolve that.  I actually sent him a Quran which
9  was part of the discussion that we had when we were last
10  here and that I thought met not all of his requirements
11  but at least the MCC's requirements but it was sent back
12  and there's nobody --

13    THE COURT:  By whom?

14    MS. KELLMAN:  By the MCC.

15    THE COURT:  Why?

16    MS. KELLMAN:  Well, the person who could answer
17  that question is on vacation for two weeks.  I can't
18  answer that. But --

19    THE COURT:  Who is it, general counsel -- is
20  there somebody that we --

21    MS. KELLMAN:  Yes, Adam Johnson is away for two
22  weeks, Judge.

23    MR. ARIAIL:  Your Honor, I think this is --
24  this is the first we're learning of this today.  I mean,
25  we can go and talk to the BOP and hopefully we can figure

35
Proceedings

1  out a way to get this done.

2          MS. KELLMAN:  But for what it's worth --

3          MR. ARIAIL:  Yes.

4          MS. KELLMAN:  -- this is not -- I checked with

5  the interpreter, not what my client requested.  In any

6  event, it is -- does meet the MCC's requirements and it

7  is a complete Quran.  So, I understood him to say that he

8  didn't have a complete Quran and that he wanted it in

9  Arabic, which this is but the commentary -- there is no

10 commentary in this and there is an English translation.

11         Now, I've spent time in almost every bookstore

12 that sells Arabic language books in Brooklyn and there

13 are many of them, and as far as I can tell, Judge, the

14 books that meet his requirements come in about thirty

15 volumes and they're all hard cover.  And the MDC will not

16 allow hard cover.

17         I found soft cover pamphlets that do chapter by

18 chapter but they're all in Arabic and they don't have

19 commentary in them.  There's almost nothing -- I don't

20 know about the Quran at this point but I have spoken with

21 Mr. --

22         THE INTERPRETER:  Albakaye.

23         MS. KELLMAN:  -- with the interpreter, who

24 lives in Washington and whose fluent in Arabic as well --

25         THE INTERPRETER:  A little bit, a little bit.

Transcriptions Plus II, Inc.

36

                              Proceedings

1         MS. KELLMAN:  Well, he's familiar enough with

2    Arabic to be able to go through a Quran and understand

3    what we're looking for and he has graciously volunteered

4    to try to assist me with this activity.

5              I've also reached out the Interpreter's Office

6    to see if they could help me with this.  In addition, I

7    would like the Court's permission, since it costs money

8    and this government has had a problem passing a budget --

9    I thought I would just stick it once more -- to have his

10   letter translated but I need the Court's permission to --

11        THE COURT:  How much is it going to cost?

12   Since he speaks English, he could maybe write me a letter

13   in English.

14        MS. KELLMAN:  I don't know that he writes in

15   English, Judge, but it is quite a substantial treatise in

16   Arabic.  Any volunteers?  So, I am --

17        THE COURT:  Find out how much it is going to

18   cost to translate it and you'll let me know.

19        MS. KELLMAN:  Okay.  I will do that.  I haven't

20   seen it before but I will speak with the Court's

21   interpreter.

22        THE COURT:  All right.

23        MS. KELLMAN:  Your Honor, one further thing,

24   just with respect to the conversations that we had on the

25   record about my client's mental status, if we could have

37

Proceedings

1   that portion sealed.  I think it's personal to him and I

2   don't think it needs to be on the public record, at least

3   not at this time.

4            THE COURT:  You'll let me know if anybody wants

5   to order the transcript.

6            THE CLERK:  Yes, Judge.

7            THE COURT:  Or let the United States Attorney

8   know and I'll deal with it then.  For the moment, I am

9   not going to seal anything.

10           MS. KELLMAN:  Thank you, Judge.

11           THE CLERK:  Thank you, counsel.

12           MR. ARIAIL:  Thank you, your Honor.

13               (Matter concluded)

14                    -o0o-

15

16

17

18

19

20

21

22

23

24

25

38

# C E R T I F I C A T E

I, LINDA FERRARA, hereby certify that the foregoing transcript of the said proceedings is a true and accurate transcript from the electronic sound-recording of the proceedings reduced to typewriting in the above-entitled matter.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I hereunto set my hand this **5th** day of **July**, 2013.

*Linda Ferrara*
Linda Ferrara

CET**D 656
Transcriptions Plus II, Inc.