18-566-cr
United States v. Hausa

# United States Court of Appeals for the Second Circuit

AUGUST TERM 2018
No. 18-566-cr

UNITED STATES OF AMERICA
Appellee,

v.

ADNAN IBRAHIM HARUN A HAUSA, also known as SPIN GHUL,
also known as ESBIN GOL, also known as ISBUNGOUL,
also known as ABU TAMIM, also known as JOSEPH JOHNSON,
also known as MORTALA MOHAMED ADAM,
Defendant-Appellant.

ARGUED: FEBRUARY 22, 2019
DECIDED: APRIL 24, 2019

Before:      KEARSE, JACOBS, HALL, Circuit Judges.

Adnan Ibrahim Harun Adam Hausa appeals from his conviction after a jury trial in the United States District Court for the Eastern District of New York (Cogan, J.) on five counts related to his participation in attacks on United States and coalition forces in Afghanistan while a member of al-Qaeda.  Hausa argues that he was denied his Sixth Amendment right to self-representation and that the government failed to prove that his conspiracy to murder U.S. nationals occurred within the jurisdiction of the United States.  We AFFIRM.

ARZA FELDMAN, Feldman & Feldman, Uniondale, NY, for the Defendant-Appellant.

MATTHEW J. JACOBS, Assistant United States Attorney (DAVID C. JAMES, Assistant United States Attorney, on the brief), for RICHARD P. DONOGHUE, United States Attorney, Eastern District of New York, Brooklyn, NY, for the Appellee.

PER CURIAM:

Adnan Ibrahim Harun Adam Hausa, a member of al-Qaeda, attacked United States and Afghan coalition forces in Afghanistan, including one assault that resulted in the death of two American soldiers. Italian authorities arrested Hausa in 2011 and extradited him to the United States for trial in the United States District Court for the Eastern District of New York (Korman, J.; Cogan, J.).

Hausa stated that he wanted to proceed without counsel, and the district court held a series of conferences to evaluate Hausa's competence both to stand trial and to waive counsel. "Because a defendant who decides to act pro se relinquishes traditional benefits associated with formal legal representation, the district court must ensure that the accused made [that] decision 'knowingly and intelligently.'" Torres v. United States, 140 F.3d 392, 401 (2d Cir. 1998) (quoting Faretta v. California, 422 U.S. 806, 835 (1975)). At each conference, Hausa obstructed and disrupted proceedings: he demanded transfer to an international court, declared himself an enemy of the court, refused to answer the court's questions, cursed at the judge and threatened to kill him. Hausa's demand to represent himself was denied.

Hausa was convicted after a jury trial on five counts related to his attacks on U.S. soldiers: (1) conspiracy to murder U.S. nationals, in violation of 18 U.S.C. § 2332(b)(2); (2) conspiracy to bomb a government facility, in violation of 18 U.S.C. § 2332f; (3) conspiracy to provide material support to al-Qaeda, in violation of 18 U.S.C. § 2339B; (4) provision and attempted provision of material support to al-Qaeda, in violation of 18 U.S.C. § 2339B; and (5) illegal use of an explosive to commit a federal felony offense, in violation of 18 U.S.C. § 844(h). He was sentenced principally to life imprisonment.

On appeal, Hausa claims that he was denied his Sixth Amendment right to self-representation because the district court did not allow him to forgo counsel, and that the government failed to prove that Count One, conspiracy to murder U.S. nationals, occurred within the special maritime and territorial jurisdiction of the United States.

## BACKGROUND

In interviews recorded after waiving his Miranda rights, Hausa described his involvement in attacks on U.S. and Coalition forces in Afghanistan and his attempt to bomb the U.S. Embassy in Nigeria.  As to an April 25, 2003 ambush, Hausa reminisced about launching rockets, firing his machine gun, and throwing grenades at U.S. soldiers:

> I took that grenade and threw it at them.  When I threw it, I threw it directly at them, and by the time it got there, it blew up in between them.  At that point I am certain that both of them were injured.

GX:31T 58-59.  Two U.S. soldiers were killed and three U.S. soldiers were seriously wounded in the ambush.

Hausa left Afghanistan for Nigeria, where he planned to expand al-Qaeda's presence in Africa and bomb the U.S. Embassy.  Soon, Hausa fled to Libya, whence he planned to enter Europe and carry out additional terror attacks, but was arrested in Tripoli.  He was released from Libyan custody in 2011 and boarded ship to Italy.  On board, he attacked law enforcement officers and was arrested by Italian authorities.  In Italy, the government conducted three days of audio-recorded interviews in the presence of an Italian judge and defense counsel.

Hausa was then indicted by a grand jury in the Eastern District of New York and extradited to the United States.  In pretrial proceedings, Hausa expressed a desire to represent himself.  To assess Hausa's competence to stand trial and purported waiver of his right to counsel, the court held a series of conferences, including three attempted Faretta colloquies, detailed below.  On each occasion, Hausa refused to answer the Judge's questions, disrupted court proceedings, and demanded transfer to some international court.

3

June 28, 2013: Hausa objected to one of the two lawyers then representing him because she drank alcohol.  GA 32.  Hausa demanded to be tried before an international court, "I don't want help. . . . I want the international court if you are not going to listen to me or speak to me."  GA 38-39.  After the court advised that an international court was not an option, Hausa launched into an incomprehensible rant that ended with some clear observations: "This no court. This no court.  Why am I here.  This no court.  . . . You no God.  You no Allah. You only judge.  . . . Thank you, on this scenario.  F*** you, Judge.  Judge.  You bad (indiscernible)."  GA 44-46.  Hausa was escorted out of the courtroom.

August 2, 2013: Hausa told the court to "take the lawyer away" because "I said I would represent myself.  I don't want somebody else to represent me." GA 52.  The court warned Hausa that self-representation is "a piece of foolishness. . . .  [H]e who is his own lawyer has a fool for a client."  GA 58. Hausa responded, "even if I am a fool, even if I am crazy, it's still my right."  GA 59.

The court told Hausa that an allocution was necessary to "make sure you understand what you're doing."  GA 59.  But Hausa refused to engage with the court's questions; instead, he demanded to be sent to the international court.

September 4, 2013: Hausa again expressed a desire to represent himself and the court again attempted to hold an allocution:

> Mr. Hausa if you want to be your own lawyer, I have to go through an allocution.  I have to ask you questions and answers to be sure that you fully understand what you're doing and in my view, the mistake that you're making by -- to be sure that you know what you're doing. . . .  [Y]ou face life imprisonment here.

GA 65.  Judge Korman explained that self-representation is "like deciding to go through major surgery in which you could lose your life and you decide to be your own surgeon."  GA 66.  The court added, "you have the right to [self-representation].  But I have to go through an allocution with you to be sure that you know what you're doing."  GA 66.

No allocution could be had.  Instead, defense counsel raised the possibility of a psychiatric evaluation of Hausa.  Hausa interrupted, launching into an extended monologue regarding his detention in Libya, the CIA, his arrest in

4

Italy, his commitment to jihad, Osama bin Laden, the Taliban, and his demand to be brought to an international court.  Again, Judge Korman warned Hausa about the dangers of self-representation, but Hausa persisted in his refusal to answer the court's questions.

Judge Korman concluded: "I'm not going to let him proceed without counsel because he won't even cooperate in my asking him questions that would allow me to make even a preliminary judgment."  GA 86.  Hausa responded, "I'm not going to answer you."  GA 86.  Judge Korman said, "Well I told you, you can't represent yourself unless you let me go through and ask you questions and answers to make sure you understand what you're doing.  And that's only the beginning.  If you don't want to, then [counsel is] going to represent you." GA 87.  Hausa explained, "I seal my mouth," and was escorted from the courtroom.  GA 87.

October 31, 2013: Defense counsel told the court that "We're in a situation where he neither wants us as lawyers nor will he respond to the Court's questions."  GA 98.  And counsel again requested an evaluation of Hausa's competence to stand trial.

March 12, 2015: Judge Cogan[1] held a competency and Faretta hearing, at which Hausa talked too rapidly for the interpreter, demanded transfer to an international court, and hummed.  The court recited the goings on:

> Mr. Hausa is continuing to speak, notwithstanding my direction to him to stop.  He is speaking at a pace that makes it impossible for the interpreter to interpret, and I cannot understand what either of them are saying.
>     Mr. Hausa, if you don't start following the directions I'm giving you in court, I'm going to have to exclude you again.  I don't want to do that. . . .  Mr. Hausa has started to hum, which is what he does when he decides he's not satisfied with the way proceedings are going.

GA 130-31.  At last, Hausa was removed to an adjoining courtroom where he could watch the proceedings on closed-circuit television.

The court found Hausa competent to stand trial, and that his performance was deliberate and conscious.  Three psychiatric evaluations had demonstrated

---

[1] On September 23, 2014, the case was reassigned from Judge Korman to Judge Cogan.

that Hausa was "clearly able to assist in his defense if he wants to do so." GA 135. The defense offered "no evidence that [Hausa] [was] not competent." GA 135.

However, as to Hausa's ability to represent himself, Judge Cogan was unable to find his waiver of counsel "knowing and intelligent" because of his refusal to answer the questions posed in the colloquies:

> The difficulty, of course, is that I can't find that Mr. Hausa is knowingly and voluntarily waiving his right to counsel if I can't have the dialogue with him sufficient to allow me to determine if there's a basis for such a finding or not.
>
> Unless the parties have any alternatives, I see no alternative but to mandate that he continue to be represented by counsel until such time as he wants to talk to me and answer my questions and allow me to make a determination as to whether he should be allowed to proceed without counsel.

GA 137-38. The court reduced the <u>Faretta</u> warnings to writing and asked Hausa to review them in his cell before reattempting a dialogue at a later conference.

<u>April 2, 2015</u>: Hausa, having refused to accept the physical copy of the <u>Faretta</u> questions, declined to engage with the court when asked if he would answer questions in order to proceed without counsel. Judge Cogan concluded:

> I have no basis to find that he is validly waiving his right to counsel if he refuses to let me ask him questions about it. . . .
>
> So, at this point, Mr. Hausa is going to continue to be represented by counsel because that's the default and he won't discuss with me the possibility of waiving counsel.

GA 153.

<u>July 22, 2015</u>: Hausa's counsel told the court that Hausa had directed them "to do nothing on his case," but "he also doesn't want to answer the questions . . . he needs to answer in order to represent himself." GA 164.

*     *     *

6

From mid-2015 on, Hausa refused to attend any court proceeding. For one 2016 conference, the district court entered an order permitting the use of necessary force to bring Hausa to the courtroom, but before the conference began, the court informed counsel:

> I received a call a little while ago, about an hour ago, from the marshals saying that force had been in fact required; that they had put him in the van, that they were concerned that he was so violent that he was going to kick out the windows on the van and they, therefore, had restrained his hands and feet with shackles. Notwithstanding those restraints, the defendant had managed to tear his clothing to shred[s] and, therefore, arrived in court wearing nothing but underwear.

GA 175.

The court denied Hausa's requests to represent himself at trial, and Hausa was convicted by the jury and sentenced principally to life imprisonment. This appeal followed.

## DISCUSSION

We review "conclusions regarding the constitutionality of a defendant's waiver [of counsel]" de novo, and "supporting factual findings" for clear error. United States v. Spencer, 995 F.2d 10, 11 (2d Cir. 1993). Deprivation of the right to self-representation is not subject to harmless error review. See United States v. Gonzalez-Lopez, 548 U.S. 140, 148-49 (2006); McKaskle v. Wiggins, 465 U.S. 168, 177 n.8 (1984).

"We review de novo questions of statutory interpretation." United States v. Al Kassar, 660 F.3d 108, 124 (2d Cir. 2011).

### I.

The Sixth Amendment guarantees a defendant the right to forgo counsel and conduct his defense personally. Faretta, 422 U.S. at 819. A court must ensure itself that the waiver of counsel is made "knowingly and intelligently," Torres, 140 F.3d at 401 (quoting Faretta, 422 U.S. at 835), which "depends upon the particular facts and circumstances of the case and characteristics of the defendant." United States v. Fore, 169 F.3d 104, 108 (2d Cir. 1999).

"Although there is no talismanic procedure to determine a valid waiver, the district court should engage the defendant in an on-the-record discussion to ensure that she fully understands the ramifications of her decision." Torres, 140 F.3d at 401 (internal citation omitted). We have explained:

> From defendant's answers and from its own observations, the trial court must be persuaded that the waiver is a rational one, and that defendant has the mental capacity to comprehend the consequences of relinquishing a constitutional right. An accused must therefore have had the disadvantages of proceeding without counsel pointed out to [him] and must be shown to possess sufficient ability to understand the nature of the proceedings against [him].

United States v. Schmidt, 105 F.3d 82, 88 (2d Cir. 1997) (internal citations omitted).

Hausa argues that his request to waive his right to counsel was "knowing and intelligent"; but the trial court did not err in concluding that it was impossible to make that determination because the court was unable to assure itself that Hausa was "aware of the dangers and disadvantages of self-representation." Faretta, 422 U.S. at 835.

It is unclear whether, in the chaotic atmosphere he created, Hausa absorbed or paid attention to anything the court said. He ignored the court's verbal questions and refused to accept written questions. Instead, Hausa demanded to be sent to an international court, cursed at the judge, spoke at an untranslatable pace, and hummed until he was removed from the courtroom.

In short, Hausa prevented the court from assessing his purported waiver by refusing to answer any questions meant to assess his understanding of the risks of self-representation.

Hausa argues that once a court informs the defendant of the risks of self-representation, it must then grant the request to appear pro se. Hausa cites United States v. Garey, 540 F.3d 1253, 1267–68 (11th Cir. 2008) (in banc) for the proposition that if the defendant understands the risks of self-representation, a question and answer exchange is not required. Garey held that a "court may, in the exercise of its discretion, discharge counsel" if it "is assured the defendant (1) understands the choices before him, (2) knows the potential dangers of

8

proceeding pro se, and (3) has rejected the lawyer to whom he is constitutionally entitled" even if a "<u>Faretta</u>-like monologue" and not a full colloquy has been completed.  540 F.3d at 1267-68.  So even if <u>Garey</u> were the law of this Circuit, its holding is consistent with the denial of Hausa's application because <u>Garey</u> required the very findings that the court in this case was unable to make.

The right to self-representation may run at cross-purposes to the right to effective assistance of counsel.  Accordingly, "we exercise caution when called upon to establish per se rules that might overprotect either of these rights."  <u>Clark v. Perez</u>, 510 F.3d 382, 395 (2d Cir. 2008).  But it is not error to deny a defendant's purported waiver of the right to counsel, if, like Hausa, the defendant prevents the court from fulfilling its obligation to ensure that a Sixth Amendment waiver is knowing and intelligent.

## II.

Even if a waiver of counsel is found to be knowing and intelligent, "[a] trial court may deny the right to act pro se where the defendant deliberately engages in serious and obstructionist misconduct, or is not able and willing to abide by rules of procedure and courtroom protocol."  <u>Clark</u>, 510 F.3d at 395 (internal citations and quotation marks omitted).  "[A] judge *may* use willingness and ability to abide by courtroom protocol as prerequisites for accepting a defendant's waiver of his right to counsel."  <u>Davis v. Grant</u>, 532 F.3d 132, 143 (2d Cir. 2008) (emphasis in original).  The right to self-representation "is not a license to abuse the dignity of the courtroom."  <u>Clark</u>, 510 F.3d at 395. (quoting <u>Faretta</u>, 422 U.S. at 834 n.46).

Hausa's obstruction is independent support for the denial of his purported waiver of counsel.  Hausa's misconduct was egregious and intolerable by any measure: he hummed and screamed, and rambled incoherently; he cursed at the judge, declared him an enemy and threatened to kill him.  That behavior required repeated removal from pretrial hearings.  And when Hausa was present, he continually violated basic courtroom rules of procedure, decorum, and protocol.

## III.

The district court denied Hausa's motion for acquittal as to Count One, conspiracy to kill U.S. nationals, in violation of 18 U.S.C. § 2332(b)(2).  Hausa

argues that subsection (2) is rendered domestic by its incorporation of 18 U.S.C. § 1111, which penalizes murder within the jurisdiction of the Unites States, and that the evidence at trial proved a conspiracy to murder American soldiers only in Afghanistan. This argument is meritless.

Section 2332(b) criminalizes attempts and conspiracies to kill U.S. nationals abroad:

> (b) Attempt or conspiracy with respect to homicide.--Whoever *outside the United States* attempts to kill, or engages in a conspiracy to kill, a national of the United States shall--
>
> > (1) in the case of an attempt to commit a killing that is a murder as defined in this chapter, be fined under this title or imprisoned not more than 20 years, or both; and
> >
> > (2) in the case of a conspiracy by two or more persons to commit a killing that is a murder as defined in section 1111(a) of this title, if one or more of such persons do any overt act to effect the object of the conspiracy, be fined under this title or imprisoned for any term of years or for life, or both so fined and so imprisoned.

18 U.S.C. § 2332(b) (emphasis added).

Subsection (2) incorporates section 1111(a), the federal definition of murder. See 18 U.S.C. § 1111(a) ("Murder is the unlawful killing of a human being . . . ."). It is section 1111(b) that punishes those "guilty of murder" committed "[w]ithin the special maritime and territorial jurisdiction of the United States." Id. § 1111(b). But as to Hausa's conviction pursuant to subsection (2), section 1111(b) is irrelevant.

Subsection (2)'s plain language criminalizes conspiracies to kill U.S. nationals committed "outside the United States." 18 U.S.C. § 2332(b); Al Kassar, 660 F.3d at 118 (section 2332(b) contains an explicit provision applying extraterritorially).

## CONCLUSION

The judgment of the district court is AFFIRMED.

10